## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| SHELTER FOREST INTERNATIONAL ACQUISITION, INC., <br>       Plaintiff, <br><br>     and <br><br> GREATRIVER WOOD CO., LTD., ET AL., <br><br>       Consolidated Plaintiffs, <br>    v. <br><br> UNITED STATES, <br>       Defendant, <br>    and <br><br> COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD | Consol. Court No. 23-00144 |

## CONSOLIDATED PLAINTIFFS' MOTION FOR
## JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade ("USCIT R."), Consolidated Plaintiffs American Woodmark Corporation, Del Valle Kahman & Company, Ike Trading Company Limited, Pittsburgh Forest Products, Panoply Wood Products USA Inc., American Pacific Plywood, Inc., Eagle Industries Company Limited, Golden Bridge Industries Pte. Ltd., Lechenwood Viet Nam Company Limited, Arrow Forest International Co., Ltd., Her Hui Wood (Vietnam) Co., Vietnam Zhongjia Wood Company Limited, Long LUU Plywood Production Co., Ltd., and TEKCOM Corporation (together: "DH Consolidated Plaintiffs") respectfully move this Court for an order granting movants judgment on the agency record against Defendant, the United States (representing the U.S. Department of Commerce ("Commerce") including but not limited to the following relief:

- Declaring Commerce's circumvention inquiry to be procedurally flawed, unlawful, and arbitrary and capricious;

- Declaring Commerce's determination that production of hardwood plywood in Vietnam is a mere assembly or completion process to be unlawful and unsupported by substantial evidence;

- Declaring Commerce's rejection of primary evidence from DH Consolidated Plaintiffs and other Participating Respondents to be arbitrary and capricious and contrary to law;

- Declaring that Commerce unlawfully expanded the scope of the Orders on Hardwood Plywood from China without an injury determination from the U.S. International Trade Commission;

- Declaring Commerce's conclusions regarding trade patterns to be unsupported by substantial evidence;

- Remanding to Commerce with instructions to reconsider its final circumvention determination in accordance with the Court's findings and conclusions; and

- Granting Plaintiff and Consolidated Plaintiffs such other relief as the Court may deem appropriate.

A memorandum of points and authorities in support of this motion is being filed contemporaneously with this motion.

WHEREFORE, for the reasons described in this Motion and the memorandum, DH Consolidated Plaintiffs respectfully request that this Court enter judgment in their favor.  A proposed order is attached for the Court's consideration.

Respectfully submitted,

/s/ *Gregory S. Menegaz*

Gregory S. Menegaz
Judith L. Holdsworth
Alexandra H. Salzman
Vivien Jinghui Wang[**]
**deKieffer & Horgan, PLLC**
1156 15th Street NW,
Suite 1101
Washington, DC 20005
Tel: (202) 783-6900
Email: gmenegaz@dhlaw.com
*Counsel to DH Consolidated Plaintiffs*

Dated: February 1, 2024

---

[**] Admitted to New Mexico Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| SHELTER FOREST INTERNATIONAL ACQUISITION, INC., <br><br> Plaintiff, <br><br> and <br><br> GREATRIVER WOOD CO., LTD., ET AL., <br><br> Consolidated Plaintiffs, <br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD, <br><br> Defendant-Intervenor. | Consol. Court No. 23-00144 |

**CONSOLIDATED PLAINTIFFS AMERICAN WOODMARK CORPORATION, ET Al.**
**RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION**
**FOR JUDGMENT UPON THE AGENCY RECORD**

Gregory S. Menegaz
Judith L. Holdsworth
Alexandra H. Salzman
Vivien J. Wang
**deKieffer & Horgan, PLLC**
1, N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Consolidated Plaintiffs*

Dated: February 1, 2024

# TABLE OF CONTENTS

I.     INTRODUCTION AND STATEMENT OF THE CASE ............................................. 1

II.    RULE 56.2 STATEMENT ......................................................................... 2

    A.    Administrative Determination Subject to Appeal .................................. 2

    B.    Issues Presented ................................................................ 2

III.   STATEMENT OF FACTS ........................................................................ 3

IV.   STANDARDS OF REVIEW ...................................................................... 13

    A.    Substantial Evidence Standard ................................................ 13

    B.    Arbitrary and Capricious Standard ............................................ 15

V.    ARGUMENT .................................................................................. 16

    A.    Statutory Requirements for a Finding of Circumvention ........................ 16

    B.    Commerce's Circumvention Inquiry was Procedurally Flawed Because Commerce Did Not Analyze the Circumvention Criteria Based on Data from Participating Respondents ........................................................ 19

        1.    Inadequacy of Commerce's Data Collection from Participating Respondents. ............................................................. 20

        2.    Commerce Supported Its Finding of Circumvention Exclusively on Uncorroborated Secondary Sources. ...................................... 24

    C.    Commerce Unreasonably Rejected Participating Respondents' Supporting Documentation that Plywood Production in Vietnam Exceeds Mere Assembly or Completion. ............................................................... 28

        1.    The Circumvention Statute Addresses Only Instances of Assembly or Completion ............................................................. 28

        2.    Primary Sources on the Record Show that the Production of Hardwood Plywood in Vietnam Exceeds Mere Assembly or Completion ............. 31

        3.    Commerce May Not Broaden the Extent of Plywood Production to Include the Forestry Industry ............................................ 36

    D.    Commerce May Not Expand the Scope of an Order Without an Injury

       Determination.. ................................................................................................. 39

  E.    Commerce's Analysis of Patterns of Trade Information is Not Supported by Substantial Evidence ....................................................................................... 40

VI.    CONCLUSION AND PRAYER FOR RELIEF ........................................................ 45

# TABLE OF AUTHORITIES

**Cases**

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014)....................................16

*Anderson v. U.S. Sec'y of Agric.*, 462 F. Supp. 2d 1333 (Ct. Int'l Trade 2006) ..........................16

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984).........................................13

*Bond v. United States*, 572 U.S. 844 (2014) ................................................................. 28-29

*Bowen v. American Hospital Ass'n*, 476 U.S. 610 (1986) ...........................................................14

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974)........................15

*Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) ........................................................................................................................ 15, 30-31

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, *reh'g denied* 468 U.S. 1227 (1984).............................................................................................................15

*Chinsung Indus. Co. v. United States*, 705 F. Supp. 598 (Ct. Int'l Trade 1989) ..........................23

*Columbia Forest Prods. v. United States*, 399 F. Supp. 3d 1283 (Ct. Int'l Trade 2019)..............41

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197 (1938) .........................................13, 14

*Cooper Tire & Rubber Co. v. United States*, 217 F. Supp. 3d 1373 (Ct. Int'l Trade 2017)..........15

*CS Wind Vietnam Co. v. United States,* 832 F.3d 1367 (Fed. Cir. 2016) .....................................16

*Deacero S.A.P.I de C.V. v. United States*, 393 F. Supp. 3d 1280, 1284 (Ct. Int'l Trade 2019) ....31

*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (1983).........................................13

*Far E. Am., Inc. v. United States,* 654 F. Supp. 3d 1308 (Ct. Int'l Trade 2023).................8, 12, 24

*Gallant Ocean (Thail.) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010)..............................27

*Hyundai Steel Co. v. United States*, 365 F. Supp. 3d 1294 (Ct. Int'l Trade 2019) .......................25

*Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309 (Ct. Int'l Trade 2021) .......................25

*Inmax SDN v. United States*, 277 F. Supp. 3d 1367 (Ct. Int'l Trade 2017)...................................41

*Jiaxing Brother Fastener Co., Ltd. v. United States*, 822 F.3d 1289 (Fed. Cir. 2016)........... 24-25

*Jinan Yipin Corp. v. United States*, 800 F. Supp. 2d 1226 (U.S. Ct. Int'l Trade Sep. 26, 2011) ...14

*KYD, Inc. v. United States*, 607 F.3d 760 (Fed. Cir. 2010) ...........................................................31

*Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375 (Fed. Cir. 2008) ...........................14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)......................14

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016)................................23, 27

*Novosteel SA v. United States*, 284 F.3d 1261 (Fed. Cir. 2002) ....................................................14

*NSK Ltd. v. United States*, 910 F. Supp. 663 (1995)......................................................................23

*NTN Bearing Corp. of Am. v. United States*, 826 F. Supp. 1435 (Ct. Int'l Trade 1993) ..............24

*Queen's Flowers de Colombia v. United States,* 981 F. Supp. 617 (Ct. Int'l Trade 1997) ............23

*Peer Bearing Company-Changshan v. United States*, 986 F. Supp. 2d 1389 (Ct. Int'l Trade 2014) ................................................................................................................................ 18-19, 45

*RHP Bearings Ltd. v. United States*, 288 F.3d 1334 (Fed. Cir. 2002).........................................15

*Saha Thai Steel Pipe Pub. Co. v. United States*, 547 F. Supp. 3d 1278, 1290 (Ct. Int'l Trade 2021) ...........................................................................................................................................40

*Serampore Industries Pvt. Ltd. v. United States*, 675 F. Supp. 1354 (Ct. Int'l Trade 1987)...14, 30

*Serv. Women's Action Network v. Sec'y of Veterans Affairs*, 815 F.3d 1369 (Fed. Cir. 2016)......15

*Shenzhen Xinboda Indus. Co. v. United States*, 279 F. Supp. 3d 1265 (Ct. Int'l Trade 2017) ...........................................................................................................................................14, 16

*Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272 (Ct. Int'l Trade 2020) ......................................................................................................................................... 24-25

*SNR Roulements v. United States*, 402 F.3d 1358 (Fed Cir. 2005).................................................13

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978 (Fed. Cir. 1994) .......14

*Ta Chen Stainless Steel Pipe v. United States*, 1999 Ct. Intl. Trade LEXIS 110; 23 C.I.T. 804 ......................................................................................................................................... 23-24

*Timex V.I., Inc. v. United States*, 157 F.3d 879 (Fed. Cir. 1998)..................................................28

*Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996)................................................15

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .........................................................13, 14

*USX Corp. v. United States*, 655 F. Supp. 487 (Ct. Int'l Trade 1987)...........................................13

*Vietnam Finewood Co. v. United States,* 633 F. Supp. 3d 1243 (Ct. Int'l Trade 2023)...6, 8, 12, 24

*Wash. Int'l Ins. Co. v. United States*, 33 C.I.T. 1023 (2009) ......................................................23

*Yangzhou Bestpak Gifts & Crafts*, 716 F.3d 1370 (Fed. Cir. 2013) ............................................14

## Statutes

5 U.S.C. § 706(2)(A) ......................................................................................................................15

19 U.S.C. § 1517 ..............................................................................................................................5

19 U.S.C. § 1517(b)(4) .....................................................................................................................6

19 U.S.C. § 1671 ............................................................................................................................39

19 U.S.C. § 1673 ......................................................................................................................39, 40

19 U.S.C. § 1516a(b)(1)(B)(i).....................................................................................................13, 15

19 U.S.C. § 1677f(i)(3)(A) .............................................................................................................16

19 U.S.C. § 1677f-1(c) ...................................................................................................................22

19 U.S.C. § 1677j(b) .................................................................................................................. *passim*

19 U.S.C. § 1677j(e) .......................................................................................................................39

## Regulations

19 CFR 351.225(h) ...........................................................................................................................4

19 C.F.R. § 351.308(d) ...................................................................................................................31

## Administrative Decisions

*Certain Hardwood Plywood Products from the People's Republic of China:  Amended Final
Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 83 Fed. Reg.
505 (January 4, 2018) ........................................................................................................................3

*Certain Hardwood Plywood Products from the People's Republic of China*, Countervailing
Duty Order, 83 Fed. Reg. 513 (Dep't Commerce Jan. 4, 2018) ......................................................3

*Certain Hardwood Plywood Products From the People's Republic of China: Initiation of Anti-Circumvention Inquiries and Scope Inquiries on the Antidumping Duty and Countervailing Duty Orders; Vietnam Assembly*, 85 Fed. Reg. 36,530 (Dep't Commerce June 17, 2020) ....................................................................................................................4

*Certain Hardwood Plywood Products From the People's Republic of China*: Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders, 87 Fed. Reg. 45.753 (July 29, 2022)....................7

*Certain Hardwood Plywood Products From the People's Republic of China*: Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders; 88 Fed. Reg. 46,740 (Dep't Commerce, July 20, 2023) ............2

*Fresh Garlic from the People's Republic of China: Final Results of the 2009–2010 Administrative Review of the Antidumping Duty Order*, 77 Fed. Reg. 34,346 (Dep't Commerce June 11, 2012) ..........................................................................................................26

*Hardwood and Decorative Plywood From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 58,273 (Dep't Commerce Sept. 23, 2013) ....................................................................................................................26

*Hardwood Plywood from China*, Inv. Nos. 701-TA-565 and 731-TA-1341 (Final), USITC Publ. 4747 (Int'l Trade Comm'n December 2017).................................................. 31-33

**Other Authorities**

Statement of Administrative Action, Accompanying the Uruguay Round Agreements Act (URAA), H. Doc. 103-316, vol. 1 (1994), U.S.C.C.A.N. 4040............................27, 29, 30, 31, 45

I.      INTRODUCTION AND STATEMENT OF THE CASE

Consolidated Plaintiffs American Woodmark Corporation, Del Valle Kahman & Company, Ike Trading Company Limited, Pittsburgh Forest Products, Panoply Wood Products USA Inc., American Pacific Plywood, Inc., Eagle Industries Company Limited, Golden Bridge Industries Pte. Ltd., Lechenwood Viet Nam Company Limited, Arrow Forest International Co., Ltd., Her Hui Wood (Vietnam) Co., Vietnam Zhongjia Wood Company Limited, Long LUU Plywood Production Co., Ltd., and TEKCOM Corporation (together: "DH Consolidated Plaintiffs") are foreign exporters and U.S. importers of hardwood plywood from Vietnam.  This case concerns Commerce's finding of circumvention where assembled plywood core components (e.g., veneer core platforms), multi-ply panels of glued core veneers, or individual core veneers are manufactured in China and exported to Vietnam, where the core inputs are used in the production of finished hardwood plywood.  The DH Consolidated Plaintiffs do not dispute that *three-ply* panels with a front or back veneer of hardwood or bamboo and manufactured in China are within the scope definition of the Orders on hardwood plywood from China.  A three-ply wood panel is plywood and remains plywood if exported from China to Vietnam.

Commerce should therefore have expressly clarified that its circumvention inquiry concerned individual veneer from China or, at most, two veneers glued together in China (so-called "two ply") and exported to Vietnam for manufacturing into finished hardwood plywood. The question is therefore whether individual veneer or two-ply used in Vietnamese production of plywood could – even hypothetically – circumvent the Orders on hardwood plywood from China.  The answer is "no."

1

## II.    RULE 56.2 STATEMENT

Pursuant to Rule 56.2(c)(1), DH Consolidated Plaintiffs hereby state the administrative decision subject to appeal and the issues of law presented:

### A.  Administrative Determinations Subject to Appeal

The U.S. Department of Commerce ("Commerce") published its final scope and circumvention determination in the Federal Register on July 20, 2023 concerning the antidumping and countervailing duty orders on hardwood plywood from the People's Republic of China.  *See Certain Hardwood Plywood Products From the People's Republic of China*: Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders; 88 Fed. Reg. 46,740 (Dep't Commerce, July 20, 2023). ("Final Det."), **PR 844**,[1] incorporating Commerce's Final Issues & Decision Memorandum ("Final IDM"), **PR 842**.

### B.  Issues Presented

1.    Issue One:  Whether Commerce's circumvention inquiry was procedurally flawed and therefore arbitrary and capricious;

2.    Issue Two:  Whether Commerce's determination that production of hardwood plywood is merely an assembly or completion process that is minor or insignificant is supported by substantial evidence;

3.    Issue Three:  Whether Commerce unreasonably rejected respondents'

---

[1] "PR" indicates public documents on Commerce's antidumping administrative record in this case; "CR" indicates confidential documents on Commerce's antidumping administrative record, ECF DOC Nos. 21-1 & 21-2.

documentation showing that plywood production in Vietnam exceeds mere assembly and completion;

4,     <u>Issue Four</u>: Whether Commerce expanded the scope of the plywood Orders;

5.     <u>Issue Five</u>:  Whether Commerce's consideration of patterns of trade information is supported by substantial evidence.

## III.    STATEMENT OF FACTS

On January 4, 2018, the U.S. Department of Commerce ("Commerce") issued antidumping and countervailing duty orders on hardwood plywood from China.  *See Certain Hardwood Plywood Products from the People's Republic of China*, Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order**,** 83 Fed. Reg. 504 (Dep't Commerce Jan. 4, 2018); *Certain Hardwood Plywood Products from the People's Republic of China*, Countervailing Duty Order, 83 Fed. Reg. 513 (Dep't Commerce Jan. 4, 2018) (together: the "Orders").

On February 25, 2020, the Coalition for Fair Trade in Hardwood Plywood (the "Coalition" or "Defendant-Intervenor") filed a request with Commerce for a scope ruling, and, alternatively, an anti-circumvention ruling.[2]  Ltr. from Wiley on behalf of the Coalition re: Request for Scope Ruling/ Anti-Circumvention Ruling (Feb. 25, 2020) ("Ruling Request"), **PR19, CR5**.  The Coalition claimed that hardwood plywood products from China that are covered by the scope of the Orders were being exported to Vietnam for assembly and exported from Vietnam to the United States.  Alternatively, the Coalition claimed that hardwood plywood products from China were completed or assembled in Vietnam, thereby circumventing the

---

[2] The Coalition was the Petitioner in the initial investigation of Hardwood Plywood from China.

Orders.  *See* 19 U.S.C. § 1677j(b) and 19 CFR 351.225(h).  Commerce initiated its scope and

circumvention inquiries on June 9, 2020.  *See* Dep't Commerce, *Certain Hardwood Plywood*

*Products From the People's Republic of China: Initiation of Anti-Circumvention Inquiries and*

*Scope Inquiries on the Antidumping Duty and Countervailing Duty Orders; Vietnam Assembly*,

85 Fed. Reg. 36,530 (June 17, 2020) ("Initiation Notice"), **PR4**.  Commerce identified five

scenarios covered by the its scope and circumvention inquiries:

> Hardwood plywood completed in Vietnam using:
>
> (i)   Face veneer, back veneer, and assembled core components manufactured in China
>       (e.g., veneer core platforms) manufactured in China and assembled in Vietnam;
>
> (ii)  Fully assembled veneer core platforms manufactured in China that are combined in
>       Vietnam with face and/or back veneers produced in Vietnam or third countries;
>
> (iii) Multi-ply panels of glued core veneers manufactured in China that are combined in
>       Vietnam to produce veneer core platforms and combined with either a face and/or
>       back veneer produced in China, Vietnam, or a third country;
>
> (iv)  Face veneer, back veneer, and individual core veneers produced in China and
>       assembled into hardwood plywood in Vietnam;
>
> (v)   Individual core veneers manufactured in China and processed into a veneer core
>       platform in Vietnam and combined with a face and/or back veneer produced in
>       Vietnam or other third country.

Initiation Notice at 36,531, n12, **PR4**.  As mentioned in the Introduction and Statement of the

Case section above, the only inputs that can be considered inquiry merchandise of the underlying

Commerce proceeding are individual veneers and two-ply.  A plywood core platform or panel of

veneer made of three plies or more are covered by the scope definition of plywood.  *See* the AD & CVD Orders at Appendix.  Further, Commerce's circumvention inquiry covers *core* veneers, not *face* veneers.  Only when Vietnamese plywood producers use face veneers *in addition to* core veneers from China are face veneers captured by Commerce's circumvention inquiry.  *See* Dep't Commerce, Memorandum to File, re: Clarification of Merchandise subject to Anti-Circumvention and Scope Inquiries (July 9, 2020) **(**"Clarification Memo"**)**, **PR21**, citing to Defendant-Intervenor's Letter, "Hardwood Plywood Products from the People's Republic of China: Coalition's Response to Request for Clarification" (May 12, 2020) at 6, **PR20, CR7 (**"The merchandise subject to these anti-circumvention and scope inquiries does not include core veneers fully produced in Vietnam or a third-country that are assembled into a veneer core platform in Vietnam and combined with a face and back veneer produced in China.").

Regarding two-ply, the sole Vietnamese producer known to have used two-ply in its plywood production was Vietnam Finewood Company Limited ("Finewood"), who was the respondent in Commerce's prior scope inquiry.  *See* Dep't Commerce, Memorandum to File, Anti-Circumvention Inquiry of Certain Hardwood Plywood Products from the People's Republic of China: Placing EAPA[3] 7252 Scope Documents Relevant to this Proceeding on the Record (Feb. 18, 2022), **PR393, CR396;** Dep't Commerce, Memorandum to File, Index of EAPA Scope Documents (Feb. 18, 2022), **PR400, CR407**; and EAPA 7252 Doc. No. 1,[4] Dep't Commerce, Antidumping Duty and Countervailing Duty Orders on Certain Hardwood Plywood Products

---

[3] EAPA – CBP evasion proceeding in accordance with the Enforce and Protect Act of 2015, 19 U.S.C. § 1517.

[4] References to Commerce's EAPA scope documents placed on the record on February 18, 2022 are referred to as "EAPA Scope Doc. No." indicating the document index number listed in **PR400, CR407.**

from the People's Republic of China, Enforcement and Protect Act (EAPA) Investigation No. 7252: Final Scope Ruling (Jan. 21, 2022), **PR394, CR397**.  Finewood ceased operations in November 2018 and dissolved in September 2019 and was not a respondent in the underlying circumvention inquiry.  *See Vietnam Finewood Co. v. United States,* 633 F. Supp. 3d 1243, 1265-66 (Ct. Int'l Trade 2023) (the court dismissed Finewood from the action for lack of standing).

Two-ply consists of two core veneers glued together by just enough glue to hold the sheets together.  Two-ply is not sanded or puttied, and has no stability that finished plywood exhibits through layers of stacking and gluing veneer; nor is it otherwise prepared for face and back veneer application.  In fact, the two-ply is no more than reinforced veneer and cannot be used as plywood for the construction of cabinets, furniture, architectural woodwork, wall paneling, manufactured homes, or recreational vehicles.  Two-ply is not graded nor CARB certified.  Two-ply looks like, and functions as, reinforced core veneer. For an in-depth description of two-ply s*ee* EAPA Scope Doc. No. 15, Finewood Supplemental Questionnaire Response, Part IV (April 20, 2021) at 14-24, **PR398, CR400**.  References to "veneer" in this brief include two-ply.

Commerce conducted the Finewood scope inquiry based on a covered merchandise referral from U.S. Customs and Border Protection (CBP) in EAPA Investigation No. 7252.  *See* 19 U.S.C. § 1517(b)(4).  Commerce aligned the circumvention inquiry underlying this litigation with its EAPA scope inquiry, which resulted in the extraordinarily long three-year duration of the instant circumvention inquiry.  *See* Initiation Notice at 36,530, **PR4**.  The period of review for the circumvention inquiry was December 2016 (the month after the Coalition filed its investigation petitions) through March 2020 (the month after the Coalition filed its scope and

circumvention requests).  *See* Dep't Commerce, Ltr. to Interested Parties re Quantity and Value Questionnaire for Vietnamese Producers and Exporters of Certain Hardwood Plywood Products (Sept. 10, 2020) at 1-2 ("Q&V Qre"), **PR62**.

Commerce issued its first quantity and value questionnaire on September 10, 2020 to 59 Vietnamese respondents for which Commerce had information that they produced and/or exported hardwood plywood from Vietnam to the United States, Q&V Qre at Att. I, **PR62**.  This initial questionnaire included two pages of questions and four excel charts to be completed. *Id*. at Att. II & III.  Commerce received responses from 51 Vietnamese companies.  *See* Dep't Commerce, *Certain Hardwood Plywood Products From the People's Republic of China*: Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders, 87 Fed. Reg. 45.753 (July 29, 2022) ("Prelim. Det."), **PR415**, and accompanying Preliminary Decision Memorandum (July 22, 2022) at App. I ("Prelim Decision Memo"), **PR409**.

Commerce issued a supplemental questionnaire on February 22, 2021 and a second supplemental questionnaire on June 15, 2021.  *See* Dep't Commerce, Ltr. re: Quantity and Value Supplemental Questionnaire for Vietnamese Producers and Exporters of Certain Hardwood Plywood Products (Feb. 22, 2021) ("1st Supp. Q&V Qre") (consisting of a little over two pages), **PR154**, and Dep't Commerce, Ltr. re: Quantity and Value Second Supplemental Questionnaire for Vietnamese Producers and Exporters of Certain Hardwood Plywood Products (June 15, 2021) ("2nd Supp. Q&V Qre") (consisting of one and half pages), **PR257**.  Altogether, 45 Vietnamese producers and exporters of hardwood plywood fully responded to Commerce's three questionnaires (referred to herein as "Participating Respondents.")  Prelim Decision Memo at

App. I, **PR409**.  With a handful of exceptions, Commerce did not address individual

respondents' responses or documentation nor ask for any clarifications of submitted responses.

Thus, Commerce's complete fact-finding efforts specific to the 45 Vietnamese

respondents that fully participated in these scope and circumvention inquiries covering over three

years of production and sales consisted of about six pages of questions and a few excel charts

over eight months.  In particular, Commerce did not request information on the Vietnamese

respondents' investments, production costs, research and development expenses, the nature of

their production processes, or extent of their production facilities figuring prominently in

Commerce's circumvention statute.  *See* 19 U.S.C. 1677j(b)(2).

Otherwise, during the two years from August 2021 through July 2023, Commerce did not

request further factual information from any party to prove or disprove the Coalition's

allegations of circumvention by any of the Vietnamese respondents.  Further, Commerce did not

select mandatory respondents for exhaustive individual investigation that could act as

representative of the Vietnamese plywood manufacturing industry.  *See* Final IDM at 20-23,

**PR842**.  Rather than use data from actively participating respondents in this segment for its

preliminary and final circumvention determinations, Commerce relied on the record of a

Finewood's scope determination that has been overturned by this Court.  *See Vietnam Finewood

Co. v. United States,* 633 F. Supp. 3d 1243 (Ct. Int'l Trade 2023); *see also Far E. Am., Inc. v.

United States*, 654 F. Supp. 3d 1308 (Ct. Int'l Trade 2023) ("*Finewood Scope Litigation*")

(sustaining Commerce's scope redetermination that two-ply panels are not subject to the scope of

the Plywood Orders).  *See, e.g.,* Prelim Decision Memo at 14-16, **PR409**, and Memorandum to

File re Production Costs Analysis and Data for the Preliminary Determination (July 22, 2022)

("Cost Production Memo"), **PR411, CR413**.  Commerce also relied extensively on hypothetical data submitted by the Coalition rather than collect actual information from participating respondents.  This is shown in Commerce's summary of its circumvention determination in its Final Issues and Decision Memorandum, where Commerce cites almost exclusively to the Coalition's submissions in support of its findings.  *See* Final IDM at 11-14 and n28-38, **PR842**.

As indicated above, Commerce's Preliminary Determination in these inquiries was published in the Federal Register on July 29, 2022.  Commerce made a country-wide determination finding that plywood produced in Vietnam under Scenarios (i) – (iii) were within the scope of the AD and CVD Orders on hardwood plywood from China, and plywood produced in Vietnam under Scenarios (iv) and (v) were circumventing the Orders.  Prelim. Det. at 45,753, **PR415**.  Despite the countrywide effect of Commerce's conclusion, Commerce failed to identify one single responding plywood producer who was either shipping in-scope merchandise to the United States or circumventing the Orders by exporting Chinese merchandise that was only insignificantly assembled or completed in a third country.

Commerce applied adverse facts available ("AFA") to 22 of the 45 Vietnamese producers and exporters, including certain DH Consolidated Plaintiffs, who fully responded to Commerce's six pages of questions and several excel charts (this sub-group of the Participating Respondents are referred to herein as "AFA Respondents"), Final IDM at 63, **PR842**.  Commerce argued, however, that these cooperating respondents provided deficient or contradictory responses.  *Id*. at 75.  Commerce did not ask for clarification or explanation of alleged deficient or contradictory responses before applying adverse facts available to these companies.  For its circumvention determination, Commerce set forth the statutory requirements and its inquiry methodologies and

relied entirely on the Coalition's speculative and unsupported allegations along with production and sales data collected in the Finewood proceeding.  Prelim. Decision Memo at 16-26, **PR409** and Cost Production Memo, **PR411, CR413**.  Commerce completely ignored all filings submitted by participating respondents that rebutted the Coalition's allegations.[5]

Commerce also set up a certification requirement for administering its countrywide scope and circumvention findings.  Prelim. Decision Memo at 27-28, **PR409**.  Commerce preliminarily allowed some Vietnamese exporters to certify that their hardwood plywood imported into the United States was not produced under any of the five scenarios for in-scope or circumventing merchandise.  The 22 AFA Respondents, including certain DH Consolidated Plaintiffs, were precluded from participating in the certification process for prior and future imports of plywood.  *Id*. at 27.

After Commerce issued its Preliminary Determination, DH Consolidated Plaintiffs and numerous other respondents submitted filings challenging various aspects of Commerce's Preliminary Determination, in many cases submitting factual information to rebut, clarify, and correct Commerce's unexpected new findings of facts concerning discrepancies and inconsistencies.  *See* Final IDM at 4 and notes 9, 10, 11 & 12, where Commerce provides

---

[5] *See, e.g*., Ltr. from deKieffer & Horgan on behalf of DH Respondents re: Comment to Petitioner's Request for Scope/Anti-Circumvention Inquiry (March 20, 2020), **PR19, CR6-7**; Ltr. from Mowry & Grimson on behalf of the Importers' Alliance[5] re: Objection to Request for Scope and Anti-Circumvention Inquiry (March 20, 2020), **PR15**; Ltr. from Vietnam Timber and Forest Product Association ("VIFOREST") re: Response Comments to Scope/Anti-Circumvention Inquiry Requests (Vietnam Assembly) (March 18, 2020), **PR17-18**; Ltr. from deKieffer & Horgan on behalf of DH Respondents re: Comments on Petitioner's Response to Request for Clarification (May 22, 2020), **PR20, CR7**; Ltr. from deKieffer & Horgan on behalf of DH Respondents re: Rebuttal Comments in Response to the Comments Filed by Petitioner re: Quantity and Value Responses (October 28, 2020), **PR145, CR155**; Ltr. from Mowry Grimson on behalf of Importers Alliance re: Response to the Q&V Questionnaire Rebuttal Comments (October 28, 2020), **PR142-144, CR152-154**.

examples of Participating Respondents' post-preliminary comments, **PR842**.  As Commerce

notes, DH Consolidated Plaintiffs and other Participating Respondents filed ministerial error

comments, requests for Commerce to re-open the administrative record and allow submission of

new factual information, comments on Commerce's safe harbor clarification, and AFA

Respondents' direct rebuttals to Commerce's specific AFA findings.  *Id*.  Commerce rejected the

Participating Respondents' post-preliminary filings insofar as they contained new factual

information, stating that such information was untimely.  *See* Final IDM at 5, **PR842**, and, *e.g.,*

Dep't Commerce, Rejection Letters dated Sept. 9, 2022 (**PR531, PR532, PR533, PR534,**

**PR535, PR536**), Sept. 26, 2022 (**PR568, PR569, PR570, PR571**), Oct. 19, 2022 (**PR615,**

**PR616**), and Nov. 29, 2022 (**PR658, PR659, PR660, PR661, PR662, PR663**).

Commerce verified on site in Vietnam 11 Vietnamese respondents from October 17,

2022 through October 25, 2022, in truncated one-day site visits.  Final IDM at 5 & n17, 19-20,

**PR842.**  Commerce however refused to verify any Participating Respondents to which

Commerce applied AFA in the Preliminary Determination.  *See e.g.,* Dep't Commerce,

Memorandum re: Verification Schedule Update (Oct. 18, 2022), **PR611**.

DH Consolidated Plaintiffs filed case briefs on January 9, 2023, arguing that Commerce's

Preliminary Determination to apply total adverse facts available to cooperating Vietnamese

exporters was not supported by substantial evidence and Commerce's Preliminary Determination

of circumvention with respect to Scenarios (iv) and (v) was not supported by substantial

evidence.  DH Consolidated Plaintiffs also argued that plywood produced in Vietnam under

Scenarios (i) through (iii) was not within the scope of the Orders.  *See* Ltr from deKieffer &

Horgan on behalf of VN Exporters and U.S. Importers re: General Issues Case Brief (January 9,

2023), **PR760, CR599** ("DH General Issues Case Brief").

Commerce issued its final determination on July 14, 2023, which was published in the Federal Register on July 20, 2023.  Final Det., **PR 844**, Final IDM, **PR 842**.  In its final determination, Commerce reversed its preliminary scope finding.  Based on the holding of the U.S. Court of International Trade in the *Finewood Scope Litigation* that two-ply panels from China were not subject to the scope of the Orders, Commerce no longer found that the inquiry merchandise produced in Vietnam under Scenarios (i) through (iii) were in-scope products. Final IDM at 2, 10, **PR842**.  Commerce found, however, that plywood produced under Scenarios (i) – (iii) were circumventing the Orders and continued to find that merchandise produced under Scenarios (iv) and (v) were also circumventing the Orders.  *Id*, at 10-14.

In determining that Scenarios (i) through (iii) were included in its circumvention findings, Commerce reasoned that more of the production process for these scenarios occurred in China, and, therefore, Commerce's preliminary circumvention analysis for Scenarios (iv) and (v), which describes less production occurring China, supports an affirmative circumvention determination for Scenarios (i) through (iii).  Prelim. IDM at 11.

In their post-preliminary submissions, DH Consolidated Plaintiffs' arguments against a finding of circumvention were limited to Scenarios (iv) and (v), based on Commerce's hypothetical findings of circumvention.  *See* DH General Issues Case Brief at 54-72, **PR760, CR599.**  Because Commerce's preliminary determination with respect to Scenarios (i) through (iii) concerned solely the agency's affirmative scope determination, DH Consolidated Plaintiffs' and other Participating Respondents' post-preliminary submissions regarding Scenarios (i) through (iii) were in rebuttal to Commerce's scope findings.  *See e.g., id*. at 24-54.  Commerce

gave Plaintiff and other interested parties no opportunity to comment on Scenarios (i) through (iii) with respect to the circumvention analysis.

## IV.   STANDARDS OF REVIEW

### A.   Substantial Evidence Standard

This Court "shall hold unlawful any determination . . . found . . . to be unsupported by substantial evidence on the record or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i); *accord SNR Roulements v. United States*, 402 F.3d 1358, 1361 (Fed Cir. 2005).

"[S]ubstantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (*quoting Consolidated Edison Corp. v. NLRB*, 305 U.S. 197, 229 (1938)).  Furthermore, "substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence.  *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view.'"  *Diversified Products Corp. v. United States*, 572 F. Supp. 883, 888 (1983) (*quoting Universal Camera*, 340 U.S. at 488).

Moreover, Commerce's determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence.  *USX Corp. v. United States*, 655 F. Supp. 487, 489 (Ct. Int'l Trade 1987). The substantial evidence standard "requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking

into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (*quoting Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474, 487-488 (1951); *see Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380-1381 (Fed. Cir. 2008) (same); s*ee also, e.g., Jinan Yipin Corp. v. United States*, 800 F. Supp. 2d 1226, 1233-1234 (U.S. Ct. Int'l Trade Sep. 26, 2011).

In addition, Commerce's determinations must be based on actual evidence.  As this Court has summarized: "[t]heory will not suffice. The Court of Appeals has underscored this principle, explaining that '[i]t is well established that speculation does not constitute 'substantial evidence.'" *Novosteel SA v. United States*, 284 F.3d 1261, 1276 (Fed. Cir. 2002). The Court of Appeals continued: 'As the Supreme Court noted in *Bowen v. American Hospital Ass'n*, 476 U.S. 610, 626 (1986), agency deference has not come so far that agency action is upheld whenever it is possible to conceive a basis for administrative action.' *Id.; see also, e.g., Yangzhou Bestpak Gifts & Crafts*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (noting that Commerce determinations cannot be based on "mere conjecture or supposition").  *Shenzhen Xinboda Indus. Co. v. United States*, 279 F. Supp. 3d 1265, 1305 (Ct. Int'l Trade 2017). Furthermore, proffered evidence must be reliable. "Mere uncorroborated hearsay or rumor does not constitute substantial evidence." *Consolidated Edison Corp. v. NLRB*, 305 U.S. 197, 230 (1938).

In deciding issues of law, Commerce's interpretation of ambiguities in the antidumping statute normally is entitled to substantial deference, but "the traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Serampore Industries Pvt. Ltd. v. United States*, 675 F. Supp. 1354, 1357 (Ct. Int'l Trade 1987)

(citation omitted).  Accordingly, when the statute is plain on its face, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-443, *reh'g denied* 468 U.S. 1227 (1984).

### B.  Arbitrary and Capricious Standard

Federal courts have recognized that the standard of review under 19 U.S.C. § 1516a(b)(1)(B)(i) encompasses the "arbitrary and capricious" standard established under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).  *Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)). "[A]n agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently.  "*RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (*quoting Transactive Corp. v. United States*, 91 F.3d 232, 237, 319 U.S. App. D.C. 428 (D.C. Cir. 1996)).  For an agency action to be upheld, it must "offer some rationale that could explain the maintenance of different standards for similarly situated claimants, or it must explain why such claimants are in fact not similarly situated.  "*Serv. Women's Action Network v. Sec'y of Veterans Affairs*, 815 F.3d 1369, 1380 (Fed. Cir. 2016).  *See Cooper Tire & Rubber Co. v. United States*, 217 F. Supp. 3d 1373, 1380 (Ct. Int'l Trade 2017).

Moreover, an agency "must cogently explain why it has exercised its discretion in a given manner."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 48 (1983) (citations omitted).  Internal inconsistency and self-contradiction do not satisfy this requirement.  Indeed, a "principal justification for the administrative state is that in 'area[s] of limitless factual

15

variations, like cases will be treated alike.'"  *Anderson v. U.S. Sec'y of Agric.*, 462 F. Supp. 2d

1333, 1339 (Ct. Int'l Trade 2006) (internal citation omitted) ("Courts will therefore not defer to

an agency regulation or adjudicative decision when they produce results which are arbitrary,

capricious, or manifestly contrary to the statutory scheme.").  Thus, when the administering

agency treats similarly situated parties differently or fails to consider an important aspect of a

problem, its decisions are arbitrary and capricious and subject to reversal.

Further, Commerce's rationale must address the parties' principal arguments.  19 U.S.C.

§ 1677f(i)(3)(A) (requiring Commerce to "include in a final determination . . . an explanation of

the basis for its determination that addresses relevant arguments, made by interested parties").

*See also CS Wind Vietnam Co. v. United States,* 832 F.3d 1367, 1375-81 (Fed. Cir. 2016)

(analyzing in detail an agency's obligation to set forth a comprehensible and satisfactory

justification for its determinations "as a reasonable implementation of statutory directives

supported by substantial evidence").  Finally, in *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343,

1350-52 (D.C. Cir. 2014) the Court underscored the importance of an agency's obligation to

"articulate an explanation for its action," stating that "a fundamental requirement of

administrative law is that an agency set forth its reasons for decision; an agency's failure to do so

constitutes arbitrary and capricious agency action"); *see Shenzhen Xinboda Indus. Co. v. United

States*, 279 F. Supp. 3d 1265, 1277 (Ct. Int'l Trade 2017).

## V.     ARGUMENT

### A.     Statutory Requirements for a Finding of Circumvention

The statute reads as follows:

(b) Merchandise completed or assembled in other foreign countries.

(1) In general. If—

> (A) merchandise imported into the United States is of the same class or kind as any merchandise produced in a foreign country that is the subject of—
>
> > (i) an antidumping duty order issued under section 736 {19 USCS § 1673e},
> >
> > (ii) a finding issued under the Antidumping Act, 1921, or
> >
> > (iii) a countervailing duty order issued under section 706 {19 USCS § 1671e} or section 303,
>
> (B) before importation into the United States, such imported merchandise is completed or assembled in another foreign country from merchandise which—
>
> > (i) is subject to such order or finding, or
> >
> > (ii) is produced in the foreign country with respect to which such order or finding applies,
>
> (C) the process of assembly or completion in the foreign country referred to in subparagraph (B) is minor or insignificant,
>
> (D) the value of the merchandise produced in the foreign country to which the antidumping duty order applies is a significant portion of the total value of the merchandise exported to the United States, and
>
> (E) the administering authority determines that action is appropriate under this paragraph to prevent evasion of such order or finding,

the administering authority, after taking into account any advice provided by the Commission under subsection (e), may include such imported merchandise within the scope of such order or finding at any time such order or finding is in effect.

(2) Determination of whether process is minor or insignificant. In determining whether the process of assembly or completion is minor or insignificant under paragraph (1)(C), the administering authority shall take into account—

> (A) the level of investment in the foreign country,
>
> (B) the level of research and development in the foreign country,
>
> (C) the nature of the production process in the foreign country,
>
> (D) the extent of production facilities in the foreign country, and

(E) whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States.

(3) Factors to consider. In determining whether to include merchandise assembled or completed in a foreign country in a countervailing duty order or an antidumping duty order or finding under paragraph (1), the administering authority shall take into account such factors as—

(A) the pattern of trade, including sourcing patterns,

(B) whether the manufacturer or exporter of the merchandise described in paragraph (1)(B) is affiliated with the person who uses the merchandise described in paragraph (1)(B) to assemble or complete in the foreign country the merchandise that is subsequently imported into the United States, and

(C) whether imports into the foreign country of the merchandise described in paragraph (1)(B) have increased after the initiation of the investigation which resulted in the issuance of such order or finding.

19 U.S.C.S. § 1677j(b).

Commerce's task in the underlying circumvention inquiry was to determine whether the production of hardwood plywood by certain DH Consolidated Plaintiffs and other Participating Respondents fulfilled the criteria of 19 U.S.C. § 1677j(b).  According to the structure and language of this statute, if the provisions of 19 U.S.C.S. § 1677j(b)(1)(A) are fulfilled, Commerce's next step is to ascertain whether the merchandise is *completed or assembled* in a foreign country, 19 U.S.C.S. § 1677j(b)(1)(B).  Only if the processing performed in the foreign country can be considered completion or assembly, does Commerce's inquiry continue with an analysis as to whether such processing is minor or insignificant, 19 U.S.C.S. § 1677j(b)(1)(C).

The *Peer Bearing* Court found that although Commerce was authorized in circumvention proceedings to enlarge the scope of an antidumping order, the statute *limited* Commerce's authority to place within an Order merchandise assembled in a third country. *Peer Bearing*

*Company-Changshan v. United States*, 986 F. Supp. 2d 1389, 1400-1403 (Ct. Int'l Trade 2014).[6]
The Court concluded:

> While it is apparent from the record evidence that the question posed by this case was of a type Congress intended Commerce to address under paragraphs (A) and (B) of § 1677j(b)(1), the same record evidence demonstrates that the processing in Thailand extended beyond a process of "assembly or completion," the term the statute applies in paragraph (C) of § 1677j(b)(1). The processing included, prior to any assembly operations, the grinding and honing of cups and cones that, upon exportation from China, were not functional cups and cones ready for assembly. Because no unfinished or incomplete bearings were exported to Thailand, the Thai operations cannot fairly be characterized as merely a "completion" process.

*Id.* at 1405-1406.

In sum, the *Peer Bearing* Court found that Congress understood that with the circumvention statute's granting of authority to Commerce to expand AD/CVD Orders beyond their initial scope, at the same time the statute placed limits on this extraordinary authority. One such limit of Commerce's authority is to address third-country processing that is, truly, only assembly and completion operations. The manufacture of hardwood plywood in Vietnam far exceeds the third-country processing targeted in the circumvention statute.

## B. Commerce's Circumvention Inquiry was Procedurally Flawed Because Commerce Did Not Analyze the Circumvention Criteria Based on Data from Participating Respondents.

The DH Consolidated Plaintiffs participated actively throughout Commerce's three-year circumvention inquiry. They were ready and willing during this time to respond to all of

---

[6] The *Peer Bearing* case first considered whether tapered roller bearings ("TRBs") processed in Thailand from unfinished cups and cones from China and finished in Thailand were within the scope of the AD Order on TRBs from China. *Peer Bearing*, 986 F. Supp. 2d at 1393, 1394. The scope of the Order included "Tapered Roller Bearings *& Parts Thereof, Finished & Unfinished,* From the People's Republic of China" *Id.* at 1392. The Court found that the TRBs from Thailand were not within the Order on TRBs from China, and stated that the situation was one addressed by the anti-circumvention statute in 19 U.S.C. § 1677j(b). *Id* at 1398-1399.

Commerce's inquiries regarding their investments, raw material purchases, production processes, production costs, and sales of inquiry merchandise and demonstrate that they did not export inquiry merchandise to the United States.  Indeed, 19 U.S.C. § 1677j(b) requires that Commerce make findings on whether the responding foreign companies fulfill the circumvention factors. Despite claiming that it had investigated all Participating Respondents in the underlying circumvention inquiry, in fact, Commerce did not investigate *any* Participating Respondent as to whether it fulfilled the statutory circumvention criteria.  *See* Final IDM at 21, **PR842**.

Commerce responded to various procedural flaws in its Final Issues and Decision Memorandum.  *See* Final IDM at 16-28.  DH Consolidated Plaintiffs are primarily concerned here with (1) the inadequacy of its data collection from participating respondents; (2) application of data from its Finewood EAPA scope inquiry; (3) failure to consider the whole administrative record.

### 1.  Inadequacy of Commerce's Data Collection from Participating Respondents.

As explained above, Commerce's complete fact-finding efforts specific to the 45 Vietnamese respondents that fully participated in these scope and circumvention inquiries covering over three years of production and sales consisted of about six pages of questions over eight months.  DH Consolidated Plaintiffs identified one question in Commerce's questionnaires that pertained directly to the circumvention statute – namely question 1 of Commerce's First Supplemental Questionnaire, **PR154**.  This question pertained only to Vietnamese producers who peeled their own veneers.  Another question, question 2.a. of Commerce's Second Supplemental Questionnaire, **PR257**, asked for a list of all Vietnamese suppliers.  However, Commerce also did not use the supplier contact information the Participating Respondents

provided in their responses for data collection.  *See e.g.*, Eagle Industries, Q&V Second Supplemental Questionnaire Response (July 9, 2021) at 3 and Exhibit SQ2-4, **PR324, CR319-322**; TEKCOM Q&V Second Supplemental Questionnaire Response (July 9, 2021) at 2 and Exhibit SQ2-4, **PR326, CR326-CR327**; Vietnam Zhongjia, Q&V Second Supplemental Questionnaire Response (July 9, 2021) at 2 and Exhibit SQ2-3, **PR318, CR302**.

Commerce itself does not even pretend that it examined Participating Respondents or their suppliers as to whether they fulfilled the circumvention criteria set forth in the circumvention statute.  Rather, Commerce summarizes its data collection as encompassing "U.S. sales of Vietnamese plywood with Chinese inputs, imports of Chinese plywood inputs, affiliations with Chinese producers and/or exporters, and confirmation that the core inputs consumed by the respondents were, in fact, of Vietnamese origin, as claimed."  Final IDM at 19, **PR842**.  Commerce describes its three questionnaires as "comprehensive" and "in-depth," claiming that certain Participating Respondents agreed with this characterization of Commerce's data collection efforts.  Final IDM at 19, n64, *citing* Ltr from Mowry & Grimson on behalf of Concannon Lumber Company, Holland Southwest International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products LLC, Taraca Pacific Inc., UFP International, LLC, Hardwoods Specialty, and Medallion Forest Products, and Laminate Technologies, Inc.'s (collectively Importer's Alliance) re: "Case Brief," (January 9, 2023) at 4.  (Importers Alliance's Case Brief), **PR746, CR586**.

Commerce, however, takes the Importers Alliance's statement of "in-depth scrutiny" out of context and misinterprets the Importers Alliance irony.  The full sentence referred to reads: "After sitting on the case for over a year, and ***effectively selecting over 51 companies for in-***

***depth scrutiny instead of selecting any mandatory respondents***, Commerce then rushed the schedule by setting the briefing schedule over the holidays."  Importers Alliance Case Brief at 4. {Emphasis added.}  The Importers Alliance makes its position clear in its main argument under the heading: "Commerce Failed to Select Mandatory Respondents Leading to a Sparce Record That Cannot Support Commerce's Affirmative Finding."  *Id*. at 28-31.  In other words, although Commerce decided to *select* all participating respondents for individual scrutiny, Commerce did not *actually scrutinize* all participating respondents in-depth.  Indeed, all three questionnaires that Commerce issued to all Participating Respondents were generic and not specific to any respondent.  Although Commerce issued supplemental questionnaires to 11 individual respondents, these consisted of one or two pages and also did not address the circumvention criteria.  *See, e.g.,* Supplemental Questionnaire issued to Lechenwood Viet Nam Company Limited (Feb. 26, 2021) at Att., **PR161**, and Supplemental Questionnaire issued to Eagle Industries Company Limited (June 28, 2021) at Att., **PR277, CR239**.

Commerce stated in its Final Issues and Decision Memorandum that it was under no obligation to select mandatory respondents as representative of all participating respondents. Final IDM at 21, **PR842**.  Looking to 19 U.S.C. § 1677f-1(c) for guidance (Section 777A(c) of the Tariff Act of 1930), Commerce notes that 19 U.S.C. § 1677f-1(c)(2) is the exception to the general rule in 19 U.S.C. § 1677f-1(c)(1) that Commerce must determine the individual weighted average dumping margin *for each known exporter and producer* of the subject merchandise. Thus, applying the intent of 19 U.S.C. § 1677f-1(c) to this circumvention inquiry, Commerce was required to investigate whether each Participating Respondent fulfilled the statutory criteria of the circumvention statute.  Namely, did the individual respondent perform merely assembly or completion operations in Vietnam?  What was the level of the company's investment, research,

and development in Vietnam?  What was the nature and extent of the company's production

process?  What was the value of the company's processing?  Was the company's production in

Vietnam minor and significant?  Commerce did not seek data from any participating respondent

that demonstrates how the respondent fulfills these circumvention criteria.

Commerce objects several times to criticism of its conduct of the underlying

circumvention inquiry, claiming that "the burden of creating an adequate record lies with

interested parties and not with Commerce."  Final IDM 28, *citing to Nan Ya Plastics Corp. v.*

*United States*, 810 F.3d 1333, 1337-38 (Fed. Cir. 2016); *see also, e.g.,* Final IDM at 25 ("If

Importers Alliance was dissatisfied with the record, it was its responsibility to timely provide the

additional information it deemed relevant and missing from the record").  Commerce

misconstrues, however, the actual issue with the inadequate record:  Commerce must clearly ask

the questions it needs to have answered to establish an adequate record.

> "{I}t is Commerce, not the respondent, which bears the burden of asking
> questions[,]" and Commerce must ask "clear" questions "to let the respondent
> know what information it really wants"); *NSK Ltd. v. United States*, 19 CIT 1319,
> 1328, 910 F. Supp. 663, 671 (1995) ("[r]espondents should not be required to
> guess the parameters of Commerce's interpretation of a phrase in the statute").

*Wash. Int'l Ins. Co. v. United States*, 33 C.I.T. 1023, 1033 (2009).

In *Ta Chen Stainless Steel Pipe*, this Court considered Commerce's argument that the

burden of creating an accurate record lies with respondents.

> Commerce grounds its argument on the truism that the respondent has the burden
> of creating an accurate record. *See Chinsung Indus. Co. v. United States*, 13 C.I.T.
> 103, 106, 705 F. Supp. 598, 601 (1989) (burden of creating an adequate record
> rests with respondents). This truism, however, cannot obviate Commerce's
> obligation to let the respondent know what information [*46]  it really wants. *See*
> *Queen's Flowers de Colombia v. United States,* 21 C.I.T. 968, 981 F. Supp. 617,
> 628 (Ct. Int'l Trade 1997) ("alleged response deficiency cannot support

23

application of [best information available] where the information sought was apparently never requested.") (citation omitted).

*Ta Chen Stainless Steel Pipe v. United States*, 1999 Ct. Intl. Trade LEXIS 110, *45-46.  *See also*

*NTN Bearing Corp. of Am. v. United States*, 826 F. Supp. 1435, 1440-41 (Ct. Int'l Trade 1993)

("Commerce may not properly conclude that resort to the BIA rule is justified in circumstances

where a questionnaire is sent and completely answered, just because the ITA concludes that the

answers do not definitively resolve the overall issue presented). Accordingly, Commerce cannot

place the blame on Participating Respondents for its own failure to examine whether any

respondent fulfilled the statutory criteria for circumvention.

### 2. Commerce Supported Its Finding of Circumvention Exclusively on Uncorroborated Secondary Sources.

Rather than use data from actively participating respondents in this segment for its

preliminary and final circumvention determinations, or by actually soliciting it from participating

exporters, Commerce relied on two secondary sources. First, Commerce used data from its scope

inquiry of Vietnam Finewood Co.  In the meantime, this Court has overturned Commerce's final

scope determination in that case.  *See Vietnam Scope Litigation* and Final IDM at 12, 13, and 30-

45, **PR842**.  To support its final determination of circumvention, Commerce cites consistently to

its Preliminary Determination and its Preliminary Production Cost Memorandum, which are

based solely on its prior Finewood analysis.  *See* Prelim Decision Memo at 18-26, **PR409**, and

Cost Production Memo, **PR411, CR413**.  Yet, Commerce's data collected in the Finewood scope

inquiry is mere secondary evidence and not probative for this instant circumvention inquiry.

Commerce has a strict practice, affirmed by the trade courts, to treat each review as a

separate segment of an antidumping proceeding, each with its own, unique administrative record.

*See Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272, 1285 (Ct. Int'l Trade 2020), citing to *Jiaxing Brother Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1299 (Fed. Cir. 2016) ("[E]ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record.").  *See also Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309, 1327 (Ct. Int'l Trade 2021) ("to the extent Commerce argues that its use of adverse facts available in a prior segment (the investigation), which this Court sustained in *Hyundai Steel*, justified its use of adverse facts available in this review, the court is unpersuaded. . . ..  The investigation record before the Court in *Hyundai Steel* contained facts not present here.") referring to *Hyundai Steel Co. v. United States*, 365 F. Supp. 3d 1294 (Ct. Int'l Trade 2019). Thus, Commerce's extensive data from its prior scope ruling without independent corroboration from the circumvention proceeding underlying this litigation cannot be considered "substantial evidence."

Otherwise, Commerce relied extensively on arguments and claims the Coalition made in its request for scope and circumvention rulings, primarily in the Coalition's narrative and in a declaration from a person associated with the Coalition member companies rather than collect actual information from participating respondents.  *See* Coalition Ruling Request at 36-44 and Exhibit 10, **PR19, CR5-6**.  This is shown in Commerce's summary of its circumvention determination in its Final Issues and Decision Memorandum, where Commerce cites almost exclusively to the Coalition's submissions in support of its findings.  *See* Final IDM at 11-14 and n28-38, **PR842**.  *See also id*. at 30-45 (Commerce's circumvention analysis), where Commerce cites consistently to pages 36-44 and Exhibit 10 (Declaration of Industry Member) of the Coalition's Request and in Commerce's Preliminary Determination in support of its circumvention analysis, Prelim Decision Memo at 18-26, **PR409.**

25

In particular, the Coalition's Declaration included in its Ruling Request as Exhibit 10 provides no concrete evidence whatsoever to support the Coalition's hypotheses in support of circumvention.  *See, e.g.,* Prelim. Dec. Memo at 19; Coalition Request at Ex. 10, **PR19, CR5-6**. The Declarer is hardly an independent expert or neutral witness.  *See* DH General Issues Case Brief at 55, **PR760, CR599**.  Rather the Declarer worked exclusively on behalf of the interests of the Coalition in his "work" on trade issues.  *See* DH March 20, 2020 Cmts, at Ex. 8.  The Declarer bases his statements and conclusions on rumors from "those in the industry," his own "understanding," and the way the Vietnamese hardwood plywood "looks."  *See* Ruling Request at Exhibit 10 and DH General Issues Case Brief at 56.

The Declaration also comes nowhere near fulfilling the requirements for specificity, source documentation, or record corroboration that Commerce requires for attaching any weight to such declarations.  In order for Commerce to accord weight to such a declaration as a reliable source of information upon which Commerce may base its conclusions, minimum requirements on source documentation and record corroboration must be presented.  "(T}he Department initially considers four factors: (1) the source and accuracy of the data; (2) explanation of the analysis/calculations; (3) whether the underlying raw data was provided; and (4) explanation of how the data was collected, sorted and analyzed."  *Fresh Garlic from the People's Republic of China: Final Results of the 2009–2010 Administrative Review of the Antidumping Duty Order*, 77 Fed. Reg. 34,346 (June 11, 2012) and accompanying Issues & Decisions Memorandum at Cmt 5.  *See also Hardwood and Decorative Plywood From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 58,273 (Sept. 23, 2013) and accompanying Issues & Decision Memorandum at Cmt. 7.C, n188 (where Commerce states: "it is unclear how these claims are supported by any factual information. Accordingly, we cannot

accord any weight to this data or the unsupported claims regarding regional production percentages.").

No source documentation or corroborating evidence is on the record of Commerce's circumvention inquiry to support the Coalition's Declaration in Exhibit 10. U.S. trade courts simply cannot accept Commerce's finding of circumvention exclusively on uncorroborated secondary sources as supported by substantial evidence.

> If Commerce "relies on secondary information rather than on information obtained in the course of . . . [the] review," the statute requires that the agency "shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." Id. § 1677e(c). "Secondary information is information derived from the petition that gave rise to the investigation . . . , the final determination [from the investigation], or any previous review . . . concerning the subject merchandise." SAA at 870, 1994 U.S.C.C.A.N. at 4199. Secondary information does not include information obtained from the subject segment, which is known as "primary information." See 19 U.S.C. § 1677e(c); see also *Gallant Ocean (Thail.) Co. v. United States*, 602 F.3d 1319, 1324 (Fed. Cir. 2010).

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1338 (Fed. Cir. 2016), *citing to Gallant Ocean (Thail.) Co. v. United States*, 602 F.3d 1319, 1324 (Fed. Cir. 2010) (finding that "Commerce failed to corroborate the adjusted petition rate with 'independent sources that are reasonably at [its] disposal'').

In conclusion, Commerce's circumvention inquiry is fatally flawed because it did not properly apply the statutory circumvention criteria to any Participating Respondent. Commerce relied on secondary sources without corroboration to reach its speculative circumvention findings and conclusions. Such secondary sources and speculation do not meet the standards of substantial evidence.

**C.    Commerce Unreasonably Rejected Participating Respondents' Supporting Documentation that Plywood Production in Vietnam Exceeds Mere Assembly or Completion.**

    **1.   The Circumvention Statute Addresses Only Instances of Assembly or Completion.**

In its finding of circumvention in the underlying case, Commerce lost sight of the statute's intention to address *instances of assembly or completion of an article* in a third country that is minor and insignificant.  The first question to resolve is therefore whether the manufacturing processes in Vietnam, hypothetically using Chinese veneers, are mere assembly or completion operations.  Only if the answer is "yes" to this first question does the second question arise as to whether the assembly or completion is minor or insignificant.  *See* 19 U.S.C. 1677j(b)(1)(B)&(C):

"if . . .

(B) before importation into the United States, such imported merchandise is *completed or assembled* in another foreign country . . .

(C) the process of assembly or completion . . . is minor or significant."

The statutory factors in 19 U.S.C. § 1677j(b) may *inform* Commerce's determination as to whether third-country production is mere assembly or completion but they cannot *override* the plain meaning of those terms.  *See Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998) ("The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning.").  Indeed, where there is "dissonance" between that ordinary meaning of a term and the reach of a statutory definition, it is appropriate to look to "the ordinary meaning of [the] defined term" "in settling on a fair reading of [the] statute." *Bond v. United States*, 572 U.S. 844,

845 (2014).

In its Final Issues and Decision Memorandum, Commerce comments on the production steps "completed" in China, but these steps concern only the production of veneer, not plywood. Final IDM at 11-12, **PR842**. To be sure, Commerce admits that the completion steps in China result in "completed inputs," not unfinished plywood. *Id*. at 12. Commerce's next statement regarding the "assembly and finishing" in Vietnam of these inputs is merely conclusory. Commerce provides no analysis whatsoever as to why it considers production of plywood in Vietnam to be mere assembly or finishing. *Id*. Rather, Commerce immediately begins its analysis of the second question as to whether the manufacturing operations in Vietnam using Chinese veneer are minor and insignificant compared to the production of veneer. *Id*. at 29-45. Only then did Commerce conclude that because operations in Vietnam are minor and significant, they are only assembly and completion operations. *Id*. at 44-45. Commerce's methodology in its "assembly or completion" analysis is backwards and simply not supported by the structure of the circumvention statute or legislative history.

We must therefore turn the analysis around to consider whether the production operations in Vietnam can be considered assembly or completion or similar operations. The authoritative Statement of Administrative Action ("SAA") describes a circumventing exporter as engaging in only screwdriver operations:

> Section 230 of the bill amends existing sections 781(a) and 781(b) of the Act
> which address the circumvention of antidumping or countervailing duty orders
> *through the establishment of screwdriver assembly operations* in the United States
> or a third country, respectively. Sections 781(a)(1) and 781(b)(1) (the so-called
> mandatory factors) focus the inquiry on whether: (1) minor or insignificant
> assembly or completion is occurring in the United States (or a third country); and
> (2) the value of the parts imported into the United States (or a third country) from
> the country subject to the order is a significant proportion of the total value of the

finished product.

Statement of Administrative Action, Accompanying the Uruguay Round Agreements Act (URAA), H. Doc. 103-316, vol. 1 (1994), U.S.C.C.A.N. 4040, 4216 ("SAA") instructing Commerce to evaluate the circumvention criteria found in 19 U.S.C. § 1677j(b)(2) at 4216. {Emphasis added.}

Although the SAA makes clear that Commerce is to consider the "particular circumvention scenario" in its analysis of the factors in 19 U.S.C § 1677j(b), equally clear is that the starting point is to ask whether the manufacturing process at issue is comparable to screwdriver operations. In such operations, all finished parts are delivered to an assembly site or line, ready to assemble with tools no more sophisticated than a screwdriver. The SAA "represents an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements, both for purposes of U.S. international obligations and domestic law," SAA at 4040. Commerce's discretion does not extend to ignoring the language of the statute (assembly, completion, minor, insignificant) nor the SAA's explanation of the statute's intent to address screwdriver operations in the U.S. and in third countries. Words have meaning, and the assumption is that Congress used the terms "assembly" and "completion" for a reason other than mere semantics. The SAA gives one interpretation of the terms with its reference to "screwdriver operations." SAA at 4216. "{T}he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Serampore Industries Pvt. Ltd. v. United States*, 675 F. Supp. 1354, 1357 (Ct. Int'l Trade 1987) (citation omitted). Accordingly, when the statute is plain on its face, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources*

*Defense Council*, 467 U.S. 837, 842-443, *reh'g denied* 468 U.S. 1227 (1984).

> **2.   Primary Sources on the Record Show that the Production of Hardwood
> Plywood in Vietnam Exceeds Mere Assembly or Completion.**

As the record of this case shows, production of hardwood plywood in Vietnam using

Chinese veneer cannot be compared to such screwdriver assembly lines or operations.  *See*

discussion in DH General Issues Case Brief at 64-72, **PR760, CR599**.  The production of

plywood transforms a thin slice or sheet of wood into a finished product that has multiple end

uses such as furniture, kitchen cabinets, architectural woodwork, wall paneling, manufactured

homes, and recreational vehicles. The construction process of plywood gives it dimensional

stability and makes it resistant to expansion and contraction caused by humidity.  *See* EAPA

Scope Doc. No 25: U.S. International Trade Commission, Publ. No. 4747, *Hardwood Plywood*

*from China*, Inv. Nos. 701-TA-565 and 731-TA-1341 (Final) (December 2017) at I-13 ("ITC

Final Rpt."), **PR398**.[7]  Individual core veneers are not suitable for any of the above uses.  The

U.S. International Trade Commission ("ITC") describes the process of manufacturing plywood

as follows:

> U.S. producers generally employ a "one-step" process, which is a continuous
> system from the log to the finished product. In the one-step process, face and back
> veneers are glued and pressed at the same time as the core veneers. The other
> prevalent system is referred to as a "two-step" process. The core is manufactured
> separately in the first step, after which it is patched and sanded. In the second

---

[7] Although submitted with the Coalition's Ruling Request, the ITC report is an "independent source"
within the meaning of the SAA.  Examples of independent sources include "published price lists, official
import statistics and customs data, and information obtained from interested parties during the instant
investigation or review." 19 C.F.R. § 351.308(d); SAA, 1994 U.S.C.C.A.N. at 4199. Further, as
interpreted by U.S. trade courts, "{t}he independent nature of a source depends on who originates the
information provided and not by who files the information." *Deacero S.A.P.I de C.V. v. United States*,
393 F. Supp. 3d 1280, 1284 (Ct. Int'l Trade 2019), c*iting KYD, Inc. v. United States*, 607 F.3d 760, 765
(Fed. Cir. 2010) (concluding that import statistics, price quotations, and affidavits from officials in a
third-party company, attached to an antidumping petition, were independent sources).

step, the face and back veneers are applied to the core using a press. Hearing testimony indicates that because the two-step process requires double the handling to that of the one-step process, the one-step process is less costly.[40] Some U.S. producers use the two-step process and others use either process, depending on the product ordered.[41] Chinese producers use the two-step process.[42]

Generally, the basic steps in the manufacturing process are similar for both imported and domestic hardwood plywood. The U.S. producers use both the one-step and two-step processes, while the Chinese producers usually use the two-step process.

In many cases, face veneers that are of a particular species and grade are purchased from other veneer producers and are then glued onto the core material to complete the manufacturing process. Prior to pressing, the face and core veneers are dried, sorted for defects, repaired or patched, taped or stitched to make larger sheets from smaller pieces, and trimmed. The veneers are stacked with their grain in alternating directions—crossbands—in order to provide strength and stability to the finished product.[43] The thickness of each layer must balance around the center, but the core, crossbands, and the face and back can be different thicknesses and materials.[44] Depending on the manufacturing process, a cold press may be used to fabricate the several plies of veneer together prior to being hot pressed to glue the veneers together.[45] The thickness and number of plies depends upon the product ordered.

After pressing and trimming, panels are sanded and, in some cases, finished depending on the end use.

. . .

The adhesive formulation is a key factor in hardwood plywood manufacturing and performance. Thermosetting adhesives are used to bond the veneer plies and/or core material. Urea-formaldehyde ("UF") based resins are the most common type of adhesives used in hardwood plywood manufacture because they are suitable for interior use, have relatively fast cure times, and do not bleed color through the plies.

ITC Final Rpt. at I-16 through I-17. As indicated in the cited footnotes, the ITC collected the

above information from Petitioners and Chinese respondents. Footnote 43 explains further the

significance of the plywood construction:

> The crossbands are the stacked veneer sheets whose grain is at alternating directions to one another (when there are multiple crossband layers) and the face veneer. *Plywood involves an odd number of layers. Its balanced construction and crossband layers provide dimensional stability;* hardwood plywood does not warp, shrink or swell as much as lumber and has uniform strength both with and across the grain.

*Id*. at I-16, n43.   {Emphasis added.}

A further primary source included in the Coalition's Petition for AD and CVD Investigations of Hardwood Plywood from China is the American National Standard for Hardwood and Decorative Plywood, ANSI/HPVA HP-1-2016.  EAPA Scope Doc. No. 20 (Coalition, Petitions for the Imposition of Antidumping and Countervailing Duties at Exhibit I-18), **PR398, CR401**  ("Petition").  The purpose of the Standard is "to establish an internationally recognized national standard covering the aesthetic and performance criteria for the principal types, grades, and sizes of hardwood and decorative plywood."  *Id*., para. 1.1.  The Standard applies to plywood panels of various kinds, i.e., *not* veneers, and is intended to provide producers, distributors, architects, contractors, builders, and users with a common basis for understanding the characteristics of plywood panels.  *Id*., para.1.2.  The Standard also makes clear that producers of finished hardwood plywood products must have the testing equipment for testing formaldehyde emissions, dimension tolerances, moisture content, and bond lines of the finished plywood.  *Id*., Table 9b and paras. 3.11 – 4.7.

Nowhere in its Final Determination does Commerce weigh the respondents' statements on the significance of plywood manufacturing from single or two-ply core veneers, generally and not only in Vietnam, as described by the International Trade Commission above.  Rather, Commerce quarrels with the meaning of the Coalition's affidavit statement that "the customer's dominant concern is that the grain of the *face* veneer and the physical appearance of the product overall, meets their need."  Final IDM at 44, *citing* to DH General Issues Case Brief at 65, **PR760, CR599** and Petition at Exhibits I-10-A, I-10-B, & 1-10-C, **PR398, CR401**.  Commerce concludes that the statement actually means that the quality of the logs from which the *core*

veneers are produced and the veneer production process is of the highest importance.  Final IDM at 44.[8]  In fact, the core veneers contribute nothing to the outward appearance or stability of the finished plywood.  *See* excerpt from the ITC's Final Report above.  DH Consolidated Plaintiffs discussed at length in their case brief the visual evidence collected on the Finewood EAPA Scope record showing that stacked thin veneer, without crossband lay-up, gluing, and pressing, are flimsy, thin sheets of wood that cannot possibly be machined for parts of furniture, kitchen cabinets, architectural woodwork, wall paneling, manufactured homes, and recreational vehicles. *See* DH General Issues Case Brief at 65-67, 68, 70, **PR760, CR599.**  Participating Respondents also documented with primary evidence in the circumvention inquiry their procedures and equipment for the unsophisticated peeling of veneers in Vietnam, including visual evidence of finished veneer ready to be used in plywood production.  *See, e.g.*, An An Supplemental Questionnaire Response (March 8, 2021) at Exhibit SQ-1, which includes photos of peeling machinery at a local factory in Vietnam, **PR182, CR160**; and Arrow Forest Supplemental Q&V Response (March 19, 2021) at Exhibit 1.B, likewise showing production of veneer at a local Vietnamese factory, **PR202, CR178**.

Further, on the basis of its on-site verifications of Vietnamese plywood producers, Commerce had the opportunity to correct its misconceptions of plywood production.  These verified respondents provided Commerce with diagrams detailing the steps in their production process.  *See, e.g.*, Greatwood Joint Stock Company Verification Exhibits (Oct. 24, 2022) at Exhibit VE-4, listing 24 different steps in its plywood production, **PR623, CR479-485**; Fulin

---

[8] The underlying circumvention inquiry concerns only the production of *core* veneers in China, not *face* veneers.

Wood Import Export Company Limited Verification Exhibits (Oct. 26, 2022) at Exhibit VE-4, showing 13 steps in its production process, **PR637, CR496-504**; and Zhongjia Wood Company Limited (Oct. 28, 2022) at Exhibit VE-4, list 20 different steps in its production process, **PR646, CR531-539**. All of these companies described their production processes starting with veneer input.

Commerce unreasonably rejected Participating Respondents' primary evidence of the significance of plywood production in Vietnam using purchased veneer. Commerce's only acknowledgment of the photographic evidence on the record is to mention that, in part, the photos do not identify the processor. Final IDM at 125 n626. Similarly, Commerce claims that sketches and diagrams that Participating Respondents put on the record "are not instructive to our circumvention analysis." Regarding documentation that Commerce collected at 11 verifications of Vietnamese plywood producers, Commerce claims that "the production processes of a cooperating respondent that reports no shipments of inquiry merchandise is not probative with respect to Commerce's overall understanding of the production of inquiry merchandise." *Id*. at 40. It was unreasonable and arbitrary for Commerce to reject this primary evidence that Commerce required the Participating Respondents to submit for the record of this case. Commerce's claim that photos, sketches and diagrams, and verification of Participating Respondents' production facilities has nothing to do with its circumvention analysis ignores the fact that this evidence is probative for answering the question as to whether Vietnamese plywood production from purchased veneers is mere assembly or completion. Rather than rely of the primary sourced evidence on the record, Commerce turned to the secondary evidence that the Coalition submitted in its Ruling Request for finding that plywood production facilities in Vietnam are minor and insignificant. Commerce's rejection of primary evidence in favor of

secondary sources in this case makes no sense and is arbitrary and capricious.  *Id*.

Keeping in mind that the first question is whether plywood production from purchased core veneers is mere completion or assembly akin to screwdriver operations, generally and not only in Vietnam, Commerce officials' viewing and on-site verification of 11 Vietnamese plywood factories that reflect, as Commerce states, "a range of operations in Vietnam," appears to be neutral, and ideal probative evidence of the extent of plywood operations in Vietnam. Commerce had no reason to resort to the Coalition's secondary information in this case to resolve the issue as to whether Vietnamese plywood production is mere completion and assembly of veneers.  Presumably Commerce would have been eager to use the primary evidence collected in its circumvention inquiry to support the Coalition's circumvention allegations. Thus, Commerce's choice to use only the Coalition's secondary data leads to the logical conclusion that Commerce agrees that the primary record evidence in this case supports a finding that Vietnamese plywood production from purchased core veneer involves considerably more sophisticated and significant operations than mere assembly or completion of veneer.

### 3. Commerce May Not Broaden the Extent of Plywood Production to Include the Forestry Industry.

To assess the extent and significance of plywood production in Vietnam using veneer sourced from China, Commerce compared the production stages of conditioning and debarking logs and cutting and slicing of veneer with the production stages of manufacturing the plywood core, applying face and back veneer, stacking, pressing, and finishing the plywood.  *See e.g*., Final IDM at 30, 35, 37, 38, 39, 40 & 44, **PR842**.  Hereby, Commerce attempts to broaden the extent of plywood production to the forestry industry.  This extension of plywood production to include the forestry and other industries is without merit.  Final IDM at 38-39, 40, **PR842**.

The costs for land, facilities, equipment, and services necessary for the maintenance of forests or plantations for trees, the felling of trees, cutting of logs, and transportation are all borne by completely different industries – forestry, lumber, logging, and trucking companies, not by plywood manufacturers.  Further, forests and logs are not used exclusively for plywood production but rather for all industries that use wood as an input.  Foresters, lumberjacks, loggers, and freight forwarders all earn their profits by servicing all woodworking industries, not just plywood factories.

Using this extended definition of plywood production from the Coalition's Inquiry Request, Commerce concluded that the nature of the plywood production and extent of the production facilities in Vietnam is insignificant compared to veneer production in Vietnam. *Id.* at 45.  Hereby Commerce did not even mention the evidence that interested parties put on the record to show that core veneer production in China and Vietnam requires minimal machinery to rotary cut the logs into veneers.  Chinese producers do not condition the core logs, saw the logs, or debark the logs with high-end machinery.  Rather, the logs are sawn in half to fit on the rotary cutting/peeling machines at approximately four feet in width to accommodate the standard 4 ft by 8 ft dimensions of most plywood.  A forklift is used to transfer the logs to the rotary cutting machine.  Debarking is done by hand or by low-cost equipment at best.  Veneer drying is done by sunlight.  *See* DH Respondents Comments on Petitioner's Response to Request for Clarification (May 22, 2020) at Exhibit 1 and Att. 1 (declaration of industry expert and photographs of veneer production in China) ("DH May 22, 2020 Cmts"), **PR20, CR7**. Commerce's assumptions about investments and plant equipment costs grossly exaggerate the costs for veneer production in China.

Commerce also recites Petitioner's claims that the physical spaces needed for storing the logs, conditioning the logs, debarking the logs, cutting the logs, peeling the veneers, and drying the veneers.is substantially greater than that needed for a plywood layup workshop. *See, e.g.*, Final IDM at 30 & n125, citing to Prelim Decision Memo (**PR409**), which cites to the Coalition's Request at 36-38 & Ex. 10, **PR19, CR5-6**. The Coalition's claim and Commerce's finding are not accurate. The rotary cutting machine that Chinese manufacturers use does not take up a lot of space. *See* DH May 22, 2020 Cmts at Ex. 1 & Att. 1. Drying veneers under the sunlight could take up some space but the manufacturers have ample space around the factory; as such, no additional cost (other than the general rent, which is typically in rural agricultural settings) is associated with drying. *See id.*

Third, the research and development ("R&D") required to set up a veneer mill is not substantial. No part of the core veneer production in China requires "precise calibration." Final IDM at 32. Chinese veneer producers source logs from local farmers. The core species are fast growth, plantation raised, hardwoods such as poplar. The local farmers regularly drop off the logs at the factory. As shown in the photos in Attachment 1 to DH May 22, 2020 Cmts, a typical Chinese veneer production facility is nothing more than a workshop and does not take months or years to be put together. The core veneer production in China needs no R&D because the machines and technology are mature.

Commerce's conclusions, on the one hand, that the storing, conditioning, and debarking of logs requires expensive, sophisticated calibrating machinery is not reasonable. On the other hand, Commerce's concludes that machinery for testing formaldehyde emissions and moisture content of the finished plywood as well as calibrating for dimension tolerances and bond lines to

meet strict U.S. standards for plywood is irrelevant and not probative for determining certain circumvention. *See e.g.*, Final IDM at 32. Commerce's double standard in analyzing the circumvention criteria is duplicitous as well as arbitrary and capricious.

### D.   Commerce May Not Expand the Scope of an Order Without an Injury Determination

The U.S. anti-dumping statute requires Commerce and the U.S. International Trade Commission ("ITC") to ensure that merchandise that is the subject of Commerce's circumvention inquiries are products that injure the relevant U.S. industry and are covered by the Commission's injury investigations. *See* 19 U.S.C. § 1671 & 19 U.S.C. § 1673. For purposes of considering the reach of the ITC's injury determination in circumvention cases, the circumvention statute requires Commerce to notify the ITC of its preliminary determination and seek consultation and advice from the ITC. 19 U.S.C. § 1677j(e). The statute, however, does not require the ITC to request consultations or provide advice to Commerce, and Commerce is not required to follow any such advice from the ITC. In this instant case, the ITC did not respond to Commerce's belated notification. *See* Final IDM at 27-28, **PR842**. This internal communication between Commerce and the ITC and the ITC's decision not to confer and advise Commerce on the injury issue in this case cannot be equated with an injury determination that veneers from China are injuring the U.S. veneer industry. In this instant case, the Commission's investigative report on hardwood plywood from China gives no indication that the Commission considered any injury to the U.S. hardwood plywood industry caused by Chinese core veneers. *See* ITC Final Rpt., **PR398**. It is the finished hardwood plywood products, not veneers that compete with the U.S. plywood industry for sales to manufacturers of cabinets, furniture, architectural woodwork, wall paneling, manufactured homes, and recreational vehicles.

As confirmed in a recent decision by the U.S. Court of International Trade concerning the scope of the antidumping duty order on circular welded carbon steel pipes and tubes (CWP) imported from Thailand:

> "A fundamental requirement of both U.S. and international law is that an antidumping duty order must be supported by an ITC determination of material injury covering the merchandise in question." *Wheatland Tube Co. v. United States, 973 F.Supp. 149, 158, 21 Ct. Int'l Trade 808, SLIP OP. 97-100 (Ct. Int'l Trade 1997), aff'd, 161 F.3d 1365 (Fed. Cir. 1998)*. The law permitting Commerce to issue antidumping orders, *19 U.S.C. § 1673*, "is remedial, [and] . . . was designed to protect domestic industry from sales of imported merchandise at less than fair value which either caused or threatened to cause injury." *Badger-Powhatan, Div. of Figgie Int'l, Inc. v. United States, 608 F.Supp. 653, 656, 9 Ct. Int'l Trade 213 (Ct. Int'l Trade 1985)*. Therefore, "[w]here the domestic industry is not injured, it cannot avail itself of the relief accorded under the antidumping statute." *Id. at 657*. And Commerce cannot "assess antidumping duties on products intentionally omitted from the ITC's injury investigation." *Wheatland Tube Co. v. United States, 161 F.3d 1365, 1371 (Fed. Cir. 1998)*. Allowing the ITC to assess such duties without an injury determination "would itself frustrate the purpose of the antidumping laws." *Id.*

*Saha Thai Steel Pipe Pub. Co. v. United States*, 547 F. Supp. 3d 1278, 1290 (Ct. Int'l Trade 2021).

In conclusion, veneers are not unfinished, uncompleted, or unassembled plywood and the ITC did not investigate whether the production of *veneers* in China and their import to the United States was injurious to the U.S. plywood industry.  Accordingly, Commerce's circumvention determination is inconsistent with the ITC's injury investigation on Hardwood Plywood from China.

## E.    Commerce's Analysis of Patterns of Trade Information is Not Supported by Substantial Evidence.

Commerce also relies on import and export data that the Coalition presented in its Request for its hypothesis that hardwood plywood from China is only assembled and finished in

Vietnam for export to the United States.  *See* Final IDM at 46-47; **PR842**; Prelim Dec. Memo at

25, 26, **PR409** and Pet. Request at 11-12, 13, 14, 34, 35, 40, 46, 47, 49-50, 51 and Ex. 6, **PR19,**

**CR5-6**.  First, import data alone is not a basis for finding circumvention.  As the U.S. Court of

International Trade ("CIT") stated in its recent *Columbia Forest* decision, which concerned the

Coalition's attempt to include softwood plywood products within the scope of the Orders:

> The court acknowledges that evidence demonstrates that, since the initiation of
> the investigation, import volumes of plywood with both veneers of softwood
> increased drastically compared with plywood with at least one veneer of
> hardwood.  Although a substitution effect may be indicative of circumvention, it
> is not a sufficient cause for Commerce to initiate a minor alterations inquiry.

*Columbia Forest Prods. v. United States*, 399 F. Supp. 3d 1283, 1295 (Ct. Int'l Trade 2019); *see*

*also Inmax SDN v. United States*, 277 F. Supp. 3d 1367 (Ct. Int'l Trade 2017) (where the Court

found that production and exports naturally flow to companies with lower AD tax rate burdens).

Thus, hardwood plywood exports to the U.S. shifting from China to Vietnam is merely the

rational and foreseeable reaction from the global markets, as the Courts appear to understand.  In

its final determination, Commerce should avoid the unfounded presumption that legitimate and

logical business decisions are evidence that Vietnamese plywood producers are engaged in

circumvention just because Vietnam overall increased its participation in international trade.

The Coalition's snapshot import data must also be put into historical perspective.

Commerce failed to consider that Vietnam's economy and manufacturing sector, including

plywood manufacturing, has grown steadily in recent years, especially since 2008.  *See* DH

March 20, 2020 Cmts. at Ex. 9, **PR19, CR7**.  The chart included in DH Respondents' March 20,

2020 Comments at Exhibit 9 shows the overall growth in exports from Vietnam to all countries

from nil in 1996 to a value of over $25,000 million in 2019.  Vietnam's main export partners for

all goods are reported as the U.S., China, and Japan.  *Id.*  A recent report by Bloomberg Markets

adds insights into Vietnam's position in global trade:

> Vietnam's ability to dance between opposing forces has lifted the country from postwar poverty to global economic success. Factory openings by Intel Corp., LG Electronics Inc., and other multinationals have made the country a vital manufacturing hub, helping to create a surging middle class. Vietnam's economy has expanded at an average yearly pace of 6.6% since 2000, boosting the average annual income to almost $2,600 from about $400. Last year it grew 7.02%, its second-fastest rate since 2007, while China's economy grew at 6.1%, an almost three-decade low.
>
> Vietnam is still new to the global economy. It didn't begin opening up to foreign investors until the late 1980s, when it instituted the doi moi ("renovation") reforms ordered by the politburo, which steered the communist country toward a market-oriented economy. Hanoi is making up for lost time by aggressively courting multinationals and signing any trade deal it can, including one in June with the European Union.
>
> Its leaders have ambitious goals. One is to build an industrialized economy by 2035, yielding a per-capita gross domestic product of $22,200, or about 10 times what it is today. As ambitious as the target is, it may be achievable if Vietnam can pull off its great-power balancing act. Its debts are manageable at 61% of GDP in 2018 (and expected to fall further by the end of 2019), the government is making key infrastructure investments, and the country has a youthful workforce, with more than half its 96 million citizens under 35.
>
> Unlike other big developing Asian nations such as Indonesia or India, which depend more on domestic demand to fuel their growth, Vietnam is particularly vulnerable to geopolitical risks because of its reliance on trade. The nation's exports are equivalent to more than 100% of GDP, according to World Bank data, making it one of the most trade-dependent nations in the world.

February / March 2020 issue of Bloomberg Markets, *Vietnam's Economy is Being Squeezed in*

*the U.S.-China Trade War, available at* https://www.bloomberg.com/news/features/2020-02-

02/vietnam-s-economy-is-being-squeezed-in-the-u-s-china-trade-war (last accessed March 15,

2020).  *See* DH March 20, 2020 Cmts at 28, **PR19, CR6-7**.

     Exhibit 10 of DH Respondents' March 20, 2020 comments also shows that Vietnam's

increased ability to manufacture and export plywood products to the United States follows

exactly Vietnam's increase in overall manufacturing capacity, in particular, since 2000.  *See Id.*
at Exhibit 10 (summary of Vietnam's plywood imports and exports, compiled by the data service
"TradeEconomy," sourced from UN Comtrade, published in February 2020 and covering
imports and exports of plywood, HTS 4412, from Vietnam to the World and to specific
countries) and Exhibit 11, which provides the tables and charts imbedded in the report.

Whereas the summary report in Exhibit 10 of DH Respondents' March 20, 2020
comments concentrates on Vietnam's import and export trade in plywood for 2017, the tables
and charts in Exhibit 11 of DH Respondents' comments provide statistics on Vietnam's import
and export trade in plywood from 2006 through 2017.  Table 1 shows that the quantity and value
of Vietnam's exports increased continually from 2006-2017.  Comparing imports to exports of
plywood, from 2006 through 2009, imports surpassed exports, indicating that Vietnam did not
manufacture enough plywood to meet both its own domestic needs as well as export to global
markets.  Beginning in 2010, however, Vietnam exported more plywood than it imported,
indicating that the country was manufacturing sufficient plywood to meet both its domestic
needs as well as trade on the global market.  Indeed, in 2017, Vietnam's plywood exports were
twice as high in value as its imports.  Further, Table 2 and Chart 1 included in Exhibit 11 of DH
Respondents' comments show that the United States was by far *not* the primary beneficiary of
Vietnam's increased plywood manufacturing capacity.  South Korea remained Vietnam's
primary market for plywood, with exports to South Korea more than three times higher than
exports to the United States in 2017.  *Id.*

Vietnam was undeniably well situated to take advantage of the trade war between the
United States and China that has been escalating since 2017, as described by Bloomberg Markets

43

above.  The rise in imports from Vietnam as described by the Coalition was thus not an act of circumvention by Vietnam plywood producers, but rather a result of Vietnam's domestic increased capacity.

Moreover, the imports of hardwood plywood from Vietnam do not come close to filling the gap in plywood imports into the United States left by the inability of Chinese exporters to service the U.S. market.  Exhibit 12 included in DH Respondents' March 20, 2020 comments shows that the combined U.S. imports of Chinese and Vietnam plywood producers in 2019 is barely half of the volume of hardwood plywood imports in 2017.  Insofar, any notion of injury to the U.S. market due to imports from Vietnam must be rejected.  Such closures and underemployment that the Coalition complains of are presumably due to the U.S. producers' competition among themselves and restructuring efforts to take advantage of huge market gains achieved through the tariffs on Chinese plywood.  *See, e.g.*, Ruling Request at 45-46, **PR19, CR5-6**.  Furthermore, ITC trade data show that U.S. imports of hardwood plywood from all countries was lower in 2019 than in any other year from 2014 through 2018.  *See* DH March 20, 2020 Cmts at Exhibit 13, **PR19, CR6-7**.  Indeed, world exports of hardwood plywood to the U.S. decreased 6.62% in quantity and almost 20% in value from 2018 to 2019.  *See id.*  Finally, regarding plywood imports from China to Vietnam, Exhibit 11 included in DH Respondents' March 20, 2020 comments shows that China has been Vietnam's primary supplier of plywood since 2006.  *Id*.  China's imports of plywood to Vietnam doubled from 2009 to 2011 and again from 2013 to 2017.  *Id*.  The Coalition's snapshot statistics of Chinese imports of plywood to Vietnam from 2015 to 2019 show only a continuation of the trend that began in 2009 and which has nothing to do with a hypothetical circumvention of Commerce's AD and CVD Orders on hardwood plywood from China.  DH March 20, 2020 Cmts. at Ex. 11.  *Id*.

As Commerce points out in its Final Determination, Commerce's patterns of trade analysis is but one factor in its circumvention analysis.  Final IDM at 43, **PR842**.  Nevertheless, Commerce's conclusions from a narrow interpretation of snapshot import and export data is without merit and completely ignores the record evidence of Vietnam's economic growth, generally, and increase in plywood production and export, in particular.  *See also* VIFOREST, Response Comments to Scope/Anti-Circumvention Inquiry Requests (Vietnam Assembly) (March 18, 2020), **PR18**.

## VI.    CONCLUSION AND PRAYER FOR RELIEF

In conclusion, Commerce must follow the intent of the circumvention statute to limit Commerce's authority to bring products manufactured in a third country, not the subject country, into the ambit of an antidumping or countervailing duty order.  See *Peer Bearing*, 986 F. Supp. 2d at 1405-1406.  The authoritative interpretation of the circumvention statute is found in the SAA, which describes assembly and completion of merchandise to be akin to screwdriver operations.  SAA, U.S.C.C.A.N. 4040, 4216.  Primary sourced evidence on the record of this case demonstrates that Vietnamese plywood production from purchased veneer far exceeds such screwdriver operations.  In particular, the International Trade Commission describes the critical process of stacking veneers in alternating directions to form crossbands, which provides strength and stability to the finished product.  Further, the formula and application of the glue is a key factor in hardwood plywood manufacturing and performance.  The customer's main concern is the quality and stability of the plywood as a whole as well as the appearance of the face veneers, which are glued onto the finished plywood core materials to complete the manufacturing process.  ITC Final Rpt. at I-16 through I-17 & n43, **PR398**.  According to Commerce's inquiry scenarios, all of these processing steps are done in Vietnam.  Because the processing in Vietnam exceeds

assembly and completion, Commerce's circumvention determination is without merit.

In light of the foregoing, Commerce's Final Determination is not supported by substantial evidence or in accordance with the law.  In other respects, such as rejection of primary sourced evidence and use of secondary sources to support its speculative conclusions, Commerce's Final Determination was arbitrary and capricious.  DH Consolidated Plaintiffs respectfully request that the Court remand this case with instructions to Commerce that it must reconsider its circumvention finding in this case because the manufacture of plywood in Vietnam cannot be considered mere assembly or completion of veneers.

Respectfully submitted,

 /s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
Vivien J. Wang
**deKieffer & Horgan, PLLC**
1156 Fifteenth St., N.W.
Suite 1101
Washington D.C.  20005
Tel: (202) 783-6900
Email: gmenegaz@dhlaw.com

Date: February 1, 2024                     *Counsel to DH Consolidated Plaintiffs*

## <u>WORD COUNT CERTIFICATE OF COMPLIANCE</u>

This brief has been prepared utilizing Microsoft Word 2016 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth in the Chambers Procedures.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **13,632** words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
DEKIEFFER & HORGAN, PLLC
1156 Fifteenth St., N.W.
Suite 1101
Washington D.C.  20005
*Counsel to DH Consolidated Plaintiffs*

1