## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| SHELTER FOREST INTERNATIONAL ACQUISITION, INC., )<br>    Plaintiff, )<br> )<br>    and )<br> )<br>GREATRIVER WOOD CO., LTD., ET AL., )<br> )<br>    Consolidated Plaintiffs, )<br>    v. )<br> )<br>UNITED STATES, )<br>    Defendant, )<br>    and )<br> )<br>COALITION FOR FAIR TRADE IN )<br>HARDWOOD PLYWOOD )<br> ) | Consol. Court No. 23-00144 |

### CONSOLIDATED PLAINTIFFS' MOTION FOR
### JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade

("USCIT R."), Consolidated Plaintiffs American Woodmark Corporation, Del Valle Kahman &

Company, Ike Trading Company Limited, Pittsburgh Forest Products, Panoply Wood Products

USA Inc., American Pacific Plywood, Inc., Eagle Industries Company Limited, Golden Bridge

Industries Pte. Ltd., Lechenwood Viet Nam Company Limited, Arrow Forest International Co.,

Ltd., Her Hui Wood (Vietnam) Co., Vietnam Zhongjia Wood Company Limited, Long LUU

Plywood Production Co., Ltd., and TEKCOM Corporation (together: "DH Consolidated

Plaintiffs") respectfully move this Court for an order granting movants judgment on the agency

record against Defendant, the United States (representing the U.S. Department of Commerce

("Commerce") including but not limited to the following relief:

- Declaring Commerce's application of total adverse facts available to Consolidated Plaintiffs Eagle Industries Company Limited, Golden Bridge Industries Pte. Ltd., Lechenwood Viet Nam Company Limited, Arrow Forest International Co., Ltd., Her Hui Wood (Vietnam) Co., Vietnam Zhongjia Wood Company Limited, Long LUU Plywood Production Co., Ltd., and TEKCOM Corporation (together: "DH Exporter Plaintiffs") unsupported by substantial evidence and contrary to law;

- Declaring Commerce's rejection of rebuttal factual information filed by DH Exporter Plaintiffs after Preliminary Determination an abuse of discretion and contrary to law;

- Remanding to Commerce with instructions to reconsider its final circumvention determination in accordance with the Court's findings and conclusions; and

- Granting Plaintiff and Consolidated Plaintiffs such other relief as the Court may deem appropriate.

A memorandum of points and authorities in support of this motion is being filed contemporaneously with this motion.

WHEREFORE, for the reasons described in this Motion and the memorandum, DH Consolidated Plaintiffs respectfully request that this Court enter judgment in their favor. A proposed order is attached for the Court's consideration.

Respectfully submitted,

/s/ *Gregory S. Menegaz*

Gregory S. Menegaz
Judith L. Holdsworth
Alexandra H. Salzman
Vivien Jinghui Wang[**]
**deKieffer & Horgan, PLLC**
1156 15th Street NW,
Suite 1101
Washington, DC 20005
Tel: (202) 783-6900
Email: gmenegaz@dhlaw.com
*Counsel to DH Consolidated Plaintiffs*

Dated: April 1, 2024

---

[**] Admitted to New Mexico Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| SHELTER FOREST INTERNATIONAL ACQUISITION, INC., ) <br><br> Plaintiff, ) <br><br> and ) <br><br> GREATRIVER WOOD CO., LTD., ET AL., ) <br><br> Consolidated Plaintiffs, ) <br> v. ) <br><br> UNITED STATES, ) <br><br> Defendant, ) <br><br> and ) <br><br> COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD ) <br><br> Defendant-Intervenor. ) | Consol. Court No. 23-00144 <br><br> **Public Version** |

**CONSOLIDATED PLAINTIFFS AMERICAN WOODMARK CORPORATION, ET Al.**
**RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION**
**FOR JUDGMENT UPON THE AGENCY RECORD**

Gregory S. Menegaz
Judith L. Holdsworth
Alexandra H. Salzman
Vivien J. Wang
**deKieffer & Horgan, PLLC**
1, N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Consolidated Plaintiffs*

Dated: April 1, 2024

# TABLE OF CONTENTS

RULE 56.2 STATEMENT ................................................................................................. 1

    A.    Administrative Determination Subject to Appeal ............................................. 1

    B.    Issues Presented ................................................................................................ 2

STATEMENT OF FACTS ............................................................................................... 3

    1.    *Fact Background As Related to Seven DH Exporter Plaintiffs* ......................... 3

    2.    *Factual Background As Related to Zhongjia* ...................................................... 6

SUMMARY OF ARGUMENT ....................................................................................... 7

ARGUMENT ................................................................................................................. 8

    I.    Standard of Review ................................................................................................ 8

    II.    Legal Framework .................................................................................................. 10

    III.    Commerce's AFA Application to DH Exporters .................................................. 11

        1.  Eagle Industries Company Limited ................................................................ 11

        2.  Golden Bridge Industries Pte. Ltd. ................................................................ 30

        3.  Lechenwood Viet Nam Company Limited ...................................................... 41

        4.  Arrow Forest International Co., Ltd. .............................................................. 49

        5.  Her Hui Wood (Vietnam) Co .......................................................................... 57

        6.  Long Luu Plywood Production Co., Ltd. ........................................................ 64

        7.  Tekcom ........................................................................................................... 70

        8.  Vietnam Zhongjia Wood Company Limited .................................................. 78

    IV. Commerce Abuse of Discretion ............................................................................ 86

    V. CONCLUSION ...................................................................................................... 90

# TABLE OF AUTHORITIES

**Cases**

*Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d 1322 (Ct. Int'l Trade 2000)..............29

*Am. Silicon Techs. v. United States*, 334 F.3d 1033 (Fed Cir. 2003)................................................9

*Asociacion Colombiana de Exportadores de Flores v. United States*, 704 F. Supp. 1114 (Ct. Int'l Trade 1989))........................................................................................................................8

*BlueScope Steel v. United States*, 548 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) ......................15, 16

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ..............................................48

*Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d 1292 (Ct. Int'l Trade 2019)............36

*Canadian Solar Int'l Ltd. v. United States*, 2019 Ct. Int'l Trade LEXIS 152 (Dec. 3, 2019) .......36

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) .....................................................................................................................................35, 36

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, *reh'g denied* 468 U.S. 1227 (1984)..........................................................................................................................9

*Consol. Bearings Co. v. United States*, 412 F.3d 1266 (Fed. Cir. 2005) ......................................83

*Daewoo Elecs. Co. v. United States*, 712 F. Supp. 931 (Ct. Int'l Trade 1989)..............................8

*Essar Steel Ltd. v. United States*, 678 F. 3d 1268 (Fed. Cir. 2012) .........................................19, 54

*Federal-Mogul Corp. v. United States*, 18 C.I.T. 1168 (1994).......................................................8

*Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375 (Fed. Cir. 2022) ...........................11, 39

*Hyundai Heavy Indus., Co. v. United States*, 332 F. Supp. 3d 1331 (Ct. Int'l Trade 2018).... 18-19

*Hyundai Steel Co. v. United States*, 282 F. Supp. 3d 1332 (Ct. Int'l Trade 2018)......................29

*Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309 (Ct. Int'l Trade 2021)........... 16, 20-21

*Koyo Seiko Co. v. United States*, 746 F. Supp. 1108 (Ct. Int'l Trade 1990); ................................8

*Koyo Seiko Co. v. United States*, 92 F.3d 1162 (Fed. Cir. 1996)...................................................29

*Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017) ................................. 17-18

*Micron Tech. v. United States*, 117 F. 3d 1386 (Fed. Cir. 1997) .................................................83

*Mosaic Co. v. United States*, 589 F. Supp. 3d 1298 (Ct. Int'l Trade 2022).....................45, 49, 78

*Motor Vehicle Mfrs. Assn. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983)............48

*Mueller Comercial De Mexico v. United States*, 753 F.3d 1227 (Fed. Cir. 2014) .................35, 36

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)............. 10, 22, 52, 66-67, 81

*NSK Ltd. v. United States*, 481 F.3d 1355 (Fed. Cir. 2007).....................................................17, 21

*Seah Steel Corp. v. United States*, 764 F. Supp. 2d 1322 (Ct. Int'l Trade 2011) ...........................9

*Shelter Forest Int'l Acquisition, Inc. v. United States*, 2022 U.S. App. LEXIS 16491 (Fed. Cir. June 15, 2022)..................................................................................................................................11

*Shelter Forest Int'l Acquisition, Inc. v. United States*, 497 F.Supp.3d 1388 (Ct. Int'l Trade 2021) ................................................................................................................................................39

*SKF USA Inc v. United States*, 29 C.I.T. 969 (2005).................................................................82, 83

*Star Fruits S.N.C. v. United States*, 393 F.3d 1277 (Fed. Cir. 2005).............................................83

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978 (Fed. Cir. 1994) .........9

*Ta Chen Stainless Steel Pipe v. United States*, 23 Ct. Int'l Trade 804 (1999) ........................21, 29

*Timex V.I., Inc. v. United States*, 157 F.3d 879 (Fed. Cir. 1998)....................................................9

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .................................................................9

*Yangzhou Bestpak Gifts & Crafts*, 716 F.3d 1370 (Fed. Cir. 2013) ..............................................15

*Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333 (Fed. Cir. 2011)............45, 78

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)............................................................................................................9

19 U.S.C. § 1677e(a) ................................................................................................................ *passim*

19 U.S.C. § 1677j(b) ........................................................................................................................55

19 U.S.C. § 1677j(f)...................................................................................................................87, 88

19 U.S.C. § 1677m(d) .......................................................................................... *passim*

19 U.S.C. § 1677m(e) ..................................................................................... 10-11

**Administrative Decisions**

*Certain Hardwood Plywood Products from the People's Republic of China*, 83 Fed. Reg. 504 (Dep't Commerce Jan. 4, 2018) ..................................................................................26

*Certain Hardwood Plywood Products From the People's Republic of China*: Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders, 87 Fed. Reg. 45.753 (July 29, 2022) ...................4

*Certain Hardwood Plywood Products From the People's Republic of China*: Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders; 88 Fed. Reg. 46,740 (Dep't Commerce, July 20, 2023) ...........4

PUBLIC VERSION

## <u>RULE 56.2 STATEMENT</u>

Pursuant to Rule 56.2(c)(1), Consolidated Plaintiffs American Woodmark Corporation, Del Valle Kahman & Company, Ike Trading Company Limited, Pittsburgh Forest Products, Panoply Wood Products USA Inc., American Pacific Plywood, Inc., Eagle Industries Company Limited, Golden Bridge Industries Pte. Ltd., Lechenwood Viet Nam Company Limited, Arrow Forest International Co., Ltd., Her Hui Wood (Vietnam) Co., Vietnam Zhongjia Wood Company Limited, Long LUU Plywood Production Co., Ltd., and TEKCOM Corporation (together: "DH Consolidated Plaintiffs"), foreign exporters and U.S. importers of hardwood plywood from Vietnam, hereby state the administrative decision subject to appeal and the issues of law presented:

## A. Administrative Determinations Subject to Appeal

DH Consolidated Plaintiffs challenge certain aspects of the U.S. Department of Commerce's final circumvention determination in the scope and circumvention inquiries concerning antidumping and countervailing duty orders on hardwood plywood from the People's Republic of China. *See Certain Hardwood Plywood Products From the People's Republic of China*: Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders; 88 Fed. Reg. 46,740 (Dep't Commerce, July 20, 2023). ("Final Det."), **PR 844**,[1] incorporating Commerce's Final Issues & Decision Memorandum ("Final IDM"), **PR 842**.

---

[1] "PR" indicates public documents on Commerce's antidumping administrative record in this case; "CR" indicates confidential documents on Commerce's antidumping administrative record, ECF DOC Nos. 21-1 & 21-2.

**B. Issues Presented**

1.    <u>Issue One</u>:  Whether Commerce's determination to apply total adverse facts available ("AFA") to each of the eight (8) foreign exporter respondents in DH Consolidated Plaintiffs group and to preclude them from participating in the certification process was supported by substantial evidence and in accordance with law;

2.    <u>Issue Two</u>:  Whether Commerce failed to comply with 19 U.S.C. § 1677m(d) when it did not promptly inform certain respondents in DH Consolidated Plaintiffs group of perceived deficiencies and provide the companies with an opportunity to remedy or explain perceived deficiencies in the 12 months from the date Commerce received the last round of supplemental questionnaire responses to the time it issued its Preliminary Scope and Circumvention Determination;

3.    <u>Issue Three</u>:  Whether Commerce acted contrary to law when it rejected post-preliminary rebuttal factual information submissions filed by certain respondents in DH Consolidated Plaintiffs group that could have cured Commerce's violation of 19 U.S.C. § 1677m(d);

4.    <u>Issue Four</u>: Whether Commerce erred in applying AFA to Zhongjia without providing Zhongjia an opportunity to correct its prior understanding of the information Commerce sought on Zhongjia's plywood input suppliers and to allow Zhongjia to retrieve certain material input documents for the first quarter of 2020 during verification.

PUBLIC VERSION

## STATEMENT OF FACTS

Pursuant to the Court's Scheduling Order dated November 29, 2023, **ECF No. 30,** granting a bifurcated briefing schedule of different legal challenges, the instant Tranche II brief focuses on Commerce's decision to apply AFA to each of the eight foreign exporter respondents in the DH Consolidated Plaintiffs group - Eagle Industries Company Limited ("Eagle Industries"), Golden Bridge Industries Pte. Ltd. ("Golden Bridge"), Lechenwood Viet Nam Company Limited ("Lechenwood"), Arrow Forest International Co., Ltd. ("Arrow Forest"), Her Hui Wood (Vietnam) Co. ("Her Hui"), Vietnam Zhongjia Wood Company Limited ("Zhongjia"), Long LUU Plywood Production Co., Ltd. ("Long LUU"), and TEKCOM Corporation ("TEKCOM") (hereinafter, "DH Exporter Plaintiffs").  Each of the six U.S. importers in the DH Consolidated Plaintiffs group – American Woodmark Corporation, Del Valle Kahman & Company, Ike Trading Company Limited, Pittsburgh Forest Products, Panoply Wood Products USA Inc., and American Pacific Plywood, Inc. – purchased Vietnamese hardwood plywood from one or several DH Exporters.

1. *Fact Background As Related to Seven DH Exporter Plaintiffs*

Of the eight DH Exporter Plaintiffs, seven are similarly situated in that Commerce applied AFA to them in the Preliminary Determination in July 2022 based on discrepancies identified in their rounds of questionnaire responses.  Such discrepancies, however, were raised and clearly identified for the first time in Commerce's Preliminary Determination. The seven DH Exporter Plaintiffs in this situation are Eagle Industries, Golden Bridge, Lechenwood, Arrow Forest, Her Hui, Long LUU, and TEKCOM.  *See* Dep't Commerce, *Certain Hardwood Plywood*

PUBLIC VERSION

*Products From the People's Republic of China*: Preliminary Scope Determination and

Affirmative Preliminary Determination of Circumvention of the Antidumping and

Countervailing Duty Orders, 87 Fed. Reg. 45.753 (July 29, 2022) ("Prelim. Det."), **PR415**, and

accompanying Preliminary Decision Memorandum (July 22, 2022) at App. II ("Prelim Decision

Memo"), **PR409**, and accompanying Application of Adverse Facts Available for the preliminary

Determination Memorandum (July 22, 2022) ("Prelim AFA Memo"), **PR410, CR412**.

After Commerce issued the Preliminary Determination, numerous interested parties,

including certain DH Exporter Plaintiffs, submitted ministerial error comments to Commerce's

Preliminary Determination and requested Commerce to re-open the administrative record and

allow submission of new factual information for respondents to clarify or correct perceived

deficiencies. *See e.g.*, Ltr. from deKieffer & Horgan on behalf of Eagle Industries: Ministerial

Error Comments (Aug. 1, 2022), **PR426, CR421**; Ltr. from deKieffer & Horgan on behalf of

Golden Bridge: Ministerial Error Comments (Aug. 1, 2022), **PR427, CR422**; Ltr. from deKieffer

& Horgan on behalf of TEKCOM: Ministerial Error Comments (Aug. 1, 2022), **PR423**.

Commerce did not respond to any of the ministerial error comments filed for two months.  In

September and October, 2022, these seven DH Exporter Plaintiffs filed direct rebuttals to

Commerce's specific AFA findings, which Commerce rejected insofar as they contained new

factual information ("NFI"):

- Ltr from deKieffer & Horgan, re: Arrow Forest Rebuttal to Preliminary
  Determination (Sept. 14, 2022) **PR543, CR438,** REJECTED and REFILED with the
  offending NFI removed on October 31, 2022, **PR650, CR554**;

- Ltr from deKieffer & Horgan, re: Eagle Industries Rebuttal to Preliminary

Determination (Sept. 16, 2022) **PR550, CR440,** REJECTED and REFILED with the offending NFI removed on January 31, 2023, **PR794, CR605**; (Commerce did not reject Eagle Industries' submission until after the affirmative case brief had been filed, thus Eagle Industries' January 31, 2023 refiling contains three revised submissions: (1) September 16, 2022 Rebuttal to the Department's Preliminary Determination, (2) January 9, 2023 Eagle Industries' Company-Specific Affirmative Case Brief, and (3) January 26, 2023 Rebuttal Comments to Petitioner's Request to Reject.);

- Ltr from deKieffer & Horgan, re: Her Hui Rebuttal to Preliminary Determination (Sept. 16, 2022), **PR555, CR443**, REJECTED and REFILED with the offending NFI removed on October 31, 2022, **PR652, CR556**;

- Ltr from deKieffer & Horgan, re: Lechenwood Rebuttal to Preliminary Determination (Sept. 16, 2022), **PR556, CR444**, REJECTED and REFILED with the offending NFI removed on October 31, 2022, **PR653, CR557**;

- Ltr from deKieffer & Horgan, re: Long LUU Rebuttal to Preliminary Determination (Sept. 16, 2022) **PR557, CR445**, REJECTED and REFILED with the offending NFI removed on October 31, 2022, **PR654, CR558**;

- Ltr from deKieffer & Horgan, re: Golden Bridge Rebuttal to Preliminary Determination (Sept. 21, 2022) **PR563, CR448**, REJECTED and REFILED with the offending NFI removed on December 5, 2022, **PR669, CR561**;

- Ltr from deKieffer & Horgan, re: TEKCOM Rebuttal to Preliminary Determination (Oct. 13, 2022) **PR608, CR453**, REJECTED and REFILED with the offending NFI removed on December 5, 2022, **PR670, CR562**.

As discussed in DH Consolidated Plaintiffs' Tranche I brief, the companies filed a single general-issue case brief on January 9, 2023, arguing that Commerce's Preliminary Determination to apply total adverse facts available to cooperating Vietnamese exporters was not supported by

substantial evidence and, further, Commerce's Preliminary Determination of circumvention with respect to Scenarios (iv) and (v) was not supported by substantial evidence.  DH Consolidated Plaintiffs also argued that plywood produced in Vietnam under Scenarios (i) through (iii) was not within the scope of the Orders.  *See* Ltr from deKieffer & Horgan on behalf of VN Exporters and U.S. Importers re: General Issues Case Brief (January 9, 2023), **PR760, CR599** ("DH General Issues Case Brief").  Moreover, each of the seven DH Exporter Plaintiffs filed company-specific affirmative case briefs arguing that Commerce's Preliminary AFA application is not supported by substantial evidence and contrary to the statutory provision that requires Commerce to issue supplemental questionnaires to identify deficiencies, and Commerce's rejection of the September and October 2022 Prelim. Rebuttal submissions containing NFI was an abuse of discretion.  *See* Ltr. from deKieffer & Horgan, re: Eagle Industries Case Brief (Jan. 9, 2023), **PR749, CR589** (Rejected and Refiled in Eagle Industries' January 31, 2023 submission, **PR794, CR605**, with other filings as discussed above); Ltr. from deKieffer & Horgan, re: Golden Bridge Case Brief (Jan. 9, 2023), **PR750, CR590**; Ltr. from deKieffer & Horgan, re: Lechenwood Case Brief (Jan. 9, 2023), **PR755, CR594**; Ltr. from deKieffer & Horgan, re: Arrow Forest Case Brief (Jan. 9, 2023), **PR748, CR588**; Ltr. from deKieffer & Horgan, re: Her Hui Case Brief (Jan. 9, 2023), **PR754, CR593**; Ltr. from deKieffer & Horgan, re: Long LUU Case Brief (Jan. 9, 2023), **PR756, CR595**; Ltr. from deKieffer & Horgan, re: TEKCOM Case Brief (Jan. 9, 2023), **PR757, CR596**.

In these company-specific case briefs, DH Exporter Plaintiffs addressed all perceived discrepancies that Commerce cited in its Preliminary Determination in support of its AFA decision.  Nevertheless, Commerce continued to apply AFA to these seven DH Exporter Plaintiffs in the July 2023 Final Determination.

PUBLIC VERSION

2. *Factual Background As Related to Zhongjia*

The eighth and remaining respondent in the DH Exporter Plaintiffs group, Zhongjia, was found to be one of the cooperating respondents in Commerce's Preliminary Determination. *See* Prelim. Decision Memo at App. I, **PR409**. Following the Preliminary Determination, Commerce verified Zhongjia on site in October 2022. In the Final Determination, Commerce found that Zhongjia's questionnaire responses were missing necessary information related to a company that sold core veneers to Zhongjia in 2019, and that Zhongjia failed to act to the best of its ability because it did not have certain 2020 material input documents on site. Final IDM at 158 – 165. As a result, Commerce applied total AFA and excluded Zhongjia from the list of companies eligible to participate in the certification process. Final IDM at 158-165.

*        *        *

The company-specific factual background underlying Commerce's decision to apply AFA to the seven exporter respondents in DH Consolidated Plaintiffs group, including how each exporters interpreted and responded to Commerce's questionnaires, varies. Further, the factual background as related to Commerce's finding against Zhongjia varies significant from the others. DH Exporter Plaintiffs therefore discuss these factual backgrounds in detail below in the company-specific subsections in the **Argument Section** below.

## SUMMARY OF ARGUMENT

Commerce's AFA application as applied to each of the DH Exporter Plaintiffs is unsupported by substantial evidence and contrary to law. In particular, the "discrepancies" and "failure to report accurate information" Commerce alleged with respect to each DH Exporter

7

PUBLIC VERSION

Plaintiffs are based on Commerce's incorrect interpretation of the questionnaire responses provided and/or Commerce's failure to issue supplemental questionnaires to provide adequate notice of perceived deficiencies of prior responses and provide DH Exporter Plaintiffs an opportunity to correct or clarify prior responses, as required under 19 U.S.C. § 1677m(d). Courts have stated time and again that "{F}air and accurate determinations are fundamental to the proper administration of our dumping laws." *Federal-Mogul Corp. v. United States*, 18 C.I.T. 1168, 1172 (1994) (citing *e.g.*, *Koyo Seiko Co. v. United States*, 14 C.I.T. 680, 682, 746 F. Supp. 1108, 1110 (1990); *Daewoo Elecs. Co. v. United States*, 13 C.I.T. 253, 279-80, 712 F. Supp. 931, 954 (1989); *Asociacion Colombiana de Exportadores de Flores v. United States*, 13 C.I.T. 13, 28, 704 F. Supp. 1114, 1126 (1989)). In the instant proceeding, Commerce's conduct is neither "fair" nor "accurate."

Finally, Commerce exceeded the statutory deadline for its determinations by over 300 percent, resulting in extreme harm to exporters and importers that had relied upon the safe harbor Commerce established at the outset of its proceedings. All kinds of statutory remedies were passed over due to this delay. In light of the unprecedented abuse of Commerce's discretion in the conduct of this investigation, the Court should vacate the Final Determination.

## **ARGUMENT**

### I.      **Standard of Review**

PUBLIC VERSION

The Court holds unlawful any aspect of Commerce's final determination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

"Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1036-37 (Fed Cir. 2003) (citing *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477, 71 S. Ct. 456, 95 L. Ed. 456 (1951)). The substantial evidence standard "requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474, 487-488 (1951).

Whether Commerce's interpretation and application of a statute is "in accordance with law" is reviewed under the two step analysis mandated by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984). "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning. Because a statute's text is Congress' final expression of its intent, if the text answers the question, that is the end of the matter." *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing *Chevron,* 467 U.S. at 843 n. 9) (citations omitted)). Although an agency may have discretion to develop its own interpretations and methodologies where the statute is ambiguous or silent, it does not have the discretion to ignore the plain meaning of the statute. *Seah Steel Corp. v. United States*, 764 F. Supp. 2d 1322, 1332 (Ct. Int'l Trade 2011).

PUBLIC VERSION

## II.  **Legal Framework**

The statute at 19 U.S.C. § 1677e(a) authorizes Commerce to make a determination on the basis of facts available when "necessary information is not available on the record," or an interested party withholds information, fails to provide information by submitted deadlines, impedes a proceeding, or provides information that cannot be verified.  *See* 19 U.S.C. § 1677e(a). Where a party has failed to cooperate to the best of its ability, Commerce is authorized to "use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available...." *Id.* at § l677e(b).  Case law has long established that respondents must not be held to a standard of perfection.  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) ("{b}efore making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information….While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping.").

Further, 19 U.S.C. § 1677m requires that Commerce conduct its proceedings in a manner that is reasonable and fair.  Specifically, § 1677m(d) requires Commerce to provide prompt notice to the party that submitted a response deemed to be deficient. It also requires Commerce to provide respondent "an opportunity to remedy or explain" any alleged deficiency in light of impending statutory and regulatory deadlines. Even where a submission meets some, but not all, of Commerce's requirements, 19 U.S.C. § 1677m(e) provides that Commerce may use the information where the respondent's submission provides a reliable basis for reaching a

10

determination and demonstrates that the respondent acted to the best of its ability in providing the information.

The trade courts have not allowed Commerce to shirk its obligations under 19 U.S.C. § 1677m(d).  *See Shelter Forest Int'l Acquisition, Inc. v. United States*, No. 2021-2281, 2022 U.S. App. LEXIS 16491, at \*13 (Fed. Cir. June 15, 2022) ("We conclude that Commerce abused its discretion in the original proceeding by failing, as required by 19 U.S.C. § 1677m(d), to notify Shelter Forest of any deficiency in its February 12, 2019 Partial Response and to provide Shelter Forest with an opportunity to remedy or explain such deficiency.").  The Federal Circuit has also found Commerce's action contrary to law when respondent's statutory entitlement to notice and opportunity to remedy any deficiency was denied.  *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1384-85 (Fed. Cir. 2022).  In the instant proceeding, Commerce failed to adhere to its statutory obligation to provide each of the seven DH Exporter Plaintiffs notice of perceived deficiencies in their submissions and provide an opportunity to respond.

## III.    **Commerce's AFA Application to the Seven DH Exporters**

### 1.    **Eagle Industries Company Limited**

Eagle Industries timely responded to all of Commerce's requests for information in these scope and circumvention inquires, including three general questionnaires and one company-specific supplemental questionnaire.  *See* Ltr. from deKieffer & Horgan on behalf of Eagle Industries re: Quantity and Value Questionnaire Response (Oct. 1, 2020) ("Eagle Industries Q&V QR"), **PR112, CR101**; Ltr from deKieffer & Horgan on behalf of Eagle Industries re: Quantity & Value Supplemental Questionnaire Response (Mar. 8, 2021) ("Eagle Industries Supp. QR"),

**PR184, CR162**; Ltr. from deKieffer & Horgan on behalf of Eagle Industries re: Q&V Second Supplemental Questionnaire (July 9, 2021) ("Eagle Industries 2nd Supp QR"), **PR324, CR319-322**; Ltr. from deKieffer & Horgan on behalf of Eagle Industries re: Q&V Third Supplemental Questionnaire (July 6, 2021) ("Eagle Industries 3nd Supp QR") (the company-specific supplemental), **PR287, CR249**.  In the Final Determination, Commerce found that Eagle Industries withheld information and failed to act to the best of its ability based on two reasons, i.e., (1) Eagle failed to report in its initial Questionnaire Response that it sourced veneers from an affiliate in China; and (2) Eagle failed to report certain veneer imports from China.  Specifically, Commerce claimed that Eagle reported in its second supplemental response questionnaire imports of certain [                    ] that Eagle Industries used as face veneers, which Eagle should have reported as core veneers.  *See* Final IDM at 84-85.  Commerce's determination is not supported by substantial evidence.

**A.** **<u>*"Sourcing of Veneers"* - Commerce Erred in Using Eagle Industries' Corrected Data In The Second Supplemental Questionnaire Response Against Eagle Industries.</u>**

In the Preliminary Determination, Commerce claimed that Eagle Industries stated in its initial Q&V response that it did not source plywood or plywood inputs from its Chinese affiliated company [                                                    ] or other Chinese plywood producers or exporters during the inquiry period, but "later in its second supplemental response, Eagle Industries identified [        ] as one of its Chinese suppliers of veneers." Prelim. AFA Memo at 6-7, **PR410, CR412**.   In the Final Determination, Commerce rejected Eagle Industries' argument that its reporting in the initial Q&V questionnaire was based on a misunderstanding of the question, and its second questionnaire response served as correction to

the prior response, effectively curing the deficiency and which cannot be considered a discrepancy.  Final IDM at 84.

In the initial Q&V, under Question 8, Commerce asked respondents to identify affiliated companies in China that are producers or exporters of plywood or plywood inputs and whether respondents sourced any plywood or plywood inputs from such affiliates.  *See* Eagle Industries Q&V QR at 5, **PR112, CR101**.  Eagle correctly reported its Chinese affiliates, including [                    ].  *Id.*  However, at the time of responding to the initial Q&V, Eagle Industries misunderstood that by "plywood inputs" Commerce meant inputs that are at the heart of this investigation, i.e., core veneers, veneered panels, and core platform.  Therefore, Eagle Industries focused its attention on identifying all core material purchases for the entire POI, from December 2016 to March 2020, and the supplier for each purchase.  Eagle Industries did not report the *small quantity* of imports of *face veneers* from [                ] and stated that it "did not source any {} **plywood inputs** from the **affiliated companies** or **other Chinese plywood producers and exporters**."  *Id.* at 5. (Emphasis supplied).  At the same time, under Question 5, though not asked by Commerce, Eagle Industries voluntarily reported that it "directly imported face/back veneers from China."  *Id.* at 4.

Eagle Industries' response under these two questions demonstrate that it did not intend to withhold information from Commerce, but it only misunderstood the "plywood inputs" in Question 8 of the initial Q&V as referring to Chinese core veneers, veneer panels, and veneer core platforms, but not face veneers.  Commerce could have requested Eagle Industries to reconcile its response under Question 5 and Question 8 in the (October 1, 2020) initial Q&V response anytime during the 22 months, from October 2020 to July 2022, yet the first time that

PUBLIC VERSION

Commerce notified Eagle Industries of this perceived deficiency was in its July 2022 AFA memorandum.

Commerce clearly knew how to ask direct questions in supplemental questionnaires because it issued a third supplemental questionnaire to Eagle Industries in June 2021. *See* Dep't Commerce, re: Eagle Industries Company Limited Quantity and Value Supplemental Questionnaire (June 28, 2021), **PR277, CR239**. The third supplemental was not a blanket supplemental questionnaire issued to all respondents in this proceeding. In that supplemental questionnaire, Commerce asked direct, Eagle Industries-specific, questions such as please explain why the commercial invoice provided in a sample sales package in your first supplemental response listed Company X as customer but the bill of lading in the same exhibit listed Company Y as the consignee. *Id.* at 1. Eagle Industries thus was able to address Commerce's perceived discrepancy directly, and this issue did not become one of the reasons for Commerce to apply AFA. Turning back to Eagle Industries' in the initial Q&V response, Commerce should have asked Eagle to explain the seemingly contradictory statements under two questions (Questions 5 and 8) in the same response. Then Eagle Industries would have explained why it misreported only information relevant to its core veneer purchases, not face and back veneers, and at the same time provide a corrected response to Question 8 of the initial Q&V Questionnaire.

In the second supplemental questionnaire, under Question 1, instead of asking Eagle Industries to confirm or revise Question 8 of its October 1, 2020 Q&V response regarding purchases from affiliated company, Commerce requested all respondents to provide in Attachment III "[a]n exhaustive list of all tariff schedule subheadings of products your company

14

imported from China under Harmonized Tariff Schedule (HTS) subheadings 4408 and 4412."

Eagle Industries 2nd Supp. QR at 1, **PR324, CR319-322**.  Eagle Industries then accurately

identified [      ] as a supplier of face veneers.  *Id.* at Exhibit SQ2-1.

   "An overriding purpose of Commerce's administration of antidumping laws is to

calculate dumping margins as accurately as possible."  *Yangzhou Bestpak Gifts & Crafts Co. v.

United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013).  In line with this purpose, 19 U.S.C. §

1677m(d) mandates that Commerce shall give respondents notice when it identifies deficiencies

in submissions and provide parties with an opportunity to respond. 19 U.S.C. § 1677m(d)

(stating that if Commerce determines that a response to a request for information "does not

comply with the request", Commerce is to "promptly <u>inform</u> the person submitting the response

of the <u>nature of the deficiency</u>{.}").  Commerce argued that it had complied with 1677m(d) by

issuing two supplemental questionnaires.  *See* Final IDM at 123-128 (stating that "respondents

were repeatedly notified of the necessary information that Commerce requested", for example

"we requested the identity of Chinese affiliates in both the initial and first supplemental

questionnaires").  Thus, the contention between Eagle Industries and Commerce is whether

Commerce's second supplemental questionnaire sufficiently informed Eagle Industries of the

deficiency and allowed Eagle the opportunity under 1677m(d) to remedy the deficiency.

   The Court's findings in *BlueScope* are directly relevant to these instant inquiries:

   Commerce waited to disregard BlueScope's U.S. sales information because of the
   mismatch in quantity figures and the lack of supporting documentation—and
   indeed, to replace all of BlueScope's information with facts available—until it was
   too late for BlueScope to remediate any deficiency in its reporting. In its decision
   memoranda, Commerce gave no reason as to why it would have been impracticable
   to ask further questions about the mismatch, or to request additional documentation

PUBLIC VERSION

to support BlueScope's claim that the sales were returned, in the final supplemental
questionnaire covering both sections relevant to the U.S. sales reconciliation, which
was issued more than three months before the Preliminary Results. Under these
circumstances, Commerce acted in violation of the statute by rejecting BlueScope's
information and relying on facts available without giving it notice of the nature of
the deficiencies in its responses, and an opportunity to remediate the mismatch
between Section A and Section C. See 19 U.S.C. § 1677e(a) (emphasis added)
(requiring that Commerce "shall, subject to section 1677m(d) of this title, use the
facts otherwise available in reaching the applicable determination").

*BlueScope Steel v. United States*, 548 F. Supp. 3d 1351, 1364-65 (Ct. Int'l Trade 2021).

In *BlueScope*, Commerce argued before the Court that BlueScope failed to provide

"usable information (1) to determine the total quantity and value of U.S. sales (Section A) and

(2) to reconcile a mismatch between the total U.S. sales quantity reported in Section A, and the

total quantity of sales reported for BlueScope's U.S. sales in Section C (i.e., the U.S. sales

database)." *Id.* at 1356. In that underlying proceeding, Commerce did issue Section A and

Section C Supplemental questionnaires to BlueScope. *Id.* at 1355. The Court found that

Commerce should have asked BlueScope to clarify such mismatch between the Section A total

quantity and Section C total quantity and should have requested further documentation from

BlueScope as support for the adjustments between the two databases when it had six month to do

so before the preliminary decision memorandum. *Id.* at 1363-65. Clearly, naming subsequent,

follow up, questionnaires as "supplemental" and asking questions related to the alleged

deficiency does not satisfy Commerce's obligation under the law; only a supplemental

questionnaire that "*specifically point[s] out and request[s] clarification of [the] deficient

response,' and identifies the information needed to make the required showing*" does. *Id.* at 1364

(quoting *Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309, 1322-23 (Ct. Int'l Trade

2021) (citing *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007)) (emphasis in original).

The facts discussed in *BlueScope* are highly comparable to the instant case. Here, there was a "mismatch" in Eagle Industries' initial Q&V response between Q.5 (where Eagle Industries reported it "directly imported face/back veneers from China") and Q.8 (where Eagle Industries reported it "did not source any {} plywood inputs from the affiliated companies or other Chinese plywood producers and exporters"). *See* Eagle Industries Q&V QR at 4 & 5, **PR112, CR101**. And there was the same mismatch between Eagle Industries' initial Q&V response Q.8 and its second supplemental response Q.1 (where Eagle Industries reported purchases of face veneers from all Chinese suppliers, including the affiliates [                                                        ], in the Exhibit SQ2-1). *See id.* at 5; Eagle 2nd Supp. QR at Exhibit SQ2-1, **PR324, CR319-322.** Commerce had 21 months from Eagle's initial questionnaire response and 12 months from Eagle's second supplemental response before issuing the Preliminary Determination to ask Eagle Industries specifically about either one of the mismatches and to resolve the perceived discrepancy.

Commerce cites *Maverick Tube*, *Hundai Heavy*, and *Essar Steel* for support that the two rounds of supplemental questionnaires issued were sufficient to provide notice to respondents that there were discrepancies in their initial reporting. *See* Final IDM at 128-129. Those cases are inapposite as the facts are different.

In *Maverick Tube*, Commerce asked the respondent Borusan to report purchases of hot rolled steel (HRS) regardless of whether it used the HRS to produce the subject merchandise, in

PUBLIC VERSION

that case oil country tubular goods or "OCTG." *Maverick Tube Corp. v. United States*, 857 F.3d

1353, 1355 (Fed. Cir. 2017). Borusan responded that it had three production facilities in the POI:

Gemlik, Halka-li, and Izmit, and it reported data only for the Gemlik location, with an

explanation as to why it believed Commerce does not need the data for the two other locations.

*Id.* at 1355-56. In a supplemental questionnaire, Commerce specifically "noted that Borusan 'did

not … report HRS purchases for [Borusan]'s two other mills,'" and thus "Commerce asked

Borusan to 'please report all of [Borusan]'s purchases of HRS, including its purchases for the

Halkali and Izmit mills.'" *Id.* at 1356 (quoting from documents in the joint appendix). Indeed, in

the supplemental questionnaire, Commerce satisfied the requirement under § 1677m(d) by

specifically identifying the data requested in the initial questionnaire that Borusan failed to

provide.

In *Hyundai Heavy*, "Commerce instructed HHI to 'report revenue in separate fields (e.g.,

ocean freight revenue, inland freight revenue, oil revenue, installation, etc.) and identify the

related expense(s) for each revenue {}'" in the initial questionnaire. *Hyundai Heavy Indus., Co.

v. United States*, 332 F. Supp. 3d 1331, 1336 (Ct. Int'l Trade 2018). HHI responded by reporting

only separate revenue and expenses for certain sales but not all, citing prior segments where

Commerce found that reporting method reasonable. *Id.* Commerce then issued two

supplemental questionnaires specifically on the reporting of separate revenue and expenses, but

HHI did not provide the data requested. *Id.* at 1336-1339. The Court found that Commerce

provided adequate notice of deficiency before resorting to AFA because "Commerce made

multiple requests for such information, including an explicit request that HHI revise its sales

database to report 'all expenses and revenues' in separate fields." *Id.* at 1341 (emphasis supplied).

In *Essar Steel*, Commerce applied AFA based on the respondent's blatant denials, twice, of a manufacturing facility in Chhattisgarh. *Essar Steel Ltd. v. United States*, 678 F. 3d 1268, 1274-75 (Fed. Cir. 2012). Critically, in Commerce's supplemental questionnaire, it pointed out specifically on what page of Essar's prior response Essar stated that it does not have any manufacturing facilities in the State of Chhattisgarh, and stated that Commerce already placed on the record an Essar press release that appears to indicate that Essar does have an iron plant located in Chhattisgarh. *Id.*

The common scheme in *Maverick Tube*, *Hyundai Heavy*, and *Essar Steel* is that in those supplemental questionnaires Commerce specifically referenced respondents' prior responses (by reciting specific portion of prior narrative response or exhibits) and posed the question again. Unlike those cases, here Commerce asked two different (albeit overlapping to some degree) questions to Eagle Industries in the initial Q&V questionnaire and in the second supplemental questionnaire. By identifying the discrepancy for the first time in the Preliminary Determination, Commerce violated section 1677m(d).

Eagle Industries (as well as all other DH Exporter Plaintiffs) rejects the notion that Commerce's two supplemental questionnaires satisfied its obligation under 1677m(d). Both of Commerce's supplemental questionnaires were generic in nature. An identical first supplemental questionnaire was sent to 51 respondents, including Eagle Industries and all other DH Exporter Plaintiffs, and an identical second supplemental questionnaire was sent to 46 respondents,

PUBLIC VERSION

including Eagle Industries and all other DH Exporter Plaintiffs.  *See* Dep't Commerce Ltrs, Quantity and Value Supplemental Questionnaire for Vietnamese Producers and Exporters of Certain Hardwood Plywood Products (February 22. 2021) ("1st Supp. Qre"), **PR154** and Quantity and Value Second Supplemental Questionnaire for Vietnamese Producers and Exporters of Certain Hardwood Plywood Products (June 15, 2021) (2nd Supp. Qre), **PR257**.  Neither of these questionnaires asked any respondent to clarify any specific aspect of its prior response.

U.S. trade courts require that Commerce must address perceived deficiencies in respondents' submissions with specificity.  As the U.S. Court of International Trade recently reiterated: "{b}roadly drawn initial or supplemental questionnaires may not sufficiently place a respondent on notice of the nature of the deficiency, and deprive it of the opportunity to remedy that deficiency.  *Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309, 1322 (Ct. Int'l Trade 2021).  In Hyundai's case the Court found that Commerce did not comply with the notice and remedial requirements of 19 U.S.C. § 1677m(d):

> Commerce's broadly drawn Supplemental Questionnaire did not satisfy the notice requirement in § 1677m(d) because it failed to identify the nature of the alleged "deficiency" in Hyundai's response with any specificity. . . .  For example, the question says nothing about any error with respect to Hyundai's interpretation of the Initial Questionnaire instructions to report product code on an "as sold" basis, and specification on an "as produced" basis, which Hyundai explained in its Section C responses.

> Moreover, the language "including whether or not the merchandise is prime or non-prime" gave no indication as to what Commerce may have found deficient. . . .  Rather, Commerce simply asked Hyundai to ensure the "accuracy" of its reporting of "all product specifications" in Hyundai's sales and cost reporting.

> It is difficult to see how the word "accuracy" in the Supplemental Questionnaire should have alerted Hyundai that the specification data it provided was somehow "deficient."

*Hyundai Steel*, 518 F. Supp. at 1326; *see also NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007) (Commerce satisfies its obligations under section 1677m(d) when it issues a supplemental questionnaire specifically pointing out and requesting clarification of deficient responses); *Ta Chen Stainless Steel Pipe v. United States*, 23 Ct. Int'l Trade 804 (U.S. 1999) ("it is Commerce, not the respondent, which bears the burden of asking questions."). As in *Hyundai Steel*, Commerce did not come close in these scope and circumvention inquiries to asking with specificity that Eagle Industries clarify specific questionnaire responses or cure identified deficiencies.

Further, Eagle Industries' misreporting in the initial Q&V response Question 8 was *de facto* remedied by Eagle Industries in its second supplemental Q&V questionnaire response when Eagle Industries listed all of its imports from China in response to Question 1, including the face veneers it imported from the affiliates [                    ]. Commerce had no reason to disregard this correction, much less use Eagle Industries' accurate and corrected data against Eagle Industries in the Preliminary Determination. In doing so, Commerce not only penalizes respondents who act to the best of their abilities to correct data, but also violates its obligation to identify deficiencies and "to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency."

In its Final Determination, Commerce stated that Eagle Industries' reporting in the second supplemental questionnaire response cannot be treated as a correction because Eagle Industries did not identify the previously submitted errors and thus the later response contains significant changes, not corrections or supplements. Final IDM at 77. Commerce further claimed that in the absence of such identification of the previously submitted errors, and without an explanation

as to how it occurred, it has no ability to determine which information Commerce was supposed

to reply on. *Id.* Commerce misconstrued Eagle Industries' argument made below.

To apply AFA, Commerce must first identify a "gap" on the record, i.e., necessary

information that was missing from the record. *See* 19 U.S.C. § 1677e(a); *Nippon Steel Corp. v.

United States*, 337 F.3d 1363, 1381 (Fed. Cir. 2003) (holding that Commerce must determine that

requested information is missing to facts otherwise available, before turning to the question

whether it may impose an adverse inference based on respondent's degree of cooperation). Here,

the relevant information Commerce sought is whether Eagle Industries purchased any plywood

inputs from its affiliates in China. Eagle Industries responded to that question by submitting the

chart in Exhibit SQ2-1 and in the *exact form* requested by Commerce. *See* Eagle 2nd Supp. QR at

Exhibit SQ2-1, **PR324,, CR319-322**. Moreover, Eagle Industries' reporting in Exhibit SQ2-1 is

supported by record documents because Commerce in the same question also requested that

respondent provide "sample entry documentation (i.e., commercial invoice, packing list, bill of

lading, customs declaration) for the first entry under each subheading." *See id.* at 1 (Question 1

– subsection (e)). Therefore, Commerce already sampled the accuracy of Eagle's reporting in

Exhibit SQ2-1 (identifying face veneer purchases from [          ]) and should have

treated that as a correction.

At a minimum, if Commerce were to treat Eagle Industries' second supplemental

questionnaire response as a discrepancy instead of a correction, Commerce's AFA application is

contrary to law because as discussed above, Commerce failed to issue a deficiency questionnaire

PUBLIC VERSION

to inform Eagle Industries of the deficiency perceived and allow for an opportunity to clarify or correct the response(s).

### B. *"Unreported Veneer Imports from China"*

#### *(i). Eagle Industries Reported The Alleged Unreported Plywood Imports And Submitted Supporting Documents In Its Second Supplemental Questionnaire Response.*

Commerce claimed in the Final Determination that it identified "an import of veneers from Eagle's affiliate in China to Eagle that the company failed to report in its questionnaire response." Final IDM at 84. Commerce then goes on further to say Eagle "attempts to minimum its failure to report all requested information by stating that it inadvertently overlooked the import due to its small, non-commercial, quantity. … the fact remains that we requested information and Eagle failed to report it." *Id.* As an initial matter, in the Preliminary Determination, Commerce did not identify any specific import transaction of veneers from Eagle Industries' affiliate in China which it failed to report. *See* Prelim AFA Memo at 6-7, **PR410, CR412**. The only specific import transaction that Commerce identified and alleged that Eagle Industries failed to report was one import transaction of plywood. *Id.* at 7 ("record information provided by the GOV indicates that Eagle Industries had imports of [                        ] under subheading [          ] from [        ] during the inquiry period {.}") (citing Ltr. from the Government of Vietnam, re: Response to the Supplemental Questionnaire, at Exhibit 2 (July 21, 2021) ("GOV Import Data"), **PR351, PR353, CR362, CR364-365**). Commerce's assumption and conclusion is contrary to record evidence.

First, Commerce uses "[          ]", the shorthand term, for Eagle Industries' Chinese affiliated company [                                    ]. *See* Prelim. AFA Memo at 6.

The GOV data Commerce cited does not show that Eagle Industries imported [

] under subheading [          ] from [               ]; instead, it shows that Eagle

Industries imported [          ] of merchandise under subheading [          ] from

[                              ]. *See* GOV Import Data

(Under Vietnamese Customs declaration number [          ] - Eagle Industries imported

[     ] pieces of merchandise under [          ] of [     ] USD on [               ] from

[          ]). [               ] is not affiliated with Eagle Industries, and it is a company

different from [          ], who is affiliated with Eagle Industries.

Indeed, Eagle Industries explained in the narrative introducing Exhibit SQ2-1 (List of

Products Imported from China) that it imported [   ] pieces of [          ] mm small size plywood

of [   ] USD delivered by [          ] and they were only sample boards, which explains why

Eagle Industries overlooked this tiny quantity of plywood when responding to the initial Q&V

Questionnaire. *See* Eagle 2nd Supp. QR at 1-2, **PR324, CR319-322**.[2]  Eagle Industries also

submitted supporting documents, i.e., the Vietnam Customs Import Declaration, for this import

transaction.   The quantity, value, and the transportation method clearly demonstrate that this was

not an import for further manufacture or for sale.  Therefore, Commerce's finding that this was

an "unreported" import transaction is blatantly wrong.   Eagle Industries reported this import

transaction in the first instance where Commerce actually asked respondents to report all their

imports from China from unaffiliated companies (i.e., in the second supplemental questionnaire,

---

[2] Commerce actually has a long-established practice of expecting respondents to exclude samples from reporting because they are neither commercial sales nor sales in the ordinary course.  Common sense indicates from the size of these very small panels that they were samples and not subject (or potentially subject") merchandise in any event. Commerce does know better.

under Question 1).  In the initial Q&V questionnaire, only Question 8 asks respondents to

explain whether they sourced any plywood or plywood inputs from their affiliated company in

China, which is clearly not applicable because Eagle Industries is not affiliated with the supplier

of the sample display boards; none of the other questions otherwise require respondents to report

their purchases from China.  *Id.*  Therefore, Eagle Industries' reporting of this import of sample

display boards serves as a correction to its prior (volunteered and unsolicited) statement that it

did not import plywood from any Chinese producers or exporters, and it in fact reported this

transaction in the first instance where Commerce actually asked for such information.

Commerce's finding that this was an "unreported" import transaction is erroneous, unreasonable

and unsupported by substantial evidence.

### (ii). Commerce Failed to Consider the Plain Meaning of the Definitions of Plywood In The Scope of Its Own Orders In Treating Face and Back Veneers of Core Platforms as Core Veneers.

Commerce faulted Eagle Industries for not reporting the [      ] veneers it imported

from China, which Eagle Industries used as *face/back* veneers, as *core* veneers.  *See* Final IDM

at 74-75.  Commerce, however, does not point to any record evidence that demonstrate Eagle

Industries' reporting was incorrect. *Id.*  Instead, Commerce asserts that "Eagle does not dispute

Commerce's finding that it imported core veneers from China to Vietnam (and then incorporated

them into plywood sold to the United States)" *Id.* at 74.  To be sure, Eagle Industries disputes

<u>vigorously</u> Commerce's finding that it imported core veneers from China.  This

mischaracterization of Eagle Industries' position is worth clarifying, as Eagle Industries has

<u>consistently and correctly</u> reported the [      ] veneers it imported from China as *face/back*

veneers.

25

PUBLIC VERSION

A piece of veneer is a piece of veneer, it does not come with the name "face/back veneer" or "core veneer" engraved upon it. The distinction between a "face/back veneer" and a "core veneer" becomes meaningful only when the veneer is incorporated with other veneers and made into a plywood panel. And it is at that time when a plywood panel is completed, "{t}he face and back veneers are the outermost veneer of wood on either side of the core," and {t}he core of hardwood and decorative plywood consists of the layer or layers of one or more material(s) that are situated between the face and back veneers." *See Certain Hardwood Plywood Products from the People's Republic of China*, 83 Fed. Reg. 504, 512 (Dep't Commerce Jan. 4, 2018) (Scope language of the Hardwood Plywood from China AD Order, same as the scope language of the CVD Order). This has been Eagle Industries' understanding of what is considered face veneer versus core veneer at the outset of the circumvention investigation. The [    ] veneers Eagle Industries imported from China were used by Eagle Industries as the *outermost* veneer of wood on either side of the core, while the core (i.e., the layers of materials situated between the face and back veneers) were entirely produced using wood veneers it sourced from local peelers in Vietnam. Therefore, Eagle properly reported the [    ] veneers it imported from China as *face/back* veneers, and did so consistently.

Specifically, in the initial Q&V response, under Question 7, Commerce asked respondents to report "an exhaustive list of the species of wood of <u>veneer core platforms</u>, <u>multi-ply core panels</u>, <u>core veneer</u>, <u>face veneer</u>, and <u>back veneer</u> **of the plywood you sold**. Please complete the chart provided in attachment II-C". *See* Eagle Q&V QR at 4-5 (emphasis supplied), **PR112, CR101**. Eagle Industries completed the chart in attachment II-C and submitted that as Exhibit 3, in which it listed the species [    ] under the column "Face

26

Veneers" and the column "Back Veneers." Eagle Industries' reporting was correct because the

[     ] veneers were used as the face veneer and back veneer <u>of the plywood Eagle Industries</u>

<u>sold</u>. *Id.* at Exhibit 3.

In the first supplemental questionnaire, Commerce did not ask any questions that would

implicate respondents' designation of "core veneer" versus "face/back veneer." *See generally*,

Dep't Commerce, Ltr. re: Quantity and Value Supplemental Questionnaire for Vietnamese

Producers and Exporters of Certain Hardwood Plywood Products (Feb. 22, 2021) ("1st Supp.

Q&V Qre"), **PR154**.

Subsequently, in the second supplemental questionnaire, under Question 1, Commerce

provided a template chart in Attachment III and requested respondents to fill out the chart

consisting of all their imports under HTS 4408 and 4412 from China. *See* Eagle Industries 2nd

Supp. QR at 1, **PR184, CR162**. The template chart provided by Commerce contains the

following columns: "Subheading," "Tariff Schedule Description," "Actual Description," and

"Supplier." Commerce further stated under sub-question 1(c) that by "actual description", the

respondent is to "identif[y] the type of wood and product (e.g., birch face/back plywood with

poplar core, poplar core veneers, etc.)." *Id.* Eagle Industries completed the chart and identified

the [     ] veneers it imported from China in the format Commerce requested. *Id.* at Exhibit

SQ2-1. In the narrative response introducing Exhibit SQ2-1, Eagle Industries also explained that

on a few occasions the local customs broker declared the [     ] veneers from China under

Vietnamese HTS [     ], which correspond to veneers other than face veneers in the

Vietnamese tariff heading. *Id.* at 2. As Eagle Industries reported, the Chinese supplier of such

PUBLIC VERSION

[      ] veneers used the term "[                    ]" on the invoice, but Eagle Industries did

not use such full-size [      ] veneers as core veneers.  Therefore, under "Actual Description,"

Eagle Industries reported the [      ] veneers imported under Vietnamese HTS [          ]

"[                                                    ]".  *Id.* at 2 & Exhibit SQ2-1

(the chart listing products imported from China based on Commerce's template chart) & Exhibit

SQ2-2 (Sample entry documentation for the first entry under each subheading, as requested

under sub-question 1(e) in the questionnaire).

       In the Final Determination, Commerce asserts that Eagle Industries' second supplemental

questionnaire response is deficient because "we {i.e., Commerce} requested information about

Eagle's imports from China (not the use of those imports when they were ultimately exported to

the United States) and Eagle failed to accurately and consistently report that information to

Commerce, which renders its questionnaire responses entirely unreliable."  Final IDM at 85.

Commerce's assertion and conclusion is illogical.

       Eagle Industries provided the requested information regarding its [      ] veneer imports

from China correctly throughout the proceeding, in accordance with the Scope language of the

underlying AD CVD Order and Commerce's questions in the initial Q&V questionnaire and in

the second supplemental questionnaire.  At no time did Commerce inform the parties the term

"core veneer" no longer refers to the layer or layers of veneers situated between the two

outermost layers of the plywood panel.  Moreover, Commerce cannot possibly take the position

that the Chinese "core veneer" subject to this circumvention inquiry is <u>not</u> based on the use of

those veneers in the plywood product ultimately exported to the United States, but instead is

28

based on the Product Name/Designation on the Chinese veneer seller's commercial invoice.  If

that were the case, a Vietnamese producer that imported Chinese veneers and used them as core

veneers in production of plywood sold to the U.S. can simply ask the Chinese veneer supplier to

list the veneers as "face veneer" on the commercial invoice and avoid the implication of

Commerce's circumvention investigation entirely.

    In sum, Eagle Industries responded correctly and consistently to Commerce's questions

regarding its imports of [        ] veneers from China. It was in the second supplemental

questionnaire where Commerce first requested that respondents submit commercial documents

of their imports under the tariff subheading 4408 and 4412 from China.  Eagle Industries timely

notified Commerce, at the first instance, that in a few occasions the Chinese supplier of [        ]

face veneer listed the veneer as "core" veneer on the invoice.  If Commerce had further questions

or wished to receive additional supporting documents (such as production documents) to

substantiate Eagle Industries' claim that those veneers were face veneers, Commerce should have

issued a questionnaire to request that.  As the Court in *Hyundai Steel Co. v. United States*, 282 F.

Supp. 3d 1332, 1344-45 (Ct. Int'l Trade 2018) discussed, "unless the requisite information has

been fairly requested [by Commerce], it is inappropriate to take recourse to [other facts

available]." *Koyo Seiko Co. v. United States*, 92 F.3d 1162, 1165 (Fed. Cir. 1996); *compare*

*Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d 1322, 1339, 24 C.I.T. 1424, 1442-43,

SLIP OP. 2000-170 (2000) (finding that, where Commerce requested data related to all "home

market sales" and the standards for home market sales were clear, it had not "'hidden the ball' in

its initial requests for information . . . "); *with Ta Chen Stainless Steel Pipe, Ltd. v. United States*,

23 C.I.T. 804, 818-19, SLIP OP. 99-117 (1999) (finding that, where Commerce had failed to

"specifically" request information regarding a particular affiliate's US sales, it had failed to provide respondent with sufficient notice). As such, Commerce's conclusion that Eagle failed to report reliable information, and thereinafter the application of AFA, is unsupported by record evidence and contrary to the law. Regardless, the data was reported and Commerce is really only taking issue with the category under which the data should have been reported. This does not create a gap in the record or any reasonable inference that the records are unreliable. If Commerce intended to defy the plain meaning of the scope of its own orders, it should have issued such interpretation through notice and comment to the industry so that the exporting and importing industries could have been on notice of Commerce's novel, albeit nonsensical, interpretation.

###    2.   **Golden Bridge Industries Pte. Ltd.**

Golden Bridge timely responded to all of Commerce's requests for information in these scope and circumvention inquires. *See* Ltr. from deKieffer & Horgan on behalf of Golden Bridge re: Quantity and Value Questionnaire Response (Oct. 1, 2020) ("Golden Bridge Q&V QR"), **PR113, CR104**; Ltr. from deKieffer & Horgan on behalf of Golden Bridge re: Quantity & Value Supplemental Questionnaire Response (Mar. 8, 2021) ("Golden Bridge Supp. QR"), **PR186, CR164**; Ltr. from deKieffer & Horgan on behalf of Golden Bridge re: Q&V Second Supplemental Questionnaire (July 9, 2021) ("Golden Bridge 2nd Supp QR"), **PR325, CR323-325**.

Commerce nonetheless applied total AFA to Golden Bridge in its July 2022 Preliminary Determination. *See* Prelim. AFA Memo at 7-8. Since then, Golden Bridge objected to

PUBLIC VERSION

Commerce's preliminary determination in two post-preliminary filings.  *See* Ltr. from deKieffer & Horgan on behalf of Golden Bridge re: Golden Bridge Comments Regarding Ministerial Errors and Procedures (August 1, 2022) ("Min. Error Cmts"); and Ltr. from deKieffer & Horgan on behalf of Golden Bridge re: Golden Bridge Rebuttal to the Department's Preliminary Determination (September 21, 2022) ("Golden Bridge Rejected Cmts"), **PR563, CR448**. Golden Bridge refiled its comments on December 5, 2022 after it removed the factual information that Commerce deemed offending. Ltr. from deKieffer & Horgan on behalf of Golden Bridge re: Golden Bridge Refiling Rejected Preliminary Determination Rebuttal Comments (December 5, 2022) ("Golden Bridge Refiled Cmts"), **PR669, CR561**.

In the Final Determination, Commerce cited two reasons for applying total AFA, i.e., (1) Golden Bridge reported "unexplained and inconsistent information throughout its response about its unaffiliated suppliers", and (2) Golden Bridge failed to report accurately its Chinese affiliated company's export to Vietnam. Commerce's reasons are unconvincing, as discussed below.

**A.**  ***"Incorrect and Inconsistent Sourcing and Import Information" - Commerce Erred In Applying AFA Against Golden Bridge Over Its Unaffiliated Vietnamese Supplier's Purchases And Rejecting Golden Bridge's New Factual Information That Demonstrates The Immateriality Of Such Information.***

Golden Bridge is a trading company registered in Singapore and did not have any production activities.  *See* Golden Bridge Q&V QR at 2, **PR113, CR104**.  During the POI, Golden Bridge purchased plywood from two Vietnamese suppliers, [

] and sold to its U.S. customers; it did not purchase any plywood inputs (i.e., veneers). *Id.* at Exhibit 3 - List of Suppliers.  Amongst Golden Bridge's two Vietnamese plywood suppliers, [          ] is an unaffiliated supplier, and [

PUBLIC VERSION

], discussed above, is an affiliated supplier. *Id.* at 4-5.  In the "Incorrect and Inconsistent Sourcing and Import Information" section of the Final Decision Memorandum, Commerce stated that the AFA finding is based on Golden Bridge's reporting about its <u>unaffiliated supplier</u>, thus Golden Bridge understands that Commerce must be referring to [          ].

In the Final IDM, Commerce quoted two paragraphs, one from Golden Bridge's initial Q&V response, including where it stated that its suppliers (i.e., [          ] and [          ]) did not source plywood from resellers in Vietnam but produced the plywood by themselves.  Final IDM at 86 (citing Golden Bridge Q&V QR at 4, **PR113, CR104**).  This statement with respect to [          ] was based upon the best of Golden Bridge's knowledge and belief, because [          ] had closed down permanently before Commerce issued the Q&V questionnaire.  Further, Golden Bridge's exhibit accompanying its initial Q&V response shows that its last purchase from [          ] was in 2019, well before the effective date of Commerce's June 2020 notice of initiation of the circumvention inquiry.  *Id.* at Exhibit 3.

Golden Bridge recognizes that it did not inform Commerce in the initial Q&V response that [          ] had closed, and it was reporting based on its best knowledge.  However, in the first supplemental questionnaire and in response to a different inquiry on eucalyptus core veneer origin, Golden Bridge informed Commerce that it "stopped purchasing from this company {i.e., [          ]} a long time ago."  Golden Bridge 1st Supp. QR at 3 (Mar. 8, 2021), **PR186, CR164**.  Subsequently, in the second supplemental questionnaire response, when asked to provide a complete list of its Vietnamese plywood suppliers' imports under HTS 4408 and 4412 from

32

China and provide supporting sample sales documentation under Question 2, Golden

Bridgeresponded:

> **Except certain face veneers, Golden Bridge's Vietnamese suppliers did not source plywood or plywood inputs covered by this Anti-Circumvention Inquiry, i.e. core veneers, core platforms or other core components, from China under HTS subheading 4408 or 4412 for the period December 2016 through March 2020.** One of the suppliers, [                    ], is separately responding to the Department's supplemental questionnaire; please refer to their response for the information regarding their imports.  **The other supplier, [                                        ], has already closed down for more than a year. Golden Bridge cannot obtain the detailed information regarding their past imports and suppliers and supporting documents.**

Golden Bridge 2nd Supp. QR at 2-3 (July 9, 2021) (emphasis supplied), **PR325, CR323-325**.

Reading this paragraph as a whole, Golden Bridge informed Commerce that it "cannot

obtain the detailed information regarding {[           ]}past imports and suppliers and

supporting documents{,}" thus it has already notified Commerce that the statement two

sentences above regarding [        ] did not source core veneers, core platforms, or other core

components from China under the two 4-digit HTS headings listed by Commerce except certain

face veneers is based on its best information or belief and may or may not be accurate.

Commerce claimed that the GOV Import data directly conflicted with the Golden

Bridge's statements and therefore Golden Bridge's response was unreliable.  Final IDM at 86.

According to Commerce, the GOV Import data showed "{1} Golden Bridge's suppliers did not

produce all of their plywood inputs; {2} Golden Bridge did source plywood inputs from China;

{3} Golden Bridge was not forthcoming about all HS subheadings under which its affiliated

exporter exported plywood or plywood inputs into Vietnam; and {4} Golden Bridge was not

forthcoming about all HTS subheadings under which its unaffiliated suppliers imported plywood

or plywood inputs into Vietnam." *Id.*  However, to the second issue Commerce identified, Golden Bridge did not source plywood inputs from China as Commerce claimed, nor does the GOV Import data substantiate that.  *See* GOV Import Data, **PR351, PR353, CR362, CR364-365.**  Commerce's conclusory statement in this regard is contrary to record evidence.  Golden Bridge responds to the first, thire, and fourth issues Commerce identified in this section because they relate to Golden Bridge's Chinese affiliated company.

Golden Bridge <u>never</u> indicated that [          ] produced all of its <u>plywood inputs</u>, only that Golden Bridge understood that [          ] produced all of its <u>plywood</u>.  *See* Golden Bridge Q&V QR at 4, **PR113, CR104.**  Further, insofar as the GOV Import Data shows that [          ] imported plywood under subheading [      ] from China, most of those imports of [          ]'s were from [                                                              ]; Golden Bridge had no means to obtain such information from [          ] who had already been closed for over a year.  *See* Prelim. AFA Memo at 8 (citing GOV Import Data) **(BPI of GOV)**. This is the same for [          ] imports under [                                        ] who are not affiliated with Golden Bridge.  In the Final IDM, Commerce claimed that its Preliminary Determination did not take issue with Golden Bridge's inability to elicit information from [          ] suppliers but rather that Golden Bridge provided inaccurate information without attempting to "qualify its response."  Final IDM at 86-87.  Commerce's statement is erroneous as Golden Bridge did inform Commerce that it was unable to obtain detailed information or documentation from company that closed over a year ago by the time it filed the questionnaire response. *See* Golden Bridge 2nd Supp. QR at 2-3 (July 9, 2021), **PR325, CR323-325.**  At the heart of Commerce's

PUBLIC VERSION

critic to Golden Bridge's response remains that Golden Bridge did not provide entirely-correct information as related to an unaffiliated long closed supplier, [          ].

The Federal Circuit ("CAFC") has placed clear limits on Commerce's application of AFA to cooperating parties pertaining to their inability to elicit information from unaffiliated suppliers. In *Mueller*, the CAFC left no doubt that the Department's primary objective must be to calculate an accurate rate for the respondent. *Mueller Comercial De Mexico v. United States*, 753 F.3d 1227, 1235 (Fed. Cir. 2014) ("*Mueller*"). Indeed, the CAFC's remand instruction stated:

> In summary, on the remand, Commerce should recalculate Mueller's rate. In doing so, Commerce must have as its primary objective the calculation of an accurate rate for Mueller—as we said in *Changzhou*—"[w]e find no support in our caselaw or the statute's plain text for the proposition that deterrence, rather than fairness or accuracy, is the overriding purpose of the antidumping statute when calculating a rate for a cooperating party. 703 {*sic*} F.3d at 1378.'"

*Mueller* at 1234, citing to *Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1378 (Fed. Cir. 2012). In *Mueller*, the CAFC considered a case where a Mexican respondent had two suppliers and was able to obtain product-specific costs from only one of the suppliers. *Mueller* at 1230. Commerce applied an adverse inference to calculate Mueller's dumping margin to fill the gap of the uncooperative supplier's missing costs of production. *Id.* at 1230 and 1236. Commerce then relied on 19 U.S.C. § 1677e(a) for calculating Mueller's dumping margin to apply AFA.

Although the CAFC acknowledged that Commerce may apply AFA to cooperating respondents based on a rationale of policy or deterrence concerns based on the particular

PUBLIC VERSION

circumstances of the case to be decided, the CAFC also emphasized that the adverse inference can be applied *only* on a case-by-case basis. *Mueller* at 1234. Here, Commerce specified no policy or deterrence concerns generally, and, in particular, made no specific findings as to how policy or deterrence concerns would justify an application of AFA in Golden Bridge's case. Most importantly, Commerce failed to recognize that in Golden Bridge's case, it is information from a supplier who has already been closed for more than a year that Golden Bridge was unable to obtain.

The trade courts also have emphasized that it is unfair and contrary to law for Commerce to employ an adverse inference when the cooperating party has no control over the non-cooperating supplier. *See Canadian Solar Int'l Ltd. v. United States*, 2019 Ct. Int'l Trade LEXIS 152 (Dec. 3, 2019) at 13 ("*Canadian Solar II*"), *citing to Mueller* at 1235. Both the U.S. Court of International Trade and the CAFC are adamant that "there is no justification for an AFA rate based in deterrence where the rate would affect only the cooperating party." *Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d 1292 (Ct. Int'l Trade 2019) ("*Canadian Solar I*"), citing to *Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1379 (Fed. Cir. 2012). In Golden Bridge's case, Commerce's application of AFA is not supported by substantial record evidence and harms only Golden Bridge as a cooperating respondent. Golden Bridge has no commercial leverage over a closed company and its reporting was materially accurate despite that fact. For the minor discrepancies, the case law above precludes Commerce from penalizing Golden Bridge. Moreover, the unaffiliated closed supplier stopped making shipments long before the effective date of the inquiry, another reason why Commerce's application of AFA was purely penal and unwarranted.

**B.**  ***"Affiliation" - Commerce Failed to Comply with Its Statutory Obligation To Issue A Supplemental Questionnaire Concerning Golden Bridge's Reporting of Its Affiliated Chinese Company's Exports.***

In the Final Determination, Commerce rejected Golden Bridge's argument that it did not have all the correct information from its Chinese affiliate [              ] regarding their exports to Vietnam at the time, and that Commerce should have issued a deficiency questionnaire.  Final IDM at 87.  In particular, citing to the Preliminary AFA Memorandum, Commerce claimed that Golden Bridge in its initial Q&V questionnaire response stated its affiliated Chinese companies did not sell any plywood or plywood inputs to Vietnam in any period, but later modified that statement with respect to [              ,] in responding to the second supplemental questionnaire.  *See* Prelim. AFA Memo at 7.  Moreover, Commerce found that despite the modification, Golden Bridge only identified [              ] and therefore is not entirely accurate.  *Id.*  However, Commerce failed to comply with 19 U.S.C. § 1677m(d) to notify Golden Bridge of this deficiency or provide Golden Bridge an opportunity to correct its response in the twelve (12) months leading up to the Preliminary Determination.

In its initial Q&V response, Golden Bridge stated that "upon information and belief", none of its Chinese affiliated companies (thereby including [              ]) sold plywood or plywood inputs to Vietnam, which turned out to be incorrect.  *See* Golden Bridge Q&V QR at 5, **PR113, CR104**.  At the time the initial Q&V response was due, Golden Bridge did not fully understand the questions as a first-time respondent, particularly due to the complexity of the questionnaire.  To begin with, the question under which Golden Bridge made this statement did not require Golden Bridge to report whether its affiliated Chinese companies sold any plywood or plywood inputs to Vietnam.  *Id.* at 4-5 (Question 8).  The question, as written by Commerce,

only required Golden Bridge to respond whether Golden Bridge sourced plywood or plywood inputs from [                    ], and Golden Bridge responded to it by stating that it "did not source any plywood or plywood inputs from its affiliated companies……" *Id.* Golden Bridge responded to Commerce's <u>*actual*</u> question truthfully and accurately, in particular because the question only pertains to Golden Bridge's own purchases. In addition, at the time of responding to the initial Q&V questionnaire, Golden Bridge focused on the Chinese-origin core veneers/veneered panels/veneer core platforms which are the actual and explicit focuses of this circumvention inquiry given Petitioners' written statements to Commerce that they did not believe plywood made in Vietnam merely containing Chinese-sourced face/back veneer were a concern or covered by this inquiry. In this instance, Golden Bridge inadvertently made an incorrect (and unsolicited) statement, according to its information and belief at the time.

In the second supplemental questionnaire response, <u>for the first time</u>, Commerce asked Golden Bridge to report its Chinese affiliated companies' exports that fall under subheadings 4408 or 4412 to Vietnam. *See* Golden Bridge 2nd Supp QR at 3 (Question 3), **PR325, CR323-325**. Golden Bridge then reported its Chinese affiliate [                    ] exported face veneers to Vietnam and submitted the export documents for the first shipment in accordance with Commerce's request. *See* Golden Bridge 2nd Supp. QR at 3 & Exhibits SQ2-2, SQ2-3 (July 9, 2021). In the Preliminary Determination, Commerce found Golden Bridge's reporting incorrect because "[                    ] had exports to Vietnam under HTS subheadings [        ] and [        ]." Prelim. AFA Memo at 8, *citing* GOV Import Data (**BPI of GOV**). However, Commerce failed to recognize that [                    ] and Golden Bridge, although affiliated, are two separately incorporated companies that operated in two different countries. As Commerce

38

issued the second supplemental questionnaire to Golden Bridge requesting information on

[                    ] exports, Golden Bridge naturally needed to request such information from

[                    ] and was only able to report what it learned at the time.  Moreover, the GOV

Import Data shows that [                    ] only exported to Vietnam a total of [    ] shipments to

Vietnam under HTS [       ] in this three-year Period of Investigation, and [

              ] were to Golden Bridge. *See* GOV Import Data (the data also shows that these [    ]

shipments were only [        ] by value of [          ]'s total exports, i.e., exports under [

              ]), **PR351, PR353, CR362, CR364-365**.

In conducting its investigations, Commerce must give respondents notice when it

identifies deficiencies in submissions and must provide parties with an opportunity to respond.

*See, e.g., Hitachi Energy,* 34 F.4th at 1385 ("Commerce has no authority to apply adverse facts

and inferences unless the respondent has failed to provide requested information when notified

of the deficiency, and has not acted to the best of its ability in responding to such requests);

*Shelter Forest Int'l Acquisition*, 497 F. Supp. 3d at 1401 ("Commerce must raise identified

deficiencies such as this one and provide respondents with an opportunity to explain, correct or

supplement it."). Here, Commerce asked Golden Bridge to report [        ]'s exports to

Vietnam <u>for the first time</u> in the second supplemental questionnaire.  Golden Bridge's response

was submitted twelve (12) months before the Preliminary Determination.  Commerce should

have identified the deficiency prior to the Preliminary Determination and should have provided

Golden Bridge <u>at least one opportunity</u> to reach out to [        ] again and correct the reporting,

in accordance with 19 U.S.C. § 1677m(d) and the case law.

Further, in reviewing the GOV data cited by Commerce in the Preliminary Determination, Golden Bridge recognizes that [        ] imported some shipments under HTS [    ] from Golden Bridge's Chinese affiliated company [                ]. *See* GOV Import Data **(BPI Of GOV)**.  However, as discussed above, Commerce only requested Golden Bridge to report [            ]'s exports for the first time in the second supplemental questionnaire and never issued a supplemental or deficiency questionnaire to Golden Bridge.  Golden Bridge was never provided an opportunity to remedy this deficiency, contrary to law.  *See* 19 U.S.C § 1677m(d).

After the Preliminary Determination, Golden Bridge obtained additional information from [            ] that provided a correction to its prior questionnaire response, which also demonstrates this deficiency was immaterial in any event.  Yet, Commerce doubled down on its violation of 1677m(d) and rejected such information.  *See* Dep't Commerce, Rejection of Golden Bridge's Submission (Nov. 29, 2022), **PR658**.  Significantly, Golden Bridge made no purchases from [      ] in 2020 and forward, as discussed above.  *See* Golden Bridge Q&V QR at Exhibit 3, **PR113, CR104-108;** Golden Bridge 1st Supp. QR at 3, **PR186, CR164**.  In other words, **none of Golden Bridge's shipments to the U.S. that are suspended or suspendable under these inquiries contain any plywood manufactured by [        ], i.e., the source of the adverse inference.**  For this additional reason, Commerce's adverse inference applied against Golden Bridge was not only unsupported by substantial evidence andcontrary to law, but also highly unreasonable in light of Commerce's frequent narrative that applies AFA for the policy consideration of inducing cooperation.

40

### 3. __Lechenwood Viet Nam Company Limited__

Lechenwood timely responded to all of Commerce's requests for information in these scope and circumvention inquires. *See* Ltr. from Fox Rothschild LLP on behalf of Lechenwood re: Quantity and Value Questionnaire Response (Oct. 1, 2020) ("Lechenwood Q&V QR"), **PR125, CR144**; Ltr from Fox Rothschild LLP on behalf of Lechenwood re: Quantity & Value Supplemental Questionnaire Response (Mar. 29, 2021) ("Lechenwood Supp. QR"), **PR239, CR223**; Ltr. from Fox Rothschild LLP on behalf of Lechenwood re: Q&V Second Supplemental Questionnaire (July 9, 2021) ("Lechenwood 2nd Supp. QR"), **PR338, CR348-349**.

In the Final Determination, as it did in the Preliminary Determination, Commerce continued to apply AFA based on its conclusion that Lechenwood's reporting of its Chinese affiliated company and the purchases from this company was incorrect. *See* Final IDM at 98. Commerce also found that Lechenwood did not accurately report all of the tariff schedule subheadings of its imports. *Id.* at 99. From the time that Lechenwood submitted its second supplemental questionnaire, Commerce asked no additional supplemental questions about these alleged deficiencies before resorting to AFA in the July 2022 Preliminary Determination.

Lechenwood objected to Commerce's Preliminary Determination in a post-preliminary filing. Commerce, however, did not allow submissions of new facts to clarify Commerce's misunderstandings. *See* Ltr from deKieffer & Horgan, re: Lechenwood Rebuttal to Preliminary Determination (Sept. 16, 2022), **PR556, CR444**, REJECTED and REFILED with the offending NFI removed on October 31, 2022 – Lechenwood Refiled Prelim. Rebuttal, **PR653, CR557**;

Dep't Commerce Memorandum re: Rejection of Lechenwood's Submission (October 25, 2022)

("Lechenwood Rejection Memo").

### A. Lechenwood's Mis-Reporting on Affiliation and Purchases from Affiliated Company Is Not a Basis to Apply AFA.

Commerce found that Lechenwood's statement in its initial and supplemental

questionnaires that it does not have any affiliates in China was contradicted by statements

Lechenwood made elsewhere in its response that it is affiliated with [

], a Chinese exporter of hardwood plywood. *See* Final IDM at

98; Prelim. AFA Memo at 17. Furthermore, Commerce found a discrepancy where Lechenwood

reported in its first supplemental questionnaire response that [          ] does not supply

Lechenwood with any plywood or plywood inputs but later identified [

] of merchandise under HTS 4408 or 4412. *Id.* Commerce erred in applying

AFA on this basis because, among other reasons, necessary information is not missing from the

record.

First, as a small company that has not participated in AD/CVD or any other related

proceedings before Commerce, Lechenwood did not fully understand Commerce's terminology

and the exact meaning of plywood inputs. Lechenwood understood that the term "plywood

inputs" referred to the core veneers/veneered panels/veneer core platforms targeted explicitly in

the circumvention inquiry. Lechenwood also understood that Chinese affiliates referred to an

affiliated producer or exporter of these plywood inputs (i.e., core veneers/veneered panels/veneer

core platforms). The misunderstanding of these terms explains these supposed discrepancies.

In its Final Determination, Commerce claimed that it "at no point notified respondents that it was only interested in seeking information about core veneer inputs {.}" Final IDM at 98. However, Commerce notified or clarified with respondents before it issued the initial Q&V questionnaire that the circumvention inquiry covers *core* veneers, not *face* veneers, and only when Vietnamese plywood producers use face veneers *in addition to* core veneers from China are face veneers captured by Commerce's circumvention inquiry. *See* Dep't Commerce, Memorandum to File, re: Clarification of Merchandise subject to Anti-Circumvention and Scope Inquiries (July 9, 2020) **(**"Clarification Memo"), **PR21**, citing to Defendant-Intervenor's Letter, "Hardwood Plywood Products from the People's Republic of China: Coalition's Response to Request for Clarification" (May 12, 2020) at 6, **PR20, CR7 (**"The merchandise subject to these anti-circumvention and scope inquiries does not include core veneers fully produced in Vietnam or a third-country that are assembled into a veneer core platform in Vietnam and combined with a face and back veneer produced in China.").

Lechenwood never intentionally withheld information concerning itself and [          ] and its affiliation is clear on the record.  In the initial questionnaire response, Lechenwood provided its business license issued upon its establishment in [       ], which clearly shows that it is [                              ]. *See* Lechenwood Q&V QR at 1 & Exhibit 2, **PR125, CR144-145**.  In the first supplemental questionnaire response, Lechenwood stated that it is "[

PUBLIC VERSION

].”

Lechenwood Supp. Q&V QR at 2-3.  As such, with these specific qualifications, Lechenwood

originally stated it had no such affiliates.

Further, Lechenwood noted that although it is [                                    ]

does not supply Lechenwood with any plywood or plywood inputs.  *Id.* at 4.  "[

                                      ]; however, Lechenwood purchased

plywood inputs locally for production in Vietnam."  *Id.*  Lechenwood also provided relevant

documentation in Exhibit 3, i.e. [

                          ], to demonstrate that Lechenwood is invested by [          ],

and other relevant documentation of [          ] in Exhibit 4, i.e. [

                              ].  *Id*. at Exhibits 3-4.  Therefore, it is apparent that

Lechenwood had no intention to withhold information about its relationship with [          ]; it

merely had a different understanding of meaning of the affiliation questions.  The information

was fully disclosed and out in the open.

This misunderstanding was also seen in Lechenwood's second questionnaire response.  In

the second supplemental questionnaire response, [

          ].  *See* Lechenwood 2nd Supp. QR at 2, **PR338, CR348-349**.  Again, this

statement was because Lechenwood continued to incorrectly understand that the question was

only referring to affiliates that exported core veneers/veneered panels/veneer core platforms

subject to the circumvention inquiry.  The qualifications to its understanding were fully disclosed

to Commerce, which was at no disadvantage in the context of this full disclosure in appreciating

such affiliations.  While Commerce issued Lechenwood supplemental questionnaires and asked

questions about affiliation, the misunderstanding of the terminology in the questionnaire was not made clear until Commerce specifically identified the discrepancy for the first time in the Preliminary Determination.

After the Preliminary Determination and with a better understanding of the terminology, Lechenwood acknowledges the plain fact that was clear for all to see that Lechenwood is affiliated with a Chinese company, [          ].  [          ] did export plywood to a Vietnamese company in the POI, but not to Lechenwood.  *See* Lechenwood Refiled Prelim. Rebuttal at 4; *see also*, GOV Import Data.  Nor did [          ] export any core veneers/veneered panels/veneer core platforms to Lechenwood, or to any other companies in Vietnam.  *Id.*

Under 19 U.S.C. § 1677e, "{t}o apply AFA, Commerce must first identify a gap in the record."  *Mosaic Co. v. United States*, 589 F. Supp. 3d 1298, 1305 (Ct. Int'l Trade 2022).  "The use of facts otherwise available . . . is only appropriate to fill gaps when Commerce must rely on other sources of information to complete the factual record."  *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1346 (Fed. Cir. 2011).  Although Lechenwood's misunderstanding of the terminologies (i.e., plywood inputs, affiliates) led to seemingly contradictory narrative responses, Lechenwood's affiliation with [          ] was clearly demonstrated by official documentation that Lechenwood placed on the record.  *See* Lechenwood Q&V QR at Exhibit 2 (Business License); Lechenwood Supp. QR at 4 & Exhibit 3 ([          ] Overseas Investment Certificate in relation to Lechenwood).  Here, Commerce has failed to make an affirmative showing that there was a relevant gap in the record created by

Lechenwood's failure to properly *characterize in a legal sense* [          ] as its affiliated

company in certain questionnaire responses.

### B. *Commerce failed to comply with 1677m(d) to issue a supplemental questionnaire regarding Lechenwood's list of merchandise imported under HTS headings 4408 and 4412.*

Commerce's other ground for apply AFA to Lechenwood relates to Lechenwood's second

supplemental questionnaire response where it did not accurately report all of the tariff schedule

subheadings of its imports under 4408 and 4412. *See* Final IDM at 90.  Discussed in more details

in the Preliminary AFA Memorandum, Commerce found that "Lechenwood listed imports under

HTS subheadings [                                         ]. However, GOV import data show

that Lechenwood also had imports under HTS subheading [          ] during the relevant

period." *Id.* (*citing* GOV Import Data).  Further, as Lechenwood listed 10-digit, 9-digit, and 6-

digit HTS headings, Commerce found that Lechenwood "did not list the eight-digit tariff

schedule descriptions for the HTS categories." *Id.*

Lechenwood recognizes that it made mistakes in responding to Question 1(a)-(e) of the

second supplemental questionnaire.  This error occurred because of two misunderstandings.

Lechenwood uses a broker for Customs declaration formalities.  Therefore, Lechenwood was not

fully aware of the exact HTS codes under which its purchases of face veneers were imported.

Moreover, due to an incorrect understanding of the questionnaire, Lechenwood put all veneer

suppliers in the same table, rather than only those from which it imported Chinese inputs, and

asked the broker to provide the HTS codes for all veneers purchased—i.e., for the Chinese and

Vietnamese inputs.   The broker did not provide Lechenwood the HTS headings in the 8-digit

format.  Nonetheless, the suppliers Lechenwood listed for HTS subheadings [

PUBLIC VERSION

] were Vietnamese core veneer suppliers.  *See* Lechenwood 2nd Supp. QR at Exhibit 1.  The fact that the suppliers of these veneers are Vietnamese companies are evident from their names – "công ty" means "Company" I n Vietnamese.  The HTS codes [

] could be used for [                        ] core veneers as provided by the broker.  Hence, this is not a material error.

In addition, due to a miscommunication, the broker wrongly provided the HTS code for plywood *exports* ([          ]) as the HTS code for the face veneer *imports*.  *Id.*  However, now with a correct understanding of the question and correcting the broker's error, the fact is that, as demonstrated by the GOV import data, Lechenwood only [

].  *See* GOV Import Data.

As discussed above, § 1677m(d) and case law require that Commerce give respondents notice when it identifies deficiencies in submissions and provide parties with an opportunity to respond.  Lechenwood's misunderstanding of information requested under Question 1(a)-(e) of the second supplemental questionnaire is clear based on the information submitted.  Commerce had ample opportunity to issue a supplemental questionnaire to request correction and provide Lechenwood an opportunity to remedy this deficiency (which in fact did not result in a gap in the record) in the twelve (12) months leading up to the Preliminary Determination but unreasonably did not do so.  Rather, only in the Preliminary Determination did Commerce notify Lechenwood of this error and listed it as a reason it was applying AFA to Lechenwood.

Upon being notified of this issue only in the Preliminary Determination, Lechenwood filed comments explaining that it had misunderstood the question.  Lechenwood did not

purposefully withhold any information from Commerce.  Indeed, Lechenwood attempted to

provide this additional documentation when first notified of the deficiency in the Preliminary

Determination, but Commerce rejected this correction as new information, further exacerbating

the violation of its statutory obligation.  *See* Dep't Commerce Memorandum re: Rejection of

Lechenwood's Submission (October 25, 2022).

Accordingly, Commerce's preliminary determination to apply AFA to Lechenwood is

inconsistent with its statutory obligation to offer Lechenwood an opportunity to remedy

deficiencies or provide clarification.  *See* 19 U.S.C. § 1677m(d).  Commerce should allow

Lechenwood to provide this documentation or otherwise find Lechenwood acted to the best of its

ability in this investigation and the missing information is not necessary or material in light of

the context of its explanations and other plainly understandable information of record.  The

documentation missing is only corroborating information on Lechenwood's purchases of Chinese

*face* veneer.  The fact that Lechenwood purchased Chinese face veneer under HTS [          ]

is already a record fact, and a fact that does not impact Commerce's circumvention inquiry by

Commerce's own clarification of same.  *See* Lechenwood 2nd Supp. QR at Exhibit 2, **PR338,**

**CR348-349**; GOV Import Data**, PR351, PR353, CR362, CR364-365.**  This is not a basis to

apply partial AFA, much less total AFA, to Lechenwood.

Indeed, "{i}t is an axiom of administrative law that an agency's explanation of the basis

for its decision must include "a 'rational connection between the facts found and the choice

made.'" *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43

(1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). In the

case of Lechenwood, generally, the so-called "deficiencies" that Commerce detected have no

impact on Commerce's inquiries as they relate to face and back veneer imported from China and in no way imply that Lechenwood imported any core materials from China. Commerce has not claimed that the record shows that Lechenwood imported the actually relevant core veneers from China that are included in the five inquiry scenarios. Further, though Lechenwood mistakenly reported importing merchandise under HTS [          ] from China, it is clearly contradicted by the GOV Import Data, which fills that gap. *See* Lechenwood 2nd Supp. QR at Exhibit 1; GOV Import Data.

Even if Commerce believed that it did not need to issue a supplemental questionnaire to Lechenwood under 1677m(d) to request correction/clarification, the most "adverse" inference that Commerce can draw based on this mis-reported information is to accept the GOV data as correct, which would not even qualify Lechenwood as subject to the inquiry at all. Alternatively, Commerce could have followed its normal circumvention inquiry practice,treated Lechenwood as a mandatory respondent, and issued full questionnairesrequesting Lechenwood's comprehensive purchases, production, and sales information in the twelve months before the Preliminary Determination. *Mosaic Co.*, 589 F. Supp. 3d at 1305 ("{t}he gap in the record must be relevant to the investigation and the use of AFA must fill in information that is actually missing."). Instead, Commerce unreasonably choose to apply total AFA to Lechenwood with no evidence that Lechenwood was conducting business in any manner other than within the safe harbor created by Commerce at the outset of this investigation.

### 4. **Arrow Forest International Co., Ltd.**

PUBLIC VERSION

Arrow timely, accurately, and completely responded to all of Commerce's requests for information in these scope and circumvention inquires.  *See* Ltr. from Fox Rothschild on behalf of Arrow re: Quantity and Value Questionnaire Response (Sept. 29, 2020) ("Arrow Q&V QR"), **PR75, CR17-18**; Ltr from Fox Rothschild on behalf of Arrow re: Quantity & Value Supplemental Questionnaire Response (Mar. 19, 2021) ("Arrow Supp. QR"), **PR202, CR178**; Ltr. from Fox Rothschild on behalf of Arrow re: Q&V Second Supplemental Questionnaire (June 30, 2021) ("Arrow 2ⁿᵈ Supp QR"), **PR278, CR240**; *see also* Ltr. from Fox Rothschild on behalf of Arrow re: Response to Petitioner's July 13, 2021 Comments on Arrow Forest's Second Supplemental Response (July 28, 2021), **PR358, CR381**.

Commerce assigned total AFA to Arrow based on its failure to provide reliable information because (1) Arrow failed to report an import transaction from China by its non-Chinese affiliated company; (2) Arrow failed to report an alleged-affiliated producer of plywood inputs in China, (3) Arrow misreported the tariff schedule subheadings for the plywood inputs it imported from China, and (4) Arrow did not provide the Vietnam Customs Import Declaration associated with the sample entry package.  Arrow responded to Commerce's preliminary findings in a rebuttal submission filed on September 14, 2022.  *See* Ltr. from deKieffer & Horgan, Arrow Forest Rebuttal to the Department's Preliminary Determination (Sept. 14, 2022) ("Arrow Rejected Post-Prelim. Rebuttal") **PR543, CR438** – Rejected and Refiled in Attachment I to Ltr. from deKieffer & Horgan, Arrow Forest Refiling Rejected Preliminary Determination Rebuttal Comments (Oct. 31. 2022) ("Arrow Refiled Post-Prelim. Rebuttal"), **PR650, CR554**.  Although in its Preliminary Determination Commerce failed to ask Arrow for clarification of the alleged deficiencies summarized above in accordance with 19 U.S.C. § 1677m(d), Commerce rejected

50

most of Arrow's explanations and supporting documentation. *See* Dep't Commerce

Memorandum re: Rejection of Arrow Forest's Submission (October 25, 2022) ("Arrow Rejection

Memo"), **PR629**. In its rejection memorandum, Commerce claims that it provided Arrow notice

of the above deficiencies in its supplemental questionnaires dated February 22, 2021 and June 1,

2021. Arrow Rejection Memo at 2. As mentioned above, Arrow timely responded to

Commerce's February 22, 2021 first general supplemental questionnaire that was issued to all

respondents in the proceeding. Arrow did not receive a questionnaire dated June 1, 2021, and

found no record on ACCESS of any questionnaire in these inquiries that Commerce issued on

June 1, 2021. Arrow did receive, however, a second general supplemental questionnaire dated

June 15, 2021, to which it also timely responded, as indicated above.

A.  ***"Affiliated Exporters of Plywood Inputs from China" - Commerce Should Consider Arrow's Explanation of its Shipment of Birch Veneer Arranged by Ike Trading.***

Commerce claimed that Arrow failed to accurately or completely respond to Commerce's

request for information about its affiliate's plywood exports. Final IDM at 81. In particular, in

the Preliminary Determination, Commerce points to GOV Import Data that showed Arrow Forest

had [                         ] from China by [

                    ] but Arrow Forest did not identify [              ] as a supplier of Chinese

hardwood plywood inputs. Prelim. AFA Memo at 4. As Commerce is aware, Ike Trading is

Arrow's U.S. parent company. The Vietnamese import data also lists [

], further corroborating that [                    ] is not a Chinese company. The Vietnamese

import data for this shipment also shows that [                              ], imported

under VN HTS No. [            ]. *See* GOV Import Data, **PR351, PR353, CR362, CR364-365**.

In international trade, a U.S. company such as Ike Trading can be a shipper on the bill of lading for shipments from any foreign country.  The shipper on the B/L does not necessarily mean the shipper is domiciled at the origination of the shipment. This is a common practice in international trade business.

As quoted by Commerce itself in the Final IDM, in the initial Q&V questionnaire, Commerce asked respondents to report "whether {it is} affiliated with any ... exporters of plywood or plywood inputs in China{.}"  Final IDM at 81; *see also*, Arrow Forest Q&V QR at 4 (Question 8), **PR75, CR17-18**.  Arrow Forest's response under that question not mentioning Ike Trading was *correct*.  Ike Trading is not an exporter of plywood related materials in China, including plywood inputs, because it is not domiciled/incorporated/operated in China.

With respect to the second supplemental questionnaire, Arrow Forest recognizes that the question asked for reporting of "products affiliates of your company exported from China to Vietnam", yet Arrow Forest responded to a different question by stating it "did not have any Chinese affiliates that exported plywood or plywood inputs from China to Vietnam."  Arrow Forest 2nd Supp. QR at 2 (in response to Question 3.  However, "the standard does not require perfection and {the Court} recognizes that mistakes sometimes occur{.}" *Nippon Steel Corp.*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  Critically, Question 3 is the first instance in the three rounds of questionnaire where Commerce asked respondents to report on their affiliated companies' exports from China instead of reporting on the activities of their affiliated companies in China.  Thus, to comply with its obligation under 19 U.S.C. § 1677m(d), Commerce at least needed issued a supplemental questionnaire to Arrow Forest that specifically alerted Arrow

Forest that it appears to have misread Question 3 in the second supplemental questionnaire, but Commerce failed to do so.

Moreover, regarding this shipment of veneer in the Vietnamese entry in question, Commerce rejected Arrow's complete explanation of the circumstances of the shipment as relevant to Commerce's query concerning veneer and plywood purchases from China and supporting documentation. *See* Arrow Rejected Post-Prelim. Rebuttal at 5-6 & Exhibits 2-5, **PR543, CR438**. In doing so, Commerce exacerbated its violation of § 1677m(d) and undermined the overarching goal of conducting AD and CVD proceedings as fair and accurate as possible.

**B.** ***"Affiliated Exports of Plywood Inputs from China" – Arrow Forest Accurately Reported that it has No Chinese Affiliates that Exported Plywood or Plywood Inputs to Vietnam.***

In the Preliminary Determination, Commerce determined that Arrow Forest is affiliated with Dalian Jianlin Wood Co., Ltd. ("Dalian Jianlin"), and since Dalian Jianlin is a plywood input producer in China, Arrow Forest failed to accurately respond to certain questions in the initial and second supplemental questionnaire response. *See* Prelim AFA Memo at 4. In the Final Determination, Commerce continued relying on this "discrepancy" in justifying its AFA application to Arrow Forest. Final IDM at 81-82. Commerce erred for two reasons.

First, Arrow Forest' questionnaire responses where it stated it does not have Chinese affiliates that are producers or exporters of plywood or plywood inputs is correct and accurate. Arrow Forest is not affiliated with Dalian Jianlin. Commerce's conclusion that Dalian Jianlin is affiliated with Arrow Forest is entirely based on the Arrow Forest's U.S.-based parent company Ike Trading's website printout. *See* Prelim AFA Memo at 4 (citing Petitioner Ltr. re: Comments

PUBLIC VERSION

on Certain Second Supplemental Quantity and Value Questionnaire Responses (July 12, 2021) at Ex. 5 ("Pet. July 12, 2021 Cmts."), **PR346, CR359)**. On that website printout, Ike Trading identifies both Arrow Forest and Dalian Jianlin as subsidiaries, but this was an overstatement and inaccurate information mainly for marketing purposes.  As is clear from Arrow Forest's Exhibit 1 of its Sept. 14, 2022 rebuttal submission, Arrow tried to submit Dalian Jianlin's Articles of Incorporation, Change Company Registration, Company Registration, and Business License issued by Dalian City Authority, which would have clarified that company's ownership if Commerce had asked for this information as required by 19 U.S.C. § 1677m(d) or accepted Arrow's proffer of the information.  *See* Arrow Rejected Post-Prelim. Rebuttal at 5 & Exhibit 1, **PR543, CR438**.

In *Essar Steel*, as discussed above, after the respondent stated that it does not have a facility in Chhattisgarh, Commerce placed a press release from the respondent advertising otherwise.  *Essar Steel Ltd. v. United States*, 678 F. 3d 1268, 1274-75 (Fed. Cir. 2012).  And it issued a supplemental questionnaire that contains specific reference to respondent's prior statement as well as the press release. *Id.* Commerce's action in *Essar Steel* provided adequate deficiency notice to respondent and allowed it to directly respond to the discrepancy, thereby satisfying its obligation under Section 1677m(d).  Commerce should have done the same in the instant case, but it did not.

Second, Commerce misconstrues Arrow Forest's argument made before the agency below that this alleged-unreported veneer factory is immaterial. *See* Final IDM at 82 (stating that Arrow does not dispute that record information indicates that Arrow is affiliated with a manufacturer of

PUBLIC VERSION

plywood inputs).  As discussed above, Arrow disputes that record information establishes

affiliation and filed rebuttal information which was rejected by Commerce.  However, assuming

*arguendo* that the website printout is accurate (and that Dalian Jianlin is affiliated with Arrow

Forest), there is still no "gap" on the record insofar as to the necessary information Commerce

needs to conduct the circumvention inquiry.  Because, in that case, two pieces of corroborating

evidence demonstrate that Dalian Jianlin [                                                    ] to Arrow

Forest.  *See* Pet. July 12, 2021 Cmts at Exhibit 5 – Ike Trading website printout (stating that

Dalian Jianlin is a "Shina (Basswood) veneer manufacturing plant", which is not a species that

Arrow produced plywood with); GOV Import Data (showing that Dalian Jianlin [

                        ] to Vietnam).   Contrary to Commerce's argument, it is not "statutorily

required" for it to examine affiliation in such instance.  The circumvention statute, in pertinent

part, states:

> (3) Factors to consider. In determining whether to include merchandise assembled
> or completed in a foreign country in a countervailing duty order or an
> antidumping duty order or finding under paragraph (1), the administering
> authority shall take into account such factors as—
>
> (A) …
>
> (B) whether the manufacturer or exporter of the merchandise described in
> paragraph (1)(B) is affiliated with the person who uses the merchandise
> described in paragraph (1)(B) to assemble or complete in the foreign country
> the merchandise that is subsequently imported into the United States, and
>
> (C) ….

19 U.S.C.S. § 1677j(b).  The plain language of the statue mandates Commerce to consider - in

this case - whether the manufacturer/exporter of the Chinese plywood input supplier is affiliated

with the person who uses such plywood input in Vietnam to manufacturer plywood.  Dalian

Jianlin [                                                    ], and naturally, Arrow Forest does not use

plywood inputs manufactured by Dalian Jianlin in China in its production of plywood in

Vietnam. As such, Commerce need not consider whether Dalian Jianlin and Arrow Forest are

affiliated in conducting the circumvention analysis.  In the circumstances, the perceived

discrepancy is truly immaterial.

    C.  **_"Incorrect HS Subheading" and "Source Documentation" – Commerce Failed To Issue A Supplemental Questionnaire And Allow Arrow Forest To Correct Its Prior Filing._**

In applying AFA, Commerce faulted Arrow Forest for not listing the correct tariff

schedule subheadings of all veneers it imported from China under Question 1 in the second

supplemental questionnaire.  Final IDM at 83.  Also under this question, Commerce argued that

in the sample entry package Arrow did not provide the Vietnamese Customs Import Declaration

as part of the package.  *Id.*  Specifically, Question 1 of the second supplemental questionnaire

requires that respondents provide a list of all imports from China under tariff subheadings 4408

and 4412, and provide sample entry documentation (*i.e.,* invoice, packing list, bill of lading,

customs declaration).

Arrow explained in its case brief before the agency that Arrow reported the veneer

imports from China based on the U.S. tariff subheading because the questionnaire does not

specify which country's tariff schedule the respondent was required to use to classify its veneer

imported from China.  Commerce in the Final Determination argued that it had clarified that

respondents should use the Vietnamese HTS by placing a letter on the record.  *See* Final IDM at

83.  Commerce's clarification letter was placed on the record 10 days after it issued the second

supplemental questionnaire and 5 days prior to the due date.  *See* 2nd Supp. Qre (June 15, 2021), **PR257**; Dep't Commerce, Memorandum: Clarification of Second Q&V Supplemental Questionnaire Response (June 25, 2021), **PR272**.  However, placing a clarification memo on the record does not relieve Commerce of its obligation to issue deficiency questionnaire.  The Statute is clear that Commerce shall inform respondents of the deficiency and allow for correction, if it determines that the response is deficient.  19 U.S.C. § 1677m(d).

Finally, with respect to the missing customs declaration, Commerce rejected Arrow's attempt to cure the deficiency by filing the customs declaration associated with this entry. *See* Arrow Rejected Post-Prelim. Rebuttal at Exhibit 6, **PR543, CR438**.

For both the tariff subheading HTS reporting and the customs declaration, Commerce requested such information <u>for the first time</u> in the second supplemental questionnaire. Though Arrow Forest's responses missed one document or were not exactly in the form and manner requested by Commerce, Commerce violated the law by not issuing a supplemental questionnaire specifically identifying the deficiences in the 12 months it had leading up to the Preliminary Determination, in which it resorted directly to total AFA.

### 5.  <u>Her Hui Wood (Vietnam) Co.</u>

Her Hui timely responded to all of Commerce's requests for information in these scope and circumvention inquires.  *See* Ltr. from Fox Rothschild LLP on behalf of Her Hui re: Quantity and Value Questionnaire Response (Oct. 1, 2020) ("Her Hui Q&V QR") , **PR99, CR55-56**; Ltr from Fox Rothschild LLP on behalf of Her Hui re: Quantity & Value Supplemental Questionnaire Response (Mar. 23, 2021) ("Her Hui Supp. QR") , **PR211, CR188-189**; Ltr. from

PUBLIC VERSION

Fox Rothschild LLP on behalf of Her Hui re: Q&V Second Supplemental Questionnaire (July 6, 2021) ("Her Hui 2nd Supp QR") , **PR292**.

Commerce's deficiency findings in the Preliminary Determination for Her Hui related to (i) a misunderstanding in reporting wood species; (ii) a misunderstanding regarding meaning of plywood inputs; and (iii) a misunderstanding of the scope of affiliation requested by Commerce. *See* Prelim AFA Mem. at 13.  In the Final Determination, Commerce maintained that Her Hui's failure to report the information mentioned above called into question the credibility of all its submitted information and renders Her Hui's all responses unreliable. *See* Final IDM at 94-95. However, Commerce failed to recognize that each of these deficiency findings were simple misunderstandings that Her Hui could have corrected if provided the opportunity as required under 19 U.S.C. § 1677m(d).   Commerce did not ask specific, additional supplemental questions about these alleged deficiencies.  Instead, the first time Commerce alerted Her Hui of these three deficiencies was in the Preliminary Determination when it was too late for Her Hui to remedy these issues.

Her Hui objected to Commerce's Preliminary Determination in a post-preliminary filing, however Commerce did not allow submissions of new facts to clarify Commerce's misunderstandings.  *See* Dep't Commerce Memorandum re: Rejection of Her Hui's Submission (October 25, 2022) ("Her Hui Rejection Memo"); Ltr from deKieffer & Horgan, re: Her Hui Rebuttal to Preliminary Determination (Sept. 16, 2022) ("Her Hui Rejected Post-Prelim. Rebuttal"), **PR555, CR443**, REJECTED and REFILED with the offending NFI removed on October 31, 2022 in Her Hui Refiled Post-Prelim. Rebuttal, **PR652, CR556**.

### A. *"Wood Species" - Commerce Failed To Consider Her Hui's Explanation Regarding its Reported Wood Species and Its Immateriality.*

In its initial Q&V questionnaire response, Her Hui filled in Attachment II-C requesting information on the wood species Her Hui used to produce plywood.  Attachment II-C provided space for five species (i.e., five rows) per year of the POI, and Her Hui filled in five species for face and back veneers.  Her Hui Q&V QR at Exhibit 1, **PR99, CR55-56**.  In the first supplemental questionnaire, Commerce requested documentation on purchases of core materials and documentation on each respondent's first sale to the United States.  Her Hui Supp. QR at 2, **PR211, CR188-189**.  In responding to this request, Her Hui provided U.S sales documents that contains additional species for back and face veneers that Her Hui had not included in Attachment II-C of its questionnaire response.  Commerce did not notify Her Hui of this discrepancy and allow Her Hui to explain or correct it in a supplemental questionnaire.  Rather, only in the Preliminary Determination did Commerce notify Her Hui of this discrepancy.

Upon being notified of this error in the Preliminary Determination, Her Hui filed comments explaining this and other perceived discrepancies, with supporting documents.  *See* Her Hui Rejected Post-Prelim. Rebuttal at 1-3 & Exhibit 1, **PR555, CR443**.  As explained, Her Hui is a first-time respondent and did not understand that it could insert more rows into Attachment II-C if the wood species of the face and back veneer it purchased were more than five (the number of rows in the Attachment II-C).  In Her Hui's first supplemental questionnaire, it submitted U.S. sales document indicating it sold plywood with [                    ] face/back veneers.  *See* Her Hui 1st Supp. QR at Exhibit 2, **PR211, CR188-189.**  It was also in this response Her Hui re-submitted Attachment II-C (list of wood species) again, and only including the original five species of face/back veneer because that is all that fit in the original chart.  *Id.* at

PUBLIC VERSION

Exhibit 3. As Her Hui explained in the narrative, it revised the chart to delete species under the "core veneer" columns; it previously reported the species for core platforms under both the core platform column and core veneer column, which it believed was not what Commerce intended. *Id.* at 2. Her Hui did not try to withhold any information from Commerce. Commerce has had Her Hui's first supplemental questionnaire response containing both the list of wood species chart and the sales documents with un-listed face/back veneer species since March 23, 2021, which was 16 months prior to the Preliminary Determination ample time to fulfill its statutory obligation to provide Her Hui with an opportunity to cure deficiencies. Her Hui could have corrected this understanding and reporting if provided the opportunity as required under 19 U.S.C. § 1677m(d).

Moreover, this error is of no relevance to the findings of this proceeding. The species of the face/back veneer are not relevant to Commerce's circumvention finding. The use of only Chinese face/back veneer is not one of the five scenarios subject to this circumvention proceeding—in other words, Commerce has already determined that even Chinese origin face/back veneer, if used without Chinese core veneers, does not bring the final product into this circumvention inquiry. The proceeding is focused on Chinese core inputs. As explained by Her Hui in its questionnaire response, Her Hui produces [     ] plywood made from exotic woods. Her Hui Supp. QR at 2. Her Hui does not purchase core veneers, but does purchase core veneer platforms made from tropical woods, [                    ]. *Id.* Her Hui documented purchases of these tropical core platforms from [                    ] in accordance with Commerce's request. *Id.* at Exhibit 1 & 3; *see also* Her Hui Q&V QR at Exhibit 1 (the first Attachment II-C where Her Hui also properly reported these two species). Commerce has not identified any error

60

in its reporting of its core wood materials, and indeed nothing on the record undermines this reporting. There is no basis to apply AFA to all of Her Hui's wood reporting.

**B. _"Sourcing" - Commerce Failed To Consider Her Hui's Explanation Regarding its Imported Wood, its Affiliates' Export to Vietnam, and Their Immaterialities._**

In the second supplemental questionnaire, under Question 1, Commerce requested companies report the HTS and descriptions of imports of products from China. Her Hui 2nd Supp QR at 1, **PR292**. Her Hui responded that it "did not import plywood or plywood inputs from China during the December 2016 – March 2020 period." _Id_. Commerce did not request any clarification from Her Hui and did not notify Her Hui of any discrepancy that Her Hui could explain or correct it in a supplemental questionnaire. Rather, only in the Preliminary Determination did Commerce notify Her Hui "GOV data indicate that Her Hui had [    ] shipments from China under HTS subheading [          ] during the period" and used this as justification for applying AFA to Her Hui. Prelim. AFA Memo at 13.

Upon being notified of this error in the Preliminary Determination, Her Hui filed comments explaining this perceived discrepancy. Her Hui explained that due to miscommunication with its previous legal counsel (who filed the questionnaire responses), Her Hui always understood in its reporting that the meaning of "plywood inputs" was limited to core veneers/veneered panels/veneer core platforms. Indeed, given the five scenarios subject to this circumvention inquiry, only plywood made with Chinese core veneers/veneered panels/veneer core platforms may circumvent the AD/CVD orders. Her Hui attempted further explanation and documentation of these [    ] shipments, but it was rejected as new information. _See_ Her Hui

PUBLIC VERSION

Rejected Post-Prelim. Rebuttal at 3-4 & Exhibit 3 (corrected Attachment III with list of imports from China) & Exhibit 4 (sample entry package), **PR555, CR443**.

Here, Commerce had <u>12 months</u> to notify Her Hui of the discrepancy, and it was obligated to notify Her Hui so Her Hui could have corrected this understanding as required under 19 U.S.C. § 1677m(d).  Notably, the information that Commerce claimed Her Hui failed to provide (i.e., Her Hui's own import information) was requested for the first time in the second supplemental questionnaire, and it was the last questionnaire Commerce issued to Her Hui.  One questionnaire cannot both be the original response where Commerce identified a deficiency and also the supplemental questionnaire issued in compliance with § 1677m(d). *But see* Final IDM at 123-128.

Moreover, this error is of no relevance to the findings of this proceeding.  As explained by Her Hui, it understood this question was only asking whether it imported core veneers/veneered panels/veneer core platforms from China.  What Her Hui imported from China under HTS subheading [              ] was not core veneer, veneered panels, or veneer core platforms.  *See* Prelim. AFA memo at 13.  Instead, product covered by this HTS is [                    ]. Therefore, the products imported if used in the production of plywood exported to the United States would not impact the circumvention analysis.  Commerce has not identified any error in its reporting of its core wood materials, and indeed nothing on the record undermines this reporting.  There is no basis to apply AFA to all of Her Hui's wood reporting.

Further, Commerce also faulted Her Hui for not providing an answer that is responsive to the Question 3 of the second supplemental questionnaire as relating to Her Hui's affiliates' export from China to Vietnam.  Final IDM at 95; Prelim. AFA Memo at 13-14.  As Her Hui

explained in comments filed after the Preliminary Determination, given the question was asking about affiliates exporting from China to Vietnam, Her Hui misunderstood that the question applies to all affiliates regardless of where the affiliated company is located.  Nonetheless, it was clear from Her Hui's answer to the question that it misunderstood this question only related to Chinese affiliates.  Yet, Commerce did not request clarification or ask Her Hui to correct this discrepancy in accordance with 19 U.S.C. § 1677m(d).

Nonetheless, when Her Hui was first notified of Commerce's perception that Her Hui did not fully respond to the questionnaire in the Final Determination, Her Hui filed an explanation. Commerce rejected some of the explanation, but it was still able to explain that it had [



]. The only Chinese sourced inputs from Her Hui's affiliates were face veneer imports that [

].  Therefore, the products imported by these affiliates do not impact the circumvention analysis.  This information was not intentionally withheld and does not impact Commerce's determination.  Further, as shown in the GOV Import Data, [

]. Had Commerce issued one supplemental questionnaire in compliance with § 1677m(d) notifying Her Hui either one of these two alleged discrepancies in Her Hui second supplemental questionnaire response, Her Hui would have remedied the deficiencies by providing information sufficient for both questions (i.e., Question 1 & 3).

**6.  Long Luu Plywood Production Co., Ltd.**

Long Luu timely responded to all of Commerce's requests for information in these scope and circumvention inquires.  *See* Ltr. from Fox Rothschild LLP on behalf of Long Luu re: Quantity and Value Questionnaire Response (September 30, 2020) ("Long Luu Q&V QR"), **PR84, CR31-32**; Ltr from Fox Rothschild LLP on behalf of Long Luu re: Quantity & Value Supplemental Questionnaire Response (Mar. 22, 2021) ("Long Luu Supp. QR"), **PR209, CR186**; Ltr. from Fox Rothschild LLP on behalf of Long Luu re: Q&V Second Supplemental Questionnaire (July 12, 2021) ("Long Luu 2nd Supp QR"), **PR342, CR352-354**.  In the Preliminary Determination and the Final Determination, Commerce applied AFA to Long Luu based on the following so-called discrepancies: (1) a correction regarding purchases from resellers; (2) a misunderstanding regarding the scope of the wood species reporting; and (3) a misunderstanding of the entry documentation requested by Commerce.

Each of these deficiency findings were simple misunderstandings that Long Luu could have corrected if provided the opportunity as required under 19 U.S.C. § 1677m(d).  Instead, Commerce did not ask specific, additional supplemental questions about these alleged deficiencies before preliminarily applying total AFA to Long Luu. After the Preliminary Determination, Luu objected to Commerce's preliminary determination in a post-preliminary filing, however Commerce did not allow submissions of new facts to clarify Commerce's misunderstandings.  *See* Dep't Commerce Memorandum re: Rejection of Long Luu's Submission (October 25, 2022) ("Long LUU Rejection Memo"); Ltr. from deKieffer & Horgan, re: Long

LUU Rebuttal to Preliminary Determination (Sept. 16, 2022)("Long LUU Rejected Post-Prelim.

Rebuttal") **PR557, CR445**, REJECTED and REFILED with the offending NFI removed on

October 31, 2022, **PR654, CR558**.

 

    A.  **_"Sourcing" - Long Luu's Correction of its Reporting of Reseller Purchases Is Not a Basis to Apply AFA._**

     In its initial Q&V questionnaire response, Long Luu reported that it does not source

inputs from resellers in Vietnam.  Long Luu Q&V QR at 3, **PR84, CR31-32**.  In the second

supplemental questionnaire, Commerce requested that Long Luu provide a complete list of all

Vietnamese suppliers and a description of the products purchased from these suppliers.  Long

Luu complied with this request. Long Luu 2nd Supp QR at Exhibit 3, **PR342, CR352-354**.

Among the Vietnamese suppliers, Long Luu reported [     ] Vietnamese suppliers that supplied

Long Luu with [                                    ].  Commerce did not notify Long Luu this

discrepancy until the Preliminary Determination.

     Upon being notified of this issue only in the Preliminary Determination, Long Luu filed

comments explaining this and other perceived discrepancies.  As explained, Long Luu is a first-

time respondent and had very limited time to respond to the initial Q&V response and limited

understanding of the meaning of the various questions and terminology.  Long Luu understood

that the focus of this circumvention inquiry was on Chinese core veneers, multi-ply core panels,

and core platforms.  Accordingly, at the time that Long Luu prepared the initial Q&V

questionnaire, Long Luu focused on its suppliers of core inputs and was not yet aware that its

Vietnamese face veneer suppliers were resellers.  However, in responding to the second Q&V

questionnaire, after careful confirmation from all of its suppliers of all wood inputs, Long Luu

confirmed from those two unaffiliated Vietnamese suppliers that sold Long Luu a *small amount* of face veneer that the resellers did import from China.

Long Luu did not intentionally withhold information from Commerce, and Commerce should allow companies to correct previous statements in supplemental questionnaire responses when made aware of discrepancies—particularly for minor discrepancies such as regarding a small amount of face veneers which are not even relevant to the circumvention inquiry per Commerce's clarifications. After all, there is no standard of perfection, rather the statute requires companies to cooperate to the best of their ability, which includes making corrections.

Further, this error is of no relevance to the findings of this proceeding. The fact that Long Luu used some Chinese face/back veneers from resellers is not relevant to Commerce's circumvention finding because Long Luu used no Chinese core inputs. The use of only Chinese face/back veneer is not one of the five scenarios subject to this circumvention proceeding—in other words, Commerce has already determined that Chinese origin or Chinese species face/back veneer alone can be used on plywood from Vietnam without being found to circumvent. The proceeding is focused on Chinese core inputs, Commerce has not identified any error in Long Luu's reporting of its core wood materials, and indeed nothing on the record undermines Long Luu's overall reporting.

In the Final Determination, Commerce claimed that Long Luu's response to the second supplemental questionnaire does not qualify as a correction unless Long Luu identified the previously submitted errors with an explanation as to how it occurred. Final IDM at 99 & 77. However, to apply AFA, Commerce must first identify a "gap" on the record, i.e., necessary information that was missing from the record. *See* 19 U.S.C. § 1677e(a); *Nippon Steel Corp. v.*

*United States*, 337 F.3d 1363, 1381 (Fed. Cir. 2003).  Here, the relevant information Commerce

sought is whether Long Luu's purchased Chinese plywood input through local suppliers.  *See*

Long Luu 2nd Supp. QR at 1-2 (Question 2).  Long Luu confirmed with its suppliers and reported

the accurate and correct information.  There is no missing information here.  Even if Commerce

insists on treating Long Luu's second supplemental questionnaire response as a discrepancy

instead of a correction, Commerce's AFA application is contrary to law because as discussed

above, Commerce failed to issue a supplemental questionnaire that inform Long Luu of the

deficiency perceived and allow Long Luu to correct or explain its prior submissions, as required

under 19 U.S.C. § 1677m(d).

> ### B.  *"Wood Species and Source Documentation" - Long Luu Properly Reported the Wood Species It Used to Produce Plywood, and Commerce Erred in Not Issuing A Supplemental Questionnaire Regarding The Sample Sales Package.*

In its initial Q&V questionnaire response, Long Luu filled in Attachment II-C requesting

information on the wood species Long Luu used to produce plywood in the POI.  Long Luu

reported various species but did not report [          ].  Long Luu Q&V QR at 3.  In the second

supplemental questionnaire, Commerce requested companies report the HTS and descriptions of

respondents' own imports of wood products from China.  Commerce also requested sample

documentation of the first entry of each HTS subheading it imported. Long Luu complied with

this request to the best of its ability, and reported [                    ] that it purchased from

China and provided the documentation.  Long Luu 2nd Supp QR at Exhibit 1.  Commerce did not

notify Long Luu of any perceived discrepancy in this reporting in order to allow Long Luu to

explain or correct it in a supplemental questionnaire.  Rather, only in the Preliminary

Determination did Commerce notify Long Luu of this alleged discrepancy with its later reporting

of [      ] veneer and questioned Long Luu's reporting that the [      ] veneer was used as a

face veneer rather than core veneer.  Prelim.  AFA Memo at 18.  In the Final Determination

Commerce stated that Long Luu "does not contest" the alleged discrepancies on wood species

reporting and that certain purchase documentation was not provided.  Final IDM at 100.  To be

clear, Long Luu contested Commerce's finding that there were discrepancies in Long Luu's

reported wood species.  *See* Long Luu Company-specific Case Brief at 6-7, **PR756, CR595**.

　　　　Upon being notified of this issue only in the Preliminary Determination, Long Luu filed

comments explaining this and other perceived discrepancies.  Commerce rejected the comment

for certain new information pertinent to this perceived discrepancy, but Long Luu was still able

to provide some explanation in its refiled comment.  As explained, due to miscommunication,

Long Luu wrongly understood that it should report its imports until the end of 2020, rather than

only through March 2020.  The [      ] veneer Long Luu reported was purchased <u>after</u> the POI.

*See* Long Luu 2ⁿᵈ Supp. QR Rsp. at Exhibit 2, **PR342, CR352-354**.   Exhibit 2 contains the "first

entry" of Long Luu's direct import from China; the invoice was issued in [

　　　　　　　　　　].  *Id.*  Indeed, Long Luu <u>did not</u> purchase any [      ]

veneer during the POI, and therefore, Long Luu did not fail to report any species used to produce

plywood in the initial Q&V.  This is further corroborated by the GOV showing that [

　　　　　　　　].  *See* GOV Import Data, **PR351, PR353, CR362,**

**CR364-365**.

　　　　With respect Commerce's claim that Long Luu failed to provide a certain supplier's

purchase documents (i.e., between Long Luu's local Vietnamese supplier and the upstream

Chinese supplier of veneer), Long Luu does not dispute that.  *See* Final IDM at 100; Prelim AFA

PUBLIC VERSION

Memo at 18; Long Luu 2nd Supp. QR at Exhibit 5.  However, Commerce did not notify Long

Luu of this error and did not provide Long Luu with the opportunity to correct it in a

supplemental questionnaire pursuant to 19 U.S.C. § 1677m(d).  Rather, only in the Preliminary

Determination did Commerce notify Long Luu of this error and listed it as a reason Commerce

was applying AFA to Long Luu.  AFA Memo at 18.

Upon being notified of this issue only in the Preliminary Determination, Long Luu filed

comments explaining that due to miscommunication with previous legal counsel, Long Luu was

not aware that the entry documentation, including customs declaration form, of the Vietnamese

supplier was requested by Commerce in this questionnaire.  Long Luu did not purposefully

withhold any information from Commerce.  Indeed, Long Luu attempted to provide this

additional documentation when first notified of the deficiency in the Preliminary Determination,

but Commerce rejected this correction as new information.

Accordingly, Commerce's preliminary determination to apply AFA to Long Luu is

inconsistent with its statutory obligation to offer Long Luu an opportunity to remedy deficiencies

or provide clarification.  *See* 19 U.S.C. § 1677m(d).

### C.  *"Type of Veneers"*

In the Final Determination, Commerce stated that Long Luu argued in its brief that

Commerce improperly determined that it mischaracterized its imported core veneers as face and

back veneers.  Final IDM at 100.  Commerce is wrong.  In the Preliminary Determination,

Commerce identified Long Luu's [                              ] as a discrepancy, but

those poplar veneers relate to Long Luu's **Post**-POI import of [        ] veneers as discussed

above. *See* Long Luu 2nd Supp. QR at Exhibits 1 & 2.  As that import should not have been

reported in the first place, Long Luu stated that "Commerce's query about the nature of the

veneer is not relevant. Long Luu did not fail to report any species or core veneer purchases,

therefore Commerce has no basis to apply AFA."  Long Luu Company-Specific Case Brief at 7,

**PR756, CR595**.  It appears that Commerce confused Long Luu's case brief with another

respondent's case brief.  Nonetheless, as Long Luu did not fail to report any species or core

veneer purchase documents in te POI, Commerce's AFA determination with respect to Long

Luu is contrary to law and unsupported by substantial evidence.


   7.  **TEKCOM Corporation**

        TEKCOM timely responded to all of Commerce's requests for information in these scope

and circumvention inquires.  *See* Ltr. from deKieffer & Horgan on behalf of TEKCOM re:

Quantity and Value Questionnaire Response (Oct. 1, 2020) ("TEKCOM Q&V QR"), **PR117,**

**CR121-125**; Ltr from deKieffer & Horgan on behalf of TEKCOM re: Quantity & Value

Supplemental Questionnaire Response (Mar. 25, 2021) ("TEKCOM Supp. QR"), **PR230,**

**CR213-214**; Ltr. from deKieffer & Horgan on behalf of TEKCOM re: Q&V Second

Supplemental Questionnaire (July 9, 2021) ("TEKCOM 2nd Supp. QR"), **PR326, CR326-327**.

        In applying AFA, Commerce found that (1) TEKCOM failed to report certain entries in

the GOV Import Data, (2) TEKCOM failed to accurately disclose all imports of core veneers

from China, and (3) TEKCOM reported incorrect wood species in the initial Q&V response.  *See*

Prelim. AFA Memo at 21-22; Final IDM at 101-102.  All three issues identified by Commerce

could have been easily explained in a supplemental questionnaire.  Instead, Commerce acted

contrary to its obligation under § 1677m(d) and did not inform TEKCOM of these deficiencies until the Preliminary Determination, when it was too late for TEKCOM to submit additional information.

TEKCOM objected to Commerce's preliminary determination in a post-preliminary filing, however Commerce did not allow submissions of new facts to clarify Commerce's misunderstandings. *See* Ltr from deKieffer & Horgan, re: TEKCOM Rebuttal to Preliminary Determination (Oct. 13, 2022) ("TEKCOM Rejected Post-Prelim. Rebuttal"), **PR608, CR453**, REJECTED and REFILED with the offending NFI removed on December 5, 2022 in TEKCOM Refiled Post-Prelim. Rebuttal, **PR670, CR562**.

### A.  *"Sourcing" - Commerce Erred in Attributing Certain Vietnamese Entries to TEKCOM.*

In the Preliminary Determination, Commerce found that "GOV data indicate that TEKCOM had [                                    ]", but "TEKCOM neither reported the supplier of these entries as a supplier of Chinese plywood or plywood inputs, nor did it provide the requested purchase and entry documentation for imports under this subheading." *See* Prelim. AFA Memo at 22.  Commerce erred in attributing these entries to TEKCOM.

As argued in TEKCOM's case brief, the entity TEKCOM with a business number of [            ] is the respondent in the circumvention inquiry. In the GOV Import data, [

                                        ]. *See* GOV Import Data, **PR351, PR353, CR362, CR364-365**. Meanwhile, [

]. *Id.*

As TEKCOM reported in its initial Q&V response, T E K C O M Corporation (hereinafter, "TEK

HCM") with the business number [                ] was the predecessor company of TEKCOM.

*See* TEKCOM Q&V QR at 2-3 & Exhibits 1-2, **PR117, CR121-125**.  TEK HCM "ceased all

operations since the start of TEKCOM Corporation", i.e., by [                ]. *Id.*  Therefore,

Commerce was made aware that TEKCOM had a predecessor company that existed in the first

few months of the POI since the time it received TEKCOM's initial Q&V response.

Eight months later, Commerce issued the second supplemental questionnaire to

"TEKCOM Corporation", not TEK HCM (or "T E K C O M Corporation").  *See* Dep't

Commerce, 2ⁿᵈ Supp. Q&V Questionnaire (June 15, 2021), **PR257**.  In this supplemental

questionnaire, Commerce asked TEKCOM to provide an exhaustive list of all tariff schedule

subheadings of products "your company" imported from China under HTS subheadings 4408

and 4412, identify the suppliers, and provide sample entry documentation.  *See id.* at Attachment

II, Question 1.  Therefore, Commerce only requested TEKCOM to report for its own imports

from China under 4408 and 4412.  Commerce cannot apply facts available, much less *adverse*

facts available, over information that was never requested.

In its Final Determination, Commerce claimed it was TEKCOM's argument was

disingenuous because TEKCOM had volunteered TEK HCM's company information in the

initial Q&V Response.  *See* Final IDM at 101.  Commerce's assumption is incorrect.  In the

initial Q&V response, TEKCOM volunteered additional information regarding its predecessor

company so that Commerce can be informed of it.  TEKCOM specifically informed Commerce

PUBLIC VERSION

that TEK HCM had ceased all operation since the start of 2017, and that TEKCOM has already started the process of deregistering TEK HCM. *See* TEKCOM Q&V QR at 2-3. After TEKCOM filed its initial Q&V response with Commerce and fully informed Commerce of the circumstance, it is up to Commerce to specifically request a defunct company's information if it wishes to receive it.

Moreover, it is clear from the GOV Import Data that the [                    ] were imported by a company with [                    ] that of TEKCOM. At a minimum, this warrants Commerce identifying the perceived discrepancy and issuing a supplemental questionnaire, as required under 19 U.S.C. § 1677m(d) and the case law. Commerce's decision to treat those two imports as TEKCOM's without asking any question is unreasonable and contrary to law. Commerce had ample opportunity to issue a supplemental questionnaire to request clarification in the twelve (12) months leading up to the Preliminary Determination but did not do so. After the Preliminary Determination, TEKCOM submitted comments with additional factual information clarifies the perceived discrepancy and in order to facilitate Commerce's compliance with 19 U.S.C. § 1677m(d). Commerce rejected the portions of TEKCOM's filing that contains such new factual information, further exacerbating the violation of the statutory obligation.

**B. _"Type of Veneers" - Commerce Erred in Finding that TEKCOM's Imported Poplar Face Veneers Were Not Used As Face Veneers._**

TEKCOM reported importing a small amount of face and back veneers from China, including certain poplar veneers. In the Preliminary Determination, Commerce relied on the ITC Report and made a broad generalization totally out of context of TEKCOM's practice and

disputed *for the first time* that the poplar veneers *could not have* been used as the face or back veneers due to the species and the thickness of the veneers.  *See* Prelim. AFA Memo at 22.  In particular, Commerce claimed that TEKCOM's imported poplar veneers of [                                    ] were significantly thicker than the other species of face veneers that TEKCOM imported, and according to the ITC Report, "almost all Chinese plywood face veneers are thinner than 0.4mm" and "poplar is one of the most common species used in core veneers by Chinese plywood producers." *Id.*  Moreover, Commerce argues that the ITC Report is supported by Chengen's bill of materials from the first annual review of the China Order. *Id.*  Commerce's finding is unsupported by record evidence and pure speculation.

In TEKCOM's initial Q&V questionnaire response, it reported that it sold plywood with poplar face and back veneers.  *See* TEKCOM Initial Q&V QR at Exhibit 5, **PR117, CR121-125**. In the second supplemental questionnaire, Commerce included a chart in Attachment III and requested TEKCOM fill out the chart, which contains the columns: "subheading," "Tariff Schedule Description," "Actual Description," and "Supplier."  *See* TEKCOM 2nd Supp. QR at 1-2 & Exhibit SQ2-1, **PR326, CR326-327**.  Question 1(c) clarifies that by "actual description", TEKCOM is to "identif[y] the type of wood and product (e.g., birch face/back plywood with poplar core, poplar core veneers, etc.)."  *Id.* at 1.  In its response, TEKCOM clarified that the [



].  *Id.* at 1-2.  Nonetheless, TEKCOM confirmed that the [

], because TEKCOM only uses full-size veneers as face or back.  *Id.* at 2.

PUBLIC VERSION

It is common knowledge in the industry and Commerce has been in many plywood plants since 2013 and knows this to be a fact for plywood production in Asia: core veneers are pieced together from smaller pieces to form completed core platform veneers whereas face and back veneers are full size for the finished plywood because they comprise the surfaces visible to the customer. Those surface veneer cannot have glue, staple, tape, and other marks which would be permissible and common for the interior veneers. Commerce witnessed these facts at each and every plant visited with undersigned counsel in their recent trip to Vietnam.

More importantly, Commerce in the Final Determination does not address TEKCOM's argument that it cannot be penalized for failing to provide supporting documents that were not requested. In the second supplemental questionnaire, Commerce _only_ required respondents to report the actual description of the veneers imported, which is precisely what TEKCOM did. *Id.* at Exhibit SQ2-1 (identifying the poplar face and back veneers as "poplar face/back veneer sheets"). As such, Commerce's claim that TEKCOM failed to provide documentation to support its face/back veneer description is unfounded. TEKCOM possess documentation (such as bill of material) that can support the face/back veneer designation. Commerce _never_ asked for such supporting documents before applying total AFA in the Preliminary Determination.

TEKCOM submitted additional documents after the Preliminary Detearmination, but Commerce rejected it for containing new factual information. Commerce's decision to penalize TEKCOM over documentation that it did not request and at the same time reject TEKCOM's post-preliminary factual information that addresses the issue that the company was made aware of for the first time in the Preliminary Determination is extremely unreasonable and unfair.

Further Commerce's reliance on the ITC Report in finding thicker poplar veneers cannot be used as face/back veneers is misplaced. *See* Final IDM at 79-80. Table IV-7 of the ITC Final shows that U.S. importer reporting approximately 50% of hardwood plywood from non-subject countries (thus including Vietnam) contains face veneers equal or thicker than 0.4mm, with 37% to 39.9% of plywood having face veneers equal or thicker than 0.6mm. *See* ITC Final, Table IV-7. TEKCOM's [      ] thick face veneer is <u>not</u> abnormal. In fact, this is much thinner than what Commerce claimed to be the normal thickness of core veneers, i.e., "the vast majority of {Chengen's} core veneers were between [                    ]." *See* Prelim AFA Memo at 22.

Moreover, while the ITC Report states that fast-growing species such as poplar are a popular choice of veneer cores of Chinese hardwood plywood, it did not speak to popular species of core veneers used in hardwood plywood from non-subject countries. It is also unreasonable for Commerce to use a general preference of using poplar veneers for plywood core in China to find such wood veneer species can <u>never</u> be used for face veneers of plywood produced in all countries. Notably, Commerce has [

                                                    ]. *See* Ltr. from deKieffer & Horgan on behalf of Golden Bridge, Quantity & Value Supplemental Questionnaire Response at Exhibit SQ-1 (Mar. 8, 2021), **PR186, CR164**. The ITC reports necessarily deal in generalities whereas Commerce has an obligation to investigate respondents specifically for their own data, which it failed to do here.

### C. *"Species" - Commerce Failed to Issue A Supplemental Questionnaire on TEKCOM's Reported Species.*

PUBLIC VERSION

Commerce points to the discrepancy of imported veneer species between the initial Q&V response and the 2nd Supplemental Q&V response, where TEKCOM reviewed its records more thoroughly with the time provided and added two more face/back veneers to its list of veneers. *See* Prelim. AFA Memo at 22; Final IDM at 102. In the initial Q&V response, TEKCOM did not identify two types of cedar veneers. *Id.* In the second supplemental questionnaire response, TEKCOM identified and reported the two types of cedar species in its list of imported face veneers under HTS 4408 and submitted the requested purchasing documents. *Id.* Commerce has unreasonably leapt to a conclusion that TEKCOM's responses were not reliable overall when in reality TEKCOM acted to the best of its ability by correcting and improving the reliability of its filing in its later responses with documentary support.

In the Final Determination, Commerce claimed that TEKCOM's response to the second supplemental questionnaire does not qualify as a correction unless it identified the previously submitted errors with an explanation as to how it occurred. Final IDM at 99 & 77. However, to apply AFA, Commerce must first identify a "gap" on the record, i.e., necessary information that was missing from the record. *See* 19 U.S.C. § 1677e(a). Here, TEKCOM reported the species it imported as requested and therefore the record does not contain a "gap." Even if Commerce were to treat TEKCOM's second supplemental questionnaire response as a discrepancy instead of a correction, Commerce's AFA application is contrary to law because as discussed above, Commerce failed to issue a supplemental questionnaire that inform TEKCOM of the deficiency perceived and allow it to correct or explain, as required under 19 U.S.C. § 1677m(d).

8.  **Vietnam Zhongjia Wood Company Limited**

With respect to Zhongjia, Commerce found no discrepancies based on the several questionnaire responses Zhongjia provided, and thus proceeded to verification.  In the Final Determination, Commerce assigned total AFA and precluded Zhongjia from participating in the certification process based on certain unreported veneer suppliers and three months of material input records not available on site.  However, "{t}o apply AFA, Commerce must first identify a gap in the record." *Mosaic Co. v. United States*, 589 F. Supp. 3d 1298, 1305 (Ct. Int'l Trade 2022).  "The use of facts otherwise available . . . is only appropriate to fill gaps when Commerce must rely on other sources of information to complete the factual record." *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1346 (Fed. Cir. 2011).  In this instance, there is no gap in the record for Commerce to apply FA, much less AFA, from the verification.

At the heart of the investigation is what core veneers Zhongjia (or any other Viet plywood producer) used to produce the hardwood plywood exported to the United States.  Zhongjia reported its core veneer suppliers from which Zhongjia purchased core veneers and actually consumed those veneers in production of hardwood plywood that Zhongjia sold to the United States.  Commerce verified and found no discrepancies.  Further, Zhongjia's outside accountant that normally works in their office in the City of Hanoi did not bring spiral-bound books of material input purchase records for the first quarter ("Q1") of 2020 to the factory on the day of verification.  This could have been easily remedied if Commerce had requested that the documents be brought over on that day or in the following week while the verifiers were still in Hanoi.  Commerce abused its discretion in not doing so but instead resorting to AFA.

PUBLIC VERSION

### A. Zhongjia's Alleged Unreported Core Veneer Supplier

Commerce faulted Zhongjia for not reporting a complete list of core veneer suppliers in the Company's second supplemental Q&V questionnaire response.  Final IDM at 158-159 (citing Dep't Commerce, memorandum: Verification of Vietnam Zhongjia Wood Company Limited at 6 (Dec. 21, 2022) ("Zhongjia Ver. Report") at 6), **PR679; CR566**.  In particular, during verification, Commerce reviewed core veneer sales documents issued to Zhongjia from a local company, [                                                    ].  *Id.*

However, in the second supplemental questionnaire, Commerce requested Zhongjia to report "all your Vietnamese suppliers of <u>plywood or plywood inputs</u>."  *See* Dep't Commerce, Quantity & Value Second Supplemental Questionnaire for Vietnamese Producers and Exporters of Certain Hardwood Plywood Products at Attachment II – Question 2 (June 15, 2021) (emphasis supplied).  At the time of responding to the questionnaire response, Zhongjia interpreted the question to mean that it needs to report suppliers whose veneers were used to produce hardwood plywood.   Zhongjia did not consider [                    ] a "supplier" because "[                    ] used to be a manufacturer at the same site where Zhongjia is currently located," and when [                    ] went bankrupt and sold its facilities, it forced Zhongjia to purchase various items (i.e., "machinery, tools, and veneers") along with the factory space.  Ver. Report at 6.  Critically, Zhongjia only used the core veneers from [

                                                            ]."  *Id.*  Commerce also noted that Zhongjia's purchases from [                    ] consist of kapok wood veneers.  *Id.*  Not

only is kapok a locally grown species, but after the verifiers walked through Zhongjia's factory and examined Zhongjia's records, they "did not identify any kapok wood used to produce plywood." *Id.*

In the Final Determination, Commerce avers that the verifier's statement it did not identify any kapok wood used to produce plywood does not establish that no such wood, or other core veneer species from [                    ] was used to produce plywood during the inquiry period. *See* Final IDM at 159.  This argument is unpersuasive because the verification report makes clear that the verifiers identified [                    ] <u>after</u> it reviewed "purchase invoices of core veneers from [                                        ]" in Zhongjia's books, and "the invoices from [                    ] showed purchases of kapok wood core veneer [.]".  Ver. Report at 6.

In the Final Determination, with no citation to any evidence and completely contrary to the verification report recounting conversations that took place at verification, Commerce stated "Zhongjia *did* use some of its unreported hardwood plywood veneer purchases to produce hardwood plywood."  Final IDM at 159 (citing to Zhongjia's Rebuttal Case Brief which states the exact opposite) {emphasis in original}.  As recounted in the report, when the verifiers asked if Zhongjia purchased any veneers from other companies that it did not report "whether or not the veneers were used to produce plywood."  Ver. Report at 6.  Zhongjia truthfully reported that it did – meaning that it did purchase some veneers from other companies that it did not report as a veneer supplier - but "[

                    ]." *Id.*

PUBLIC VERSION

In setting up the factory with new and existing machines in 2019, Zhongjia purchased an insignificant amount of veneers for internal consumption, i.e., to [

].  It did not keep any production records for such internal consumption, nor was it expected to, much less required by any law or regulation.  Commerce's reliance on *Nippon Steel* for the proposition that Zhongjia should have maintained its records and be familiar with all of the records it does maintain is misplaced.  *See* Final IDM at 160 (citing *Nippon Steel*).  In *Nippon Steel*, the respondent NSC, despite multiple requests by Commerce, failed to submit a conversion factor that would allow Commerce to convert sales made at actual and theoretical weights to a common basis, and no party disputed that this is a piece of information that a company is normally expected to maintain when it is making sales based on two different weighing methods, and that NSC in fact had the information available.  *Nippon Steel Corp. v. United States*, 337 F. 3d 1373, 1377 & 1383 (Fed. Cir. 2003).  Here, Zhongjia was not expected to maintain some kind of *internal consumption* records for small amounts of veneer used in the its startup phrase, particularly in 2019, a year before Petitioner filed the Scope and Circumvention Inquiry Petition.  The *Nippon Steel* court found that the first prerequisite for Commerce to apply AFA is that "it must make an objective showing that a reasonable and responsible {respondent} would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations."  *Id.* at 1382.  Commerce has failed to do that here.  The materials were overhead and scrap; not consumed in the production records that Zhongjia in fact did keep and review with Commerce.

PUBLIC VERSION

In any event, Zhongjia informed Commerce that the reason that it did not report veneer suppliers such as [                    ] in prior questionnaire responses was because it did not consume those veneers in production of hardwood plywood it sold, and thus did not consider such company as a "plywood inputs supplier." *See* Ver. Report at 6. Commerce did not indicate to Zhongjia until the Final Determination that it believed Zhongjia should have reported such companies. At verification Zhongjia understood that Commerce found the explanation reasonable because if Commerce found Zhongjia's interpretation of the phrase incorrect, which did not become apparent until Commerce applied total AFA in the Final Determination, Commerce should have issued Zhongjia a supplemental questionnaire under 19 U.S.C. § 1677m(d) for Zhongjia to correct prior reporting by supplementing those companies' information.

Even if Zhongjia was somehow made aware that Commerce found the explanation unsatisfactory and that it should have reported such companies as "plywood inputs suppliers" at any time between the verification and the Final Determination, Zhongjia did not have the opportunity to provide clarification or corrective information, unless solicited by Commerce, as it was already passed the new factual information deadline. In *SKF USA*, a case presenting highly similar facts, Commerce applied AFA to SKF, claiming that SKF did not provide certain requested information at verification and thus failed to act to the best of its ability. *SKF USA Inc v. United States*, 29 C.I.T. 969, 979-80 (2005). The Court held that Commerce's notification provided to SKF, which was in the final decision memorandum where it applied partial AFA for the first time in the course of the proceeding, did not allow SKF a reasonable opportunity to respond, correct, or clarify the exact information and documents that Commerce sought during

82

verification as required under 1677m(d). *Id.* Commerce likewise acted contrary to law and failed to provide Zhongjia such opportunity in the instant case.

### B. Zhongjia's Spiral-Bound Q1 2020 Purchase Records

Zhongjia has administrative staff necessary for the conduct of its business but does not have a dedicated accounting department, and instead uses an outside accounting firm for that purpose as many small companies do. On the day of the verification, the outside accountant misunderstood the verification agenda, and therefore did not bring Zhongjia's 2020 Q1 purchase invoices with her to the factory. *See* Dep't Commerce, Verification of Questionnaire Responses at 9-10 (Oct. 7, 2022), **PR606**. This oversight was due to the fact that all subsections under **VII. Material Inputs** in the verification agenda that specifically requested material purchase invoices only did so in relation to selected month(s) in 2019. *Id.* As such, the accountant brought complete material input records for 2019 organized by quarters and spiral-bounded, and for 2020 some accounting records but not all of the source documents.

Commerce's verification procedures are reviewed under the abuse of discretion standard. *Micron Tech. v. United States*, 117 F. 3d 1386, 1396 (Fed. Cir. 1997). "An abuse of discretion occurs where the decision … represents an unreasonable judgment in weighing relevant factors." *Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005) (citing *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005)).

In *SKF USA*, discussed above, verification took place at SKF's headquarters in Paris. *SKF USA*, 29 C.I.T. at 970. On the day of the verification Commerce requested supporting documents to SKF's U.S. market and home market sales breakout, which SKF did not "arrange

PUBLIC VERSION

for the documentation to be transported from Sarma facilities in St. Vallier {to the verification site}." *Id.* at 973. Although there was genuine dispute as to what transpired at verification, (i.e., Commerce officials recollected that company staff said there was no one at the Sarma facilities available to locate and transmit the documents, whereas company official recalled that it offered to fax the documents over within a short period of time but Commerce rejected the offer, *see id.*), the underlying facts are highly similar to that of Zhongjia, where the outside accountant did not bring over the Q1 2020 material inputs records to Zhongjia's factory. In *SKF USA*, the Court found Commerce's decision to not wait for the documents during verification and instead ended it one day early unreasonable, and Commerce's subsequent partial AFA application in the final decision memo was contrary to law. Likewise, Commerce's treatment of Zhongjia was unreasonable on the specific facts of its verification procedures.

        In the Final Determination, Commerce claimed that Zhongjia's offer to retrieve the documents in the late afternoon of the only day of verification was not practicable. *See* Final IDM at 164. Yet this truncated one-day verification was of Commerce's own planning. Notwithstanding the more or less unprecedented short scheduled duration of these verifications, the verifiers did not request to view the documents at issue until late afternoon; and the verification ended a few hours later. Commerce could have had Zhongjia's staff bring the documents over from its accountant's office on that day if the verifiers had made clear their need for such documents early in the day. This is not a criticism of the verifiers, but rather Zhongjia objects to the reasonableness of Commerce's conclusions in light of the specific circumstances.

PUBLIC VERSION

Second, Commerce verified Zhongjia on Friday, October 21, 2022.  On Monday and Tuesday of the following week, two companies - TL Trung Viet Co. Ltd. and VVAT Company Limited - which Commerce had planned to verify both dropped out for different reasons.  *See* Dep't Commerce, Memorandum: Revised Verification Schedule (Oct. 18, 2022), **PR611**. There were at least two full business days where Commerce could have gone back to Zhongjia to review the Q1 2020 (last quarter of the POI) purchase documents while the verifiers were still in Hanoi, Vietnam.

Moreover, the 2020 purchase invoices were the only set of records that Zhongjia missed in preparing the documents requested in the verification agenda.  This oversight cannot outweigh the fact that Zhongjia fully cooperated in the investigation including the verification - right through to the last minute when Commerce left.  Afterall, the temporarily unavailable documents were for only one quarter out of the entire inquiry period.  And Zhongjia could have easily remedied the issue if Commerce acted reasonably to review the documents on that day or in the following week or in a post-verification supplemental questionnaire.

Zhongjia further objects to Commerce's statement that it "was unable to review official records from 2019 {.}"  Final IDM at 163.  In fact, Commerce verified Zhongjia's official records from 2019 and found no discrepancies.  Ver. Report at 3 ("We reviewed the [

] that Zhongjia used as accounting records prior to 2020. We examined the balance sheet of accounts it provided and discussed how these reports were generated from its records. … We viewed the Vietnamese tax authority's website {for the financial records Zhongjia filed with the Vietnamese tax authority} and noted no discrepancies with the material Zhongjia

85

PUBLIC VERSION

provided. …") (citing to Exhibit VE-3 in Ltr. from deKieffer & Horgan on behalf of Zhongjia,

Re: Verification Exhibits (Oct. 28, 2022) ("Zhongjia Ver. Exhibits"), **PR646, CR531, 534-535** ).

Exhibit VE-3 contains Zhongjia's 2019 financial documents maintained at its offices and

screenshots of those documents pulled from the Vietnamese tax authority's website.  *See*

Zhongjia Ver. Exhibits at Exhibit VE-3, pp. 5-21**.**

     Significantly, for 2020 Q1, Commerce reviewed the financial statements that the outside

accountant brought with her.  *See id.* at Exhibit VE-3, pp. 22-34.  Commerce verified the

accounting software that Zhongjia started using on January 1, 2020 that "tracks <u>raw material</u>

<u>purchases</u>, production, sales revenue, and finished goods." *See* Ver. Report at 3 & Exhibit VE-3

at pp. 1-3.  Further, under the Quantity & Value Reconciliation Section of the verification

agenda, since Zhongjia did not make sales in the months in 2019 that the Department selected,

Commerce examined Zhongjia's 2020 "sales report and detailed sales ledgers" and "commercial

invoices and packing lists for March 2020 and reconciled these sales to its financial statements."

Ver. Report at 4 (citing Exhibit VE-5).  In sum, Commerce indeed reviewed a tremendous

amount of information for Q1 2020 in the course of its highly truncated one-day verification and

found no discrepancies.  Substantial evidence on the record only supports a determination that

Zhongjia cooperated fully and Commerce should have allowed Zhongjia to participate in the

certification process.

**IV.  Commerce Abused All Statutory Review Deadlines for the Circumvention Inquiry
    and Subsequent Annual Review of Same.**

     Although the Court has generally given deference to Commerce when it slightly exceeds

statutory deadlines for its review functions, Commerce's abuses in this case extend beyond any

measure of reason and strain the Court's indulgence past the breaking point. A few highlights demonstrate these abuses, which alone merit voiding its circumvention affirmative findings.

First, Commerce blew through any reasonable deadline to arrive at a preliminary determination in its circumvention investigation, which typically would take 6 to 9 months. 19 U.S.C. §1677j(f) ("The administering authority shall, to the maximum extent practicable, make the determinations under this section within 300 days from the date of the initiation of a countervailing duty or antidumping circumvention inquiry under this section.").[3] Here, Commerce initiated the investigation in June 2020 and did not render its preliminary determination until July 2022, some 24 months later. Based on deficiency findings without notice to the exporters and a surprise voiding of the "safe harbor" Commerce created for Vietnamese produced wood core material, Commerce caused otherwise manageable but now massive contingent liabilities to accrue to many importers who operated within the safe harbor based on the physical characteristics of their plywood imports. Had Commerce issued its Preliminary Determination per the statutory deadline or overwhelming practice within 6-9 months, liabilities would only have accrued for 6-9 months. Instead, liabilities accured over the course of three years: 2021, 2022, and even 2023. Furthermore, AD/CVD margins that should have been zero based on safe harbor exports of plywood from Vietnam, ballooned without notice to 206.34%, placing enormous strains on importers, large and small.

---

3 The reference in the statute to "determinations" must mean both the preliminary and final determinations within 300 days or about 10 months. Commerce took some 36 months to meet its obligations under the statute.

Second, Commerce further extended its final determination into the summer of 2023, again abusing the statutory guidance. 19 U.S.C. §1677j(f).   In total, where the statute contemplated 300 days to come to a circumvention final determination, Commerce took over 1,095 days to complete its review, which extends far beyond a mere missing of the target set forth in the statute.  This exacerbated the impacts on exporters and importers.  There were large gaps of time in Commerce's largely ineffectual investigation, compelling a conclusion that it did not exert its maximum efforts to complete the determinations within 300 days. *See* 19 U.S.C. §1677j(f).

Third, all kinds of other procedural consequences flowed from these abuses.  For instance, early review deadlines were missed.  Had the investigation arrived at a preliminary determination or even a final determination in 2020 or 2021, interested parties (i.e., exporters or importers) could have contained their surprise liabilities and sought administrative review in January 2021 for 2020 and January 2022 for 2021 (plywood AD PORs happen to match each calendar year).  As fully extended reviews take routinely 18 months to complete from initiation in the month following the review request, over thousands (if not hundreds of thousands) of annual reviews in Commerce practice, interested parties would have been table to take corrective action on the liabilities and AFA findings by the summer of 2022 at the latest, with final results of review of 2020 (January 2021 request, February Initiation, August 2022 final results 18 months later).  As it turns out, with the massive and unprecedented three-year investigation, the earliest parties could request review was January 2023 for POR.

PUBLIC VERSION

Moreover, had the investigation followed the statutory track, exporters could have sought a changed circumstances review in early 2021 to prove individually that circumstances "changed" and that they could now prove from records never requested that they were manufacturing Vietnam-produced cores into hardwood plywood. Such streamlined reviews generally take 4-8 months. Exporters never got that chance to get back to production and exportation for the U.S. market in a timely reasonable manner.

Finally, the extreme procedural abuse continues in the 2022 annual review of Chinese hardwood plywood, where no actual Chinese direct exports are implicated. Commerce announced at the fully extended (12 months) statutory maximum hard deadline in January 2024 for its preliminary results that it was further extending the already fully extended preliminary results until later in July 2024. Commerce had no good reason for so doing though it cited a few inapposite cases, like specks of sand in an ocean of otherwise consistently rendered preliminary results within 12 months.

In a hauntingly familiar pattern, Commerce failed in its fully extended 12 months to either (1) select a respondent or (2) issue a basic production eligibility questionnaire. When the questionnaire did issue, it was "dropped" on the eve of the Lunar New Year and Spring Festival in Asia, ensuring that exporters would lose at least two weeks in even addressing the questionnaire to a dwindling list of exporters able and willing to participate in this administrative gauntlet. Apparently, Commerce now believes it can extend any preliminary decision and any final decision indefinitely for years with no legitimate reason or the approprium of the courts. All this waiting prevents plants from regaining permission to export to the United States for

89

years upon years and further harms importers suffering from large contingent liabilities out of the blue.

The questionnaire, in the end, was addressed to each exporter named in the review for which there was evidence of type 3 entries in the review period. *See* **Exhibit 1**, attached, IA Access Code 4502820-01 A-570-051 (Feb. 2, 2024). The Questionnaire consists of 14 single-spaced questions regarding comprehensive raw wood material (veneer) purchases and how they trace to U.S. sales. What the questionnaire makes plain is that there is no reason why Commerce could not have issued it in the summer of 2020 at the outset of the original investigation.

All but one of the surviving mills with hope to participate in the U.S. market have answered the questionnaire within March of 2024. What we have is four wasted years of inactivity that conveniently reigned down harm on Vietnamese plywood producers, exporters, and their importers. Commerce's extreme abuse of its statutory guidance on circumvention and the principles of notice to importers of liabilities and the lack of normally available remedies for redress of same warrant vacating the Final Determination.

## V. Conclusion

In light of the foregoing, Commerce's finding that eight DH Exporter Plaintiffs failed to provide necessary information and did not act to the best of its ability is not supported by substantial evidence. Commerce's failure to notify the DH Exporter Plaintiffs of deficiencies in their submissions was contrary to law. Commerce's rejection of the post-preliminary factual information submitted by DH Exporter Plaintiffs when such information, if considered, could have cured Commerce's belated deficiency notice provided for the first time in the Preliminary

PUBLIC VERSION

Determination or in the Final Determination, was contrary to law and an abuse of discretion if not contrary to law.  DH Consolidated Plaintiffs respectfully request that the Court vacate the Final Determination or remand this case to Commerce while lifting all enforcement measures in the meantime.

Respectfully submitted,

 /s/ Gregory S. Menegaz

Gregory S. Menegaz
Alexandra H. Salzman
Vivien J. Wang ∗
**DEKIEFFER & HORGAN, PLLC**
1156 Fifteenth St., N.W.
Suite 1101
Washington D.C.  20005
Tel: (202) 783-6900
Email: gmenegaz@dhlaw.com

Date: April 1, 2024                          *Counsel to DH Consolidated Plaintiffs*

---

∗ Admitted to New Mexico Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

91

## <u>WORD COUNT CERTIFICATE OF COMPLIANCE</u>

This brief has been prepared utilizing Microsoft Word 2016 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **25, 245** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**deKieffer & Horgan, PLLC**
1156 Fifteenth St., N.W.
Suite 1101
Washington D.C.  20005
*Counsel to DH Consolidated Plaintiffs*

# Exhibit 1

# Commerce Circumvention Questionnaire for POR 2022

Barcode:4502820-01 A-570-051 REV - Admin Review 1/1/22...UNITED STATES DEPARTMENT OF COMMERCE

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-051, C-570-052
Administrative Reviews
POR: 1/1/2022 – 12/31/2022
Public Document
E&C/OV: RJ

February 2, 2024

To:    All Interested Parties Listed in Attachment I

Re:    <u>Administrative Review of the Antidumping and Countervailing Duty Orders on Certain
       Hardwood Plywood from the People's Republic of China: Certification Eligibility
       Questionnaire</u>

This letter concerns the administrative review of the antidumping and countervailing duty orders
on certain hardwood plywood products (hardwood plywood) from the People's Republic of
China (China). The period of review (POR) is September 26, 2021, through December 31, 2022.
You are receiving this letter because you responded to Commerce's November 20, 2023,
quantity and value (Q&V) questionnaire,[1] you have a suspended Type 03 entry that is subject to
administrative review, and you are currently ineligible to participate in the certification program
established in the *Circumvention Determination*.[2] Commerce is issuing this supplemental
questionnaire to gather additional details from responding parties. As specified in the enclosed
supplemental questionnaire, we have identified additional information necessary for
consideration of your certification eligibility. *See* Attachment II. Please file your response to
this questionnaire in accordance with the filing requirements and guidelines (including the
guidelines regarding English translations) detailed in the Q&V Questionnaire. Your response to
this questionnaire, along with the appropriate summarization of proprietary data, as required by
19 CFR 351.304(c), is due no later than **5:00 p.m. Eastern Time (ET) on February 23, 2024**.

There are four attachments to this letter. All companies identified in Attachment I must respond
to the questions in Attachment II, which is divided into three parts. Commerce is requesting that
all exporters respond to Part 1, all companies (exporters and manufacturers) respond to Part 2
(except for questions identified as exporter only), and exporters and manufacturers respond to
Part 3. Attachment III contains a glossary of terms and Attachment IV contains the scope of the
relevant orders and the description of the hardwood plywood for which we are requesting
information (*i.e.*, hardwood plywood regardless of claimed country of origin).

If you are unable to provide a complete response to every question in the attached questionnaire
by the established deadline or are unable to provide all requested supporting documentation by
the same date, you must notify the official in charge and submit a request for an extension of the
deadline for all or part of the questionnaire response. If you require an extension for only part of
your response, submit the request separate from the portion of your response filed under the

---

[1] *See* Commerce's Letter "Quantity and Value Questionnaire," dated November 20, 2023 (Q&V Questionnaire).
[2] *See Certain Hardwood Plywood Products from the People's Republic of China: Final Scope Determination and
Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 88 FR
46740 (July 20, 2023), and accompanying Issues and Decision Memorandum.

current deadline.  Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information, and promises to supply such missing information when available in the future, do not substitute for a written extension request. Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request and any factual statements made in support of such reasons require certifications, pursuant to 19 CFR 351.303(g).  An extension request submitted without a proper certification for any factual information contained therein will be considered improperly filed and, as with any other improperly filed document, will not be accepted.  Any extension granted in response to your request will be in writing; otherwise, the original deadline will apply.

If Commerce does not receive either the requested information or a written extension request before 5:00 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding.  Commerce will not accept any requested information submitted after the deadline.  As required by section 351.302(d) of our regulations, we will reject such submissions as untimely.  Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences, pursuant to section 776(b) of the Act and/or a continued finding that your company is not eligible to participate in the certification regime in these proceedings.

For more detailed instructions regarding the submission of filings, please refer to the cover letter and general instructions in the Q&V Questionnaire.  We appreciate your attention to these matters.  The information which you submit may be subjected to verification.  Failure to allow verification of any item may affect the consideration which we will accord to that item or to any other material, whether or not we verify the latter.

Should you have any questions about this matter, please contact Rachel Jennings at rachel.jennings@trade.gov.

Sincerely,

Kabir Archuletta
Program Manager, Office V
Enforcement and Compliance

Attachment

2

**ATTACHMENT I**

*Companies that are required to respond to this supplemental questionnaire:*

- Arrow Forest International Co., Ltd.
- Eagle Industries Company Limited
- Golden Bridge Industries Pte. Ltd.
- Govina Investment Joint Stock Company
- Greatriver Wood Co. Ltd.
- Groll Ply and Cabinetry Co., Ltd.
- Hai Hien Bamboo Wood Joint Stock Company
- Her Hui Wood (Vietnam) Co., Ltd.
- Innovgreen Thanh Hoa Co. Ltd.
- Lechenwood Viet Nam Company Limited
- Long LUU Plywood Production Co., Ltd.
- Quoc Thai Forestry Import Export Limited Company

Barcode:4502820-01 A-570-051 REV - Admin Review 1/1/22 - 12/31/22 Plywood AR5

# ATTACHMENT II

## CERTIFICATION ELIGIBILITY QUESTIONNAIRE

### Certain Hardwood Plywood Products (Hardwood Plywood) from the People's Republic of China (China)

**PERIOD OF REVIEW (POR)**:  **September 26, 2021, through December 31, 2022**

**NOTE** :    *In accordance with 19 CFR 351.303(e), "A document submitted in a foreign language must be accompanied by an English translation of the entire document or of only pertinent portions, where appropriate, unless the Secretary waives this requirement for an individual document. A party must obtain the Department's approval for submission of an English translation of only portions of a document prior to submission to the Department."*

**NOTE**:    *Please repeat the question prior to giving your response when responding to this supplemental questionnaire.*

**NOTE**:    *If a calculation worksheet is requested, please submit the requested worksheet in pdf format as well as electronic format in Excel.*

**NOTE**:    *If you provide any information in response to this questionnaire that is different or contradictory to information that is already on this record, you must identify each discrepancy and explain the reason for it.*

**Certification Eligibility Reconsideration**

In the *Circumvention Determination*[3] we determined that circumvention was occurring through five production scenarios involving hardwood plywood inputs from China assembled in Vietnam prior and then entered into the United States.[4] As part of this affirmative circumvention determination, Commerce found that certain companies were not eligible to participate in the certification regime.

1.  Please state whether you are requesting that the U.S. Department of Commerce (Commerce) reconsider your certification ineligibility.

2.  If you are requesting that Commerce reconsider your certification ineligibility, please respond to the remainder of the questions in this questionnaire.

---

[3] *See Certain Hardwood Plywood Products from the People's Republic of China: Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 88 FR 46740, 46741 and Appendix V (July 20, 2023).

[4] *See* Attachment IV-A for a description of the merchandise covered by the scope of the *Orders*, including the five circumventing production scenarios found to be within the scope of the *Orders*.

**Part 1 – Entry Information[5]**

**Attachment IV-A contains the scope of the *Orders*.[6]  Attachment IV-B contains the scope of the merchandise subject to this certification eligibility review.  Herein, we refer to "hardwood plywood" when discussing the merchandise subject to this certification eligibility review (*i.e.*, plywood that meets the physical description of the *Orders*, regardless of where the wood inputs were manufactured/processed).**

> The questions in this part must be answered by all exporters who are requesting reconsideration of certification eligibility, and are in receipt of this questionnaire.

**I.**    **Instructions for the Narrative Response and the Computer File of U.S. Entries of Merchandise Which Entered the United States During the POR**

The following instructions combine the questionnaire with the Excel data worksheet format.  "FIELD NUMBER" includes the number and descriptive name of the field in the computer data file.  "FIELD NAME" includes the "short" or variable name for the submitted printouts of the data file.  "DESCRIPTION" defines the data you should report in the field of the computer data file, and "NARRATIVE" describes the additional information we request you provide, not in the computer data file, but in a narrative response.

**For each entry of hardwood plywood during the POR, report in an Excel worksheet the following information:**

**FIELD NUMBER 0.0**        **SEQUENCE NUMBER**

      FIELD NAME:        SEQU

      DESCRIPTION:        Assign a unique sequential number to each entry record.  This record number should remain constant in all future submissions (*i.e.*, entry record line items should not be renumbered during the course of this segment).

**FIELD NUMBER 1.0:**        **Complete Product Code**

      FIELD NAME:        PRODCODU

      DESCRIPTION:        Report the commercial product code assigned by your company in the normal course of business to the specific product sold in the United States.  If the product entered is further manufactured in the United States, report the product code of the product as imported.

---

[5] In the absence of entry information, please report shipments to the United States.
[6] *See Certain Hardwood Plywood Products from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 83 FR 504 (January 4, 2018); and *Certain Hardwood Plywood Products from the People's Republic of China:  Countervailing Duty Order*, 83 FR 513 (January 4, 2018) (collectively, the *Orders*).

Barcode:4502820-01 A-570-051 REV - Admin Review 1/1/22 - 12/31/22 Plywood AR5

<u>The following fields (1.1 through 1.5) should be reported as a transaction listing (herein referred to as your "entry database") in Excel format:</u>

**FIELD NUMBER 1.1:**     **Face Veneer Species**

FIELD NAME:          FACESPU

DESCRIPTION:         Indicate the type of wood used in the face veneer of the product. For purposes of this field, the face veneer is the outermost veneer of the product which is of a superior grade than that of the back veneer, which is the other outermost veneer of the product.

| | |
|---|---|
| 01 | Alder (*Alnus*) |
| 02 | Ash, Black (*Fraxinus nigra*) |
| 03 | Ash, White (*Fraxinus quadrangulata, F. pennsylvanica, F.    Americana*) |
| 04 | Bamboo (*Bambuseae*) |
| 05 | Beech (*Fagus*) |
| 06 | Birch (*Betula*) |
| 07 | Box Elder (*Acer negundo*) |
| 08 | Cherry (*Prunus*) |
| 09 | Cypress (*Taxodium*) |
| 10 | Elm, Rock (*Ulmus crassifolia, U. thomasii, U. serotina, U. alata*) |
| 11 | Elm, Soft (*Ulmus americana, U. rubra*) |
| 12 | Fir (*Abies*) |
| 13 | Gum (*Liquidambar*) |
| 14 | Hickory (*Carya*) |
| 15 | Larch (*Larix*) |
| 16 | Lauan (*Shorea*) |
| 17 | Mahogany (*Swietenia*) |
| 18 | Mahogany, African (*Khaya*) |
| 19 | Maple, Hard (*Acer nigrum, A. saccharum*) |
| 20 | Maple, Soft (*Acer rubrum, A. saccharinum*) |
| 21 | Meranti (*Shorea*) |
| 22 | Oak, Red (*Quercus veluntia, Q. marilandica, Q. kelloggi, Q. falcate var. pagodaefolia, Q. laurifolia, Q. ellipsoidalis, Q. rubra, Q. nuttallii, Q. palustris, Q. coccinea, Q. shumardii, Q. falcate, Q. laevis, Q. phellos*) |
| 23 | Oak, White (*Quercus arizonica, Q. douglasii, Q. macrocarpa, Q. lobata, Q. prinus, Q. muehlenbergii, Q. emoryi, Q. gambelii, Q. oblongifolia, Q. virginiana, Q. garryana, Q. lyrata, Q. stellata, Q. michauxii, Q. bicolor, Q. alba*) |
| 24 | Okoume (*Aucoumea*) |

2

Barcode:4502820-01 A-570-051 REV - Admin Review 1/1/22 - 12/31/22 Plywood AR5

| | |
|---|---|
| 25 | Pecan (*Carya*) |
| 26 | Pine, Eastern White (*Pinus strobes*) |
| 27 | Pine, Lodgepole (*Pinus contorta*) |
| 28 | Pine, Ponderosa (*Pinus ponderosa*) |
| 29 | Pine, Other (*Pinus muricata, P. coulteri, P. sabibiana, P. attenuate, P. monticola, P. banksiana, P. jeffreyi, P. flexillis, P. palustris, P. elliottii, P. resinosa, P. rigida, P. echinata, P. radiate, P. lambertiana, P. albicaulis, P. taeda, P. elliottii, P. serotina, P. clausa, P. glabra, P. virginiana*) |
| 30 | Poplar (*Liriodendron*) |
| 31 | Rosewood (*Delbergia*) |
| 32 | Rubberwood (*Hevea*) |
| 33 | Sapele (*Entandrophrangma*) |
| 34 | Teak (*Tectona*) |
| 35 | Walnut (*Juglans*) |
| 36-n | Other (Specify commercial name and scientific name) |

**FIELD NUMBER 1.2:**       **Face Veneer Thickness**

FIELD NAME:        FACETHU

DESCRIPTION:       Indicate the thickness of the face veneer of the product.
For purposes of this field, the face veneer is the outermost veneer of the product which is of a superior grade than that of the back veneer, which is the other outermost veneer of the product.

| | |
|---|---|
| 01 | Less than .25 mm |
| 02 | Greater than or equal to .25 mm but less than .50 mm |
| 03 | Greater than or equal to .50 mm but less than .75 mm |
| 04 | Greater than or equal to .75 mm but less than 1.00 mm |
| 05 | Greater than or equal to 1.00 mm but less than 1.50 mm |
| 06 | Greater than or equal to 1.50 mm but less than 2.00 mm |
| 07 | Greater than or equal to 2.00 mm but less than 3.00 mm |
| 08 | Greater than or equal to 3.00 mm but less than 4.00 mm |
| 09 | Greater than or equal to 4.00 mm but less than 5.00 mm |
| 10 | Greater than or equal to 5.00 mm but less than 6.00 mm |
| 11 | Greater than or equal to 6.00 mm |

**FIELD NUMBER 1.3:**       **Back Veneer Species**

FIELD NAME:        BACKSPU

DESCRIPTION:       Indicate the type of wood used in the back veneer of the product.  If another grading system is used, please specify.  For purposes of this field, the back veneer is the outermost veneer of

3

Barcode:4502820-01 A-570-051 REV - Admin Review 1/1/22 - 12/31/22 Plywood AR5

the product which is of an inferior grade than that of the face veneer, which is the other outermost veneer of the product.

| | |
|---|---|
| 01 | Alder (*Alnus*) |
| 02 | Ash, Black (*Fraxinus nigra*) |
| 03 | Ash, White (*Fraxinus quadrangulata, F. pennsylvanica, F.      Americana*) |
| 04 | Bamboo (*Bambuseae*) |
| 05 | Beech (*Fagus*) |
| 06 | Birch (*Betula*) |
| 07 | Box Elder (*Acer negundo*) |
| 08 | Cherry (*Prunus*) |
| 09 | Cypress (*Taxodium*) |
| 10 | Elm, Rock (*Ulmus crassifolia, U. thomasii, U. serotina, U. alata*) |
| 11 | Elm, Soft (*Ulmus americana, U. rubra*) |
| 12 | Fir (*Abies*) |
| 13 | Gum (*Liquidambar*) |
| 14 | Hickory (*Carya*) |
| 15 | Larch (*Larix*) |
| 16 | Lauan (*Shorea*) |
| 17 | Mahogany (*Swietenia*) |
| 18 | Mahogany, African (*Khaya*) |
| 19 | Maple, Hard (*Acer nigrum, A. saccharum*) |
| 20 | Maple, Soft (*Acer rubrum, A. saccharinum*) |
| 21 | Meranti (*Shorea*) |
| 22 | Oak, Red (*Quercus veluntia, Q. marilandica, Q. kelloggi, Q. falcate var. pagodaefolia, Q. laurifolia, Q. ellipsoidalis, Q. rubra, Q. nuttallii, Q. palustris, Q. coccinea, Q. shumardii, Q. falcate, Q. laevis, Q. phellos*) |
| 23 | Oak, White (*Quercus arizonica, Q. douglasii, Q. macrocarpa, Q. lobata, Q. prinus, Q. muehlenbergii, Q. emoryi, Q. gambelii, Q. oblongifolia, Q. virginiana, Q. garryana, Q. lyrata, Q. stellata, Q. michauxii, Q. bicolor, Q. alba*) |
| 24 | Okoume (*Aucoumea*) |
| 25 | Pecan (*Carya*) |
| 26 | Pine, Eastern White (*Pinus strobes*) |
| 27 | Pine, Lodgepole (*Pinus contorta*) |
| 28 | Pine, Ponderosa (*Pinus ponderosa*) |
| 29 | Pine, Other (*Pinus muricata, P. coulteri, P. sabiniana, P. attenuate, P. monticola, P. banksiana, P. jeffreyi, P. flexillis, P. palustris, P. elliottii, P. resinosa, P. rigida, P. echinata, P. radiate, P. lambertiana, P. albicaulis, P. taeda, P. elliottii, P. serotina, P. clausa, P. glabra, P. virginiana*) |

4

| | |
|---|---|
| 30 | Poplar (*Liriodendron*) |
| 31 | Rosewood (*Delbergia*) |
| 32 | Rubberwood (*Hevea*) |
| 33 | Sapele (*Entandrophrangma*) |
| 34 | Teak (*Tectona*) |
| 35 | Walnut (*Juglans*) |
| 36-n | Other (Specify commercial name and scientific name) |

**FIELD NUMBER 1.4:**        **Core Composition**

FIELD NAME:        CORECOMPU

DESCRIPTION:        Indicate the composition of the material of the core layer(s) of the product.  If the core layer(s) are made of multiple materials, report "Other" in this field and specify each combination of materials for each unique product.  For example, if the core of a product is made of Veneer – Acacia and Particle board, report 10 and specify in the narrative that 10 denotes "Veneer – Acacia and Particle board," if the core of another product is made of Veneer – Eucalyptus and MDF, report 11 and specify in the narrative that 11 denotes "Veneer – Eucalyptus and MDF," *etc.*

| | |
|---|---|
| 01 | High-density fiberboard (HDF) |
| 02 | Medium-density fiberboard (MDF) |
| 03 | Particle board |
| 04 | Veneer – Species A (identify species) |
| 05 | Veneer – Species B (identify species) |
| 06 | Veneer – Species C (identify species) |
| 07 | Veneer – Species D (identify species) |
| 08 | Veneer – Species E (identify species) |
| 09 | Lumber |
| 10-n | Other – specify |

**FIELD NUMBER 1.5:**        **Number of Plies**

FIELD NAME:        NUMPLYU

DESCRIPTION:        Report the total number of plies in the product, including face and back veneers.  Ensure that your response in this field is reported in two digits.  For example, should your product include 5 plies, you should report 05 in this field.

| | |
|---|---|
| 03 | 3 plies |
| 04 | 4 plies |
| 05 | 5 plies |
| 06 | 6 plies |

| 07 | 7 plies |
| 08 | 8 plies |
| 09 | 9 plies |
| 10-n | 10 plies |

**FIELD NUMBER 1.6:**    **Exporter**

    FIELD NAME:    EXPORTERU

    DESCRIPTION:    Report the name of the exporter of record in Vietnam for each transaction.

    NARRATIVE:    Provide a list of exporters of record with any codes or abbreviations you used to identify them.  Also, if more than one affiliate was an exporter of hardwood plywood during the POR, please explain the functions of each and the circumstances under which each exported hardwood plywood.

**FIELD NUMBER 1.7:**    **Manufacturer**

    FIELD NAME:    MFRU

    DESCRIPTION:    If you sold hardwood plywood produced by more than one manufacturer, identify the name of the manufacturer in each record (*i.e.*, your company's name, name of supplier).

    NARRATIVE:    Provide a list of manufacturers that supplied you with the exported hardwood plywood and define any codes or abbreviations you used to identify them.

**FIELD NUMBER 1.8:**    **Manufacturer Relationship**

    FIELD NAME:    MFRRELU

    DESCRIPTION:    Report the code designating whether the manufacturer is yourself, an affiliate, or an unaffiliated company.  For any manufacturer you report as an affiliate, please provide a detailed explanation of the nature of the affiliation.

        1 = Self-produced
        2 = Unaffiliated Producer
        3 = Affiliated Producer

**FIELD NUMBER 1.9:**    **Reseller**

    FIELD NAME:    RESELLU

6

DESCRIPTION:   Report the name or internal code designating any reseller or intermediary.

NARRATIVE:     Provide a list of resellers and intermediaries and any internal codes used to identify them.

**FIELD NUMBER 1.10:     Importer**

FIELD NAME:    IMPORTERU

DESCRIPTION:   Report the name of the U.S. importer of record.

NARRATIVE:     Provide a list of importers of record with any codes or abbreviations you used to identify them.

**FIELD NUMBER 1.11:     Customer**

FIELD NAME:    CUSCODU

DESCRIPTION:   Report the name of the first U.S. customer or the internal accounting code designating the customer.

NARRATIVE:     Provide a list of customer names and codes as an attachment to your narrative response.

**FIELD NUMBER 1.12:     Quantity**

FIELD NAME:    QTYU

DESCRIPTION:   Report the quantity for this transaction.  In general, this quantity will be the quantity of the specific shipment or invoice line, net of returns where possible.

NARRATIVE:     Explain how returns, if you permit them, affect the information recorded in the general ledger and sales ledger.

**FIELD NUMBER 1.13:     Quantity Unit of Measure**

FIELD NAME:    QTUMU

DESCRIPTION:   Report all sales in this file in the same unit of measure.  Use an abbreviation or code to indicate the unit of measure.

1 or MT = metric tons
2 or KG = kilograms

7

3 - n = Specify as needed.

**FIELD NUMBER 1.14:**    **Gross Unit Price**

      FIELD NAME:      GRSUPRU

      DESCRIPTION:     Report the unit price recorded on the invoice for sales shipped and invoiced in whole or in part.  To report portions of sales not yet shipped, provide the agreed unit sale price for the quantity that will be shipped to complete the order.  This value should be the gross price for a single unit of measure.

**FIELD NUMBER 1.15:**    **Entry Type**

      FIELD NAME:      TYPEU

      DESCRIPTION:     Report the entry type code recorded on the CBP Form 7501 Entry Summary.

## II.    <u>Additional Information Regarding Your Entry Database</u>

1. If you were unable to report all entries of your merchandise during the POR, describe how you identified the POR shipments reported in your entry database (*e.g.*, invoice date, shipment date) and why you chose that date (*e.g.*, date of revenue recognition in sales journal, readily accessible in sales system, *etc.*).

2. Explain how you determined that none of your sales to the United States contained wood inputs from China that would result in hardwood plywood covered by the scope of the *Orders*.  Provide detailed documentation supporting your response.

3. Tie the total quantity and value of the transactions included in the listing of entries/shipments during the POR to either your financial statements or, if you do not have audited financial statement, to a third-party verified source such as a tax return.

4. For each manufacturer identified in your entry database, please provide their complete address and phone number.

8

Barcode:4502820-01 A-570-051 REV - Admin Review 1/1/22 - 12/31/22 Plywood AR5

## Part 2 – General Information

**Exporter Only Questions:  Economic, Industry, and Company Background**

1.  In your separate rate application, you identified the owner(s) of your company.

    a.  Please explain whether owner(s) of your company (directly and indirectly) also own(s), directly or indirectly, or control(s) other producers or exporters involved in the production, sale, or distribution of hardwood plywood (of any origin).

    b.  If owner(s) of your company, also own(s) or control(s) other producers or exporters involved in the production, sale, or distribution of hardwood plywood (of any origin), please identify the name(s) and address(es) of those producers and/or exporters.

    c.  Please describe the business activities of each company identified in subpart b., the nature of the affiliation, and how each company is involved in the hardwood plywood industry.

2.  Provide copies of any business licenses held by your company and any **affiliates**[7] identified in question 1, and English translations of those licenses.

3.  Explain how you determined the ultimate customer or market for the products sold through resellers.  In addition, explain whether you provide customer lists to or make joint sales calls with the reseller, or provide post-sales support or purchase incentives to the reseller's customers.  Provide written sales contracts or sales terms with these resellers.

> The remaining questions this part must be answered by all companies (exporters <u>and</u> manufacturers of the merchandise exported by the exporter to the United States, irrespective of whether the exporter and manufacturer(s) are affiliated parties)

<u>Corporate Structure and Affiliations</u>

The purpose of the questions concerning operational and legal structures and affiliations is to provide Commerce with an understanding of your company and its role in the manufacture and/or sale of hardwood plywood.

4.  Provide an organization chart and description of your company's operating structure. Describe the general organization of the company and each of its operating units.  For example, if your operations are structured by product or families of products, provide a description of each product group; if your operations are structured by function, provide a list of functional groups and the activities performed by each.

---

[7] *See* Attachment III for definition of "affiliates" or "affiliated persons."

Although you may provide a general description of the structure of the company as a whole, it is particularly important that the description of those units involved in the development, manufacture, sale and distribution of the hardwood plywood be sufficiently detailed to provide Commerce with a good working understanding of how these units function within the company.

5.  Provide a list of all the manufacturing facilities, sales office locations, research and development facilities and administrative offices involved in the manufacture and sale of the hardwood operated by your company.  Please give a full address for each facility, and briefly describe the purpose of each.

6.  Provide an organization chart and description of your company's legal structure.  In addition to the chart, provide a list of names and addresses of all companies affiliated with your company through stock ownership or otherwise.  In responding to this question, refer to the definition of affiliated person provided in the Glossary of Terms at Attachment III.  Describe also the activities of each affiliated company, with particular attention to those involved with hardwood plywood as defined in Attachment IV.  Specify the percentage of ownership among the companies listed.

7.  Provide a list of all third parties in which your company or its owners, either collectively or individually, own five percent or more in stock.  Include each third party's full name and address and describe its activities.  Also provide a complete list of companies or individuals that own five percent or more in stock in the third party which includes each owner's full name and address and specifies its percentage of ownership.

8.  Provide a full narrative history of your company.

9.  Provide a copy of any capital verification reports you filed during the POR or in the three years prior to the POR.

<u>Accounting/Financial Practices</u>

A detailed understanding of your accounting and financial practices will help to ensure an accurate verification, and is necessary for Commerce to analyze your reporting and allocation of expenses.

10.  Describe your company's accounting and financial reporting practices, including your normal corporate accounting period.

11.  Please provide the following financial documents for the fiscal years 2021 and 2022: (1) chart of accounts; (2) audited, consolidated and unconsolidated financial statements (including any footnotes and auditor's opinion), or, if company has no audited financial statements, provide tax returns; (3) internal financial statements or profit and loss reports of any kind that are prepared and maintained in the normal

course of business for hardwood plywood; or, in the absence of such reports, for the product line that corresponds most closely to the definition of hardwood plywood, including those for the next largest and smallest categories of merchandise and for the next largest and smallest internal business unit producing or selling hardwood plywood; and (4) financial statements or other relevant documents (*i.e.*, profit and loss reports) of all affiliates involved in the production or sale of hardwood plywood in the U.S. market, of all affiliated suppliers to these affiliates, and of the parent(s) of these affiliates.

<u>Merchandise</u>

The questions which follow relate to hardwood plywood sold in the United States.

12. Provide a description of the types of hardwood plywood produced and/or sold by your company. Include in the description a list (and brief description) of any products with a similar production process to hardwood plywood.

13. Provide a key to your product codes assigned to the merchandise in the normal course of business, including an explanation of the full range of prefixes, suffixes, or other notations that identify special features. Explain whether identical products are listed under different codes depending on whether the product is destined for the U.S. market or another market. If so, provide a list showing how identical products are identified by product codes.

14. Provide all catalogs and brochures issued by your company and affiliates that include hardwood plywood sold by your company in the United States. Also provide copies of internet-based advertising by your company and its affiliates that include hardwood plywood sold by your company to the United States. Indicate the relevant sites.

Barcode:4502820-01 A-570-051 REV - Admin Review 1/1/22 - 12/31/22 Plywood AR5

### Part 3 – Production Information

The remaining questions must be answered by all companies (exporters <u>and</u> manufacturers of the merchandise exported by the exporter to the United States, irrespective of whether the exporter and manufacturer(s) are affiliated parties).

**Production**

1.  Provide a description of the manufacturing process for the hardwood plywood that was shipped to the United States. Your description should address each of the items listed below.

    a.  Describe the Vietnamese production facilities used to manufacture plywood. If manufacturing operations take place at more than one facility, identify each facility and describe the production activities that take place at each facility.

    b.  Identify all products manufactured at those production facilities.

    c.  Provide a flowchart that details the complete production cycle for hardwood plywood. This should include descriptions of each stage of production and the locations of primary cost centers.

2.  Please provide an inventory movement schedule that details for each wood input used in the production of **hardwood plywood (regardless of country of origin)** for each month of the POR the following items:

    a.  opening inventory;

    b.  purchases;

    c.  consumption;

    d.  sales;

    e.  ending inventory.

3.  Tie the above inventory movement schedules to your audited financial statements, or, if you do not have audited financial statements, tax returns.

**Tracking of Hardwood Plywood Inputs**

Respond to the following questions with respect to the wood inputs used to produce the hardwood plywood reported in the entry database requested in Part 1.

4.  Explain how you track the country of origin of the wood inputs used to produce hardwood plywood. Provide documentation to support your response.

5. Please explain whether you are able to track the country of origin of the wood inputs of the hardwood plywood used to produce the hardwood plywood listed in the entry database provided in response to Part 1 of this questionnaire.  Provide documentation supporting your response.

6. If you do not know the country of origin of some, or all, of the wood inputs used to produce your hardwood plywood:

    a. Identify the wood inputs for which you are unable to track the country of origin.

    b. Explain why you do not know the country of origin of these wood inputs.

7. If you purchased wood inputs from suppliers, provide the following in an Excel worksheet:

    a. name of each supplier;

    b. the inputs each supplier provided;

    c. whether supplier was an affiliate;

    d. quantity and value of each input supplied by the supplier;

    e. country of origin of each input supplied by the supplier.

8. Please provide the following information concerning your company's imports of wood inputs from China used to produce merchandise that it sold during the POR:

    a. The quantity and value of each wood input imported from China before or during the POR that was used to produce merchandise sold during the POR.

    b. A detailed description for each product imported, including wood species, dimensions, and intended use;

    b. The identity of the supplier of each Chinese input (even if non-resident China exporter) and whether you are affiliated with that party;

    c. Harmonized Tariff Schedule (HTS) subheading (of Vietnam, 8-digit level) under which product was imported;

    d. Purpose of import (*e.g.*, face veneer, core veneer, multi-ply core panel, facility repairs, remained in inventory, *etc*.).

9. For each HTS subheading reported in response to subpart c above, provide the following:

    a.   A complete set of Vietnam Customs clearance documentation for the first entry during the POR under each 8-digit subheading;

    b.   A narrative explanation about, and documentation from your production system demonstrating, the consumption of those imports, or an explanation why such a demonstration is not possible (supported by documentation from your production system);

    c.   A narrative explanation and documentation from your sales/production system demonstrating the sale of products containing those imported inputs during the POR.

3

**Attachment III**
**GLOSSARY OF TERMS**

> This glossary is intended to provide parties with a basic understanding of many technical terms that appear in the antidumping questionnaire. These explanations are not regulations or rules with the force of law. As difficult or detailed questions arise, parties should seek clarification from the statute, regulations, and Commerce, rather than attempting to derive precise guidance from these general explanations.

**Administrative Protective Order**

An administrative protective order is the legal mechanism that controls the limited disclosure of business proprietary information to representatives of interested parties. Commerce authorizes the release of proprietary information under administrative protective order only when the representatives file a request in which they agree to the following four conditions: (a) to use the information only in the antidumping (AD) proceeding, (b) to secure the information and protect it from disclosure to any person not subject to an administrative protective order, (c) to report any violation of the terms of the protective order, and (d) to acknowledge that they may be subject to sanctions if they violate the terms of the order. (Section 777(c) of the Tariff Act of 1930, as amended (the Act). *See also* **Proprietary Information** and **Proprietary Treatment**.

**Administrative Review**

Administrative proceeding conducted by Commerce to determine the amount of AD duties that Customs will assess on imports of the subject merchandise during the period of review or to determine if a suspension agreement has been violated. Commerce also establishes new cash deposit rates for entered subject merchandise for each of the companies reviewed. (Section 751 of the Act.)

**Affiliated Persons**

The term affiliated persons (affiliates) includes: (1) members of a family; (2) an officer or director of an organization and that organization; (3) partners; (4) employers and employees; (5) any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and that organization; (6) two or more persons directly or indirectly controlling, controlled by, or under common control with, any person; and (7) any person who controls any other person and that other person. Control exists when a person is legally or operationally in a position to exercise restraint or direction over another person. A control relationship should also have the potential to affect decisions concerning the production, pricing, or cost of the merchandise under investigation or review. (Section 771(33) of the Act; sections 351.102(b) and 351.401(f) of the regulations.)

Examples of situations which may indicate control include (but are not limited to): (a) joint ventures and franchises; (b) lender/borrower situations; (c) a close relationship with a supplier, (sub) contractor, lender, distributor, exporter or reseller; and (d) a group of companies controlled by, for example, a family, a corporation, or the same investors. An example of affiliation by

common control may be the affiliation between the owners of a joint venture when each owner is in a control position with that joint venture.

Section 351.102(b) of Commerce's regulations states that the term person includes any interested party as well as any other individual, enterprise, or entity, as appropriate.  In Commerce's practice, the term person includes any company, individual, organization, partnership or group.

## Antidumping Law and Regulations

The United States antidumping laws are set forth in Title VII of the Act (19 U.S.C. 1673 *et seq.*).  Commerce's regulations governing antidumping proceedings are set forth at 19 CFR Part 351, published in the *Federal Register* on May 19, 1997 (62 FR 27379-27424), and September 20, 2021 (86 FR 52300-52384).  For procedures governing Administrative Protective Orders and the treatment of proprietary information, please *see* 19 CFR Parts 351 and 354, published in the *Federal Register* on May 4, 1998 (63 FR 24391), and September 29, 2023 (88 FR 67069-67081).

## Business Proprietary Information

Business proprietary information (BPI) is sensitive business data that would cause substantial harm to the submitting party if disclosed publicly.  Examples of information that Commerce normally treats as business proprietary, if requested and not already in the public domain, include trade secrets concerning the production process, production and distribution costs, terms of sale, individual prices, and the names of customers and suppliers.

## Certification of Accuracy

Any person that submits factual information to Commerce must include with the submission a certification of the completeness and accuracy of the factual information.  Certifications must be made by a knowledgeable official responsible for presentation of the factual information and by the party's legal counsel or other representative, if any.  A sample certification form is included as Appendix IV to the Q&V Questionnaire.  (Section 782 (b) of the Act; section 351.303(g) of the regulations.)

## Dumping

Dumping occurs when imported merchandise is sold in, or for export to, the United States at less than the normal value of the merchandise.  The dumping margin is the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise.  The weighted-average dumping margin is the sum of the dumping margins divided by the sum of the export prices and constructed export prices.

## Exporter

As a general matter, an exporter arranges for the sending or carrying abroad of merchandise.  Most commonly, the exporter of merchandise takes possession of the merchandise and actively

participates in the transport of merchandise to an importer.  Should an intermediate party, who is not a reseller, be involved in export transactions, Commerce will focus primarily on the actual involvement of the intermediate party in the sale and transportation of the merchandise to determine which party is the "exporter" for AD/CVD purposes.

## Facts Available

Commerce seeks to make its antidumping determinations on the basis of responses to its antidumping questionnaires.  However, for a variety of reasons, the data needed to make such determinations may be unavailable or unusable.  In such instances, the law requires Commerce to make its determinations on the basis of "the facts otherwise available" (more commonly referred to as "the facts available").  More specifically, Commerce must use the facts available if necessary information is not available on the record of an antidumping proceeding.  In addition, Commerce must use the facts available where an interested party or any other person:  (1) withholds information requested by Commerce; (2) fails to provide requested information by the requested date or in the form and manner requested; (3) significantly impedes an antidumping proceeding; or (4) provides information that cannot be verified.

In selecting the information to use as the facts available, the law authorizes Commerce to make an inference that is adverse to an interested party if Commerce finds that party failed to cooperate by not acting to the best of its ability to comply with a request for information.  However, the law also provides that when Commerce relies on secondary information rather than on information obtained in the course of an antidumping proceeding, Commerce must, to the extent practicable, corroborate that information from independent sources that are reasonably at Commerce's disposal.

Submitted information that does not meet all of the requirements may be used if:  (1) the information is submitted within applicable deadlines; (2) the information can be verified; (3) the information is not so incomplete that it cannot serve as a reliable basis for a determination; (4) the party establishes that it acted to the best of its ability; and (5) Commerce can use the information without undue difficulties.  Finally, if an interested party promptly informs Commerce of difficulties it is having in responding to a request for information, Commerce will consider modifying its request to the extent necessary to avoid imposing an unreasonable burden on the party.  (Sections 776 and 782(c)-(e) of the Act; section 351.308 of the regulations.)

## Non-Market Economy

A non-market economy country is any country that Commerce determines does not operate on market principles.  Commerce considers the following factors about a foreign country in making these decisions:  (1) the extent to which the currency is convertible; (2) the extent to which wage rates are determined by free bargaining between labor and management; (3) the extent to which joint ventures or foreign investment are permitted; (4) the extent of government ownership or control of means of production; (5) the extent of government control over allocation of resources and over the price and output decisions of enterprises; and (6) other factors Commerce considers appropriate.  (Section 771(18)(B) of the Act.)

**Regulations**

*See* **Antidumping Law and Regulations**

## Verification

To establish the adequacy and accuracy of information submitted in response to questionnaires and other requests for information, Commerce examines the records of the party that provided the information and interviews company personnel who prepared the questionnaire response and are familiar with the sources of the data in the response.  This process is called verification.  Commerce will verify information relied upon in making a final determination in an investigation, or in an administrative review when revocation of an antidumping order is properly requested.  Commerce also will verify information submitted in an administrative review if an interested party so requests and no verification of the producer or exporter had been conducted during the two immediately preceding reviews of that producer or exporter, or if good cause for verification is shown.  (Section 782(i) of the Act; section 351.307 of the regulations.)

4

**Attachment IV-A**
**Scope of the AD/CVD Orders**

The merchandise covered by these reviews is hardwood and decorative plywood, and certain veneered panels as described below. For purposes of these proceedings, hardwood and decorative plywood is defined as a generally flat, multilayered plywood or other veneered panel, consisting of two or more layers or plies of wood veneers and a core, with the face and/or back veneer made of non-coniferous wood (hardwood) or bamboo. The veneers, along with the core may be glued or otherwise bonded together. Hardwood and decorative plywood may include products that meet the American National Standard for Hardwood and Decorative Plywood, ANSI/HPVA HP-1-2016 (including any revisions to that standard).

For purposes of these *Orders* a "veneer" is a slice of wood regardless of thickness which is cut, sliced or sawed from a log, bolt, or flitch.[8] The face and back veneers are the outermost veneer of wood on either side of the core irrespective of additional surface coatings or covers as described below.

The core of hardwood and decorative plywood consists of the layer or layers of one or more material(s) that are situated between the face and back veneers. The core may be composed of a range of materials, including but not limited to hardwood, softwood, particleboard, or medium-density fiberboard (MDF).

All hardwood plywood is included within the scope of these *Orders* regardless of whether or not the face and/or back veneers are surface coated or covered and whether or not such surface coating(s) or covers obscures the grain, textures, or markings of the wood. Examples of surface coatings and covers include, but are not limited to: ultra violet light cured polyurethanes; oil or oil-modified or water based polyurethanes; wax; epoxy-ester finishes; moisture-cured urethanes; paints; stains; paper; aluminum; high pressure laminate; MDF; medium density overlay (MDO); and phenolic film. Additionally, the face veneer of hardwood plywood may be sanded; smoothed or given a "distressed" appearance through such methods as hand-scraping or wire brushing. All hardwood plywood is included within the scope even if it is trimmed; cut-to-size; notched; punched; drilled; or has undergone other forms of minor processing.

All hardwood and decorative plywood is included within the scope of these *Orders*, without regard to dimension (overall thickness, thickness of face veneer, thickness of back veneer, thickness of core, thickness of inner veneers, width, or length). However, the most common panel sizes of hardwood and decorative plywood are 1219 x 1829 mm (48 x 72 inches), 1219 x 2438 mm (48 x 96 inches), and 1219 x 3048 mm (48 x 120 inches).

Subject merchandise also includes hardwood and decorative plywood that has been further processed in a third country, including but not limited to trimming, cutting, notching, punching, drilling, or any other processing that would not otherwise remove the merchandise from the

---

[8] *See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 83 FR 504 (January 4, 2018); *see also Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order*, 83 FR 513 (January 4, 2018) (collectively, *Orders*).

scope of these *Orders* if performed in the country of manufacture of the in-scope product.

The scope of these *Orders* excludes the following items:  (1) structural plywood (also known as "industrial plywood" or "industrial panels") that is manufactured to meet U.S. Products Standard PS 1-09, PS 2-09, or PS 2-10 for Structural Plywood (including any revisions to that standard or any substantially equivalent international standard intended for structural plywood), and which has both a face and a back veneer of coniferous wood; (2) products which have a face and back veneer of cork; (3) multilayered wood flooring, as described in the antidumping duty and countervailing duty orders on multilayered wood flooring from the People's Republic of China, Import Administration, International Trade Administration.  *See Multilayered Wood Flooring from the People's Republic of China*, 76 FR 76690 (December 8, 2011) (amended final determination of sales at less than fair value (LTFV) and AD order); and *Multilayered Wood Flooring from the People's Republic of China*, 76 FR 76693 (December 8, 2011) (countervailing duty order), as amended by *Multilayered Wood Flooring from the People's Republic of China: Amended Antidumping and Countervailing Duty Orders*, 77 FR 5484 (February 3, 2012); (4) multilayered wood flooring with a face veneer of bamboo or composed entirely of bamboo; (5) plywood which has a shape or design other than a flat panel, with the exception of any minor processing described above; (6) products made entirely from bamboo and adhesives (also known as "solid bamboo"); and (7) Phenolic Film Faced Plyform (PFF), also known as Phenolic Surface Film Plywood (PSF), defined as a panel with an "Exterior" or "Exposure 1" bond classification as is defined by The Engineered Wood Association, having an opaque phenolic film layer with a weight equal to or greater than 90g/m3 permanently bonded on both the face and back veneers and an opaque, moisture resistant coating applied to the edges.

On July 14, 2023, Commerce determined that imports of hardwood plywood completed in Vietnam using hardwood plywood inputs (face veneer, back veneer, and/or either an assembled core or individual core veneers) manufactured in China, or Chinese hardwood plywood inputs (assembled cores, multi-ply core panels, or individual core veneers) combined in Vietnam with other inputs (face and/or back veneers) manufactured in Vietnam or third countries, and subsequently exported to the United States, were circumventing these *Orders*.  Accordingly, these *Orders* include hardwood plywood that is exported to the United States that is completed in Vietnam under the following scenarios:

1. Face veneer, back veneer, and assembled core components (*e.g.*, veneer core platforms) manufactured in China and assembled in Vietnam;
2. Fully assembled veneer core platforms manufactured in China that are combined in Vietnam with face and/or back veneers produced in Vietnam or third countries;
3. Multi-ply panels of glued core veneers manufactured in China that are combined in Vietnam to produce veneer core platforms and combined with either a face and/or back veneer produced in China, Vietnam, or a third country;
4. Face veneer, back veneer, and individual core veneers produced in China and assembled into hardwood plywood in Vietnam; and
5. Individual core veneers manufactured in China and processed into a veneer core platform in Vietnam and combined with a face and/or back veneer produced in Vietnam or other third country.

Excluded from the scope of these *Orders* are wooden furniture goods that, at the time of importation, are fully assembled and are ready for their intended uses.  Also excluded from the scope of these *Orders* is "ready to assemble" (RTA) furniture.  RTA furniture is defined as (A) furniture packaged for sale for ultimate purchase by an end-user that, at the time of importation, includes (1) all wooden components (in finished form) required to assemble a finished unit of furniture, (2) all accessory parts (*e.g.*, screws, washers, dowels, nails, handles, knobs, adhesive glues) required to assemble a finished unit of furniture, and (3) instructions providing guidance on the assembly of a finished unit of furniture; (B) unassembled bathroom vanity cabinets, having a space for one or more sinks, that are imported with all unassembled hardwood and hardwood plywood components that have been cut-to-final dimensional component shape/size, painted or stained prior to importation, and stacked within a singled shipping package, except for furniture feet which may be packed and shipped separately; or (C) unassembled bathroom vanity linen closets that are imported with all unassembled hardwood and hardwood plywood components that have been cut-to-final dimensional shape/size, painted or stained prior to importation, and stacked within a single shipping package, except for furniture feet which may be packed and shipped separately.

Excluded from the scope of these *Orders* are kitchen cabinets that, at the time of importation, are fully assembled and are ready for their intended uses.  Also excluded from the scope of these *Orders* are RTA kitchen cabinets.  RTA kitchen cabinets are defined as kitchen cabinets packaged for sale for ultimate purchase by an end-user that, at the time of importation, includes: (1) all wooden components (in finished form) required to assemble a finished unit of cabinetry; (2) all accessory parts (*e.g.*, screws, washers, dowels, nails, handles, knobs, hooks, adhesive glues) required to assemble a finished unit of cabinetry; and (3) instructions providing guidance on the assembly of a finished unit of cabinetry.

Excluded from the scope of these *Orders* are finished table tops, which are table tops imported in finished form with pre-cut or drilled openings to attach the underframe or legs.  The table tops are ready for use at the time of import and require no further finishing or processing.

Excluded from the scope of these *Orders* are finished countertops that are imported in finished form and require no further finishing or manufacturing.

Excluded from the scope of these *Orders* are laminated veneer lumber door and window components with:  (1) a maximum width of 44 millimeters, a thickness from 30 millimeters to 72 millimeters, and a length of less than 2413 millimeters; (2) water boiling point exterior adhesive; (3) a modulus of elasticity of 1,500,000 pounds per square inch or higher; (4) finger-jointed or lap-jointed core veneer with all layers oriented so that the grain is running parallel or with no more than 3 dispersed layers of veneer oriented with the grain running perpendicular to the other layers; and (5) top layer machined with a curved edge and one or more profile channels throughout.

Excluded from the scope of these *Orders* are certain door stiles and rails made of LVL that have a width not to exceed 50 millimeters, a thickness not to exceed 50 millimeters, and a length of less than 2,450 millimeters.

3

Imports of hardwood plywood are primarily entered under the following HTSUS subheadings:
4412.10.0500; 4412.31.0520; 4412.31.0540; 4412.31.0560; 4412.31.0620; 4412.31.0640;
4412.31.0660; 4412.31.2510; 4412.31.2520; 4412.31.2610; 4412.31.2620; 4412.31.4040;
4412.31.4050; 4412.31.4060; 4412.31.4075; 4412.31.4080; 4412.31.4140; 4412.31.4150;
4412.31.4155; 4412.31.4160; 4412.31.4180; 4412.31.4200; 4412.31.4500; 4412.31.4850;
4412.31.4860; 4412.31.4863; 4412.31.4865; 4412.31.4866; 4412.31.4880; 4412.31.4869;
4412.31.5125; 4412.31.5135; 4412.31.5155; 4412.31.5165; 4412.31.5175; 4412.31.5235;
4412.31.5255; 4412.31.5260; 4412.31.5262; 4412.31.5264; 4412.31.5265; 4412.31.5266;
4412.31.5268; 4412.31.5270; 4412.31.5275; 4412.31.6000; 4412.31.6100; 4412.31.9100;
4412.31.9200; 4412.32.0520; 4412.32.0540; 4412.32.0565; 4412.32.0570; 4412.32.0620;
4412.32.0640; 4412.32.0670; 4412.32.2510; 4412.32.2525; 4412.32.2530; 4412.32.2610;
4412.32.2630; 4412.32.3125; 4412.32.3135; 4412.32.3155; 4412.32.3165; 4412.32.3175;
4412.32.3185; 4412.32.3235; 4412.32.3255; 4412.32.3265; 4412.32.3275; 4412.32.3285;
4412.32.5600; 4412.32.5700; 4412.33.0620; 4412.33.0640; 4412.33.0670; 4412.33.2630;
4412.33.3235; 4412.33.3255; 4412.33.3265; 4412.33.3275; 4412.33.3285; 4412.33.5700;
4412.34.2600; 4412.34.3235; 4412.34.3255; 4412.34.3265; 4412.34.3275; 4412.34.3285;
4412.34.5700; 4412.39.1000; 4412.39.3000; 4412.39.4011; 4412.39.4012; 4412.39.4019;
4412.39.4031; 4412.39.4032; 4412.39.4039; 4412.39.4051; 4412.39.4052; 4412.39.4059;
4412.39.4061; 4412.39.4062; 4412.39.4069; 4412.39.5010; 4412.39.5030; 4412.39.5050;
4412.41.0000; 4412.42.0000; 4412.51.1030; 4412.51.1050; 4412.51.3111; 4412.51.3121;
4412.51.3141; 4412.51.3161; 4412.51.3175; 4412.51.4100; 4412.51.5100; 4412.52.1030;
4412.52.1050; 4412.52.3121; 4412.52.3161; 4412.52.3175; 4412.52.4100; 4412.52.5100;
4412.91.0600; 4412.91.1020; 4412.91.1030; 4412.91.1040; 4412.91.3110; 4412.91.3120;
4412.91.3130; 4412.91.3140; 4412.91.3150; 4412.91.3160; 4412.91.3170; 4412.91.4100;
4412.91.5115; 4412.92.0700; 4412.92.1120; 4412.92.1130; 4412.92.1140; 4412.92.3120;
4412.92.3150; 4412.92.3160; 4412.92.3170; 4412.92.4200; 4412.92.5215; 4412.94.1030;
4412.94.1050; 4412.94.3105; 4412.94.3111; 4412.94.3121; 4412.94.3141; 4412.94.3161;
4412.94.3175; 4412.94.4100; 4412.99.0600; 4412.99.1020; 4412.99.1030; 4412.99.1040;
4412.99.3110; 4412.99.3120; 4412.99.3130; 4412.99.3140; 4412.99.3150; 4412.99.3160;
4412.99.3170; 4412.99.4100; 4412.99.5115; 4412.99.5710; and 9403.91.0080.

Imports of hardwood plywood may also enter under HTSUS subheadings 4412.10.9000;
4412.94.5100; 4412.94.9500; 4412.99.6000; 4412.99.7000; 4412.99.8000; 4412.99.9000;
4412.99.9500; 9403.90.7005; 9403.90.7010; 9403.90.7080; 9403.91.0005; and 9403.91.0010.
While the HTSUS subheadings are provided for convenience and customs purposes, the written
description of the scope of these *Orders* is dispositive.

Barcode:4502820-01 A-570-051 REV - Admin Review 1/1/22 - 12/31/22 Plywood AR5

**Attachment IV-B**
**Description of Hardwood Plywood Subject to Certification Eligibility Reviews**

For the purpose of certification eligibility reconsideration, the hardwood plywood for which we are requesting information meets the description above (Attachment IV-A) *without regard to the country of origin of wood inputs*. This description is physical in nature, only. The respondent is required to report all of its entries of hardwood plywood to the United States[9] that meet this physical description, including entries of hardwood plywood completed in Vietnam using non-Chinese wood inputs.

## Merchandise Covered by the *Circumvention Determination*

On July 14, 2023, Commerce determined that imports of hardwood plywood completed in Vietnam using hardwood plywood inputs (face veneer, back veneer, and/or either an assembled core or individual core veneers) manufactured in China, or Chinese hardwood plywood inputs (assembled cores, multi-ply core panels, or individual core veneers) combined in Vietnam with other inputs (face and/or back veneers) manufactured in Vietnam or third countries, and subsequently exported to the United States, were circumventing the *Orders* on hardwood plywood from China.[10] Accordingly, we determined that the *Orders* include hardwood plywood that is exported to the United States and that is completed in Vietnam under any of five specific scenarios, identified in the scope, that are related to certain wood inputs.[11] However, for these certification eligibility reviews, all hardwood plywood that is suspended as Type 3 is under review, regardless of where the wood inputs were manufactured/processed.

---

[9] In the absence of entries, please report shipments to the United States.
[10] *See Certain Hardwood Plywood Products from the People's Republic of China: Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 88 FR 46740 (July 20, 2023), and accompanying Issues and Decision Memorandum.
[11] *See* Attachment IV-A.