IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| SHELTER FOREST INTERNATIONAL ACQUISITION, INC., ) ) ) Plaintiff, ) ) and ) ) GREATRIVER WOOD CO. LTD., ET AL., ) ) Consolidated Plaintiffs, ) ) v. ) ) UNITED STATES, ) ) Defendant, ) and ) ) COALITION FOR FAIR TRADE IN ) HARDWOOD PLYWOOD, ) ) Defendant-Intervenor. ) | Consol. Court No. 23-00144 |

**ORDER**

Upon consideration of plaintiffs' motions for judgment upon the agency record, defendant's and defendant-intervenor's responses thereto, plaintiffs' replies, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion is DENIED; and it is further

ORDERED that the defendant's request for a partial voluntary remand to reexamine instructions to Customs is granted; and it is further

ORDERED that the Department of Commerce's challenged determination is sustained in all other respects.

Dated:_____

      New York, New York

                                  _____

                                  CHIEF JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | | |
|---|---|---|
| SHELTER FOREST INTERNATIONAL ACQUISITION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | Consol. Court No. 23-00144 |
| GREATRIVER WOOD CO. LTD., ET AL., | ) | |
| | ) | |
| Consolidated Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:

SAVANNAH MAXWELL
Attorney
U.S. Department of Commerce
Office of the Chief Counsel
for Trade Enforcement and Compliance
U.S. Department of Commerce

SOSUN BAE
Senior Trial Counsel
COLLIN T. MATHIAS
Trial Attorney
U.S. Department of Justice
Commercial Litigation Branch

Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel:  (202) 305-7568
Facsimile: (202) 514-8624

July 2, 2024                        Attorneys for Defendant United States

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................iv

STATEMENT PURSUANT TO RULE 56.2 ...........................................................3

    I.       Administrative Determination Under Review .......................................3

    II.      Issues Presented ...................................................................................3

STATEMENT OF FACTS ..................................................................................3

    I.       Commerce's Antidumping And Countervailing Duty Orders ...............3

    II.      Commerce Initiates Scope And Circumvention Inquiries ....................4

    III.    Respondent Selection And Issuance Of Questionnaires .....................6

    IV.    Preliminary Scope And Circumvention Determination ......................8

        A.       Commerce's Preliminary Application Of AFA ......................8

        B.       Commerce's Preliminary Scope And Circumvention Findings ...............10

        C.       Certification Program ...........................................................12

    V.      Post-Preliminary Proceedings ..........................................................12

    VI.    Final Circumvention Determination ...................................................14

SUMMARY OF THE ARGUMENT .......................................................................16

ARGUMENT.....................................................................................................18

    I.       Standard Of Review.............................................................................18

    II.      Commerce's Anticircumvention Determination Is Lawful And Supported By Substantial Evidence...............................................................19

        A.       Legal Framework For Circumvention Determinations ...........................19

    III.    Commerce's Circumvention Inquiry Was Not Procedurally Flawed.................21

        A.       Commerce's Questionnaires And Data Collection Were Robust..........22

B.  Commerce Reasonably Relied On Data From The Finewood Scope Proceeding .........................................................................24

C.  Commerce Was Not Required To Select Mandatory Respondents Or Go Further In Examining Participating Respondents ..................................26

IV.  Commerce's Circumvention Determination Is Lawful And Supported By Substantial Evidence ...........................................................................30

A.  Record Evidence Supports Commerce's Finding That The Process of Assembling Hardwood Plywood Inputs In Vietnam To Produce Inquiry Merchandise Is Minor And Insignificant.................................................. 30

B.  Commerce's Analysis Of Patterns Of Trade Is Supported By Substantial Evidence And In Accordance With Law.................................................. 32

C.  Commerce's Circumvention Determination Did Not Impermissibly Expand The Scope Of The Order ...........................................................36

V.  Commerce Acted Reasonably And Lawfully In Rejecting Untimely New Factual Information ..............................................................................38

A.  Framework For Submission Of Factual Information .............................39

B.  Commerce's Rejection Of Untimely NFI Was Reasonable, Particularly Given The Circumstances Of The Underlying Proceeding ....................41

C.  Commerce Acted Consistently With Judicial Precedent .........................43

1.  Judicial Precedent Supports Commerce's Determination And Commerce Did Not Misinterpret Prevailing Standards When Rejecting NFI ...........................................................................43

2.  The Case Law Relied On By Plaintiffs Does Not Undermine Commerce's Decision Not To Accept Untimely Filed NFI .........48

D.  Commerce's Rejection Of Shelter Forest's Untimely NFI Was Reasonable And Lawful .........................................................................52

1.  Background For Rejection Of Shelter Forest's NFI ...................52

2.  Commerce Properly Rejected Shelter Forest's NFI ....................54

E.  The Remaining Company-Specific Arguments Raised By Plaintiffs Are Unpersuasive .........................................................................................56

VI.    Commerce's Certification Program is Lawful........................................................ 61

VII.    We Respectfully Request A Voluntary Remand For Commerce To Consider Its Customs Instructions For An An And Greatwood.............................................. 67

CONCLUSION ........................................................................................................................68

## <u>TABLE OF AUTHORITIES</u>

**<u>CASES</u>**                                                                                    **<u>PAGE(S)</u>**

*Ad Hoc Shrimp Trade Action Committee v. United States,*
    882 F. Supp. 2d 1377 (Ct. Int'l Trade 2013)...................................................................67

*Al Ghurair Iron & Steel LLC v. United States,*
    536 F. Supp. 3d 1357 (Ct. Int'l Trade 2021)...........................................................34, 37

*Ancientree Cabinet Co., Ltd. v. United States,*
    565 F. Supp. 3d 1373 (Ct. Int'l Trade 2022)...................................................................29

*Atl. Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984)........................................................................................18

*Baroque Timber Industries (Zhongshan) Co., Ltd. v. United States,*
    925 F. Supp. 2d 1332 (Ct. Int'l Trade 2013)...................................................................68

*Consolidated Edison Co. v. NLRB,*
    305 U.S. 197 (1938) ........................................................................................................18

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) ........................................................................................................18

*Dalian Meisen Woodworking Co. v. United States,*
    No 20-00109, 2023 WL 3058783 (Ct. Int'l Trade Apr. 24, 2023)......................60, 61, 63

*Deacero S.A. de C.V. v. United States,*
    817 F.3d 1332 (Fed. Cir. 2016)..................................................................................19, 27

*Deacero S.A.P.I. de C.V. v. United States,*
    353 F. Supp. 3d. 1303 (Ct. Int'l Trade 2018).................................................................47

*Dongtai Peak Honey Indus. v. United States,*
    777 F.3d 1343 (Fed. Cir. 2015)..................................................................................42, 43

*Essar Steel Ltd. v. United States,*
    678 F.3d 1268 (Fed. Cir. 2012)..............................................................................43, 44, 45

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996)....................................................................................18, 22

*Goldlink Indus. Co. v. United States,*
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006)...........................................................32, 33

*Goodluck India v. United States,*
 11 F.4th 1335 (Fed. Cir. 2021)..........................................................................40

*Grobest & I-Mei Indus.(Vietnam) Co., Ltd. v. United States,*
 815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012)................................... 40, 47, 48, 51

*Hlds (B) Steel Sdn Bhd v. United States,*
 No. 21-00638, 2024 WL 244937 (Ct. Int'l Trade Jan. 23, 2024) ..............................34, 36

*Inmax SDN v. United States,*
 277 F. Supp. 3d 1367 (Ct. Int'l Trade 2017)...........................................34, 35

*Invenergy Renewables LLC v. United States,*
 552 F. Supp. 3d 1382 (Ct. Int'l Trade 2021)................................................24

*Linyi Chengen Import and Export Co., Ltd. v. United States,*
 433 F. Supp. 3d 1278 (Ct. Int'l Trade 2020)..........................................48, 51

*Macao Commercial v. United States,*
 437 F. Supp. 3d 1324 (Ct. Int'l Trade 2020).................................................64

*Micron Tech., Inc. v. United States,*
 117 F.3d 1386 (Fed. Cir. 1997).......................................................40, 41

*Nan Ya Plastics Corp., Ltd. v. United States,*
 810 F.3d 1333 (Fed. Cir. 2016).......................................................24, 41

*Nippon Steel Corp. v. United States,*
 458 F.3d 1345 (Fed. Cir. 2006)............................................................18

*NTN Bearing Corp. v. United States,*
 74 F.3d 1204 (Fed. Cir. 1995)..............................................................40

*Pro-Team Coil Nail Enterprise, Inc. v. United States,*
 419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019)................................................51

*PSC VSMPO–Avisma Corp. v. United States,*
 688 F.3d 751 (Fed. Cir. 2012)..............................................................40

*Qingdao Sea-Line Trading Co. v. United States,*
 766 F.3d 1378 (Fed. Cir. 2014)............................................................29

*QVD Food Co., Ltd. v. United States,*
 658 F.3d 1318 (Fed. Cir. 2011)........................................................41, 42

*Saha Thai Steel Pipe Pub. Co. v. United States*,
    547 F. Supp. 3d 1278 (Ct. Int'l Trade 2021) ...................................................37

*SeAH Steel Corp. v. United States*,
    704 F. Supp. 2d 1353 (Ct. Int'l Trade 2010) .................................................67

*Shelter Forest Int'l Acquisition, Inc. v. United States*,
    497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021) ...........................................48, 49

*Shelter Forest Int'l Acquisition, Inc. v. United States*,
    No. 2021-2281, 2022 WL 2155965 (Fed. Cir. June 15, 2022) .......................48

*SKF USA Inc. v. United States*,
    254 F.3d 1022 (Fed. Cir. 2001) ..............................................................67, 68

*Smith-Corona Group v. United States*,
    713 F.2d 1568 (Fed. Cir. 1983) ....................................................................22

*Star Fruits S.N.C v. United States*,
    393 F.3d 1277 (Fed. Cir. 2005) ....................................................................47

*Ta Chen Stainless Steel Pipe Ltd. v. United States*,
    23 C.I.T. 804 (Ct. Int'l Trade 1999) ............................................................24

*Target Corp. v. United States*,
    609 F.3d 1352 (Fed. Cir. 2010) ....................................................................19

*Timken U.S. Corp. v. United States*,
    318 F. Supp. 2d 1271 (Ct. Int'l Trade 2004) .................................................45

*Timken U.S. Corp. v. United States*,
    434 F.3d 1345 (Fed. Cir. 2006) ........................................................40, 45, 46

*Uniroyal Marine Exports Ltd. v. United States*,
    626 F. Supp. 2d 1312 (Ct. Int'l Trade 2009) .................................................60

*United States v. Great Am. Ins. Co. of New York*,
    738 F.3d 1320 (Fed. Cir. 2013) ....................................................................26

*Usinor Sacilor v. United States*,
    872 F. Supp. 1000 (Ct. Int'l Trade 1994) .....................................................40

*Vietnam Finewood Co. Ltd. v. United States*,
    633 F. Supp.3d 1243 (Ct. Int'l Trade 2023) ...............................................8, 14

*Wash. Int'l Ins. Co. v. United States,*
    33 C.I.T. 1023 (Ct. Int'l Trade 2009) ......................................................24

*WelCom Prods v. United States,*
    865 F. Supp. 2d 1340 (Ct. Int'l Trade 2012) ..........................................47

*Wheatland Tube Co. v. United States,*
    161 F.3d 1365 (Fed. Cir. 1998) ...............................................................19

*Yantai Timken v. United States,*
    521 F. Supp. 2d 1356 (Ct. Int'l Trade 2007) ............................... 40, 45, 46

## STATUTES

19 U.S.C. § 1671 ...............................................................................................64

19 U.S.C. § 1671d(c)(1)(B)(ii) .........................................................................64

19 U.S.C. § 1673 ...............................................................................................64

19 U.S.C. § 1673d(c)(1)(B)(ii) .........................................................................64

19 U.S.C. § 1673e .............................................................................................37

19 U.S.C. § 1675(b)(4) ......................................................................................35

19 U.S.C. § 1677e(b) ....................................................................................9, 10

19 U.S.C. § 1677f-1(c)(1) .................................................................................26

19 U.S.C. § 1677j .......................................................................................19, 23

19 U.S.C. § 1677j(a) .....................................................................................6, 28

19 U.S.C. § 1677j(b) ..................................................................................passim

19 U.S.C. § 1677j(b)(1) .....................................................................................27

19 U.S.C. § 1677j(b)(2) ...............................................................................30, 31

19 U.S.C. § 1677j(b)(3) ...............................................................................33, 35

19 U.S.C. § 1677j(c) ..........................................................................................35

19 U.S.C. § 1677j(d) ..........................................................................................48

19 U.S.C. § 1677j(e) ..........................................................................................37

19 U.S.C. § 1677j(e)(3) ................................................................................................38

19 U.S.C. § 1677m(d) ...........................................................................................57, 58

## **REGULATIONS**

19 C.F.R. § 351.102(b)(4) .....................................................................................52, 53

19 C.F.R. § 351.102(b)(21) ..........................................................................................39

19 C.F.R. § 351.225(c) ...................................................................................................5

19 C.F.R. § 351.225(h) .......................................................................................5, 19, 20

19 C.F.R. § 351.301 ......................................................................................................39

19 C.F.R. § 351.301(c)(5) ............................................................................................39

19 C.F.R. § 351.302(b) ...........................................................................................39, 54

19 C.F.R. § 351.302(d) ...........................................................................................39, 55

## **OTHER AUTHORITIES**

*Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order,*
    82 Fed. Reg. 513 (Dep't of Commerce Jan. 4, 2018) .......................................4

*Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping and Countervailing Duty Orders,*
    82 Fed. Reg. 58,170 (Dep't of Commerce Dec. 11, 2017) .............................29

*Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,*
    83 Fed. Reg. 504 (Dep't of Commerce Jan. 4, 2018) .......................................3

*Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty Order,*
    84 Fed. Reg. 29,164 (Dep't of Commerce June 21, 2019) .............................63

*Final Affirmative Determination of Circumvention of Antidumping and Countervailing Duty Orders, and Partial Recission of Aluminum Extrusions from the People's Republic of China:*
    84 Fed. Reg. 39,805 (Dep't of Commerce Aug. 12, 2019) .............................63

*Hydrofluorocarbon Blends from the People's Republic of China: Final Scope Ruling on Unpatented R- 421A; Affirmative Final Determination of Circumvention of the Antidumping Duty Order for Unpatented R-421A,*
    85 Fed. Reg 34,416 (Dep't of Commerce June 4, 2020)...................................................64

*Certain Hardwood Plywood Products from the People's Republic of China: Initiation of Anti-circumvention Inquiries and Scope Inquiries on the Antidumping Duty and Countervailing Duty Orders; Vietnam Assembly,*
    85 Fed. Reg. 36,530 (Dep't of Commerce June 17, 2020)................................... 5, 27, 56

*Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws,*
    86 Fed. Reg. 52,300 (Dep't of Commerce Sept. 20, 2021) .................................................5

*Certain Uncoated Paper from Brazil, the People's Republic of China, and Indonesia: Affirmative Final Determinations of Circumvention of the Antidumping Duty Orders and Countervailing Duty Orders for Certain Uncoated Paper Rolls,*
    86 Fed. Reg. 71,025 (Dep't of Commerce Dec. 12, 2021).............................................28

*Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders on Certain Hardwood Plywood Products From the People's Republic of China,*
    87 Fed. Reg. 45,753 (Dep't of Commerce July 29, 2022)................................................8

*Certain Hardwood Plywood Products from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders,*
    88 Fed. Reg. 46,740 (Dep't of Commerce July 20, 2023)...........................................3, 14

Omnibus Trade Act of 1987, Report of the Senate Finance Committee,
    S. Rep. No. 100-71 (1987) .....................................................................................21, 64

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| SHELTER FOREST INTERNATIONAL ACQUISITION, INC., ) ) ) Plaintiff, ) ) and ) ) GREATRIVER WOOD CO. LTD., ET AL., ) ) Consolidated Plaintiffs, ) ) v. ) ) UNITED STATES, ) ) Defendant, ) and ) ) COALITION FOR FAIR TRADE IN ) HARDWOOD PLYWOOD, ) ) Defendant-Intervenor. ) | Consol. Court No. 23-00144 |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.2
MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of this Court's rules, defendant, the United States, respectfully submits this response in opposition to the motions for judgment upon the agency record filed by plaintiffs American Plywood Pacific, *et al*. (DH plaintiffs), ECF No. 31; Shelter Forest International Acquisition Inc. (Shelter Forest), ECF No. 32; Greatriver Wood Co. Ltd., *et al*. (Greatriver), ECF No. 33; Tumac Lumber Co. (Tumac), ECF No. 34; Concannon Lumber Company, *et al*. (MG plaintiffs), ECF No. 35; and Cabinetworks Group, Inc., *et al.* (STR plaintiffs), ECF No. 39.  Plaintiffs challenge the Department of Commerce's (Commerce) anticircumvention determination concerning certain hardwood plywood products from the

People's Republic of China (China).  Because Commerce's determination is based upon substantial evidence on the record and is in accordance with law, we respectfully request that the Court deny plaintiffs' motions.  Further, without confessing error, we respectfully request a partial remand to Commerce so that Commerce may reexamine its customs instructions for An An Plywood Joint Stock Company (An An) and Greatwood Hung Yen Joint Stock Company (Greatwood).  Finally, we respectfully request that the Court sustain the remaining determination.

Commerce's scope and anticircumvention inquiries covered certain hardwood plywood exported to the United States and produced under the following scenarios:

1)  Face veneer, back veneer, and assembled core components (*e.g.*, veneer core platforms) manufactured in China and assembled in Vietnam;

2)  Fully assembled veneer core platforms manufactured in China that are combined in Vietnam with face and/or back veneers produced in Vietnam or third countries;

3)  Multi-ply panels of glued core veneers manufactured in China that are combined in Vietnam to produce veneer core platforms and combined with either a face and/or back veneer produced in China, Vietnam, or a third country;

4)  Face veneer, back veneer, and individual core veneers produced in China and assembled into hardwood plywood in Vietnam; and

5)  Individual core veneers manufactured in China and processed into a veneer core platform in Vietnam and combined with a face and/or back veneer produced in Vietnam or other third country.

Commerce found that each of the five scenarios were circumventing the orders.  That is, it found that hardwood plywood products completed in Vietnam using hardwood plywood inputs manufactured in China, as well as Chinese hardwood plywood inputs combined in Vietnam with other inputs manufactured in Vietnam or third countries, and subsequently exported to the United States, constitute merchandise circumventing the antidumping and countervailing duty orders covering certain hardwood plywood from China.

2

**STATEMENT PURSUANT TO RULE 56.2**

I.    Administrative Determination Under Review

Plaintiffs challenge numerous aspects of Commerce's anticircumvention determination on certain hardwood plywood from China.  *See Certain Hardwood Plywood Products from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 88 Fed. Reg. 46,740 (Dep't of Commerce July 20, 2023) (P.R. 844)[1] (final determination), and accompanying Issues and Decision Memorandum (IDM) (P.R. 842).

II.    Issues Presented

1.    Whether Commerce's inquiry was procedurally flawed.

2.    Whether Commerce's affirmative circumvention determination was supported by substantial evidence and in accordance with law.

3.    Whether Commerce's rejection of untimely filed new factual information was consistent with Commerce's regulations and did not constitute an abuse of discretion.

4.    Whether Commerce's certification program is lawful.

5.    Whether the Court should grant our request for a voluntary remand so that Commerce can consider certain Customs and Border Protection (CBP) instructions as they relate to companies no longer receiving an adverse facts available (AFA) finding.

**STATEMENT OF FACTS**

I.    Commerce's Antidumping And Countervailing Duty Orders

In January 2018, Commerce issued antidumping and countervailing duty orders covering

---

[1]  Unless noted otherwise, citations to the public (P.R.) and confidential (C.R.) record documents refer to the record of the antidumping proceeding, rather than the countervailing one. *See* ECF No. 21-1, 21-2.

certain hardwood plywood products from China.  *See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 83 Fed. Reg. 504 (Dep't of Commerce Jan. 4, 2018); *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order*, 82 Fed. Reg. 513 (Dep't of Commerce Jan. 4, 2018).  The orders cover, in relevant part:

> hardwood and decorative plywood, and certain veneered panels as described below. For purposes of this proceeding, hardwood and decorative plywood is defined as a generally flat, multilayered plywood or other veneered panel, consisting of two or more layers or plies of wood veneers and a core, with the face and/or back veneer made of non-coniferous wood (hardwood) or bamboo. The veneers, along with the core may be glued or otherwise bonded together. Hardwood and decorative plywood may include products that meet the American National Standard for Hardwood and Decorative Plywood, ANSI/HPVA HP- 1-2016 (including any revisions to that standard). For purposes of these Orders a "veneer" is a slice of wood regardless of thickness which is cut, sliced or sawed from   a   log, bolt, or flitch.

*Id.*

The orders apply to hardwood plywood from China that meets the physical description of the scope, even if it is exported to a third country for additional processing, so long as the hardwood plywood continues to meet the physical description:

> Subject merchandise also includes hardwood and decorative plywood that has been further processed in a third country, including but not limited to trimming, cutting, notching, punching, drilling, or any other processing that would not otherwise remove the merchandise from the scope of the Orders if performed in the country of manufacture of the in-scope product.

*Id*.

II.    <u>Commerce Initiates Scope And Circumvention Inquiries</u>

On February 25, 2020, petitioner, the Coalition for Fair Trade in Hardwood Plywood (Coalition) filed a request for a scope and/or a circumvention ruling, alleging that hardwood

plywood products manufactured from Chinese-origin core veneers, multi-ply core veneer panels, and/or veneer core platforms and assembled in Vietnam are either covered by or circumventing the orders. *See* Petitioner's Request (P.R. 19) (C.R. 5); Petitioner's Clarification (P.R. 20). The Coalition requested that Commerce issue a scope ruling pursuant to 19 C.F.R. § 351.225(c),[2] confirming that hardwood plywood from China that is assembled in Vietnam before being imported into the United States is within the scope of the orders. *See* Petitioners Request (P.R. 19). In the alternative, the Coalition requested that Commerce conduct an anticircumvention inquiry, pursuant to 19 U.S.C. § 1677j(b) and 19 C.F.R. § 351.225(h), and determine that hardwood plywood products assembled in Vietnam using hardwood plywood inputs from China are circumventing the orders. *Id.*

On June 17, 2020, Commerce published an initiation notice for scope and country-wide anticircumvention inquiries. *See Certain Hardwood Plywood Products from the People's Republic of China: Initiation of Anti-circumvention Inquiries and Scope Inquiries on the Antidumping Duty and Countervailing Duty Orders; Vietnam Assembly*, 85 Fed. Reg. 36,530 (Dep't of Commerce June 17, 2020) (initiation notice). The initiation notice stated that the inquiries would cover hardwood plywood completed in Vietnam using:

1)    Face veneer, back veneer, and assembled core components (*e.g.*, veneer core platforms) manufactured in China;

2)    Fully assembled veneer core platforms manufactured in China that are combined in Vietnam with face and/or back veneers produced in Vietnam or third countries;

---

[2]  Commerce's scope and circumvention regulations were significantly revised on September 20, 2021, with an effective date of November 4, 2021. *See Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300 (Dep't of Commerce Sept. 20, 2021). The scope and circumvention inquiries underlying this case were initiated prior to the effective date of the new regulations; accordingly, any reference to or reliance on the regulations is to the prior versions of the regulations.

3)    Multi-ply panels of glued core veneers manufactured in China that are combined in Vietnam to produce veneer core platforms and combined with either a face and/or back veneer produced in China, Vietnam, or a third country;

4)    Face veneer, back veneer, and individual core veneers produced in China; and

5)    Core veneers manufactured in China and processed into a veneer core platform in Vietnam and combined with a face and/or back veneer produced in Vietnam or other third country.

*Id.* at n.12.

Following the initiation notice, certain interested parties submitted comments expressing confusion on the exact production scenarios covered by the inquiries. *See* Concannon Request for Clarification (P.R. 8). In response, Commerce issued a memo clarifying the types of merchandise it intended to examine, explaining that:

> the detailed description in . . . the *Initiation Notice* accurately describes the merchandise subject to this inquiry and is in accordance with the petitioner's request, as explained in its May 12, 2020 clarification . . . . The merchandise subject to these anticircumvention and scope inquiries does not include core veneers fully produced in Vietnam or a third-country that are assembled into a veneer core platform in Vietnam and combined with a face and back veneer produced in China.

July 9, 2020 Clarification Memo (P.R. 21).

III.    Respondent Selection And Issuance Of Questionnaires

In its request for a scope and/or circumvention ruling, the Coalition identified numerous exporters and producers of hardwood plywood that it believed may be assembling hardwood plywood in Vietnam from Chinese inputs, but also alleged that a country-wide finding of circumvention should apply to all exports of Chinese-origin hardwood plywood assembled in Vietnam. *See* Petitioner's Request (P.R. 19) (C.R. 5). As 19 U.S.C. § 1667j(b) does not specify how Commerce should identify companies for examination in anticircumvention inquiries, Commerce identified the universe of potential respondents based on information submitted by

the Coalition, publicly-available information, and entries of appearances submitted by interested parties. *See* Petitioner's Request at 50-52 and Exhibit 9 (P.R. 19) (C.R. 5); September 10, 2020 Company Documentation Memo (P.R. 63). Commerce also relied on CBP entry data that identified exporters of hardwood plywood from Vietnam with shipments under relevant subheadings of the Harmonized Tariff Schedule (HTS) between December 8, 2016, and March 31, 2020. *See* Release of CBP Data and Publicly Identifiable Companies (P.R. 26).

On September 10, 2020, Commerce issued quantity and value (Q&V) questionnaires to producers and exporters of hardwood plywood from Vietnam, inquiring into their sales of hardwood plywood to the United States and their sourcing of hardwood plywood inputs from China. *See* Q&V Questionnaire (P.R. 62). Commerce received questionnaire responses from 51 Vietnamese companies, including several unsolicited responses; eight companies from which Commerce had solicited a response failed to respond to the questionnaire. *See* Preliminary Decision Memorandum (PDM) at 30-35 (P.R. 409). None of the 51 responding companies reported producing hardwood plywood under any of the five scenarios subject to the inquiries.

On February 22, 2021, Commerce issued a supplemental questionnaire to the 51 companies that responded to the Q&V questionnaire and received 46 timely responses. *See* Supplemental Questionnaire (P.R. 154). Commerce issued a questionnaire to the Government of Vietnam and received a response on April 6, 2021. *See* GOV Questionnaire (P.R. 153); GOV Initial Questionnaire Response (P.R. 248-252). Commerce then issued second supplemental questionnaires to the 46 companies that had timely responded to the supplemental questionnaire and received 45 timely responses. *See* Second Supplemental Questionnaire (P.R. 257). Commerce also issued a supplemental questionnaire to the Government of Vietnam and received a response on July 21, 2021. *See* GOV Supplemental Questionnaire (P.R. 260*j*); GOV

Supplemental Questionnaire Response (P.R. 351-355).  No companies responding to the initial,

or supplemental questionnaires reported producing hardwood plywood under any of the five

production scenarios subject to the inquiries.  Accordingly, Commerce did not select any

individual respondents for further examination.

Commerce also placed additional relevant documents on the record of the proceeding,

including documents from an earlier, related scope proceeding (Finewood scope proceeding).

*See* February 18, 2022 Memo Placing EAPA Documents on Record (P.R. 393), and Attachments

(P.R. 394-399).  In the Finewood scope proceeding, Commerce had interpreted the scope of the

orders covering hardwood plywood from China as including two-ply panels, and found that

hardwood plywood assembled in Vietnam using two-ply panels imported from China was not

substantially transformed by the processing in Vietnam.  *See Vietnam Finewood Co. Ltd. v.*

*United States*, 633 F. Supp.3d 1243, 1248 (Ct. Int'l Trade 2023).

IV.    Preliminary Scope And Circumvention Determination

On July 22, 2022, Commerce released an affirmative preliminary scope ruling and

circumvention determination.  *See Preliminary Scope Determination and Affirmative*

*Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty*

*Orders on Certain Hardwood Plywood Products From the People's Republic of China*, 87 Fed.

Reg. 45,753 (Dep't of Commerce July 29, 2022) (preliminary determination), and accompanying

PDM (P.R. 409).

A.    Commerce's Preliminary Application Of AFA

In the preliminary determination, Commerce found that 36 companies either provided

unreliable responses to its questionnaires or failed to respond entirely.  PDM at 11, 20.

Specifically, Commerce found that the responses of 22 of the 45 companies that had responded

to Commerce's initial and supplemental questionnaires contained significant discrepancies, inconsistencies, or misleading information.  *Id.* at 10.  Commerce explained that those respondents:

- failed to provide information regarding their affiliation with Chinese companies and/or imports of hardwood plywood inputs from their affiliates;

- initially claimed that they did not source hardwood plywood inputs from Vietnamese resellers despite either later acknowledging they did, or record information indicating otherwise;

- failed to identify all species of wood or provided inconsistent responses regarding the species of wood used in hardwood plywood or hardwood plywood inputs that were sold;

- failed to provide documentation to support their claim that they imported only face/back veneers from China (identifiable due to their size);

- claimed that they did not have imports from China during the inquiry period despite entry data provided by the GOV indicating that they did; or

- had more than one of the aforementioned discrepancies in their responses.

*Id*.

Accordingly, Commerce preliminarily found that the 22 companies provided significantly contradicting or misleading information, such that their responses could not be relied upon under 19 U.S.C. § 1677e(a)(2)(A)-(C); therefore, Commerce determined to apply facts available with an adverse inference (AFA), pursuant to 19 U.S.C. § 1677e(b), to those companies, as they had failed to cooperate and not acted to the best of their abilities in complying with Commerce's requests for information.  PDM at 10-11.  Commerce also determined to apply AFA to the 14 companies that had failed to respond to either the initial or supplemental questionnaires.  *Id.*

Commerce found that, by providing inconsistent or conflicting responses regarding which species of wood they consumed, the identities of their Chinese and Vietnamese suppliers, and the products they imported from China, the 22 companies providing unreliable responses did not

demonstrate that they did not import hardwood plywood inputs from China, and/or produce or export inquiry merchandise.  *See* Preliminary AFA Memo (C.R. 412); PDM at 12-13.  In addition, Commerce found that the 14 nonresponsive companies did not indicate that they were having difficulty providing the requested information or request to submit information in an alternate form.  PDM at 13.  Accordingly, as AFA, Commerce found that the 36 non-cooperating companies produced and/or exported hardwood plywood under all five production scenarios subject to the inquiries.  *Id*.

B.    Commerce's Preliminary Scope And Circumvention Findings

Commerce preliminary found, relying on data from its earlier Finewood scope ruling, that merchandise covered by three of the production scenarios under examination fell within the scope of the orders.  PDM at 15-16.  In the Finewood scope ruling, Commerce had determined that the country of origin of hardwood plywood is imparted at the location where the veneers are first glued/assembled.  Commerce preliminarily applied these rulings to the inquiry merchandise, finding that the following three production scenarios resulted in Chinese-origin hardwood plywood because the veneers are first glued/assembled in China and are, thus, covered by the scope of the orders:

1)    Face veneer, back veneer, and assembled core components (*e.g.*, veneer core platforms) manufactured in China and assembled in Vietnam;

2)    Fully assembled veneer core platforms manufactured in China that are combined in Vietnam with face and/or back veneers produced in Vietnam or third countries; and

3)    Multi-ply panels of glued core veneers manufactured in China that are combined in Vietnam to produce veneer core platforms and combined with either a face and/or back veneer produced in China, Vietnam, or a third country.

*Id.*

For the remaining two scenarios, Commerce preliminary determined that the inquiry

merchandise was not subject to the orders, and so examined whether the merchandise was

circumventing the orders pursuant to 19 U.S.C. § 1677j(b).  *See* PDM at 16-26.  In accordance

with the factors outlined in section 1677j(b), Commerce examined, among other things: 1)

whether the merchandise is of the same class or kind as the merchandise subject to the orders; 2)

whether prior to importation into the United States the merchandise is completed or assembled in

Vietnam from merchandise that is subject to the orders; 3) whether the process of assembly is

minor or insignificant; 4) whether the value of the merchandise produced in China is a

significant portion of the value of the merchandise exported to the United States; and 5) whether

action in is necessary to prevent evasion of the *Orders.  Id.* at 16-24.

Commerce first found that the record demonstrated that the inquiry merchandise was of

the same class or kind of merchandise as the hardwood plywood subject to the orders.  PDM at

17-18.  Commerce then found, based on AFA and the record, that the merchandise was

assembled and completed in Vietnam using Chinese inputs.  *Id.* at 18-19.  Commerce next

examined whether the process of assembly or completion in Vietnam was minor or insignificant,

finding, based on the level of investment and research/development in Vietnam, the nature of the

production processes in Vietnam, the extent of the production facilities in Vietnam, and the

proportion of the value of the processing performed in Vietnam (as well as the value of the

merchandise produced in China), that the process of assembly or completion in Vietnam was

minor and/or insignificant.  *Id.* at 19-25.  Finally, Commerce found that other factors—including

patterns of trade, affiliation, and increase in imports—supported a finding that circumvention of

the orders had occurred.  *Id*. at 25-26.  Commerce concluded, based on the record and, where

appropriate, AFA, that hardwood plywood assembled by the 36 non-cooperative and

nonresponsive companies, using the two remaining production scenarios, was circumventing the

orders.  *Id.* at 26.

Commerce also made a country-wide determination, applying its affirmative preliminary finding to all shipments of hardwood plywood from Vietnam on or after June 17, 2020.  PDM at 27.  In doing so, Commerce explained that the 36 non-cooperative and nonresponsive companies accounted for a significant volume of hardwood plywood exported from Vietnam to the United States, and that imports of hardwood plywood from Vietnam had significant increased during the inquiry period.  As such, Commerce found that the production processes of the 36 companies were representative of the experience of other hardwood plywood producers in Vietnam.  *Id*.

C.    Certification Program

To administer the country-wide preliminary finding, Commerce put in place a certification program to allow the cooperative companies to certify that their merchandise was not made under one of the five production scenarios subject to the inquiries.  *See* PDM at 27-28.  Specifically, Commerce allowed companies to certify that entries of hardwood plywood from Vietnam used inputs sourced from a country other than China, explaining that properly certified entries would not be subject to AD/CVD cash deposits under the orders.  Commerce preliminarily determined not to allow the 36 non-cooperative and nonresponsive companies to participate in the certification program.

V.    Post-Preliminary Proceedings

Following its preliminary determination, Commerce received multiple comments from interested parties, including several post-preliminary and/or "ministerial error" comments.  *See, e.g.*, An An Ministerial Error Comments (P.R. 420); Greatwood Hung Yen Ministerial Error Comments (P.R. 421); Concannon Ministerial Error Comments (P.R. 429); and Greatriver Comments on Preliminary (P.R. 430).  Several interested parties also submitted requests asking

Commerce to: 1) reopen the record to allow the submission of new factual information (NFI), 2) modify the instructions sent to CBP to exclude certain non-inquiry merchandise, 3) extend the deadline for importers and exporters to certify that their entries of hardwood plywood from Vietnam were not produced under one of the five scenarios, and 4) modify the certification program eligibility.  *See, e.g.*, DH Respondents Request to Re-Open Record (P.R. 474); Shelter Forest Request for Reconsideration of New Factual Information (P.R. 626); Concannon Request to Correct Cash Deposit Instructions (P.R. 443); Tumac Request to Correct Cash Deposit Instructions (P.R.526); Govina, *et al.* Request for Extension of Time for Completion of Certification Process for Past Entries (P.R. 525).  Commerce declined to accept post-preliminary NFI, modify the description of the merchandise covered by the inquiries in the cash deposit instructions, or modify the preliminary determination based on the "ministerial error" allegations, but agreed to extend the deadline for the certification.  *See* December 6, 2022 Response to Request to Reconsider Submission of New Factual Information (P.R. 672); November 30, 2022 Memo Extending Certification and Response to Ministerial Allegations (P.R. 664).

Regarding the requests to consider the submission of NFI, Commerce explained that its preliminary determination did not constitute factual information, and that it had complied with its statutory obligations to provide parties notice of deficiencies, issuing deficiency questionnaires to numerous companies, including Shelter Forest's Vietnamese supplier, and giving the companies an opportunity to respond.  December 6, 2022 Response to Request to Reconsider Submission of New Factual Information at 2 (P.R. 672).  Accordingly, and because Commerce had already issued the preliminary determination, it would not accept NFI or reopen the record. *Id*.

Regarding the potential modification of eligibility for the certification program, Commerce acknowledged that the unique circumstances of the inquiries could potentially present procedural and equity concerns related to certification and the extended period of entries impacted by the proceeding.  *See* November 30, 2022 Memo Extending Certification and Response to Ministerial Allegations at 3 (P.R. 664).  Commerce thus proposed a potential modification through which it might allow the 22 non-cooperative companies (those that had submitted unreliable questionnaire responses) to certify entries for the period of June 17, 2020, through December 31, 2021,[3] in order to ensure that CBP did not assess AD/CVD duties on non-inquiry merchandise from those companies.  *Id*.  Commerce also stated that it would continue to consider the appropriate mechanism for addressing certification eligibility for future entries—*e.g.*, a changed circumstance review or administrative review.  *Id*. at 4.  Regarding the "ministerial error" allegations, Commerce noted that, in the context of circumvention inquiries, it generally addresses those types of allegations after the final determination, and so declined to address them until that time.  Following in-person verification of multiple companies,[4] parties submitted their case and rebuttal briefs.  On February 15, 2023, Commerce held a hearing with all interested parties.  *See* Public Hearing Transcript (P.R. 814).

VI.    Final Circumvention Determination

On July 20, 2023, Commerce issued its final determination.  *See Final Determination*, 88 Fed. Reg. 46,740, and accompanying IDM.  Commerce noted that, following the release of its

---

[3]  These dates cover the period for which Commerce has already completed reviews and/or issued liquidation instructions.

[4]  Commerce had originally, and inadvertently, included Greatriver in its verification schedule, despite having preliminarily applied AFA to Greatriver, but realized its error and canceled the verification prior to its occurrence.  IDM at 143.

preliminary determination, this Court had held, in a case appealing Commerce's Finewood scope ruling, that two-ply panels from China were not subject to the scope of the orders because the orders "unambiguously cover{} products of three or more plies."  IDM at 10 (citing *Vietnam Finewood*, 633 F. Supp. 3d at 1257).  Because Commerce had relied on the Finewood scope ruling in preliminarily determining that merchandise stemming from production scenarios one, two, and three was covered by the scope of the orders, it revised its finding for those scenarios for the final determination, determining that all five production scenarios circumvented the orders.  *Id.* at 10-11.  In doing so, Commerce observed that the first three production scenarios involved merchandise entering Vietnam even further downstream in the production process than in the fourth and fifth scenarios, which Commerce had determined to be circumventing the orders:

> In other words, more of the production process for scenarios one, two, and three occur in China, and, therefore, the circumvention analysis outlined in the Preliminary Determination, which examined two scenarios with less production occurring in China, supports an affirmative circumvention determination for these three scenarios

*Id.* at 11.  Commerce also addressed numerous issues raised by the parties to the proceeding, including: 1) whether its inquiry was procedurally flawed, 2) whether assembly in Vietnam is minor or significant, 3) whether patterns of trade supported a circumvention determination, 4) whether the record supported a circumvention determination, 5) whether Commerce had properly rejected untimely NFI, and 6) whether Commerce should revise its CBP instructions and certification program.[5]

---

[5] Commerce's findings regarding these, and any other relevant issues, are discussed in the pertinent sections of the argument.

## SUMMARY OF THE ARGUMENT

Commerce, in conducting its circumvention inquiry, acted within its discretion and consistently with the governing statutory and regulatory framework, and its final affirmative determination was supported by substantial evidence and in accordance with law. Plaintiffs raise a number of arguments regarding both procedural issues and the substance of Commerce's determination; the Court should reject them all. First, Commerce's inquiry was not procedurally flawed. While plaintiffs criticize the adequacy of Commerce's data collection, this argument lacks merit. Commerce issued multiple questionnaires to the respondents, seeking information regarding companies' United States sales of Vietnamese plywood with Chinese inputs, imports of Chinese plywood inputs, and affiliations with Chinese producers and/or exporters. Commerce also did not err, but rather acted within the bounds of its discretion and reasonably based on the facts of the record, in relying on data from a prior related scope proceeding and in declining to select mandatory respondents.

Commerce's affirmative circumvention determination is also supported by substantial evidence and in accordance with law. Commerce properly examined the evidence, with an eye toward the statutory criteria, and reasonably determined that the record evidence supported a finding that the process of assembling hardwood plywood inputs in Vietnam to produce inquiry merchandise is minor and insignificant. Its determination is consistent with the International Trade Commission's (ITC) injury determination, and its affirmative circumvention determination did not unlawfully expand the scope of the orders. In addition, Commerce reasonably determined that patterns of trade support its circumvention finding, taking into account information such as sourcing patterns, and whether imports into the third country have increased after the initiation of the investigation.

Plaintiffs complain that Commerce abused its discretion by not accepting untimely filed NFI that multiple interested parties had attempted to submit after the issuance of the preliminary determination. But Commerce reasonably rejected this information in accordance with its regulations. Commerce explained that the untimely filed NFI did not constitute rebuttal information pursuant to 19 C.F.R. § 351.102(b)(21)(iv), as the preliminary determination did not include new factual information. Commerce was not required to issue further questionnaires, and it explained why it would not have been practicable to issue 22 company-specific third (or in some cases fourth or fifth) supplemental questionnaires. Commerce's rejection of untimely filed NFI was also consistent with the precedent of this Court and the Court of Appeals for the Federal Circuit.

Commerce also acted lawfully in creating its certification program. Plaintiffs contend that Commerce abused its discretion by implementing a certification regime and issuing customs instructions that allegedly conflicted with guidance earlier provided by Commerce on the scope of its circumvention inquiry. Commerce created the regime to allow cooperating parties to certify that their merchandise was not circumventing the orders and sent instructions to CBP consistent with this intention; these actions were supported by Commerce's past practice, and necessary for it to fulfill its statutory directive to prevent evasion. Commerce reasonably determined that removing certain non-inquiry merchandise from the certification requirement would undermine the effectiveness of its determinations because there would be no requirement for exporters or importers of such merchandise to gather and maintain supporting documentation.

Finally, we respectfully request a voluntary remand for Commerce to reexamine its issuance of certain customs instructions as they relate to An An and Greatwood.

# ARGUMENT

## I.    Standard Of Review

This Court will sustain "'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1037 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).  "Substantial evidence" consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Therefore, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted).  The Court should sustain Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984) (citation omitted).

"{T}he antidumping statute reveals tremendous deference to the expertise of the Secretary of Commerce in administering the antidumping law." *Fujitsu*, 88 F.3d at 1039 (internal quotation and citation omitted).  "Antidumping and countervailing duty determinations involve complex accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." *Id.* (citation omitted).  "This deference is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is

18

based on Commerce's technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute, as opposed to interpreting the meaning of the statute itself where ambiguous." *Id.*

## II.    Commerce's Anticircumvention Determination Is Lawful And Supported By Substantial Evidence

### A.    Legal Framework For Circumvention Determinations

Congress enacted 19 U.S.C. § 1677j to address and combat the circumvention of antidumping and countervailing duty orders.  Pursuant to the statute, "Commerce may determine that certain types of articles are within the scope of a duty order, even when the articles do not fall within the order's literal scope." *Deacero S.A. de C.V. v. United States*, 817 F.3d 1332, 1337 (Fed. Cir. 2016), *see also Target Corp. v. United States*, 609 F.3d 1352, 1355 (Fed. Cir. 2010); *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1370 (Fed. Cir. 1998).  As relevant here, Commerce may find circumvention exists when merchandise—of the same class or kind as that subject to an antidumping or countervailing duty order—is completed or assembled in a foreign country other than the country to which the order applies.  19 U.S.C. § 1677j(b).

In determining whether companies are circumventing an order by assembling or completing merchandise in another country, Commerce considers whether:

(A)    the merchandise imported into the United States is of the same class or kind as merchandise produced in a foreign country that is the subject of an AD/CVD order,

(B)    before importation into the United States, such imported merchandise is completed or assembled in another foreign country from merchandise which is subject to the order or produced in a foreign country to which such order applies,

(C)    the process of assembly or completion in the foreign country is minor or insignificant,

(D)    the value of the merchandise produced in the foreign country is a significant portion of the total value of the merchandise exported to the United States, and

(E)      action is appropriate to prevent evasion of such order.

*Id.* § 1677j(b)(1); *see also* 19 C.F.R. § 351.225(h) (explaining that Commerce "may include

within the scope of an antidumping or countervailing duty order, at any time such order is in

effect, imported merchandise completed or assembled in a foreign country other than the country

to which the order applies").

Whether the process of assembly or completion under section 1677j(b)(1)(C) is "minor or

insignificant" further depends on five subfactors:

(A)      the level of investment in the foreign country,

(B)      the level of research and development in the foreign country,

(C)      the nature of the production process in the foreign country,

(D)      the extent of the production facilities in the foreign country,

(E)      whether the value of the processing performed in the foreign country represents a
         small proportion of the value of the merchandise imported into the United States.

*Id.* § 1677j(b)(2).  No one single subfactor is controlling, and Commerce will make its

determination based on the totality of circumstances.  *See* 19 C.F.R. § 351.225(h); Statement of

Administrative Action, Accompanying the Uruguay Round Agreements Act (SAA), H.R. Doc.

No. 103-316, vol. 1, at 893 (1994).

Section 1677j(b)(3) also sets forth additional criteria for Commerce to consider in

determining whether merchandise assembled or completed in a foreign country should be

included within the scope of an antidumping or countervailing duty order, including:

(A)      the pattern of trade, including sourcing patterns,

(B)      whether the manufacturer or exporter of the merchandise is affiliated with the
         person who uses the merchandise to assemble or to complete in the foreign
         country the merchandise that is subsequently imported into the United States, and

(C)    whether imports into the foreign country of the merchandise have increased after the initiation of the investigation that resulted in the issuance of such order.

*Id.* § 1677j(b)(3).

The legislative history behind the circumvention statute indicates that its purpose is to "authorize the Commerce Department to apply antidumping and countervailing duty orders in such a way as to prevent circumvention and diversion of U.S. law."  Omnibus Trade Act of 1987, Report of the Senate Finance Committee, S. Rep. No. 100-71, at 101 (1987).  Congress has thus expressed its intention that the circumvention statute "grant the Commerce Department substantial discretion in interpreting these terms, and invoking these measures, so as to allow it flexibility to apply the provisions in an appropriate matter{,}" and that Commerce use its authority "to the fullest extent possible to combat diversion and circumvention of the antidumping and countervailing duty laws."  *Id.* at 100.  "{A}ggressive implementation" of the circumvention laws "can foreclose these practices."  *Id.*

III.    <u>Commerce's Circumvention Inquiry Was Not Procedurally Flawed</u>

Plaintiffs claim that Commerce's inquiry was so procedurally flawed as to require a remand.  *See* DH Plaintiffs' Tranche I Br. at 19-24, Greatriver's Tranche I Br. at 17-21, MG Plaintiffs' Tranche I Br. at 28-33.  Plaintiffs' arguments rest on three primary bases: 1) that Commerce's Q&V questionnaires were insufficiently comprehensive, 2) that Commerce relied on outdated, secondary data from the Finewood scope proceeding, and 3) that Commerce erred by not selecting mandatory respondents for further examination.  *Id.*  These arguments lack merit; Commerce complied with its legal obligations and acted reasonably in conducting its inquiries, and its determination was supported by substantial evidence.

A.    Commerce's Questionnaires And Data Collection Were Robust

Plaintiffs' arguments regarding the purported insufficiency of Commerce's data collection do not withstand scrutiny.  Commerce issued each participating respondent not only a comprehensive initial Q&V questionnaire, but also two supplemental questionnaires.  *See* September 10, 2020 Q&V Questionnaire (P.R. 62), February 25, 2021 Q&V Supplemental Questionnaire (P.R. 154), and June 15, 2021 Q&V Second Supplemental Questionnaire (P.R. 259).  These questionnaires requested information necessary for Commerce to reach a determination, including information regarding companies' United States sales of Vietnamese plywood with Chinese inputs, imports of Chinese plywood inputs, and affiliations with Chinese producers and/or exporters; Commerce also requested that the participating respondents confirm whether the core inputs used were of Vietnamese origin.  *See id.*; *see also* IDM at 19.

Plaintiffs contend that Commerce's questionnaires were inadequate because they did not refer directly to the criteria listed in the circumvention statute, and that Commerce could not have reasonably expected companies to submit data concerning the statutory criteria without specific requests from Commerce to do so.  *See* DH Tranche I Br. at 20-21, Greatriver Tranche I Br. at 18-19, 21.  In making these arguments, plaintiffs both take an inordinately narrow view of the information requested by Commerce and seek to impose impermissibly rigid requirements on how Commerce frames its questionnaires.  Commerce is not required to tailor its questionnaires in a particular way (and certainly not in a way preferred by respondents) or to explicitly lay out the statutory criteria in its questionnaires.  As stated above, Commerce enjoys substantial discretion in conducting circumvention inquiries, in addition to the deference generally accorded it in its fact-finding capacity.  *See Fujitsu Gen. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (citing *Smith-Corona Group v. United States*, 713 F.2d 1568, 1571, 1582 (Fed. Cir. 1983)

22

("This court has recognized that the antidumping statute 'reveals tremendous deference to the expertise of {Commerce} in administering the antidumping law.")).

Moreover, while Commerce may not have explicitly cited word-for-word the statutory criteria in asking its questions, it nonetheless solicited the information it needed to make a determination according to the statutory requirements. Pursuant to 19 U.S.C. § 1677j(b), when Commerce conducts an analysis regarding merchandise completed or assembled in a foreign country, it needs to understand the production processes of the foreign respondents, including, crucially, whether the merchandise includes inputs from the country subject to the orders—here, China. Commerce's questionnaires thus solicited information directly relevant to its analysis of whether companies were producing and/or exporting merchandise that might include Chinese inputs, including information regarding companies' United States sales of Vietnamese plywood with Chinese inputs, imports of Chinese plywood inputs, affiliations with Chinese producers and/or exporters, and whether the core inputs consumed by the respondents were actually of Vietnamese origin. For example, Commerce requested that companies provide the monthly and total quantity of sales of plywood to the United States containing inputs produced in China between December 2016 and March 2020. September 10, 2020 Q&V Questionnaire at Attachment II (P.R. 65). And, directly related to the criteria in section 1677j(b)(3)(B), Commerce also requested information regarding whether the companies are affiliated with producers or exporters of plywood or plywood inputs from China. *Id*. These types of questions solicited information necessary for Commerce to analyze the origin of the core veneers and the relationships with Chinese entities that produced the inputs—both essential for Commerce to fulfill its statutory requirements.

Furthermore, if the interested parties had concerns regarding the sufficiency of Commerce's three questionnaires, they had ample opportunity to submit comments detailing such concerns and ask for clarification on the nature of Commerce's requests or how they related to the statutory requirements; no such comments were filed prior to the preliminary determination and the closing of the record. *See* IDM at 19. Plaintiffs cite this Court's decision in *Ta Chen Stainless Steel Pipe Ltd. v. United States*, 23 C.I.T. 804 (Ct. Int'l Trade 1999), and other similar cases, in arguing that Commerce was obligated to ask clearer questions of the respondents. *See* DH Plaintiffs' Tranche I Br. at 23-24, Greatriver Tranche I Br. at 19-20. But *Ta Chen* and the other cases relied on by plaintiffs are inapposite, as they concern the application of AFA, whereby Commerce is statutory required to provide a notice of deficiency and an opportunity to remedy. *See, e.g., Ta Chen*, 23 C.I.T. at 810; *Wash. Int'l Ins. Co. v. United States*, 33 C.I.T. 1023, n. 3 (Ct. Int'l Trade 2009). Here, plaintiffs contest the adequacy of the **questionnaires**, not the responses. And, to the extent it was required to do so, Commerce provided whatever notice of deficiency and opportunity to remedy by issuing two supplemental questionnaires. Finally, if any interested parties were concerned with the sufficiency of the record and wished to provide further clarifying information, there was nothing preventing them from doing so in a timely manner. *See* IDM at 28; *see also Nan Ya Plastics Corp., Ltd. v. United States*, 810 F.3d 1333, 1338-39 (Fed. Cir. 2016) ("{T}he burden of creating an adequate record lies with interested parties and not with Commerce.").

    B.    <u>Commerce Reasonably Relied On Data From The Finewood Scope Proceeding</u>

Plaintiffs, in particular MG plaintiffs, argue that Commerce failed to provide a satisfactory explanation for its reliance on data from the Finewood scope proceeding, which was overturned by the Court. MG Plaintiffs' Tranche I Br. at 28-33 (citing *Invenergy Renewables*

*LLC v. United States*, 552 F. Supp. 3d 1382 (Ct. Int'l Trade 2021)).  But neither *Invenergy* nor any other case cited by plaintiffs precludes Commerce from relying on data used in another proceeding eventually overturned by the Court, particularly where Commerce explicitly placed the data from the other proceeding ***on the record of this proceeding***.  *See* February 18, 2022 Memo Placing EAPA Documents on Record (P.R. 393), and Attachments (P.R. 394-399). Plaintiffs have articulated no satisfactory reason that Commerce should be precluded from relying on data from the Finewood proceeding, which concerned the same country, time period, and types of merchandise.  *See* PDM at 16, 23-25.  Crucially, the Finewood data were from a Vietnamese producer of plywood and contemporaneous with the inquiry period examined in the underlying circumvention inquiry.  Commerce reasonably relied on the data as probative when examining, *inter alia*, the production process of a Vietnamese producer to determine whether the value of the processing performed in Vietnam represents a small proportion of the value of the merchandise imported into the United States.  *See* IDM at 35; PDM at 23-24.  Moreover, nothing in the Court's decision in *Vietnam Finewood*—which concerned whether two-ply panels were unambiguously outside the scope of the orders—renders the underlying data from that proceeding insufficient or otherwise deficient such that Commerce could not rely on it when making a circumvention determination based on different considerations than the Court's ruling in *Vietnam Finewood*.

Plaintiffs also contend that the Finewood data are outdated and that Commerce did not consider the facts detracting from its conclusion.  Concannon Tranche I Br. at 32-33.  But, as stated above, the data are contemporaneous, with the Finewood data encompassing a timeframe entirely subsumed by the period for underlying inquiries—December 2016 through March 2020. *Id.* at 32.  Moreover, one of the pieces of data complained about by plaintiffs falls within the

range of the respondents' reported data for the underlying inquiries—spanning from 2005 to March 2019 and incorporating nearly the whole period covered by the inquiries. *Id.* at 31-32; *see also* P.R. 394 at SV Exh. There is simply no support for the notion that the Finewood data are not contemporaneous with the underlying inquiry period.

And, despite plaintiffs' complaint that Commerce failed to address the outdated data argument in its final determination, Commerce was under no obligation to explicitly do so, particularly where the argument so clearly lacks merit. *See, e.g.*, SAA at 892 (explaining that existing law "does not require that an agency make an explicit response to every argument made by a party" but "instead requires that issues material to the agency's determination be discussed so that the path of the agency may reasonably be discerned"); *Snyder v. Dep't of Navy*, 854 Fed. Cir. 1366, 1373 (Fed. Cir. 2017) (citation omitted) (holding that an agency "is not require{d} to . . . address every argument raised by a party or explain every possible reason supporting its conclusion." ). It was, or should have been, reasonably discernable to the parties that Commerce was, correctly, unconcerned about whether the Finewood data were outdated, given that it falls squarely within the inquiry period. Simply put, there is no evidence on this issue that "detracts" from Commerce's determination.

C. **Commerce Was Not Required To Select Mandatory Respondents Or Go Further In Examining Participating Respondents**

DH plaintiffs argue that Commerce was required, by 19 U.S.C. § 1677f-1(c)(1), to "scrutinize all participating respondents in{}depth" to determine whether each individual respondent fulfilled the statutory criteria for finding circumvention. DH Plaintiffs' Tranche I Br. at 22. This argument misinterprets the nature of an affirmative circumvention inquiry, which is not geared toward calculating individual dumping margins for respondents, but rather finding that certain merchandise is subject to the order by way of circumvention. Section 1677f-

1(c)(1)[6]—which governs the determination of dumping margins—states that Commerce "shall determine the individual weighted-average margin of dumping for each known exporter and producer of the subject merchandise." But Commerce determines dumping margins for respondents in antidumping and countervailing duty investigations and administrative reviews. By contrast, in affirmative circumvention determinations, Commerce does not calculate dumping margins; instead, it determines whether to include the merchandise at issue "within the scope of such order or finding at any time such order or finding is in effect." *See* 19 U.S.C. § 1677j(b)(1); *see also Deacero*, 817 F.3d at 1337 ("In order to effectively combat circumvention of antidumping duty orders, Commerce may determine that certain types of articles are within the scope of an order, even when the articles do not fall within the order's literal scope."). Because Commerce was not calculating dumping margins for individual respondents, but rather determining whether merchandise should be construed as within the scope of the orders, it was not required to "scrutinize all participating respondents in{}depth."

Greatriver, on the other hand, contends that Commerce should have selected mandatory respondents, as it often does in antidumping or countervailing duty investigations and reviews. Greatriver Tranche I Br. at 20-21. But there simply exists no requirement for Commerce to select mandatory respondents in circumvention inquiries. Greatriver claims that, in the initiation notice, Commerce stated that it intended to select mandatory respondents. *Id*. at 20 (citing *Certain Hardwood Plywood Products from the People's Republic of China: Initiation of Anti-Circumvention Inquiries and Scope Inquiries on the Antidumping Duty and Countervailing Duty Orders; Vietnam Assembly*, 85 Fed. Reg. at 36,533). This misconstrues the initiation notice,

---

[6] DH plaintiffs speculate, without support, as to the intent of the statute. But the Court should not consider such underdeveloped, conclusory assertions. *See United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013).

which states only that "Commerce intends to request comments from interested parties regarding respondent selection and to issue questionnaires to solicit information from producers and exporters in Vietnam{.}"  Initiation Notice, 85 Fed. Reg. at 36,533.

Nothing in the initiation notice promises that Commerce would select mandatory respondents, and, as Commerce explained, while it may have expressed an inclination to do so, "{a}s the facts of these inquiries developed, we determined that the facts did not support doing so."  IDM at 23.  After Commerce initiated the scope and circumvention inquiries, 36 companies either provided unreliable responses to its questionnaires or failed to respond to them entirely. *Id.*  All other respondents reported that they had no shipments of inquiry merchandise. Greatriver claims that Commerce did not explain why it would have been necessary, to select as a mandatory respondent, a company that actually engaged in the production scenarios covered by the inquiries.  Greatriver Tranche I Case Br. at 19.  This is simply not accurate.

As Commerce stated, the "primary concern in a circumvention inquiry is to gather information and determine whether specific merchandise is circumventing the applicable order(s)."  IDM at 24.  Commerce observed, citing to a previous administrative determination, that "the purpose of selecting mandatory respondents {is} . . . to collect information pursuant to {19 U.S.C. § 1677j(a)} which would permit us to determine whether {products} are circumventing the *Order*."  *Id.* (citing *Certain Uncoated Paper from Brazil, the People's Republic of China, and Indonesia:  Affirmative Final Determinations of Circumvention of the Antidumping Duty Orders and Countervailing Duty Orders for Certain Uncoated Paper Rolls*, 86 Fed. Reg. 71,025 (Dep't of Commerce Dec. 12, 2021), and accompanying IDM at 59). Commerce further explained that "this goal would best be effectuated by selecting a mandatory respondent that can provide usable data regarding the production and sale of ***inquiry***

*merchandise*." *Id.* (emphasis added).  Because no respondents claimed to produce or ship

inquiry merchandise, Commerce reasonably determined not to select mandatory respondents, but

"conducted its circumvention analysis based on the information available on the record." *Id*.

Greatriver also argues that, in certain other circumvention inquiries, Commerce has

selected mandatory respondents.  Greatriver Tranche I Br. at 20-21.  But simply because

Commerce *can* limit the number of respondents in a proceeding, and simply because it may have

done so in some other circumvention inquiries, does not mean that Commerce must do so for *all*

circumvention inquiries.  IDM at 21 (citing *Certain Corrosion-Resistant Steel Products from the*

*People's Republic of China*:  *Affirmative Preliminary Determination of Anti-Circumvention*

*Inquiries on the Antidumping and Countervailing Duty Orders*, 82 Fed. Reg. 58,170 (Dep't of

Commerce Dec. 11, 2017) ("there is no established practice for selecting respondents for

individual examination in anti-circumvention inquiries")).  Of course, each proceeding stands on

its own record and Commerce is permitted, not mandated, to limit the number of respondents.

IDM at 21, 23; *see also Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387

(Fed. Cir. 2014) ("{E}ach administrative review is a separate exercise of Commerce's authority

that allows for different conclusions based on different facts on the record{.}").  And, as this

Court has held, "citing isolated investigations does not prove the existence of past practices; it

just proves that Commerce thought differently on different facts at different times." *Ancientree*

*Cabinet Co., Ltd. v. United States*, 565 F. Supp. 3d 1373, 1381 (Ct. Int'l Trade 2022).

Commerce was not required to select mandatory respondents, and it explained why, on the facts

of the underlying record, it would not have made sense to do so.  Accordingly, the Court should

reject plaintiffs' arguments.

IV.    Commerce's Circumvention Determination Is Lawful And Supported By Substantial
       Evidence

Plaintiffs contest certain aspects of Commerce's affirmative determination that the

merchandise covered by the five production scenarios was circumventing the orders, but

Commerce correctly found, based on substantial record evidence and in accordance with the

statutory criteria, that assembly in Vietnam was minor and insignificant, and that patterns of

trade supported a circumvention determination.  Moreover, the circumvention finding did not

unlawfully expand the scope of the order.  Accordingly, this Court should sustain Commerce's

affirmative circumvention determination.

A.    Record Evidence Supports Commerce's Finding That The Process of Assembling
       Hardwood Plywood Inputs In Vietnam To Produce Inquiry Merchandise Is Minor
       And Insignificant

DH plaintiffs claim that Commerce did not sufficiently focus on whether the record

evidence indicated that the instances of assembly or completion of an article in a third country

were minor and insignificant, and that it unreasonably failed to consider documentation that the

plywood processes in Vietnam exceeds mere assembly or completion.  DH Plaintiffs' Tranche I

Br. at 28.  These claims fail for a number of reasons.

First, DH plaintiffs oversimplify the analysis Commerce must undertake when

determining whether assembly in Vietnam is minor or insignificant.  The statute directs

Commerce to examine certain factors, namely: (A) the level of investment in the foreign country,

(B) the level of research and development in the foreign country, (C) the nature of the production

process in the foreign country, (D) the extent of production facilities in the foreign country, and

(E) whether the value of the processing performed in the foreign country represents a small

proportion of the value of the merchandise imported into the United States.  19 U.S.C.

§ 1677j(b)(2).  The SAA, meanwhile, explains that no single factor is controlling.  *See* SAA at

893.  Accordingly, it is Commerce's practice to evaluate each of the factors, as it exists in the

country of assembly, depending on the particular circumvention scenario presented.  Here,

Commerce acted consistently with the statute and SAA in examining the record evidence and

reaching a conclusion that assembly operations in Vietnam are minor and insignificant.  IDM at

44-45.

DH plaintiffs argue that the "primary sources" on the record of the proceeding show that

the manufacturing of plywood in Vietnam exceeds mere completion or assembly, and that

Commerce unreasonably ignored those sources.  DH Plaintiffs' Tranche I Br. at 31-36.  But

Commerce addressed these sources and explained why the record still demonstrated that

circumvention was occurring.  For instance, Commerce addressed the EAPA Inv. 7252

documents, which DH plaintiffs claim demonstrate that processing in Vietnam is "of major

significance."  DH Plaintiffs' Tranche I Br. at 31-36.  While certain interested parties claimed

that these documents contain sketches and diagrams of manufacturing facilities that demonstrate

extensive production processes in Vietnam, Commerce explained that its circumvention analysis

in this proceeding pertains only to production processes taking place in China and Vietnam under

certain production scenarios, and that sketches and diagrams of certain manufacturing facilities

in Vietnam merely show that those manufacturing facilities exist.  IDM at 44-45.  They do not

indicate how, if at all, those facilities and capabilities are employed under the production

scenarios that Commerce was examining in the underlying inquiries.  *Id.*  Therefore, Commerce

reasonably determined that the EAPA Inv. 7252 documents were not instructive to that aspect of

its circumvention analysis.

DH plaintiffs also argue that Commerce erred by broadening the extent of plywood

production to include the forestry industry, *i.e.*, by "compar{ing} the production stages of

conditioning and debarking logs and cutting and slicing of veneer with the production stages of manufacturing the plywood core, applying face and back veneer, stacking, pressing, and finishing the plywood." DH Plaintiffs' Tranche I Br. at 36. But, as Commerce explained, log production is part of the hardwood plywood manufacturing process. IDM at 40. In a fully integrated hardwood plywood operation, the process begins with forestry, and the Coalition provided probative record information that such a process begins by harvesting logs. *See* Petitioner's Request at 38, 40-44, and Exh. 10 (P.R. 19) (C.R. 5); *see also* Petitioner's Clarification at 12 (P.R. 20) (C.R. 7). In addition, as noted above, the record indicates that some of the largest producers in China are fully integrated, managing forest resources and producing logs. *See id*. Thus, Commerce reasonably concluded that record evidence supports the conclusion that the level of equipment and technology required for production facilities in China, starting from the beginning of the process with harvesting logs, is more advanced than that required to simply assemble veneers into hardwood plywood in Vietnam. IDM at 40. DH plaintiffs do not point to contrary record evidence or case law supporting their arguments that log acquisition and processing should not be considered part of the hardwood plywood production process; instead, their arguments amount to mere disagreement with Commerce's reasonable evaluation of the evidence. Such disagreement does not suffice to set aside the agency's determination. *See Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006).

B.    Commerce's Analysis Of Patterns Of Trade Is Supported By Substantial Evidence And In Accordance With Law

DH plaintiffs claim that Commerce's analysis of information relating to patterns of trade is unsupported by substantial evidence and unlawful. Specifically, they contend that Commerce's conclusions are based on a narrow interpretation of snapshot data and that

Commerce improperly ignored Vietnam's economic growth.  *See* DH Plaintiffs' Tranche I Br. at 40-45.  But Commerce correctly found that the patterns of trade support its affirmative circumvention finding.

Pursuant to 19 U.S.C. §§ 1677j(b)(3)(A) and (C), when determining whether to include merchandise assembled or completed in a foreign country in an order, Commerce shall consider: (1) the pattern of trade, including sourcing patterns; (2) whether the manufacturer or exporter in the foreign country is affiliated to the manufacturer or exporter subject to the order; and (3) and whether imports into the third country have increased after the initiation of the investigation. Commerce's practice is to analyze these criteria together, with no one factor being dispositive. *See, e.g.*, *U.K. Carbon & Graphite Co. v. United States*, 931. F. Supp. 2d 1322, 1302-03 (Ct. Int'l Trade 2013).  Furthermore, as Commerce explained, section 1677j(b)(1)(E) allows Commerce to make an affirmative circumvention finding if it "determines that action is appropriate…to prevent evasion" of the relevant orders; it ***does not*** require Commerce to consider the intent of a company to evade duties.  IDM at 46.

Consideration of the patterns of trade supports Commerce's circumvention determination. The Coalition placed on the record data demonstrating that, between 2016 and 2019, the volume of exports of hardwood plywood from Vietnam to the United States increased approximately 950 percent by value, while the Chinese exports of hardwood plywood to the United States dropped significantly; in addition, Chinese exports of wood veneers to Vietnam between 2015 and 2019 have dramatically increased by over 350 percent by value.  PDM at 18-19 (citing Petitioner's Request at 11-13, 35 (P.R. 19) (C.R. 5); and Petitioners Clarification at Exh. 2 (P.R. 20) (C.R. 7)).

In the face of this evidence, DH plaintiffs urge this Court, without support, to consider Vietnam's plywood exports over a 24-year period, rather than the shorter period considered by Commerce.  DH Plaintiffs' Tranche I Case Br. at 42-43.  But this Court and the Federal Circuit have sanctioned Commerce's examination of a shorter period, holding that a succinct timeframe for analysis allows Commerce to analyze whether patterns have changed in reaction to antidumping and countervailing duty investigations, and that this is sufficient to fulfill the patterns of trade criterion.  *See Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357, 1380-1 (Ct. Int'l Trade 2021), *aff'd by Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351 (Fed. Cir. 2023) ("Commerce considered country-wide sourcing patterns by comparing the average monthly volume of imports of CRS and HRS substrates from China to the UAE before and after the initiation of the CORE investigations . . . .  Once Commerce analyzed sourcing patterns, Commerce completed its duty under the statute and was not mandated to factor in AGIS' proposed data in its analysis{.}").

In the underlying proceeding, Commerce analyzed the percentage increase in imports of hardwood plywood from Vietnam to the United States and inputs from China to Vietnam beginning in 2015, shortly before producers would have become aware of the possibility of an order.  PDM at 25.  Commerce identified specific dramatic increases in imports that occurred immediately after the initiation of the circumvention investigation.  *Id.*  Record evidence thus supports the conclusion that patterns of trade indicated that circumvention of the orders was occurring.  DH plaintiffs may dispute Commerce's comparison, and offer an alternative timeline and fact pattern, but, as this Court has held, where Commerce's choice of facts is debated, "{it} gets the benefit of the doubt." *Hlds (B) Steel Sdn Bhd v. United States*, No. 21-00638, 2024 WL 244937, at *2 (Ct. Int'l Trade Jan. 23, 2024).

DH plaintiffs rely on this Court's statement in *Columbia Forest Prods. v. United States*, F. Supp. 3d 1283, 1295 (Ct. Int'l Trade 2019), that, "{a}lthough a substitution effect may be indicative of circumvention, it is not a sufficient cause for Commerce to initiate a minor alterations inquiry." *Id*. at 41 (citing *Columbia Forest*, F. Supp. 3d at 1295; *Inmax SDN v. United States*, 277 F. Supp. 3d 1367 (Ct. Int'l Trade 2017) (for the proposition that production flows naturally to companies with lower AD tax rate burdens)). But *Columbia Forest* has no bearing on a circumvention analysis being conducted pursuant to 19 U.S.C. § 1677j(b). Rather, that case concerns Commerce's decision not to initiate a minor alterations inquiry. Minor alterations inquiries are conducted via an entirely different statutory set of criteria and address a different type of circumvention; it does not require consideration of patterns of trade. *See* 19 U.S.C. § 1677j(c). Nor does the fact that import/export data would not be sufficient to prompt initiating a minor alteration inquiry under 19 U.S.C. § 1677j(c) have any relevance to what constitutes sufficient evidence for a third-country circumvention finding under 19 U.S.C. § 1677j(b). Indeed, the Court's analysis in *Columbia Forest* does not mention the term "patterns of trade."

Any reliance on *Inmax* is also unavailing, as that case is both factually distinguishable and legally inapposite. *See* IDM at 46-47. *Inmax* concerned a changed circumstance review in which the Court reasoned that potential evasion was "sufficient to warrant a closer look from Commerce." *Inmax*, 277 F. Supp. 3d at 1372. In that case, although exports from Inmax had drastically decreased while exports from an affiliate that had been assigned a much lower all-others rate had increased, Commerce later discovered that Inmax had ceased production and its affiliate had started production; therefore, no evasion had occurred. *Id*. Changed circumstances investigations are conducted pursuant to 19 U.S.C. § 1675(b)(4), which consists of an entirely different framework than that for circumvention inquiries conducted under 19 U.S.C.

§ 1677j(b)(3).  DH plaintiffs cite *Inmax* for the proposition that production flows naturally to companies with lower antidumping tax burdens—a broad statement not made at any point in the decision—but that does not translate to a conclusion that all patterns of trade are natural and should be disregarded for purposes of circumvention analysis.

To find circumvention based on patterns of trade, Commerce need only consider the criteria set forth in section 1677j(b)(3), not factors such as why the investigation was initiated or the extent to which the product has penetrated the U.S. market.  *See Hlds (B) Steel Sdn Bhd*, 2024 WL 244937, at *4.  But rather than arguing that Commerce did not sufficiently consider the statutory criteria, DH plaintiffs argue that the criteria should be altered to include considerations of intent and sweeping historical background information.  DH Plaintiffs' Tranche 1 Br. at 41. This Court cannot change the section 1677j(b)(3) criteria, and Commerce fulfilled its statutory duty by sufficiently evaluating the criteria put forth in the statute.

Finally, while Commerce found that patterns of trade supported a circumvention finding, it did not rely solely on that single factor, but explained that other factors, including the affiliation status of exporters and the increase in plywood imports and inputs to Vietnam, "also support an affirmative circumvention finding."  IDM at 47.

C.    Commerce's Circumvention Determination Did Not Impermissibly Expand The Scope Of The Order

DH plaintiffs argue that Commerce's circumvention finding expanded the scope of the underlying hardwood plywood order because the finding is allegedly inconsistent with the ITC injury investigation.  DH Plaintiffs' Tranche I Br. at 39-40.  According to DH plaintiffs, the ITC did not investigate whether the production and importation of veneers from China into the United States was injurious to the domestic plywood industry.  *Id*. at 40.  This argument lacks merit and fundamentally misunderstands the nature of a circumvention inquiry.

36

19 U.S.C. § 1677j(b) authorizes Commerce to include merchandise within the scope of an order if it concludes that the merchandise is circumventing the order. IDM at 194-95. Section 1677j(b)(1)(A) further requires that the merchandise subject to a circumvention inquiry must be of the same class or kind as the merchandise that is the subject of an antidumping duty order issued under 19 U.S.C. § 1673e. Thus, when Commerce makes an affirmative circumvention finding, it is determining that the merchandise "falls within the scope of the AD/CVD order," not expanding it. *See Al Ghurair Iron & Steel*, 536 F. Supp. 3d at 1365. Put another way, when Commerce makes an affirmative determination of circumvention, it has evaluated the production processes occurring in the third country at issue and determined that the country of origin before final assembly or completion—here, China—should be the country subject to the underlying order rather than the third country. Finally, under section 1677j(e), Commerce affords the ITC an opportunity to provide consultation or advice regarding "whether the inclusion would be inconsistent with the affirmative determination of the Commission." 19 U.S.C. § 1677j(e). DH plaintiffs' argument that Commerce expanded the scope because there was no ITC injury investigation on veneers is therefore meritless.

DH plaintiffs do not contend that the finished products leaving Vietnam and entering the United States are not of the same class or kind of merchandise than that subject to the order: hardwood plywood. Indeed, Commerce explained how record information establishes that the inquiry merchandise produced under all five production scenarios is of the same class or kind of merchandise as the hardwood plywood subject to the orders. *See* PDM at 17-18, IDM at 11. And DH plaintiffs' attempts to distinguish the inquiry merchandise as merely "veneers" do not succeed, given that the orders explicitly cover merchandise "consisting of two or more layers or plies of wood veneers and a core, with the face and/or back veneer{.}" DH plaintiffs' reliance

on *Saha Thai Steel Pipe Pub. Co. v. United States*, 547 F. Supp. 3d 1278, 1290 (Ct. Int'l Trade 2021) is likewise misplaced. *Saha Thai* concerned a scope ruling, and the interpretation of the language of the antidumping duty order; the considerations in scope proceedings are different than those in circumvention inquiries. Thus, the statements in *Saha Thai* regarding material injury are inapposite to the Court's analysis of the circumvention determination below.

Finally, Commerce followed the statutory requirement to notify the ITC and give it an opportunity for consultations and advice. *See* ITC Notification Letter (P.R. 508). 19 U.S.C. § 1677j(e)(3) allows the ITC to provide advice "if {it} believes . . . that a significant injury issue is presented by the proposed inclusion{.}" But whether to give consultation and advice is in the ITC's discretion. *See* 19 U.S.C. § 1677j(e)(3) ("the {ITC} *may* provide written advice{.}" (emphasis added)). Here, the ITC chose not to offer consultation and advice in response to Commerce's notification.

DH plaintiffs' claim that the ITC's decision not to advise "cannot be equated with an injury determination." DH Plaintiffs' Tranche I Br. at 39. First, as stated above, DH plaintiffs misunderstand the relationship between an injury determination and a circumvention finding. Furthermore, the ITC's decision to not consult with and provide advice to Commerce indicates the ITC's lack of belief that a significant issue existed related to material injury. If the ITC had believed that significant injury conflicts existed, it would presumably have offered to consult or give advice, in accordance with its statutory right. The ITC elected not do so; to disregard this action would render its choice purposeless.

V. **Commerce Acted Reasonably And Lawfully In Rejecting Untimely New Factual Information**

Following the issuance of its preliminary determination, Commerce received several submissions from parties seeking to place NFI on the record of the proceeding. Commerce acted

lawfully, and within its discretion, in rejecting the information. Plaintiffs' arguments do not demonstrate otherwise.

    A.    <u>Framework For Submission Of Factual Information</u>

Commerce's regulations both define what constitutes factual information and set forth deadlines for submitting that information. 19 C.F.R. § 351.301, for instance, creates time limits for submitting factual information. Extension of those time limits is governed by 19 C.F.R. § 351.302. An untimely filed extension request will not be considered unless the party demonstrates "an extraordinary circumstance exists." 19 C.F.R. § 351.302(b). An extraordinary circumstance is defined as an unexpected event that could not have been prevented if reasonable measures had been taken, and which precludes a party or its representative from filing a timely extension request through all reasonable means. 19 C.F.R. § 351.302(c)(i)-(ii).

The types of factual information accepted by Commerce are delineated at 19 C.F.R. § 351.102(b)(21). Subsections (i)-(iv) lay out categories of evidence constituting factual information, and subsection (v) allows for evidence "other than factual evidence" described by the preceding subsections. 19 C.F.R. § 351.102(b)(21). Section 351.104(b)(21) also includes, in its definitions of factual information, evidence used to rebut, clarify, or correct evidence submitted by interested parties or Commerce. Pursuant to 19 C.F.R. § 351.301(c)(5), parties are required to explain why any submissions containing factual information submitted pursuant to section 351.102(b)(21)(v) do not meet the definition of factual information as set forth in subsections (i)-(iv), and provide a detailed narrative of why the information should nonetheless be considered by Commerce. If parties do not meet these requirements, or if they fail to meet the deadline for submitting the information—30 days before the scheduled date of the preliminary

determination or 14 days before verification, whichever is earlier—Commerce will reject the submission. 19 C.F.R. § 351.301(c)(5); *see also* 19 C.F.R. § 351.302(d).

Courts have long upheld Commerce's discretion in establishing and enforcing its administrative procedures, including those regarding time limits. *See, e.g., Yantai Timken v. United States*, 521 F. Supp. 2d 1356, 1370 (Ct. Int'l Trade 2007) ("Commerce has broad discretion to establish its own rules governing administrative procedures, including the establishment and enforcement of time limits."); *PSC VSMPO–Avisma Corp. v. United States,* 688 F.3d 751, 761 (Fed. Cir. 2012) ("{t}he role of judicial review is limited to determining whether the record is adequate to support the administrative action{,}" and therefore "{a} court cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result."). Of course, "Commerce has discretion both to set deadlines and to enforce those deadlines by rejecting untimely filings." *Grobest & I-Mei Indus.(Vietnam) Co., Ltd. v. United States*, 815 F. Supp. 2d 1342, 1365 (Ct. Int'l Trade 2012) (*citing NTN Bearing Corp. v. United States,* 74 F.3d 1204, 1206–07 (Fed. Cir. 1995)); *see also Yantai Timken Co.*, 521 F. Supp. 2d at 1371 ("In order for Commerce to fulfill its mandate to administer the antidumping duty law, including its obligation to calculate accurate dumping margins, it must be permitted to enforce the time frame provided in its regulations.").

While acknowledging potential fairness concerns, courts have recognized the need for Commerce to balance those concerns with "the burden imposed upon the agency by accepting the late submission," *Usinor Sacilor v. United States,* 872 F. Supp. 1000, 1008 (Ct. Int'l Trade 1994), and "the need for finality at the final results stage," *Timken U.S. Corp. v. United States,* 434 F.3d 1345, 1353 (Fed. Cir. 2006). And it is within Commerce's discretion to decide which

interest outweighs the other. *Goodluck India v. United States*, 11 F.4th 1335, 1343 (Fed. Cir. 2021) (citing *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997)).

      B.      Commerce's Rejection Of Untimely NFI Was Reasonable, Particularly Given The
              Circumstances Of The Underlying Proceeding

Despite plaintiffs' contentions to the contrary, Commerce sought to build robust and complete records within the bounds of its resources and timing constraints throughout the inquiries. IDM at 63. The breadth of this case was unique in its enormity—for its preliminary determination, Commerce reviewed 146 questionnaire responses from 37 respondents (much of which contained confusing discrepancies), having solicited factual information from all actively cooperating respondents *three times*. IDM at 28, 63. The Coalition also submitted three sets of comments detailing discrepancies in the other parties' responses. *Id*. Each time Commerce requested information or the Coalition placed new information on the record, parties were permitted to provide clarifying information to explain those discrepancies. Commerce was not required to continue to solicit information *ad infinitum* until every single inaccurate or inconsistent piece of information on the already extensive record was corrected. This is particularly so given that "the burden of creating an adequate record lies with interested parties and not with Commerce." *Nan Ya,* 810 F.3d at 1337-38 (quoting *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)). That Commerce asked for information three separate times demonstrates that it attempted to collect as much, and as accurate, information as possible to make a reasoned determination.

Following its preliminary determination, Commerce received a multitude of submissions. In the first business day alone, the interested parties submitted seven different "ministerial error" allegations. IDM at 27. The next day, Commerce received another "ministerial error" comment. *Id*. Two days after that, it received comments discussing the preliminary determination along

with a request to submit NFI.  *Id.*  Over the following three weeks, Commerce received 20 more submissions consisting of: comments on the preliminary determination, requests for hearings, and requests to reopen the record to allow factual information.  *Id.*  Each submission required significant attention and consideration, some required responses, and many contained unsolicited and untimely NFI.  *Id.*

Commerce reasonably rejected the untimely NFI contained in the submissions filed after the preliminary determination.  Prior to issuing that determination, Commerce had been seeking this information from the parties for over 302 days, and had granted multiple extensions of time for parties to respond to the questionnaires and provide factual information.  *See, e.g.* Supplemental Questionnaire Extension (P.R. 228); Second Supplemental Questionnaire Extension (P.R. 275).  To the extent that plaintiffs complain that Commerce did not extend the final deadline for these inquiries so that it could accept untimely NFI, it is not for the interested parties "to dictate whether and when Commerce actually needs the requested information." *Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343, 1352 (Fed. Cir. 2015). Additionally, as discussed above, Commerce was required to analyze no less than 146 questionnaire responses.  Put another way, for each participating company, Commerce had to analyze a minimum of three questionnaire responses, then resolve any discrepancies among the responses, the Coalition's, and the information submitted by the Vietnamese government.

Commerce could not continue indefinitely the cycle of affording companies more opportunities to submit factual information, and reasonably declined to allow NFI submitted after the preliminary determination, explaining that it was necessary to limit factual information to the time periods and purposes described in the regulations so that it could best parse an extremely large volume of information from dozens of interested parties without further

prolonging resolution of the inquiries. IDM at 63. In reaching this conclusion, Commerce considered the amount of time it would need to collect all the information the parties proposed to submit, the time it would take to allow parties to submit comments and rebuttal comments, and the extensive time that would have been necessary for Commerce to analyze that significant volume of information. *See Dongtai Peak*, 777 F.3d at 1353 (accepting Commerce's explanation for why it declined to accept untimely NFI, which included "the time and effort to gather necessary information, consider the facts of the record, and provide interested parties with an appropriate period for comments and rebuttal comments."). Commerce's decision not to allow untimely NFI was supported by the factual circumstances of the underlying proceeding and in accordance with its regulations; the Court should reject any arguments to the contrary.

C.    Commerce Acted Consistently With Judicial Precedent

Plaintiffs cite several cases from this Court and the Federal Circuit, claiming that they demonstrate that Commerce abused its discretion in rejecting untimely filed NFI. But the case law relied on by plaintiffs fails to detract from Commerce's finding, as those cases are either distinguishable or consistent with Commerce's actions, and Commerce did not misapply judicial precedent in rejecting the NFI.

1.    Judicial Precedent Supports Commerce's Determination And Commerce Did Not Misinterpret Prevailing Standards When Rejecting NFI

Despite plaintiffs' claims to the contrary, Commerce's determination to reject untimely filed NFI is supported by relevant judicial precedent, and Commerce did not incorrectly interpret that precedent in explaining its decision.

To start, the Federal Circuit's decision in *Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) supports Commerce's decision not to accept untimely filed NFI. In *Essar Steel*, the Federal Circuit sustained Commerce's decision to reject untimely factual information,

43

holding that Commerce is not required to accept *post hoc* documentation when the respondent could have submitted the information earlier, but instead failed to submit it until facing a negative determination.  *Id*. at 1276.  In doing so, the Federal Circuit stated that:

> {w}ithout the ability to enforce full compliance with its questions, Commerce runs the risk of gamesmanship and lack of finality in its investigations. Indeed, Essar's actions demonstrate both. Essar withheld information about its Chhattisgarh facility. Only when Essar knew that it would face countervailable subsidies did it finally make concessions about its Chhattisgarh facility. In addition, Essar's failure to cooperate with Commerce's questions lengthened the investigation.

*Id.*

    In its final determination, Commerce explained that, consistent with *Essar Steel*, it would appropriately and reasonably continue to decline to accept post-preliminary NFI submissions, as those factual submissions purported to address parties' ***pre-preliminary*** failures to provide adequate responses to Commerce's questions.  IDM at 59.  Here, 20 respondents provided inaccurate and inconsistent information in response to Commerce's repeated requests for information.[7]  *Id*.  And, similar to in *Essar Steel*, only ***after*** the record had closed and Commerce had preliminary applied AFA did respondents and importers attempt to submit information that could have been submitted in a timely manner.[8]

---

[7]  For the preliminary determination, Commerce applied AFA to 22 participating but non-cooperating respondents; for the final determination, Commerce reversed its AFA decision regarding two companies—An An and Greatwood Hung Yen—leaving the total number of AFA companies at 20.

[8]  For example, as detailed below regarding Shelter Forest, importers—who were all on public notice of the circumvention inquiries—could have entered appearances and monitored the pre-preliminary proceedings, and submitted comments and factual information upon reviewing respondents' questionnaire responses for potential discrepancies and Commerce's supplemental questionnaires.

Furthermore, companies' failures to cooperate with Commerce's questions had already increased the duration of the inquiries because Commerce was required to closely examine multiple submissions from the responding parties. IDM at 58. The sheer volume and inaccuracy of these submissions drove the lengthy period that transpired between the submission of the final supplemental questionnaire responses and the issuance of the preliminary determination. As Commerce explained, and as stated above, allowing parties to submit additional information after the preliminary determination would have only increased the already extraordinary volume of information that Commerce had to analyze and, consequently, the length of time for issuing a final determination. IDM at 59. If Commerce had reopened the record to accept the multitude of late submissions, it would have "lead to inefficiency and delay in finality." *Essar Steel*, 678 F.3d at 1277. Finally, the exceptions delineated by *Essar Steel* that would allow the Court to order Commerce to reopen and supplement the agency record are not met: there has been no allegation (nor could there be) that the original record was tainted by fraud, and Commerce's determination was not based on data that it—or any other agency—indicated was inaccurate. *Id.*

Plaintiffs allege that Commerce misapplied this Court's decision in *Yantai Timken*. *See* Shelter Forest Tranche I Br. at 18-19; Cabinetworks Tranche I Br. at 23-24; Concannon Tranche I Br. at 26-28. But Commerce did not such thing. In *Yantai Timken*, a respondent had included unsolicited and untimely NFI in its administrative case brief, arguing that Commerce was required to accept NFI after a preliminary determination if that information was necessary to determine dumping margins as accurately as possible, and claiming that the late submission contained information corroborating claims and data that had been previously timely submitted. *See Yantai Timken*, 521 F. Supp. 2d at 1370. The Court disagreed, stating that "{p}laintiffs,

however, misinterpret *Timken*[9] . . . .  *Timken* permits submission of information after a preliminary determination to correct errors of information already on the record.  {It} is inapplicable to the instant case because Plaintiffs here sought to introduce new factual information after Commerce issued the preliminary results."  *Id.* (cleaned up).  The Court noted that the respondent had ample opportunities to submit complete and accurate information in a timely manner, and had submitted responses to the original questionnaire and multiple supplemental questionnaires.  *Id.*  The Court concluded that, because the information proffered by the respondent constituted untimely filed NFI (as opposed to a correction of errors or an explanation or corroboration of information already on the record), Commerce was not required to accept it.  *Id.* at 1370-71.

Plaintiffs attempt to distinguish *Yantai Timken* by arguing that the respondent in that case had more opportunities to submit complete and accurate information, and that it had tried to submit the information ***after*** verification, whereas, in the underlying proceeding, parties had submitted the new information prior to verification such that Commerce could have confirmed it at verification and analyzed it in a timely manner.  *See* STR Plaintiffs' Tranche I Br. at 23-24, MG Plaintiffs' Tranche I Br. at 27-28.  But neither *Yantai Timken*, nor any other case, permits Commerce to ***only*** reject untimely filed NFI if it is submitted after verification.  Indeed, such a rule would render Commerce's regulatory deadlines meaningless.  Commerce assessed the totality of the circumstances, including whether the parties could have submitted the information earlier, the volume of the information, and the potential delay and need for finality, and made a reasoned decision not to accept post-preliminary NFI.  Finally, Commerce did not rely on *Yantai*

---

[9]  *Timken* here refers to *Timken U.S. Corp. v. United States*, 318 F. Supp. 2d 1271 (Ct. Int'l Trade 2004), *aff'd after remand by Timken U.S. Corp. v. United States*, 434 F.3d 1345 (Fed. Cir. 2006).

*Timken* for the proposition that it can never accept NFI after a prelamination determination; rather, it cited the case in explaining that it was not required to accept untimely filed NFI when parties had the opportunity to timely submit the information during the proceeding, but failed to do so.

In *Deacero S.A.P.I. de C.V. v. United States*, 353 F. Supp. 3d. 1303 (Ct. Int'l Trade 2018), the Court further elucidated its reasoning regarding acceptance of corrective information, holding that "Commerce has the discretion to decide whether to accept corrective information on a case-by-case basis," balancing the dual interests of accuracy and finality. *Id*. at 1307. However, as Commerce explained here, there were no calculation, classification, or other similar errors in need of correction in the underlying review; indeed, Commerce does not even calculate dumping margins in anticircumvention inquiries. IDM at 59. Rather, Commerce found that the respondents' questionnaire responses contained discrepancies, misleading information, and other inaccuracies. *Id.* The respondents, and any other interested parties, had the obligation to review the factual information on the record, as well as the opportunity to ensure, in a timely manner, that the information was complete and accurate.

In sum, Commerce's rejection of untimely filed NFI was not an abuse of discretion or otherwise arbitrary. "Commerce has discretion both to set deadlines and to enforce those deadlines by rejecting untimely filings." *Grobest*, 815 F. Supp. 2d at 1365. The courts have made clear that an abuse of that discretion "occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represent an unreasonable judgment in weighing relevant factors" and that "{a}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *See WelCom Prods v. United States*, 865 F. Supp. 2d 1340, 1344 (Ct. Int'l Trade

2012) (citing *Star Fruits S.N.C v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005)). Here, Commerce's decision not to accept post-preliminary NFI was consistent with its regulations and judicial precedent and balanced the competing interests of accuracy and finality.

> 2.    The Case Law Relied On By Plaintiffs Does Not Undermine Commerce's Decision Not To Accept Untimely Filed NFI

Plaintiffs cite certain cases from this Court—namely *Shelter Forest Int'l Acquisition, Inc. v. United States*, 497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021), *aff'd after remand by Shelter Forest Int'l Acquisition, Inc. v. United States*, No. 2021-2281, 2022 WL 2155965 (Fed. Cir. June 15, 2022); *Grobest*, 815 F. Supp.2d 1342; and *Linyi Chengen Import and Export Co., Ltd. v. United States*, 433 F. Supp. 3d 1278 (Ct. Int'l Trade 2020)—in arguing that Commerce abused its discretion by not accepting untimely filed NFI. But these cases are distinguishable or otherwise inapposite, and do not support the proposition that Commerce acted unreasonably in rejecting the information.

In the *Shelter Forest* litigation, Shelter Forest had argued that Commerce improperly rejected its NFI, which was intended to demonstrate that its hardwood plywood was not later-developed merchandise pursuant to 19 U.S.C. § 1677j(d). *See Shelter Forest*, 497 F. Supp. 3d at 1399. The Court held that Commerce had acted unreasonably in rejecting the late submission because it had not adequately notified Shelter Forest—prior to the preliminary determination—of discrepancies between Shelter Forest's assertion that its merchandise was not later-developed and the supporting documentation it had submitted. *Id.* at 1400. The Court took particular issue with the fact that Commerce had relied on Shelter Forest's information in determining that inquiry merchandise was later-developed, and that Commerce created the impression that Shelter Forest was accepted as a voluntary respondent, without giving Shelter Forest an opportunity to remedy any deficiencies. *Id.* at 1399-1401. The Court held that Commerce had improperly

relied on supplemental questionnaires issued to mandatory respondents, when Shelter Forest was a voluntary respondent, as notice to Shelter Forest that its responses were deficient. *Id.* at 1401.

The facts of this case are readily distinguishable from *Shelter Forest*. Here, all 20 companies that participated in the proceeding and were assigned AFA were sent the initial Q&V questionnaires and at least two supplemental questionnaires. IDM at 123-124. Thus, respondents were directly and repeatedly notified of their deficiencies, and given multiple opportunities to provide complete and accurate information. *Id.* at 123. The questionnaires made clear what information Commerce was seeking regarding the parties' inputs, suppliers, and affiliates. Unlike in *Shelter Forest*, the respondents and other interested parties had ***ample*** opportunity to provide Commerce with timely filed factual information, but failed to do so. Moreover, the Court in *Shelter Forest* rejected Commerce's arguments regarding time and resource complaints, holding that Commerce had not explained why reviewing a 100-page submission over a four-month period would have been unduly burdensome. *Shelter Forest*, 497 F. Supp. 3d at 1401-02. Here, as established above, Commerce described why accepting the parties' post-preliminary NFI would place an undue burden on Commerce and significantly delay resolution of the administrative proceeding, citing the volume of the information companies sought to place on the record (in addition to the extraordinary volume of information already on the record), the fact that the voluminous record and numerous supplemental questionnaires had already delayed the proceeding,[10] and the additional time it would take to collect the new information, analyze it, and allow parties to submit comments and rebuttal

---

[10] Oddly, STR plaintiffs imply that the unusually long period for the underlying proceeding, including the amount of time it took to issue the preliminary determination, demonstrates that there would be no undue delay from accepting the untimely filed NFI.

comments.  IDM at 58, 63.  Accordingly, *Shelter Forest* does not dictate, or even suggest, a finding that Commerce abused its discretion.

Plaintiffs also rely on *Grobest*,[11] claiming that Commerce improperly found that the need for finality outweighed the interests of accuracy, and that, rather than conducting a case-by-case analysis, it simply rejected the NFI because the parties had submitted the information after the preliminary determination.  MW Plaintiffs' Tranche I Br. at 19-20, 22, 24; Shelter Forest Tranche I Br. at 8, 13, 17.  But, as already established several times, Commerce ***did*** balance the competing interests, and found that the burden and delay that would be caused by accepting the NFI, as well as the fact that the parties were not diligent in seeking to remedy discrepancies and inaccuracies, rendered it appropriate for Commerce to decline to accept the untimely filed NFI.[12]

MG plaintiffs and Shelter Forest also rely on *Grobest*, *Shelter Forest*, and other cases in purporting to demonstrate that Commerce had more days remaining between the submittal of the NFI and the final determination in the underlying proceeding than it had in cases where the Court had held that Commerce unreasonably rejected untimely filed NFI.  MG Plaintiffs' Tranche I Br. at 23, Shelter Forest Tranche I Br. at 12.  But plaintiffs ignore that there is no bright line rule on the number of days that must remain before the final determination before Commerce can reject untimely filed NFI; rather, the analysis must be undertaken on a case-by-case basis.  *See*

---

[11]  MG plaintiffs and Shelter Forest also rely on the Federal Circuit's decision in *NTN Bearing* for the same propositions as in *Grobest*.

[12]  MG plaintiffs also claim that rejecting the NFI led to inaccurate results and purport to demonstrate how its NFI would have corrected the deficiencies on the record.  MG Plaintiffs' Tranche I Br. at 21.  The Court should not consider such argument.  First, plaintiffs had ample opportunity to correct their deficiencies in a timely manner.  Second, Commerce did not perform a fulsome analysis of how each piece of untimely filed NFI would have changed its substantive determinations; nor should it have, as doing so would have caused undue burden and defeated the purpose of rejecting the NFI.

*Grobest*, 815 F. Supp. 2d at 1365.  Moreover, the cases cited by plaintiffs do not involve the same volume of documentation and burden on Commerce as here.  For example, in *Shelter Forest*, Shelter Forest tried to submit 100 pages of information.  *See supra* at 50.  In *Grobest*, the respondent tried to submit a separate rate certification, which the Court stated would not be a great burden to review.  *Grobest*, 815 F. Supp. 2d at 1367.  In *Pro-Team Coil Nail Enterprise, Inc. v. United States*, 419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019), the respondent submitted a Q&V schedule prior to the preliminary results and the schedule summarized information already on the record, thereby making the burden "minimal."  *Id.* at 1332.  Here, by stark contrast, Commerce received at least 30 submissions containing untimely filed NFI.

Finally, this Court's decision in *Linyi Chengen* is inapposite and, in any event, is on appeal to the Federal Circuit.  In *Linyi Chengen*, Commerce accepted two pages of a 12-page document proffered at verification and rejected the remainder as NFI.  *See Linyi Chengen*, 433 F. Supp. 3d at 1285.  This Court held that it was unreasonable to reject the rest of the document, and that Commerce should accept it as "an opportunity to accept evidence that would corroborate, support, or clarify the log volumes reported in the questionnaire responses."  *Id.* Here, Commerce did not accept part of a document submission while rejecting the rest.  Indeed, many of the discrepancies found by Commerce were the result of respondents' submissions directly conflicting with information submitted by the respondents themselves or with corroborating documentation from the Vietnamese government.  IDM at 59 (citing Preliminary AFA Memo (C.R. 412)).  Furthermore, the mere ten additional pages at issue in *Linyi Chengen* cannot be compared to the voluminous amount of new information the parties sought to place on the record here.

Commerce's rejection of the parties' post-preliminary NFI was supported by substantial evidence and in accordance with law; accordingly, this Court should reject plaintiffs' attempts to frame Commerce's reasonable action as an abuse of discretion. Because certain plaintiffs have made arguments specific to the rejection of their submissions, we address each of these arguments separately below.

### D. Commerce's Rejection Of Shelter Forest's Untimely NFI Was Reasonable And Lawful

Shelter Forest, an importer of hardwood plywood, claims that Commerce's rejection of its late-submitted "country of origin" documentation constitutes an abuse of discretion. Shelter Forest Br. at 6-16. As with its overall rejection of untimely filed NFI, Commerce's decision not to accept Shelter Forest's proffered information—submitted nearly a month after the preliminary determination—was reasonable and within Commerce's discretion.

### 1. Background For Rejection Of Shelter Forest's NFI

Shelter Forest entered an appearance in the proceeding only ***after*** the issuance of the preliminary determination. *See* Shelter Forest EOA (P.R. 419). On August 19, 2022, Shelter Forest filed a submission containing factual information that it claimed was timely and proper pursuant to 19 C.F.R. §§ 351.102(b)(21)(iv), 351.301(c)(4),[13] as the information purportedly rebutted "factual conclusions" contained in the preliminary determination. *See* Shelter Forest NFI Submission (P.R. 475); Shelter Forest NFI Rejection Letter (P.R. 615). Commerce rejected this submission as untimely filed NFI, explaining that the preliminary determination did not contain new factual information; accordingly, there was nothing to which Shelter Forest could

---

[13]   It appears that Shelter Forest cited 19 C.F.R. § 351.102(b)(4) in its submission, but Commerce noted that section 351.301(b)(4) does not exist, and stated that it assumed Shelter Forest had intended to refer to section 351.301(c)(4). *See* Shelter Forest NFI Rejection Letter (P.R. 615).

have properly responded pursuant to the regulations.  *See* Shelter Forest NFI Rejection Letter

(P.R. 615).

Commerce likewise disagreed with Shelter Forest's alternative rationale—that it had

good cause, pursuant to 19 C.F.R. § 351.102(b)(21)(v), for submitting late NFI because it

allegedly had no notice of the discrepancies in its Vietnamese supplier's questionnaire responses

until the issuance of the preliminary determination.  *See id.* at 2.  As Commerce explained, it had

published a notice in the Federal Register in 2020; this notice alerted the public—including

Shelter Forest—that Commerce was initiating circumvention inquiries on certain hardwood

plywood products exported from Vietnam.  *Id*. at 2 (citing *Initiation Notice*, 85 Fed. Reg. at

36,530).  Thus, as Commerce observed, parties interested in the outcome of the circumvention

inquiries, including importers like Shelter Forest, that sourced hardwood plywood exported from

Vietnam, had ample opportunity to enter appearances so that they could review the information

on the record and timely comment on information other parties had submitted.

Commerce further noted that it had complied with its statutory obligations to provide

notice of deficiencies to parties submitting information, as it issued deficiency/supplemental

questionnaires to multiple companies, including Shelter Forest's supplier.  *Id*.  Commerce

explained that the notification requirement applies only to the submitter of the information, and

not to other parties; accordingly, Commerce was not required to request information from Shelter

Forest or notify it of its supplier's deficiency.  *Id*.  On October 24, 2022, Shelter Forest filed a

request for reconsideration.  *See* Shelter Forest Request for Reconsideration (P.R. 626).

Commerce denied this request, reiterating its reasons for denying the request in the first instance.

*See* Denial of Request for Reconsideration (P.R. 672).

2.    Commerce Properly Rejected Shelter Forest's NFI

Shelter Forest claims that its information should have been accepted as timely filed

factual information, and that Commerce abused its discretion in rejecting the information.

Shelter Forest Tranche I Br. at 15, n.2.  But, as stated above, Commerce explained that the

untimely filed information did not constitute rebuttal information pursuant to 19 C.F.R.

§ 351.102(b)(21)(iv) because the preliminary determination did not include new factual

information.  IDM at 56.  Commerce's analysis of the record in the preliminary determination

did not contain new evidence, new statements of fact, new documents, or new data.  *Id.*

Accordingly, Shelter Forest's post-preliminary submissions were untimely and properly rejected.

Shelter Forest also argues, as it did below, that good cause existed such that Commerce

should have allowed the new information under 19 C.F.R. § 351.102(b)(21)(v). [14]  Shelter Forest

Tranche I Br. at 16-19.  In the underlying proceeding, Shelter Forest claimed that: (1) supporting

documentation demonstrated that its supplier had only supplied hardwood plywood that did not

use Chinese cores, (2) it knew that its supplier was fully defending its interests and therefore it

had no reason to participate prior to the preliminary determination, and (3) it did not believe its

merchandise could be covered by the inquiries.  Shelter Forest claims that Commerce's

justifications for not accepting its information should be rejected because, in its view, Commerce

---

[14]  While Shelter Forest argues that there was "good cause" for Commerce to accept its
information, good cause is not the applicable standard.  Under the regulations, before the
applicable deadlines, the Secretary may, for good cause, extend the time limit for the submission
of factual information.  An untimely filed extension request, however, will not be considered
unless the party demonstrates "an extraordinary circumstance exists."  19 C.F.R. § 351.302(b).
Shelter Forest failed to identify any extraordinary circumstances that would warrant an extension
of a deadline for submitting factual information, much less one that would warrant the
introduction of this information 409 days after the last deadline for submission.

did not balance the burden of accepting the information with the interest in accuracy. Shelter Forest Tranche I Br. at 17-19. This is not accurate.

Commerce explained why it found Shelter Forest's arguments unavailing, and why it would not be appropriate to allow Shelter Forest to submit information that its exporter, Lechenwood Viet Nam Company Ltd. (Lechenwood), had failed to submit prior to the preliminary determination. IDM at 57. First, as Commerce stated, it is the ***respondent*** that was required to respond to Commerce's requests for information, and an importer cannot provide Commerce with a complete picture of a respondent's production practices, nor cure a respondent's failures to provide reliable information. *Id.* Importantly, if a respondent is not sufficiently familiar with its own books and records to provide accurate answers to Commerce's requests, Commerce has no reason to believe that it would be able to accurately certify its merchandise, regardless of the picture an importer paints regarding its own purchases. *Id.* Commerce would also have to question the reliability of information provided by that respondent to the importer, given a situation where that the importer could not certify as to the accuracy of information generated by the respondent. *Id.* Accordingly, Commerce reasonably determined that Shelter Forest's late-submitted information would not rectify the concerns that Commerce had with Lechenwood's responses, and that Shelter Forest had not demonstrated sufficient reason for Commerce to accept the information. *Id.*

Notably absent from Shelter Forest's arguments is a reasonable explanation as to why the information it tried to submit late was not available at the time that Commerce issued questionnaires to Vietnamese producers, including Lechenwood. Shelter Forest's decision not to participate in the inquiries until after the preliminary determination because it thought Lechenwood would represent its interests, did not constitute sufficient cause for Commerce to

accept its untimely filed information.  Commerce is not responsible for interested parties'
decisions to not participate in or adequately monitor its proceedings.  IDM at 57.

Here, the initiation notice provided public notice that Commerce was conducting
circumvention inquiries into hardwood plywood from Vietnam.  *Initiation Notice*, 85 Fed. Reg.
at 36,533.  Commerce also repeatedly stated that the failure to respond or provide accurate
responses could result in the application of AFA.  *See, e.g. Initiation Notice*, 85 Fed. Reg. at
36,533 ("A company's failure to respond completely and timely to Commerce's requests for
information may result in the application of partial or total facts available …"); Q&V
Questionnaire ("Failure to provide accurate information or to cooperate to the best of your ability
may result in Commerce resorting to the use of facts available and adverse inferences within the
meaning of section 776 of the Act.") (P.R. 62); First Supplemental Q&V Questionnaire (P.R.
154); Second Supplemental Q&V Questionnaire (P.R. 268).  Furthermore, as explained in more
detail below, Commerce has a well-established practice for excluding non-cooperative
respondents from its certification programs.  Accordingly, all parties were aware that: (1)
Commerce would be investigating hardwood plywood from Vietnam; (2) a certification program,
by its very nature, would necessarily cover non-inquiry merchandise; (3) AFA was a potential
outcome for respondents if they failed to cooperate; and (4) the use of AFA in circumvention
inquiries generally precludes non-cooperative companies from the certification program.  IDM at
57-58.  Shelter Forest should have either participated earlier in the proceeding, or monitored the
proceeding and coordinated with Lechenwood to provide timely information.

  E.  The Remaining Company-Specific Arguments Raised By Plaintiffs Are
     Unpersuasive

MG plaintiffs argues that Commerce abused its discretion in rejecting the NFI submitted
by Hai Hien Bamboo Wood Joint Stock Company (Hai Hien), Her Hui Wood (Vietnam) Co.,

Ltd. (Her Hui), Long Luu Plywood Production Co., Ltd (Long Luu), Lechenwood, Tekcom

Corporation (Tekcom), and Win Faith Trading (Win Faith), because Commerce had allegedly

failed to provide these companies with notice of the deficiencies in their questionnaire responses,

and therefore did not comply with the statutory requirements in 19 U.S.C. § 1677m(d).  *See* MG

Plaintiffs' Tranche I Br. at 8-12.  But, as established above, Commerce did notify those

companies of their deficiencies, sending multiple supplemental questionnaires to the parties and

seeking clarification for the inconsistencies it had found in the earlier questionnaire responses.

On February 21, 2021, Commerce issued its first supplemental questionnaire to all 51

companies that had responded to the initial Q&V questionnaire.  *See* First Supplemental Q&V

Questionnaire (P.R. 154).  In that questionnaire, Commerce asked questions to clarify issues

pervasive throughout the companies' initial questionnaire responses.  For instance, many

companies provided information about their affiliates and hardwood plywood inputs that

conflicted with other information on the record.  *See* Petitioner's Comments on Q&V

Questionnaires at 5-9 (P.R. 135-136, C.R. 150-151).  As another example, many companies

reported that they had no United States sales during the inquiry, which was called into question

by other record information.  *Id*.

Accordingly, in its first supplemental questionnaire Commerce requested, for the second

time, that all 51 respondents provide information about their exports of hardwood plywood and

the inputs used to produce their hardwood plywood.  *See* First Supplemental Q&V Questionnaire

(P.R. 154).  Commerce also requested, for the second time, information regarding the identity of

Chinese affiliates that manufactured or exported hardwood plywood or hardwood plywood

inputs.  *See id*.  The fact that Commerce requested information in the first supplemental

questionnaire, particularly information it had already asked for, constituted notification to

respondents that the initial questionnaire responses contained deficiencies and Commerce needed additional information and/or clarification. Commerce also issued numerous additional, company-specific supplemental questionnaires, including to Lechenwood. *See* Lechenwood Supplemental Q&V Questionnaire (P.R. 161). In its supplemental questionnaire to Lechenwood, Commerce asked it about its assertions that it had no Chinese affiliates, given that Lechenwood's business license indicated that Chinese hardwood plywood exporters/producers were owners. *See id.*

Commerce then issued a second supplemental questionnaire to all companies that had responded to the first supplemental questionnaire. *See* Second Supplemental Q&V Questionnaire (P.R. 268). This questionnaire addressed deficiencies in the responses to the first supplemental questionnaire. Specifically, Commerce ask for clarification regarding the following issues: (1) the first supplemental questionnaire responses failed to fully demonstrate that respondents' core veneers were sourced in Vietnam; (2) the Coalition had submitted comments suggesting that many respondents had not, as requested, identified all sales containing Chinese inputs, and that responses regarding hardwood plywood inputs conflicted with publicly available information; (3) whether import data from the Vietnamese government would corroborate import information provided by the respondents; and (4) whether respondents accurately reported that they did not source hardwood plywood or hardwood plywood inputs from China. *Id.* Commerce also requested additional information about the respondents' affiliates and the hardwood plywood and hardwood plywood inputs those affiliates exported from China to Vietnam. *Id.*

Commerce also issued another round of company-specific questionnaires, including to Hai Hien and Win Faith. *See* Hai Hien Supplemental Questionnaire (P.R. 261), Win Faith

Supplemental Questionnaire (P.R. 276).  The questionnaire to Hai Hien addressed inconsistent information regarding Hai Hien's Chinese affiliates, inconsistent information between the source documents provided by Hai Hien and its narrative responses, and information about one of Hai Hien's representatives.  *See* Hai Hen Supplemental Questionnaire (P.R. 261).  The questionnaire to Win Faith addressed inconsistent information about Win Faith's Chinese affiliates.  *See* Win Faith Supplemental Questionnaire (P.R. 276).  While the companies responded to the general and company-specific questionnaires, Commerce explained in the preliminary determination that these additional responses did not cure the inconsistencies in their reporting.  *See* PDM at 12-13, Preliminary AFA Memo (C.R. 412).  Commerce accordingly applied AFA to certain respondents, as it had requested information and put the parties on notice as to their deficiencies, but the respondents had not cured their issues.  In sum, Commerce sufficiently notified the companies as to their deficiencies, and gave them opportunities to submit complete and accurate information.  Commerce was not required to allow these companies, who had the opportunity to submit information earlier, to submit new factual information after the issuance of the preliminary determination.

To the extent plaintiffs argue that Commerce should have sent further additional deficiency questionnaires, Commerce explained why it would not have practicable to issue 22 company-specific third (or fourth or fifth) supplemental questionnaires.  Commerce detailed that: (1) not including the responses of respondents who stopped responding to Commerce's questionnaires, Commerce had a total of 146 questionnaire responses to analyze in order to determine whether any respondent had shipments of inquiry merchandise; (2) information concerning discrepancies had already been requested multiple times; (3) the discrepancies concerned basic facts, central to these inquiries, that should have been simple for the respondents

to resolve; (4) after reviewing the large volume of questionnaire responses and realizing that significant and pervasive errors remained throughout the response, there was not sufficient time to issue additional questionnaires and review the responses; (5) the pattern established by the respondents indicated that additional discrepancies would be likely submitted and uncovered in any future questionnaire responses; and (6) by failing to supply such basic, fundamental information, it was apparent that respondents were either not familiar with their own corporate structure and books and records, and were not fully cooperating.  IDM at 133.

MG plaintiffs also claim that Commerce's rejection of post-preliminary NFI was inappropriate because its requests were unclear and it was required to give respondents another chance to correct the errors prior to issuing the final determination.   MG Plaintiffs' Tranche I Br. at 15-16.  Commerce reasonably rejected this argument, noting that this Court has upheld Commerce's decision to reject NFI in similar circumstances.  IDM at 59-60 (citing *Uniroyal Marine Exports Ltd. v. United States*, 626 F. Supp. 2d 1312, 1314-18 (Ct. Int'l Trade 2009)). Commerce's questionnaires included language explaining that, if parties had any questions about the questionnaire, they should contact Commerce officials.  *See* Initial Q&V Questionnaire at 2 (P.R. 62); Supplemental Q&V Questionnaire at 2 (P.R. 154); Second Supplemental Questionnaire at 2 (P.R. 268).  Two respondents did ask for clarification regarding certain issues, but no other parties requested clarification.  *See* Memorandum, "Clarification of Second Q&V Supplemental Questionnaire Response" (P.R. 272)  If the respondents were unsure about the information Commerce was seeking in its questionnaires, they should have requested clarification. *See Dalian Meisen Woodworking Co. v. United States*, No 20-00109, 2023 WL 3058783, at *3-4 (Ct. Int'l Trade Apr. 24, 2023) (parties must either do as Commerce requests or follow up with Commerce).  Because none of the AFA companies requested clarification

regarding Commerce's questionnaires, they cannot now claim that a lack of understanding as to the information Commerce was seeking.  IDM at 59-60.

Finally, Greatriver contends that "the law and regulations are clear that Greatriver is not required to respond to allegations made by the Petitioner."  Greatriver Tranche I Br. at 24.  While correct that Greatriver was not ***required*** to submit rebuttal argument or factual information in response to the Coalition's comments, the regulations nonetheless ***permit*** companies to submit rebuttal to a petitioner's comments.  IDM at 25-26.  Accordingly, Commerce correctly found that parties had the opportunity to address the Coalition's comments.  IDM at 25.  Commerce further explained that:

> parties were able to submit argument and/or comments during this proceeding ***at any point in time*** and all parties were permitted to submit NFI within regulatory or extended deadlines.  With respect to the submission of rebuttal factual information in response to NFI submitted by the petitioner, respondents had seven days after each petitioner filing to submit their rebuttal, or request an extension of the deadline to submit their rebuttal, in accordance with Commerce's regulations.

*Id.* (emphasis in original).  No parties, however, submitted rebuttal comments addressing the discrepancies pointed out by the Coalition, ***despite the opportunity to do so***.  IDM at 25-26. The failure of Greatriver and other companies to take advantage of the opportunity to address the Coalition's comments does not require Commerce to then allow untimely filed information be accepted after the record has been closed.

## VI.    Commerce's Certification Program is Lawful

MG plaintiffs and STR plaintiffs argue that Commerce's certification regime, put in place to allow cooperative parties to certify that their merchandise does not fall under one of the circumventing scenarios, is arbitrary and capricious and constitutes an abuse of discretion.  *See* MG Plaintiffs' Tranche I Br. at 33-39, STR Tranche I Br. at 7-13.  Plaintiffs claim that

61

Commerce's certification regime and ensuing customs instructions conflicted with guidance provided by Commerce on the scope of its circumvention inquiry.  In lodging this argument, plaintiffs misunderstand the purpose of Commerce's clarification of the scope of the inquiry and ignore the practical implications of putting a certification regime in place.

Out of a concern that Vietnamese hardwood plywood could be mistakenly included as hardwood plywood produced under one of circumventing production scenarios, Commerce implemented a certification regime to allow cooperating parties to certify that their hardwood plywood from Vietnam was completed using a production scenario other than those Commerce found to be circumventing the orders.  PDM at 27-28; IDM at 171.  If companies provided certifications and supporting documentation upon entry, these certified entries would not be treated as merchandise subject to the order and the companies would not need to make cash deposits.  PDM at 27-28.  Commerce also sent instructions to CBP consistent with the certification regime.  PDM at 27-28.

Early in the proceeding, due to confusion from interested parties, Commerce clarified what types of merchandise it was intending to examine in its inquiries.  *See* Comments from Concannon Requesting Clarification on Scope of Inquiry (P.R. 8).  Commerce explained that:

> Commerce hereby clarifies that the detailed description in . . . the *Initiation Notice* accurately describes the merchandise subject to this inquiry and is in accordance with the petitioner's request, as explained in its May 12, 2020 clarification . . . . The merchandise subject to these anticircumvention and scope inquiries does not include core veneers fully produced in Vietnam or a third-country that are assembled into a veneer core platform in Vietnam and combined with a face and back veneer produced in China.

July 9, 2020 Clarification Memo (P.R. 21).

While MG plaintiffs claim that Commerce expressly stated that certain "safe harbor" merchandise was not subject to the scope of the proceeding, MG Plaintiffs' Tranche I Br. at 34,

at no point did Commerce refer to any merchandise as "safe harbor." Indeed, Commerce does not advise parties on what merchandise they should ship in order to avoid duties. IDM at 171. Rather, the clarification memo only clarified that certain merchandise was not subject to the circumvention inquiries and confirmed that the initiation notice accurately described the subject merchandise. *See* July 9, 2020 Clarification Memo at 2 (P.R. 21). Commerce did not make a finding as to whether core veneers—fully produced in Vietnam or a third country that are assembled into a veneer core platform in Vietnam and combined with a face and back veneer produced in China—were subject to, or circumventing, the orders, and, importantly, it did not state that any hardwood plywood assembled in Vietnam would be exempt from any resulting certification program. *See id.*; IDM at 172.

Commerce's standard practice with respect to inquiry merchandise that is indistinguishable on its face from non-inquiry merchandise at entry is to establish certification programs that require parties to affirmatively declare, and maintain supporting documentation demonstrating, that the merchandise being entered is not the specific product(s) subject to the inquiry. IDM at 172; *see also*, *e.g.*, *Final Affirmative Determination of Circumvention of Antidumping and Countervailing Duty Orders, and Partial Recission of Aluminum Extrusions from the People's Republic of China:* 84 Fed. Reg. 39,805 (Dep't of Commerce Aug. 12, 2019), and accompanying IDM at Cmt. 3; *Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty Order,* 84 Fed. Reg. 29,164 (Dep't of Commerce June 21, 2019), and accompanying IDM at 21. Thus, plaintiffs' contention that the clarification memo should result in the exemption of non-subject production scenarios from the certification program misunderstands the nature of the memo.

Plaintiffs' arguments also demonstrate a lack of understanding of the way Commerce's certification programs are administered. The certification regime is necessary for Commerce to fulfill its statutory directive to prevent evasion of the orders. Congress intended to combat loopholes in antidumping and countervailing duty law by granting Commerce discretion in circumvention proceedings, and to "use this authority to the fullest extent possible to combat diversion and circumvention of the antidumping and countervailing duty laws." *See*, *e.g.*, *Macao Commercial v. United States*, 437 F. Supp. 3d 1324, 1329-30 (Ct. Int'l Trade 2020) (citing 1987 Senate Report, S. Rep. No. 100-71 at 100 (1987)). In establishing the certification regime, Commerce was guided by 19 U.S.C. §§ 1671, 1673, 1671d(c)(1)(B)(ii) and 1673d(c)(1)(B)(ii), which address Commerce's authority to impose duties on merchandise subject to an order.

In its final determination, Commerce examined previous certification regimes it had established. IDM at 172-174. In a proceeding involving hydrofluorocarbon blends from China, Commerce examined a subset of merchandise based on its physical characteristics (*i.e.*, patented or unpatented R-421A) and established a certification program for merchandise that was not circumventing the relevant order but was physically indistinguishable at entry from inquiry merchandise (*i.e.*, patented R-421A). *See Hydrofluorocarbon Blends from the People's Republic of China: Final Scope Ruling on Unpatented R- 421A; Affirmative Final Determination of Circumvention of the Antidumping Duty Order for Unpatented R-421A*, 85 Fed. Reg 34,416 (Dep't of Commerce June 4, 2020) (*HFCs R-421A from China*), and accompanying IDM. Commerce explained that this proceeding was similar to *HFCs R-421A from China* because the merchandise in these inquiries is physically indistinguishable from other hardwood plywood completed in Vietnam. IDM at 174. Thus, Commerce concluded that it was reasonable to require exporters and importers to certify that their shipments of hardwood plywood from

Vietnam are not inquiry merchandise and maintain documentation to support their claims.  *Id.* at 172, 174.

For Commerce to exempt certain hardwood plywood imported from Vietnam from the certification requirements would run counter to the very purpose of the certification program. Nonetheless, plaintiffs argue that, because Commerce clarified that hardwood plywood produced with Vietnamese core veneers and Chinese face and back veneers are not the inquiry merchandise, the certification requirements should not apply to this merchandise.  MG Plaintiffs' Tranche I Br. at 34; STR Plaintiffs' Tranche I Br. at 8.  As already stated, Commerce reasonably relied on record evidence that the merchandise in these inquiries is physically indistinguishable from other hardwood plywood completed in Vietnam.  *See* IDM at 185.  Removing certain non-inquiry merchandise from the certification requirement would conflict with Commerce's mandate to provide an administrable and enforceable remedy by making the enforcement of the affirmative circumvention determination more difficult.  *Id.* at 174.  Commerce determined that such a change would undermine the effectiveness of these determinations because there would be no requirement for exporters or importers of such merchandise to gather and maintain supporting documentation.  *Id.*  This would complicate any examination of such entries by CBP, and Commerce would not be able to verify the accuracy of non-certified entries of non-inquiry merchandise.  *Id.*

Commerce also explained that an exemption for certain merchandise would create a loophole that companies could exploit, which could ultimately undermine the remedy afforded by the affirmative circumvention determination, and, more generally, the purpose of the orders. IDM at 174.  To exclude specific merchandise would weaken the enforcement mechanism; companies could simply enter such merchandise as non-subject merchandise and avoid duties

with the knowledge that neither Commerce nor CBP would not be able to audit such claims. *Id.* Accordingly, Commerce reasonably determined that exempting certain hardwood plywood from the certification requirements would defeat the purpose of the certification program. *Id.* at 173-174. Despite plaintiffs' claims to the contrary, Commerce has not treated "core veneers fully produced in Vietnam or a third-country that are assembled into a veneer core platform in Vietnam and combined with a face and back veneer produced in China" as inquiry merchandise. Rather, because CBP would not be able to tell by looking at a sheet of plywood where the plywood inputs came from, Commerce created a certification program that treated all hardwood plywood from Vietnam the same, providing an opportunity for merchandise produced and/or exported by any cooperating importer respondents to be certified as non-circumventing and enter without regard to antidumping or countervailing duties.

Finally, Commerce's instructions to CBP are reasonable and effectuate its final determination. The plain language of the instructions directs CBP to collect cash deposits on merchandise produced under one of the five production scenarios and that is not certified as out of scope. IDM at 173. The CBP instructions expressly describe only merchandise that is covered by these inquiries and that, as a consequence of Commerce's affirmative determination, is within the scope of the orders. As explained above, Commerce determined that adding an explicit exclusion for merchandise resulting from one specific production scenario, among many, was unnecessary. IDM at 174.

Commerce's certification program provides it a mechanism to assess companies' claims that their shipments are not inquiry merchandise, and encourages companies to accurately report their entries of hardwood plywood assembled in Vietnam. Plaintiffs' attempt to undermine the program fail.

VII.  We Respectfully Request A Voluntary Remand For Commerce To Consider Its Customs Instructions For An An And Greatwood

STR plaintiffs claim that Commerce failed to issue appropriate customs instructions regarding An An and Greatwood.  STR Plaintiffs' Tranche I Br. at 29-31.  Commerce had initially applied AFA to these companies in the preliminary determination, but decided in the final determination that AFA was not warranted.  *See* IDM at 75-76.  Commerce stated that it would modify the instructions issued to CBP to permit An An and Greatwood to certify their entries of non-inquiry merchandise.  *Id.*

STR plaintiffs argue that Commerce's customs instructions following the final determination did not address the suspension placed on these companies at the preliminary determination stage, during which An An and Greatwood were on the list of companies that were not allowed to certify.  STR Plaintiffs' Tranche I Br. at 29-30.  Because the final customs instructions stated that the companies were now eligible, but did not address the retroactive suspension, STR plaintiffs allege that the instructions failed to properly reverse the application of AFA for the two companies.  *Id.*  Without confessing error, we respectfully request that the Court remand this issue to Commerce so it can reconsider its position.

There are three primary scenarios in which an agency may seek a voluntary remand, including 1) to reconsider its decision because of intervening events outside of the agency's control, 2) to reconsider its previous position without confessing error, and (c) to change a decision it believes was incorrect.  *See SKF USA Inc. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001).  A voluntary remand is generally appropriate if the agency's concern is substantial and legitimate.  *Id.* at 1029; *see also Ad Hoc Shrimp Trade Action Committee v. United States*, 882 F. Supp. 2d 1377, 1381 (Ct. Int'l Trade 2013); *SeAH Steel Corp. v. United States*, 704 F. Supp. 2d 1353, 1378 (Ct. Int'l Trade 2010).  "{C}oncerns are considered substantial and

legitimate when (1) Commerce supports its request with a compelling justification, (2) the need for finality does not outweigh the justification, and (3) the scope of the request is appropriate." *Baroque Timber Industries (Zhongshan) Co., Ltd. v. United States*, 925 F. Supp. 2d 1332, 1339 (Ct. Int'l Trade 2013). Likewise, clarifying and correcting a potentially inaccurate determination is a compelling justification for voluntary remand. *Id.*

Commerce's reasons for seeking a partial remand on this issue are "substantial and legitimate." *SKF*, 254 F.3d at 1029. In the final determination, Commerce indicated that it would modify the instructions issued to CBP to permit An An and Greatwood to certify their entries of non-inquiry merchandise. But, in issuing its final customs instructions, Commerce's instructions did not address An An and Greatwood's entries for the period from initiation to the final determination. We thus respectfully request that the case be remanded for Commerce to reconsider its customs instructions regarding An An and Greatwood. It is appropriate for the Court to grant our request for a partial remand to provide Commerce the opportunity to reconsider its instructions. A voluntary remand is also consistent with the Court's objective to "secure the just, speedy, and inexpensive determination of every action and proceeding." USCIT R. 1.

## CONCLUSION.

For these reasons, we respectfully request that the Court deny plaintiffs' motions for judgment on the agency record, grant a voluntary remand to permit Commerce to reexamine its customs instructions regarding An An and Greatwood, and otherwise sustain Commerce's final circumvention determination.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:                          /s/ Sosun Bae
                                     SOSUN BAE
                                     Senior Trial Counsel
                                     COLLIN T. MATHIAS
                                     Trial Attorney
                                     Commercial Litigation Branch
SAVANNAH MAXWELL                     Civil Division
Attorney                             United States Department of Justice
Office of the Chief Counsel          P.O. Box 480
  for Trade Enforcement and Compliance   Ben Franklin Station
U.S. Department of Commerce          Washington, DC 20044
                                     Telephone: (202) 305-7568
                                     Facsimile: (202) 514-8624

July 2, 2024                         Attorneys for Defendant United States

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 19,967 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>s/Collin T. Mathias</u>
COLLIN T. MATHIAS