IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| SHELTER FOREST INTERNATIONAL ACQUISITION, INC., | ) )  )  ) |
| Plaintiff, | ) ) |
| and | ) ) |
| GREATRIVER WOOD CO. LTD., ET AL., | ) ) |
| Consolidated Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) |
| COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD, | ) ) ) |
| Defendant-Intervenor. | ) ) |

Consol. Court No. 23-00144

**DEFENDANT'S RESPONSE TO PLAINTIFF'S AND CONSOLIDATED PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:

SAVANNAH MAXWELL
Attorney
U.S. Department of Commerce
Office of the Chief Counsel
for Trade Enforcement and Compliance
U.S. Department of Commerce

SOSUN BAE
Senior Trial Counsel
COLLIN T. MATHIAS
Trial Attorney
U.S. Department of Justice
Commercial Litigation Branch

Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel:  (202) 305-7568
Facsimile: (202) 514-8624

September 20, 2024                    Attorneys for Defendant United States

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| SHELTER FOREST INTERNATIONAL ACQUISITION, INC., | ) ) ) |
| Plaintiff, | ) ) |
| and | ) ) |
| GREATRIVER WOOD CO. LTD., ET AL, | ) ) |
| Consolidated Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) )     Consol. Court No. 23-00144 |
| Defendant, | ) ) |
| and | ) ) |
| COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD | ) ) ) |
| Defendant-Intervenor. | ) ) ) |

## <u>ORDER</u>

Upon consideration of plaintiffs' motions for judgment upon the agency record, defendant's and defendant-intervenor's responses thereto, plaintiffs' replies, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motions are DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States.


Dated:_____          _____
      New York, New York                            CHIEF JUDGE

# **TABLE OF CONTENTS**

STATEMENT PURSUANT TO RULE 56.2(c)(1) .................................................2

    I.    Administrative Determination Under Review .........................................2

    II.    Issue Presented For Review .....................................................................2

STATEMENT OF FACTS .................................................................................3

    I.    Early Administrative Proceedings............................................................3

    II.    Commerce's Assessment Of AFA To Certain Companies ......................5

SUMMARY OF THE ARGUMENT ..................................................................7

ARGUMENT ......................................................................................................8

    I.    Standard Of Review .................................................................................8

    II.    Legal Framework For Facts Available With An Adverse Inference ........9

    III.    Commerce's Application of Facts Available With An Adverse Inference Is Supported By Substantial Evidence And In Accordance With Law ......................11

        A.  Commerce Reasonably Resorted To Facts Available..........................11

            1.   Commerce Acted Within Its Discretion To Set and Enforce Its Deadlines ... 12

            2.   Commerce Satisfied The Statutory Requirement To Notify Respondents Of Deficiencies .............................................................17

            3.   Plaintiffs' "Equity"-Based Arguments Lack Merit .....................22

        B.  Commerce Was Warranted In Applying AFA To Each Respondent At Issue ...25

            1.   Bao Yen and Thang Long.............................................................27

            2.   Cam Lam.......................................................................................30

                 a.  Background Facts Relevant To Cam Lam ...........................31

                 b.  Commerce's AFA Determination Was Lawful And Supported By The Record ................................................32

            3.   Zhongjia ......................................................................................35

      a.   Background Facts Relevant To Zhongjia ................................................. 36

      b.   Commerce's AFA Determination Was Lawful And Supported By The Record ................................................................................................. 37

4.   TL Trung ..................................................................................................... 44

5.   Eagle .......................................................................................................... 45

      a.   Background Facts Relevant To Eagle ................................................. 45

      b.   Commerce's AFA Determination Was Lawful And Supported By The Record ................................................................................................. 46

6.   Hai Hien ..................................................................................................... 51

      a.   Background Facts Relevant To Hai Hien ............................................ 52

      b.   Commerce's AFA Determination Was Lawful And Supported By The Record ................................................................................................. 53

7.   Groll Ply .................................................................................................... 58

      a.   Background Facts Relevant To Groll Ply ........................................... 58

      b.   Commerce's AFA Determination Was Lawful And Supported By The Record ................................................................................................. 60

8.   Govina ....................................................................................................... 62

      a.   Background Facts Relevant To Govina ............................................... 62

      b.   Commerce's AFA Determination Was Lawful And Supported By The Record ................................................................................................. 63

9.   Innovgreen ................................................................................................. 65

      a.   Background Facts Relevant To Innovgreen ........................................ 66

      b.   Commerce's AFA Determination Was Lawful And Supported By The Record ................................................................................................. 66

10. Her Hui ...................................................................................................... 71

      a.   Background Facts Relevant To Her Hui .............................................. 71

b.  Commerce's AFA Determination Was Lawful And Supported By The Record ..................................................................................72

11. Long Luu ..................................................................................75

a.  Background Facts Relevant To Long Luu ...............................75

b.  Commerce's AFA Determination Was Lawful And Supported By The Record ..................................................................................77

12. Tekcom ..................................................................................79

a.  Background Facts Relevant To Tekcom ...............................79

b.  Commerce's AFA Determination Was Lawful And Supported By The Record ..................................................................................81

13. Golden Bridge ..................................................................................84

a.  Background Facts Relevant To Golden Bridge ...................85

b.  Commerce's AFA Determination Was Lawful And Supported By The Record ..................................................................................86

14. Lechenwood ..................................................................................90

a.  Background Facts Relevant To Lechenwood ...................90

b.  Commerce's AFA Determination Was Lawful And Supported By The Record ..................................................................................92

15. Arrow Forest ..................................................................................99

a.  Background Facts Relevant To Arrow Forest ...................99

b.  Commerce's AFA Determination Was Lawful And Supported By The Record ................................................................................101

16. Win Faith ..................................................................................103

a.  Background Facts Relevant To Win Faith ...................103

b.  Commerce's AFA Determination Was Lawful And Supported By The Record ................................................................................105

17. Plywood Sunshine ..................................................................................107

a.  Relevant Background For Plywood Sunshine .....................................107

b.  Commerce's AFA Determination Was Lawful And Supported By The Record ..........................................................................................109

18. Greatriver ...................................................................................110

a.  Background Facts Relevant To Greatriver...........................................110

b.  Commerce's AFA Determination Was Lawful And Supported By The Record ..........................................................................................112

CONCLUSION........................................................................................115

## TABLE OF AUTHORITIES

**CASES**                                                                           **PAGE(S)**

*AK Steel Corp. v. United States*,
    34 F. Supp. 2d 756 (Ct. Int'l Trade 1998) ...................................................... 21

*Altx, Inc. v. United States*,
    370 F.3d 1108 (Fed. Cir. 2004) .......................................................................... 9

*Am. Silicon Techs. v. United States*,
    261 F.3d 1371 (Fed. Cir. 2001) ...................................................................... 107

*Apiário Diamante Comercial Exportadora Ltda. v. United States*,
    705 F. Supp. 3d 1398 (Ct. Int'l Trade 2024) ................................................... 20

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) .......................................................................... 9

*BlueScope Steel Ltd. v. United States*,
    548 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) ............................................. 14, 47

*Borden Inc. v. United States*,
    40 F. Supp. 2d 466 (Ct. Int'l Trade 1999) ...................................................... 14

*Bowe-Passat v. United States*,
    17 C.I.T. 335 (Ct. Int'l Trade 1993) ................................................................ 18

*Canadian Solar Int'l Ltd. v. United States*,
    415 F. Supp. 3d 1326 (Ct. Int'l Trade 2019) ................................................... 87

*China Steel Corp. v. United States*,
    393 F. Supp. 3d 1322 (Ct. Int'l Trade 2019) ................................................... 60

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ............................................................................................ 9

*Dalian Meisen Woodworking Co., Ltd. v. United States*,
    No. 20-00109, 2023 WL 3058783 (Ct. Int'l Trade Apr. 24, 2023) ...................... 34, 89, 94

*Deacero S.A.P.I. de C.V. v. United States*,
    353 F. Supp. 3d 1303 (Ct. Int'l Trade 2018) ................................................. 105

*Dongtai Peak Honey Indus. Co. v. United States*,
    777 F.3d 1343 (Fed. Cir. 2015) ........................................................................ 12

*Downhole Pipe & Equip., L.P. v. United States,*
  776 F.3d 1369 (Fed. Cir. 2015)..................................................................... 106

*Essar Steel Ltd. v. United States,*
  721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010) ...................................... 68, 79, 113

*Essar Steel Ltd. v. United States,*
  678 F.3d 1268 (Fed. Cir. 2012)................................................................ *passim*

*Ferrostaal Metals Gmbh v. United States,*
  518 F. Supp. 3d 1357 (Ct. Int'l Trade 2021) ......................................... 68, 113

*Fine Furniture (Shanghai) Ltd. v. United States,*
  865 F. Supp. 2d 1254 (Ct. Int'l Trade 2012) ..................................................... 56

*Fujitsu Gen. Ltd. v. United States,*
  88 F.3d 1034 (Fed. Cir. 1996)............................................................. 8, 12, 107

*Garg Tube Exp. LLP v. United States,*
  698 F. Supp. 3d 1230 (Ct. Int'l Trade 2024) ............................................. 96, 97

*Goodluck India Ltd. v. United States,*
  11 F.4th 1335 (Fed. Cir. 2021) ............................................................ 32, 34, 93

*Gov't of Quebec v. United States,*
  567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022), *aff'd*, 105 F.4th 1359 (Fed. Cir. 2024)....... 39

*Hitachi Energy USA Inc. v. United States,*
  34 F.4th 1375 (Fed. Cir. 2022) ............................................................... 21, 110

*Hitachi Metals, Ltd. v. United States,*
  949 F.3d 710 (Fed. Cir. 2020)............................................................................. 9

*Hyundai Heavy Industries, Co. Ltd. v. United States,*
  332 F. Supp. 3d. 1331 (Ct. Int'l Trade 2018) ...................................... 48, 82, 89

*Hyundai Steel Co. v. United States,*
  279 F. Supp. 3d 1349 (Ct. Int'l Trade 2017) ................................................. 107

*Jinan Yipin Corp. v. United States,*
  971 F. Supp. 2d 1296 (Ct. Int'l Trade 2014) ................................................... 70

*Linyi Chengen Imp. & Exp. Co. v. United States,*
  391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) ........................................... *passim*

*Maverick Tube Corp. v. United States,*

857 F.3d 1353 (Fed. Cir. 2017)................................................................. 19, 48, 56

*Max Fortune Indus. Co. v. United States*,
37 C.I.T. 549 (Ct. Int'l Trade 2013) ............................................... 41

*Mid Continent Nail Corp. v. United States*,
949 F. Supp. 2d 1247 (Ct. Int'l Trade 2013) .................................. 15

*Mueller Comercial De Mexico v. United States*,
753 F.3d 1227 (Fed. Cir. 2014)....................................................... 87

*New Mexico Garlic Growers Coalition v. United States*,
352 F. Supp. 3d 1281 (Ct. Int'l Trade 2018), *aff'd*, 953 F.3d 1358 (Fed. Cir. 2020) *passim*

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003)................................................ *passim*

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006)......................................................... 9

*PAM, S.p.A. v. United States*,
582 F.3d 1336 (Fed. Cir. 2009)......................................................... 9

*Pro-Team Coil Nail Enter. Inc. v. United States*,
No. 2022-2241, 2024 WL 3824005 (Fed. Cir. Aug. 15, 2024) ....................................... 97

*PSC VSMPO-Avisma Corp. v. United States*,
688 F.3d 751 (Fed. Cir. 2012)........................................................ 12

*Qingdao Sea-Line Trading Co. v. United States*,
766 F.3d 1378 (Fed. Cir. 2014)............................................. 107, 112

*Reiner Brach GmbH & Co.KG v. United States*,
206 F. Supp. 2d 1323 (Ct. Int'l Trade 2018) ....................... 14, 30, 62

*Saha Thai Steel Pipe Pub. Co., LTD v. United States*,
605 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) .................................. 94

*Saha Thai Steel Pipe Public Co. Ltd. v. United States*,
663 F.Supp.3d 1356 (Ct. Int'l Trade 2023) .................................... 19

*SeAH Steel Corp. v. United States*,
659 F. Supp. 3d 1318 (Ct. Int'l Trade 2023) ........................... 30, 33

*Shelter Forest Int'l Acquisition, Inc. v. United States*,
497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021) .......................... 21, 94

*Sigma Corp. v. United States*,
    841 F. Supp. 1255 (Ct. Int'l Trade 1993) ........................................................ 20

*SKF USA Inc. v. United States*,
    29 C.I.T. 969 (Ct. Int'l Trade 2005) ....................................................... 40, 41

*SKF USA Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001) ................................................................... 43

*Smith-Corona Grp. v. United States*,
    713 F.2d 1568 (Fed. Cir. 1983) ................................................................... 12

*Star Fruits S.N.C. v. United States*,
    393 F.3d 1277 (Fed. Cir. 2005) ................................................................... 24

*Tatung Co. v. United States*,
    18 C.I.T. 1137 (Ct. Int'l Trade 1994) ........................................................ 41

*Thyssen Stahl AG v. United States*,
    886 F. Supp. 23 (Ct. Int'l Trade 1995) ................................................. 41, 42

*Torrington Co. v. United States*,
    68 F.3d 1347 (Fed. Cir. 1995) ................................................................... 15

*Tung Mung Dev. Co. v. United States*,
    25 C.I.T. 752 (2001) ................................................................................. 10

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ................................................................................... 9

*Uttam Galva Steels Ltd. v. United States*,
    No. 2021-2119, 2022 WL 1419596 (Fed Cir. May 5, 2022) ........................... 56

*Yantai Timken Co., Ltd. v. United States*,
    521 F. Supp. 2d 1356 (Ct. Int'l Trade 2007) .............................................. 30

## **STATUTES**

19 U.S.C. § 1516a(b)(1)(B) ............................................................................... 9

19 U.S.C. § 1677(e) ....................................................................................... 96

19 U.S.C. § 1677e(a) ............................................................................... *passim*

19 U.S.C. § 1677e(b) ................................................................ *passim*

19 U.S.C. § 1677j(b) .................................................. 69, 103, 113

19 U.S.C. § 1677m(d) .............................................................. *passim*

19 U.S.C. § 1677m(e) ................................................ 10, 68, 114

19 U.S.C. §1677m(i) ............................................................. 98

## RULES

CIT R. 56.2 ........................................................................ 1

## REGULATIONS

19 C.F.R. § 351.213(e)............................................................ 23, 90

19 C.F.R. § 351.301(c)(1)(v) ............................................... 19, 65

## ADMINISTRATIVE DETERMINATIONS

*Antidumping Duties; Countervailing Duties*,
    62 Fed. Reg. 27,269 (Dep't of Commerce May 19, 1997) ............................................. 23

*Certain Hardwood Plywood Products from the People's Republic of China*,
    82 Fed. Reg. 513 (Dep't of Commerce Jan. 4, 2018) ..................................... 50

*Certain Hardwood Plywood Products from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*,
    88 Fed. Reg. 46,740 (Dep't of Commerce July 20, 2023)............................................. 2, 7

*Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*,
    83 Fed. Reg. 504 (Dep't of Commerce Jan. 4, 2018)................................... 3, 50

*Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order*,
    83 Fed. Reg. 513 (Dep't of Commerce Jan. 4, 2018) ....................................... 3

*Certain Hardwood Plywood Products from the People's Republic of China: Initiation of Anti-circumvention Inquiries and Scope Inquiries on the Antidumping Duty and Countervailing Duty Orders; Vietnam Assembly*,
   85 Fed. Reg. 36,530 (Dep't of Commerce June 17, 2020) ................................................ 3

*Certain Pea Protein From The People's Republic of China*,
   89 Fed. Reg. 10,038 (Dep't of Commerce Feb. 13, 2024) ................................................ 99

*Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders on Certain Hardwood Plywood Products From the People's Republic of China*,
   87 Fed. Reg. 45,753 (Dep't of Commerce July 29, 2022) ................................................ 5

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| SHELTER FOREST INTERNATIONAL ACQUISITION, INC., | ) ) ) |
| Plaintiff, | ) ) |
| and | ) ) |
| GREATRIVER WOOD CO. LTD., ET AL, | ) ) |
| Consolidated Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD | ) ) ) |
| Defendant-Intervenor. | ) ) ) |

Consol. Court No. 23-00144

## DEFENDANT'S RESPONSE TO PLAINTIFF'S AND CONSOLIDATED PLAINTIFFS' MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of this Court's rules, defendant, the United States, respectfully submits this response in opposition to the motions for judgment upon the agency record filed by plaintiffs American Plywood Pacific, et al. (DH plaintiffs), ECF No. 48; Shelter Forest International Acquisition Inc. (Shelter Forest), ECF No. 54; Greatriver Wood Co. Ltd., et al. (Greatriver), ECF No. 52; Tumac Lumber Co. (Tumac), ECF No. 53; Concannon Lumber Company, et al. (MG plaintiffs), ECF No. 55; and Cabinetworks Group, Inc., et al. (STR

plaintiffs), ECF No. 39 (collectively, plaintiffs). Plaintiffs challenge the Department of Commerce's final affirmative determination in a circumvention inquiry concerning the antidumping duty and countervailing duty orders covering certain hardwood plywood products from the People's Republic of China. Specifically, plaintiffs challenge Commerce's application of facts available with an adverse inference (AFA) to various companies. Because Commerce's determination is based on substantial evidence and is in accordance with law, we respectfully request that the Court deny plaintiffs' motions.

## STATEMENT PURSUANT TO RULE 56.2(c)(1)

I.    Administrative Determination Under Review

Plaintiffs challenge Commerce's final affirmative determination in a circumvention inquiry concerning the antidumping and countervailing duty orders covering certain hardwood plywood from China. *See Certain Hardwood Plywood Products from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 88 Fed. Reg. 46,740 (Dep't of Commerce July 20, 2023) (P.R. 844)[1] (final determination), and accompanying Issues and Decision Memorandum (IDM) (P.R. 842).

II.   Issue Presented For Review

Whether Commerce's application of facts available with an adverse inference is supported by substantial evidence and in accordance with law.

---

[1] Unless noted otherwise, citations to the public (P.R.) and confidential (C.R.) record documents refer to the record of the antidumping proceeding, rather than the countervailing one. *See* ECF No. 21-1, 21-2.

2

## STATEMENT OF FACTS

Given the Court's direction to limit factual and procedural background statements and avoid repetition, ECF No. 65, we adopt the statement of facts set forth in our Tranche I brief, largely limiting our statement of facts here to background information relevant to the Tranche II issue—Commerce's application of AFA. *See* ECF No. 59. We also provide company-specific factual background in the sections relevant to each company.

I.    Early Administrative Proceedings

Commerce has issued antidumping and countervailing duty orders covering certain hardwood plywood products from China. *See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 83 Fed. Reg. 504 (Dep't of Commerce Jan. 4, 2018); *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order*, 83 Fed. Reg. 513 (Dep't of Commerce Jan. 4, 2018).

On February 25, 2020, petitioner, the Coalition for Fair Trade in Hardwood Plywood (petitioner or Coalition) filed a request for a scope and/or a circumvention ruling, alleging that hardwood plywood products manufactured from Chinese-origin core veneers, multi-ply core veneer panels, and/or veneer core platforms and assembled in Vietnam are either covered by or circumventing the orders. Petitioner's Request (P.R. 19) (C.R. 5); Petitioner's Clarification (P.R. 20). On June 17, 2020, Commerce published an initiation notice for scope and country-wide anticircumvention inquiries. *See Certain Hardwood Plywood Products from the People's Republic of China: Initiation of Anti-circumvention Inquiries and Scope Inquiries on the Antidumping Duty and Countervailing Duty Orders; Vietnam Assembly*, 85 Fed. Reg. 36,530 (Dep't of Commerce June 17, 2020).

On September 10, 2020, Commerce issued quantity and value (Q&V) questionnaires to producers and exporters of hardwood plywood from Vietnam, inquiring into their sales of hardwood plywood to the United States and their sourcing of hardwood plywood inputs from China.  *See* Initial Questionnaire (P.R. 62).  Commerce received questionnaire responses from 51 Vietnamese companies, including several unsolicited responses; eight companies from which Commerce had solicited a response failed to respond to the questionnaire.  *See* Preliminary Decision Memorandum (PDM) at 30-35 (P.R. 409).  None of the 51 responding companies reported producing hardwood plywood under any of the scenarios subject to the inquiries.

On February 22, 2021, Commerce issued a supplemental questionnaire to the 51 companies that had responded to the Q&V questionnaire, and received 46 timely responses.  *See* 1st Supp. Questionnaire (P.R. 154).  In the first supplemental questionnaire, Commerce requested, for the second time, that all 51 respondents provide:  (1) information about their exports of hardwood plywood and the inputs used to produce their hardwood plywood, (2) the identity of Chinese affiliates that manufacture or export hardwood plywood or hardwood plywood inputs, and (3) additional information about third-country sales if the respondent indicated that they had no United States sales.  *Id*; *see also* IDM at 123.  Commerce also issued a questionnaire to the government of Vietnam about imports from China, receiving a response on April 6, 2021.  *See* GOV Questionnaire (P.R. 153), GOV Initial Questionnaire Response (P.R. 248-252).

Commerce then issued second supplemental questionnaires to the 46 companies that had timely responded to the supplemental questionnaire, and received 45 timely responses.  *See* 2nd Supp. Questionnaire (P.R. 257).  In the second supplemental questionnaire, Commerce requested information about:  (1) imports the company made from China under Harmonized Tariff

Schedule (HTS) subheadings 4408 and 4412, including a tariff schedule description at the eight-digit level of each product, actual description of the product identifying the type of wood, identity of the suppliers, and sample entry documents; (2) the company's Vietnamese suppliers of plywood or plywood inputs, including a description of the products purchased from the Vietnamese suppliers and imports the supplier made from China; and (3) exports that the company's affiliates made from China to Vietnam under subheadings 4408 and 4412. *Id.* Commerce also issued a supplemental questionnaire to the government of Vietnam, requesting more specific information regarding imports from China. *See* GOV Supp. Questionnaire (P.R. 260*)*; GOV Supp. Questionnaire Resp. (P.R. 351-355). Because no companies reported producing hardwood plywood under any of the production scenarios subject to the inquiries, Commerce did not select individual respondents for further examination.

In addition to gathering information from companies and the Vietnamese government, Commerce placed relevant documents on the record of the proceeding, including documents from an earlier, related scope proceeding (Finewood scope proceeding). *See* February 18, 2022 Memo Placing EAPA Documents on Record (P.R. 393), and Attachments (P.R. 394-399).

II.    <u>Commerce's Assessment Of AFA To Certain Companies</u>

On July 22, 2022, Commerce released a preliminary scope ruling and affirmative circumvention determination. *See Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders on Certain Hardwood Plywood Products From the People's Republic of China*, 87 Fed. Reg. 45,753 (Dep't of Commerce July 29, 2022) (preliminary determination), and accompanying PDM. Commerce preliminarily found that 36 companies had either provided unreliable responses to its questionnaires or had failed to respond entirely. PDM at 11, 20.

Commerce found that the responses of 22 companies contained significant discrepancies, inconsistencies, or misleading information.  *Id.* at 10.  Commerce explained that those respondents:

- failed to provide information regarding their affiliation with Chinese companies and/or imports of hardwood plywood inputs from their affiliates;

- initially claimed that they did not source hardwood plywood inputs from Vietnamese resellers despite either later acknowledging they did, or record information indicating otherwise;

- failed to identify all species of wood or provided inconsistent responses regarding the species of wood used in hardwood plywood or hardwood plywood inputs that were sold;

- failed to provide documentation to support their claim that they imported only face/back veneers from China (identifiable due to their size);

- claimed that they did not have imports from China during the inquiry period despite entry data provided by the GOV indicating that they did; or

- had more than one of the aforementioned discrepancies in their responses.

*Id.*

Accordingly, Commerce preliminarily found that the 22 companies provided significantly contradicting or misleading information, such that their responses could not be relied on pursuant to 19 U.S.C. § 1677e(a)(2)(A)-(C).  Therefore, Commerce determined to apply AFA to those companies pursuant to 19 U.S.C. § 1677e(b), as they had failed to cooperate and not acted to the best of their abilities in complying with Commerce's requests for information.  PDM at 10-11. Commerce found that, by providing inconsistent or conflicting responses regarding the species of wood the companies consumed, the identities of their Chinese and Vietnamese suppliers, and the products they imported from China, the 22 companies providing unreliable responses failed to demonstrate that they did not import hardwood plywood inputs from China, and/or produce or export inquiry merchandise.  *See* Preliminary AFA Memo (C.R. 412); PDM at 12-13.

Commerce also preliminarily determined to apply AFA to the 14 companies that had failed to respond to either the initial or supplemental questionnaires. *Id.* Commerce explained that the 14 nonresponsive companies did not indicate any difficulty providing the requested information or request to submit information in an alternate form. PDM at 13. Accordingly, as AFA, Commerce found that the 36 non-cooperating companies produced and/or exported hardwood plywood under all five production scenarios subject to the inquiries. *Id.*

On July 20, 2023, Commerce issued its final determination. *See Final Determination*, 88 Fed. Reg. 46,740, and accompanying IDM. Commerce continued to find that the responses of 20 companies contained significant discrepancies, inconsistencies, or misleading information that rendered their submissions unreliable. IDM at 75-103. Commerce explained that the companies had failed to provide consistent and fully responsive information regarding wood species, suppliers, affiliations, imports of hardwood plywood inputs from China, source documentation, and the type of veneers they or their suppliers imported from China. *Id.* at 136. Commerce also continued to find that 13[2] companies failed to respond. *Id.* at Appendix III. Additionally, Commerce found that four companies failed verification. *Id.* at Appendix II. As AFA, Commerce determined that the 37 non-cooperating companies produced and/or exported hardwood plywood under all five production scenarios subject to the inquiries and were not eligible for the certification program. *Id.* at Appendices I-III.

## SUMMARY OF THE ARGUMENT

Commerce's application of facts available with an adverse inference is supported by substantial evidence and in accordance with law. Commerce reasonably determined it was

---

[2] Greatwood Company Limited was part of the list of 14 nonresponsive companies in the preliminary determination but was removed because Greatwood Company Limited and Greatwood Hung Yen were found to refer to the same company. IDM at 109.

impracticable to issue more supplemental questionnaires in addition to the initial and two

supplemental questionnaires it had already issued, as well as the questionnaires issued to the

Vietnamese government.

Commerce also followed the statutory requirements for applying AFA. Commerce's

determination to apply facts because parties withheld requested information, failed to provide

such information by the deadlines or in the form or manner requested, significantly impeded the

proceeding, and/or provided information that could not be verified is supported by the record and

complies with the statutory requirements. Commerce also acted reasonably, and within its

discretion, by not issuing additional questionnaires—after already issuing two supplemental

questionnaires and several company-specific questionnaires—and by not issuing company-

specific supplemental to every deficient respondent. Commerce's actions were sufficient to

provide respondents with notice of their deficiencies, and the respondents' failure to timely

provide accurate and reliable information for the record is of their own making.

Finally, Commerce's application of AFA to each plaintiff-respondent at issue was lawful

and supported by substantial evidence. Accordingly, Commerce's final determination should be

sustained.

## **ARGUMENT**

I.    Standard Of Review

In reviewing Commerce's antidumping and countervailing duty determinations, "the

Court of International Trade must sustain 'any determination, finding or conclusion found' by

Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in

accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir.

1996) (quoting

19 U.S.C. § 1516a(b)(1)(B)).  "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence."  *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). Further, even if the Court may draw two inconsistent conclusions from the record evidence, that possibility "does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Under this standard, a reviewing court "must affirm {Commerce's} determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from {Commerce's} conclusion."  *Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 716 (Fed. Cir. 2020) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)).

A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court will sustain Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from them.  *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

## II.    Legal Framework For Facts Available With An Adverse Inference

Commerce shall use facts otherwise available to reach its final determination when "necessary information is not available on the record," a party "withholds information that has been requested," fails to provide the information timely or in the manner requested, "significantly impedes a proceeding," or provides information Commerce is unable to verify. 19

U.S.C. § 1677e(a)(1)-(2).  Where an agency's request is clear and relates to issues in an investigation, a respondent has a "statutory obligation to prepare an accurate and complete record in response to questions plainly asked by Commerce." *Tung Mung Dev. Co. v. United States*, 25 C.I.T. 752, 758 (2001).  "The mere failure of a respondent to furnish requested information—for any reason—requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003).  However, prior to resorting to facts otherwise available, Commerce must inform and provide, where practicable, the noncomplying party with an opportunity to comply.  19 U.S.C. § 1677m(d).  If a party is provided with an opportunity to comply and does so, Commerce may nevertheless "disregard all or part of the original and subsequent responses" if it determines that the information provided is not satisfactory or untimely, subject to 19 U.S.C. § 1677m(e).  *Id*.

Further, if Commerce finds that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," then Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b).  When determining whether a respondent has complied to the "best of its ability," Commerce "assess{es} whether {a} respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel*, 337 F.3d at 1382.  Adverse inferences are not warranted "merely from a failure to respond," but rather in instances when Commerce reasonably expected that "more forthcoming responses should have been made." *Id*. at 1383.  "The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." *Id.*  "Respondents should be forthcoming with

information, regardless of their views on relevancy, in the event the agency finds differently."

*Linyi Chengen Imp. & Exp. Co. v. United States*, 391 F. Supp. 3d 1283, 1298 (Ct. Int'l Trade

2019) (citations omitted).

III.    Commerce's Application of Facts Available With An Adverse Inference Is Supported By
        Substantial Evidence And In Accordance With Law

    A.    Commerce Reasonably Resorted To Facts Available

Substantial evidence supports Commerce's decision to apply facts otherwise available

when determining whether certain exporters circumvented the antidumping and countervailing

duty orders of hardwood plywood from China.  The record demonstrates that 20 respondents

provided inconsistent or conflicting information regarding the species of wood they consumed,

the identities of their suppliers, and/or the products they imported from China; this rendered their

information unreliable and unusable.  *See* Preliminary AFA Memo, PDM at 12-13, IDM at 63-

103.  Additionally, the Vietnamese government placed import data on the record that directly

conflicted with the information submitted by certain respondents, further undermining the

accuracy of the respondents' reporting.  *See* GOV Import Data (P.R. 351, P.R. 353) (C.R. 362,

C.R. 364-365).  Based on these pervasive issues, Commerce determined it was necessary to rely

on facts available, pursuant to 19 U.S.C. § 1677e(a)(2)(A)-(C).  IDM at 121-134.  In doing so,

Commerce found that these 20 respondents withheld information, failed to provide information

in the form and manner requested, and significantly impeded the proceeding; Commerce also

found that, because these respondents did not provide complete and accurate answers, their

submissions were rendered unreliable, thus creating gaps in the record.  IDM at 121-122.  This

decision is supported by both the law and the record.

Plaintiffs claim that Commerce failed to adequately consider the requirements of 19

U.S.C. §§ 1677e(a)(2)(B)-(C) and 1677m(d), in particular the requirement for Commerce to

notify respondents of deficiencies and afford them an opportunity to remedy such deficiencies. They further contend that Commerce—not the respondents—is responsible for any limitations in the record, as Commerce allegedly abused its discretion and failed to conduct a fair inquiry. *See, e.g.,* STR Plaintiffs' Tranche II Br. at 14-16, DH Plaintiffs' Tranche II Br. at 86-89. But plaintiffs' attempts at diminishing Commerce's discretion to develop and implement administrative procedures for conducting circumvention inquiries are unavailing. In its final determination, Commerce explained how the complexity of these inquires and the number of respondents required it to establish firm deadlines and carefully consider its resources in gathering the information necessary to make its findings. IDM at 109, 125-127. Commerce further complied with the statutory requirements for applying facts available, addressing in its final determination the statutory criteria. *Id.* at 121-133. Commerce reasonably exercised its discretion and complied with its statutory obligations in conducting its circumvention inquiries and determining to apply facts available.

      1.     <u>Commerce Acted Within Its Discretion To Set and Enforce Its Deadlines</u>

Plaintiffs argue that Commerce acted unreasonably by issuing its preliminary determination a year after the deadline for the last supplemental questionnaire responses without allowing respondents another opportunity to cure their deficiencies. *See, e.g.*, STR Plaintiffs' Tranche II Br. at 17. Commerce enjoys substantial discretion in performing its administrative duties. *See Fujitsu*, 88 F.3d at 1039 (Fed. Cir. 1996) (citing *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1571, 1582 (Fed. Cir. 1983)). This discretion includes setting and enforcing administrative deadlines. *See Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1352 (Fed. Cir. 2015) (citing *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760 (Fed. Cir. 2012) ("{i}t is fully within Commerce's discretion to 'set and enforce deadlines.'")).

Given the wide latitude afforded Commerce in this arena, and the unique circumstances of these inquiries, plaintiffs cannot show that Commerce abused its discretion by setting and enforcing deadlines.

In conducting its scope and circumvention inquiries, which covered five separate production scenarios, Commerce had to account for a significant number of respondents, and thus requested specific information on the respondents' inputs, suppliers, and affiliates of hardwood plywood.  IDM at 133-134.  Numerous respondents, however, omitted information and/or provided inconsistent responses.  Specifically, Commerce found that 20 of the 45 companies providing responses to its initial and supplemental Q&V questionnaires tendered submissions containing significant discrepancies, inconsistencies, and/or misleading information. *Id.* at 75-103.

These deficiencies not only raised significant concerns about the reliability of respondents' submissions, but also undermined Commerce's ability to determine whether inquiry merchandise was shipped to the United States during the inquiry period.  By failing to report consistent and accurate information, the 20 respondents created a record lacking the necessary information for Commerce to determine, using the facts on the record, as to whether the respondents were circumventing the orders, thereby warranting the application of facts available pursuant to 19 U.S.C. § 1677e(a).

Plaintiffs complain that Commerce "had an entire year from the deadline for the final supplemental quantity and value questionnaire until the issuance of the Preliminary Determination in July 2022" and could have allowed respondents additional opportunities to remedy any deficiencies.  *See* STR Plaintiffs' Tranche II Br. at 17.  While the deadline for the preliminary determination in the inquiries was extended for a longer period than typical,

Commerce extended the deadline because it required significant time to adequately research, analyze, and make determinations on the multitude of complicated issues presented by the unique nature of the inquiries.  Commerce did *not* extend the deadline to continue the fact-gathering stage of the inquiries and permit respondents multiple opportunities to remedy their deficiencies, beyond those required by 19 U.S.C. § 1677m(d).[3]  *See* IDM at 133-134.

To that end, plaintiffs' assertion that Commerce had a year to issue additional questionnaires is misleading.  The time between the deadline for the second supplemental Q&V questionnaire responses and issuance of the preliminary determination was necessary for Commerce to evaluate the voluminous information already on the record—including multiple questionnaire responses from at least 45 respondents, comments from the petitioner, rebuttal comments, and the Vietnamese government's submissions—and then make its preliminary determinations on numerous issues.  *See generally* PDM; *see also* IDM at 126-127.   Commerce was not required to issue additional supplemental questionnaires or provide another opportunity to remedy, nor would it have been practicable to do so.[4]  *See* 19 U.S.C. § 1677m(d) (requiring notice and an opportunity to remedy deficient responses "to the extent practicable . . .  in light of the time limits established for the completion of investigations or reviews"); *BlueScope Steel Ltd. v. United States*, 548 F. Supp. 3d 1351, 1367 (Ct. Int'l Trade 2021) (explaining how Commerce

---

[3]  As discussed in more detail below, Commerce complied with section 1677m(d), notifying respondents of their deficiencies and providing an opportunity to remedy.

[4]  Moreover, the discrepancies were woven throughout the respondents' questionnaires responses.  IDM at 129-130.  Given this, Commerce had every reason to presume that additional supplemental questionnaires would yield additional discrepancies.  *See Reiner Brach GmbH & Co.KG v. United States*, 206 F. Supp. 2d 1323, 1337 (Ct. Int'l Trade 2018) (quoting *Borden Inc. v. United States*, 40 F. Supp. 2d 466, 472 (Ct. Int'l Trade 1999) ("This Court has acknowledged that 'Commerce must necessarily draw some inferences from a pattern of behavior.'")).

could have, pursuant to statute, "assert{ed} that it was not practicable to afford BlueScope the

opportunity to remedy or explain the deficiencies it found{.}").

Commerce explained as much, stating:

> {I}t was simply not practical to issue 22 company-specific third (or
> fourth, or in some cases, a fifth) supplemental Q&V questionnaires
> because: (1) not including the responses of respondents who stopped
> responding to Commerce's questionnaires, we had a total of 146
> questionnaire responses to analyze in order to determine whether
> any respondent had shipments of inquiry merchandise; (2)
> information concerning the discrepancy had already been requested
> multiple times; (3) the discrepancies were regarding basic facts
> central to these inquiries that should have been simple for the
> respondents to provide; (4) after reviewing the large volume of
> questionnaire responses and realizing that significant and pervasive
> errors remained throughout the response, there was not sufficient
> time to issue additional questionnaires and review the responses; (5)
> the pattern established by the respondents indicated that additional
> discrepancies would be submitted and uncovered in any future
> questionnaire response; and (6) by failing to supply such basic,
> fundamental information, it was apparent that respondents were
> either not familiar with their own corporate structure and books and
> records, or were not fully cooperating.

*See* IDM at 133.

The practicality and resource concerns in analyzing the initial Q&V responses of over 50

companies prompted Commerce to issue two non-company-specific supplemental questionnaires

requesting information to address issues pervasive throughout the questionnaire responses, rather

than dozens of individual supplemental questionnaires to each deficient company.  "{A}gencies

with statutory enforcement responsibilities enjoy broad discretion in allocating investigative and

enforcement resources."  *Mid Continent Nail Corp. v. United States*, 949 F. Supp. 2d 1247, 1278

(Ct. Int'l Trade 2013); *see also Torrington Co. v. United States,* 68 F.3d 1347, 1351 (Fed. Cir.

1995).  Here, Commerce was faced with limited resources and the intensive task of analyzing

information from 50 different companies and the Vietnamese government; it thus acted

reasonably by distributing supplemental questionnaires more broadly applicable to the pool of respondents. Plaintiffs' suggestion that Commerce should have issued individual supplemental questionnaires to every deficient respondent fails to show any abuse of discretion or legal error.

Moreover, Commerce ***did*** issue company-specific supplemental questionnaires addressing company-specific issues to multiple respondents, including: Groll Ply and Cabinetry (Groll Ply), Huong Son Wood Group Co., Ltd. (Huong Son), Lechenwood Viet Name Company Limited (Lechenwood), Linwood Vietnam Co. Ltd (Linwood), Plywood Sunshine Ltd. Co. (Plywood Sunshine), Thanh Hoa Industrial Wood Company, Ltd. (Thanh Hoa), Truong Son North Construction JSC (Truong Son), Hai Hien Bamboo Wood Joint Stock Company (Hai Hien), Eagle Industries Company Limited (Eagle), and Win Faith Trading (Win Faith). *See* IDM at 123-125.

Given Commerce's limited resources and the significant practicality concerns present in the underlying inquiries, Commerce acted within its discretion in setting and enforcing its deadlines, and did not act contrary to any statutory requirement in determining not to issue company-specific supplemental questionnaires to every deficient respondent. In effectively and efficiently allocating its resources, Commerce balanced the interests of obtaining sufficient information to conduct its inquiries with the need for finality. The Court should decline plaintiffs' invitation to intrude on Commerce's authority to prescribe and enforce deadlines and procedures for its administrating proceedings. *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) ("Without the ability to enforce full compliance with its questions, Commerce runs the risk of gamesmanship and lack of finality in its investigations{.}").

2.    Commerce Satisfied The Statutory Requirement To Notify Respondents
        Of Deficiencies

Plaintiffs claim that Commerce failed to notify them of their deficiencies prior to

applying AFA.  But Commerce's repeated requests for information were not a "gotcha policy,"

as plaintiffs claim, *see* STR Plaintiffs' Tranche II Br. at 17-18; rather, the requests constituted

notifications to respondents that their previous responses were deficient.  Commerce's multiple

requests for information placed the respondents on notice that their responses were deficient and

identified specific areas where Commerce needed additional information or clarification;

Commerce thus complied with the notice requirements set forth in 19 U.S.C. § 1677m(d).[5]  IDM

at 128.

For instance, in the first supplemental questionnaire, Commerce addressed

inconsistencies regarding affiliates and inputs, requesting again that parties provide certain

information about their exports and inputs, as well as information about their Chinese affiliates.

IDM at 124 (citing P.R. 154).  In the second supplemental questionnaires, Commerce addressed

multiple issues, including: (1) that the first supplemental questionnaire responses failed to fully

demonstrate that respondents' core veneers were sourced in Vietnam; (2) that the petitioner

submitted comments suggesting that many respondents had not identified all sales containing

Chinese inputs, and that their responses about hardwood plywood inputs were in conflict with

---

[5]  Commerce also correctly determined that facts available was warranted pursuant to 19
U.S.C. § 1677e(a)(2).  Despite Commerce requesting the same information more than once,
certain respondents still withheld requested information about their hardwood plywood inputs,
suppliers, and/or affiliations.  IDM at 134.  In addition, the respondents failed to submit
requested information by the deadline.  *Id*.  Finally, by failing to respond or by providing
inaccurate, misleading, or contradictory initial and supplemental Q&V questionnaire responses,
the respondents significantly impeded the inquiries; without fully responsive or reliable
questionnaire responses, Commerce was not able to determine—based on the facts on the
record—whether these respondents accurately reported no shipments of inquiry merchandise.  *Id*.

publicly available information; (3) whether the Vietnamese government's import data was consistent with import information provided by the respondents; and (4) whether respondents accurately reported that they did not source hardwood plywood or hardwood plywood inputs from China. IDM at 125-126 (citing P.R. 257). Commerce also ***again*** requested information about the respondents' affiliates and the inputs those affiliates exported from China to Vietnam. *Id*. These were not "generic" or "general" questionnaires designed as a "gotcha," but were questionnaires that targeted significant issues present in the majority of the responses submitted. *Id*.: *cf., Bowe-Passat v. United States*, 17 C.I.T. 335, 343 (Ct. Int'l Trade 1993) (explaining how Commerce sent out a generalized questionnaire and misled a respondent "into believing that it had satisfied its burden regarding certain expenses by the absence of specific mention or concern for those items."). And, of course, Commerce also issued company-specific supplemental questionnaires to several respondents, including multiple plaintiffs to this litigation. IDM at 123-126 (citing P.R. 155-165).

The Vietnamese government also placed information on the record that called into question the accuracy of the respondents' questionnaire responses. On April 6, 2021,[6] the Vietnamese government submitted a list of all imports from China into Vietnam under HTS subheadings 4412 and 4408 ("plywood, veneered panels and similar laminated wood" and "face veneer sheets," respectively). *See* IDM at 76, C.R. 232, 364-365). Commerce used this data as an independent source to fact-check the respondents' reporting. In many cases, this import data demonstrated that the companies were not accurately reporting information about their Chinese imports. *Id*. Any claim by plaintiffs that they were unaware—prior to the preliminary determination—of the discrepancies between their responses and the import data is belied by the

---

[6] The government provided translated versions on July 21, 2021. C.R. 364-365.

record, as the Vietnamese government provided its list of import data **before** the responses to

Commerce's second supplemental questionnaires were due.  *Id.* at 130, P.R. 275.  Accordingly,

respondents could have, in their second supplemental questionnaire responses, addressed any

inconsistencies between the government data and their earlier questionnaire responses.  *Id.*  In

addition, the petitioner submitted multiple sets of detailed comments identifying multiple

discrepancies found in the respondents' questionnaire responses.  C.R. 150-151, C.R. 156, 177,

C.R. 359, C.R. 380.  The respondents therefore had the ability to respond to the petitioner's

comments prior to the preliminary determination.  *See* 19 C.F.R. § 351.301(c)(1)(v); *see New*

*Mexico Garlic Growers Coalition v. United States*, 352 F. Supp. 3d 1281, 1294-95 (Ct. Int'l

Trade 2018), *aff'd*, 953 F.3d 1358 (Fed. Cir. 2020).  And, indeed, multiple respondents **did**

respond, correcting their deficiencies.  IDM at 130.  That certain respondents addressed their

deficiencies in response to Commerce's supplemental questionnaires, the Vietnamese

government's import data, and the petitioner's comments demonstrates that respondents were on

notice as to their deficiencies and had adequate opportunity to resolve them.

The Court of Appeals for the Federal Circuit has held that repeated requests from

Commerce satisfies the notice requirement set forth in 19 U.S.C. § 1677m(d).  *See Maverick*

*Tube Corp. v. United States*, 857 F.3d 1353, 1360 (Fed. Cir. 2017) (respondent "was on notice

that its initial response was deficient because Commerce issued the supplemental questionnaire

seeking the same information."); *Essar Steel*, 678 F.3d at 1275-76 (holding that, where

Commerce issued repeated requests for the same information and the company still failed to

timely report accurate information, Commerce could apply facts available); *see also Saha Thai*

*Steel Pipe Public Co. Ltd. v. United States*, 663 F. Supp. 3d 1356, 1373-74 (Ct. Int'l Trade 2023)

("Commerce complied with § 1677m(d) by virtue of its series of questionnaires in which the

agency repeatedly asked for information about Saha Thai's potential affiliates."); *Apiário Diamante Comercial Exportadora Ltda. v. United States*, 705 F. Supp. 3d 1398, 1410 (Ct. Int'l Trade 2024). Moreover, this Court has held that the requirement to notify respondents of deficiencies is satisfied where, as here, the petitioner submits comments regarding the deficiencies and Commerce issues a supplemental questionnaire. *See New Mexico Garlic Growers*, 352 F. Supp. 3d at 1294-95.

In arguing that Commerce failed to notify them of their deficiencies, plaintiffs, in particular the STR plaintiffs, cite multiple cases, all of which are factually distinguishable or otherwise inapposite. For instance, STR plaintiffs cite *Sigma Corp. v. United States*, 841 F. Supp. 1255 (Ct. Int'l Trade 1993), in alleging that Commerce expected respondents to be "mind-readers." STR Plaintiffs' Tranche II Br. at 18. But in that case, the Court faulted Commerce for changing its position between the preliminary and final results without giving any notice to the respondents of the potential for such a change. *See id.* at 1267. Here, Commerce did not change its position; rather, during the fact-gathering stage, it provided multiple opportunities for respondents to report accurate information and remedy any inconsistencies or other deficiencies. IDM at 130. The respondents did not need to be "mind readers" to know that Commerce sought the information that it requested—they needed only to completely and accurately answer Commerce's repeated questions.

Plaintiffs also claim that, because they were allegedly unaware of their deficiencies until after the issuance of the preliminary determination, Commerce should have been obligated to consider post-preliminary submissions containing new factual information. They argue that Commerce has, in the past, relied on explanations of data discrepancies even at the case briefing stage. *See* DH Plaintiffs' Tranche II Br. at 4-6, STR Plaintiffs' Tranche II Br. at 17-18 (citing

20

*AK Steel Corp. v. United States*, 34 F. Supp. 2d 756 (Ct. Int'l Trade 1998)).  But in *AK Steel*, it was Commerce's choice to accept a post-preliminary explanation of discrepancies and, importantly, Commerce had not previously sought the information the respondent had failed to provide; rather, the respondent had no reason to be aware of the potential discrepancies until the petitioner filed its case brief.  *See AK Steel*, 34 F. Supp. 2d at 772.  In contrast, here, Commerce requested all the information at issue prior to issuing its preliminary determination, and put the respondents on notice as to their potential deficiencies through supplemental questionnaires. IDM at 129.

The remaining cases relied on by STR plaintiffs are likewise inapposite.  This proceeding did not involve, for example, a situation where a respondent affirmatively requested to supplement the record after Commerce changed its methodology on remand.  *See* STR Plaintiffs' Tranche II Br. at 18 (citing *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1384 (Fed. Cir. 2022) ("holding that producers were entitled to supplement the record after Commerce changed its methodology to satisfy a prior remand.")).  Nor did Commerce claim that supplemental questionnaires issued only to ***mandatory*** respondents served as notice to a ***voluntary*** respondent that its responses were deficient.  *Id.* (citing *Shelter Forest Int'l Acquisition, Inc. v. United States*, 497 F. Supp. 3d 1388, 1401 (Ct. Int'l Trade 2021)).

Ultimately, none of these authorities demonstrate that Commerce was required to do more than it did in order to comply with the requirements of section 1677m(d).  The respondents had two to four opportunities (depending on how many company-specific questionnaires they received) to remedy their deficiencies and provide accurate and reliable information; their failure to do so and thereby build an accurate record should not be Commerce's burden.  IDM at 129-132; *see Essar Steel*, 678 F.3d at 1276 ("{i}t is {the respondent's} burden to create an accurate

record during Commerce's investigation … {t}o allow constant reopening supplementation of the record would lead to inefficiency and delay in finality.").  The statute does not require Commerce to provide companies with perpetual opportunities to remedy questionnaire deficiencies (*i.e.*, allowing companies to file successive supplemental responses until they finally address all deficiencies).  *See, e.g., New Mexico Garlic Growers*, 352 F. Supp. 3d at 1295 ("{T}he agency provided QTF two opportunities to provide accurate affiliation information, and QTF failed to do so. Commerce was not required to provide additional supplemental questionnaires seeking the same information").

Any argument that Commerce erred in applying facts available must fail.  Commerce correctly determined, pursuant to 19 U.S.C. §§ 1677e(a)(2)(A)-(C), that the respondents withheld requested information, failed to provide information by the deadline, and significantly impeded the proceeding.  IDM at 134.  The record also demonstrates that the respondents were given adequate notice of their deficiencies through Commerce's repeated requests for the same information, the Vietnamese government's import data, and petitioner's comments.  *Id*. Therefore, Commerce's determination to apply facts otherwise available to fill the gap in the record was in accordance with law and supported by substantial evidence.

### 3.    Plaintiffs' "Equity"-Based Arguments Lack Merit

DH plaintiffs raise certain "equity"-based concerns regarding Commerce's decision to extend its statutory deadlines for the circumvention inquiry, alleging that this "procedural abuse" has continued into subsequent reviews and plaintiffs have suffered harm as a result.  *See* DH Plaintiffs' Tranche II Br. at 86-90.  First, plaintiffs claim that massive financial liabilities have accrued over the course of three years (rather than the more typical six to nine months) and margins that should have been zero percent based on "safe harbor" exports of plywood from

Vietnam have now grown to 206.34%. *Id*. at 87. Plaintiffs also argue that Commerce did not exert maximum effort to timely complete its inquiries, and that its decision to extend the statutory deadlines have prevented interested parties from taking corrective action in subsequent reviews. *Id*. at 88-89.

As an initial matter, Commerce does not refer to any merchandise as "safe harbor" merchandise, as it does not advise parties on what merchandise they should ship in order to avoid duties. IDM at 171-172; *see also* Govt. Tranche I Br. at 62-63. In any event, Commerce addressed plaintiffs' procedural concerns, developing an appropriate mechanism to remedy them. Commerce explained that it intended to expand the periods of review for the ongoing antidumping and countervailing administrative reviews to capture any affected entries, as well as afford parties the opportunity to request reviews of entries during those expanded periods. IDM at 181.

Importantly, Commerce acted within its discretion in extending the deadlines for the underlying proceedings. In antidumping proceedings, "an administrative review . . . normally will cover, as appropriate, entries, exports, or sales of the subject merchandise during the 12 months immediately preceding the most recent anniversary month." 19 C.F.R. § 351.213(e)(1). In countervailing duty proceedings, "an administrative review . . . normally will cover entries or exports of the subject merchandise during the most recently completed {calendar year}." *Id.* at section 351.213(e)(2). Thus, while Commerce's regulations "normally" limit its administrative reviews to 12 months or a calendar year, Commerce may expand that period if necessary. IDM at 181; *see also Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,317 (Dep't of Commerce May 19, 1997) ("The use of 'normally' indicates that the Secretary has the

discretion to use some other period in appropriate circumstances, but the Department will exercise this discretion only in very unusual circumstances.").

Given the highly unusual number of respondents, the scope of the inquiries, and the large volume of record information (as well as its finite resources), Commerce reasonably determined that expanding the period of review would be appropriate, and that it would expand the periods of review for ongoing administrative reviews to include entries suspended as a consequence of the preliminary determination. *Id*. And, if exporters can demonstrate that their merchandise is indeed non-subject plywood, Commerce will instruct Customs and Border Protection to liquidate the associated entries without regard to antidumping and countervailing duties and to refund all cash deposits collected on those entries. *Id*. at 181-182. Finally, the appropriate avenue for addressing any concerns with the underlying inquiries' effect on subsequent administrative reviews is ***in the context of those reviews***, which is exactly what Commerce intends to do. *Id.* at 182.

Commerce acknowledged respondents' equity concerns and has made clear that its actions have not been taken to penalize them. IDM at 144. Neither its finding of facts available nor its extension of the deadlines were intended to be punitive; rather, Commerce could not find the information submitted by certain respondents to be reliable or accurate, and required a longer-than-typical time to contend with the unprecedented nature of these inquiries. Consequently, respondents have to provide cash deposits on entries of their merchandise until they can actually demonstrate that their merchandise is not subject to the scope of the orders. *Id*. Respondents will be able to request a review of their past entries and demonstrate whether they are eligible to certify their future entries. Commerce's actions were reasonable, supported by the record, and within its action. *See Star Fruits S.N.C. v. United States,* 393 F.3d 1277, 1281 (Fed.

Cir. 2005) ("{a}n abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence or represent an unreasonable judgment in weighing relevant factors.").

       B.      <u>Commerce Was Warranted In Applying AFA To Each Respondent At Issue</u>

While 51 companies responded to at least one of Commerce's questionnaires, *see* PDM Appendix I, the discrepancies and inconsistencies in the responses of 20 companies undermined the accuracy and reliability of their information.  IDM at 137-138, Appendix I.  Commerce found deficiency themes pervasive across the companies' responses, namely:  (1) the failure to provide crucial information regarding their affiliates; (2) the existence and nature of the companies' and their affiliates' imports; (3) issues regarding the sourcing of inputs from Vietnamese resellers; (4) the mischaracterization of core veneers as face and/or back veneers; and/or (5) inconsistent reporting of the wood species used in their hardwood plywood or inputs.  *Id.* at 125-126.

With regard to these companies, Commerce found that they did not cooperate to the best of their ability, as they failed to provide information that was—or should have been—readily available to them.  IDM at 135-136.  Commerce explained that such information would normally be recorded in respondents' books and records, and, to the extent they were not, it would demonstrate inadequate record-keeping.  *Id*. at 137-138.  Specifically, Commerce found that companies should have been able to provide complete and accurate disclosures concerning:  (1) information regarding wood species, (2) information regarding the source of their hardwood plywood inputs, (3) the identities of their affiliates and whether the affiliates exported hardwood plywood from China to Vietnam, (4) their imports of hardwood plywood inputs, (5) source documentation regarding those inputs, and (6) the types of veneers they used.  *Id.*  Commerce observed that, prior to the preliminary determination, no party had alleged any inability to

provide the information requested by Commerce. *Id*. at 138. Commerce also found that certain companies, including Eagle, Innovgreen, Govina, and Tekcom, did not act to the best of their ability when they provided conflicting information between their initial and supplemental questionnaire responses—without contemporaneous explanation—then later claimed the supplemental responses constituted corrections. *Id*. at 77. Finally, Commerce explained why the missing or unreliable information was significant enough to justify the application of AFA. *Id*. at 139-141.

In addition to the 20 companies providing unreliable response, four other companies failed verification. *Id*. at Appendix II. Finally, certain companies, such as Bao Yen MDF Joint Stock Company (Bao Yen) and Thang Long Wood Panel Company Ltd. (Thang Long) responded to Commerce's initial questionnaire but failed to respond to the supplemental questionnaires. PDM at Appendix I. Plaintiffs now challenge Commerce's application of AFA to at least 19 of these companies. But Commerce's application of both facts available and an adverse inference was warranted for each company. First, Commerce—after affording respondents the opportunity to remedy their deficiencies—determined that there were gaps in the record that did not allow it to determine whether those companies had circumvented the orders or even shipped inquiry merchandise during the relevant time period. Accordingly, Commerce determined to apply facts available pursuant to 19 U.S.C. § 1677e(a)(2). IDM at 120-134. Commerce also found that the respondents failed to cooperate to the best of their abilities to provide information readily accessible to them, and reasonably applied an adverse inference. *Id*. at 134-145.

As a result of Commerce's AFA findings, the respondents were found to have produced/or exported hardwood plywood under all five production scenarios subject to the

inquiries.  IDM at 2.  Plaintiffs lodge numerous arguments specific to multiple companies receiving AFA.  These companies include:  Innovgreen Thanh Hoa Co. Ltd. (Innovgreen), Hai Hien, Cam Lam Vietnam Joint Stock Company (Cam Lam), Govina Investment Joint Stock Company (Govina), Groll Ply, Eagle, Golden Bridge Industries Pte. Ltd. (Golden Bridge), Lechenwood, Arrow Forest International Co., Ltd. (Arrow Forest), Her Hui Wood (Vietnam) Co., Ltd. (Her Hui), Long LUU Plywood Production Co., Ltd. (Long Luu), TEKCOM Corporation (Tekcom), VietNam ZhongJia Wood Company Limited (Zhongjia), Win Faith, Plywood Sunshine, Bao Yen, Thang Long, TL Trung Viet Co. Ltd. (TL Trung), and Greatriver Wood Co. Ltd. (Greatriver).

Broadly speaking, plaintiffs argue that: (1) respondents misunderstood their Q&V initial and supplemental questionnaires; (2) respondents were not provided adequate notice of, and/or an opportunity to remedy their deficiencies; and (3) respondents made "corrections" in supplemental filings that were incorrectly construed as discrepancies with their questionnaire responses.  We take arguments relating to each respondent in turn, explaining why Commerce's application of AFA to each respondent was lawful and supported by substantial evidence.

### 1.  Bao Yen and Thang Long

Commerce's application of AFA to Bao Yen and Thang Long was supported by substantial evidence and in accordance with law.  Bao Yen and Thang Long responded to Commerce's initial Q&V questionnaire, but neither company responded to the subsequent supplemental questionnaires.  IDM at 105.  As such, necessary information was not available on the record, and Bao Yen and Thang Long withheld information requested by Commerce.  *See* 19 U.S.C. §§ 1677e(a)(1)-(2)(A).  Accordingly, Commerce applied facts available, then, pursuant to

section 1677e(b), found Bao Yen and Thang Long had not cooperated to the best of their abilities, meriting an adverse inference. *Id.* at 107-108.

MG plaintiffs allege that Bao Yen and Thang Long failed to respond to the supplemental questionnaires due to miscommunication with a third company, which did not timely inform them of the supplemental questionnaires. *See* MG Plaintiffs' Tranche II Br. at 22-24. They also claim that Commerce required perfection by requiring Bao Yen and Thang Long to respond to its supplemental questionnaires before the issuance of the preliminary determination, and unreasonably rejected Bao Yen and Thang Long's submission of untimely new factual information after the preliminary determination. *Id.*

Even assuming the miscommunication occurred, that miscommunication did not excuse Bao Yen and Thang Long from timely responding to Commerce's questionnaires, and Commerce correctly rejected their attempts to file new factual information after the issuance of the preliminary determination. As Commerce explained, all the record documents—including the questionnaires—were available on Commerce's Antidumping and Countervailing Duty Centralized Electronic Service System (i.e., ACCESS) and fully accessible to the respondents and their legal representatives. IDM at 105. Both Bao Yen and Thang Long responded to the Q&V questionnaire via ACCESS, demonstrating their awareness of Commerce's inquiries. Bao Yen Q&V Response (P.R. 80), Thang Long Q&V Response (P.R. 101), IDM at 105. Bao Yen and Thang Long were listed as companies "that are required to respond to the supplemental questionnaire," putting the onus on ***them*** to monitor the docket and provide timely responses.[7] IDM at 105-106 (citing Q&V Supp. Questionnaire (P.R. 154)).

---

[7] Moreover, nothing on the record, other than Bao Yen's and Thang Long's *post hoc* excuses, demonstrates that this third party failed to provide them with the supplemental questionnaires.

While perfection is not required, the best of its ability standard "does not condone inattentiveness, carelessness, or inadequate record keeping." *Nippon Steel*, 337 F.3d at 1382. Requiring companies to respond to mandatory questionnaires is not tantamount to mandating perfection; rather, it simply asks companies to perform their basic responsibilities. MG plaintiffs contend—rather bizarrely—that Bao Yen and Thang Long did not respond to the supplemental questionnaires because they believed they did not need to do so, as they purportedly did not export inquiry merchandise during the relevant time period. MG Plaintiffs' Tranche II Br. at 23. As an initial matter, this argument appears to contradict their earlier one—that they failed to respond due to a miscommunication with a third-party trading company. *Id.* Surely, Bao Yen and Thang Long did not believe both that they were not required to respond, and that they did not know about the existence of the questionnaires.

In any event, Bao Yen and Thang Long cannot simply claim that they did not believe they needed to respond to the supplemental questionnaires based upon their own determination that they did not produce or ship inquiry merchandise, as it is Commerce that makes this determination. Here, Commerce did not exempt Bao Yen or Thang Long from responding to the supplemental questionnaires, but directed both companies to respond. Q&V Supp. Questionnaire (P.R. 154). Commerce not only named Bao Yen and Thang Long as companies required to respond, it also stated, "{y}ou are receiving this letter because you responded to Commerce's quantity and value (Q&V) questionnaire that requested information about whether you produce or export hardwood plywood products that are made from certain components produced in China. Commerce is issuing this supplemental questionnaire to gather additional details from responding parties." *Id.* Commerce's supplemental questionnaires did not provide an option to not respond based on the company's belief that it did not produce or export inquiry merchandise.

Moreover, as Commerce explained, "{n}either company sought clarification from Commerce about whether they needed to respond to the questionnaires given their claims of no exports{.}" IDM at 106. It is a respondent's burden to clarify its understanding of Commerce's directives and instructions rather than rely on its own interpretation. *SeAH Steel Corp. v. United States*, 659 F. Supp. 3d 1318, 1326 (Ct. Int'l Trade 2023). And even in the initial questionnaire, Commerce requested that parties respond "regardless of whether the company exported merchandise subject to this anticircumvention inquiry to the United States." IDM at 106 (citing Initial Questionnaire (P.R. 62)). Thus, any subjective belief that Bao Yen or Thang Long were not required to respond to the supplemental questionnaires is unreasonable. Because the companies were able to, but did not, respond to the supplemental questionnaires, Commerce correctly determined that they did not cooperate to the best of their ability. Even if their failures to respond were unintentional, they were still mistakes resulting from inattentiveness or carelessness, warranting AFA. IDM at 108.

Finally, Commerce lawfully rejected Bao Yen and Thang Long's untimely filed new factual information (NFI). Commerce explained that its rejection of untimely NFI is consistent with its regulations and practice, balances the competing interests of accuracy and finality, and is consistent with case law. IDM at 108 (citing *Yantai Timken Co., Ltd. v. United States*, 521 F. Supp. 2d 1356, 1370 (Ct. Int'l Trade 2007)); *Reiner Brach*, 206 F. Supp. 2d at 1334; *Essar Steel*, 678 F.3d at 2176). As discussed in detail in our Tranche I brief, the acceptance of untimely NFI was not warranted "in light of the multitude of opportunities parties were afforded to provide information in these inquiries." IDM at 109.

    2.   <u>Cam Lam</u>

Cam Lam failed to timely inform Commerce of significant reporting errors in its

submitted information, instead choosing to wait until verification, when it was too late for

Commerce accept sweeping changes to a company's previously reported data.  IDM at 147-150.

Cam Lam withheld information (accurate sales data) requested by Commerce, failed to provide

that information in the form and manner requested by the deadline, significantly impeded the

proceeding by failing to notify Commerce of the inaccuracies prior to verification, and provided

information that could not be verified; accordingly, Commerce resorted to facts available.  *Id.*;

*see also* 19 U.S.C. § 1677e(a)(2)(A)-(D).  In addition, because the information was in Cam

Lam's possession such that it should have been able to accurately report the quantity and value

of its own sales, Commerce determined that Cam Lam failed to cooperate to the best of its

ability.  IDM at 150.  Finally, Commerce reasonably determined that the corrections presented at

verification were not "minor" in nature.

a.    <u>Background Facts Relevant To Cam Lam</u>

Cam Lam timely submitted initial and supplemental questionnaire responses.  *See* Cam

Lam Q&V Questionnaire Resp. (P.R. 118, C.R. 126); Cam Lam Supp. Q&V Resp. (P.R. 237,

C.R. 220).  On October 25, 2022, Commerce conducted a verification of Cam Lam's responses.

IDM at 145, Cam Lam Verification Report (C.R. 571).  But, at the start of verification, Cam Lam

attempted to submit extensive corrections, which amounted to a near-wholesale revision of its

Q&V data.  Commerce was thus unable to verify Cam Lam's reported information.  IDM at 147.

As Commerce explained:

> {T}he quantity changes related to {Cam Lam's} reported U.S. sales
> were not limited to the month of July, despite Cam Lam's
> explanation for the changes largely resting on a change in that month
> and that being the only month in which Cam Lam claimed
> reclassification of sales from U.S. to third country.  We also noted
> quantity changes of an unexpected magnitude for a change to the
> conversion calculation from pieces to cubic meters and for a
> company that should be very familiar with this type of conversion.

31

Specifically, verifiers noted that the total reported U.S. quantity was reduced by nearly 10 percent, and on a month-by-month basis the changes ranged from an increase in more than 26 percent and a decrease in more than 65 percent. Third country sales' totals increased from zero to over 11,400 cubic meters (m3) worth $4.6 million U.S. dollars (USD), and domestic sales totals increased by 116 percent in volume (5,565.12 m3 to 12,010.89 m3) and 79 percent in value ($2,761,711.84 USD to $4,949,904.40 USD).

Cam Lam Verification Report at 3. Because Cam Lam officials could not adequately explain the reasons for the changes, and the changes were so significant such that Commerce could not determine whether the sales of inquiry merchandise were properly reported, Commerce declined to accept Cam Lam's corrections and decided to discontinue verification. *Id*. at 4. In the final determination, Commerce continued to find that the corrections presented by Cam Lam at the start of verification constituted significant revisions to the information submitted in its questionnaire responses. IDM at 147-150. Accordingly, Commerce determined that Cam Lam withheld information, failed to provide information by the deadline, impeded the proceeding, and provided information that could not be verified; Commerce also determined that Cam Lam had failed to cooperate to the best of its ability, and applied AFA to Cam Lam.

        b.    Commerce's AFA Determination Was Lawful And Supported By The Record

Substantial evidence supports Commerce's determination to end Cam Lam's verification after its belated attempt to submit significant corrections at verification. Verification is not an opportunity to submit new factual information, and Commerce may, within its discretion, decline to accept new factual information at verification (beyond minor corrections). *See Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343 (Fed. Cir. 2021) ("A minor correction is one that rectifies 'minor mistakes in addition, subtraction, or other arithmetic function, minor data entry

mistakes, clerical errors resulting from inaccurate copying, duplication, or the like, or minor classification errors."); *SeAH Steel*, 659 F. Supp. 3d at 1327.

STR plaintiffs claim that the corrections were minor, and therefore Commerce was obligated to consider them. *See* STR Plaintiffs' Tranche II Br. at 28-31. This allegation is unsupported by the record. As Commerce explained, Cam Lam's proposed corrections amounted to a near wholesale revision to its entire Q&V response, including an increase in sales in periods previously reported as having no sales, changes from United States sales to third country sales, and unexpectedly large quantity changes. IDM at 147, Cam Lam Verification Report at 3 (C.R. 571), Cam Lam Verification Exhibits (C.R. 530). Changes of this magnitude cannot be described as minor.

STR plaintiffs contend that these discrepancies should be considered minor because they are not material to Commerce's ability to verify whether Cam Lam's material inputs are circumventing the orders. *See* STR Plaintiffs' Tranche II Br. at 29-31. This ignores the implications of Cam Lam's major corrections. Significant quantity and sales changes over a period of several years—where Cam Lam had previously reported no sales of plywood at all— call into question the reliability of the entirety of Cam Lam's reporting, including the species of veneers it consumed, the suppliers of those veneers, the customers to whom it sold, and the country of origin of the veneers. IDM at 150. Commerce reasonably found that the magnitude and breadth of Cam Lam's changes, as well as Cam Lam's failure to accurately report its own sales in a timely manner, undermined the reliability and accuracy of Cam Lam's overall reporting. *Id*.

STR plaintiffs, unable to explain how its sweeping changes to multiple months of its United States Q&V data, and multiple years of its third-country and domestic sales, are minor,

tries to shift focus by claiming—without support or detail—that the verification report contains

certain inaccuracies. *See* STR Plaintiffs' Tranche II Br. at 30. According to STR plaintiffs, the

alleged inaccuracies in the verification report are indicative of Commerce's unwillingness to

provide a reasonable opportunity for Cam Lam to explain the significant changes it proposed.

*See id.* at 29-30. This argument does not demonstrate error by Commerce. Verification is not an

information-gathering exercise, and during verification Commerce is not required to accept

revisions to previously reported information, unless they are minor corrections. *See Goodluck*

*India*, 11 F.4th at 1343. Commerce's decision to stop soliciting additional explanation from

Cam Lam after its submission of significant changes at verification is consistent with its practice

and decisions of this Court, which has held that:

> {W}hen a respondent fails to provide requested substantive
> information during an investigation, at verification Commerce has
> the discretion to decline to accept the late submission of that
> information. . . . {Commerce} need not accept corrective substantive
> information at verification as to deficiencies in a respondent's
> original submissions{.}

*Dalian Meisen Woodworking Co., Ltd. v. United States*, No. 20-00109, 2023 WL 3058783, at *4

(Ct. Int'l Trade Apr. 24, 2023) (emphasis removed). Cam Lam's changes were not minor

corrections, but instead were significant changes to fundamental information. Therefore,

Commerce reasonably determined that it would not accept any additional new information or

explanation of Cam Lam's changes.

STR plaintiffs contend that Commerce erred in refusing to listen to Cam Lam's

explanations of the changes to its data. *See* STR Plaintiffs' Tranche II Br. at 29-30. But, as

explained in the verification report, Cam Lam's own counsel represented that "company officials

in the room could not provide the requested explanation because a junior accountant who was

not present in the room prepared the initial draft, then a consultant for Cam Lam who was not

34

present revised that draft." IDM at 148-149 (citing Cam Lam Verification Report at 4 (C.R. 571)). Cam Lam's counsel did not retrieve this junior accountant. In the absence of any Cam Lam official who could explain the reasoning for the changes, or the full nature of the changes themselves, Commerce reasonably determined not to accept the changes or continue verification. *Id.* Plaintiffs offer no legal authority requiring Commerce to accept *post hoc* explanations proffered in post-verification submissions. In any event, the magnitude of the proposed revisions demonstrates, on their face, that they are not minor.

As a consequence of Cam Lam's actions, Commerce determined that Cam Lam withheld information requested by Commerce, failed to provide information by the established deadlines, significantly impeded the proceeding by failing to notify Commerce of these significant changes prior to verification, and provided incorrect information that could not be verified; thus, Commerce correctly applied facts available to Cam Lam pursuant to 19 U.S.C. §§ 1677e (a)(2)(A)-(D). IDM at 150. And, because the information—the quantity and value of its own sales—was in Cam Lam's possession and was information it should have been able to accurately report earlier, Commerce reasonably determined that Cam Lam failed to act to the best of its ability in the proceeding, warranting AFA. *See* 19 U.S.C. § 1677e(b); *see also* IDM at 150.

3.    Zhongjia

Following verification, Commerce found that Zhongjia had failed to report all of its suppliers and core veneer purchases and to provide documentation requested at verification. IDM at 158-165; *see also* Zhongjia Verification Report at 6 (C.R. 566). Specifically, Commerce determined that critical information regarding Zhongjia's veneer purchases and suppliers were not on the record, that Zhongjia withheld such information along with Q1 2020 material input records requested at verification, and that the information Zhongjia provided could not be

verified; accordingly, Commerce resorted to facts available.  *See id.*; *see also* 19 U.S.C.

§§ 1677e(a)(1)–(2)(A), (D).  Because the information Zhongjia had failed to report was available

and central to these inquiries, and Zhongjia was provided advance notice of the information that

would be requested at verification but still failed to provide it, Commerce reasonably determined

that Zhongjia failed to act to the best of its ability and thus applied an adverse inference.  IDM at

165.

a.    <u>Background Facts Relevant To Zhongjia</u>

In its second supplemental questionnaire, Commerce asked respondents to report "a

complete list of all {their} Vietnamese suppliers of plywood or plywood inputs" from December

2016 through March 2020.  *See* 2nd Supp. Questionnaire at Attachment II (P.R. 257).  In

response, Zhongjia provided a list containing the names of multiple core veneer suppliers.  *See*

Zhongjia's 2nd Supp. Questionnaire Resp. (P.R. 318, C.R. 300-302).  When Commerce

examined Zhongjia's records at verification, Commerce found that this supplier list was

incomplete.  IDM at 159.  Specifically, Commerce found documentation that Zhongjia had

purchased core veneers during the inquiry period from a company that was not among the core

veneer suppliers reported in any of its questionnaire responses.  *See* Zhongjia Verification Report

(C.R. 566); *cf.* Zhongjia 2nd Supp. Questionnaire Resp. at Exh. SQ2-3 (C.R. 350).  Zhongjia

explained that the core veneers it purchased from this unreported company included kapok wood

veneers and were not used to produce hardwood plywood, but produced no documentation to

support its assertion.  *See* Zhongjia Verification Report at 6.  Given Zhongjia's response, and its

failure to list this supplier, Commerce determined that Zhongjia had failed to comply with

Commerce's direction to report a complete list of all its Vietnamese suppliers of plywood or

plywood inputs.  IDM at 159.

36

At verification, Commerce also asked to review Zhongjia's Q1 2020 material input

records.  Zhongjia was unable to provide them, claiming that the records were at another location

in Hanoi, and that its third-party accountant had misunderstood the verification agenda and

which records would be examined.  IDM at 161.  As Commerce could not verify Zhongjia's

inquiry period material input purchase records, or even a sampling of those records, Commerce

could not verify Zhongjia's assertion that it did not produce inquiry merchandise, *i.e.*, use core

veneers of Chinese origin to produce hardwood plywood.  IDM at 163.

> b.    Commerce's AFA Determination Was Lawful And Supported By
> The Record

Substantial evidence supports Commerce's application of AFA to Zhongjia.  Zhongjia

failed to report a complete list of its suppliers, despite Commerce's instructions for it to do so,

and did not provide documentation requested by Commerce at verification.  With regard to the

supplier list, Commerce discovered a discrepancy between Zhongjia's reported supplier list in its

questionnaire response and its records at verification.  IDM at 159.  DH plaintiffs claim that

Zhongjia had interpreted Commerce's questionnaire to mean that it only needed to report

suppliers whose veneers were actually used to produce hardwood plywood, and that it did not

consider the unreported company a supplier.  *See* DH Plaintiffs' Tranche II Br. at 79.  But that is

not what Commerce asked for; rather, it requested a complete list of all Vietnamese suppliers of

plywood or plywood inputs.  2nd Supp. Questionnaire at Attachment II (P.R. 257).  Commerce

thus expected respondents to comply with the wording of its questionnaire and report all

Vietnamese suppliers of plywood or plywood inputs regardless of whether the veneers were used

to produce hardwood plywood.  As Commerce explained, whether or not veneers are used to

produce plywood not sold to the United States does not negate the fact that they are still inputs

used to produce plywood, and Commerce asked for a list of all Vietnamese suppliers of such

products.  IDM at 160.  Significantly, the unreported supplier is one of the companies listed in the Vietnamese government's import data as having purchased veneers from China during the inquiry period.  *See* GOV Supp. Questionnaire Resp. at Exh. 2 (C.R. 364).  Thus, Commerce reasonably determined that Zhongjia's incomplete supplier list represented necessary information missing from the record, and information withheld by Zhongjia, despite Commerce's request.  IDM at 160.

DH plaintiffs also argue that Commerce verified that the unreported kapok wood veneer that it purchased from the unreported supplier was not used to produce hardwood plywood, and therefore Zhongjia's failure to report the supplier was harmless.  *See* DH Plaintiffs' Tranche II Br. at 79-80.  First, this does not change the fact that Zhongjia withheld information requested by Commerce and failed to provide that information during the fact-gathering stage.  Moreover, the fact that Commerce did not identify—at verification—any kapok wood used to produce plywood does not mean that no such wood, or other core veneer species from the unreported supplier, was used to produce hardwood plywood during the inquiry period.  IDM at 159.  As Commerce stated, "Zhongjia ***did*** use some of its unreported hardwood plywood veneer purchses to produce hardwood plywood."  Commerce found that Zhongjia did not have documentation to support the assertion that these kapop wood veneers were not used to produce hardwood plywood.  *Id*.  All the record evidence shows is that Zhongjia purchased kapok wood veneers, not what merchandise those veneers were used to produce.

DH plaintiffs next claim that the volume of core veneers it purchased were too small to warrant retaining records, that it did not keep or retain certain records because it used those veneers in 2019 (before the initiation of the inquiries), and that the person responsible for those purchases left the company without leaving records.  *See* DH Plaintiffs' Tranche II Br. at 81; *see*

*also* IDM at 159 n. 819.  These statements are not supported by the record.  IDM at 159 n. 819.

Zhongjia was responsible for maintaining its own records.  *See Nippon Steel*, 337 F.3d at 1383

("It is not an excuse that the employee assigned to prepare a response does not know what files

exist, or where they are kept, or did not think—through inadvertence, neglect, or otherwise to

look beyond the files immediately available.").  Inadequate record keeping does not excuse

Zhongjia from a finding that it did not act to the best of its ability in responding to Commerce's

questionnaires.  *See id.*

DH plaintiffs argue that Commerce failed to "make an objective showing that a

reasonable and responsible {respondent} would have known that the requested information was

required to be kept and maintained{.}"  DH Plaintiffs' Tranche II Br. at 81 (citing *Nippon Steel*,

337 F.3d at 1382).  But, as Commerce observed, 25 respondents demonstrated that hardwood

plywood producers maintain information regarding suppliers of hardwood plywood inputs in the

course of their business; accordingly, it was reasonable for Commerce to assume that this type of

information should have been available to respondents, as it is normally recorded in companies'

books and records.  IDM at 136.  Zhongjia's inadequate record-keeping does not excuse its

failure to timely report information Commerce specifically requested.  And, while DH plaintiffs

characterize the omission of the supplier as a small error, Zhongjia's disregard of Commerce's

instructions allowed Commerce to infer that Zhongjia's information was unreliable and

inaccurate.[8]  *See, e.g., Gov't of Quebec v. United States*, 567 F. Supp. 3d 1273, 1286 (Ct. Int'l

Trade 2022), *aff'd*, 105 F.4th 1359 (Fed. Cir. 2024) (stating while the impact of the discovered

errors, taken alone may be small, Commerce could reasonably infer that there may remain other

errors).

---

[8]  As discussed below, this was not the only basis for the decision to AFA.

DH plaintiffs complain that Zhongjia did not have the opportunity to clarify or correct the information regarding its supplier because Commerce did not issue a post-verification supplemental questionnaire. DH Plaintiffs' Tranche II Br. at 82 (citing *SKF USA Inc. v. United States*, 29 C.I.T. 969, 979-80) (Ct. Int'l Trade 2005)). But *SKF USA* is distinguishable. In that case, the Court held that Commerce had unreasonably denied the respondent an adjustment for failing to submit information that it had not been given an adequate opportunity to provide. *Id.* In contrast, here Commerce asked twice for the input supplier information missing from the record (*i.e.*, information regarding Zhongjia's input suppliers). *See* Zhongjia 2nd Supp. Questionnaire Resp. at Exh. SQ2-3 (C.R. 350). Because Zhongjia failed to timely report all core veneer purchases and suppliers, and Commerce only discovered this deficiency at verification, Commerce was justified in applying AFA.

In addition to failing to provide an accurate supplier list, Zhongjia also failed to provide documentation at verification regarding Zhongjia's Q1 2020 material inputs, even though Commerce had notified Zhongjia in advance of the verification that it would want to review such documentation.[9] IDM at 161. Zhongjia contends that Commerce could have waited for the documents to arrive from the location they were kept instead of ending verification early. *See* DH Plaintiffs' Tranche II Br. at 83-85 (citing *SKF USA*, 29 C.I.T. at 970). But Commerce did not discover that Zhongjia did not have the documents until late in the afternoon on the only day of verification; it was thus impracticable for Commerce to return on another day and provide Zhongjia additional time. IDM at 164.

---

[9] The verification agenda stated that Commerce would "review the methodology used to determine that hardwood plywood inputs were, or were not, purchase from, or originated from, the People's Republic of China, including (but not limited to) production records{,} material purchases and freight invoices. Review the bills of material for all hardwood plywood produced during the inquiry period." Verification Agenda at 9 (P.R. 571) (cleaned up).

Commerce is not required to accept information when there is insufficient time to fully evaluate it for accuracy and completeness. *See Tatung Co. v. United States*, 18 C.I.T. 1137, 1140–41 (Ct. Int'l Trade 1994) ("Due to stringent time deadlines and the significant limitations on Commerce's resources, 'it is vital that accurate information be provided promptly to allow the agency sufficient time for review.'"); *see also Max Fortune Indus. Co. v. United States*, 37 C.I.T. 549, 555 (Ct. Int'l Trade 2013) ("Commerce properly exercised its discretion in rejecting the late-submitted information."); *Thyssen Stahl AG v. United States*, 886 F. Supp. 23, 26-27 (Ct. Int'l Trade 1995) (holding that Commerce "is not required to request that missing information be provided at a future date").

Zhongjia's reliance on *SKF USA* is misplaced.   In *SKF USA*, the respondent communicated its willingness and ability to provide certain source documentation at the time of verification, and Commerce declined to accept it, even though the respondent was able to provide the documentation with only a few minutes' notice. *See SKF USA*, 29 C.I.T. at 974. Moreover, in *SKF* there were two full days of verification remaining when the issue arose, and it is unclear whether Commerce had made an advance request for the information. *Id.* at 974-75. Based on those facts, this Court held that Commerce could not apply an adverse inference.   In contrast, here Commerce did not discover the error until near the close of verification, it requested the information well in advance of verification, and the record does not indicate that Zhongjia could have provided the information within minutes; rather, the documentation was at an entirely different location than the verification.

DH plaintiffs try to shift the blame to Commerce, claiming that Commerce could have had Zhongjia's staff start bringing the documents over sooner if Commerce had made clear its need for them early in the day.  DH Plaintiffs' Tranche II at Br. at 84.  But Commerce is not

required to itemize beforehand every possible document it will need during verification, particularly where the verification outline clearly indicates that the list of items is not necessarily all-inclusive.  *See Thyssen*, 886 F. Supp. at 26-27.  Zhongjia had two weeks' notice that its material inputs documentation would be among the items examined at verification.  Verification Agenda at 9 (P.R. 606).  Thus, the onus was on ***Zhongjia***, not Commerce, to make the documentation available at verification.  Indeed, the verification agenda stated:

> It is the responsibility of the respondent to be fully prepared for this verification. If your client is not prepared to support or explain a response item at the appropriate time, the verifiers will move on to another topic. If, due to time constraints, it is not possible to return to that item, we may consider the item unverified, which may result in our basing the results of this circumvention inquiry on the facts available, possibly including information that is adverse to the interests of your client.

*Id.* at 2.  As Commerce explained, travelling from another office to during the late afternoon of the only day of verification to retrieve the materials was not practicable, and expecting Commerce officials to return another day and provide Zhongjia extra time was likewise not practical or reasonable.  IDM at 164.  Commerce's busy verification schedule included visits to numerous respondents; there was no room for last-minute modifications to accommodate more time at one particular site.[10]  *Id.* at 164-165.  Commerce did not abuse its discretion by adhering to the verification timeline and agenda provided well in advance of the event.

Maintaining consistent standards across all verifications promotes fairness and transparency for all participants.  By contrast, providing Zhongjia an opportunity to remedy its

---

[10]  DH plaintiffs note that two companies that Commerce had intended to verify the week after Zhongjia's verification dropped out, leaving Commerce time to go back to Zhongjia.  *See* DH Plaintiffs' Tranche II BR. at 85.  First, Commerce would have acted within its discretion by declining to extend verification even if time constraints had not prevented it from doing so.  Second, Commerce still had a busy schedule.  Third, as explained above, it would have been inequitable to other respondents for Commerce to spend extra time with Zhongjia.

inadequate preparation for verification by giving it an extra day would have resulted in inconsistent treatment *vis-a-vis* other, similarly situated respondents that did not receive extra time for verification. *See, e.g., SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (stating that "an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.")

Finally, DH plaintiffs assert that the Q1 2020 material input records are the only set of records it had missed, and those records accounted for a small component of its overall verification. *See* DH Plaintiffs' Tranche II Br. at 85. First, Commerce's application of AFA to Zhongjia was not based on only one issue; as discussed above, Zhongjia also failed to report a complete list of core veneer purchases and suppliers. Moreover, the record undermines Zhongjia's claim. Zhongjia admitted that its early recordkeeping processes were poor, and evolved as its business developed. IDM at 163. Zhongjia only started using professional accounting software at the start of 2020, and most of its inquiry period sales occurred during Q1 2020. *Id.*, Zhongjia Verification Report at 3 (C.R. 566), Zhongjia Questionnaire Resp. at Exh. 2 (C.R. 80). Because Commerce was unable to review official records from 2019,[11] and the majority of Zhongjia's relevant sales occurred in Q1 2020, the records of raw material inputs from that quarter were crucial to Commerce's verification.

Commerce could not determine that Zhongjia's system accurately represented all purchases when Commerce could not examine the requested supporting documentation. IDM at

---

[11] Zhongjia objects to Commerce's finding that it was unable to review official records from 2019. *See* DH Plaintiffs' Tranche II Br. at85-86 But, as Commerce explained, Zhongjia only started operations in 2019, did not use professional accounting software until 2020, and had questionable record-keeping at the start. IDM at 164; *see also* DH Plaintiffs' Tranche II Br. at 81 (Zhongjia did not keep certain production records)

163. It would be unreasonable to expect Commerce to disregard the material shortcomings in the record, particularly considering that the entire premise of verification is for Commerce to examine source documentation. Because Commerce could not verify all Zhongjia's inquiry period material input purchase records, or even a sampling of original material inputs records from Q1 2020, Commerce could not verify Zhongjia's assertion that it did not produce inquiry merchandise, *i.e.*, use core veneers of Chinese origin to produce hardwood plywood. IDM at 163.

Given the issues with Zhongjia' supplier list and the Q1 2020 material inputs records, Commerce correctly determined that a gap existed in the record, Zhongjia withheld requested information, and also failed to provide information by the deadlines and provided information that could not be verified. Commerce also reasonably found that Zhongjia had failed to cooperate to the best of its ability to provide all its suppliers, core veneer purchases, and Q1 2020 material inputs records when requested during the fact-gathering stage. IDM at 165. In addition, Commerce determined that Zhongjia did not act to the best of its ability to during the verification itself, given that Zhogjia had advance notice that Commerce official would be examining material input records from the inquiry period, and that Zhongjia failed to articulate why information regarding its input suppliers was not readily available. Accordingly, this Court should sustain Commerce's application of AFA to Zhongjia.

### 4. TL Trung

Commerce's application of AFA to TL Trung—a respondent that declined to participate in verification—was supported by substantial evidence and in accordance with law. MG plaintiffs' only challenge to Commerce's application of AFA to TL Trung is that Commerce's circumvention determination was not supported by substantial evidence or in accordance with

law because it allegedly relied on flawed data in finding that the process of assembly or completion in Vietnam was minor and insignificant.  *See* MG Plaintiff's Tranche II Br. at 25.  As explained in our Tranche I brief, Commerce's finding that the process of assembly in Vietnam was minor and insignificant is supported by the record, and the data it relied on were not flawed.  *See* Govt. Tranche I Br. at 24-25, 30-32.  Accordingly, the Court should sustain the application of AFA to TL Trung.

     5.    <u>Eagle</u>

Commerce's application of AFA to Eagle was supported by substantial evidence and in accordance with law; Eagle's responses contained numerous errors and inconsistencies regarding sourcing of core veneers from its affiliated Chinese supplier, and it incorrectly characterized veneers as face and back veneers rather than core veneers.

     a.    <u>Background Facts Relevant To Eagle</u>

Commerce's initial questionnaire directed respondents to report "whether any of those inputs {sourced from resellers in Vietnam} were produced in China," "whether any of that plywood {sourced from resellers in Vietnam} contained inputs that were produced in China," and whether the respondent was affiliated with producers or exporter of plywood or plywood inputs from China.  Initial Questionnaire (P.R. 62).  In its initial response, Eagle stated that, although it was affiliated with Chinese plywood producer ███████████████████████ ███████████, Eagle did not source plywood or plywood inputs from Chinese plywood producers or exporters during the inquiry period.  Eagle Initial Questionnaire Response (C.R. 101).

Commerce then issued a second supplemental questionnaire, requesting "an exhaustive list of all tariff schedule subheadings of products your company imported from China under

Harmonized Tariff Schedule (HTS) subheadings 4408 and 4412," an "exhaustive list of all tariff schedule subheadings of products your supplier imported from China under subheadings 4408 and 4412," and "an exhaustive list of all tariff schedule subheadings of products affiliates of your company exported from China to Vietnam under subheadings 4408 and 4412." 2nd Supp. Questionnaire (P.R. 257). In its response, Eagle reported for the first time that it imported ███████████████ under subheading ████. Eagle 2nd Supp. Questionnaire Resp. (C.R. 319). While the ███████████ were identified as ████████████ in the purchase documents, Eagle claimed that these ████████████ were technically face/back veneers. *Id*. at 2. Eagle also identified ████████ as one of its Chinese suppliers of veneers. *Id*. at Exhibit SQ2-5. Eagle also reported an import of plywood that it had not reported in its initial response. *Id*. at Exhibit SQ2-1; IDM at 84.

Commerce found that the veneers alleged as face/back veneers by Eagle should properly be considered core veneers and, as such, determined that Eagle had failed to report ████████ ████ that it imported from China. Preliminary AFA Memo at 7. Commerce concluded that Eagle's failure to accurately report this import information rendered its questionnaire responses entirely unreliable, and found that Eagle did not act to the best of its ability in responding to the questionnaires. IDM at 77, 85.

      **b.**    **Commerce's AFA Determination Was Lawful And Supported By The Record**

Commerce was warranted in its application of AFA to Eagle. Commerce found discrepancies between Eagle's responses regarding the sourcing of the veneers from its affiliates and imports of veneers from Eagle's Chinese affiliate that Eagle had failed to report in its response. While Eagle initially stated that it did not source plywood or plywood inputs from Chinese plywood producers or exporters during the inquiry period, in its second supplemental

questionnaire response, Eagle disclosed that its Chinese affiliate ███████ supplied core

veneers.  Preliminary AFA Memo at 6-7 (citing Eagle 2nd Supp. Questionnaire Resp. (C.R.

319)).  Because Eagle failed to accurately and consistently report information, Commerce

considered Eagles' responses to be entirely unreliable.  IDM at 84-85.  Because Eagle's actions

resulted in a gap in the record, Commerce appropriately determined to apply facts available.

IDM at 122.

Commerce also explained that it was reasonable to expect respondents—including

Eagle—to know information about their imports, suppliers, affiliations, and source

documentation because this information is normally recorded in companies' books and records

and this information would be required to be maintained under the certification program.  IDM at

137-138.  Accordingly, Commerce reasonably applied AFA to Eagle for its failure to act to the

best of its ability.  *Id*. at 77, 137-138.

DH plaintiffs argue that Commerce did not notify Eagle of its deficiency in its

supplemental questionnaires.  *See* DH Plaintiffs' Tranche II Br. at 15-17.  As support, they rely

primarily on this Court's decision in *BlueScope*.  In *BlueScope*, the Court held that Commerce

had not complied with the statutory requirement to notify a respondent of its deficiency because

BlueScope's changes were solicited by Commerce, Commerce did not request further

documentation or clarification regarding the changes, and Commerce failed to explain why it

would be impracticable to give BlueScope an opportunity to remedy its deficiencies.  *BlueScope*,

548 F. Supp. 3d at 1363-1365.

*BlueScope* is distinguishable.  First, as explained above, Commerce's repeated requests

for the same information constituted sufficient notice under section 1677m(d).  Moreover, and

crucially, Commerce **did** explain why it would not be practicable to allow respondents another

opportunity to remedy their deficiencies.  IDM at 133-134.  The time between the final deadline

for the second supplemental questionnaire responses and the preliminary determination was

necessary for Commerce to evaluate at least 146 questionnaire responses (and other voluminous

record information) and form its preliminary determinations; accordingly, "it was not practicable

to collect additional information."  IDM at 133.  Commerce articulated that, "after reviewing the

large volume of questionnaire responses and realizing that significant and pervasive errors

remained throughout the response, there was not sufficient time to issue additional

questionnaires and review the responses," and that "the pattern established by the respondents

indicated that additional discrepancies would be submitted and uncovered in any future

questionnaire response."  *Id.*

DH plaintiffs also contend that certain cases Commerce relied on its final

determination—namely, *Maverick Tube*, *Hyundai Heavy*, and *Essar Steel*—are distinguishable

because those cases involved situations where Commerce's supplemental questionnaires

specifically reference respondents' prior responses when requesting the same information.  *See*

DH Plaintiffs' Tranche II Br. at 19.  But Commerce cited these cases for the proposition that

supplemental questionnaires and repeated requests for the same information are sufficient to

provide notice.  IDM at 128-129.  Those cases do not preclude Commerce's repeated requests for

the same information from constituting sufficient notice, particularly given that the statute only

requires the opportunity to remedy or explain a deficiency "to the extent practicable."  19 U.S.C.

§ 1677m(d).

Here, "{t}he supplemental questionnaires issued to all participating companies (first 51,

and then, 46 respondents) requested information addressing themes and issues that were

pervasive throughout all of the questionnaire responses (*e.g.*, respondents provided lists of

species used to produce hardwood plywood, but those lists did not include the species that were included in their source documents or other publicly available information)."  IDM at 126. Commerce explained that the supplemental questionnaires targeted significant issues present in most of the questionnaire responses submitted and were not simply general questionnaires.  *Id*. For example, in the second supplemental questionnaire, Commerce again requested information regarding the respondents'—including Eagle's—imports of plywood inputs, suppliers, and affiliates.  Second Supplemental Questionnaire (P.R. 257) (asking for the "identity of each company that supplied your company with products under HTS subheading 4408 or 4412," and "your Vietnamese suppliers sourced plywood or plywood inputs from China under HTS subheadings 4408 or 4412 for the period December 2016 through March 2020" among other requests).  Commerce's notice was not insufficient simply because it did not explicitly name Eagle with regard to that question.  It would not be reasonable—or practicable—to expect Commerce to issue company-specific supplemental questionnaires to each respondent, given the vast number of respondents and the similar deficiencies pervasive across the respondents' submissions.  IDM at 123.

DH plaintiffs next assert that no gap in the record existed with regard to Eagle because Eagle's second supplemental questionnaire response constituted a correction with regard to the veneers imported by its affiliates.  *See* DH Plaintiffs' Tranche II Br. at 21-22.  Similarly, plaintiffs claim that Eagle imported from an unaffiliated company and that its subsequent response reporting the import from that company should therefore be considered a correction. *See* DH Plaintiffs' Tranche II Br. at 24-25.

But, as Commerce explained, "Eagle did not notify or explain to Commerce that it was correcting its information."  IDM at 84.  Without an explanation or an identification of the

previously submitted errors and why they occurred, Commerce found that Eagle's second

supplemental response statements were not corrections but rather significant changes. *Id.* at 77.

Commerce also found that, without an explanation, it does not have the "ability to determine

which information Commerce was supposed to rely on for its analysis, and why it should not rely

on the other information." *Id.* Commerce explained that the only conclusion it could reasonably

draw from the conflicting information was that Eagle did not report its information correctly or

consistently, and that "Commerce cannot be expected to know why a respondent is modifying its

answers." *Id.* at 77-78. Commerce further observed that Eagle's post-preliminary, *post hoc*

explanations did not constitute record evidence demonstrating that its later responses were

corrections. *Id.* at 77. In light of these findings, Commerce determined that these

inconsistencies and omissions rendered Eagle's responses unreliable, creating a gap in the record

and warranting facts available. *Id.* at 103, 121.

DH plaintiffs argue that Commerce erred in treating the veneers Eagle reported as

face/back veneers to be core veneers because Eagle actually used the veneers as face or back

veneers. *See* DH Plaintiffs' Tranche II Br. at 25-30. In doing so, they assume that there is a

distinction between face/back veneers and core veneers that exists even before the veneers have

been affixed; this assumption is not supported by the language of the orders or the record. The

orders state that "hardwood and decorative plywood is defined as a generally flat, multilayered

plywood *or other veneered panel*, consisting of two or more layers or plies of wood veneers and

a core, with the face and/or back veneer made of non-coniferous wood (hardwood) or bamboo."

*See Certain Hardwood Plywood Products from the People's Republic of China*, 83 Fed. Reg.

504 (Dep't of Commerce Jan. 4, 2018) (final determination); *Certain Hardwood Plywood*

*Products from the People's Republic of China*, 82 Fed. Reg. 513 (Dep't of Commerce Jan. 4,

2018) (final determination) (emphasis added).  The orders also define face and back veneers as "the outermost veneer of wood *on either side of the core* irrespective of additional surface coatings or covers as described below."  *Id*. (emphasis added).  Accordingly, "a veneer cannot be a face or back veneer if it is not attached to a core."  IDM at 85 (emphasis removed).  Even assuming that Eagle's core veneers became face or back veneers when they were placed on the outside of other core veneers, Commerce explained that Eagle assembled these core veneers into core veneer panels, or "the core," *in Vietnam*.  IDM at 85 (citing Eagle 2nd Supp. Questionnaire Resp. at 2 (C.R. 319).  As such, the core veneers that Eagle imported *from China* were just that—core veneers, not face or back veneers.  Eagle's own record information further belies its argument, as its purchase documents identified ████████████ as ████████████.  Preliminary AFA Memo at 7 (citing Eagle 2nd Supp. Questionnaire Response (C.R. 319)).

Commerce explained that Eagle's failure to report its imports of core veneers from China prevented Commerce from examining those imports to determine whether they were used exclusively as the outer veneers of veneer core platforms (which would still constitute core veneers of the finished plywood panel) or if they were also incorporated into the inner layers of the finished veneer core platform.  IDM at 85.  Accordingly, Commerce concluded that, due to Eagle's failure to accurately and consistently report the import of core veneers to Commerce, Eagle's questionnaire responses were rendered entirely unreliable.  IDM at 85.  In conjunction with its finding that Eagle did not act to the best of its ability in responding to Commerce's questionnaires, Commerce appropriate applied AFA to Eagle.

6.  Hai Hien

Commerce's application of AFA to Hai Hien was supported by substantial evidence and in accordance with law.  Commerce found that Hai Hien had failed to accurately report

information regarding its Chinese affiliates and the type of veneers used in its hardwood

plywood—information that is essential to determining a respondent's inputs, purchasing

behavior, affiliates, and production of plywood.  IDM at 92-94.  Commerce reasonably

determined that Hai Hien, in mischaracterizing its veneers and not identifying a Chinese affiliate,

failed to provide accurate information and did not cooperate to the best of its ability.

a.    Background Facts Relevant To Hai Hien

In its initial questionnaire response, Hai Hien claimed that it was not affiliated with any

producer or exporter of plywood or plywood inputs from China.  Hai Hien Questionnaire Resp.

at 5 (C.R.76), IDM at 93.  However, Hai Hien acknowledged in its first and second supplemental

questionnaire responses that one of its shareholders had previously held a position for a Chinese

manufacturer of plywood/plywood inputs.  Hai Hien Supp. Questionnaire Resp. at 2-3 (P.R. 189,

C.R. 167); Hai Hien 2nd Supp. Questionnaire Resp. at 3, 5 (P.R. 284, C.R. 242).  Regarding this

individual, Hai Hien stated, in response to a company-specific supplemental questionnaire, that,

"{s}ince Hai Hien was established, ███████████████████████████████████

██████████████████████████████."  Hai Hien Supp. Questionnaire (C.R.

237), Hai Hien 2nd Supp. Questionnaire Resp. at 5 (C.R. 242).

However, Commerce had, in September 2017, conducted a █████████████

███████████—the Chinese manufacturer—during the ████████████████████

████████████████████.  During this event, ████████████████████████████

███████████████████████.  *See* Preliminary AFA Memo at 12 (C.R. 412)

(citing Petitioner Comments on Certain Second Supp. Questionnaire Responses at Exh. 3) (C.R.

359)).  Hai Hien reported that it was incorporated in ██████.  Hai Hien Questionnaire Resp. at 2

(C.R. 76).  Accordingly, Commerce determined that Hai Hien had failed to disclose a Chinese

affiliate.

In its initial questionnaire, Commerce also asked Hai Hien to report the quantity of plywood it sold to the United States that contained inputs that were produced in China. Initial Questionnaire at Attachment II (P.R. 64). Hai Hien responded that the question was "{n}ot applicable, because the plywood exported to the United States during the time period did not contain inputs from China." Hai Hien Initial Questionnaire Resp. at 3 (P.R. 106). Hai Hien further stated that "all the individual core veneers are domestically sourced and produced in Vietnam." *Id.* Hai Hien also reported in its initial questionnaire response that it used ███████ ███████ to produce the plywood it exported to the United States. Preliminary AFA Memo at 12 (C.R. 412). In its second supplemental questionnaire response, Hai Hien reported that it imported ███████ from China. Hai Hien 2nd Supp. Questionnaire Resp. at 1-2 (C.R. 242). It also claimed that these imported ███████████ as face/cover sheets due to their ███████. *Id.* But Commerce found that the ███████ shown in Hai Hien's sample entry documentation for its Chinese imports all have a thickness of at least ██████ and the *majority* were ███████ thick—thicknesses indicative of ***core veneers***. Preliminary AFA Memo at 12 (citing Hai Hien 2nd Supp. Questionnaire Resp. (C.R. 242)). Due to these inconsistencies, Commerce determined that Hai Hien had failed to accurately report its imported veneers as core veneers from China. *Id.*; IDM at 92-93.

b.    Commerce's AFA Determination Was Lawful And Supported By The Record

Substantial evidence supports Commerce's determination to apply AFA to Hai Hien based on its failure to accurately report information regarding its Chinese affiliates, and the discrepancies in its reporting on the type of veneers used in its hardwood plywood. The record contradicts Hai Hien's statement that its shareholder had held no position with a Chinese

producer or exporter of plywood or plywood inputs since Hai Hien's establishment.  IDM at 93.

Instead, the record demonstrates that the shareholder was ████████████████████

██████████████████—a Chinese plywood producer.  Preliminary AFA Memo (citing

Petitioner Comments on Certain Second Supp. Questionnaire Responses at Exh. 3) (C.R. 359)).

In its initial questionnaire, Commerce explicitly asked respondents to :

> State whether you are affiliated with any:
>
>     a.  producers of plywood or plywood inputs in China; or
>
>     b.  exporters of plywood or plywood inputs in China.
>
> If yes, please identify those producers or exporters, the types of plywood or inputs produced, the nature of the affiliation (*i.e.*, familial, common ownership, interlocking directorates, etc.), and whether you sourced any plywood or plywood inputs from each affiliated company.

Initial Questionnaire at Attachment II (P.R. 64).[12]  Hai Hien consistently represented that it was

"not affiliated with any producers or exporters of plywood or plywood inputs in China."  Hai

Hien Questionnaire Resp. at 4-5 (C.R. 76), Hai Hien Supp. Questionnaire Resp. at 2-3 (P.R.

189), Hai Hien 2nd Supp. Questionnaire Resp. at 4-6 (P.R. 284).  Given the stark discrepancy

between Hai Hien's representations and the contradictory record evidence regarding its

shareholder, Commerce reasonably determined that Hai Hien failed to provide accurate

information regarding its Chinese manufacturing affiliate.  *See* IDM at 93-94.

STR plaintiffs argue that this discrepancy simply reflects a misunderstanding of its

supplemental questionnaire response.  *See* STR Plaintiffs' Tranche II Br. at 24-28.  According to

them, the term "established" Hai Hien used in its questionnaire response was meant to refer to

---

[12]  Commerce also asked additional questions regarding Hai Hien's shareholder in a company-specific supplemental questionnaire.  Hai Hien Supp. Questionnaire (C.R. 237).

the year the company was "restructured."[13]  *Id*. at 25-26; Hai Hien's 2nd Supp. Questionnaire

Resp. at 5 ("Since Hai Hien was established, {this individual} has not held any positions in, or

owned any shares of any, Chinese producers or exporters of plywood or plywood inputs") (C.R.

242).  But there is no support for the contention that Hai Hien was referring to the restructure

date rather than the date it was actually established—█████.  And, indeed, the only sensible

conclusion for Commerce to have drawn was that, by "established," Hai Hien meant just that.

IDM at 93-94.  Certainly, there was nothing to indicate that, by "established," Hai Hien actually

meant "restructured."  Hai Hien cannot evade the plain meaning of the term "established."

STR plaintiffs claim that Hai Hien's reporting was consistent with the effective dates on

the articles of incorporation it provided in its questionnaire response.  *See* STR Plaintiffs'

Tranche II Br. at 26.  But nothing on Hai Hien's business registration (which shows the

restructure date) suggests anything that could have changed the company to such an extent that it

could no longer be considered as "established" in the year it was actually established—█████.

IDM at 93-94.  Hai Hien did not report a name change, nor alert Commerce as to any confusion

about the nature of the question in its questionnaire responses.  *Id*.

STR plaintiffs further contend that there were no gaps in the record because Hai Hien's

reporting was consistent, and, even if there were, the issue could have been clarified had

Commerce notified Hei Hien of the discrepancy.  *See* STR Plaintiffs' Br. at 26.  First, Hai

Hien's reporting was not consistent or accurate, and, as a result, Commerce could not draw

reliable conclusions regarding Hai Hien's Chinese affiliates.  Moreover, as established above,

Commerce's repeated requests for the same specific information placed Hai Hien on notice that

---

[13]  Hai Hien stated in its initial questionnaire response that it "was restructured and
started production and sales business of plywood" in 2018.  IDM at 93 (citing Hai Hien Initial
Questionnaire Resp. at 2 (P.R. 106)).

its initial response was deficient.  *See Maverick Tube*, 857 F.3d at 1360.  Commerce also issued a

company-specific supplemental questionnaire to Hai Hien targeting inconsistent information

about Hai Hien's Chinese affiliates, inconsistent information between the source documents Hai

Hien provided and its narrative responses, and information about one of Hai Hien's

representatives.  Hai Hien Supp. Questionnaire (C.R. 237).  Accordingly, Hai Hein was on notice

as to the deficiencies regarding its affiliate information, and Commerce was not required to ask

again for clarification.  Failure to accurately disclose affiliates is a serious issue, and Commerce

may lawfully apply AFA if respondents fail to disclose affiliates when requested.  *See New*

*Mexico Garlic Growers*, 352 F. Supp. 3d at 1293-94; *see also Uttam Galva Steels Ltd. v. United*

*States*, No. 2021-2119, 2022 WL 1419596, at *3 (Fed Cir. May 5, 2022).

With respect to veneer type, record information demonstrates that Hai Hien

mischaracterized its core veneers from China as face and back veneers.  IDM at 92-93.

Commerce relied on data from the International Trade Commission (ITC), as well as data

collected in previous proceedings, in finding that the thickness of veneers imported from China

by Hai Hien was indicative of core veneers, rather than the face veneers Hai Hien claims.  *Id*. at

79 (citing Relevant Documents Memo at Exhs. 14, 25 (C.R. 399).  Specifically, the ITC data, as

well as the data from the first review of the antidumping duty order covering hardwood plywood

from China, show that both the thickness and the wood type of the veneers are aligned with core

veneers, rather than face veneers.  *Id.*

STR plaintiffs contend that Commerce's analysis is speculative; *see* STR Plaintiffs'

Tranche II Br. at 27-28; however, it is for **Commerce** to weigh the evidence, not Hai Hien or the

Court.  *See Fine Furniture (Shanghai) Ltd. v. United States*, 865 F. Supp. 2d 1254, 1263 (Ct.

Int'l Trade 2012).  Here, substantial evidence supported Commerce's determination that, even

though multiple respondents—including Hai Hien—identified their veneers as face and back veneers, the characteristics of those veneers demonstrated that they were likely to be core veneers.  IDM at 79, 92-93; Preliminary AFA Memo at 12-13 (C.R. 412).

STR plaintiffs also argue that Commerce should not have relied on data from a previous proceeding, and that it ignored certain evidence that showed that face veneers could be of similar thickness to Hai Hien's.  STR Plaintiffs' Tranche II Br. at 28.  These arguments lack merit. Commerce placed the data from the previous proceeding on the record, so could rely on it in this proceeding.  *See* Govt. Tranche I Br. at 24-25.  And Commerce did not, as STR plaintiffs claim, ignore the potentially contradictory evidence; rather, it explained that the evidence did not indicate whether the plywood with similarly thick veneers was even imported from Vietnam. IDM at 79-80.

Finally, STR plaintiffs complain that Commerce failed to notify Hai Hien of the deficiency and improperly rejected Hai Hien's attempts to submit post-preliminary factual information to address its use of poplar veneer as face veneer.  *See* STR Plaintiffs' Tranche II Br. at 27.  As demonstrated above, Commerce's repeated requests for the same information constituted sufficient notice to Hai Hien of its deficiency.[14]  And, as discussed in detail in our Tranche I brief, Commerce appropriately rejected post-preliminary NFI, as those factual submissions purported to address parties' ***pre-preliminary*** failures to provide adequate responses to Commerce's questionnaires.  *See* Govt. Tranche I Br. at 38-51.  The fact remains that Hai Hien provided inaccurate and inconsistent information in response to Commerce's repeated

---

[14]  Again, in addition to the two more broadly applicable supplemental questionnaires, Commerce issued a company-specific supplemental questionnaire to Hai Hien, in which it notified Hai Hien of deficiencies regarding its shareholder affiliation and the species of veneer. Hai Hien Supp. Questionnaire (C.R. 237).

requests for information, both with regard to its Chinese affiliates and the type of veneers used in its hardwood plywood; these issues undermined the accuracy of its reported information and rendered its information unreliable.  *See* IDM at 94.  Commerce thus appropriately applied AFA to Hai Hien.

       7.    <u>Groll Ply</u>

Commerce found multiple inconsistencies and inaccuracies in Groll Ply's questionnaire responses.  Specifically, Commerce found that: (1) Groll Ply failed to disclose its affiliation with a Chinese producer or exporter of plywood or plywood inputs; (2) the Vietnamese government's import data contradicted Groll Ply's reporting of its Chinese inputs under certain HTS subheadings; and (3) Groll Ply reported its poplar veneers as face veneers, even though record evidence established that the characteristics of the veneers were indicative of core veneers.  IDM at 91-92.  The information Commerce requested was essential to determine Groll Ply's inputs, purchasing behavior, affiliates, and production of plywood.  Groll Ply did not put forth maximum effort in complying with Commerce's requests; accordingly, Commerce reasonably determined to apply AFA.

       a.    <u>Background Facts Relevant To Groll Ply</u>

In response to Commerce's initial question regarding Chinese affiliates, Groll Ply stated that it was "not affiliated with any producer or exporters of plywood or plywood inputs in China."  Groll Ply Initial Questionnaire Resp. at 9 (Question 8) (P.R. 120) (C.R. 133).  Groll Ply repeated this point in its first and second supplemental questionnaire responses.  Groll Ply Supp. Questionnaire Resp. at 2-3 (P.R. 238) (C.R. 221), Groll Ply 2nd Supp. Questionnaire Resp. at 12 (Question 3) (C.R. 387).  Documentation regarding Groll Ply's first shipment to the United States, however, identified an affiliate of Groll Ply's as a seller of plywood inputs from China.

Preliminary AFA Memo at 11 (C.R. 412) (citing Groll Ply Supp. Questionnaire Resp. at Exh. 2 (C.R. 221), 2nd Supp. Questionnaire Resp. at Exh. 2 (C.R. 387). Accordingly, Commerce determined that Groll Ply had failed to disclose its Chinese affiliate. IDM at 91.

Commerce requested that respondents provide "an exhaustive list of all tariff schedule subheadings of products affiliates of your company exported from China to Vietnam under subheadings 4408 and 4412." 2nd Supp. Questionnaire (P.R. 257). In its response, Groll Ply indicated that all of its imports from China were under HTS subheadheading ██ and only in the years ███████. Preliminary AFA Memo at 11 (C.R. 412) (citing Groll Ply 2nd Supp. Questionnaire Resp. at Exh. 1 (C.R. 387)). However, the Vietnamese government's import data demonstrated that Groll Ply had a significant number of entries from China in ███, which including a significant number of entries under HTS subheading ███. *Id.* (citing GOV Import Data (C.R. 364-365). Commerce found this discrepancy particularly notable because Groll Ply had reported that it was incorporated in April 2019, while the import data indicated that Groll Ply had ██ entries under HTS headings ███████ prior to that date. *See* Groll Ply Supp. Questionnaire Resp. at 5 (P.R. 238) (C.R. 221), Preliminary AFA Memo at 11 (C.R. 412) (citing GOV Import Data (C.R. 364-365). Commerce thus determined that Groll Ply failed to comply with Commerce's requests for information. IDM at 92.

In addition, Groll Ply reported that it "consumed individual veneer core platforms, and core veneers that were domestically sourced in Vietnam to produce core platforms," and that the veneers it consumed to produce plywood were of the ███ species. Groll Ply Initial Questionnaire Resp. at Exh. 1 (C.R. 134), Groll Ply Supp. Questionnaire Resp. at 2 (C.R. 221). However, the Vietnamese government's submission indicated that Groll Ply actually purchased plywood inputs with characteristics of core veneers from Chinese suppliers. Preliminary AFA

Memo at 11-12 (citing GOV Supp. Questionnaire Resp. at Exh. 5 (C.R. 371-372, 378). Because Groll Ply had not expressed that it purchased these inputs, or Groll Ply report suppliers of such inputs, Commerce determined that Groll Ply had failed to comply with Commerce's requests. As a result of Groll Ply's multiple omissions and discrepancies, Commerce found that Groll Ply withheld and failed to report requested information; accordingly, Commerce applied AFA to Groll Ply.

> b.    Commerce's AFA Determination Was Lawful And Supported By The Record

Substantial evidence supports Commerce's finding that Groll Ply withheld information from Commerce and failed to report information about affiliated Chinese plywood input suppliers, core veneer imports from China, and the suppliers of those imports. IDM at 91-92. First, Groll Ply failed disclose its affiliation with a Chinese company that is a producer or exporter of plywood or plywood products from China, but instead repeatedly stated that it was not affiliated with any producers or exporters of plywood or plywood inputs in China, despite its own record evidence indicating otherwise. IDM at 91, Preliminary AFA Memo at 11 (citing Groll Ply Supp. Questionnaire Resp. at Exh. 2 (C.R. 221), 2nd Supp. Questionnaire Resp. at Exh. 2 (C.R. 387).

STR plaintiffs claim that Groll Ply's exhibit showing its relationship with a Chinese affiliate constitutes a correction of its earlier response, rather than a discrepancy. *See* STR Plaintiffs' Tranche II Br. at 34. However, unexplained changes cannot reasonably be considered a "correction." IDM at 91; *see also China Steel Corp. v. United States*, 393 F. Supp. 3d 1322, 1337, 1342 (Ct. Int'l Trade 2019). It strains credulity to suggest that an unexplained exhibit could suffice a "correction" to Groll Ply's repeated denials of Groll's relationship with a Chinese plywood input exporter, particularly given that Groll Ply did not explain in its submission that

the exhibit served to correct information from earlier filings, only making that argument after Commerce preliminarily applied AFA. Nothing on the record indicates, which, if any, of Groll Ply's certified responses contain the "correct" response to Commerce's questions about Chinese affiliates. Accordingly, Commerce correctly found that Groll Ply withheld information regarding its affiliates. IDM at 91.

Commerce also appropriately found that Groll Ply failed to provide a complete list of products imported from China, and thereby failed to comply with Commerce's requests for information. IDM at 91-92. The import data from the Vietnamese government squarely contradicted Groll Ply's representations both with regard to the HTS subheadings it imported under and the years in which it imported. Preliminary AFA Memo at 11 (citing Groll Ply 2nd Supp. Questionnaire Resp. at Exh. 1 (C.R. 387), GOV Import Data (C.R. 364-365)). This clear discrepancy warranted the application of AFA, particularly given that Groll Ply had reported that it was incorporated in April 2019, while the import data indicated that Groll Ply had █ entries under HTS headings ██████████ prior to that date. *See* Groll Ply Supp. Questionnaire Resp. at 5 (P.R. 238) (C.R. 221), Preliminary AFA Memo at 1 (citing GOV Import Data (C.R. 364-365)). Finally, Groll Ply's reporting of core veneer was contradicted by record data from the Vietnamese government. Preliminary AFA Memo at 11-12 (citing GOV Supp. Questionnaire Resp. at Exh. 5 (C.R. 371-372, 378).

Notably, Groll Ply does not contest the substance of Commerce's findings with regard to the HTS subheadings or the characteristics of its veneer. Rather, it argues only that it cooperated in the proceeding, and that Commerce was obligated to issue a supplemental questionnaire to request clarification or correction. *See* STR Plaintiffs' Tranche II Br. at 34-35. Commerce provided Groll Ply with multiple opportunities to provide information regarding plywood

products imported from China.  IDM at 92 (citing Initial Questionnaire (P.R. 62), Supp.

Questionnaire (P.R. 154), 2nd Supp. Questionnaire (P.R. 257)).  Groll Ply consistently failed to

provide the requested information.  IDM at 91-92.  Notwithstanding practicality concerns, given

the discrepancies woven throughout Groll Ply's questionnaire responses, it was reasonable for

Commerce to expect that issuing another supplemental questionnaire would not resolve the

discrepancies.  *See Reiner Brach*, 206 F. Supp. 2d at 1337.

Groll Ply's submissions were rife with inconsistencies, both internally and with the

Vietnamese government's record evidence, and it did not correct or clarify such inconsistencies,

even in the face of Commerce's repeated requests for information and the Vietnamese

government's submissions.  Accordingly, Commerce reasonably applied AFA.

## 8.   Govina

Commerce determined, based on discrepancies in Govina's source reporting, that

Govina's questionnaire responses were unreliable, and that Govina had not acted to the best of its

ability.  IDM at 77, 88-89.  Specifically, Commerce found that Govina had failed to report that it

sourced plywood inputs from Vietnamese resellers and that it did not provide requested customs

declaration for its own Chinese imports.  *Id*.  This determination was based on substantial

evidence and in accordance with law.

### a.   Background Facts Relevant To Govina

In its initial questionnaire response, Govina reported that it did not source any plywood

inputs from resellers in Vietnam.  Govina Questionnaire Resp. (P.R. 95, C.R. 47-48).  However,

in its second supplemental questionnaire response, Govina reported that it ***had*** actually

purchased plywood inputs from Vietnamese resellers, including inputs manufactured in China.

Govina 2nd Supp. Questionnaire Resp. (P.R. 343, C.R. 355-358).  Govina did not explain the

discrepancy between its responses, and the record did not indicate which response contained the accurate information. IDM at 88, Preliminary AFA Memo at 8-9. Accordingly, Commerce found that Govina's responses contained a significant discrepancy concerning its sourcing. IDM at 88.

While Govina claimed that it could not provide requested sample entry documentation for the Chinese-origin plywood inputs it purchased from Vietnamese resellers because its Vietnamese supplier was unable to obtain documentation from the importer of record, it did not even provide the requested customs declarations for its own Chinese imports, even though that documentation would have been readily available to it. Preliminary AFA Memo at 9, IDM at 88. Therefore, Commerce could not confirm Govina's claim as to the HTS subheading[15] for its inputs from China. Accordingly, Commerce determined that Govina's questionnaire responses were unreliable, and that Govina had not acted to the best of its ability, meriting the application of AFA. IDM at 77, 89.

> b.    Commerce's AFA Determination Was Lawful And Supported By The Record

Substantial evidence supports Commerce's finding that Govina's submissions were unreliable because they contained discrepancies regarding the sourcing of plywood inputs and because Govina had failed to provide requested customs declaration for its own Chinese imports, even though it should have been able to do so. As with Groll Ply, STR plaintiffs claim that Govina's second supplemental questionnaire response was a correction to its initial questionnaire response, rather than a discrepancy. *See* STR Plaintiffs' Tranche II Br. at 31-32. But, as

---

[15] Commerce also found that the HTS subheading was not valid, according to the official tariff schedule submitted by the Vietnamese government. Preliminary AFA Memo at 9 (C.R. 412).

Commerce explained, Govina's second supplemental questionnaire response should not be construed as a correction because Govina failed to identify any previous error or otherwise explain that it was correcting its information, only stating *post hoc* that the second supplemental responses was a correction.  IDM at 77, 88.  Accordingly, Commerce could not determine which of the contradictory information it should rely on, and, because Govina's responses contained significant unexplained changes rendering its information unreliable, Commerce determined to apply AFA.  IDM at 77.

Contrary to STR plaintiffs' claims, Commerce was not obligated to issue Govina an additional supplemental questionnaire regarding its sourcing and customs declarations.  *See e.g., New Mexico Garlic Growers*, 352 F. Supp. 3d at 1295 ("{T}the agency provided QTF two opportunities to provide accurate affiliation information, and QTF failed to do so. Commerce was not required to provide additional supplemental questionnaires seeking the same information."); *Essar Steel*, 678 F.3d at 1276 ("{i}t is {the respondent's} burden to create an accurate record during Commerce's investigation … {t}o allow constant reopening supplementation of the record would lead to inefficiency and delay in finality.").  As Commerce explained, it "cannot be expected to know why a respondent is modifying its answers and is not required to perpetually supplement a respondent when its supplemental questionnaire response introduce contradictory information."  IDM at 78.

Commerce also acted within its discretion in following its own regulations and not allowing Govina to submit untimely NFI in response to petitioner's comments, in which petitioner identified deficiencies in Govina's submissions.  *See* STR Plaintiffs' Tranche I Br. at 32 (citing Petitioner Comments on 2nd Supp. Questionnaire Resp. (P.R. 357, C.R. 380)), Govt. Tranche I Br. at 38-51.  Respondents had seven days after petitioner's comments to either submit

a rebuttal, or request an extension of the deadline to submit a rebuttal.  *See* 19 C.F.R.

§ 351.301(c)(1)(v).  Govina waited approximately one month after petitioner's comments before

it sought leave to submit NFI in response to the comments—well beyond the regulatory deadline.

Govina Request for Leave to Submit NFI (P.R. 379).  Commerce thus lawfully rejected the

request.

Finally, STR plaintiffs argue that, while Govina did not submit the customs declaration

for its Chinese imports, it still complied with Commerce's requests by providing certain entry

documentation (*i.e.*, invoices, packing lists, bills of lading.).  *See* STR Plaintiffs' Tranche II Br.

at 33.  But Commerce explicitly requested that parties provide ***customs declarations*** for the first

entry of plywood products into Vietnam under each subheading.  2nd Supp. Questionnaire (P.R.

257).  After withholding critical sourcing information, Govina failed to provide another piece of

requested information that was important to Commerce's ability to confirm the reliability of

Govina's responses, despite having the ability to do so.  IDM at 88-89.  Govina's submissions

had significant discrepancies and omissions; moreover, Govina failed to make clear whether its

inconsistent information constituted a correction and did not deny that it could have provided

customs declarations for its own imports; as such, Govina did not act to the best of its ability and

Commerce was justified in applying AFA.

### 9. Innovgreen

Innovgreen provided contradictory responses regarding the species of veneers it used in

producing plywood, and, similar to Hai Hien, characterized its veneers as face veneers even

though the characteristics of the veneers aligned with those of core veneers.  IDM at 97-98.

Contrary to Innovgreen's claims, Commerce appropriately determined not to construe

Innovgreen's later submission ██████████████ species of veneers as a correction or

clarification, and explained why the record supported a finding that Innovgreen did not correctly characterize its veneers as face veneers.  *Id.* at 77, 79-80, 97-98.  Accordingly, this Court should sustain Commerce's determination with regard to Innovgreen.

a.    Background Facts Relevant To Innovgreen

In its initial Q&V questionnaire response, Innovgreen stated that it used ▮▮▮ species of veneers to produce its plywood.  Preliminary AFA Memo at 17 (C.R. 412) (citing Innovgreen Questionnaire Response at Exh. 1 (P.R. 121) (C.R. 135)).   However, in its second supplemental questionnaire response, Innovgreen reported that it imported several different species of veneer sheets from China that it had not previously disclosed as species of veneer used in producing plywood.  Innovgreen 2nd Supp. Questionnaire Resp. (P.R. 334) (C.R. 339-341).  Additionally, while Innovgreen declared its veneers under the HTS subheading encompassing face veneers, the ▮▮▮▮ veneers it imported were much thicker than the face veneers of other species used as face veneers by Innovgreen.  Preliminary AFA Memo at 17 (citing Innovgreen 2nd Supp. Questionnaire Resp. at Exh. 2 (P.R. 121) (C.R. 135)).  Commerce also found that Innovgreen's veneer imports were of a thickness consistent with core veneers, rather than face veneers. Preliminary AFA Memo at 17 (citing Relevant Documents Memo at Exh. SQ3-24 (C.R. 399)); IDM at 79-80, 97-98.  Commerce relied on ITC data, as well data collected in previous examinations of Chinese producers, to support its finding that Innovgreen's veneers were more typical of core veneers than face veneers.  IDM at 79-80 (citing Relevant Documents Memo at Exhs. 14, 25 (C.R. 399).

b.    Commerce's AFA Determination Was Lawful And Supported By The Record

Substantial evidence supports Commerce's determinations that Innovgreen's responses contained significant discrepancies regarding the species of wood used by Innovgreen and that

Innovgreen failed to accurately report its types of veneers.  STR plaintiffs repeat the same

arguments raised with regard to other respondents—namely that the species information in

Innovgreen's second supplemental response was a correction rather than a discrepancy, that

Commerce did not support its finding regarding veneer thickness with substantial evidence, and

that Commerce should have given it another opportunity to remedy[16] the deficiency.  *See* STR

Plaintiffs' Tranche II Br. at 20-24.  As already discussed, where a respondent does not inform

Commerce that is correcting earlier information (except as a *post hoc* matter), Commerce cannot

ascertain which of the respondent's conflicting responses is correct.  IDM at 76-78.  As such,

Commerce reasonably declined to construe Innovgreen's later response as a correction.

Moreover, as established above, Commerce's repeated requests for information, particularly in

conjunction with inconsistent data from the Vietnamese government and allegations of

deficiency by petitioner, constitute sufficient notice pursuant to 19 U.S.C. § 1677m(d).

STR plaintiffs also claim that Innovgreen's "second supplemental response could have

been verified as is{,}" such that Commerce should not have deemed it unreliable and

inconsistent.  *See* STR Plaintiffs' Tranche II Br. at 22.  But because Innovgreen failed to identify

its later response as a correction or explain the errors in its earlier response, Commerce could not

determine how alleged errors were introduced in Innovgreen's earlier responses to begin with,

and whether errors were still present in the later response.  IDM at 77.  Put another way,

Commerce cannot verify information when a company provides two different answers to the

same question, without any explanation.  *See Linyi Chengen*, 391 F. Supp. at 1299 ("Because

---

[16]  STR plaintiffs also claim that Commerce had over a year to request clarification, but, as discussed above, the time between the deadline for final questionnaire responses and the preliminary determination was necessary for Commerce to review the voluminous record and conduct complex analysis on multiple issues.  It would not have been practicable to issue an additional questionnaire.

Commerce did not rely upon Bayley's questionnaires, it did not need to verify them."). To the extent Innovgreen implies that Commerce was obligated to investigate its own data through verification, it is incorrect. Commerce must do so only if all five criteria set forth by 19 U.S.C. § 1677m(e) are met. Innovgreen has not established that all the criteria in section 1677m(e) were met; accordingly, Commerce was not required to address whether the unreliable questionnaire responses were verifiable. IDM at 143.

STR plaintiffs argue that Innovgreen's inconsistent reporting of wood species between its initial and second supplemental questionnaires was immaterial to Commerce's circumvention analysis.[17] STR Plaintiffs' Tranche II Br. at 22. As an initial matter, inaccurate statements placed on the record and certified as accurate are always a concern to Commerce and cannot be dismissed out of hand as "immaterial." IDM at 139. This is particularly so when Commerce establishes a certification program after an affirmative circumvention determination, as a respondent must be familiar with its records, and deemed to be reliable and cooperative. *Id.* It is Commerce, not the respondent, that determines whether information is relevant to its analysis. *See, e.g., Ferrostaal Metals Gmbh v. United States,* 518 F. Supp. 3d 1357, 1376 (Ct. Int'l Trade 2021) ("It is well established that it is Commerce, not the respondent, that determines what information is to be provided") (citations omitted); *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1299 (Ct. Int'l Trade 2010) ("Regardless of whether {the respondent} deemed the license information relevant, it nonetheless should have produced it in the event that Commerce reached a different conclusion.").

---

[17] They also argue, in a similar vein, that Innovgreen's deficiencies were not pervasive enough to warrant AFA. STR Plaintiffs' Tranche II Br. at 21.

In addition, the very fact that Commerce requested the information means Commerce considers that information necessary to its determination of whether a company shipped inquiry merchandise to the United States. IDM at 39. The focus of the inquiries was whether Vietnamese companies imported Chinese veneers, to use in the production of their hardwood plywood. *Id*. As part of its analysis, Commerce must consider "the pattern of trade, including sourcing patterns." 19 U.S.C. § 1677j(b)(3). Therefore, information regarding the sourcing of veneers is integral to Commerce's ability to perform its statutory duties. IDM at 39. Origin information is essential because Commerce must determine whether the veneers were from China. *Id*. And species information is significant because certain species are native or more prominent in China. *Id*. Far from immaterial, the information requested by Commerce was central to its inquiries, and Commerce's concerns about the reliability and accuracy of Innovgreen merited its application of facts available.

Finally, with regard to the misreporting of core veneers as face veneers, STR plaintiffs contend that Commerce erred in comparing Innovgreen's veneers to veneers imported by another respondent without discussing how the other respondent's data was comparable to Innovgreen's. *See* STR Plaintiffs' Tranche II Br. at 23. But Commerce ***did*** undertake such an analysis. Preliminary AFA Memo at 17. It compared the sizes between the two respondents' veneers and explained that the size of the core veneers imported by the other respondent was of a similar thickness to the veneers Innovegreen reported as face veneers. *Id*. STR plaintiffs also claim that Commerce ignored evidence in the ITC data table showing that around 37 to 39.9 percent of hardwood plywood imported into the United States from non-subject countries have face veneers of a similar thickness to Innovgreen's. STR Plaintiffs' Tranche II Br. at 23. However, as Commerce explained, Vietnam was not identified in the referenced data. IDM at 79. STR

plaintiffs allege that data on thickness of face veneers is applicable regardless of country of origin, but they provide no support for this assertion. Plaintiffs' unsupported contentions constitute an insufficient basis to set aside Commerce's determination, which is supported by substantial evidence, in the form of the ITC data and data from an earlier review.

STR plaintiffs attempt to undermine Commerce's reliance on information placed on the record by petitioner indicating "that the value of Vietnam's hardwood plywood exports increased from 63.8 million USD in 2017 to 309.3 million USD in 2019, a 384 increase, which is a trajectory that suggests even more massive growth for the remainder of the inquiry period." STR Plaintiffs' Tranche II Br. at 23-24 (citing Petitioner Request for Scope/Circumvention Inquiry (P.R. 19) (C.R. 5)), IDM at 80. Commerce acknowledged that it could not speculate as to what changes may have occurred in an industry that has undergone such transformation, but also explained that it could not ignore evidence that Vietnamese production closely resembles Chinese production with regard to the thickness of veneers. IDM at 80 (citing Fulin Wood Verification Exhibits at 211-12 (C.R. 503), Woodsland Tuyen Verification Exhibit at 189 (C.R. 469)). Commerce also observed that no party cited record evidence demonstrating that face veneers are produced and consumed in the same thickness as core veneers. IDM at 80. Based on the totality of the evidence, Commerce found that veneers of a certain thickness should be characterized as core veneers in these inquiries. *See Jinan Yipin Corp. v. United States*, 971 F. Supp. 2d 1296, 1314 (Ct. Int'l Trade 2014) ("The evidence that the {respondents'} cite is neither so clear nor so strong as to require Commerce to reach a result other than that which the agency reached..."). Commerce determined, based on substantial evidence, that Innovgreen's submissions were unreliable, and also found that Innovgreen did not act to the best of its ability. IDM at 77, 97. Accordingly, application of AFA was warranted as to Innovgreen.

10.    Her Hui

a.    Background Facts Relevant To Her Hui

In its initial questionnaire response, Her Hui reported ██████ species of wood it used in producing plywood.  Her Hui Initial Questionnaire Resp. at Exh. 1 (P.R. 99, C.R. 55).  However, in its supplemental questionnaire response, Her Hui submitted purchase documentation that reflected purchases of plywood produced using certain wood species not listed in its initial questionnaire response.  Her Hui Supp. Questionnaire Resp. (C.R. 188-189).  While Her Hui claimed that it did not know it could add more rows to the sample spreadsheet Commerce included in its initial questionnaire, Commerce rejected the argument, explaining that the request clearly instructs respondents to report an exhaustive list of wood species and observing that Her Hui did not request clarification from Commerce on how to report its full information if it believed it could not add more rows to the spreadsheet.  IDM at 94.  Commerce determined that Her Hui's failure to report called into question the accuracy of its information and that Her Hui did not cooperate to the best of its ability.  *Id.*, Preliminary AFA Memo at 13.

Commerce also instructed respondents to report an "exhaustive list of all tariff schedule subheadings of products your company imported from China under {HTS} subheadings 4408 and 4412." 2nd Supp. Questionnaire (P.R. 257).  Her Hui responded that it did not import plywood or plywood inputs from China during the inquiry period, claiming that all of its plywood inputs were imported from Malaysia or Indonesia.  Her Hui 2nd Questionnaire Resp. (P.R. 292).  The Vietnamese government's import data, however, indicated that Her Hui did have shipments from China under relevant HTS subheadings during the inquiry period.  Preliminary AFA Memo at 14 (citing GOV Import Data at Exh. 2 (C.R. 364-365)).  Commerce thus found that Her Hui had failed to report its own imports.  IDM at 94-95.

71

Commerce also made clear that its request to report an exhaustive list of products companies' affiliates imported under HTS subheadings 4408 and 4412 applied to **all** affiliates, regardless of the affiliate's location.  2nd Suppl. Clarification (P.R. 272).  Despite this clarification, Her Hui stated that it "did not have any **Chinese** affiliates that exported plywood or plywood inputs from China to Vietnam" during the inquiry period (emphasis added).  Her Hui 2nd Supp. Questionnaire Resp. at 2 (P.R. 292).  Commerce thus determined Her Hui's submissions not to be fully responsive to Commerce's request, which sought information regarding affiliates regardless of their geographic location.  Preliminary AFA Memo at 14.  Commerce found that Her Hui's failure to report its own imports, and those of its affiliates, called into question the credibility of its submissions and prevented Commerce from examining imports from China to Vietnam to confirm whether they had inputs used to produce inquiry merchandise.  IDM at 95.  Commerce found that Her Hui did not provide accurate information, impeded the proceeding, and did not cooperate to the best of its ability, thereby warranting the application of AFA.  *Id*. at 94-95.

> b.    Commerce's AFA Determination Was Lawful And Supported By The Record

Substantial evidence supports Commerce's findings that Her Hui inconsistently reported its wood species and failed to report its own wood imports, and those of its affiliates.  DH plaintiffs' arguments challenges to Commerce's AFA determination are unpersuasive.[18]  First, plaintiffs contend that Commerce failed to consider Her Hui's explanation regarding its failure to fully report its wood species in its initial response and its argument as to the immateriality of wood species.

---

[18]  In addition to the arguments discussed in this section, DH plaintiffs also argue that Commerce had many months before the preliminary determination to provide it with notice and opportunity to cure the wood species deficiency.  *See* DH Plaintiffs' Tranche II Br. at 59-60.  As explained above, Commerce complied with statutory notice requirements and was not required to issue a supplemental questionnaire, nor would it have been practicable to do so.

*See* DH Plaintiffs' Tranche II Br. at 59-60. This is not correct. In its final determination, Commerce acknowledged Her Hui's claim that it did not know it could add rows to the sample spreadsheet, but pointed out that Commerce had issued clear instructions to report "an exhaustive list of the species of wood{,}" and that these instructions did not limit parties to the five rows in the sample spreadsheet. IDM at 94.

Commerce's questionnaire also directed respondents to contact Commerce if they had questions about the spreadsheet or questionnaire. Initial Questionnaire at 2 (P.R. 62). Had Her Hui been confused as to how to provide a full list within the spreadsheet, it should have sought clarification. Commerce appropriately found that its failure to do so demonstrated a failure to cooperate to the best of its ability. IDM at 94. Commerce also considered respondents' arguments regarding materiality, explaining why the information it sought was necessary to its determination. IDM at 139. Commerce explained that Her Hui's failures prevented Commerce from examining Her Hui's Chinese imports to confirm whether those imports had inputs that could be used to produce inquiry merchandise, and observed that accurate reporting of all inputs and supply chain activities is necessary to make a negative determination of circumvention with confidence. IDM at 95.

DH plaintiffs claim that Commerce improperly rejected Her Hui's post-preliminary explanation of its inconsistences. DH Plaintiffs' Tranche II Br. at 59. First, Commerce, while it rejected Her Hui's submission, did address the substance of the submission in its final determination. IDM at 94. Thus, any claimed procedural error would be harmless. Second, as we have explained, Commerce appropriately rejected parties' post-preliminary factual submissions. IDM at 59, Govt. Tranche I Br. at 38-51. Her Hui provided inaccurate and inconsistent information in response to Commerce's repeated requests for information; Commerce was not

required to allow Her Hui another opportunity—after the preliminary determination—to submit NFI and *post hoc* explanation.

DH plaintiffs allege that, in its supplemental questionnaire response, Her Hui revised its wood species chart to delete species that were unintentionally duplicated in its previous submission, explaining the revision in its narrative response.  *See* DH Plaintiffs' Tranche II Br. at 60.  Her Hui stated:

> Please also note that the company incorrectly reported in the original Q&V response that it purchased core veneers based on a misunderstanding of the terminology.  Please see Exhibit 3 for a signed certification form the company confirming that it does not purchase core veneers, and a corrected Attachment II-C.

Her Hui Supp. Questionnaire Resp. at 2 (P.R. 211).  But this explanation fails to reconcile the fact that Her Hui submitted purchase documentation for certain wood species with its failure to report an exhaustive list in its initial questionnaire response.

DH plaintiffs argue that Commerce also failed to consider Her Hui's explanation regarding its failure to report its own wood imports from China and the imports of its affiliates, claiming that there was a miscommunication with Her Hui's previous legal counsel such that Her Hui assumed that the meaning of "plywood inputs" was limited to core/veneers/veneered panels/veneer core platforms.  DH Plaintiffs' Tranche II Br. at 61.  Again, Her Hui could have, and should have, contacted Commerce if it was confused about the nature of the request, which clearly required respondents to list all of its imports from China under certain HTS subheadings, as well as all of its affiliates' imports from China under the same subheadings.  IDM at 94.

But as mentioned above, Her Hui could have contacted Commerce to seek clarification on how to report its information, but it chose not to do so.  IDM at 94.  Moreover, Commerce included language within its questionnaire indicating that "{s}hould {the respondent} have any

questions about this matter" it may contact Commerce officials.  *See* Commerce Initial

Questionnaire at 2 (P.R. 62).  However, Her Hui did not seek clarification.  Her Hui also failed to

seek clarification on its purported misunderstanding of Commerce's request for information

regarding imports from all of its affiliates under certain HTS subheadings.  DH Tranche II Br. at

63.  Given that record evidence provided by the government of Vietnam directly contradicted

Her Hui's claims that it did not have shipments from China and that Her Hui was unresponsive

to Commerce's requests for import information from its affiliates, it was reasonable for

Commerce to determine that Her Hui failed to fully report its Chinese wood imports and wood

imports from its affiliates.

Given Her Hui's failure to comply with Commerce's instructions to provide an

exhaustive list of wood species, its failure to request clarification from Commerce, record

evidence directly contradicting Her Hui's claims that it did not have shipments from China, and

its unresponsiveness as to its affiliate import information, Commerce reasonably determined that

Her Hui failed to provide accurate information, impeded the proceeding, and failed to cooperate

to the best of its ability.  Accordingly, Commerce was justified in its application of AFA.

11.   Long Luu

a.   Background Facts Relevant To Long Luu

In its initial questionnaire response, Long Luu reported that it did not source any plywood

inputs from resellers in Vietnam.  Long Luu Initial Questionnaire Resp. (P.R. 84, C.R. 31).

However, in its second supplemental questionnaire response, Long Luu reported that it had

purchased plywood inputs, including those manufactured in China, from Vietnamese resellers.

Long Luu 2nd Questionnaire Resp. (P.R. 342) (C.R. 352-354).  In this submission, Long Luu did

not explain the discrepancies with its earlier response, or otherwise notify Commerce it was

correcting a deficiency. Commerce determined that Long Luu's responses contained significant discrepancies regarding the sourcing of its plywood inputs. IDM at 99.

Also in its initial questionnaire response, Long Luu identified multiple wood species used in its hardwood plywood. Long Luu Initial Questionnaire Resp. at Exh. 1 (C.R. 31). But in its second supplemental questionnaire response, Long Luu reported that it imported ████ veneer from China—a species not part of its initial response. Long Luu 2nd Questionnaire Resp. at Exh. 1 (C.R. 352). Based on this inconsistent reporting, Commerce determined that Long Luu failed to accurately report information about its plywood inputs and provide all requested information. IDM at 100.

Commerce also found that Long Luu failed to accurately disclose all imports of core veneers, instead characterizing its ████ veneers as face veneers. *Id.* In addition to noting the difference in thickness between face and core veneers, Commerce explained that, while Long Luu claimed that it used its ████ veneers as ████, it did not provide any documentation to that effect. Preliminary AFA Memo at 18 (citing Long Luu 2nd Questionnaire Resp. (C.R. 352)).

Finally, in response to Commerce's request for sample purchase documentation for the first entry of Chinese-origin plywood inputs under each HTS subheading, Long Luu provided only the Value Added Tax invoice from the purchase between itself and its Vietnamese reseller. Preliminary AFA Memo at 18 (citing Long Luu 2nd Supp. Questionnaire Resp. at Exh. 5). Long Luu failed to provide the other documentation requested by Commerce, such as the bill of lading, packing list, and customs declaration. *Id.* Taking into account Long Luu's failures, Commerce found Long Luu's submissions to be wholly unreliable, and determined to apply AFA.

b.    Commerce's AFA Determination Was Lawful And Supported By
The Record

Substantial evidence supports Commerce's findings that Long Luu failed to report that it sourced plywood inputs from Vietnamese resellers, failed to accurately report its wood species, failed to provide source documentation for its Chinese-origin plywood inputs, and mischaracterized its veneer imports.  DH plaintiffs largely avoid the substance of Commerce's determinations, instead purporting to raise procedural and materiality concerns.

DH plaintiffs contend that Commerce erred in determining that Long Luu's second supplemental questionnaire response, in which it stated—contrary to its initial questionnaire response—that it did source inputs from suppliers in Vietnam, could not serve as a correction to its initial response, particularly given that it was a first-time respondent.  *See* DH Plaintiffs' Tranche II Br. at 65-66.  Aside from failing to explain that it was correcting a discrepancy, Long Luu never once requested clarification from Commerce regarding its purported confusion as to "the meaning of the various questions and terminology." *Id.* at 65.  Simply being a first-time respondent does not excuse Long Luu's failure to either request clarification or identify when it was making a correction.  As Commerce stated, "{t}he mere failure of a respondent to furnish requested information—for any reason—requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination."  *See* IDM at 100 (citing *Nippon Steel*, 337 F.3d at 1381.).

DH plaintiffs claim that, because Long Luu eventually reported accurate information, there is now no gap in the record.  DH Plaintiffs' Tranche II Br. at 66-67.  But because Long Luu failed to identify the error in its original submission or explain how it was fixed in the supplemental response, Commerce could not determine which information was correct, and therefore reasonably found discrepancies on the record—*i.e.*, a gap warranting the application of

facts available.  Long Luu's *post hoc* explanations as to which information is accurate do not detract from Commerce's finding.

DH plaintiffs also argue that Long Luu was not aware, at the time of its initial response, that its Vietnamese suppliers were resellers.  *See* DH Plaintiffs' Tranche II Br. at 65.  Again, Long Luu failed to notify Commerce of any difficulties in providing the requested information. IDM at 136.  Moreover, as Commerce explained, Commerce can reasonably assume that the source of a respondent's hardwood plywood inputs (*i.e.*, whether Long Luu purchased hardwood plywood inputs from Vietnamese resellers, the name of those suppliers, and from where they sourced their materials), is information readily available to that respondent.  IDM at 137.  This information is normally recorded in companies' books and records; to suggest that Long Luu did not maintain this information would only provide further support for the application of AFA, as it would indicate Long Luu's inadequate record-keeping.  *See Nippon Steel*, 337 F.3d at 1382.

With respect to Long Luu's failure to identify all species of wood it used to produce plywood, DH plaintiffs claim that Long Luu misunderstood that it needed to report its imports until the end of 2020, rather than only through March 2020, and that it stated as much in a post-preliminary submission Commerce rejected.  *See* DH Plaintiffs' Tranche II Br. at 68.  But Long Luu failed to articulate this purported misunderstanding or any explanation for its inconsistency until after the preliminary determination, despite ample opportunity to do so.  IDM at 60.  Long Luu's *post hoc* efforts do not reverse the consequences of withholding information.  IDM at 58. Accurate reporting of all inputs and supply chain activities is a necessary condition to make a negative determination of circumvention with confidence.  IDM at 94.  Long Luu undermined the reliability of its information with its own inaccurate reporting, and its failure to either seek

clarification or identify its errors in a timely manner.  Its purported miscommunications with previous counsel do not relieve it of the burden to create an accurate record before Commerce.

DH plaintiffs do not dispute that Long Luu failed to provide Commerce with requested purchase documentation—*i.e.*, a bill of lading, packing list, and customs declaration, instead claiming that Commerce did not inform Long Luu of the missing information and offer it a chance to remedy the error.  *See* DH Plaintiffs' Tranche II Br. at 68-69, Preliminary AFA Memo at 18.  But, again, Commerce complied with its duty to notify Long Luu of its deficiencies by requesting the same information more than once.  Supp. Questionnaire (P.R. 154), 2nd Supp. Questionnaire (P.R. 257).

DH plaintiffs also do not dispute that Long Luu mischaracterized its core veneers as face and back veneers.  Instead, they claim that the veneers in question are only related to imports after the inquiry period and are therefore not relevant.  *See* DH Plaintiffs' Tranche II Br. at 69-70.  But Commerce considers any inaccurate record statements certified as accurate a matter of concern, and does not simply deem such actions irrelevant.  IDM at 139.  Moreover, respondents do not get to determine which information to deem relevant.  IDM at 139; *Essar Steel Ltd.*, 721 F. Supp. 2d at 1299 ("Regardless of whether {the respondent} deemed the license information relevant, it nonetheless should have produced it in the event that Commerce reached a different conclusion.").  Commerce could not determine whether it needed more information about Long Luu's veneers if it did not report its information accurately, particularly given Long Luu's inconsistencies about the period of inquiry it needed to report for.  IDM at 139.

12.  Tekcom

a.  Background Facts Relevant To Tekcom

In its initial questionnaire response, Tekcom reported that it sourced face and back

veneers from resellers in Vietnam and China.  Preliminary AFA Memo at 22 (citing Tekcom

Questionnaire Resp. at 4-5 (P.R. 117)).  In its second supplemental questionnaire, Commerce

specifically requested an "exhaustive list of all tariff schedule subheadings of products

{companies} imported from China under {HTS} subheadings 4408 and 4412."  2nd Supp.

Questionnaire (P.R. 257).  In response, Tekcom claimed that, during the inquiry period, it did not

import any products from China under the HTS subheading 4412.  Tekcom 2nd Supp.

Questionnaire Resp. at 1-2, Exh. SQ2-1 (C.R. 326-327).  The Vietnamese government's import

data, however, indicated that Tekcom in fact had ████████████████████████████████.

Preliminary AFA Memo at 22 (citing GOV Import Data (C.R. 362, C.R. 364-365)).  Tekcom

neither reported the supplier of the unreported entries as a supplier of Chinese plywood or

plywood inputs, nor provided the requested purchase and entry documentation for imports under

the subheading.  Preliminary AFA Memo at 22.  Accordingly, Commerce found that Tekcom

withheld requested information.  IDM at 101.

Commerce also found that Tekcom failed to accurately disclose its imports of core

veneers, instead classifying its poplar veneers as face and back veneers.  IDM at 101,

Preliminary AFA Memo at 22.  While Tekcom claimed that it imported veneers that were used

only as face and back veneers, and that the size description in the entry documentation supports

its position that the veneers were used as face veneers, it did not otherwise provide support for its

claim that its veneers were face and back veneers.  *Id.*  Given this, as well as the ITC data and

data from earlier administrative proceedings demonstrating that the thickness of the veneer is

more indicative of core than face or back veneers, and record information showing that at least

some of Tekcom's veneers were significantly thicker than the other veneers it claimed as face or

back veneers, Commerce determined that Tekcom had failed to accurately characterize its

imported veneers as core veneers from China.  *Id*., IDM at 101.

Finally, in its initial questionnaire response, Tekcom reported using various species of wood in producing plywood.  Preliminary AFA Memo at 22 (citing Tekcom's Questionnaire Resp. at Exh. 5 (C.R. 121)).  However, in its second supplemental questionnaire response, Tekcom reported that it imported two other species of wood not listed in its initial response.  *Id*. (citing Tekcom's 2nd Supp. Questionnaire Resp. at Exh. SQ2-1 (C.R. 326)).  Based on this inconsistent reporting, Commerce determined that Tekcom failed to identify all species of wood it used to produce the plywood it sold to the United States and that its responses contained significant discrepancies.  IDM at 102.

> b.    Commerce's AFA Determination Was Lawful And Supported By The Record

Commerce appropriately applied AFA to Tekcom, as Tekcom failed to report its imports ███████████████████████, incorrectly reported core veneers as face and back veneers, and inconsistently reported the wood species it used.  Preliminary AFA Memo at 21-22, IDM at 101-102.  The Vietnamese government's import data contradicts Tekcom's reporting of its imports, demonstrating that Tekcom had at least ███████████████████████████████████.  Preliminary AFA Memo at 21-22 (citing GOV Import Data (C.R. 362, C.R. 364-365)).  DH plaintiffs argue that Commerce erred in attributing the entries at issue to Tekcom, and that the entries should instead be attributed to a prior iteration of the company that existed during the first few months of the inquiry period.  DH Plaintiffs' Tranche II Br. at 71-72.  According to plaintiffs, because Commerce only requested the list of tariff schedule subheadings for the products of "your company," and Tekcom—rather than the earlier iteration—was the respondent receiving the request, Tekcom did not actually fail to disclose information about its imports.  *Id*. at 72.

This argument does not pass muster.  As Commerce explained in its final determination, Tekcom—in its initial questionnaire response—provided incorporation, registration, and ownership information regarding both its current and previous iterations, in answer to Commerce's request that respondents "{r}eport the date of incorporation of your company and provide documentation supporting your response."  IDM at 101 (citing Tekcom Initial Questionnaire Resp. at 2 (P.R. 117, C.R. 171).  Commerce thereby reasonably determined that Tekcom was aware that Commerce's requests for information applied to the company as it existed during the inquiry period—in both iterations—and that it was disingenuous for Tekcom to later claim that it was unaware that Commerce's requests would apply to the earlier iteration. IDM at 101.

DH plaintiffs allege that Tekcom provided the information on its earlier iteration merely "so that Commerce can be informed," and that the onus was on Commerce to specifically request information from a "defunct" company.  *See* DH Plaintiffs' Tranche II Br. at 72-73.  But "{i}ntentional obtuseness on the part of respondent does not obviate Commerce's multiple requests . . . for the relevant information."  *See Hyundai Heavy Industries, Co. Ltd. v. United States*, 332 F. Supp. 3d. 1331, 1341-42 (Ct. Int'l Trade 2018).  Plaintiffs also argue that Commerce should have issued a supplemental questionnaire to request clarification, but, as stated above, Commerce was not required to do so, given practicability concerns.

DH plaintiffs next claim that Commerce erred in finding that it mischaracterized its imported veneers as face veneers.  *See* DH Plaintiffs' Tranche II Br. at 73-74.  As already explained, Commerce's determination with regard to veneer thickness was supported by substantial evidence.  In addition to the arguments made by other parties, DH plaintiffs incorrectly allege that the ITC Report Commerce relies on indicates that "approximately 50% of

hardwood plywood from non-subject countries (thus including Vietnam) contains face veneers equal or thicker than 0.4mm," and that its veneers are much thinner than what Commerce considers the normal thickness of core veneers to be. *See* DH Plaintiffs' Tranche II Br. at 76. But, as Commerce explained, import data collected by the ITC demonstrates that almost all Chinese plywood face veneers are thinner than 0.4mm. IDM at 79, Preliminary AFA Memo at 22 (citing ITC Report (P.R. 399)). Moreover, Vietnam is not identified anywhere in the referenced table, only non-subject sources (*i.e.*, non-China sources), and there is no indication whether Vietnam was included in the majority of sources whose face veneers were thinner than 0.4 mm or other sources of face veneers that were greater than or equal to 0.6 mm. IDM at 79-80.

DH plaintiffs further argue, without record support, that the size of Tekcom's poplar veneers indicates that they were used as face veneers. DH Plaintiffs' Tranche II Br. at 74-75. Commerce reasonably rejected, as unsupported, plaintiffs' assertion that "{i}t is common knowledge in the industry and Commerce has been in many plywood plants since 2013 and knows this to be a fact for plywood production in Asia{.}" *Id.* at 75. Commerce rightfully rejected this unsupported claim below, and the Court should as well.

Finally, DH plaintiffs claim that Tekcom should not be penalized for failing to provide documentation indicating that its imported veneers were face and back veneers, because Commerce's second supplemental questionnaire only required respondents to report the actual description of the veneers imported. *See* DH Plaintiffs' Tranche II Br. at 75. Contrary to plaintiffs' assertion, Commerce specifically requested that respondents provide sample entry documentation (*i.e.*, commercial invoice, packing list, bill of lading, customs declaration) for the first entry of plywood products into Vietnam under each subheading. Commerce's 2nd Supp.

Questionnaire at 5 (P.R. 257). DH plaintiffs state that Tekcom possesses documentation—such as a bill of material—that would support its designation, *see* DH Plaintiffs' Tranche II Br. at 75, but this assertion only highlights Tekcom's abdication of its responsibility to provide this documentation to Commerce during the fact-gathering stage of the inquiries.

With respect its Tekcom's failure to accurately report its wood species, DH plaintiffs argue that Commerce erred in determining that the second supplemental questionnaire was a discrepancy rather than a correction. *See* DH Plaintiffs' Tranche II Br. at 77. This argument, of course, fails for the reasons already described, and Commerce appropriately determined that Tekcom's decision to introduce two additional wood species were significant changes introducing discrepancies to its responses. IDM at 88. Similarly, Tekcom's argument that no gap in the record existed fails for the same reasons explained with regard to Long Luu.

In sum, Commerce found, based on substantial evidence, that Tekcom's responses contained significant discrepancies, that other record information contradicted representations made by Tekcom, and that Tekcom acted disingenuously by not disclosing information regarding its earlier iteration's imports. IDM at 101-102. Commerce also found that Tekcom did not act to the best of its ability in responding to Commerce's questionnaires. As such, Commerce's application of AFA to Tekcom was warranted.

13.    Golden Bridge

Commerce's application of AFA to Golden Bridge was supported by substantial evidence and in accordance with law; Golden Bridge's responses contained errors, omissions, and inconsistencies regarding its suppliers' sourcing, imports, affiliations, and affiliates' inputs. Because Golden Bridge failed to consistently and accurately report information, Commerce

deemed Golden Bridge's submissions unreliable.  And, because Golden Bridge should have

possessed and/or known the information at issue, Commerce was justified in applying AFA.

a.    <u>Background Facts Relevant To Golden Bridge</u>

Commerce's initial questionnaire directed respondents to report whether "any of those

inputs {sourced from resellers in Vietnam} were produced in China," "any of that plywood

{sourced from resellers in Vietnam} contained inputs that were produced in China," and the

respondent was affiliated with producers or exporter of plywood or plywood inputs from China.

Initial Questionnaire (P.R. 62).  In its initial questionnaire response, Golden Bridge stated that its

affiliated Chinese companies did not sell any plywood or plywood inputs to Vietnam in any

periods and that ████████████████████████████████████████████

████████████████████████████████████████.  Golden

Bridge Initial Questionnaire Resp. at 4-5 (C.R. 104).

Commerce then issued a second supplemental questionnaire, requesting that respondents

provide "an exhaustive list of all tariff schedule subheadings of products your company imported

from China under Harmonized Tariff Schedule (HTS) subheadings 4408 and 4412," an

"exhaustive list of all tariff schedule subheadings of products your supplier imported from China

under subheadings 4408 and 4412," and "an exhaustive list of all tariff schedule subheadings of

products affiliates of your company exported from China to Vietnam under subheadings 4408

and 4412."  2nd Supplemental Questionnaire (P.R. 257).  Golden Bridge, in its response to that

questionnaire, acknowledged that ████████████████████████████████

████████████████████████████████████.  Golden Bridge 2nd Supp.

Questionnaire Resp. at 3, Exh. SQ2-2 (C.R. 323-325).  Golden Bridge also stated that, ██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████. *Id.* at 3.

The Vietnamese government's import data, however, showed that ███████ had exports

to Vietnam under HTS subheadings ████████████████, and ████████████████ had

imports from China under HTS subheadings ████████████████. GOV Import Data (C.R.

364-365), Preliminary AFA Memo at 8.  Commerce found that Golden Bridge's response was

contradicted or undermined by the import data.  IDM at 86.  Because Golden Bridge did not

notify Commerce of any difficulties in collecting information, but instead certified that its

responses were accurate, Commerce concluded that Golden Bridge had failed to accurate report

the source and content of its inputs.  *Id.* at 87.  Commerce also determined that Golden Bridge

did not report all requested information about its affiliated supplier's exports to Vietnam, finding

unpersuasive its claim that it did not have access to the affiliate's information.  *Id.* at 87.

        b.      **Commerce's AFA Determination Was Lawful And Supported By The Record**

Commerce's application of AFA to Golden Bridge was supported by substantial evidence

and in accordance with law.  Golden Bridge reported that ████████████████████████

████████████████████████████████████████████████ and ████████████

████████████████████████████████████████████████

████████████████; however, import data from the Vietnamese government contradicts

those representations, instead indicating that ███████ had exports to Vietnam under HTS

subheadings ████████████████ and ████████████████████████████████

████████████████████████. Preliminary AFA Memo at 8.  Because Golden

Bridge provided inconsistent and incorrect information, Commerce deemed its submissions

wholly unreliable, and found that it withheld requested information, did not provide the

information by the deadline, and significantly impeded the proceeding.  IDM at 86-88, 121.

Commerce also reasonably expected Golden Bridge to have access to information regarding its

suppliers and affiliations.  IDM at 137-138.

DH plaintiffs rely on *Mueller Comercial De Mexico v. United States*, 753 F.3d 1227

(Fed. Cir. 2014) and *Canadian Solar Int'l Ltd. v. United States*, 415 F. Supp. 3d 1326 (Ct. Int'l

Trade 2019), in arguing that Commerce should not have applied AFA because Golden Bridge

had no control over its unaffiliated supplier.  *See* DH Plaintiffs' Tranche II Br. at 35-36.  But

plaintiffs' reliance on these cases is misplaced.  *See* IDM at 78-79.  In those cases, Commerce

applied AFA due to the respondents' failure to compel information from unaffiliated suppliers.

In contrast, Commerce's application of AFA to Golden Bridge was due to Golden Bridge's not

being forthcoming about any difficulties obtaining information from its unaffiliated supplier, and

instead submitting incomplete and inaccurate responses regarding the inputs purchased from the

unaffiliated supplier.[19]  IDM at 86-87.  Moreover, Commerce applied AFA not only based on the

information regarding the unaffiliated supplier, but also due to inconsistencies in Golden

Bridge's reporting regarding its affiliate.  *Id.* at 87 ("Golden Bridge did not report all requested

information about its affiliated supplier's exports to Vietnam.").

Specifically, Golden Bridge stated in its initial questionnaire response that its Chinese

affiliates did not sell any plywood or plywood inputs to Vietnam.  Golden Bridge Initial

Questionnaire Resp. at 5 (C.R. 104).  However, in its second supplemental questionnaire

response, Golden Bridge stated that ███████████████████████████████████████

███████████████.  Golden Bridge 2nd Supp. Resp. at 3 (C.R. 323).  Golden Bridge also

---

[19]  In fact, Commerce expressly declined to base AFA on Golden Bridge's inability to submit customs declarations for shipments made to an unaffiliated supplier, finding that Golden Bridge demonstrated it could not reasonably have access to the documents.  IDM at 87-88.

identified only ███████████████████████████████████████████

████████████████, and not ██████████████████████████. *Id.* However,

Vietnamese import data indicated that ██████ had exports to Vietnam under HTS

subheadings █████████████ as well. GOV Import Data (C.R. 364-365).

In addition, Golden Bridge claimed that its suppliers did not source plywood from

resellers in Vietnam but produced the plywood themselves and that █████████████

█████████████████████████████████████████████████

█████████████████. Golden Bridge Initial Questionnaire Resp. at 4 (C.R. 104).

In its second supplemental response, Golden Bridge reported that, ████████████

██████████████████████████████████████████████

███████████████████████. Golden Bridge

2nd Supp. Questionnaire Resp. at 3 (C.R. 323). Golden Bridge also reported that its affiliated

supplier █████ is a plywood producer in Vietnam. Golden Bridge 1st Supp. Questionnaire

Resp. at 3 (C.R. 164). However, the Vietnamese import data indicated that, not only the

unaffiliated supplier ███████ but also the affiliated supplier ██████ had imports from China

under HTS subheadings █████████████. GOV Import Data (C.R. 364-365).

Accordingly, substantial evidence demonstrated that Golden Bridge's suppliers sourced

plywood inputs from China, and that Golden Bridge was not forthcoming about the imports of

both its unaffiliated and affiliated suppliers. IDM at 86. Commerce also explained that "Golden

Bridge did not qualify its response or notify Commerce of any difficulty in collecting

information, and it reported all of its responses as entirely accurate." *Id.* at 87. The record

clearly demonstrates that Commerce's application of AFA was predicated on multiple issues

with Golden Bridge's reporting.

DH plaintiffs next allege that Golden Bridge responded to the question asked and focused on core veneers, because it believed those to be the focus of the inquiry. *See* DH Plaintiffs' Tranche II Br. at 38. But Commerce did not restrict its questions in the manner suggested by plaintiffs. As Commerce explained, "there is no justification for not answering a question that was asked—there are only the record facts, which indicate that Commerce repeatedly requested certain information, and the respondents did not provide accurate responses." IDM at 142; *see also Hyundai Heavy*, 332 F. Supp. at 1341-42 ("Intentional obtuseness on the part of {a} respondent does not obviate Commerce's 'clear request' for the relevant information."); *Dalian Meisen*, No. 20-00109, 2023 WL 3058783, at *5 (explaining that respondents cannot answer a question that was not asked just because "Commerce didn't ask {} the question in the way {they} wanted it asked").

DH plaintiffs attempt to excuse Golden Bridge's failures regarding ███████ by asserting, that although ███████ and Golden Bridge are affiliated, they are in two separate countries and are separately incorporated. *See* DH Plaintiffs' Tranche II Br. at 38. But again, Golden Bridge reported all of its information as accurate and did not notify Commerce of any difficulty in eliciting information from its affiliate until after the preliminary determination. IDM at 87. As Commerce observed, if anything, "Golden Bridge's certification is evidence, in and of itself, that it would share and receive information with/from its affiliate." *Id*. Moreover, Commerce reasonably expected that that this information was available to Golden Bridge, given that the information requested in the questionnaires "(e.g., names of affiliates, location of suppliers, species of veneers used to produce hardwood plywood, etc.) concerned basic facts that any exporter of hardwood plywood to the United States would reasonably know." *Id.* at 136.

DH plaintiffs next argue that, because Golden Bridge did not make any purchases from

████████ after 2019, none of Golden Bridge's suspended shipments contain plywood

manufactured by ███████; according to plaintiffs, this renders Commerce's application of

AFA "highly unreasonable."  DH Plaintiffs' Tranche II Br. at 40.  But again, Commerce's

application of AFA was based on numerous factors, not just issues regarding ████████.

Moreover, Commerce found that Golden Bridge's multiple inconsistencies and inaccuracies

rendered its submissions, "on the whole, unreliable."  IDM at 88.  While Golden Bridge may

have changed its sourcing practices, such changes have no bearing on Commerce's decision

related to a different period where Golden Bridge *did* source from ███████.  Indeed, in

investigations, where the period of investigation may not contain suspended entries, an AFA

determination in the investigation based upon sales from the period of investigation is still valid

even if the only entries suspended are for the first administrative review.  *See* 19 C.F.R.

§ 351.204(b) (explaining that period of investigation for an antidumping duty investigation is the

four most recently completed fiscal quarters preceding the month the petition was filed); 19

U.S.C. § 1673b(d)(2) (beginning suspension of subject merchandise for the first review on the

date of publication of the affirmative preliminary determination Federal Register notice); 19

C.F.R. § 351.213(e)(1)(ii) (explaining that the period of the first administrative review begins on

the date of suspension).

      14.    <u>Lechenwood</u>

         a.    <u>Background Facts Relevant To Lechenwood</u>

In its initial questionnaire response, Lechenwood stated that it was not affiliated with a

producer or exporter of plywood or plywood inputs in China.  Lechenwood also submitted, as an

exhibit to this response, a business license, in which Lechenwood's owner is listed Huainan

Mengping Import and Export Co., Ltd. (Mengping).  Lechenwood Initial Questionnaire Resp.

(C.R. 144).  Commerce then issued a company-specific supplemental questionnaire to

Lechenwood, asking for additional information about Lechenwood's affiliation with Mengping.

Lechenwood Supp. Questionnaire (P.R. 161).  In Lechenwood's response to the company-

specific questionnaire, it stated that it is ███████████████████████████████

███████████████, but that ██████████ did not supply Lechenwood with any plywood or

plywood inputs.  Lechenwood Supp. Questionnaire Resp. at 2-4 (C.R. 223).

Commerce also issued second supplemental questionnaire, in which it requested

respondents submit an exhaustive list of all imports from China under HTS subheadings 4408

and 4412 from December 2016 to March 2020, as well as the descriptions of the subheadings

and associated sample purchase and customs documentation. 2nd Supp. Questionnaire (P.R.

257).  In response, Lechenwood identified ████████████████████████, but also

stated that ████████████████████████.  Lechenwood 2nd Supp.

Questionnaire Resp. at 2, Exh. 1 (C.R. 348-349).  Lechenwood also listed its imports from China

under HTS subheadings ██████████████████████, but failed to list the schedule

description for the subheadings, and did not provide customs declarations as part of its sample

entry documentation.  *Id*.

The Vietnamese government also submitted information, including import data, showing

that that ████████ was a plywood input supplier for Lechenwood during the relevant period,

and that Lechenwood also had imports under HTS subheading ██████████, despite not

reporting any such imports.  GOV Supp. Questionnaire Resp. and Import Data (C.R. 362, 364-

365), Preliminary AFA Mem at 17-18.

In its final determination, Commerce found that Lechenwood repeatedly reported conflicting and incorrect information regarding ████████ and its HTS subheadings, despite having the ability to report accurate information and Commerce's clear requests. IDM at 98-99. Accordingly, Commerce deemed Lechenwood's information unreliable. *Id.*

> b.     Commerce's AFA Determination Was Lawful And Supported By The Record

This Court should sustain Commerce's application of AFA to Lechenwood. Lechenwood repeatedly provided discrepant information regarding its affiliate ████████████. IDM at 98-99, Preliminary AFA Memo at 17. In addition, submissions from the Vietnamese government contradicted Lechenwood's claims regarding the affiliate. *Id.* Finally, Lechenwood failed to accurately report its imports, did not provide required schedule descriptions, and failed to submit customs declarations, as requested by Commerce. *Id.* Because Lechenwood provided inconsistent and incorrect information regarding its sourcing and affiliation, Commerce appropriately found that Lechenwood's submissions were wholly unreliable. IDM at 98-99, 121. Additionally, Commerce reasonably expected Lechenwood to have access to information regarding its suppliers, affiliations, and source documentation; accordingly, Commerce found that Lechenwood did not cooperate to the best of its ability. IDM at 137-138.

DH plaintiffs assert, as they did for Golden Bridge and Her Hui, that Lechenwood is a first-time respondent and did not understand Commerce's terminology. *See* DH Plaintiffs' Tranche II Br. at 42. According to DH plaintiffs, Lechenwood understood the inquiries to only target core veneers, and so cabined its responses regarding plywood inputs to core veneers. *Id.* at 43. But Commerce never told respondents that it only sought information about core veneer inputs; indeed, multiple production scenarios involve Chinese face and back veneers. IDM at 9 (showing the majority of production scenarios involved face and back veneers), 98. And, as

Commerce found, multiple respondents actually mischaracterized their core veneers as face and back veneers. *Id.* at 98. There is no reasonable basis for Lechenwood to have understood Commerce's questions regarding plywood inputs to only apply to core veneers. DH plaintiffs cite the clarification memo as purported evidence that Commerce only meant the inquiries to cover core veneers. *See* DH Plaintiffs' Tranche II Br. at 43. But the memo does not seek to clarify the nature of Commerce's questionnaires, and it does not indicate that Commerce only sought information on core veneer inputs. Clarification Memo (P.R. 21). Finally, as Commerce explained, "Lechenwood's lack of understanding, given its failure to request clarification from Commerce, does not excuse it from accurately reporting the requested information and does not detract from any of our preliminary findings." IDM at 98.

DH plaintiffs also claim that Lechenwood misunderstood the questions regarding affiliation. *See* DH Plaintiffs' Tranche II Br. at 43. Even accepting this *post hoc* explanation, and excusing Lechenwood's failure to request clarification from Commerce, plaintiffs' claim does not adequately explain how the misunderstanding led to Lechenwood's repeated reporting of inconsistent and erroneous information in its responses, which Lechenwood certified as accurate. IDM at 98.

DH plaintiffs next contend that no gap existed in the record because the ███████████ constituted official documentation demonstrating Lechenwood's affiliation with ████████. *See* DH Plaintiffs' Tranche II Br. at 45-46. This argument ignores that, due to the multiple discrepancies, errors, and omissions in Lechenwood's reporting, Commerce found that Lechenwood's information to be wholly unreliable. IDM at 103. As Commerce explained, "{i}t is the sum of two or more of failings that rendered the questionnaire responses unreliable and warranted the application of AFA." IDM at 140; *see also Goodluck India*, 11 F.4th at 1337

(explaining that Commerce correctly found that issues that are systemic rather than singular are not minor); *Dalian Meisen*, 2023 WL 3058783, at *6 ("The issue is not any one individual error. The issue is the errors in their totality, which the Department reasonably determined warranted the application of total AFA."). Shelter Forest argues that *Dalian Meisen* is distinguishable because Lechenwood misunderstood the question rather than admitting that it withheld information. *See* Shelter Forest Tranche II Br. at 18-19. However, Lechenwood's intentions do not change the fact that its submission had multiple errors, omissions, and inconsistencies, and do not bear on whether a gap exists in the record. IDM at 98-99, 121.

Both DH plaintiffs and Shelter Forest claim that Commerce failed to comply with section 1677m(d) by not issuing another supplemental questionnaire to Lechenwood. *See* DH Plaintiffs' Tranche II Br. at 46-49; Shelter Forest Tranche II Br. at 14-15, 19-20. In particular, Shelter Forest appears to imply that, like in *BlueScope*, Commerce did not make a finding that issuing a supplemental questionnaire would be impracticable. Shelter Forest Tranche II Br. at 19-20. Of course, this contention is belied by Commerce's explanations as to why it would not be practicable to issue more supplemental questionnaires. IDM at 133.

Shelter Forest also cites *Saha Thai Steel Pipe Pub. Co., LTD v. United States*, 605 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) and *Shelter Forest* in contending that Commerce must consider efforts to cure information gaps that it has identified. *See* Shelter Forest Tranche II Br. at 16-17. Those cases are inapposite. In *Saha Thai*, the Court held that Commerce had not provided adequate notice to the respondent of the deficiencies when it applied AFA for the first time in the final results. *Id.* at 1369. In *Shelter Forest*, meanwhile the Court held that Commerce failed to demonstrate that reviewing an additional submission would be unduly burdensome. 497 F. Supp. 3d at 1401. In contrast, here, Commerce applied AFA in the

preliminary determination, *after* the parties had sufficient opportunity to correct their deficiencies or request clarification, and Commerce fully explained why it was not practicable to issue further supplemental questionnaires and why it could not evaluate all the untimely NFI respondents had attempted to submit.  IDM at 132-133; *see also* Govt. Tranche I Br. at 38-54.

Shelter Forest argues that it was unreasonable for Commerce to charge Lechenwood with knowledge of the discrepancy before its second questionnaire response.  *See* Shelter Forest Tranche II Br. at 16.  However, the Vietnamese government had submitted the contradictory record information before the responses to Commerce's second supplemental questionnaires were due.  IDM at 76.  As such, Commerce found that "parties were able to address any inconsistencies between the GOV data and their initial or first supplemental questionnaire responses in their subsequent Q&V supplemental questionnaire responses."  IDM at 76.  Indeed, ████████████████████ appear in the data that the Vietnamese government submitted on April 6, 2021, before Lechenwood's second supplemental questionnaire response was due.  GOV Initial Questionnaire Resp. (C.R. 232).  Finally, Lechenwood had already submitted inconsistent information with its initial questionnaire response and its response to the company-specific questionnaire—both of which were submitted prior to the issuance of Commerce's second supplemental questionnaire.

Shelter Forest next contends that Commerce failed to articulate its reasoning for applying AFA to Lechenwood.  *See* Shelter Forest Tranche II Br. at 20-22.  But, as described above, Commerce found there was a gap in the record, fulfilling the requirements of 19 U.S.C. § 1677e(a)(1).  And, in addition to its broader finding that the companies listed in an appendix to its final determination—including Lechenwood—withheld accurate information, failed to timely

respond, and significantly impeded the inquiries,[20] Commerce specifically explained that

Lechenwood repeatedly failed to report, and provided inconsistent and inaccurate information in

response to Commerce's requests.  IDM at 98-99, 122-123, 134.  Commerce's explanations here

were not akin to those remanded in *Garg Tube Exp. LLP v. United States*, 698 F. Supp. 3d 1230

(Ct. Int'l Trade 2024), where the Court held that Commerce's rationale was not reasonably

discernible.  *Id.* at 1238.

Shelter Forest asserts that Commerce only cited general accuracy concerns in finding that

Lechenwood did not act to the best of its ability.  *See* Shelter Forest Tranche II Br. at 21.  This is

not accurate.  Rather, Commerce explained that the respondents included in Appendix I—

including Lechenwood—had failed to cooperate to the best of their ability because they withheld

and failed to accurately report information that should have been in their possession or otherwise

readily available.  IDM at 136.  Specifically, Commerce stated that it could reasonably assume

that respondents have access to information regarding suppliers because the "information is

normally recorded in companies' books and records and to suggest that any respondent did not

maintain this information would provide further support for Commerce's decision to disallow a

respondent from the certification program, which requires maintaining documentation on the

source of the veneer cores."  *Id.* at 137.  Commerce also reasonably expected respondents to

know information regarding affiliations, and specifically, "the identity of their affiliates, where

those affiliates were located, whether their affiliates produced hardwood plywood, and whether

their affiliates exported hardwood plywood inputs from China to Vietnam."  *Id*.  Commerce

---

[20]  We submit that, given the extraordinary nature of these inquires, Commerce's lengthy discussion of its decision to apply facts available to all the companies listed in Appendix I (Companies that Failed to Provide Useable Responses) is sufficient on its own to fulfill the requirements of 19 U.S.C. § 1677(e), without Commerce having to explicitly reference section 1677(e) in its discussions of each separate respondent.  IDM at 123-124, Appendix I.

additionally found that respondents should know information regarding their imports of

hardwood plywood inputs from China such as "whether respondents imported hardwood

plywood inputs, the HS subheadings of those imports, and the details about their suppliers'

imports" and source documentation because respondents or their suppliers were importers of

record. *Id*. Commerce then tied each category for which it found respondents did not cooperate

to the best of their ability to specific respondents. *Id.* at 138. For Lechenwood, Commerce noted

that the company gave Commerce inconsistent or inaccurate or both inconsistent and inaccurate

information regarding its suppliers, affiliations, imports of hardwood plywood inputs from

China, and source documentation, and that Lechenwood did not cooperate to the best of its

ability because it should have known or been able to attain such information. IDM 137-138 n.

707-710; 98-99. Thus, Commerce's path was reasonably discernible. *See Garg Tube*, 698 F.

Supp. 3d at 1238.

     Shelter Forest complains that Commerce treated companies that failed to respond and

companies that failed to cooperate and did not provide reliable information the same. *See* Shelter

Forest Tranche II Br. at 23-24. But it cites no legal authority precluding Commerce from

applying AFA to both non-responsive companies and companies that responded but were found

to not be fully cooperative and have unreliable information. Indeed, Commerce has done so in

the past. For example, in *Pro-Team Coil Nail Enter. Inc. v. United States*, No. 2022-2241, 2024

WL 3824005 (Fed. Cir. Aug. 15, 2024), Commerce applied total AFA to both Bonuts, a non-

responsive respondent, and Unicatch, a respondent that fully participated in the proceeding but

failed to submit certain cost reconciliation information such that Commerce all of its information

was unreliable and unusable. *Id.* at *2-3. The Federal Circuit ultimately upheld Commerce's

application of total AFA to Unicatch, even though Commerce had ostensibly "treated it the

same" as the non-responsive Unicatch in the sense that it applied total AFA to both companies. *Id.* at *4-6. There was nothing unlawful in Commerce's determination to apply AFA both to non-responsive respondents, and to those that participated but provided unreliable and unusable information. IDM at Appendix I, Appendix III.[21]

Shelter Forest argues that there is no affirmative evidence that the companies receiving AFA—including Lechenwood—actually circumvented the orders. *See* Shelter Forest Tranche II Br. at 24-26. But this misunderstands Commerce's actions; Commerce was not required to affirmatively determine that the companies affirmatively circumvented the orders; rather, it found, as an adverse inference, that the non-responsive and non-cooperating companies produced and/or exported hardwood plywood under all five production scenarios subject to the inquiries and were thus ineligible for the certification program. IDM at 57, 107, 144. This action was lawful and consistent with Commerce's past practice. Shelter Forest also argues that Commerce rejected evidence[22] that Lechenwood did not actually circumvent the orders. Shelter Forest Tranche II Br. at 26. But Commerce lawfully rejected Lechenwood's untimely filed new factual information. *See* Govt. Tranche I Br. at 38-55.

Finally, Shelter Forest asserts that Commerce could have still tried to verify Lechenwood's responses. *See* Shelter Forest Tranche II Br. at 27. But Commerce is not required to verify a company when it determines to apply total AFA, as it does not intend to actually rely on that company's own information. *See* 19 U.S.C. § 1677m(i); *see also Certain*

---

[21] Commerce also applied total AFA to companies failing verification, as listed in Appendix II.

[22] In footnote 3 of its brief, Shelter Forest explains that it intends to put the rejected information before the court in the joint appendix. We reserve the right to object to the inclusion of a non-record document in the joint appendix.

*Pea Protein From the People's Republic of China*, 89 Fed. Reg. 10,038, 10,040-41 (Dep't of

Commerce Feb. 13, 2024), and accompanying PDM.

        15.   <u>Arrow Forest</u>

        a.   <u>Background Facts Relevant To Arrow Forest</u>

In its initial questionnaire response, Arrow Forest reported that it was not affiliated with

any producers or exporters of plywood or plywood inputs in China.  Arrow Forest Initial

Questionnaire Response (C.R. 18).  Arrow Forest stated again in its first supplemental

questionnaire response that it was not affiliated with any producers or exporters of plywood or

plywood inputs in China.  Arrow Forest 1st Supp. Questionnaire Resp. (C.R. 178).  Commerce

then issued a second supplemental questionnaire, requesting an exhaustive list of all tariff

schedule subheadings of products respondents imported from China under HTS subheadings

4408 and 4412 during the period from December 2016 to March 2020 and the commercial

invoice, packing list, bill of lading, and customs declaration for the first entry of plywood

products into Vietnam under each subheading.  2nd Supp. Questionnaire (P.R. 257).  Commerce

clarified this question, explaining that "Commerce seeks an exhaustive list of all products

exported from China and entered into Vietnam under subheadings 4408 and 4412 by any affiliate

of your company, regardless of where that affiliated company is located."  2nd Supp.

Clarification Memo (P.R. 272).  In its second supplemental questionnaire response, Arrow Forest

stated that "it did not have any Chinese affiliates that exported plywood or plywood inputs from

China to Vietnam under subheadings 4408 or 4412 during the December 2016-March 2020

period," and listed imports under HTS subheading ███████.[23]  Arrow Forest 2nd Supp.

---

     [23]  According to the official tariff schedule, HTS subheading ████████ is not a
valid subheading.  Preliminary AFA Memo at 4 n.18.

Questionnaire Response at Exh. 1 (C.R. 240).  Arrow Forest provided a sales contract, commercial invoice, packing list, and bill of lading, but did not provide the requested customs declaration.  *Id.* at Exh. 2.  Additionally, the bill of lading submitted by Arrow Forest identified an HTS subheading, but not at the required 8-digit level.  *Id.*  Indeed, "none of the purchase documentation submitted by Arrow Forest corroborates the specific HTS subheading under which it reported sourcing products from China."  Preliminary AFA Memo at 4.

On July 12, 2021, the petitioner submitted comments on the second supplemental questionnaire responses, which included information from Arrow Forest's U.S.-based parent company, Ike Trading Co., Ltd. (Ike), identifying both Arrow Forest and Dalian Jianlin Wood Co., Ltd. (Dalian Jianlin), a Chinese veneer manufacturing plant, as subsidiaries.  Petitioner 2nd Supp. Response Comments (July 12, 2021) at Exh. 5 (C.R. 359).  On July 21, 2021, the Vietnamese government submitted import data showing both that Arrow Forest ███████ ████████████ from China even though Arrow Forest did not identify ███ as a supplier of Chinese hardwood plywood inputs and that Arrow Forest had imports from China under HTS subheadings ████████████████████—imports not reported by Arrow Forest.  GOV Supp. Resp. and Import Data (C.R. 364-365); Preliminary AFA Memo at 4.

In its final determination, Commerce found that Arrow answered a question not asked by Commerce, responding only that it did not have Chinese affiliates, rather than listing all affiliates' exports from China to Vietnam, as requested by Commerce.  IDM at 81.  Accordingly, Commerce found that Arrow did not accurately or completely respond to requested information.  Commerce also found that the record indicated that Arrow was affiliated with a plywood input manufacturer, but that Arrow withheld that information.  *Id.* at 82.  Finally, Commerce found

that Arrow did not accurately report its import under the HTS subheadings, and that it had failed to provide required source documentation.  *Id.* at 83.

> b.  Commerce's AFA Determination Was Lawful And Supported By The Record

Commerce's application of AFA to Arrow Forest was supported by substantial evidence and in accordance with law, as Arrow Forest omitted information about its affiliations, failed to report affiliated exports of plywood inputs from China, failed to accurately report the HTS subheadings of its imports from China, and failed to supply requested source documentation, Commerce thus considered Arrow Forrest's submissions wholly unreliable, determining that Arrow Forest withheld requested information, did not provide the information by the deadlines, and significantly impeded the proceeding.  IDM at 80-83, 121.  Commerce reasonably expected Arrow Forest to have access to information regarding its affiliated exports from China, affiliations, imports, and source documentation, and thus also found that Arrow Forest did not cooperate to the best of its ability.  IDM at 137-138.

DH plaintiffs' arguments are unpersuasive.  First, they contend that ████████ is not a Chinese company or exporter of plywood related materials in China, and therefore did not need to be identified.  *See* DH Plaintiffs' Tranche II Br. at 51-52.  However, the Vietnamese import data indicates that Arrow Forest ██████████████████████ from China.  Preliminary AFA Memo at 4 (citing GOV Import Data (C.R. 364-365).  Importantly, the question was not whether ██████ is a Chinese company, but whether Arrow Forrest's affiliate "exported plywood inputs from China to Vietnam during the inquiry period."  IDM at 81.  Commerce even issued a clarification memo specifically noting that the affiliate need not be Chinese: "Commerce seeks an exhaustive list of all products exported from China and entered into Vietnam under subheadings 4408 and 4412 by any affiliate of your company, ***regardless of***

*where that affiliated company is located*." 2nd Supp. Clarification Memo (P.R. 272). As such, DH plaintiffs' argument is untenable. Commerce's finding that "Arrow failed to fully respond to Commerce's request that it report its affiliate's exports from China to Vietnam," and thus "failed to accurately or completely respond to Commerce's request for information about its affiliate's plywood exports" is supported by the record. IDM at 81.

DH plaintiffs also repeat that Commerce unreasonably required perfection. *See* DH plaintiffs Tranche II Br. at 52-53. This is not true. Commerce reasonably expected Arrow Forest to heed Commerce's instructions and accurately report information regarding Arrow Forest's suppliers, affiliations, imports of hardwood plywood inputs from China, and source documentation. IDM at 137-138. Arrow Forest's failure to do so (by not fully responding the Commerce's multiple requests to report affiliate exports by from China to Vietnam, and completely ignoring Commerce's direction to do so regardless of the location of the affiliated company) was evidence that it did not put forth maximum effort in responding to Commerce's questionnaires.

DH plaintiffs next allege that Arrow Forest is not affiliated with Dalian Jianlin, and that Commerce rejected information demonstrating this fact, along with information about the customs declaration Arrow Forest had failed to provide. *See* DH Plaintiffs' Tranche II Br. at 53-54, 57. As already explained, Commerce lawfully rejected respondents' untimely NFI. *See* Govt. Tranche I Br. at 38-60. Moreover, the record contains timely-submitted evidence that Dalian Jianlin and Arrow Forest were affiliated. Petitioner 2nd Supp. Response Comments at Exh. 5 (C.R. 359). By contrast, Plaintiffs' argument that the evidence from Arrow Forest's own parent company, which demonstrates that Arrow Forest and Dalian Jianlin are both subsidiaries,

is "inaccurate information mainly for marketing purposes" is unsupported by the record.  DH

Plaintiffs' Tranche II Br. at 54.

According to DH plaintiffs, even assuming that Dalian Jianlin is an affiliate, no gap in the

record exists because the circumvention statute does not require examination of affiliation.  *See*

DH Plaintiffs' Tranche II Br. at 54-56.  However, Commerce found that Arrow Forest's

information to be wholly unreliable, thereby creating a gap in the record under section 1677e(a).

IDM at 80-83; Preliminary AFA Memo at 4.  Moreover, Commerce is statutorily required to

examine affiliations in circumvention inquiries.  19 U.S.C. § 1677j(b)(3)(B) (listing affiliation as

a factor to consider in circumvention determinations).  Finally, it is Commerce's role, not the

respondent's, to determine what information is necessary to making a circumvention

determination.

    16.   Win Faith

    a.   Background Facts Relevant To Win Faith

Win Faith's initial questionnaire response listed a Chinese exporter, ██████████

███████████████████████, as an affiliate, but also stated that Win Faith was

not affiliated with any Chinese producers of plywood or plywood inputs.  Win Faith Initial

Questionnaire Resp. (C.R. 116).  In response to Commerce's first supplemental questionnaire,

Win Faith submitted a sales contract related to Win Faith's first shipment of plywood, which

identified the seller as ████████████ with an email address ending in ████████████

and at an address in the ████████████████.  Win Faith 1st Supp. Questionnaire Resp.

(Mar. 8, 2021) at Exh. SQ-1 (C.R. 174).  The contract further stated that, during the ██████████

████████████████████████████████████████████████

██████████" referencing these contact points.  *Id.*

Petitioner submitted comments on the supplemental questionnaire responses, including publicly-available information stating that ████████████████████████ ████████████████████████████████████ has specialized in manufacturing and exporting wood panel products, including plywood, for more than 20 years. Petitioner Comments on Supp. Questionnaire at Exh. 1 (C.R. 177). The submission also indicated that ████████ related group of companies includes multiple plywood factories. *Id.*

Commerce then issued a company-specific questionnaire to Win Faith, directing Win Faith to reconcile its statement that Win Faith is not affiliated with any Chinese plywood or plywood input producer with contradictory record evidence about ████████. Win Faith Supp. Questionnaire (C.R. 238). Win Faith responded that ████████ is a Chinese trading company which sold face veneers and plywood to some furniture producers in Vietnam, but that those veneers and plywood were used in furniture production and those "customers did not produce plywood nor did they resell plywood to the United States." Win Faith 2nd Supp. Questionnaire Resp. at 3 (C.R. 313).

In its final determination, Commerce determined to apply AFA to Win Faith, as Win Faith had failed to fully disclose the extent of its relationship with affiliate ████████, a Chinese exporter of hardwood plywood. IDM at 102. While Win Faith claimed that this affiliate did not produce hardwood plywood in China and was actually a trading company, Commerce found the assertions unsupported and contradicted by the record evidence. *Id.* Commerce also found that the record supported a finding that the affiliate was involved in Win Faith's sales to the United States. *Id.* at 103.

b.    Commerce's AFA Determination Was Lawful And Supported By
The Record

Commerce's application of AFA to Win Faith was supported by substantial evidence and

in accordance with law.  Commerce found, based on the record, that Win Faith was affiliated

with Chinese producers and exporters of plywood, and that Win Faith's Chinese affiliate was

involved in Win Faith's United States sales.  Preliminary AFA Memo at 23; IDM at 102, 144.

Because Win Faith failed to disclose to Commerce the extent of its relationship with its affiliate,

along with other crucial affiliate information, Commerce reasonably found Win Faith's

submissions to be wholly unreliable.

MG plaintiffs contend that no gap existed in the record, and allege that affiliation was not

relevant to Commerce's determination of whether Win Faith circumvented the orders.  *See* MG

Plaintiffs' Tranche II Br. at 12-13.  As explained above, Commerce must consider affiliation in

its circumvention inquiries.  Understanding "the relationships between the respondents and

Chinese producers and/or exporters of hardwood plywood and/or hardwood plywood inputs"

was "paramount" to its determination.  IDM at 140.  Moreover, a gap in the record did exist, as

Commerce found Win Faith's information to be unreliable due to Win Faith's failure to disclose

key information about its affiliate and record evidence contradicting Win Faith's representations.

IDM at 102-13, Preliminary AFA Memo at 23.  Commerce may, of course, apply total AFA

when it concludes that all of a responding party's information is unreliable.  *See Deacero S.A.P.I.*

*de C.V. v. United States*, 353 F. Supp. 3d 1303, 1305 n.2 (Ct. Int'l Trade 2018).

This Court has sustained Commerce's application of AFA when a respondent fails to

accurately report affiliate information.  *See Linyi Chengen*, 391 F. Supp. 3d at 1299.  In that case,

Commerce relied on information on the internet in determining that the respondent was affiliated

with a U.S. customer; the Court held that it reasonable for Commerce to have suspected that the

respondent had failed to provide Commerce with information regarding that affiliate.  *Id.* at

1298-99.  Similarly, here Win Faith claimed it was not affiliated with any Chinese producers of

plywood or plywood inputs.  Preliminary AFA Memo at 23.  However, record information

submitted by the petitioner, as well as information in Win Faith's own records, contradicted that

claim, demonstrating that Win Faith's Chinese affiliate was a producer of hardwood plywood

involved in Win Faith's sales to the United States.  Win Faith 1st Supp. Questionnaire Resp. at

Exh. SQ-1 (C.R. 174), Petitioner Comments on Supp. Questionnaire at Exh. 1 (C.R. 177), IDM

at 144.

     MG plaintiffs also argue that Commerce's application of AFA was not supported by

substantial evidence because Win Faith explained for the inconsistencies regarding its affiliate.

*See* MG Plaintiffs' Tranche II Br. at 14-16.  But Commerce found these explanations to be

unsupported and did not overcome the record evidence that supported a finding that Win Faith

had a Chinese affiliate that produced hardwood plywood and was involved in Win Faith's United

States sales.  IDM at 102, 144.  For example, MG plaintiffs claim that ▮▮▮▮▮▮ statements

that it was a plywood manufacturer were untrue and for advertisement purposes.  *See* MG

Plaintiffs' Br. Tranche II at 14; IDM at 102, 144.  But Commerce was not required to take these

types of statements at face value, and the Court should reject plaintiffs' invitation to reweigh the

evidence.  *See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed.

Cir. 2015).  Here, Commerce relied on record evidence contradicting Win Faith's

representations, including information that ▮▮▮▮▮ specialized in manufacturing and exporting

wood panel products, including plywood; that its related group of companies include plywood

factories, and that it was involved in Win Faith's sales to the United States.  Accordingly,

substantial evidence supported Commerce's determination, even in light of Win Faith's

unsupported explanations. *See Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) ("Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence.") (citing *Fujitsu*, 88 F.3d at 1044).

MG plaintiffs point out that, in the underlying antidumping investigation, Commerce found ▮▮▮▮▮ to be only a trading company. *See* MG Plaintiffs' Tranche II Br. at 15. But Commerce makes determinations based upon the evidence on the record for each specific segment. *See Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014) ("each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record."); *Hyundai Steel Co. v. United States*, 279 F. Supp. 3d 1349, 1372 (Ct. Int'l Trade 2017) ("Commerce is not bound by decisions made in different segments of a proceeding, let alone decisions made in different proceedings." (citation omitted)). The record evidence in ***this*** proceeding supported Commerce's determination that Win Faith did not accurately represent its relationship with ▮▮▮▮▮, or the nature of ▮▮▮▮▮ operations and involvement.

          17.   <u>Plywood Sunshine</u>

          a.   <u>Relevant Background For Plywood Sunshine</u>

In its initial questionnaire response, Plywood Sunshine reported that it "does not source inputs from resellers in Vietnam;" it also identified ▮▮▮▮▮▮▮ as the only species of wood that it used to produce plywood. Plywood Sunshine Initial Questionnaire Resp. at 3-4, Exh. 1 (C.R. 49). It did not report any species of wood used as ▮▮▮▮▮▮▮. Commerce then issued a company-specific supplemental questionnaire to Plywood Sunshine about various inconsistencies, including about the wood species for face and back veneers.

Plywood Sunshine Supp. Questionnaire (P.R. 163, C.R. 159).  On March 25, 2021, Plywood

Sunshine responding, stating that it "consumed only individual core veneers that were

domestically sourced in Vietnam to produce core platforms, and then applied face and back

veneers to produce plywood."  Plywood Sunshine 1st Supp. Resp. at 2 (C.R. 212).

Commerce issued a second supplemental questionnaire, requesting an exhaustive list of

all tariff schedule subheadings of products that Plywood Sunshine imported from China under

HTS subheadings 4408 and 4412, as well as the commercial invoice, packing list, bill of lading,

and customs declaration for the first entry of plywood products into Vietnam under each

subheading.  2nd Supp. Questionnaire (P.R. 257).  On June 25, 2021, Commerce clarified that

"Commerce seeks an exhaustive list of all products exported from China and entered into

Vietnam under subheadings 4408 and 4412 by any affiliate of your company, *regardless of*

*where that affiliated company is located*."  Second Supp. Clarification Memo (P.R. 272)

(emphasis added).  In response to Commerce's second supplemental questionnaire, Plywood

Sunshine stated that "did not have any Chinese affiliates that exported plywood or plywood

inputs from China to Vietnam under subheadings 4408 or 4412," but did not respond to

Commerce's actual request, which asked for an exhaustive list of all products exported from

China to Vietnam from *any* affiliate, not just those from China.  Plywood Sunshine 2nd Supp.

Resp. at 3 (C.R. 274).  Contrary to its initial questionnaire response, Plywood Sunshine also

reported—for the first time—that it had purchased ███████████ from a Vietnamese

supplier, and ███████████████ imported from China from Vietnamese

resellers.  *Id.* at Exhs. 1-3.  Plywood Sunshine also reported that it purchased plywood inputs of

Chinese origin from Vietnamese suppliers ████████████████ during the inquiry

period, despite having previously claimed that Plywood Sunshine did not source inputs from

resellers in Vietnam.  *Id*. at Exhibit 2.  Commerce thus determined that Plywood Sunshine was

not fully responsive to Commerce's requests, and that its responses were inconsistent.

Preliminary AFA Memo at 20.

> b.    Commerce's AFA Determination Was Lawful And Supported By The Record

Commerce's application of AFA to Plywood Sunshine was supported by substantial

evidence and in accordance with law.  Because Plywood Sunshine failed to provide all wood

species that it used for plywood production, provided inconsistent information regarding whether

sourced inputs from resellers in Vietnam, and failed to provide a complete response to

Commerce's request for affiliate information, Commerce found Plywood Sunshine's information

to be unreliable, and determined that Plywood Sunshine withheld information requested by

Commerce, did not provide the information by the deadlines for submission of the information,

or in the form and manner requested, and significantly impeded the proceeding.  Preliminary

AFA Memo at 20, IDM at 121-122.  Commerce further determined that Plywood Sunshine had

not cooperated to the best of its ability because it was expected to know information about its

affiliates and should have had information regarding the source of its inputs readily available.

IDM at 137.

MG plaintiffs argue that Commerce did not provide notice and an opportunity to explain

and correct any deficiency, that the second supplemental questionnaire was too generalized, and

that it would have been practicable for Commerce to issue another questionnaire before the

preliminary determination.  *See* MG Plaintiffs' Tranche II Br. at 17-21.  These arguments have

already been exhaustively addressed.  Commerce provided sufficient notice and explained why it

would not have been practicable to issue another questionnaire; moreover, Commerce's second

supplemental questionnaire was not broad or general, but rather repeated specific requests for

information that multiple respondents had failed to fully comply with.  IDM at 124-134.  Finally, Commerce issued Plywood Sunshine a company-specific questionnaire addressing at least one of the issues that was the basis for the application of AFA.  Plywood Sunshine Supp. Questionnaire (C.R. 159).

MG plaintiffs cite *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375 (Fed. Cir. 2022) in contending that Commerce had failed to notify Plywood Sunshine of deficiencies.  *See* MG Plaintiffs' Tranche II Br. at 19-20.  But in *Hitachi Energy*, Commerce did not issue a supplemental questionnaire to request the information it later determined was withheld.  In contrast, here Commerce issued supplemental questionnaires and a clarification memorandum requesting the same information from respondents.

18.    Greatriver

a.    Background Facts Relevant To Greatriver

In its initial questionnaire response, Greatriver reported that it imported face and back veneers directly from China, rather than purchasing them from resellers.  Greatriver's Initial Questionnaire Resp. (P.R. 94, C.R. 45).  Greatriver also reported that it purchased medium-density fiberboard (MDF) for core and multi-ply core panels from Vietnamese core producers who are not resellers.  *See id.* at 3; Preliminary AFA Memo at 9.

The import data from the Vietnams government indicated that Greatriver sourced inputs from two additional Chinese ████████████████████████████████ ████████████████████████████████████████████ during the inquiry period. Preliminary AFA Memo at 9 (citing GOV Import Data (C.R. 364-365)).  Greatriver explained that it reported one of these suppliers, but the import data contained a typographical error in the company's name.  IDM at 89.  Commerce agreed, but still found that Greatriver had failed to

report the other supplier—███████████ *See* Preliminary AFA Memo at 9; IDM at 89.

With respect to its wood species, Greatriver initially reported that it used ████

██████████████████████████████, as well as ████. Greatriver

Initial Questionnaire Resp. (P.R. 94, C.R. 45). However, in its first supplemental questionnaire

response, Greatriver submitted documentation indicating that it also sold plywood with ████

████████████████. Greatriver Supp. Questionnaire Resp. (C.R. 184). In its second

supplemental response, Greatwood also reported importing ██████████ veneers from

China—species absent from its earlier responses. Greatriver 2nd Supp. Questionnaire Resp.

(C.R. 280). Additionally, in its initial questionnaire response, Greatriver reported consuming

██████ to produce plywood. Greatriver Questionnaire Resp. at Attachment II-C (P.R. 94, C.R.

45). However, Greatriver did not report ██████ as a species imported from China or supplied

by Vietnamese suppliers in any of its questionnaire responses, so the record has no information

regarding where Greatriver obtained its ██████ wood. Therefore, Commerce determined that

Greatriver inconsistently reported its wood species. IDM at 89.

Finally, in its second supplemental questionnaire, Commerce requested that Greatriver

report "{a}n exhaustive list of all tariff schedule subheadings of products {that} affiliates of your

company exported from China to Vietnam under subheadings 4408 and 4412." 2nd Supp.

Questionnaire (P.R. 257). Greatriver responded that it did not have any affiliates in China and,

thus, the question was not applicable. Greatriver 2nd Supp. Questionnaire Resp. at 3 (C.R. 280).

Commerce found that, because Commerce asked respondents to identify all affiliates exporting

from Chian to Vietnam, and Greatriver only answered with regard to Chinese affiliates, that

Greatriver had failed to report requested information regarding its affiliates. IDM at 90,

Preliminary AFA Memo at 10.

      b.      Commerce's AFA Determination Was Lawful And Supported By
The Record

Commerce's AFA determination was lawful and supported by substantial evidence.

Commerce found that Greatriver had failed to: (1) report one of its suppliers of Chinese inputs,

(2) accurately report its wood species, and (3) fully respond to Commerce's request for

information regarding its affiliates. Greatriver argues that none of Commerce's determinations

support a finding that there was a material gap in the record or that it failed to cooperate to the

best of its ability. Greatriver Tranche II Br. at 10. Greatriver's arguments are unavailing.

With regard to its failure to report a supplier, Greatriver admits that it did not import from

███████████, but claims that, because it indicated that its supplier ██████████ imported

from ████████████, there was no missing information. *See* Greatriver Tranche II Br. at 10.

But Greatriver's argument only bolsters Commerce's conclusion, as Greatriver's own

submissions indicate a contradiction, essentially reporting both that it did and did not import

inputs from ████████████. Moreover, as Commerce explained, the Vietnamese import data

indicated that Linyi imported from ████████████. Preliminary AFA Memo at 9.

Accordingly, Commerce deemed Greatriver's information unreliable, creating a gap in the record

and meriting the application of facts available. It was Greatriver's responsibility to build an

accurate record because the information necessary to conduct these inquiries was in its

possession. *See Qingdao*, 766 F.3d at 1386. Greatriver failed to do so, instead reporting

information that was both internally inconsistent and contradicted by the Vietnamese import

data.

Greatriver claims that the supplier information requested by Commerce was immaterial

because it related to inputs from China used to produce face and back veneers, and the inquiries

purportedly only concerned core veneers. *See* Greatriver Tranche II Br. at 11. As demonstrated

above, this claim fails on numerous grounds.  First, multiple production scenarios covered by the inquiries actually refer to face and back veneers.  Second, Commerce determines what information is relevant to its determination, not the respondent.  Respondents are not excused from fully and accurately responding to Commerce's requests simply because they don't find the information relevant.  *See Ferrostaal,* 518 F. Supp. 3d at 1376; *Essar Steel*, 721 F. Supp. 2d at 1299.  Finally, Commerce is required to consider "the pattern of trade, including sourcing patterns."  19 U.S.C. § 1677j(b)(3).  Therefore, Commerce reasonably concluded that the sourcing of companies' face and back veneers was integral to its ability to conduct an analysis in these inquiries.

Greatriver does not contest that it reported different wood species across its responses, but contends that no species were ultimately missing from the record.  *See* Greatriver Tranche II Br. at 11-12.  But Greatriver's failure to identify that it was correcting its earlier responses or timely explain that its later reporting was meant to be additive meant that Commerce could not determine which response was accurate and reliable.  IDM at 77.  Greatriver also argues that its inconsistent reporting of wood species was immaterial to Commerce's determination.  *See* Greatriver Tranche II Br. at 11-12.  For the reasons described above, this argument fails.  Moreover, Commerce explained that wood species information is essentially because certain species are native to or more prominent in China, and thus guide Commerce's determination as to whether veneers were from China.  IDM at 139.

Greatriver next argues that Commerce erred in finding found that it had failed to respond to the affiliation question because it reasonably believed Commerce's request to be limited to information about ***Chinese*** affiliates.  *See* Greatriver Tranche II Br. at 13.  Such a belief was not reasonable in light of Commerce's unambiguous reqest for information regarding ***all*** affiliates

exporting from China to Vietnam, not solely Chinese affiliates.  Commerce explicitly stated in its clarification memo that "{it} seeks an exhaustive list of all products exported from China and entered into Vietnam under subheadings 4408 and 4412 by any affiliate of your company, *regardless of where that affiliated company is located*."  2nd Suppl. Clarification Memo (P.R. 272) (emphasis added).

Greatriver professes to not understand how an affiliate could export from China to Vietnam if it is not located in China.  *See* Greatriver Tranche II Br. at 13.  As an initial matter, any such confusion does not excuse Greatriver's failure to comply with Commerce's express request.  Moreover, it is possible for non-Chinese affiliates to export from China into Vietnam.  As Commerce explained, a shipper on the bill of lading does not necessarily mean the shipper is domiciled at the origination of the shipment.  IDM at 90 n. 430.  Indeed, another respondent acknowledged that it is common practice in international trade for a shipper on a bill of lading not to be domiciled at the shipment origin location.  *Id.*

Greatriver also complains that it was ready to cooperate during verification, but that Commerce then cancelled the verification.  Greatriver Tranche II Br. at 15.  But Commerce's initial inclusion of Greatriver in its verification schedule was inadvertent.  IDM at 43.  Accordingly, Commerce fixed its error by canceling the verification.  *Id.*; *see also* 19 U.S.C. § 1677m(e)(3).  Commerce also explained that it could not have moved forward with Greatriver's verification because its responses were so "riddled with fundamental flaws and inconsistencies" that it would not know which answers to verify.  IDM at 43.  When a respondent's information is deemed unreliable, Commerce need not conduct a verification.  *See Linyi Chengen*, 391 F. Supp. at 1299.  Here, Commerce found that Greatriver had failed to provide forthcoming responses and did not act to the best of its ability.  IDM at 43.  Accordingly, Commerce acted appropriately in

canceling a verification it had scheduled only by mistake.

Finally, Greatriver argues that Commerce did not comply with the requirements of 19 U.S.C. § 1677m(d) because Commerce had ample time to seek clarification but only sent out general questionnaires. *See* Greatriver Tranche II Br. at 14-17. Again, Commerce complied with the statutory requirements to provide notice and opportunity to remedy, and its supplemental questionnaires were not too generic or generalized to qualify as repeated requests for information. Finally, Commerce explained the impracticability of collecting additional information in this exceptional circumstance.

In sum, Commerce explained how substantial evidence demonstrated that Greatriver had failed to accurately and fully respond to Commerce's requests for information, rendering Greatriver's information unreliable. Commerce also found that Greatriver had not cooperated to the best of its ability. IDM at 137, 143. Accordingly, Commerce reasonably determined to apply AFA to Greatriver.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny plaintiffs' motions and sustain Commerce's final determination.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA MCCARTHY
Director

s/Tara K. Hogan
TARA K. HOGAN
Assistant Director

115

OF COUNSEL:                                    s/Sosun Bae
SAVANNAH MAXWELL                               SOSUN BAE
Attorney                                       Senior Trial Counsel
U.S Department of Commerce                     COLLIN T. MATHIAS
Office of the Chief Counsel for Trade          Trial Attorney
   Enforcement and Compliance   U.S. Department of Justice
1401 Constitution Ave. NW                      Civil Division
Washington, DC  20230                          Commercial Litigation Branch
                                               PO Box 480
                                               Ben Franklin Station
                                               Washington, DC  20044
                                               Tel: (202) 305-7568
                                               Fax: (202) 305-2062
                                               Email: Sosun.Bae@usdoj.gov

September 20, 2024                             Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to the Court's August 20, 2024 second amended scheduling order, that this brief contains 34,073 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>s/Sosun Bae</u>
Sosun Bae