NON-CONFIDENTIAL VERSION

# THE UNITED STATES COURT OF INTERNATIONAL TRADE

SHELTER FOREST INTERNATIONAL
ACQUISITION, INC.,

                    Plaintiff,

GREATRIVER WOOD CO., LTD., *et al.*,

                    Consolidated Plaintiffs,

        and

CONCANNON LUMBER COMPANY, *et al.*,

                    Plaintiff-Intervenors,

        v.

UNITED STATES,

                    Defendant,

        and

COALITION FOR FAIR TRADE IN
HARDWOOD PLYWOOD,

                    Defendant-Intervenor.

Before: Hon. Mark A. Barnett,
            Chief Judge

Consol. Court No. 23-00144

NON-CONFIDENTIAL VERSION

Business Proprietary Information
Removed from Brackets on Pages 20,
25-30, 33, 36-41, 43-48, 52, 53, and
55-58

## DEFENDANT-INTERVENOR COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD RESPONSE TO MOTION FOR JUDGEMENT ON THE AGENCY RECORD

Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
Tessa V. Capeloto, Esq.
Maureen E. Thorson, Esq.
John Allen Riggins, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition for Fair Trade in Hardwood Plywood*

November 4, 2024

Consol. Ct. No. 23-00144                                    NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ....................................................................................... 1

II.     STATEMENT PURSUANT TO RULE 56.2 .......................................... 2

        A.      Administrative Determination Under Review ..................................... 2

        B.      Issues Presented ................................................................................. 3

III.    STATEMENT OF THE FACTS ............................................................... 3

IV.     SUMMARY OF ARGUMENT ................................................................. 6

V.      ARGUMENT .......................................................................................... 8

        A.      Commerce Complied with 19 U.S.C. § 1677m(d)'s Requirement to
                Notify Parties of Deficient Reporting and Providing an Opportunity
                to Cure ............................................................................................... 8

        B.      Commerce's Application of AFA to Non-Cooperating Respondents
                Was Supported by Substantial Evidence and In Accordance with
                Law .................................................................................................. 16

                1.      Arrow Forest .......................................................................... 19

                2.      Bao Yen and Thang Long ....................................................... 21

                3.      Cam Lam ................................................................................ 22

                4.      Eagle ...................................................................................... 24

                5.      Golden Bridge ........................................................................ 28

                6.      Govina .................................................................................... 30

                7.      Greatriver ............................................................................... 32

                8.      Groll Ply ................................................................................ 34

                9.      Hai Hien ................................................................................. 38

                10.     Her Hui ................................................................................... 40

                11.     Innovgreen ............................................................................. 43

                12.     Lechenwood ........................................................................... 45

                13.     Long Luu ................................................................................ 48

                14.     Plywood Sunshine .................................................................. 50

                15.     TEKCOM ............................................................................... 52

                16.     TL Trung ................................................................................ 54

                17.     Win Faith ................................................................................ 54

                18.     Zhongjia ................................................................................. 58

**Consol. Ct. No. 23-00144**                                                      **NON-CONFIDENTIAL VERSION**

VI.     CONCLUSION ................................................................................................................ 61

Consol. Ct. No. 23-00144                                    NON-CONFIDENTIAL VERSION

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Hitachi Energy USA v. United States,*
    34 F.4th 1375 (Fed. Cir. 2022) ........................................................13

*Hyundai Elec. & Energy Sys. Co., Ltd. v. United States,*
    15 F.4th 1078 (Fed. Cir. 2021) ........................................................18

*Hyundai Elec. & Energy Sys. Co., Ltd. v. United States,*
    578 F. Supp. 3d 1245 (Ct. Int'l Trade 2022) ....................................11

*Hyundai Elec. & Energy Sys. v. United States,*
    No. 2021-2312, 2022 WL 3273811 (Fed. Cir. Aug. 11, 2022) ............56

*Hyundai Steel Co. v. United States,*
    518 F. Supp. 3d 1309 (Ct. Int'l Trade 2021) ..............................12, 13

*Linyi Chengen Import and Export Co., Ltd. v. United States,*
    391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) ....................................18

*Mukand, Ltd. v. United States,*
    767 F.3d 1300 (Fed. Cir. 2014).........................................................19

*N. M. Garlic Growers Coal. v. United States,*
    352 F. Supp. 3d 1281 (Ct. Int'l Trade 2018) ................................9, 17

*Nippon Steel Corp. v. United States,*
    337 F.3d 1373 (Fed. Cir. 2003)...............................................*passim*

*Pro-Team Coil Nail Enterprise, Inc. v. United States,*
    483 F. Supp. 3d 1242 (Ct. Int'l Trade 2020) ....................................18

*Shanghai Taoen Intern. Co., Ltd. v. United States,*
    29 CIT 189, 360 F. Supp. 2d 1339 (2005)........................................19

*Shelter Forest Int'l Acquisition, Inc., v. United States,*
    497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021) ....................................14

*Since Hardware (Guangzhou) Co., Ltd. v. United States,*
    34 CIT 1262 (2010) ....................................................................18, 19

*SKF USA, Inc. v. United States,*
    24 CIT 822, 116 F. Supp. 2d 1257 (2000) ..........................................9

Case 1:23-cv-00144-MAB    Document 86    Filed 11/05/24    Page 5 of 69

Consol. Ct. No. 23-00144                              NON-CONFIDENTIAL VERSION

*Steel Authority of India, Ltd. v. United States,*
    149 F. Supp. 2d 921 (Ct. Int'l Trade 2001) .......................................................18

*Taian Ziyang Food Co., Ltd. v. United States,*
    33 CIT 828, 637 F. Supp. 2d 1093 (2009).................................................11, 17

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States,*
    652 F.3d 1333 (Fed. Cir. 2011).............................................................18, 56

**Statutes**

19 U.S.C. § 1677e ......................................................................................16

19 U.S.C. § 1677e(b) .................................................................................16

19 U.S.C. § 1677j(f) ..................................................................................15

19 U.S.C. § 1677m(d) ..........................................................................*passim*

19 U.S.C. § 1677m(d)(1) .............................................................................9

**Other Authorities**

*Certain Hardwood Plywood Products from the People's Republic of China,*
    85 Fed. Reg. 36,530 (Dep't Commerce June 17, 2020) ........................................3

*Certain Hardwood Plywood Products from the People's Republic of China,*
    87 Fed. Reg, 45,753 (Dep't Commerce July 29, 2022) .........................................4

*Certain Hardwood Plywood Products from the People's Republic of China,*
    88 Fed. Reg. 46,740 (Dep't Commerce July 20, 2023) .........................................2

*Countervailing Duty Investigation of Stainless Steel and Strip from the People's*
    *Republic of China*, 82 Fed. Reg. 9,714 (Dep't Commerce Feb. 8, 2017).................9

Uruguay Round Agreements Act, Statement of Administrative Action,
    H.R. Doc. No. 103–316, vol. 1 (1994), *reprinted in* 1994 ....................................15

## I.    **INTRODUCTION**

On behalf of Defendant-Intervenor, the Coalition for Fair Trade in Hardwood Plywood ("Coalition"), we respectfully submit the following response to the Tranche II opening briefs of Consolidated Plaintiffs American Woodmark Corporation, Del Valle Kahman & Company, Ike Trading Company Limited, Pittsburgh Forest Products, Panoply Wood Products USA Inc., American Pacific Plywood, Inc., Eagle Industries Company Limited ("Eagle"), Golden Bridge Industries Pte. Ltd. ("Golden Bridge"), Lechenwood Viet Nam Company Limited ("Lechenwood"), Arrow Forest International Co., Ltd. ("Arrow Forest"), Her Hui Wood (Vietnam) Co. ("Her Hui"), Vietnam Zhongjia Wood Company Limited ("Zhongjia"), Long LUU Plywood Production Co., Ltd. ("Long LUU"), and TEKCOM Corporation ("TEKCOM"); Consolidated Plaintiff Greatriver Wood Co., Ltd. ("Greatriver"); Plaintiff-Intervenors Concannon Lumber Company, Northwest Hardwoods, Inc., Richmond International Forest Products LLC, Taraca Pacific Inc., UFP International, LLC, Medallion Forest Product, Hardwoods Specialty Products USLP, Paxton Hardwoods LLC, and Rugby Holdings LLC dba Rugby Architectural Building Products; Plaintiff Shelter Forest International Acquisition, Inc. ("Shelter Forest"); Consolidated Plaintiffs Cabinetworks Group, Inc. f/k/a/ ACProducts, Inc., ACPI Wood Products, LLC, Cabinetworks Group Middlefield, LLC, Cabinetworks Group Michigan, LLC, Boise Cascade Building Materials Distribution LLC, and USPLY LLC; and Consolidated Plaintiff Tumac Lumber Co., Inc. (collectively, "Respondents"). Consolidated Pls.' American Woodmark Corporation, *et al.* Rule 56.2 Mem. in Support of Mot. For J. upon the Agency R. (Apr. 10, 2024), ECF No. 48 ("DH Respondents Br."); Greatriver Wood Co., Ltd.'s Mem. in Support of Rule 56.2 Mot. For J. on the Agency R. (May 1, 2024), ECF No. 52 ("Greatriver Br."); Rule 56.2 Tranche II Mot. for J. on the Agency R. of Behalf of Consol. Pls. Concannon Lumber Company, Northwest Hardwoods,

Inc., Richmond Int'l Forest Products LLC, Taraca Pacific Inc., UFP Int'l, LLC, Medallion Forest

Product, Hardwood Specialty Products USLP, Paxton Hardwoods LLC and Rugby Holdings LLC

dba Rugby Architectural Building Products (May 1, 2024), ECF No. 55 ("M&G Respondents

Br."); Pl. Shelter Forest's Rule 56.2 Mem. in Support of Mot. for J. on the Agency R. (May 1,

2024), ECF No. 54 ("Shelter Forest Br."); Mem. of Points and Authorities in Support of Its Rule

56.2 Mot. for J. on the Agency R. (Apr. 1, 2024), ECF No. 39 ("ST&R Respondents Br."); Consol.

Pl.'s Br. in Support of Rule 56.2 Mot. for J. on the Agency R. (May 1, 2024), ECF No. 53.[1]

　　　The Coalition adopts the arguments made in Defendant the United States' September 20,

2024 response brief. Def.'s Resp. to Pls.' and Consol. Pls.' Rule 56.2 Mots. For J. on the Agency

R. (Sept. 20, 2024), ECF No. 68 ("Defendant Br."). Consistent with the Court's Order, Second

Amended Scheduling Order (Aug. 20, 2024), ECF No. 65, in this brief, the Coalition provides

additional context and argument to aid the Court's understanding of the issues raised in

Respondents' appeals.

## II.    <u>STATEMENT PURSUANT TO RULE 56.2</u>

### A.    <u>Administrative Determination Under Review</u>

　　　Respondents challenge various aspects of the U.S. Department of Commerce's

("Commerce") final affirmative circumvention determination regarding the antidumping ("AD")

and countervailing duty ("CVD") orders on hardwood plywood from China. *See* Issues and

Decision Memorandum accompanying *Certain Hardwood Plywood Products from the People's*

---

[1]　　The brief submitted by Tumac Lumber Co., Ltd. incorporated by reference the arguments raised by other plaintiffs and did not otherwise present any arguments. Accordingly, the Coalition does not further address this brief herein.

*Republic of China*, 88 Fed. Reg. 46,740 (Dep't Commerce July 20, 2023) (final scope deter. and affirm. final deter. of circ. of the AD and CVD orders), P.R. 842 ("IDM").[2]

### B.    Issues Presented

1.    Whether Commerce's decision to rely on adverse facts available ("AFA") was supported by substantial evidence and in accordance with law, where it provided companies multiple opportunities to accurately report information about affiliates, inputs, imports, and sales.

2.    Whether Commerce's decision to rely on AFA was supported by substantial evidence and in accordance with law with regard to the companies that provided inaccurate, inconsistent, and misleading information.

## III.    STATEMENT OF THE FACTS

The Coalition incorporates herein the statement of facts provided in Defendant's Tranche I brief and the Coalition's Tranche I brief, as well as the general and company-specific facts included in Defendant's Tranche II brief. *See* Def.'s Resp. to Pls.' Rule 56.2 Mot. For J. on the Agency R. (July 2, 2024), ECF No. 59 at 3-15; *see also* Def.-Intervenor Coalition for Fair Trade in Hardwood Plywood's Resp. to Mot. For J. on the Agency R. (Aug. 16, 2024), ECF No. 63 at 3-8 ("Def.-Intervenor Br."); Defendant Br. at 3-7, 27-115. The Coalition below highlights certain information and provides additional information and context to assist the Court in its consideration of the issues.

On June 20, 2020, Commerce initiated the Coalition's request for these scope and circumvention inquiries. *See Certain Hardwood Plywood Products from the People's Republic of China,* 85 Fed. Reg. 36,530, (Dep't Commerce June 17, 2020) (initiation of anti-circ. inquiries and

---

[2]    Documents on the agency record are referred to within this brief by the number provided in Commerce's administrative record index for the AD proceeding, filed with the Court on September 5, 2023, as ECF. Nos. 21-1 and 21-2. Confidential documents are referred to with the rubric "C.R." followed by the relevant number; public documents and public versions of confidential documents are referred to by the rubric "P.R." followed by the relevant number.

scope inquiries on the AD and CVD orders; Vietnam assembly), P.R. 4. After initiation, Commerce

issued questionnaires to all potential respondents that included requests for, *inter alia*, information

on the quantity and value of sales, the types and sources of products sold, the types and sources of

inputs used, affiliation with any Chinese producers or exporters of plywood or plywood inputs.

Letter from Kabir Archuletta, Program Manager, Off. V, AD/CVD Operations, Enf't & Compl., to

All Interested Parties, re: *Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain*

*Hardwood Plywood Products from the People's Republic of China: Quantity and Value*

*Questionnaire for Vietnamese Producers and Exporters of Certain Hardwood Plywood Products*

(Sept. 10, 2020), P.R. 62, at Attachment II ("DOC Initial Q"). Fifty-one companies responded. *See*

Preliminary Decision Memorandum accompanying *Certain Hardwood Plywood Products from the*

*People's Republic of China*, 87 Fed. Reg, 45,753 (Dep't Commerce July 29, 2022) (prelim. scope

deter. and affirm. prelim. deter. of circ. of the AD and CVD orders), P.R. 409, at 3 ("Prelim.

Memo").

        Commerce then issued supplemental questionnaires to these fifty-one companies, giving

companies an opportunity to clarify their original reporting and provide supporting documentation

about the source of hardwood plywood inputs, destination of hardwood plywood sales, and each

responding party's Chinese affiliates. Letter from Kabir Archuletta, Program Manager, Off. V,

AD/CVD Operations, Enf't & Compl., to All Interested Parties, re: *Anti-Circumvention Inquiry of*

*the Antidumping Duty Order on Certain Hardwood Plywood Products from the People's Republic*

*of China: Quantity and Value Supplemental Questionnaire for Vietnamese Producers and*

*Exporters of Certain Hardwood Plywood Products* (Feb. 22, 2021), P.R. 154, at Attachment II

("DOC First Supplemental Q"). Many of Commerce's instructions were conditional based on the

responding company's initial questionnaire response. *See, e.g.*, *id.* ("If you reported in your Q&V

questionnaire that you did not export any plywood to the United States that was produced using Chinese core components . . . ."). Other questions requested additional information and clarification regarding information requested in the initial questionnaire. *Compare id.* ("Please indicate whether you are affiliated with any Chinese manufacturer and/or exporter of plywood or plywood inputs or any Chinese individual that is affiliated with any Chinese manufacturer and/or exporter of plywood or plywood inputs" and "(1) state the name of each affiliated company or individual; (2) describe the nature of the affiliation and whether/how these companies/individuals are involved in your business . . .; (3) discuss the scope of the business operations of any affiliated companies; and (4) provide documentation supporting your response."), *with* DOC Initial Q at Attachment II, p. I-2 ("State whether you are affiliated with any: a. producer of plywood or plywood inputs in China; or b. exporters of plywood or plywood inputs from China.").

Forty-six companies responded to Commerce's first supplemental questionnaire, and Commerce issued a second supplemental questionnaire to each of these responding companies. Letter from Kabir Archuletta, Program Manager, Off. V, AD/CVD Operations, Enf't & Compl., to All Interested Parties, re: *Anti-Circumvention Inquiry of the Antidumping and Countervailing Duty Orders on Certain Hardwood Plywood Products from the People's Republic of China: Quantity and Value Second Supplemental Questionnaire for Vietnamese Producers and Exporters of Certain Hardwood Plywood Products* (June 15, 2021), P.R. 257, at Attachment II ("DOC Second Supplemental Q"). Commerce's second supplemental questionnaire solicited more granular information on the respondents' inputs, imports, sales, and affiliates, requesting further information, documentation, and explanation related to information previously reported. *See id.* Commerce issued a third supplemental questionnaire to several companies, which addressed additional issues with respondents' affiliation, input, and sales reporting. *See* IDM at 123-24.

On July 22, 2022, Commerce issued its affirmative preliminary determination. Prelim. Memo at 1. Commerce included a separate memorandum detailing why it was applying adverse facts available ("AFA") to thirty-six companies for failing to fully cooperate with Commerce's inquiries. *Id.* at 10-14; Memorandum from Kabir Archuletta, Program Manager, Off. V, Enf't & Compl., to The File, re: *Anti-Circumvention Inquiry of Certain Hardwood Plywood Products from the People's Republic of China Application of Adverse Facts Available for the Preliminary Determination* (July 22, 2022), C.R. 412, P.R. 410, ("AFA Memo"). The AFA Memo explained that fourteen of these companies failed to respond to Commerce's requests for information and that the remaining twenty-two companies "provided responses with significant deficiencies" causing the "necessary information regarding the aforementioned companies' inputs, purchasing behavior, affiliates, and production of plywood {to be} missing from the record." AFA Memo at 2, 23.

In the final determination, issued July 20, 2023, Commerce reversed its AFA decision for two companies but continued to rely on AFA for the remaining companies for which AFA was preliminarily applied, as well as additional companies that failed verification. *See* IDM at 75 and Appendix II. Commerce explained that it "did not apply AFA based on one discrepancy, but rather, based on several discrepancies that rendered the responses from those companies unreliable." *Id.* Commerce explained each responding company's failures to comply with requests for information. *See generally id.* at 80-103.

## IV.   SUMMARY OF ARGUMENT

Commerce's decision to rely on AFA with respect to each company at issue is supported by substantial evidence and in accordance with law. As such, Respondents' arguments should be rejected, and Commerce's determination should be sustained. *First*, Commerce satisfied its

requirement to notify parties of deficient reporting and provide an opportunity to cure. Dozens of parties submitted incomplete, inaccurate, and misleading information in their initial questionnaire responses. Commerce provided these companies with second, third, and—in some cases—fourth chances to correct or clarify their reporting. Yet, responding parties continued to provide information that was inaccurate, incomplete, or misleading. Additionally, these companies declined to provide factual information in response to the Government of Vietnam's ("GOV") questionnaire responses, which impugned the respondents' reporting, or the Coalition's submissions, which highlighted respondents' inaccurate, incomplete, and misleading reporting. Respondents have not shown that Commerce erred by issuing questionnaires to the fifty-one companies that responded to the initial questionnaire or the forty-six companies that responded to the first supplemental questionnaire. Commerce's requirement to notify parties of deficiencies is not indefinite. Rather, the agency must only provide parties with an opportunity to correct the record to the "extent practicable" in light of its valid interest in finalizing the proceeding.

*Second*, Commerce's decision to apply AFA to each of the non-cooperative respondents was supported by substantial evidence and in accordance with law. In its preliminary determination, AFA memo, and final determination, Commerce identified specific issues in the respondents' reporting that made these responses unreliable or incomplete. In many cases, respondents offered contradictory answers to basic questions, such as whether the company had affiliates in China. These flawed responses not only deprived Commerce of necessary information, but the deficiencies were so fundamental that they rendered respondents' information altogether unreliable. Commerce made an AFA decision for each company after a thorough examination of each company's reporting.

## V.    <u>ARGUMENT</u>

### A.    <u>Commerce Complied with 19 U.S.C. § 1677m(d)'s Requirement to Notify Parties of Deficient Reporting and Provide an Opportunity to Cure</u>

Respondents claim that Commerce failed to provide an opportunity to remedy deficient responses, pursuant to 19 U.S.C. § 1677m(d), because the agency did not issue further supplemental questionnaires. *See* ST&R Respondents Br. at 16-17; DH Respondents Br. at 11. This argument should be rejected. Commerce received responses to its initial questionnaires that included widespread and overlapping deficiencies. The agency issued supplemental questionnaires to 51 respondent companies targeting shared deficiencies, as well as second supplemental questionnaires and questionnaires to individual companies. *See* Defendant Br. at 17-18. Commerce's multiple efforts to collect, analyze, and clarify information from dozens of companies meets the 19 U.S.C. § 1677m(d) standard.

19 U.S.C. § 1677m(d) requires that Commerce identify deficiencies in parties' responses and provide "an opportunity to remedy or explain the deficiency." As an initial matter, the failures in respondents' reporting go the beyond mere deficiencies. Many respondents provided plainly incorrect information in response to straightforward instructions (*e.g.*, "State whether you are affiliated with any . . . producers of plywood or plywood inputs in China or exporters of plywood or plywood inputs in China."), as well as information that directly contradicted prior reporting without acknowledgement or explanation. DOC Initial Q at Attachment II. While Respondents cite cases involving minor reporting omissions or discrepancies, *see, e.g.*, Shelter Forest Br. at 10-11 (citing *Hitachi Energy USA v. United States*, 34 F.4th 1375, 1384 (Fed. Cir. 2022) (rejecting Commerce's decision not to reopen the record for the respondent to provide the final piece of missing information after Commerce revised its methodology on remand)), Commerce is not required to afford respondents multiple opportunities to respond to questions to which a respondent

has clearly provided incorrect information. *See, e.g.*, Issues and Decision Memorandum accompanying *Countervailing Duty Investigation of Stainless Steel and Strip from the People's Republic of China*, 82 Fed. Reg. 9,714 (Dep't Commerce Feb. 8, 2017) (final affirm. deter., and final affirm. critical circ. deter., in part) at 35 ("If {Commerce} had to treat such intentional 'non-responses' as deficiencies, and had to provide a second chance to submit withheld information, parties would be able to essentially grant themselves an extension to any deadline, simply by not responding, knowing that they would be provided additional time to 'remedy' the 'deficiency,' after {Commerce} issued a supplemental questionnaire."). Indeed, parties could simply withhold information until the last opportunity and reverse their reporting without recourse.

Further, Commerce's obligations under 19 U.S.C. § 1677m(d) have limits. Once Commerce has identified deficiencies and provided an opportunity to remedy, the agency may disregard any supplemental information it finds unsatisfactory. *See* 19 U.S.C. § 1677m(d)(1). Commerce is not required to issue additional requests where it has addressed a deficiency in the first instance but finds the resulting explanation unsatisfactory or nonexistent. *See Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1298 (Fed. Cir. 2021) (upholding Commerce's decision to reject a revised cost database based on the respondent's unsatisfactory explanation); *see also N. M. Garlic Growers Coal. v. United States*, 352 F. Supp. 3d 1281, 1293-95 (Ct. Int'l Trade 2018), aff'd, 953 F.3d 1358 (Fed. Cir. 2020) ("Rather, one supplemental questionnaire is enough . . . . In sum, the agency provided {the respondent} two opportunities to provide accurate affiliation information, and {the respondent} failed to do so. Commerce was not required to provide additional supplemental questionnaires seeking the same information."); *SKF USA, Inc. v. United States*, 24 CIT 822, 835, 116 F. Supp. 2d 1257, 1268 (2000) ("In other words . . . § 1677m(d) does

not impose on Commerce a requirement that it must provide an additional notice and opportunity to remedy a deficiency, that is, issue a second supplemental questionnaire.").

Contrary to Respondents' assertion that Commerce asked them to be "mind-readers", *see* ST&R Respondent Br. at 18 (citing *Sigma Corp. v. United States*, 841 F. Supp. 1255, 1267) (Ct. Int'l Trade 1993), respondents were on notice of the information Commerce was requesting. For example, as the Coalition explained in its Tranche I response brief:

- The initial questionnaire requested that parties state whether they are affiliated with producers or exporters of plywood or plywood inputs in China. DOC Initial Q at Attachment II, p. I-2. The first supplemental questionnaire again requested that parties identify Chinese affiliates that produce or export plywood or plywood inputs and sought additional specific information regarding any such entity. *See* DOC First Supplemental Q.

- The initial questionnaire requested that parties state whether they obtained inputs made in China from Vietnamese resellers. DOC Initial Q at Attachment II, p. I-4. In the second supplemental questionnaire, Commerce requested further clarifying information regarding inputs from China provided by Vietnamese resellers. DOC Second Supplemental Q at Attachment II, p. 2.

- The initial questionnaire requested that parties provide information on the core species used. DOC Initial Q at Attachment II, p. I-7. The first supplemental questionnaire requested supporting documentation regarding core materials used. DOC First Supplemental Q at Attachment II, p. VI-4.

*See* Def.-Intervenor Br. at 26. Commerce also issued questionnaires to the GOV requesting information about Vietnamese imports of face and back veneers, core veneers, fully assembled veneer core platforms, and multi-ply panels of glued core veneers from China. *See* Letter from Kabir Archuletta, Program Manager, AD/CVD Operations, Off. V., Enf't & Compl., to Tran Tuan Anh, Ministry of Industry and Trade, The Socialist Republic of Vietnam, re: *Certain Hardwood Plywood from the People's Republic of China: Scope Ruling/Anticircumvention Ruling Inquiry* (Feb. 22, 2021), P.R. 153, at Attachment, p. 1-2. In addition to these questionnaires, the Coalition submitted comments highlighting deficiencies in each round of questionnaire responses. *See* Letter

from Wiley Rein LLP to Sec'y Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Rebuttal Brief* (Feb. 1, 2023), C.R. 608, P.R. 808, at 62-66 ("Coalition's Rebuttal Br."). Indeed, one respondent—Thanh Truc Manufacturing and Trading Company Limited ("Thanh Truc")—acknowledged an inconsistency between its reporting and the GOV's official import data and provided an explanation. *See* Letter from Mowry & Grimson, PLLC to Sec'y Commerce, re: *Investigation of the Antidumping and Countervailing Duty Orders on Hardwood Plywood Products from the People's Republic of China, Circumvention Inquiry – Vietnam Assembly: Rebuttal and Clarifying NFI Concerning GOV's Supplemental Questionnaire Response* (July 30, 2021), C.R. 382, P.R. 360. Thanh Truc's example demonstrates that companies knew or should have known the information Commerce was requesting and their obligation to provide accurate information in each subsequent round of questionnaires.

Moreover, 19 U.S.C. § 1677m(d) does not absolve respondents from their obligation to provide accurate and complete information. *See Taian Ziyang Food Co., Ltd. v. United States*, 33 CIT 828, 843-845, 637 F. Supp. 2d 1093, 1111-12 (2009) (rejecting respondent's claim that Commerce violated its 19 U.S.C. § 1677m(d) duty where respondent failed to accurately answer an initial questionnaire). Likewise, Respondents cannot place the burden on Commerce to resolve inconsistencies where the respondent maintains "inconsistent factual and reporting positions." *See Hyundai Elec. & Energy Sys. Co., Ltd. v. United States*, 578 F. Supp. 3d 1245, 1255 (Ct. Int'l Trade 2022). Numerous companies responded with information that was factually inaccurate from the outset and maintained inconsistent positions through multiple rounds of questionnaires. *See, e.g.*, Defendant Br. at 59-61 (discussing Groll Ply's shifting responses regarding the source of its plywood inputs and identity of its affiliates), 92-93 (discussing Lechenwood's misrepresentations regarding its plywood inputs and affiliates), 105-106 (discussing Win Faith's contradictions

regarding its Chinese affiliates). In many cases, these companies persisted with inaccurate or misleading claims about their inputs despite official Vietnamese import data that contradicted their reporting. *See, e.g.*, *id.* at 79-80, 86-87.

Respondents also fault Commerce for not issuing company-specific supplemental questionnaires. *See* DH Respondents Br. at 19. As an initial matter, Commerce did issue some company-specific inquiries. *See* Defendant Br. at 16 (listing the ten companies receiving company-specific supplemental questionnaires); *see also* IDM at 123-125. These questionnaires, in addition to the other supplemental questionnaire issued, highlighted fundamental discrepancies throughout respondents' responses. Even with these additional opportunities to respond, respondents submitted information that was still deficient or contradicted earlier reporting.

Respondents rely on *Hyundai Steel* to assert that Commerce's questionnaires were insufficient to satisfy the requirements of 19 U.S.C. § 1677m(d). *See* DH Respondents' Br. at 20. This reliance is misplaced. In the proceeding underlying *Hyundai Steel*, the respondent reported differences in specifications for products "as produced" and "as sold," explained this reporting, and reconciled the data with source documentation; while Commerce was concerned with the respondent's reporting, its supplemental questionnaire requested only that the respondent "ensure that {it had} accurately reported all product specifications . . . ." *Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309, 1316-18, 1324 (Ct. Int'l Trade 2021). Although the respondent responded that its reporting was accurate, Commerce applied AFA on the grounds that the respondent's reporting precluded the agency from accurately determining normal value without undue burden. *Id.* at 1318, 1320. This is distinct from the facts of the present case. Here, Commerce requested specific additional information from the respondents in the supplemental questionnaires. Commerce did not simply request that respondents "confirm the accuracy" of their reporting, but

requested the identification of specific information, explanations, and documentation. Moreover, unlike in *Hyundai Steel*, the respondents here provided incomplete, inaccurate, and inconsistent information across questionnaire responses. Further, while *Hyundai Steel* dealt with a single issue for a single respondent, here Commerce was faced with multiple inconsistencies across multiple questionnaire responses for multiple respondents. Thus, what was practical in *Hyundai Steel* was not necessarily practical here. *See* 19 U.S.C. § 1677m(d) (clarifying that Commerce must provide an opportunity to explain deficiencies "to the extent practical").

Respondents also reference *Hitachi Energy USA v. United States* in an attempt to heighten Commerce's 19 U.S.C. § 1677m(d) burden. *See* Shelter Forest Br. at 10-11; *see also* M&G Respondents Br. at 19-20. These references divorce *Hitachi* from its distinct context. To start, the Federal Circuit subsequently modified *Hitachi* to clarify that Commerce's obligation was only "unqualified" "in the circumstances of this case." *Hitachi Energy USA v. United States*, 34 F.4th 1375, 1384 (Fed. Cir. 2022), *mod.fied and petition for panel reh'g denied per curium*, Order, *Hitachi Energy USA v. United States*, Ct. No. 2020-2114 (Nov. 23, 2022), ECF No. 77.

Indeed, the facts of *Hitachi* are highly specific and easily distinguishable. After appeal and remand, Commerce changed its methodology for identifying service-related revenue but did not reopen the record for the respondent to submit information consistent with the methodological change. *See Hitachi*, 34 F.4th at 1383. The Federal Circuit required Commerce to accept the respondent's new information after the methodological change—information that was already on the record in different form. *Id.* at 1384. That is, the respondent in *Hitachi* never had an opportunity to provide corrective information after Commerce changed its methodology on remand. *See id.* In the present case, however, Commerce gave respondents multiple opportunities to report and clarify fundamental items, such as affiliation, imports, and sales before issuing its preliminary

determination. Yet, when given second and third chances, Respondents reported inaccurate, incomplete, and contradictory information. *See generally* Defendant Br. at 25-115.

Several Plaintiffs also point to *Shelter Forest* for the general proposition that Commerce must provide notice of deficiencies. *See, e.g.*, DH Respondent Br. at 11; ST&R Respondent Br. at 18. Again, this reliance is misplaced. In *Shelter Forest*, the Court found that Commerce violated 19 U.S.C. § 1677m(d) when it effectively required a voluntary respondent to infer that its responses were deficient because of a questionnaire issued to a mandatory respondent. *Shelter Forest Int'l Acquisition, Inc., v. United States*, 497 F. Supp. 3d 1388, 1398-1402 (Ct. Int'l Trade 2021). Here, Commerce issued two rounds of supplemental questionnaires to each responding company, explicitly indicating what information it was requesting. Moreover, in *Shelter Forest*, the missing piece of information was dispositive as to one remaining requirement. *See id.* at 1399. In contrast, here, respondents submitted inaccurate information on issues as fundamental as whether they had affiliates in China. Finally, the Court in *Shelter Forest* found that there was little burden on Commerce to accept information from the sole voluntary respondent. *See id.* at 1401-02. In the present case, twenty-two companies submitted information that was inaccurate, despite issuing numerous questionnaires over two years. As such, the burden on Commerce to issue yet another round of questionnaires to the companies would be substantial.

Finally, 19 U.S.C. § 1677m(d) only requires Commerce to provide an opportunity to remedy or explain a deficiency "to the extent practicable" considering the investigation's deadlines. This provision is not intended to "override the time-limits for completing investigations or reviews, nor to allow parties to submit continual clarifications or corrections of information or to submit information that cannot be evaluated adequately within the applicable deadlines."

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1, at 865 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4195.

Respondents themselves recognize the extraordinary length of this proceeding, claiming that Commerce "blew through" a reasonable preliminary determination deadline. *See* DH Respondents Br. at 87. Yet, they also claim that Commerce did not do enough meet the requirements of 19 U.S.C. § 1677m(d). Respondents cannot have it both ways. The statute urges Commerce to render a circumvention determination within 300 days of initiation "to the maximum extent practical." 19 U.S.C. § 1677j(f). Thus, Commerce was forced to balance 19 U.S.C. § 1677j(f)'s instruction to adhere to the 300-day deadline "to the maximum extent practical" with 19 U.S.C. § 1677m(d)'s instruction to provide an opportunity to correct deficiencies "to the extent practicable." Commerce postponed its circumvention determinations to conduct extensive fact gathering. *See* Letter from Kabir Archuletta, Program Manager, Off. V., Enf't & Compl., to All Interested Parties, re: *Hardwood Plywood Products from the People's Republic of China: Extension of Deadline for Issuing the Final Determinations in the Anti-Circumvention and Scope Inquires* (Mar. 11, 2021), P.R. 197 ("Commerce needs additional time to issue and analyze questionnaire responses and comments from interested parties, issue the preliminary determinations, perform procedures to verify respondents' questionnaire responses, allow parties an opportunity to comment on the preliminary determinations, and analyze and respond to any issues that parties may raise in response to the preliminary determinations . . . ."). The responses Commerce received were contradictory, inaccurate, and unexplained. Faced with these widespread

reporting issues, it was reasonable for Commerce not to issue further supplemental questionnaires or provide any more opportunities to correct.[3]

### B.  Commerce's Application of AFA to Non-Cooperating Respondents Was Supported by Substantial Evidence and In Accordance with Law

Commerce acted within its statutory authority to apply total AFA to companies that provided inconsistent and inaccurate information in response to basic instructions. Pursuant to 19 U.S.C. § 1677e, parties may rely on facts otherwise available where information is missing from the record or an interested party has withheld information, failed to provide information in the form or manner requested, significantly impedes a proceeding, or provides unverifiable information. Further, if Commerce determines that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information{,}" Commerce may rely on an adverse inference in selecting among facts available. 19 U.S.C. § 1677e(b). The Federal Circuit has explained that the statute does not require perfection but does demand that a respondent "do the maximum it is able to do." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). To meet this standard, respondents are expected to keep "full and complete records documenting the information that a reasonable {respondent} should anticipate being called upon to produce{,}" be familiar with all such records, and "conduct prompt, careful, and comprehensive investigations of all relevant records . . . to the full extent of the {respondent's} ability to do so." *Id.* Moreover, it is not necessary for a party to have acted willfully, as the statute does not require a finding of motivation or intent. *Id.* at 1383.

---

[3]    Notably, the scale of the underlying investigation makes Commerce's application an issue of first impression. Court decisions reviewing the application of 19 U.S.C. § 1677m(d) generally involved one or a few mandatory respondents' information, meaning Commerce could dedicate a larger percentage of its resources to scrutinizing and addressing specific deficiencies in the respondents' reporting. In contrast, the underlying circumvention investigation included 146 questionnaire responses from approximately 50 companies. *See* IDM at 133.

Respondents argue that Commerce cannot rely on facts available because there was no "gap" on the record. *See, e.g.*, M&G Respondents Br. at 22; DH Respondents Br. at 45; Shelter Forest Br. at 20-21. However, while respondents' reporting did create discrete unexplained gaps in the record, the more fundamental problem identified by Commerce was the inaccurate, inconsistent, and unexplained responses that rendered all of respondents' reporting unreliable. *See* IDM at 75 ("We did not apply AFA based on one discrepancy, but rather, based on several discrepancies that rendered the responses from those companies unreliable").

As this Court has recognized, Commerce may rely on 19 U.S.C. § 1677e(a)(2)(A) (*i.e.*, withholding requested information), 19 U.S.C. § 1677e(a)(2)(B) (*i.e.*, failing to provide information by the deadline or in the form and manner requested), and 19 U.S.C. § 1677e(a)(2)(C) (*i.e.*, impeding a proceeding) as grounds for the application of AFA where respondents provide contradictory, conflicting, or unreliable information. *See Deacero*, 996 F.3d at 1296-97; *Deosen Biochemical Ltd. v. United States*, 301 F. Supp. 3d 1372, 1378-79 (Ct. Int'l Trade 2018); *Taian Ziyang*, 637 F. Supp. 2d at *841-43, **1110-11. For example, in *Deacero*, the Federal Circuit upheld Commerce's decision to apply facts available (with an adverse inference) under subsections (A), (B), and (C) where the respondent provided "inconsistent representations, and fail{ed} to timely explain and meaningfully support those representations." 996 F.3d at 1296-97; *see N. M. Garlic Growers Coal.*, 352 F. Supp. 3d at 1293-94, *c,f'd*, 953 F.3d 1358 (Fed. Cir. 2020) (upholding Commerce's use of AFA where the respondent "failed to cooperate to the best of its ability and significantly impeded the proceeding because it provided false or incomplete information regarding its affiliations").

Moreover, Commerce rightly relied on an adverse inference because Respondents were responsible for the lack of reliable information. When deciding whether responding parties put

forth "maximum effort" to respond to the "best of their abilities," *Nippon Steel*, 337 F.3d at 1382-83, Commerce will analyze whether it was "reasonable for Commerce to expect that more forthcoming responses should have been made . . . ." *See Hyundai Elec. & Energy Sys. Co., Ltd. v. United States*, 15 F.4th 1078, 1090 (Fed. Cir. 2021) (quoting *Nippon Steel*, 337 F.3d at 1383); *see also Linyi Chengen Import and Export Co., Ltd. v. United States*, 391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019). The Court has previously recognized that it is reasonable for Commerce to expect "accurate" and "responsive" answers to questionnaires that seek "information that is 'fundamental'" to Commerce's ultimate analysis. *Pro-Team Coil Nail Enterprise, Inc. v. United States*, 483 F. Supp. 3d 1242, 1249 (Ct. Int'l Trade 2020) (quoting *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1307 (Fed. Cir. 2014)). Here, Commerce asked basic questions about affiliation, inputs, and sales, which is information that should be readily available to any company. Moreover, this information is fundamental to the aim of the circumvention investigation. Respondents provided responses that were incomplete or, after several rounds of questionnaires, directly contradicted reporting in earlier questionnaires. Commerce reasonably decided that respondents did not put forth maximum effort and cooperate to the best of their ability when they could not accurately report this basic information.

Further, it was reasonable for Commerce to disregard respondents' information in its entirety as "total AFA" due to the pervasive and persistent deficiencies in respondents' reporting. *See* Shelter Forest Br. at 25. Commerce may disregard a company's information entirely where deficiencies in respondents' submissions are so pervasive and persistent that they make other information unreliable. *See Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011); *Steel Authority of India, Ltd. v. United States*, 149 F. Supp. 2d 921, 928 (Ct. Int'l Trade 2001); *Since Hardware (Guangzhou) Co., Ltd. v. United States*, 34 CIT 1262,

1274 (2010); *Shanghai Taoen Intern. Co., Ltd. v. United States*, 29 CIT 189, 199 n.13, 360 F. Supp.

2d 1339, 1348 n.13 (2005); *Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1313,

1324-25 (Ct. Int'l Trade 2015). This Court has explained that total rather than partial AFA is

appropriate where respondents fail to provide a credible explanation for the inconsistencies in their

responses regarding information that is core to the proceeding. *See Mukand, Ltd. v. United States*,

767 F.3d 1300, 1308 (Fed. Cir. 2014); *see also Since Hardware (Guangzhou) Co., Ltd. v. United

States*, 34 CIT 1262, 1273-74 (2010) (upholding Commerce's decision to rely on total AFA where

respondent's inconsistent supplier and input reporting prevented calculating a reliable dumping

margin). Accurate reporting on affiliates, inputs, sales, and production were core to Commerce's

circumvention analysis. As such, Commerce reasonably determined that it could not draw an

accurate conclusion based on unreliable information.

In light of this statutory framework, Commerce's application of AFA to each company

deemed to be non-cooperative was supported by substantial evidence and in accordance with law.

As discussed in detail in Defendant's brief, the numerous company-specific arguments regarding

the application of AFA raised by Respondents are unpersuasive and should fail. Defendant Br.

at 27-115. The Coalition adopts the arguments raised by Defendant and provides below additional

discussion, highlighting certain facts and providing further context for Commerce's determination.

### 1.    Arrow Forest

Commerce properly applied AFA to Arrow Forest. As Commerce explained, Arrow

Forest's responses contained multiple discrepancies, including with regard to its affiliations, inputs

imported from China, and source documentation. AFA Memo at 4; IDM at 80-83; Defendant Br.

at 99-101. In light of these issues, Commerce concluded that "Arrow's failure to disclose its

affiliation, its affiliate's exports from China, accurately report the HS subheadings of its imports

from China, and to supply all requested source documentation render Arrow's submissions, on the whole, unreliable." IDM at 83. This was fully supported by the record and in accordance with law. Defendant Br. at 99-101-03.

Respondents first contest Commerce's finding that Arrow Forest failed to accurately identify its affiliate as a supplier because its affiliate was not located in China. DH Respondent Br. at 51-53. However, Commerce requested that Arrow Forest identify "each company that supplied your company with products under HTS subheading 4408 or 4412"; there was no limitation that only suppliers in China should be identified. Letter from Fox Rothschild LLP to Sec'y Commerce, re: *Certain Hardwood Plywood Products from the People's Republic of China: Submission of Second Supplemental Quantity and Value Response on Behalf of Arrow Forest International Co., Ltd.* (June 30, 2021), C.R. 240, P.R. 278, at 1. Nor does the record support the claim that Arrow Forest misunderstood the question, as [

            ]. *Id.* at Exhibit 1 and Exhibit 2; Letter from Wiley Rein LLP to Sec'y Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Comments on Certain Second Supplemental Quantity and Value Questionnaire Responses* (July 12, 2021), C.R. 359, P.R. 346, at Exhibit 4.

Respondents next assert that Commerce improperly found that Arrow Forest failed to accurately report information regarding an affiliated Chinese company, Dalian Jianlin Wood Co., Ltd. ("Dalian"). DH Respondents Br. at 53-56. To start, Respondents claim that Arrow Forest is not affiliated with Dalian and the website material identifying it as such is "mainly for marketing purposes." *Id.* at 53-54. However, Respondents point to no record evidence to support this assertion. *Id.* In contrast, Commerce relied on record information to support its finding that Dalian is an affiliate. *See* AFA Memo at 4 (noting that Arrow Forest's parent company identified Arrow

Forest and Dalian as subsidiaries). Further, contrary to Respondents' claims, this failure was not "immaterial." DH Respondents Br. at 55-56. Understanding respondents' affiliations and connections to Chinese plywood and plywood input producers and exporters was a critical aspect of Commerce's analysis. *See* IDM at 82. As Commerce explained, "Arrow's failure to disclose all of its Chinese affiliates that produce plywood inputs is indeed a serious failure." *Id.*

Finally, Respondents seek to excuse Arrow Forest's failure to provide proper information on and supporting documentation for its imports of Chinese inputs because Commerce did not provide the company with another opportunity to respond. DH Respondents Br. at 56-57. As discussed above, Commerce provided respondents with multiple opportunities to provide complete and correct information and satisfied the requirements under 19 U.S.C. § 1677m(d). Further, as Commerce explained, Arrow Forest's failure to provide complete information on its imports, in conjunction with its other failures, rendered the company's submissions "on the whole, unreliable." IDM at 83. Commerce reasonably expects respondents to be fully forthcoming in responding to requests for information; a review of the record here shows that Arrow Forest was not, and regardless of whether this was a result of carelessness, inattentiveness, or other reasons, Commerce properly found that the company did not cooperate to the best of its ability.

### 2.    Bao Yen and Thang Long

Commerce properly applied AFA to Bao Yen and Thang Long based on the companies' failure to respond to the agency's supplemental questionnaire. IDM at 105-09. As explained by Defendant, Bao Yen and Thang Long were among the companies required to respond to the supplemental questionnaire, but neither company submitted a timely response. Defendant Br. at 29; IDM at 106-107. A company that entirely fails to respond to a request for information has not put forth maximum effort. Whether Bao Yen and Thang Long believed they needed to provide

additional evidence is irrelevant; Commerce requested additional information from these companies in a supplemental questionnaire and they failed to provide a response. Respondents claim that Bao Yen and Thang Long "made reasonable conclusions that they were not required to respond to Commerce's supplemental questionnaires" and attempted to do so "as soon as they reasonably became aware of the fact that Commerce sought further information from them . . . ." M&G Respondents Br. at 23-24. However, this is not supported by the record, as Commerce expressly identified Bao Yen and Thang Long as companies required to respond to the supplemental questionnaire. Defendant Br. at 28. Additionally, the companies responded to the prior questionnaire, demonstrating their awareness of Commerce's requests for information. *Id.* Commerce reasonably expects respondents that are cooperating to the best of their ability to submit timely responses to requests for information. Accordingly, Commerce's application of AFA to Bao Yen and Thang Long is supported by substantial evidence and in accordance with law.

### 3.    Cam Lam

Commerce properly applied AFA to Cam Lam. As detailed by Defendant, at the start of verification, Cam Lam attempted to make a significant correction to its reporting. *See id.* at 31-35; IDM at 145-50. In particular, Cam Lam "reported in its initial Q&V response domestic sales in only 9 months of the inquiry period and no third-country sales for any month of the inquiry period. In its revised Q&V, Cam Lam reported domestic sales in all but 3 months of the 40-month inquiry period and third-country sales in 25 out of 40 months." Memorandum from Kabir Archuletta, Program Manager, Off. V, AD/CVD Operations, to The File, re: *Verfication of Cam Lam Joint Stock Company* (Dec. 21, 2022), C.R. 571, P.R. 684, at 3 ("Cam Lam Verification Report"); *see* IDM at 147-148. Additionally, the explanations provided for the revisions did not appear to be consistent with the revised data, and Cam Lam was unable to answer Commerce questions about

the revisions. Cam Lam Verification Report (Dec. 21, 2022) at 3-4; *see* IDM at 148-149. In

rejecting this information, Commerce explained that this modification amounted to a "wholesale

revision to its entire {quantity and value} response" and thus could not be considered minor. *See*

IDM at 147-148. Moreover, the "magnitude and breadth of the changes," representing Cam Lam's

"failure to accurately report its own sales{,}" rendered "any claims by Cam Lam unreliable and

prevent{ed} Commerce from accepting its claims with confidence." *Id.* at 148. As a result,

consistent with its normal practice, Cam Lam's information could not be verified and Commerce

appropriately applied AFA.

Respondents argue that Commerce improperly applied AFA to Cam Lam because the

proposed corrections at verification were minor and the agency improperly declined to consider

the company's explanations for the revisions. ST&R Respondents Br. at 28-29. The record does

not support these arguments. To start, while Respondents assert that Cam Lam's revisions were

"minor," they fail to explain why they should be considered as such. ST&R Respondents Br. at 28-

31. "A minor correction is one that rectifies minor mistakes in addition, subtraction, or other

arithmetic function, minor data entry mistakes, clerical errors resulting from inaccurate copying,

duplication, or the like, or minor classification errors." *Goodluck India Ltd. v. United States*, 11 F.

4th 1335, 1343 (Fed. Cir. 2021) (internal quotations omitted). Given the scope and scale of Cam

Lam's revision to its Q&V data, Commerce properly declined to consider them to be minor. IDM

at 147-148. Moreover, Commerce's verification report details the steps the agency took to question

Cam Lam about the revisions and Cam Lam's inability to provide full and complete responses to

these inquiries. Cam Lam Verification Report (Dec. 21, 2022) at 3-4; *see* IDM at 148-50.

Respondents' fault Commerce for not accepting explanations that were provided at verification,

but this ignores that the company was unable to provide full and complete responses to

Commerce's inquiries. *Compare* ST&R Respondents Br. at 29 (arguing that, at verification, "counsel requested the opportunity to explain the minor discrepancies on more than one occasion and Commerce declined"), *with* Cam Lam Verification Report (Dec. 21, 2022) at 3-4 ("When counsel responded on Cam Lam's behalf, verifiers asked why company officials could not answer a question as straightforward as who prepared the response and requested that company officials provide the explanation."). Accordingly, Respondents fail to identify any error in Commerce's conduct at verification or in the resulting report.

Finally, Respondents claim that the corrections to Cam Lam's Q&V response "were not material to the determination of circumvention." ST&R Respondents Br. at 30-31. This is incorrect. As Commerce explained, the revisions "represented significant changes to Cam Lam's reported U.S., third-country, and domestic sales data, and the implications of such changes would have impacted all of Cam Lam's data, including the species of wood that it consumed, the suppliers of its wood inputs, its customers, and potentially its trading activity with Chinese suppliers." IDM at 150. Moreover, the extent of the revisions and the fact that they related to such a basic aspect of Cam Lam's reporting cast doubt on the accuracy and reliability of all of Cam Lam's reporting. *Id.* at 148. Thus, Cam Lam's revisions were material to Commerce's determination.

### 4.    Eagle

Commerce's application of AFA to Eagle was supported by the record and otherwise consistent with the law. Eagle submitted incomplete, inaccurate, and inconsistent information throughout the proceeding with regard to critical aspects of its reporting. Critically, Eagle failed to provide complete information regarding both the source and types of materials obtained from China despite numerous opportunities to do so. AFA Memo at 6-7; IDM at 84-85. This information

was central to Commerce's analysis, and Eagle's failure to respond fully and accurately regarding these data rendered its responses unreliable. IDM at 85; *see* Defendant Br. at 45-51.

Respondents assert that Eagle accurately reported information regarding its affiliate and the materials obtained from it, claiming that it simply misunderstood Commerce's initial question. DH Respondent Br. at 12-14. This is not supported by the record. In the original questionnaire response, Commerce directed Eagle to identify whether it was affiliated with any producer or exporter of plywood or plywood inputs and whether it obtained *any* plywood or plywood inputs from these affiliates. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Anti-Circumvention Inquiry of Certain Hardwood Plywood Products from the People's Republic of China: Quantity and Value Questionnaire Response on Behalf of Eagle Industries Company Limited* (Oct. 1, 2020), C.R. 101, P.R. 112, at 5. In response, Eagle Industries stated that it had Chinese affiliates, [                                                                ], but that it "did not source any plywood or plywood inputs" from these companies. *Id.* Contrary to Respondents' claims, nothing in Commerce's questionnaire suggested that the agency's question was only concerned with core materials. In fact, the questionnaire makes clear that Commerce was requesting information on *all* Chinese sourced inputs. *See id.* at 4 (directing Eagle to identify whether it obtained Chinese "inputs" from resellers in Vietnam, including whether the "inputs" were face/back veneers or core materials). Further, even if one were to accept Respondents' explanation, Commerce requested in the first supplemental response that Eagle identify its Chinese affiliates and describe "whether/how these companies/individuals are involved in your business in Vietnam . . . ." Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Anti-Circumvention Inquiry of Certain Hardwood Plywood Products from the People's Republic of China: Quantity & Value Supplemental Questionnaire Response on Behalf of Eagle Industries Company Limited* (Mar.

8, 2021), C.R. 162, P.R. 184, at 2 ("Eagle SQR"). In response, Eagle again stated that it "did not

source any plywood or plywood inputs from {its} affiliated companies . . . ." *Id.* at 3. It is not

reasonable to interpret this question as asking only about the importation of core materials from

Chinese affiliates. Thus, Eagle again reported incomplete and inaccurate information about its

affiliate and its provision of inputs.

When Eagle provided information in a subsequent supplemental response showing that it

did obtain veneers from its Chinese affiliate, Commerce properly declined to consider this as a

correction and instead found that Eagle's responses contained significant discrepancies. *See* IDM

at 84; Defendant Br. at 49-50. Nor does Eagle's belated reporting of imports from its Chinese

affiliate render its responses complete and without error. *See* DH Respondents Br. at 22. As

Defendant explained, Eagle did not identify any prior error in its reporting or explain why it was

submitting information that contradicted its prior responses. *See* Defendant Br. at 49-50. Moreover,

even in its second supplemental response Eagle continued to provide incomplete information about

its Chinese affiliates. In particular, in response to Commerce's request that it provide an

"exhaustive list of all tariff schedule subheading" under HTS 4408 and 4412 that its Chinese

affiliates exported to Vietnam, Eagle stated that [

]. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re:

*Anti-Circumvention Inquiry of Certain Hardwood Plywood Products from the People's Republic*

*of China: Q&V Second Supplemental Questionnaire on Behalf of Eagle Industries Company*

*Limited* (July 9, 2021), C.R. 319, P.R. 324, at 4 and Exhibit SQ2-5 ("Eagle 2SQR"). However, data

from the GOV show that [                                                                    ]. Letter from

the Ministry of Industry and Trade of the Government of Viet Nam to Sec'y Commerce, re: GOV's

Initial Questionnaire Response (Apr. 6, 2021), C.R. 229-231, P.R. 248-250, at Exhibit GOV-2

("GOV IQR"). In light of the significant inconsistencies in Eagle's reporting and Eagle's failure to acknowledge or explain such discrepancies, Commerce reasonably found this to be evidence of unreliable reporting.

Respondents also challenge Commerce's finding that Eagle failed to properly report its imports of [          ] veneers from China. DH Respondents Br. at 25-30. Respondents' claims cannot be reconciled with the record. Sales documentation submitted by Eagle shows that it [

                                    ]. Eagle 2SQR at Exhibit SQ2-2. Given that the subject circumvention inquiry is centered on the use of Chinese core materials, no reasonable respondent could believe that these purchases were not relevant and should not have been identified earlier in response to Commerce's requests for information. Eagle's claim that these veneers were in fact used as face/back veneers based on their size cannot excuse this failure. *See id.* at 2. Notably, Eagle provides no documentation to support this claim. To the contrary, the information provided by Eagle shows that the veneers are identified as [                                    ]; this documentation also shows that these [

                                    ]. *Id.* at Exhibit SQ2-2 and Exhibit SQ2-7. Further, as Defendant explains, Eagle's grounds for treating these veneers as face/back veneers is not supported by the record. Defendant Br. at 50-51. Thus, the record supports the conclusion that Eagle did import [                    ] from China. Consequently, Commerce's finding that Eagle failed to consistently and accurately report information and, as a result, that Eagle's questionnaire responses are unreliable, is supported by the record. *See* IDM at 84-85; Defendant Br. at 46-51.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

5.    **Golden Bridge**

Commerce's application of AFA to Golden Bridge is supported by the record and in accordance with law. As Commerce explained, and as detailed by Defendant, Golden Bridge repeatedly provided incomplete and inaccurate information, submitting questionnaire responses that were inconsistent with prior responses and with other information on the record. *See* AFA Memo at 7-8; Defendant Br. at 85-86. In particular, Commerce identified errors with Golden Bridge's reporting regarding its Chinese affiliates and the materials obtained from Vietnamese suppliers. *See* IDM at 86-87. This information was critical to Commerce's analysis, and Golden Bridge's repeated failure to accurately respond to Commerce's questions rendered its submissions as a whole unreliable. *See id.*; Defendant Br. at 86-90.

In challenging Commerce's application of AFA to Golden Bridge, Respondents first argue that Commerce improperly relied on contradictory information regarding its unaffiliated reseller. DH Respondents Br. at 31-36. Respondents contend that Golden Bridge responded to the best of its ability and should not be penalized for failing to provide information about an unaffiliated party. *Id.* Both of these claims are undermined by the record. Golden Bridge stated in its initial questionnaire response that [

]. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Anti-Circumvention Inquiry of Certain Hardwood Plywood Products from the People's Republic of China: Quantity and Value Questionnaire Response* (Oct. 1, 2020), C.R. 104, P.R. 186, at 4 ("Golden Bridge Q&V"). However, the record shows that Golden Bridge's unaffiliated supplier, [

]. GOV IQR at Exhibit GOV-2.    Notably, [

28

]; *see* AFA Memo at 8. In other words, regardless of its affiliation with

[                    ], Golden Bridge had access to this information by reason of [                                        ].

Again, this makes clear both that Golden Bridge provided incorrect information and that it had

access to or could have obtained this information and chose not to supply it. Indeed, Golden Bridge

[

                                        ], in a supplemental questionnaire response. Letter from

deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Anti-Circumvention Inquiry of Certain*

*Hardwood Plywood Products from the People's Republic of China: Q&V Second Supplemental*

*Questionnaire on Behalf of Golden Bridge Industries Pte. Ltd.* (July 9, 2021), C.R. 323, P.R. 325

at 3 and Exhibit SQ2-2 ("Golden Bridge 2SQR"). For a respondent to act to the best of its ability,

it is expected to do the maximum it is able to do, including conducting "prompt, careful, and

comprehensive investigations of all relevant records . . . ." *Nippon Steel*, 337 F.3d at 1382. The

record here shows that Golden Bridge did not do so.

Respondents also assert that Golden Bridge should have been provided with another

opportunity to clarify its reporting regarding its Chinese affiliate. DH Respondents Br. at 37-40.

However, Golden Bridge was provided multiple opportunities to provide information about its

Chinese affiliate and failed to do so. To start, in its initial questionnaire response, Golden Bridge

stated that its "affiliated Chinese companies did not sell any plywood or plywood inputs to Vietnam

in any periods." Golden Bridge Q&V at 4-5. In its first supplemental questionnaire response, in

response to Commerce's request that it, *inter alia*, describe how its affiliated companies are

involved in its business in Vietnam and the scope of these companies' business operations, Golden

Bridge again stated that "those Chinese affiliated producers and exporters did not sell any plywood

or plywood inputs to Vietnam in any periods." Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Anti-Circumvention Inquiry of Certain Hardwood Plywood Products from the People's Republic of China: Quantity and Value Questionnaire on Behalf of Golden Bridge Industries Pte. Ltd.* (Mar. 8, 2021), C.R. 164, P.R. 186, at 2. In its second supplemental response, however, Golden Bridge reversed course—without explanation—and stated that its Chinese affiliate [          ] did have exports to Vietnam. Golden Bridge 2SQR at 3. However, even here, Golden Bridge continued to provide incomplete information, stating only that [

]. *Id.* at 2 and Exhibit SQ2-2; GOV IQR at Exhibit GOV-2. Thus, Golden Bridge clearly and repeatedly provided inaccurate information regarding its Chinese affiliate.

Respondents attempt to excuse these shortcomings by stating that Golden Bridge and [          ] are [                    ], and Golden Bridge reported "what it learned at the time." DH Respondents Br. at 38-39. This does not cure Golden Bridge's failings. As noted above, [

]. Thus, at best, this demonstrates that Golden Bridge failed to do the maximum it was able to do in responding to Commerce's questions as [

]. Golden Bridge's failure to do so demonstrates that the company did not do the maximum it was able to do in responding to Commerce's requests for information.

### 6.    Govina

Commerce properly applied AFA to Govina. As Commerce explained, Govina failed to provide complete and accurate information regarding critical aspects of its reporting. *See* AFA

Memo at 8-9; IDM at 88-89. This included Govina providing incomplete and inconsistent information regarding the sources of its materials and failing to provide requested documentation for its inputs. *See* AFA Memo at 8-9; IDM at 88-89; Defendant Br. at 62-63. As a result, Commerce found that Govina's responses contained significant discrepancies and could not be considered reliable. *See* IDM at 88-89. Full and complete information regarding the materials used was central to Commerce's determination, and, as such, Govina's failures in reporting this information support the application of AFA. *See* Defendant Br. at 63-65.

Respondents argue that Govina's misreporting regarding its suppliers was based on "misunderstandings" and its subsequent, contradictory information was a "correction." ST&R Respondents Br. at 31-32. This is not supported by the record. In its initial questionnaire response, Govina reported that it did not obtain any plywood or plywood inputs from resellers in Vietnam. Letter from Fox Rothschild LLP to Sec'y Commerce, re: *Certain Hardwood Plywood Products from the People's from Republic of China: Submission of Quantity and Value Response on Behalf of Govina Investment Joint Stock Company* (Oct. 1, 2020), C.R. 47, P.R. 95, at 2-3; AFA Memo at 8. In its second supplemental questionnaire, without explanation, Govina then changed course and stated that it not only had purchases of inputs from Vietnamese resellers, but that it obtained Chinese inputs from these resellers. Letter from Fox Rothschild LLP to Sec'y Commerce, re: *Certain Hardwood Plywood Products from the People's from Republic of China: Submission of Second Supplemental Quantity and Value Response on Behalf of Govina Investment Joint Stock Company* (July 12, 2021), C.R. 355, P.R. 343, at 2. As Commerce explained, when confronted with changes in supplemental responses

> {w}ithout an explanation, or an identification of the previously submitted errors, we find that these were significant changes, not corrections or supplements. Additionally, none of these parties identified an error in their original submission or explained how it was fixed in the supplemental response. In the absence of any

> such explanation, we have no ability to determine which information Commerce was supposed to rely on for its analysis, and why it should not rely on the other information. In fact, the only conclusions we are able to ascertain from these conflicting responses is that these respondents did not report their information "correctly" or consistently. There is also no record evidence to support these post-hoc statements that these were purportedly "corrections." Further, without being provided reasons for the changes, we have no way to determine how these supposed errors were introduced, such that they are no longer present in the new information.

IDM at 77. Respondents fail to explain why its unsupported statements that Govina was simply confused should overcome this conclusion. ST&R Respondents Br. at 31-32.

Additionally, Respondents claim that Commerce improperly faulted Govina for not providing certain source documentation. *Id.* at 33. However, Respondents acknowledge that Govina did not submit information requested by Commerce. *Id.* Providing only some information requested does not amount to being fully responsive nor does it demonstrate that Govina did the maximum it was able to do. *See Nippon Steel*, 337 F.3d at 1382. Thus, Commerce's reliance on Govina's failure to provide complete information in support of the application of AFA is supported by the record. Further, as discussed above, Commerce provided respondents, including Govina, multiple opportunities to submit complete and accurate information and, therefore, Respondents' argument that Commerce should have allowed Govina to submit further information to address the shortcomings in its responses does not persuade. *See* ST&R Respondents Br. at 33.

### 7.    Greatriver

Commerce properly applied AFA to Greatriver. Commerce identified multiple areas of Greatriver's reporting where the company submitted incomplete and inconsistent information. *See* AFA Memo at 9-10. In particular, Commerce highlighted that Greatriver failed to provide complete and accurate information regarding the source of its plywood inputs and the types of inputs used. *See id.*; IDM at 89-91; Defendant Br. at 110-111. As a result, Commerce found that Greatriver's responses were unreliable, which supported the application of AFA. *See* Defendant Br. at 112-115.

Respondents assert that the application of AFA to Greatriver was unreasonable, first claiming that Greatriver did not fail to identify any suppliers. Greatriver Br. at 9-11. This ignores the complete record. In a supplemental questionnaire, Commerce instructed Greatriver to identify each company that provided it with inputs from China, which Greatriver stated it did in Exhibit S-1. Letter from Husch Blackwell to Sec'y Commerce, re: *Hardwood Plywood from the People's Republic of China: 2nd Supplemental Quantity and Value Questionnaire Response on Behalf of Greatriver Wood Co., Ltd.* (July 9, 2021), C.R. 280, P.R. 310, at 1 ("Greatriver 2SQR"). This exhibit does not identify [                                    ] notwithstanding other record information showing that Greatriver had imported from this entity. *See id.* at Exhibit S-1; *see also* AFA Memo at 9. Thus, Commerce correctly concluded that Greatriver did not provide complete and accurate information about its suppliers. *See* IDM at 89. That Greatriver identified [

] as a source of materials obtained from its Vietnamese supplier does not remedy this shortcoming. Greatriver Br. at 10. Commerce separately requested that Greatriver identify the companies from which it imported Chinese materials and those from which its suppliers imported. Greatriver 2SQR at 1-2. Thus, Greatriver's identification of this company in response to the latter question does not demonstrate that it accurately responded to the former question. The incompleteness of Greatriver's responses is further underscored by the fact that, in its initial questionnaire response, it stated that it obtained materials "directly from China, rather than purchasing them from any resellers." Letter from Husch Blackwell to Sec'y Commerce, re: *Hardwood Plywood from the People's Republic of China: Quantity and Value Questionnaire Response on Behalf of Greatriver Wood Co., Ltd.* (Oct. 1, 2020), C.R. 45, P.R. 94, at 3 ("Greatriver Q&V"). As such, Commerce reasonably found that the inconsistencies in Greatriver's responses rendered them unreliable. *See* Defendant Br. at 112.

Respondents next claim that Greatriver provided complete information regarding the species of wood it used. Greatriver Wood Co., Ltd.'s Mem. in Support of Rule 56.2 Mot. For J. on the Agency R. (May 1, 2024), ECF No. 52, at 11 ("Greatriver Br. 2"). This, too, ignores the record. In its initial questionnaire, Greatriver was instructed to provide "an exhaustive list" of the species of wood it used, which Greatriver stated it did. Greatriver Q&V at 3. However, Greatriver's subsequent response revealed the use of additional species that had not been previously identified. *See* AFA Memo at 9. Contrary to Respondents' claims otherwise, this does not demonstrate that Greatriver did in fact report all species used. *See* Greatriver Br. 2 at 11-12. Commerce had no grounds for concluding that the subsequent response was complete and accurate, particularly given that Greatriver provided this information without any discussion or recognition of the inconsistent information. Greatriver 2SQR at 1; *see* IDM at 89-90. Thus, Respondents' assertions that the record contains complete information is unsupported. *See* Greatriver Br. 2 at 11-12.

Finally, Respondents unpersuasively argue that the information for which Commerce identified errors does not support the application of AFA because it is immaterial. *See id.* at 10-12. As explained by Defendant, obtaining complete and accurate information regarding Greatriver's source of materials was integral to Commerce's analysis. *See* Defendant Br. at 113. Further, as Greatriver failed to provide complete and accurate information about its face/back veneer sourcing and the inputs used, Commerce reasonably concluded that it could not rely on other aspects of Greatriver's reporting. *See* IDM at 90-91.

### 8.    Groll Ply

Commerce's application of AFA to Groll Ply was supported by substantial evidence and in accordance with law. Commerce identified numerous and significant inaccuracies and inconsistencies with Groll Ply's reporting, including with respect to its affiliation with Chinese

sellers of plywood inputs and inputs Groll Ply obtained from China. *See id.* at 91-92; AFA Memo at 11-12. This information was critical to Commerce's analysis, and Groll Ply had multiple opportunities to provide it. *See* Defendant Br. at 58-62. Moreover, the extent of Groll Ply's incomplete and inaccurate reporting rendered its reporting as a whole unreliable, such that the application of AFA was appropriate.

In challenging Commerce's determination, Respondents first claim that Groll Ply cooperated in the underlying proceeding because it timely responded to all requests to information. ST&R Respondents Br. at 34. However, AFA is not avoided by simply responding to questionnaires; instead, a respondent must "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries . . . ." *Nippon Steel*, 337 F.3d at 1382. In light of the shortcomings identified by Commerce, the record fully supports a finding that Groll Ply did not meet this standard. *See* Defendant Br. at 60-62.

Respondents next claim that Commerce incorrectly found that Groll Ply provided inaccurate information regarding its Chinese affiliate. ST&R Respondents Br. at 34. This is not supported by the record. According to Respondents, Groll Ply disclosed its affiliation with a Chinese company. *Id.* But Commerce did not simply ask if Groll Ply had Chinese affiliates; Commerce asked whether Groll Ply had affiliates that were producers or exporters of plywood or plywood input and whether Groll Ply obtained plywood or plywood inputs from any such companies. *See* Letter from Fox Rothschild LLP to Sec'y Commerce, re: *Certain Hardwood Plywood Products from the People's from Republic of China: Submission of Quantity and Value Response on Behalf of Groll Ply* (Oct. 1, 2020), C.R. 133, P.R. 120, at 3 ("Groll Ply Q&V"); Letter from Fox Rothschild LLP to Sec'y Commerce, re: *Certain Hardwood Plywood Products from the People's from Republic of China: Submission of Supplemental Quantity and Value Response on*

**BUSINESS PROPRIETARY INFORMATION**
**HAS BEEN DELETED**

*Beha.f  of Groll Ply* (Mar. 29, 2021), C.R. 221, P.R. 238, at 2 ("Groll Ply SQR"). In response, Groll

Ply repeatedly stated that it was not affiliated with any producers or exporters of plywood or

plywood inputs in China. *See* Groll Ply Q&V at 3; Groll Ply SQR at 2-3. Additionally, while Groll

Ply identified [                                        ] as an affiliated company, it repeatedly described this

company  [

                                                                                                ]. Groll Ply SQR

at 2-4 and Exhibit 2. Similarly, Groll Ply stated that [

                                                                ]. *Id.* at 4. This ignores the fact that Groll Ply [

                                                                ]. Letter from Fox Rothschild LLP to

Sec'y Commerce, re: *Certain Hardwood Plywood Products from the People's from Republic  of*

*China: Re-Submission  of Second Supplemental Quantity and Value Response on Beha.f  of Groll*

*Ply* (July 6, 2021), C.R. 252, P.R. 290, at Exhibit 2 ("Groll Ply 2SQR"). In other words, Groll Ply

was far from forthcoming about its relationship with [

                                    ].

    Moreover, contrary to Respondents' assertion, Groll Ply's second supplemental response

did not "correct" this; instead, when asked to provide a list of all plywood and plywood inputs

exported by an affiliate from China to Vietnam, Groll Ply responded: "This question is inapplicable

as we do not have any Chinese affiliate."   Groll Ply 2SQR at 2. While Groll Ply provided

documentation showing a [                                                                                        ],

this does not cure the failures in its reporting; to the contrary, it underscores the unreliability of

Groll Ply's reporting.

Finally, Respondents claim that Commerce improperly relied on information provided by the GOV to find Groll Ply's responses unreliable. ST&R Respondents Br. at 35. However, the data from the GOV simply highlighted Groll Ply's failure to provide complete and accurate data. *See* AFA Memo at 11-12. To start, these data show that [

]. GOV IQR at Exhibit GOV-2. These data also show that Groll Ply had [

]. *Id.* This included [

]. *Id.*; Groll Ply 2SQR at Exhibit 1. Importantly, the data from the GOV leaves no doubt that Groll Ply had [

]. *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Request for Affirmative Preliminary Determination* (Aug. 18, 2021), C.R. 393, P.R. 378, at 12; Groll Ply SQR at 2. Moreover, the GOV data show that Groll Ply had shipments from China [          ], notwithstanding the fact that the company reported that it was incorporated in 2019. *See* AFA Memo at 11. These are not simply discrepancies. Instead, the GOV data confirmed that there were significant inaccuracies in Groll Ply's reporting such that the company's reporting as a whole could not be considered complete or accurate.

### 9.    Hai Hien

Commerce's application of AFA to Hai Hien is supported by substantial evidence and otherwise in accordance with law. As Commerce highlighted, Hai Hien failed to provide full information regarding its [                                    ]. *Id.* at 12-13; *see* Defendant Br. at 52-53. Additionally, while Hai Hien stated that it used [

], record information indicated that the [              ] imported from China were core veneers. AFA Memo at 12-13; *see* Defendant Br. at 52-53. As Hai Hien failed to report complete and accurate information about its Chinese affiliations and its imports from China—two issues critical to Commerce's analysis—Commerce's finding that Hai Hien's reporting as a whole was unreliable was supported by the record. *See* IDM at 92-95.

Respondents claim that Hai Hien provided complete and accurate information regarding its affiliates. ST&R Respondents Br. at 25-27. But this is not supported by the record. In particular, as Commerce noted, despite Hai Hien's claim that it is not affiliated with any Chinese producers of plywood, Hai Hien's [

]. *See* AFA Memo at 12. Further, while Hai Hien stated that [

].[4] *See*

---

[4]      Hai Hien's intertwined relationship with [              ] was further supported by publicly available information from the Vietnam Timber and Forest Product Association, which stated that Hai Hien is "one of the enterprises which is getting the investment capital from a large plywood manufacturer in Shandong, China" and that "Zhongan Hou, a Chinese investment representative of" Hai Hien, explained that "his company in China as well as other business are diverting their investment" to countries like Vietnam. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Comments on Quantity and Value Questionnaire Responses* (Oct. 15, 2020), C.R. 150, P.R. 135, at Exhibit 8 ("Coalition's Comments on Q&V Resps."). Notably, [

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

*id.* Respondents attempt to dismiss this by asserting that Commerce "misunderstood" Hai Hien's reporting, which was based on the period since the company was "reconstructed" in [      ]. ST&R Respondents Br. at 25-27; *see* Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Anti-Circumvention Inquiry of Certain Hardwood Plywood Products from the People's Republic of China: Quantity and Value Questionnaire Response on Behalf of Hai Hien* (Oct. 1, 2020), C.R. 76, P.R. 106, at 2. But this does not change the fact that Hai Hien's statement was simply incorrect. Further, Respondents provided no reason as to why Hai Hien would only have provided this answer since the company's "reconstruction," nor did Hai Hien provide any information demonstrating that [

].

Respondents also assert Commerce should have obtained clarification from Hai Hien. ST&R Respondents Br. at 26-27. But Hai Hien's statement that [       ] had not held any position in Chinese producers or exporters of plywood or plywood inputs "{s}ince Hai Hien was established" was made in response to a supplemental questionnaire in which Commerce asked directed questions specifically about [

]. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Anti-Circumvention Inquiry of Certain Hardwood Plywood Products from the People's Republic of China: Hai Hien's Response to the General 2nd SQ and Company-Specific Q&V SQ* (July 2, 2021), C.R. 242, P.R. 284, at 4-5 ("Hai Hien 2SQR"). Commerce reasonably expected Hai Hien to respond fully and accurately to such questions and was not required to provide Hai Hien with an additional opportunity to correct its inaccurate reporting. *See* Defendant Br. at 55-56.

---

]. *See* Coalition's Rebuttal Br. at 102.

Respondents also claim that Commerce's conclusions regarding the certain veneers imported by Hai Hien are unsupported. ST&R Respondents Br. at 27-28. However, Commerce's conclusions were based on Hai Hien's own data, which showed that the [            ] it imported from China were [            ] thicker than other veneers. AFA Memo at 12-13; Hai Hien 2SQR at Exhibit SQ2-3. Commerce also supported its determination based on other record information regarding the characteristics of Chinese core veneers. *See* AFA Memo at 12-13; IDM at 79-80, 92-93. Respondents fault Commerce for relying on such information, but fail to explain why it was improper for the agency to consider evidence regarding the characteristics of Chinese core veneers when examining Hai Hien's reported purchases of Chinese veneers. This is particularly true in light of Hai Hien's failure to provide any documentation to support its claim that the veneers' size indicated that they were used as face veneers. Hai Hien 2SQR at 2. As such, Commerce's conclusion that Hai Hien provided incomplete and inaccurate information about its Chinese affiliations and the materials it imports from China was supported by the record, supporting Commerce's finding that Hai Hien's submissions as a whole were unreliable. *See* IDM at 94.

### 10.    Her Hui

Commerce properly applied AFA to Her Hui. As Commerce explained, Her Hui failed to provide complete and accurate information regarding multiple aspects of its reporting. *See* AFA Memo at 13-14; IDM at 94-95. The failures in Her Hui's reporting extended to the types of plywood inputs it used and the sourcing of its plywood inputs. IDM at 94-95; *see* Defendant Br. at 71-72. This information was critical to Commerce's analysis, and Her Hui's submission of incomplete and inaccurate information prevented the agency from relying on its reporting. IDM at 94-95.

Respondents argue that Her Hui's failures should be excused because the company misunderstood Commerce's questions. *See* DH Respondents Br. at 58. This argument does not persuade. First, with regard to the reporting of veneer species, Respondents state that Her Hui's failure to provide complete information was a result of the company believing that it could only list five species for each year. *Id.* at 59. This is not credible, given that Commerce directed the company to provide "an *exhaustive* list of the species of wood . . . ." Letter from Fox Rothschild LLP to Sec'y Commerce, re: *Certain Hardwood Plywood Products from the People's Republic of China: Submission of Quantity and Value Response on Behalf of Her Hui Wood (Vietnam) Co., Ltd.* (Oct. 1, 2020), C.R. 55, P.R. 99, at 4 ("Her Hui Q&V") (emphasis added). Moreover, [

]. AFA Memo at 13; Her Hui Q&V at Exhibit 1.

Second, Respondents attempt to excuse Her Hui's failure to report all Chinese imports because the company believed that it only needed to report core materials. DH Respondents Br. at 61. But the questionnaire was clear that Commerce was requesting information on *all* plywood inputs; indeed, the questionnaire directed that Her Hui include an "exhaustive list of all tariff schedule subheadings of products your company imported from China under Harmonized Tariff Schedule (HTS) subheadings 4408 and 4412." Letter from Fox Rothschild LLP to Sec'y Commerce, re: *Certain Hardwood Plywood Products from the People's Republic of China: Submission of Supplemental Quantity and Value Response on Behalf of Her Hui Wood (Vietnam) Co., Ltd.* (July 6, 2021), P.R. 292, at 2. No reasonable respondent would understand that question to be asking for imports under subheadings 4408 and 4412 only to the extent they included core materials. Similarly, Respondents assert that Her Hui understood Commerce's request for information on materials its affiliates exported from China to Vietnam to be limited to Chinese

affiliates. DH Respondents Br. at 62-63. However, Commerce clarified that it was seeking information about all affiliates, "regardless of where that affiliated company is located{,}" making clear that it was not only asking about Chinese affiliates. Memorandum from Mark Harrison, Int'l Trade Analyst, Off. V, AD/CVD Operations, to The File, re: *Anti-Circumvention Inquiry of Certain Hardwood Plywood Products from the People's Republic of China: Clarification of Second Q&V Supplemental Questionnaire Response* (June 25, 2021), P.R. 272, at 1.

In short, Respondents' claims that Her Hui misunderstood its reporting requirements are not supported by the record. At best, Her Hui was insufficiently careful and attentive in providing its responses, which does not excuse it from the application of AFA. *See Nippon Steel*, 337 F.3d at 1382. Moreover, as explained by Defendant, if Her Hui was unsure of the reporting requirements for any of these issues, it could have contacted Commerce to seek clarification. Defendant Br. at 73-75. Finally, Respondents incorrectly argue that the errors in Her Hui's reporting are not relevant to Commerce's determination. DH Respondents Br. at 60-63. Commerce's analysis was based on the materials respondents used in the production of plywood. Thus, it is critical that the agency have complete and accurate information in this regard. For example, as Commerce's explained, Her Hui's failure to report its imports "not only calls into question the credibility of all of its submitted information, but also prevented Commerce from examining any of its Chinese imports to confirm whether those imports were actually inputs that could be used to produce inquiry merchandise." IDM at 95. Moreover, the significant discrepancies in Her Hui's reporting cast doubt on the completeness and accuracy of all its reporting and, consequently, support the application of AFA.

### 11.    Innovgreen

Commerce properly applied AFA to Innovgreen. The record shows that Innovgreen provided inaccurate and incomplete information regarding basic aspects of its reporting. For example, in its initial questionnaire response, Commerce directed Innovgreen to provide an "exhaustive" list of the wood species used in its plywood. Letter from Fox Rothschild LLP to Sec'y Commerce, re: *Certain Hardwood Plywood Products from the People's from Republic of China: Submission of Quantity and Value Response on Behalf of Innovgreen Thanh Hoa Co., Ltd.* (Oct. 1, 2020), C.R. 135, P.R. 12, at 3. In response, Innovgreen identified [

                                                                    ]. *Id.* at Exhibit 1.

However, in its second supplemental response, Innovgreen [

                              ]. Letter from Fox Rothschild LLP to Sec'y Commerce, re: *Certain Hardwood Plywood Products from the People's from Republic of China: Submission of Second Supplemental Quantity and Value Response on Behalf of Innovgreen Thanh Hoa Co., Ltd.* (July 9, 2021), C.R. 341, P.R. 334, at 1-2 and Exhibit 1 ("Innovgreen 2SQR"); AFA Memo at 17. As Defendant notes, Innovgreen did not explain why—or even identify that—its earlier reporting was incorrect; thus, Commerce reasonably declined to consider Innovgreen's conflicting information as a correction. Defendant Br. at 66-67. Moreover, changes in Innovgreen's reporting was particularly concerning in light of the fact that Innovgreen subsequently reported purchasing [

                      ]. AFA Memo at 17; *see* IDM at 79. As Commerce's circumvention inquiry was focused on the use of Chinese core materials, Innovgreen's failure to provide complete and

accurate information about its inputs rendered its reporting as a whole unreliable. *See* IDM at 97-98.

Respondents first claim that the inconsistent information provided in Innovgreen's responses should be considered a "correction." ST&R Respondents Br. at 20-21. However, as highlighted above, Commerce explained that the submission of contradictory information in a subsequent questionnaire response does not constitute a simple "correction" when respondents do not identify the prior errors or explain how they were corrected. IDM at 77. In light of Innovgreen's failure to acknowledge or explain the changes in its reporting, Commerce reasonably considered the inconsistent information in Innovgreen's supplemental response to be evidence of the company's failure to act to the best of its ability. *See* Defendant Br. at 70. While acting to the best of one's ability does not require perfection, "it does not condone inattentiveness, carelessness, or inadequate record keeping{,}" and Commerce reasonably expected Innovgreen to be more forthcoming in its reporting. *Nippon Steel*, 337 F.3d at 1382. Nor is this information immaterial, as Respondents suggest. *See* ST&R Respondents Br. at 22. As Commerce's inquiry was centered on the materials used by Vietnamese companies, having complete and accurate information regarding such materials is critical to Commerce's analysis.

Respondents also contend that Commerce relied on improper information in finding that the thickness of certain veneers supported its AFA finding. *Id.* at 23. To start, this argument ignores Commerce's analysis of Innovgreen's own data, which showed that the [              ] it imported were substantially thicker than the veneers of other species Innovgreen used. AFA Memo at 17; *see* Innovgreen 2SQR at 2 and Exhibit 1 and Exhibit 2 (showing the [

]). Other documentation submitted by Innovgreen likewise showed that its [

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

]. Innovgreen SQR at Exhibit 2 ([

]). That the thickness of these veneers were [                          ]

was further supported by additional record evidence regarding the typical thickness of [

]. AFA Memo at 17. While Respondents fault Commerce for considering this

information, they fail to explain why information on [                    ] is not relevant when

considering the characteristics of [                         ]. And, as Commerce recognized,

"no party cited any record evidence supporting the claim that face veneers are produced and

consumed in the same thickness as core veneers." IDM at 80. As such, Commerce's reliance on

this information and finding that certain materials imported by Innovgreen were consistent with

core veneers is reasonable and supported by the record. *See id.* at 79.

### 12.    Lechenwood

Commerce's application of AFA to Lechenwood is supported by the record and otherwise

in accordance with law. In its questionnaire responses, Lechenwood failed to provide accurate

information regarding some of the most basic aspects of its reporting. *See* AFA Memo at 17-18;

IDM at 98-99. Lechenwood repeatedly provided incorrect information regarding its affiliation with

a Chinese plywood producer and that company's provision of inputs. *See* AFA Memo at 17-18;

IDM at 98-99. Lechenwood's inability to accurately report even this basic information despite

multiple chances to do so demonstrates the company's failure to act to the best of its ability and

renders the company's reporting as a whole unreliable. As such, Commerce's application of AFA

was appropriate.

Respondents assert that Lechenwood's reporting failures regarding its Chinese affiliate do

not support the application of AFA because there is no gap in the record and any misreporting was

unintentional. DH Respondents Br. at 42-46; Shelter Forest Br. at 21. This claim is not supported by the facts or the law. In its initial questionnaire, Commerce directed Lechenwood to state whether it was affiliated with any Chinese producer or exporter of plywood or plywood inputs; in response, Lechenwood stated: "We are not affiliated with any producer or exporters of plywood or plywood inputs in China." Letter from Fox Rothschild LLP to Sec'y Commerce, re: *Certain Hardwood Plywood Products from the People's from Republic of China: Submission of Quantity and Value Response on Behalf of Lechenwood Viet Nam Company Limited* (Oct. 1, 2020), C.R. 144, P.R. 125, at 3 ("Lechenwood Q&V"). Notably, this statement was made [

                        ] Huainan Mengping Import and Export Co., Ltd ("Mengping"), a Chinese exporter of hardwood plywood. *Id.* at Exhibit 2; Coalition's Comments on Q&V Resps. at 5-6. In a supplemental questionnaire response, Commerce requested that Lechenwood explain its relationship with Mengping, and, in response, Lechenwood acknowledged that it is [


            ]. Letter from Fox Rothschild LLP to Sec'y Commerce, re: *Certain Hardwood Plywood Products from the People's from Republic of China: Submission of Supplemental Quantity and Value Response on Behalf of Lechenwood Viet Nam Company Limited* (Mar. 29, 2021), C.R. 223, P.R. 239, at 2-4. This company also elsewhere stated that [

                                                    ].

*Id.* at 2-3. This, however, [

            ]. Letter from Fox Rothschild LLP to Sec'y Commerce, re: *Certain Hardwood Plywood Products from the People's from Republic of China: Submission of Second Supplemental Quantity and Value Response on Behalf of Lechenwood Viet Nam Company Limited* (July 9, 2021), C.R. 348, P.R. 338, at Exhibit 1. Further, in its second supplemental questionnaire

response, [                                                              ]. *Id.* at 2. Thus,

Lechenwood repeatedly provided incorrect information in responding to basic questions about its

Chinese affiliate. Lechenwood's inability to accurately respond to the most basic information about

its affiliate render its reporting as a whole unreliable; in other words, if Lechenwood did not even

accurately report that it is affiliated with a Chinese producer of plywood—[

                                    ]—Commerce rightfully questions the accuracy of all of

Lechenwood's reporting.

   Respondents attempts to excuse Lechenwood's failings by asserting that the company

misunderstood the question and was still responsive do not persuade. DH Respondents Br. at 42-

46; Shelter Forest Br. at 19. For example, Respondents highlight that, in its initial response,

Lechenwood reported that it was [                          ]. DH Respondents Br. at 43. But

this does not demonstrate that Lechenwood was fully responsive, as the documentation provided

in the initial questionnaire response provided no indication that [                              ].

Lechenwood Q&V at Exhibit 2; *see* IDM at 98-99. Similarly, Respondents claim that Lechenwood

believed that it only needed to identify Chinese affiliates that exported core materials. DH

Respondents Br. at 44-45. But the questionnaire was clear that it was requesting information on

any Chinese affiliate that produced or exported plywood or plywood inputs. Lechenwood Q&V

at 3. Further, the first supplemental response requested information on "the nature of the affiliation

and whether/how these companies/individuals are involved in your business in Vietnam . . . ."

Letter from Fox Rothschild LLP to Sec'y Commerce, re: *Certain Hardwood Plywood Products

from the People's from Republic of China: Submission of Supplemental Quantity and Value

Response on Behalf of Lechenwood Viet Nam Company Limited* (Mar. 29, 2021), C.R. 223, P.R.

239, at 2. This request was clearly not limited to information about core materials, yet Lechenwood

responded—incorrectly—that it had [

]. *Id.* at 2-3.

In short, as Commerce explained, Lechenwood "repeatedly reported conflicting and incorrect information" and "failed to consistently, accurately, and completely report information in response to Commerce's requests for information." IDM at 98-99. Commerce reasonably expected that Lechenwood would be more forthcoming in its responses, particularly with regard to its Chinese affiliates. Lechenwood's failure to do so—regardless of whether it was intentional or based on responding to the questionnaires with insufficient care—demonstrates that the company did not cooperate to the best of its ability. *See Nippon Steel*, 337 F.3d at 1382. Further, given Lechenwood's failures with respect to basic information that was central to Commerce's analysis, the agency properly applied AFA.

### 13.   Long Luu

Commerce properly applied AFA to Long Luu. Commerce identified multiple shortcomings and inconsistencies in Long Luu's reporting. *See* AFA Memo at 18. This related to the source of Long Luu's inputs, the types of inputs used, and the provision of supporting documentation. *See id.*; IDM at 99-100. As detailed by Defendant, the failures in Long Luu's reporting rendered its responses unreliable and thus supported the application of AFA. Defendant Br. at 75-79.

Respondents first argue that Commerce improperly found that Long Luu reported inaccurate information regarding its sources, as it corrected its prior reporting in a supplemental questionnaire response. DH Respondent Br. at 65-67. This ignores the record. Long Luu initially stated that it did "not source inputs from resellers in Vietnam." Letter from Fox Rothschild LLP to Sec'y Commerce, re: *Certain Hardwood Plywood Products from the People's from Republic of*

*China: Submission of Quantity and Value Response on Behalf of Long Luu Plywood Production Co., Ltd.* (Sept. 30, 2020), C.R. 31, P.R. 84, at 3 ("Long Luu Q&V"); AFA Memo at 18. However, upon request from Commerce for further information on its suppliers, Long Luu subsequently stated that it did obtain inputs from Vietnamese resellers, including inputs from China. Letter from Fox Rothschild LLP to Sec'y Commerce, re: *Certain Hardwood Plywood Products from the People's from Republic of China: Submission of Second Supplemental Quantity and Value Response on Behalf of Long Luu Plywood Production Co., Ltd.* (July 12, 2021), C.R. 352, P.R. 342, at 2 ("Long Luu 2SQR"). As Defendant explained, Commerce properly rejected Long Luu's subsequent response as a correction given that Long Luu did not identify the error in its original response or explain how or why it needed to be corrected. Defendant Br. at 77; IDM at 99.

Further, even if Long Luu's misreporting was based on its "misunderstanding," DH Respondents Br. at 64, the "best of one's ability" standard "does not condone inattentiveness, carelessness, or inadequate record keeping." *Nippon Steel*, 337 F.3d at 1382. Commerce's initial questionnaire directed the company to identify Chinese inputs obtained from Vietnamese and to state whether the inputs were "1) face/back veneers, 2) veneer core platforms, 3) multi-ply core panels, or 4) individual core veneers." Long Luu Q&V at 3. A reasonable respondent could not have read this question to relate only to core materials. *See* DH Respondents Br. at 65. Similarly, Respondents' claims that Long Luu's failures were not intentional is irrelevant, as the AFA statute does not require intent for a respondent to fail to act to the best of its abilities. *Nippon Steel*, 337 F.3d at 1383.

With regard to Commerce's finding that Long Luu failed to provide certain purchase documentation, "Long Luu does not dispute that." DH Respondents Br. at 68. Nonetheless, Respondents assert that Commerce was required to provide Long Luu with another opportunity to

correct this shortcoming. *Id.* at 69. As discussed above, Commerce satisfied its obligations with regard to 19 U.S.C. § 1677m(d). Notably, here, Long Luu had initially reported that it did not obtain Chinese inputs from Vietnamese resellers. Long Luu Q&V at 3. When Commerce requested further information about Long Luu's inputs, it contradicted its prior reporting and failed to fully document its new response. Long Luu 2SQR at 2 and Exhibit 5. As Commerce explained, "mere failure of a respondent to furnish requested information—for any reason—requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination." IDM at 100 (quoting *Nippon Steel*, 337 F.3d at 1381). Given the absence of requested information and the submission of inconsistent responses, Commerce reasonably found that Long Luu failed to fully cooperate and that the application of AFA was appropriate. *See* IDM at 99-100; Defendant Br. at 77-79.

### 14.    Plywood Sunshine

Commerce's application of AFA to Plywood Sunshine is supported by the record and otherwise in accordance with law. As Commerce explained, during the underlying proceeding, Plywood Sunshine provided incomplete and inconsistent information about its inputs, including its use of Chinese materials. AFA Memo at 20; *see* Defendant Br. at 107-109. For example, in the initial Q&V questionnaire, Commerce directed respondents to identify all resellers from which they purchased plywood inputs in 2016 through 2020 and to identify what the inputs were. *See* Letter from Fox Rothschild LLP to Sec'y Commerce, re: *Certain Hardwood Plywood Products from the People's from Republic of China: Submission of Quantity and Value Response on Behalf of Plywood Sunshine* (Oct. 1, 2020), C.R. 49, P.R. 96, at 3. In response, Plywood Sunshine stated that it did not source inputs from resellers in Vietnam. *Id.* However, in its second supplemental Q&V response, upon further questioning from Commerce regarding the source of its inputs,

Plywood Sunshine revealed that it had purchases of Chinese plywood inputs from resellers in Vietnam. Letter from Fox Rothschild LLP to Sec'y Commerce, re: *Certain Hardwood Plywood Products from the People's from Republic of China: Submission of Second Supplemental Quantity and Value Response on Behalf of Plywood Sunshine* (July 8, 2021), C.R. 274, P.R. 306, at 2-3 and Exhibit 2. As the circumvention proceeding was centered on the use of Chinese plywood inputs, Plywood Sunshine's failure to provide complete and accurate information in this regard support Commerce's finding that the company's reporting could not be relied upon. *See* AFA Memo at 3, 20; Defendant Br. at 109-110.

Respondents' arguments regarding Plywood Sunshine are largely based on claims that Commerce failed to satisfy the requirements of 19 U.S.C. § 1677m(d). M&G Respondents Br. at 17-19. As discussed above, Commerce fully complied with the requirements of this provision. *See* Defendant Br. at 17-22. Commerce issued multiple questionnaires to Plywood Sunshine—including a company specific questionnaire—requesting information on its production and sales and these responses revealed incomplete and contradictory information. *See* AFA Memo at 20; Defendant Br. at 107-110. Thus, Commerce properly resorted to AFA.

Respondents also assert that Commerce's conclusion that Plywood Sunshine was not fully responsive is not supported by the record. M&G Respondents Br. at 20-21. Respondents' argument ignores the full record. To start, with regard to Plywood Sunshine's failure to fully respond to Commerce's request that it identify affiliates' exports from China to Vietnam, Respondents do not claim that Plywood Sunshine provided full and complete information but instead state only that the company should have been given another opportunity to clarify its responses. *Id.* Moreover, Commerce's application of AFA was based on its consideration of Plywood Sunshine's responses as a whole and the extent to which Plywood Sunshine failed to cooperate the best of its ability

based on the totality of its responses. *See* AFA Memo at 20. As discussed by Defendant, Commerce identified numerous problems with Plywood Sunshine's questionnaire responses, which, taken together, demonstrated that the company provided incomplete and inconsistent information and that, therefore, the application of AFA was supported. Defendant Br. at 107-109.

### 15. TEKCOM

Commerce's application of AFA to TEKCOM was supported by the record and in accordance with law. As Commerce explained, there were significant deficiencies in TEKCOM's reporting. *See* AFA Memo at 21-22; IDM at 101-102. In particular, TEKCOM did not provide complete and accurate information regarding the inputs it obtained from China and the plywood materials used. *See* AFA Memo at 21-22. This information was critical to Commerce's inquiry, and TEKCOM's multiple failures rendered its reporting unreliable. IDM at 101-102; *see* Defendant Br. at 79-81.

Respondents first assert that Commerce incorrectly found that TEKCOM did not report all imports from China because [                    ] TEKCOM's predecessor company. DH Respondents Br. at 71-72. This argument does not persuade. As shown in TEKCOM's initial response, the predecessor and successor companies have [                    ] and the successor company was formed "to replace the previous entity . . . to raise additional funds from foreign investors." Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Anti-Circumvention Inquiry of Certain Hardwood Plywood Products from the People's Republic of China: Quantity and Value Questionnaire Response on Behalf of TEKCOM Corporation* (Oct. 1, 2020), C.R. 121, P.R. 117, at 3 ("TEKCOM Q&V"). Thus, the predecessor and successor entities [                    ]. Respondents' claim that TEKCOM fully responded to Commerce's questionnaires because they

requested information on "your company" likewise fall flat. DH Respondents Br. at 72. Notably, in its initial questionnaire response, [

]. TEKCOM Q&V at 3 and Exhibit 3. This demonstrates that [

]. Indeed, as Commerce noted, "TEKCOM was aware that our requests for information applied to the company as it existed during the inquiry period, in this case in two forms . . . . It is disingenuous for TEKCOM to now claim that it was unaware that our requests for information also applied to its prior iteration to the extent that the activities of that company related to the purchase, production and/or sale of plywood or plywood inputs." IDM at 101. Consequently, Commerce properly concluded that TEKCOM failed to report all of its Chinese imports. *See id.*

Respondents next fault Commerce for finding that TEKCOM failed to accurately identify its poplar veneers as core veneers. DH Respondents Br. at 73-76. Respondents assert that TEKCOM stated that these veneers were used as face/back veneers because they were "full-size." *Id.* at 74. However, as Commerce highlighted, TEKCOM provided no documentation to support this claim. IDM at 101; *see* Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, *re: Anti-Circumvention Inquiry of Certain Hardwood Plywood Products from the People's Republic of China: Q&V Second Supplemental Questionnaire on Behalf of Tekcom Corporation* (July 9, 2021), C.R. 326, P.R. 326, at 2 ("TEKCOM 2SQR"). In contrast, Commerce relied on record information to support its conclusion that these were in fact core veneers. Commerce noted that TEKCOM's poplar veneers were significantly thicker than other veneers identified as face/back veneers. AFA Memo at 22. Additional record information further supported that veneers of this thickness were

core veneers. *Id.* As discussed above, Commerce reasonably considered record evidence regarding TEKCOM's own purchases as well as other record evidence regarding the qualities of core veneers from China. Respondents contest Commerce's reliance on this information but do not identify any contradictory information. DH Respondents Br. at 75-76.

Finally, Respondents assert that TEKCOM's inconsistent reporting of the veneer species it used should be considered a "correction." *Id.* at 77. As discussed above, Commerce properly declined to consider TEKCOM's reporting in its supplemental response as a correction. The initial questionnaire clearly requested information on all veneer species used. TEKCOM Q&V at 4. In TEKCOM's supplemental response, it did not identify any error in its prior reporting or explain why its reporting was different; instead, it simply reported inconsistent information. TEKCOM 2SQR at 2 and Exhibit SQ2-1; *see* IDM at 102. Thus, Commerce's finding that TEKCOM's response contained significant discrepancies such that the application of AFA was appropriate was supported by the record. IDM at 101-102; *see* Defendant Br. at 81-84.

### 16.    TL Trung

In challenging Commerce's application of AFA as to TL Trung, Respondents argue only Commerce's affirmative circumvention determination was not supported by substantial evidence and otherwise in accordance with law. M&G Respondents Br. at 25. As highlighted by Defendant, and as explained in Defendant's and Defendant-Intervenor's Tranche I response briefs, Commerce's affirmative circumvention determination was proper. *See* Defendant Br. at 44-45. Accordingly, Respondents' argument regarding the application of AFA as to TL Trung must fail.

### 17.    Win Faith

Commerce properly applied AFA to Win Faith. As Commerce explained, it applied AFA to Win Faith based on the company's failure to disclose its affiliation with Chinese producers of

hardwood plywood and the extent to which its Chinese affiliate was involved in its sales of hardwood plywood to the United States. IDM at 102-103, 144. As Defendant highlights, this was critical information in Commerce's investigation, Win Faith's failures rendered its responses unreliable, and the application of AFA was appropriate. Defendant Br. at 105-107.

Respondents first assert that the application of AFA was improper because there was no gap in the record that Commerce needed to fill with respect to Win Faith's reporting. M&G Respondents Br. at 12-14. This is incorrect. As Defendant notes, Commerce underscored that understanding affiliations is "essential" to its circumvention determinations, noting that it "is statutorily obligated to consider the Chinese affiliations of its respondents." IDM at 140; Defendant Br. at 105. Beyond that, having a full understanding of a company's affiliations and the role of affiliates in the production and sales process is relevant to understanding and analyzing information a company provides regarding its sales and ability to trace inputs. *See* M&G Respondents Br. at 13. In this regard, it is notable that Win Faith reported that its Chinese affiliate [                                                                                    ]. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Anti-Circumvention Inquiry of Certain Hardwood Plywood Products from the People's Republic of China: Q&V Second Supplemental Questionnaire Response on Behalf of Win Faith Trading Limited* (July 9, 2021), C.R. 313-314, P.R. 322, at 3 and Exhibit SQ2-2. Thus, Win Faith's failure to be fully forthcoming about its affiliates is directly relevant to Commerce's analysis. Moreover, due to Win Faith's failure to provide complete and accurate information regarding its affiliates, Commerce considered Win Faith's responses as a whole to be unreliable. *See* IDM at 102-103. As Defendant explains, it is well established that Commerce may apply total AFA in such circumstances. Defendant Br. at 105.

For these same reasons, Respondents' reliance on *Zhejiang Dunan* and *Hyundai* is misplaced. In *Zhejiang Dunan*,[5] the Federal Circuit found that Commerce erred in applying a transaction-specific margin to certain sales as partial AFA when the only information missing was quantity data, which was not needed to calculate the relevant margins. *Zhejiang Dunan*, 652 F.3d at 1347-48. And in *Hyundai*, the Court found that Commerce's determination to apply total AFA in light of misreported information for one sale based on a misunderstanding of the scope and where the respondent otherwise complied with Commerce's requests was supported. *Hyundai Elec. & Energy Sys. v. United States*, No. 2021-2312, 2022 WL 3273811, at *4 (Fed. Cir. Aug. 11, 2022). In contrast, here, the gaps and inaccuracies in Win Faith's reporting were not minor or inconsequential; instead, these issues were central to Commerce's determination and significant enough that they rendered Win Faith's reporting as a whole unusable.

Respondents also claim that the application of AFA to Win Faith was unsupported because Commerce did not consider evidence that detracted from its conclusion. M&G Respondents Br. at 14-15. In particular, Respondents state that Win Faith's Chinese affiliate, [        ], is not a producer of hardwood plywood and that the companies identified on [        ] website as affiliated plywood manufacturers are identified as such only for advertising purposes. *Id.* at 14. However, as Defendant explained, Commerce considered Win Faith's arguments in this regard and found them to be unsupported and insufficient to overcome the shortcomings in Win Faith's reporting. Defendant Br. at 106-107. As an initial matter, Commerce's determination was not centered on a finding that [        ] itself was necessarily a producer of hardwood plywood, but

---

[5]    In *Zhejiang Dunan*, the Federal Circuit did not find that Commerce improperly relied on AFA, as Respondents suggest. M&G Respondents Br. at 13. In that case, the question before the Court was "whether Commerce properly selected the adverse inference it applied to certain sales . . . {and} DunAn {did} not challenge Commerce's finding that the use of facts otherwise available and an adverse inference were necessary." *Zhejiang Dunan*, 652 F.3d at 1345.

that [        ]—and therefore Win Faith—is affiliated with Chinese plywood manufacturers. *See*

AFA Memo at 23. Thus, Win Faith's claims about [          ] status as a producer, even if true,

do not undermine Commerce's conclusion. *See* M&G Respondents Br. at 14-15. Additionally, as

Defendant explains, Win Faith provided no evidence to support its claims that the companies

identified on [          ] website as affiliated plywood producers are not truly affiliates.

Defendant Br. at 106. Nor did Win Faith's assertions outweigh record evidence, including

[          ] website stating that [

  ] and that it has [                                                              ].

Letter from Wiley Rein LLP to Sec'y Commerce, re: *Hardwood Plywood Products from the*

*People's Republic of China: Comments on Supplemental Quantity and Value Questionnaire*

*Responses* (Mar. 18, 2021), C.R. 177, P.R. 201, at Exhibit 1. Moreover, [          ] website

includes a section titled [            ] on which it states that it has [

                              ]. *Id.* This information fully supports Commerce's

determination that Win Faith did not fully and accurately identify its affiliates and is not

undermined by Win Faith's unsupported claims.

    Respondents similarly claim that Commerce's finding that [          ] was involved in Win

Faith's sales is unsupported. M&G Respondents Br. at 15-16. Here, too, Respondents fail to

persuade. In particular, as Commerce highlighted, Win Faith provided a contract for a sale of

plywood to the United States that identified the seller as [                                    ]

email address and a physical address in the [                              ]; the contract also

indicated that the [

]. *See* AFA Memo at 23; Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Anti-Circumvention Inquiry of Certain Hardwood Plywood Products from the People's Republic of China: Quantity and Value Supplemental Questionnaire Response on Behalf of Win Faith Trading Limited* (Mar. 8, 2021), C.R. 174, P.R. 196, at Exhibit SQ-1 ("Win Faith SQR"). Win Faith's unsupported claims that it was reasonable for [          ] to be identified in the contract do not undermine Commerce's conclusion that this information shows that Win Faith's Chinese affiliates were significantly involved in its U.S. sales. *See* AFA Memo at 23. Notably, Respondents now appear to acknowledge that [          ] has a role in Win Faith's sales of plywood to the United States, stating that it is reasonable "that a trading company would list its supplier in its sales contract." M&G Respondents Br. at 16. Thus, not only does the record fully support Commerce's conclusion that "Win Faith's Chinese affiliate was involved in its sales to the United States . . .{,}" IDM at 103, but Respondents' statement highlights the importance of this information, given that, in the underlying proceeding, Win Faith claimed that [          ] "did not provide or sell any plywood or plywood inputs to" Win Faith. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Anti-Circumvention Inquiry of Certain Hardwood Plywood Products from the People's Republic of China: Quantity and Value Questionnaire Response on Behalf of Win Faith Trading Limited* (Oct. 1, 2020), C.R. 116, P.R. 116, at 5; Win Faith SQR at 2.

18.    **Zhongjia**

Commerce properly applied AFA to Zhongjia. In conducting its verification of Zhongjia, Commerce found that it was unable to verify certain aspects of the company's reporting and that the company failed to provide all requested information. *See* IDM at 158-165; Defendant Br. at 36-37. In particular, verification revealed that Zhongjia had failed to report all suppliers and

purchases of core veneers, and Zhongjia was unable to provide material input records for part of the period of investigation. *See* IDM at 158-165. The materials used by Zhongjia are of central importance to Commerce's circumvention inquiry, and thus Zhongjia's failures at verification prohibited Commerce from considering the company's responses verified. *See id.* at 158. As such, Commerce's application of AFA was fully supported by the record.

Respondents first claim that Commerce incorrectly faulted Zhongjia for failing to identify one of its core suppliers. DH Respondents Br. at 79-83. Respondents do not dispute that Zhongjia failed to report one of its suppliers but seek to excuse Zhongjia's failure because it did not consider the company to be a "supplier." *Id.* at 79. As an initial matter, when Commerce requested documentation to support Zhongjia's claim that the veneers purchased from this supplier were used in non-plywood applications, Zhongjia was unable to provide support. Memorandum from Genevieve Coen, Nicolas Mayora, Miranda Bourdeau, Int'l Trade Compl. Analysts, Off. V, through Kabir Archuletta, Program Manager, Off. V, AD/CVD Operations, to The File, re: *Circumvention Inquiry on the Antidumping and Countervailing Duty Orders on Certain Hardwood Plywood Products from the People's Republic of China: Verification of Vietnam Zhongjia Wood Company Limited* (Dec. 21, 2022), C.R. 566, P.R. 679, at 6 ("Zhongjia Verification Report"). Moreover, Zhongjia's incorrect belief about whether this company should have been reported does not justify its reporting. Indeed, Commerce requested that Zhongjia provide a "complete list of *all* {its} Vietnamese suppliers" of plywood inputs, without qualifying that such inputs needed to be used to manufacture plywood. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Anti-Circumvention Inquiry of Certain Hardwood Plywood Products from the People's Republic of China: Q&V Second Supplemental Questionnaire on Behalf of Zhongjia* (July 9, 2021), C.R. 302, P.R. 318, at 2 (emphasis added). As Respondents recognize, the core veneers used by Zhongjia

are "{a}t the heart of the investigation." DH Respondents Br. at 78. Thus, it was critical that Zhongjia report all its purchases of plywood inputs regardless of whether such materials were ultimately used to producer plywood. *See* Defendant Br. at 37. As explained by Defendant, the reason why Zhongjia chose not to report this supplier does not change the fact that this information was requested and was not provided. *See id.* at 38-39.

Respondents likewise attempt to excuse Zhongjia's inability to provide Commerce with certain material input records, claiming that this failure was based on a misunderstanding and was immaterial. DH Respondents Br. at 83-86. Respondents' arguments do not persuade. As explained by Defendant, at verification, Commerce asked to examine Zhongjia's material input records for Q1 2020; however, Zhongjia was unable to provide this information. *See* Defendant Br. at 37; Zhongjia Verification Report at 6. That Zhongjia may not have believed the information was needed does not excuse its failure. Commerce's verification agenda made clear that Zhongjia should "have at hand *all* company records and worksheets used in responding to the questionnaire{s}" and that the items listed in agenda were "illustrative but not all-inclusive." Memorandum from Kabir Archuletta, Program Manager, Off. V, AD/CVD Operations, to Selected Companies, re: *Circumvention Inquiry on the Antidumping and Countervailing Duty Orders on Certain Hardwood Plywood Products from the People's Republic of China: Verification of Questionnaire Responses* (Oct. 7, 2022), P.R. 606, at 5 (emphasis added). The Verification Agenda also warned that, if Zhongjia was "not prepared to support or explain a response item at the appropriate time, the verifiers will move on to another topic. If, due to time constraints, it is not possible to return to that item, we may consider the item unverified," which could result in the application of AFA. *Id.* at 1-2. As such, Zhongjia was on notice regarding what was expected of it.

Further, this information is not immaterial and could not simply be replaced by other documentation from 2020. *See* DH Respondents Br. at 85-86. As Commerce explained, without the requested information, Commerce could not

> conclusively determine that the system accurately represented all purchases when we could not examine the requested supporting documentation. It would be unreasonable to disregard these material shortcomings in the record, particularly considering that the entire premise of verification is for Commerce to examine source documentation.

IDM at 163. In this regard, it is noteworthy that examination of the material input records for 2019 revealed that Zhongjia had failed to identify all its input suppliers. Zhongjia Verification Report at 6. Thus, the record supports Commerce's conclusions regarding the relevance of this information and the resulting application of AFA.

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, in conjunction with the arguments presented in Defendant's brief, we respectfully request that the Court deny Respondents' motions for judgement on the agency record and sustain Commerce's final circumvention determination.

**Consol. Ct. No. 23-00144**                                        **NON-CONFIDENTIAL VERSION**

Respectfully submitted,

*/s/ Timothy C. Brightbill*

Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
Tessa V. Capeloto, Esq.
Maureen E. Thorson, Esq.
John Allen Riggins, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition for Fair Trade in
Hardwood Plywood*

Dated:  November 4, 2024

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Defendant-Intervenor Coalition for Fair Trade in Hardwood Plywood's Response to Motions for Judgement on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2016), is 18,743 words.


*/s/ Timothy C. Brightbill*
(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

Coalition for Fair Trade in Hardwood Plywood
(Representative Of)

November 4, 2024
(Date)

## THE UNITED STATES COURT OF INTERNATIONAL TRADE

**SHELTER FOREST INTERNATIONAL ACQUISITION, INC.,**

**Plaintiff,**

**GREATRIVER WOOD CO., LTD.,** *et al.,*

**Consolidated Plaintiffs,**

**and**

**CONCANNON LUMBER COMPANY,** *et al.,*

**Plaintiff-Intervenors,**

**v.**

**UNITED STATES,**

**Defendant,**

**and**

**COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD,**

**Defendant-Intervenor.**

Before: Hon. Mark A. Barnett,
Chief Judge

Consol. Court No. 23-00144

## <u>ORDER</u>

Upon consideration of Plaintiffs' motions for judgement upon the agency record and all other papers and proceedings herein, it is hereby

ORDERED that Plaintiffs' motions are denied; and it is further

ORDERED that the U.S. Department of Commerce's determination is sustained.

SO ORDERED.


Dated: _____          _____
        New York, New York                                Hon. Mark A. Barnett, Chief Judge