UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| SHELTER FOREST INTERNATIONAL ACQUISITION, INC., <br><br> Plaintiff, <br><br> and <br><br> GREATRIVER WOOD CO., LTD., ET AL., <br><br> Consolidated Plaintiffs, <br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD <br><br> Defendant-Intervenor. | Consol. Court No. 23-00144 <br><br> **Public Version** |

**DH CONSOLIDATED PLAINTIFFS AMERICAN WOODMARK CORPORATION, ET Al. TRANCHE II REPLY BRIEF**

Gregory S. Menegaz
Judith L. Holdsworth
Alexandra H. Salzman
Vivien J. Wang
**deKieffer & Horgan, PLLC**
1145 Fifteenth Street, N.W.
Suite 1101
Washington DC 20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to DH Consolidated Plaintiffs*

Dated: January 2, 2025

## TABLE OF CONTENTS

I.    Commerce Acted Contrary to Law By Failing to Issue Company-Specific Deficiency
      Questionnaires Before Finding That There Is A Gap On the Record ............................ 2

II.   Commerce failed to justify its application of Adverse Inferences ................................. 7

III.  DH Exporter Plaintiffs Company-Specific Arguments ................................................. 8

      A.    Eagle Industries Company Limited ...................................................................... 8

      B.    Golden Bridge Industries Company Limited ..................................................... 17

      C.    Lechenwood Viet Nam Company Limited ........................................................ 24

      D.    Arrow Forest International Co., Ltd.  ................................................................ 27

      E.    Her Hui Wood (Vietnam) Co. ........................................................................... 31

      F.    Long Luu Plywood Production Co., Ltd. ........................................................... 36

      G.    TEKCOM Corporation ...................................................................................... 44

      H.    Vietnam Zhongjia Wood Company Limited ..................................................... 52

IV.   Conclusion ................................................................................................................. 59

# TABLE OF AUTHORITIES

## Cases

*Apiário Diamante Comercial Exportadora Ltda. v. United States*, 705 F. Supp. 3d 1398 (Ct Int'l Trade 2024) ........................................................................................................28

*BlueScope Steel v. United States*, 548 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) .........................34

*Bluescope Steel Ltd. v. United States*, 589 F. Supp. 3d 1294 (Ct. Int'l Trade 2022)....................12

*Canadian Solar Int'l Ltd. v. United States*, 415 F. Supp. 3d 1326 (Ct. Int'l Trade 2019).............23

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003) ........................................41

*Dalian Meisen Woodworking Co. v. United States*, 2023 Ct. Int'l. Trade LEXIS 61*, Slip Op. 2023-60 (Ct. Int'l Trade, Apr. 24, 2023) ........................................................................26

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365 (Fed. Cir. 2014) ............... 23-24

*Fisher S.A. v. United States*, 700 F. Supp. 2d 1364 (Ct. Int'l Trade 2010) ...................... 20-21, 47

*Goodluck India Ltd. v. United States*, 11 F.4th 1335 (Fed. Cir. 2021) ..........................................26

*GPX Int'l Tire Corp. v. United States*, 893 F. Supp. 2d 1296 (Ct. Int'l Trade 2013) ..................30

*GPX Int'l Tire Corp. v. United States*, 942 F. Supp. 2d 1343 (Ct. Int'l Trade 2013).....................7

*Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261 (Ct Int'l Trade 2018) ........................31

*Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375 (Fed. Cir. 2022) ..........................43, 56

*Hyundai Heavy Industries, Co. Ltd. v. United States*, 332 F. Supp. 3d 1331 (Ct. Int'l Trade 2018) ....................................................................................................19, 46, 47

*Hyundai Heavy Indus. Co. v. United States*, 485 F. Supp. 3d 1380 (Ct. Int'l Trade 2020)...... 2, 3

*Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309 (Ct. Int'l Trade 2021) ......................34

*Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States*, 753 F.3d 1227 (Fed. Cir. 2014) .................................................................................................................1

*Nat'l Nail Corp. v. United States*, 390 F. Supp. 3d 1356 (Ct. Int'l Trade 2019) ..........8, 24, 34, 54

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)................................. *passim*

*Novosteel SA v. United States*, 284 F.3d 1261 (Fed. Cir. 2002) ...................................................49

*NSK Ltd. v. United States*, 481 F.3d 1355 (Fed. Cir. 2007) ..........................................................34

*Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565 (Fed. Cir. 1990)...................................15

*Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373 (Fed. Cir. 2016) ..............20, 47

*Shelter Forest Int'l Acquisition, Inc. v. United States*, 497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021) *aff'd,* 2022 U.S. App. LEXIS 16491 (Fed. Cir. 2022) [Nonprecedential] .........................28

*SKF USA Inc v. United States*, 29 C.I.T. 969 (2005) ...........................................................56, 57

*Ta Chen Stainless Steel Pipe v. United States*, 23 C.I.T. 804 (1999) ...........................................17

*Timken U.S. Corp. v. United States*, 434 F.3d 1345 (Fed. Cir. 2006) ...........................................21

## Statutes

19 U.S.C. § 1677e(a) ...........................................................................................................26

19 U.S.C. § 1677e(a)-(b) ....................................................................................................1, 40

19 U.S.C. § 1677e(a)(2)(A)-(D) .........................................................................................1-2

19 U.S.C. § l677e(b) .............................................................................................................2, 7

19 U.S.C. § 1677f-1(c)(2)(A) ...............................................................................................6

19 U.S.C. § 1677j(b)(3)(B) ...................................................................................................30

19 U.S.C. § 1677m(d) ...................................................................................................*passim*

## Administrative Decisions

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 87 Fed. Reg. 75,221, 75222 (Dec. 8, 2022)...............................................................6

*Certain Hardwood Plywood Products From the People's Republic of China: Preliminary Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 84 Fed. Reg. 27,081 (June 11, 2019) ........................................................................6

PUBLIC VERSION

Consolidated Plaintiffs American Woodmark Corporation, Del Valle Kahman & Company, Ike Trading Company Limited, Pittsburgh Forest Products, Panoply Wood Products USA Inc., American Pacific Plywood, Inc., Eagle Industries Company Limited ("Eagle"), Golden Bridge Industries Pte. Ltd. ("Golden Bridge"), Lechenwood Viet Nam Company Limited ("Lechenwood"), Arrow Forest International Co., Ltd. ("Arrow"), Her Hui Wood (Vietnam) Co. ("Her Hui"), Long LUU Plywood Production Co., Ltd. ("Long Luu"), TEKCOM Corporation ("TEKCOM"), Vietnam Zhongjia Wood Company Limited ("Zhongjia"), (together: "DH Plaintiffs") hereby reply to Defendant's Response to Plaintiffs' Tranche II Rule 56.2 Motions for Judgment on the Agency Record (September 20, 2024), **ECF No. 68** ("Def. Tr.II Rsp. Br."), and Defendant-Intervenor Coalition for Fair Trade in Hardwood Plywood's Tranche II Response to Motion for Judgment on the Agency Record (November 4, 2024), **ECF 85** ("Coalition Tr.II Rsp. Br.").

Before discussing the discrepancies Commerce found against each DH Plaintiff and Defendant's and Coalition's arguments therein, we address several general arguments that Defendant and the Coalition made in support of Commerce's overall procedure in this investigation as related to applying adverse facts available ("AFA") to the 22 cooperating respondents including DH Plaintiffs.

19 U.S.C. § 1677e subsections (a) and (b) have different purposes. *See Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States*, 753 F.3d 1227, 1232 (Fed. Cir. 2014); 19 U.S.C. § 1677e(a)-(b). Under 19 U.S.C. § 1677e(a), Commerce can make a determination on the basis of facts available ("FA") when necessary information is not available on the record, or an interested party withholds information, fails to provide information by submitted deadlines, impedes a proceeding, or provides information that cannot be verified.  19 U.S.C. §

1

1677e(a)(2)(A)-(D).  However, "Commerce's authority to use the facts otherwise available is subject to 19 U.S.C. § 1677m(d){.}" *Hyundai Heavy Indus. Co. v. United States*, 485 F. Supp. 3d 1380, 1388 (Ct. Int'l Trade 2020).

After Commerce complies with § 1677m(d) and determines that information is missing pursuant to § 1677e(a), if Commerce makes an additional finding that the party has failed to cooperate to the "best of its ability," Commerce can use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available, thereby using AFA. *See* 19 U.S.C. § l677e(b).  While the "best of its ability" standard "does not condone inattentiveness, carelessness, or inadequate record keeping," it also "does not require perfection and recognizes that mistakes sometimes occur {.}" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

## I.    Commerce Acted Contrary to Law By Failing to Issue Company-Specific Deficiency Questionnaires Before Finding That There Is A Gap On the Record.

Commerce failed to comply with § 1677m(d) that requires Commerce to provide prompt notice to the party that submitted a response deemed to be deficient and provide the respondent "an opportunity to remedy or explain" any alleged deficiency to the extent practicable. 19 U.S.C. § 1677m(d).

Defendant argues that the first supplemental Quantity & Value questionnaire (the "1st Supp. Q&V") and the second supplemental Quantity & Value questionnaire (the "2nd Supp. Q&V") issued to all respondents satisfy the requirement under § 1677m(d).  *See* Def. Tr.II Rsp. Br. at 17-22; *see also,* Coalition Tr.II Rsp. Br. at 8-10.  Defendant asserts that Commerce made "repeated requests for information," and that "constituted notification to respondents that their

PUBLIC VERSION

previous responses were deficient."  *See* Def. Tr.II Rsp. Br. at 17; *see also*, *id.* at 48 (characterizing the supplemental questionnaires as requesting information "addressing {the same} themes and issues" as requested in the initial questionnaire).  This argument is without merit.

First, only some questions asked in the Initial Quantity & Value Questionnaire (the "Q&V"), the 1st Supp. Q&V, and the 2nd Supp. Q&V can be said to overlap to a certain extent, as discussed in detail in the company-specific sections below, while the others do not overlap at all and were questions Commerce only asked once throughout the investigation.  However, "[s]imilarities in questions between the initial and supplemental questionnaire alone do not serve as evidence that Commerce found the initial questionnaire response deficient."  *Hyundai Heavy Indus.*, 485 F. Supp. 3d at 1402.  Commerce, in finding discrepancies between a respondent's two questionnaire responses, was required to identify those discrepancies to the respondent under § 1677m(d).

Further, in applying AFA to each DH Exporter Plaintiff, Commerce asserted one or more reasons concerning information that the respondents were *asked for the first time* to provide in the 2nd Supp. Q&V, as discussed in their company-specific sections below.  Defendant's argument that issuing the 1st and 2nd supplemental questionnaires satisfied § 1677m(d) falls flat on its face.  Additionally, amongst DH Plaintiffs, Commerce only issued a 3rd Supp. Q&V to Eagle Industries and Lechenwood, and both were issued prior to Commerce receiving their 2nd Supp Q&V questionnaire response ("QR").  Defendant therefore is precluded from using Eagle's or Lechenwood's 3rd Supp. Q&V to justify finding discrepancies based on information asked for the first time in the 2nd Supp. Q&V.

Separately, Commerce in some instances found discrepancies in DH Plaintiffs' 2nd Supp.

PUBLIC VERSION

Q&V QR by comparing those with the Government of Vietnam's ("GOV") Import Data.  Here,

Commerce has an obligation to issue a supplemental questionnaire under 19 U.S.C. § 1677m(d).

Respondents are not mind-readers and are not required to guess how Commerce intended to use

the voluminous GOV Import Data, which covers all Vietnamese entity's imports under HTS

4408 (for veneers) and 4412 (for plywood and veneered panels) for the entire POI.   Further, by

the time respondents submitted their 2nd Supp. Q&V QR, Commerce still had an *outstanding*

supplemental questionnaire to the GOV to revise the import data previously submitted.  *See*

Dep't Commerce, Supplemental Questionnaire for GOV (June 15, 2021) (In addition to the

import data, Commerce also requested the GOV to provide all inspection reports of plywood

exporters that were audited by the GOV), **PR260, CR235-236**; GOV, Response to Suppl.

Questionnaire (July 21, 2021), **PR351-355, CR362-379.**  After Commerce decided that it would

compare the GOV Import Data with respondents' reporting, Commerce was required to issue a

supplemental questionnaire to the respondents identifying the perceived discrepancies and allow

each respondent at least one opportunity to correct or explain their reporting.

   Third, Defendant claims that it was not practicable to issue a company-specific

supplemental questionnaire to the 22 cooperating respondents that it applied AFA against due to

its limited resources and the intensive task of analyzing 146 questionnaire responses, and

§1677m(d) only requires Commerce to do so "to the extent practicable … in light of the time

limits established for the completion of investigations or reviews[.]"  *See* Def. Tr.II Rsp. Br. at

14-16.  Incongruous, however, is Defendant's argument that Commerce acted reasonably in

extending a one-year investigation into a three-year investigation.  *See id.* at 23-24.  Commerce

cannot have it both ways.  In any event, Defendant grossly mischaracterized the number of

questionnaire responses it needed to evaluate in the 12 months between the time it received all

respondents' 2nd Supp. Q&V QR by early July 2021 and the July 2022 Preliminary

Determination. *See id.* at 14-16 & 48 ("The time between the final deadline for the second

supplemental questionnaire responses and the preliminary determination was necessary for

Commerce to evaluate at least 146 questionnaire responses (and other voluminous record

information) and form its preliminary determinations.") *citing* Final IDM at 133, **PR842**.

Commerce issued the Initial Q&V to 59 companies, so it was Commerce's decision from the

beginning to investigate this many companies. *See* Dep't Commerce, Initial Q&V (Sept. 10,

2020) at Attachment I, **PR64-65**. Further, to the extent that Defendant argues Commerce needed

to review from anew 146 responses after receiving the 2nd Supp. Q&V QRs, this cannot be

reconciled with its argument that the 1st Supp. Q&V and 2nd Supp. Q&V satisfy its obligation

under § 1677m(d). It also begs the question as to what Commerce did in the first year of this

three-year long investigation other than draft three general brief questionnaires on preliminary

case issues.

Instead, Commerce should have reviewed the 51 short initial Q&V QRs in the *5 months* -

from October 1, 2021 when it received all of them, to February 22, 2021 (**PR154**) when it issued

the 1st Supp. Q&V - and gained a decent level of familiarity with all of them. Commerce then

had more than *3 months* - from March 8, 2022 when it started receiving the 1st Supp. Q&V, to

June 15, 2021 when it issued the 2nd Supp. Q&V (**PR260**) - to review the 1st Supp. Q&V QRs

from 46 respondents and compare them with the prior Initial Q&V QRs submitted by those 46

companies. Subsequently, Commerce received the 2nd Supp. Q&V QRs from 45 companies

from July 9, 2021 to July 12, 2021. Therefore, Commerce had ample time to review 2nd Supp.

Q&V QRs from 45 respondents and compare them with the prior two rounds of questionnaire

responses - which, again, are record information that Commerce should have been familiar with

to some extent given the time it had to review them and the GOV Import Data. There is no justification for Commerce's failure to issue 22 company-specific supplemental questionnaires as required under § 1677m(d) in the 12 months leading up to the Preliminary Determination.

Alternatively, at any time prior to the Preliminary Determination, Commerce could have relied upon its sampling authority under 19 U.S.C. § 1677f-1(c)(2)(A) to reduce its burdens. *See* 19 USC 1677f-1(c)(2)(A) (stating that Commerce can sample respondents if it is not practicable to calculate company-specific dumping margin for each respondent). Though this statutory provision does not expressly apply to circumvention inquiries, Commerce has consistently relied on it to limit mandatory respondents in circumvention inquiries. *See e.g.*, *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 87 Fed. Reg. 75,221, 75222 (Dec. 8, 2022); *Certain Hardwood Plywood Products From the People's Republic of China: Preliminary Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 84 Fed. Reg. 27,081 (June 11, 2019) and accompanying Decision Memorandum at 3 (June 4, 2019).

Not only that, after the July 2022 Preliminary AFA Memo where Commerce identified the discrepancies underlying the AFA application for the first time, Commerce had yet another 12 months to issue supplemental questionnaires or 10 months to evaluate the post-preliminary submissions filed by all DH Plaintiffs and certain other respondents to correct or clarify their prior responses (which were all rebuttal to Commerce's Preliminary AFA findings and therefore limited in nature) prior to issuing its final determination. Commerce's refusal to re-open the record and rejection of factual information filed after the Preliminary Determination amounts to

an abuse of discretion.

## II.    Commerce failed to justify its application of Adverse Inferences.

Commerce is required to "examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation" before applying adverse inferences. *GPX Int'l Tire Corp. v. United States*, 942 F. Supp. 2d 1343, 1359 (Ct. Int'l Trade 2013), *citing* 19 U.S.C. § 1677e(b) and *Nippon Steel*, 337 F.3d at 1382.   Here, Commerce failed to justify how each respondent failed to act to the best of their ability in light of the companies' explanations and circumstances, other than asserting that the discrepancies are the type of "inattentiveness" and "carelessness" condemned by the *Nippon Steel* Court.  *See* Final IDM at 137-142; *Nippon Steel,* 337 F.3d at 1382.  Essentially, Commerce – and now Defendant – argues that because the information in which Commerce found discrepancies is of the kind that Commerce expects respondents to possess, failing to provide such information justifies using AFA instead of FA. *See* Final IDM at 137-142; Def. Tr.II Rsp. Br. at 25-26.

However, the same can be said for most of the information requested from mandatory respondents in Commerce's initial questionnaires issued in AD and CVD investigations and reviews, and information requested in Commerce's Separate Rate Application questionnaire in NME AD cases.  If that were the standard, Commerce can apply AFA whenever it finds information missing from the record, without evaluating each respondent's circumstances and conduct.  This is belied by 19 U.S.C. § 1677e(a) and e(b).  *See also*, *Nippon Steel*, 337 F. 3d at 1382-83 (before applying AFA, Commerce "must make an *objective showing* that a reasonable and responsible {respondent} would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations… Second, Commerce must then make a *subjective showing* that the respondent under investigation not

only has failed to promptly produce the requested information, but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records.") (Emphasis supplied); *Nat'l Nail Corp. v. United States*, 390 F. Supp. 3d 1356, 1373 (Ct. Int'l Trade 2019) ("It is worth noting that the subjective component of the 'best of its ability' standard judges what constitutes the maximum effort that a particular respondent is capable of doing, ***not some hypothetical, well-resourced respondent*.**") (Emphasis supplied).

As discussed in further detail in the company-specific sections, each DH Exporter Plaintiff filed post-preliminary comments to explain their inadvertent reporting error, accompanied by additional information and documents that cure the reporting discrepancy. Commerce in the Final Determination failed to take into account the company-specific circumstances.

As demonstrated below, Commerce's AFA applications to all DH Exporter Plaintiffs were contrary to the deficiency statute and the statutes governing the use of FA and AFA.

## III.    DH Exporter Plaintiffs Company-Specific Arguments

### A.  Eagle Industries Company Limited

In the underlying investigation, Eagle's various responses were overall reliable and demonstrated that Eagle responded to the questionnaires to the best of its ability.  However, in defending Commerce's AFA application, Defendant first claims that "[w]hile Eagle initially stated that it did not source plywood or plywood inputs from Chinese plywood producers or exporters during the inquiry period, in its second supplemental questionnaire response, Eagle

disclosed that its Chinese affiliate [          ] supplied core veneers." Def. Tr.II Rsp. Br. at 46-47, *citing* Prelim AFA Memo at 6-7, **PR410, CR412**. Defendant's claim is both contrary to record evidence and to Commerce's own finding below. In the proceeding below, Commerce did not find that Eagle's Chinese affiliate [          ] supplied core veneers, nor could it have.

As reported, Eagle's two Chinese affiliated companies are [

          ]. *See* Ltr. from deKieffer & Horgan on behalf of Eagle Industries re: Quantity and Value Questionnaire Response (Oct. 1, 2020) ("Eagle Q&V QR") at 5, **PR112, CR101**. Amongst these two affiliates, Eagle purchased from [          ] only, and it only purchased face/back veneers of various wood species. *See* Eagle re: Q&V Second Supplemental Questionnaire (July 9, 2021) ("Eagle 2nd Supp. Q&V QR") at Exhibit SQ2-1, **PR324, CR319-322**. In its Preliminary Determination, citing to Eagle's 2nd Q&V QR Exhibit SQ2-1, Commerce found that "Eagle Industries identified [          ] as one of its Chinese suppliers of veneers." *See* Prelim. AFA Memo at 7, **PR410, CR412**. That reference to "veneers" can only possibly mean face veneers based on Eagle's response cited by Commerce. Further, Eagle reported from the beginning that it imported face/back veneers from China during the POI. *See* Eagle Q&V QR at 4 ("{Eagle} directly imported face/back veneers from China.") As such, Eagle consistently reported that it imported face/back veneers from China, from the filing of its initial Q&V QR to the 2nd supplemental Q&V QR.

As discussed in Tr.II R56.2 brief, the "discrepancy" regarding Eagle's import of face veneers from [          ] was really a discrepancy within Eagle's initial Q&V response, where it reported under Question 5 that it imported face/back veneers from China but reported under Question 8 that it did not source any plywood inputs from China (from affiliated

PUBLIC VERSION

companies or unaffiliated companies).  *See* DH Plaintiffs Tr.II 56.2 Brief at 13-14 (Apr. 10, 2024), **ECF No. 48**; Eagle Q&V QR at 4-5, **PR112, CR101**.  The reporting error occurred because Eagle misunderstood the term "plywood inputs" under Question 8 to include only individual core veneers, veneered panels, or veneered core platforms (collectively, core materials) that are the center of this investigation.  *Id.*  Eagle's initial Q&V QR, as a whole, clearly demonstrates that Eagle had no intention of withholding any information, and it reported from the beginning that it did not import any core materials from China and only imported face/back veneers, including from its affiliated companies and unaffiliated companies.

Further, Eagle's misunderstanding of the term "plywood inputs" in Question 8 of the initial Q&V to mean the various core materials is not unreasonable.  Prior to Commerce's issuance of the initial Q&V, it issued the clarification memo that the circumvention inquiry does not cover "core veneers fully produced in Vietnam or a third-country that are assembled into a veneer core platform in Vietnam and combined with a face and back veneer produced in China." *See* Dep't Commerce, re: Clarification of Merchandise subject to Anti-Circumvention and Scope Inquiries (July 9, 2020) ("Clarification Memo"), **PR21**.  Further, in Question 4 of the initial Q&V Commerce, Commerce asked companies to report the Q&V of "Plywood Sales to the United States with **Inputs** Produced in China," which is segregated into the five inquiry scenarios.  The overlapping "inputs" from China under all five inquiry scenarios are core materials (i.e., "assembled cores," "individual core veneers," "veneer core platforms").  Initial Q&V at Q4 & Attachment II-B, **PR64-65**.  Further down in Question 8, when Commerce asked if respondents source any plywood inputs from their Chinese affiliates, it did not specifically define what "plywood inputs" means.  *Id.* at Q8.

The Coalition argues that even if Commerce were to accept Eagle's explanation

regarding the initial Q&V, Eagle also reported in the 1st Supp. Q&V that it did not source any plywood or plywood inputs from its affiliated companies in China, and that misunderstanding was unreasonable. *See* Coalition Tr.II Rsp. Br. at 25-26, *citing* Eagle 1st Q&V QR at 2-3, **PR184, CR162.**  The Coalition's argument is unconvincing because Commerce in the 1st Q&V questionnaire did not clarify what constituted plywood inputs.  *See generally*, Eagle 1st Supp. Q&V QR.  Therefore, in responding to the 1st Supplemental Q&V, Eagle was still treating "plywood inputs" as core materials.  This is evident by Eagle's response – the same sentence where the Coalition quoted only half in its brief - "{h}owever, Eagle Industries did not source any plywood or plywood inputs from the affiliated companies or other Chinese plywood producers and exporters in any period." *Id.* at 3.

Although Eagle's initial Q&V QR contained contradictory information, Commerce's determination to apply AFA is unlawful because it failed to issue a deficiency questionnaire to Eagle to correct or clarify this inconsistency that was within Eagle's initial Q&V QR. Commerce received Eagle's initial Q&V QR in October 2020, i.e., *22 months* prior to issuing its Preliminary Determination.  *See* DH Plaintiffs Tr.II 56.2 Brief at 15-21 (discussing that courts have held that, to satisfy its obligations under 19 U.S.C. § 1677m(d), Commerce must specifically point out the deficiency that requires correction or clarification, *citing*, *inter alia*, *BlueScope Steel v. United States*, 548 F. Supp. 3d 1351 (Ct. Int'l Trade 2021); *Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309 (Ct. Int'l Trade 2021)).

Additionally, Defendant's argument that Commerce's "repeated requests" for the same information constitutes sufficient notice is beside the point. Def. Tr.II Rsp. Br. at 47-48.  Eagle repeatedly responded that it imported face/back veneers from China, in its initial Q&V QR (under Question 5) and in its 2nd supplemental Q&V QR.  In its efforts to distinguish *BlueScope*,

PUBLIC VERSION

Defendant also claims that it was not practicable for Commerce to allow Eagle an opportunity to remedy this deficiency due to time constraints between the second supplemental questionnaire responses and the preliminary determination and Commerce's task of reviewing voluminous record information. *See* Def. Tr.II Rsp. Br. at 46-47. However, this discrepancy originated from Eagle's incorrect understanding of a particular question in the initial Q&V QR and is obvious to Commerce based on contradictory information provided within the initial Q&V QR, which Commerce had five months to review and could have included that in the 1st Supp. Q&V. *See* Eagle Initial Q&V QR at 4-5, **PR112**, **CR101.** Further, although Commerce received additional questionnaire responses later, altogether Commerce had twenty-two (22) months – from October 2020 to July 2022 – to issue Eagle a supplemental questionnaire to clarify Eagle's understanding of "plywood inputs" in its initial Q&V QR before resorting to AFA in the Preliminary Determination.

In those 22 months, Commerce failed to fulfill its statutory obligation to specifically point out the discrepancy to Eagle and request clarification, which would have alerted Eagle to its misunderstanding of Commerce's question and given Eagle a chance to modify its initial Q&V response to answer the question that Commerce intended to ask. Then there would be no discrepancy between Eagle's *modified* Q&V QR and the 2nd Supp. Q&V QR. In *BlueScope*, the Court found Commerce's AFA application unreasonable when it failed to explain why it did not request further documentation from BlueScope in the time period of "more than six months before the Preliminary Results." *Blue Scope*, 548 F. Supp. 3d at 1364. On remand in that case, Commerce indeed did not attempt to explain and instead issued BlueScope a supplemental questionnaire to address deficiencies. *See Bluescope Steel Ltd. v. United States*, 589 F. Supp. 3d 1294 (Ct. Int'l Trade 2022). If six months was not defensible, Commerce surely cannot defend

its failure to act when it had 22 months before the preliminary determination to do so.

Eagle also argued in the alternative that Commerce could have treated Eagle's 2nd Supp. Q&V QR reporting the face/back veneers imports from [                    ] as correction information to its initial Q&V QR's Question 8 response.  *See* DH Plaintiffs Tr.II 56.2 Br. at 21-22.  With no small amount of irony, Defendant claims that Commerce needs respondents to specifically identify the prior response to which such correction is made because otherwise "Commerce cannot be expected to know why a respondent is modifying its answers," while at the same time argues that a general supplemental questionnaire issued to all respondents sufficiently satisfies Commerce's obligation to notify each respondent of their deficiencies.  Def. Tr.II Rsp. Br. at 49-50.  Defendant's argument also fails to take into account that Eagle attempted to correct its initial Q&V response multiple times after Commerce issued its preliminary determination, nor does Defendant explain why Commerce could not accept Eagle's explanation regarding how the error occurred in its final determination.

On a related issue, Petitioner argues that Eagle's reporting of [                    ]'s exports to Vietnam in the 2nd Supp. Q&V QR was also incorrect in other aspects. *See* Coalition Tr.II Rsp. Br. at 26, *citing* GOV Import Data.  The Court must reject Petitioner's argument because Commerce never cited this as a reason to apply AFA to Eagle in the administrative proceeding. Petitioner failed to provide any record citation to the Prelim. AFA Memo or Final IDM. *Id.* In any event, the very few unreported exports from [                    ] to Vietnam were to other unaffiliated companies, so Commerce did not require Eagle to report those exports (made by [                    ]) until the 2nd Supp. Q&V, and therefore cannot use this as a discrepancy to apply AFA until after it satisfied its obligation under § 1677m(d).

Eagle also challenged Commerce's finding that Eagle failed to report an import of

PUBLIC VERSION

plywood from China based on the GOV Import data.  *See* Final IDM at 84[1]; DH Plaintiffs 56.2

Br. at 23-24 ("Therefore, Commerce's finding that this was an 'unreported' import transaction is

blatantly wrong. Eagle reported this import transaction <u>in the first instance</u> where Commerce

actually asked respondents to report all their imports from China from unaffiliated companies

{.}").  The plywood import that Commerce accused Eagle of failing to report was based on a

comparison of Eagle's 2nd Supp. Q&V QR and the GOV Import Data, and that was an import of

[   ] pieces of sample plywood boards from an unaffiliated company [

                                                                                  ].  *See* Prelim. AFA at 7 (citing GOV Import

Data).  Eagle reported that import in its 2nd Supp. Q&V QR, which was overlooked by

Commerce. *See* Eagle 2nd Supp. Q&V QR at 2 & Exhibit SQ2-3, **PR324, CR319-322.**

Defendant did not respond to this argument, appearing to agree with Eagle that Commerce's

Prelim. AFA finding in this aspect was wrong.

        To the extent that Commerce found that Eagle's reporting of this plywood import in the

2nd Supp. Q&V QR contradicted its response to Question 8 of the initial questionnaire (which

Commerce does not clearly articulate in its Final IDM), Eagle's 2nd supplemental questionnaire

identifying this import should be treated as corrective information to its prior (volunteered and

unsolicited) statement.  DH Plaintiffs 56.2 Br. at 24-25.  Defendant argues that Commerce

correctly found that Eagle's second supplemental response contained - not corrections - but

---

[1] Commerce stated in its Final IDM that it "identified an import of <u>*veneers*</u> from Eagle's <u>*affiliate*</u> in China to Eagle that the company failed to report in its questionnaire response."  *See* Final IDM at 84, *citing* Prelim. AFA Memo.

However, based on Commerce's language in that paragraph, record evidence, and Commerce's own Prelim. AFA Memo, it is clear that Commerce meant to say that it identified an import of <u>*plywood*</u> from Eagle's <u>*unaffiliated*</u> Chinese supplier to Eagle that the company failed to report. *See* DH Plaintiffs Tr.II 56.2 Br. at 23-24.

PUBLIC VERSION

rather significant changes. Def. Tr.II Rsp. Br. at 49-50, *citing* DH Plaintiffs Tr.II 56.2 Br. at 24-25. However, Defendant made no effort to confront the fact that these [    ] pieces of plywood were sample boards, which explains why Eagle overlooked this tiny quantity of plywood when responding to the initial Q&V questionnaire and therefore voluntarily reported that it had no imports of plywood from China including from unaffiliated companies, when such information was not even requested by Commerce. DH Plaintiffs Tr.II 56.2 Br. at 24-25; Eagle 2nd Supp. Q&V QR at 2 & Exhibit SQ2-3, **PR324, CR319-322.**

Further, a normal piece of plywood is 1.2 meters (i.e., 4 feet) wide and 2.4 meters (i.e., 8 feet) long, with a surface area of 2.88 m2. The sample plywood boards were [

], so even putting all [    ] pieces side-by-side the surface area is still *much smaller than one piece of normal plywood*. *See* Eagle 2nd Supp. Q&V QR at 2 & Exhibit SQ2-3. Defendant's argument that these [    ] pieces of sample plywood boards of such tiny volume is a "significant change" to Eagle's prior reporting is unconvincing.

Next, Defendant maintains that Eagle's reporting of certain [        ] veneers as face/back veneers was incorrect because core platform coverings are still core veneers. Def Tr.II Rsp. Br. at 50-51. Defendant also claims that Eagle erroneously assumed that there is a distinction between face/back veneers and core veneers even before the veneers have been affixed. *Id.* at 50. On the contrary, Eagle differentiated the face/back veneers versus core veneers based on how they were used/affixed, and reported accurate information based on Commerce's questions asked. *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565, 1574 (Fed. Cir. 1990) ("a submitter need only provide complete answers to the questions presented in an information request.")

Relevant to this issue is that in the initial Q&V, Commerce asked respondents to report

the species of core veneers and face/back veneers consumed in the hardwood plywood the respondent sold to the United States. *See* Eagle Q&V QR at 4-5, **PR112**, **CR101**. Eagle reported selling plywood with [        ] face/back veneers, along with numerous other species such as [                        ], etc. *Id.* at Exhibit 3. Then later in the 2nd supplemental questionnaire, Commerce requested Eagle to identify its imports from China under HTS subheadings 4408 and 4412, and the "actual description of products which identifies the type of wood and products (*e.g.*, birch face/back plywood with poplar core, poplar core veneers, etc.)." Eagle 2nd Supp. QR at 1-2, **PR324, CR319-322.** Eagle reported that it imported [        ] veneers from China along with many other species, noting specifically that despite some commercial invoices issued by a Chinese supplier for some [        ] veneers referred to the product as [                ], Eagle in fact used those as face and back veneers to cover up the core platforms. *Id.* at 1-2 & Exhibit SQ2-1.

Defendant acknowledges that the scope language specifically defined the face and back veneers as "the outermost veneer of wood on either side of the core irrespective of additional surface coatings or covers as described below." Def Tr.II Rsp. Br. at 51. Therefore, based on the scope language of the *Hardwood Plywood from China* AD CVD Orders, the imported [    ] veneers that Eagle used as the *outermost* veneers of wood on either side of the core platform (which does not have any additional outer-layers attached to it by the time they are exported from Vietnam to the United States) undisputedly are considered the face/back veneers for purposes of the Orders.

Defendant next argues that when Eagle imported those veneers from China they were called core veneers, so Eagle should have reported them in earlier responses, and Eagle's failure to do so prevented Commerce from examining those imports further. *Id.* Defendant's argument

PUBLIC VERSION

lacks any support from record evidence.  The Chinese supplier who referred to [       ] veneers as "[                    ]" on the commercial documents is an unaffiliated company.  *Id.* at Exhibit SQ2-1 & GOV Import Data, **PR351, PR353, CR362, CR364-365.**  There were no specific questions, nor does Defendant or Coalition point to any, in the initial Q&V or in the 1st supplemental Q&V that required Eagle to report imports of veneer from unaffiliated Chinese suppliers, much less to report such imports based on product name listed on the commercial invoice instead of actual use.  Instead, Eagle flagged this issue *in the first instance* it was asked to report its imports from unaffiliated Chinese suppliers.  As Defendant apparently agrees, there is no distinction between face/back veneers and core veneers that exists before the veneers have been affixed.  *See* Def Tr.II Rsp. Br. at 50.  Therefore, Eagle's interpretation that the request for product description in the 2nd Supp. Q&V Questionnaire means a description based on the product's actual use, instead of the name they were imported under, was reasonable.

Insofar as Commerce complains that it needed more time to investigate wood inputs by the product description on the invoice when sold to Eagle as opposed to actual consumption or use, it should have asked Question 1 in the 2nd Supplemental Q&V response in its the initial Q&V or the 1st Supp. Q&V and *made that clear*.  Commerce's claim that Eagle's alleged inaccurate reporting somehow impeded the investigation must be rejected, because it was Commerce's own decision to ask that for the first time in the 2nd Supp. Q&V.  *Ta Chen Stainless Steel Pipe v. United States*, 23 C.I.T. 804 (1999) ("[I]t is Commerce, not the respondent, which bears the burden of asking questions.").

### B.  Golden Bridge Industries Company Limited

Golden Bridge is a trading company in Singapore with no production activities. *See* Ltr.

from deKieffer & Horgan on behalf of Golden Bridge re: Quantity and Value Questionnaire Response (Oct. 1, 2020) ("Golden Bridge Q&V QR") at 2, **PR113, CR104.** During the POI, Golden Bridge purchased plywood manufactured in Vietnam from two suppliers, unaffiliated [                                        ] and affiliated Eagle, and exported such plywood to the United States. *Id.* at Exhibit 3. Further, like Eagle, Golden Bridge is affiliated with the same Chinese companies - [                              ]. *See id.* at 5. However, because Golden Bridge sources plywood products from Vietnam, it has no seller/buyer relationship with any Chinese companies, including its affiliates in China.

In its brief, Defendant continues to defend Commerce's determination by arguing there is a discrepancy between Golden Bridge's initial Q&V QR where it stated its Chinese affiliates did not sell any plywood or plywood inputs to Vietnam but reported in its second supplemental Q&V QR that one of its affiliated companies [                ] exported face veneers to Vietnam. Def. Tr.II Rsp. Br. at 87-89. Defendant also claimed that Golden Bridge's reporting of its affiliated Chinese company's exports to Vietnam in the 2nd supplemental Q&V QR contradicted the import data provided by the Government of Vietnam (GOV). *Id.* at 87-88.

Golden Bridge acknowledges that it incorrectly stated in the initial Q&V QR that its affiliated Chinese company [                ] did not export any plywood or plywood inputs. *See* Golden Bridge Q&V QR at 4-5, **PR113, CR104.** However, the Defendant's argument that Golden Bridge failed to answer a question that was asked in its initial Q&V response has no merit. *See* Def. Tr.II Rsp. Br. at 89. Commerce did *not* ask Golden Bridge to report [ 
]'s exports to Vietnam in its initial Q&V questionnaire. The initial Q&V only asked Golden Bridge to "identify {the affiliated Chinese} producers or exporters, the types of plywood or inputs produced, the nature of the affiliation (i.e., familial, common ownership, interlocking

PUBLIC VERSION

directors, etc.), and **whether you sourced** any plywood or plywood inputs from each affiliated

company."  Golden Bridge Q&V QR at 4-5 (emphasis supplied).  Golden Bridge responded:

> **Golden Bridge is affiliated with [                                        ],
> a plywood producer in China, and [                        ], a plywood
> exporter in China with common shareholdings. However, Golden Bridge did
> not source any plywood or plywood inputs from its affiliated companies or
> other Chinese plywood producers or exporters in any event.** Also, upon
> information and belief, the affiliated Chinese companies did not sell any plywood
> or plywood inputs to Vietnam in any periods.

*Id.* at 5 (emphasis supplied).  Golden Bridge in its first two sentences already correctly and fully

responded to Commerce's question asked.  Although in the last sentence it voluntarily offered

incorrect information regarding its Chinese affiliates' exports to Vietnamese, Golden Bridge

qualified that statement by saying it was "upon information and belief."  *Id.*  That, accompanied

by the fact that the (incorrect) information provided was not sought by Commerce, demonstrates

that this was not an instance of "intentional obtuseness" on the part of Golden Bridge.  *See* Def.

Tr.II Rsp. Br. at 89, *quoting Hyundai Heavy Industries, Co. Ltd. v. United States*, 332 F. Supp.

3d 1331, 1341-42 (Ct. Int'l Trade 2018).  Commerce erred in using this statement in the Q&V

response to find it a discrepancy when compared with Golden Bridge's 2nd supplemental Q&V

QR.  The Coalition asserts that Golden Bridge was asked in the 1st Supp. Q&V to report its

affiliated companies' involvement in Golden Bridge's business in Vietnam and the scope of the

Chinese affiliate's business operations, and Golden Bridge's response was therefore inaccurate.

*See* Coalition Tr.II Rsp. Br. at 29-30, *citing* Golden Bridge 1st Supp. Q&V QR at 2, **PR186,

CR164**.  However, Golden Bridge's response to that question asked in the 1st Supp. Q&V was

fully correct; it only volunteered the same (incorrect) statement as it did in the initial Q&V with

the qualification that it was only Golden Bridge's understanding.  *See* Golden Bridge 1st Supp.

Q&V QR at 2.

19

PUBLIC VERSION

Defendant criticizes Golden Bridge's 2nd Supplemental Q&V QR in that it "identified only [

], and not [                                                        ]." Def. Tr.II Rsp. Br. at 88.  This error occurred because Golden Bridge was unfamiliar with [                    ]'s records and it only reported the information received at the time.  DH Plaintiffs Tr.II 56.2 Br. at 38-39.  In its brief, Defendant avers that Commerce was reasonable to expect that the information was available to Golden Bridge because it is affiliated with [                    ].  Def. Tr.II Rsp. Br. at 89.  Defendant ignored Golden Bridge's main argument that Commerce asked Golden Bridge to report [                    ]'s exports to Vietnam <u>for the first time</u> in the second supplemental questionnaire, and thus Commerce should have identified the deficiency in the 12 months leading up to the Preliminary Determination, and provided Golden Bridge <u>at least one opportunity</u> to contact [                    ] again and correct its reporting.  *See* DH Plaintiffs Tr.II 56.2 Br. at 38-39.  Indeed, after Golden Bridge was made aware of the deficiency for the first time in Commerce's Preliminary Determination, it promptly submitted corrected reporting of [                    ]'s exports to Vietnam, but Commerce rejected it as untimely new factual information.  *See* Ltr from deKieffer & Horgan, re: Golden Bridge Rebuttal to Preliminary Determination (Sept. 21, 2022) **PR563, CR448**.  Commerce had ample time - ten months to be exact - between Golden Bridge's post-preliminary submission and its Final Determination.  It was an abuse of discretion for Commerce to reject Golden Bridge's corrections.  *See Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016) (finding that Commerce has authority to reject corrected data resulting from "fraud" or "intentional concealment of relevant information," but it is an abuse of its discretion to refuse "updated data when there was plenty of time for Commerce to verify or consider it."); *Fisher S.A. v. United*

20

*States*, 700 F. Supp. 2d 1364, 1375-76 (Ct. Int'l Trade 2010) (holding that Commerce abused its discretion in rejecting additional factual information included in respondent's case brief when "upon reviewing the preliminary results of the administrative review of an antidumping duty order, the respondent {} allegedly realized that it had 'inadvertently and inaccurately' misreported sales data important in calculating an accurate dumping margin."), *citing Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1347-48 (Fed. Cir. 2006).

Defendant's next two arguments relate to Golden Bridge's two Vietnamese plywood suppliers' sourcing from China. Starting with Eagle, Defendant took issue with Golden Bridge's reporting that Eagle did not source plywood *from resellers* in Vietnam but produced the plywood itself, and that it did not purchase or source individual core veneers, multi-ply core panels, or core platforms from China except for face/back veneers. Def. Tr.II Rsp. Br. at 89. Defendant further claims that the GOV Import data shows Eagle had imports from China under HTS subheadings [                    ]. *Id., citing* GOV Import Data (**CR364-365**).

First, Golden Bridge's reporting that Eagle did not source plywood from *resellers* in Vietnam is *accurate*. Golden Bridge Q&V QR at 4, **PR113, CR104**. Neither Commerce nor Defendant pointed to any record evidence to show otherwise. Moreover, the statement that Eagle did not purchase individual core veneers, multi-ply core panels, or core platform from China is also not incorrect. *See id.* at 4; Golden Bridge 2nd Q&V QR at 2-3. In fact, in its response, Golden Bridge specifically referred Commerce to Eagle's own 2nd Q&V QR, where Eagle effectively addressed the "discrepancy" that arose from the GOV Import Data by explaining that the products it imported under HTS subheadings [        ] were face veneers, and the one time it imported product under HTS heading [      ] were the [    ] pieces of sample

plywood boards), **PR325, CR323-325**; *see also*, *supra,* Eagle's Company-Specific Section.  As such, Commerce erred in finding Golden Bridge's reporting regarding Eagle's imports from China was inconsistent with record information.

As to Golden Bridge's reporting of the other plywood supplier [          ]'s imports from China, Defendant incorrectly argues that "Commerce's application of AFA to Golden Bridge was due to Golden Bridge's not being forthcoming about any difficulties obtaining information from its unaffiliated supplier, and instead submitting incomplete and inaccurate responses regarding the inputs purchased from the unaffiliated supplier."  Def. Tr.II Rsp. Br. at 87 & 88. Golden Bridge informed Commerce that it was unable to collect detailed information from [          ].  Specifically, in the 1st supplemental Q&V, Commerce asked Golden Bridge to provide documents demonstrating that the Eucalyptus core veneers incorporated in Golden Bridge's plywood exports to the United States were produced in Vietnam.  *See* Golden Bridge 1st Supp. QR at 3, **PR186, CR164.**  Golden Bridge did not provide the eucalyptus origin documentation for such plywood purchases from [          ] and instead responded that "Golden Bridge {} purchased from an unaffiliated Vietnam manufacturer [

          ] and exported to the United States; **however, Golden Bridge stopped purchasing from this company a long time ago**." *Id.* (Emphasis supplied).  Golden Bridge therefore already informed Commerce that it was unable to obtain specific documentation from [          ].  Additionally, in its 2nd Q&V response and in response to Commerce's request to report supplier's imports from China under HTS 4408 and 4412, Golden Bridge specifically said that it "cannot obtain the detailed information regarding their past imports and suppliers and supporting documents."  Golden Bridge 2nd Supp. QR at 2-3 (July 9, 2021), **PR325, CR323-325**; *see also*, DH Plaintiffs Tr.II 56.2 Br. at 33 (block-quote of Golden Bridge's full response to the

question at issue).  As such, Defendant's assertion that Golden Bridge did not notify Commerce

of any difficulty in collecting information from its unaffiliated plywood supplier [            ]

must be rejected.  In addition, as Defendant noted, Commerce in its Final Determination no

longer based AFA in part on Golden Bridge's inability to submit customs declarations for the

first shipment its Chinese affiliates made to an unaffiliated Vietnamese company.  Def Tr.II Rsp.

Br. at 87, n19 (noting that "Golden Bridge demonstrated it could not reasonably have access to

the documents").  There, Golden Bridge's response was that it "does not have customs

declaration documents for the first shipment because the Vietnamese customer handled the

customs entry clearance." Golden Bridge 2nd Supp. QR at 3, **PR325, CR323-325.**  Commerce

found this response to be sufficient for alerting Commerce of the difficulty in obtaining

requested documentation. Likewise, Commerce should find Golden Bridge's response regarding

its inability to obtain detailed information and supporting documentation from [            ]

regarding its imports from China sufficient.

Critically, [            ] had been closed for more than a year by the time Golden Bridge

filed its 2nd supplemental Q&V QR in July 2021.  Golden Bridge 2nd Supp. QR at 2-3 (July 9,

2021), **PR325, CR323-325.**  Commerce's AFA application to Golden Bridge over its inability to

obtain information from a closed company when Golden Bridge has specifically alerted

Commerce of such circumstances is contrary to case law. *See Canadian Solar Int'l Ltd. v. United*

*States*, 415 F. Supp. 3d 1326, 1333-35 (Ct. Int'l Trade 2019) (discussing that it is unfair and

contrary to law for Commerce to employ an adverse inference when the cooperating party has no

control over the non-cooperating supplier); *Fine Furniture (Shanghai) Ltd. v. United States*, 748

F.3d 1365, 1373 (Fed. Cir. 2014) (finding AFA was improperly imposed against the cooperating

party when "a remedy reaching a cooperating party would have no impact on the non-

cooperating parties").

Therefore, the Court should reject each and all reasons Commerce cited for applying AFA to Golden Bridge.  Defendant repeatedly stated that Commerce applied AFA to Golden Bridge over "numerous factors."  *See* Def Tr.II Rsp. Br. at 87 & 90.  Golden Bridge, as with all other DH Exporter Plaintiffs, has demonstrated that all factors underlying Commerce's AFA application were either unlawful or contradicted by record evidence.

### C.  Lechenwood Viet Nam Company Limited

Lechenwood acknowledges that it made certain reporting mistakes in its questionnaire responses, but the Court should remand Commerce's determination because Lechenwood's mistakes either did not create a gap on the record or the mistakes occurred for the first time in Lechenwood's second supplemental questionnaire response.  Thus, Commerce was obligated to issue a deficiency questionnaire.  DH Plaintiffs Tr.II 56.2 Br. at 42-49.

Defendant first argues that Commerce correctly did not consider Lechenwood's explanation that it misunderstood the questions regarding plywood inputs and affiliation for being a "*post hoc* explanation."  *See* Def. Tr.II Rsp. Br. at 92-93; Final IDM at 98.  Commerce erred because a respondent's explanation of a reporting error due to a misunderstanding of the questions asked by Commerce is necessarily *post hoc*, otherwise the respondent would not have made the error.  Unlike impermissible *post hoc* rationalization offered by government counsel to justify agency determinations on alternative grounds, neither Commerce nor the Court should reject respondents' *post hoc* explanation.  *See supra, Nippon Steel*, 337 F. 3d at 1382-83 and *Nat'l Nail Corp.*, 390 F. Supp. 3d at 1373 (discussing the objective and subject components of

the 'best of its ability standard').

As discussed above in Eagle's Company-Specific Section, a misunderstanding of Commerce's question regarding plywood inputs was not unreasonable. Further, Lechenwood also misunderstood that Commerce's question regarding affiliated Chinese company's exports in the initial Q&V questionnaire and in the 2nd Supplemental Q&V questionnaire to be limited to affiliates that exported core materials subject to the circumvention inquiry. *See* DH Plaintiffs' Tr.II 56.2 Br. at 42-43. Further, Lechenwood has explained how its misunderstanding led to repeated reporting errors after the Preliminary Determination in further submissions.

Additionally, the essential information Commerce needed was whether Lechenwood purchased plywood or core materials from China, including from its affiliated company. Commerce has that information based on record evidence. *See id.* at 41-42 & 44. Specifically, Lechenwood's official business license as well as Lechenwood's 1st supplemental Q&V QR clearly demonstrate that it is affiliated with [

                    ] by ownership. *See* Ltr. from Fox Rothschild LLP on behalf of Lechenwood re: Quantity and Value Questionnaire Response (Oct. 1, 2020) ("Lechenwood Q&V QR") at Exhibit 2, **PR125, CR144**; Ltr from Fox Rothschild LLP on behalf of Lechenwood re: Quantity & Value Supplemental Questionnaire Response (Mar. 29, 2021) ("Lechenwood Supp. QR") at 2-3, **PR239, CR223.** The GOV Import Data demonstrate that Lechenwood [

                                   ]. *See* Ltr. from the Government of Vietnam, re: Response to the Supplemental Questionnaire, at Exhibit 2 (July 21, 2021) ("GOV Import Data"), **PR351, PR353, CR362, CR364-365.**

Defendant does not appear to dispute that there is no "gap" on the record pertaining to such essential information, only that Commerce correctly found Lechenwood's information

PUBLIC VERSION

wholly unreliable due to the multiple discrepancies, errors, and omissions. *See* Def. Tr.II Rsp. Br. at 93-94 (citing *Goodluck India Ltd. v. United States*, 11 F.4th 1335 (Fed. Cir. 2021) for the proposition that Commerce correctly applied AFA for issues "that are systemic rather than singular"). *Goodluck India* is not directly applicable because the errors that the respondent in that case sought to correct impacted hundreds of sales in its Section B database, and those corrections were presented as "minor correction" during verification. *Goodluck India*, 11 F.4th at 1340. Commerce had no other record data to use for those 682 sales. *Id.* Likewise, the errors in *Dalian Meisen Woodworking Co. v. United States,* cited by Defendant, were similar to *Goodluck India* in that Meisen misreported data including sales terms and ZIP codes in its sales database, thus creating a gap in the record. *Dalian Meisen Woodworking Co. v. United States*, 2023 Ct. Int'l. Trade LEXIS 61*, Slip Op. 2023-60 at 12-13 (Ct. Int'l Trade, Apr. 24, 2023). The Court even noted that Meisen "fails to specify what sort of 'partial facts available' it contends Commerce should have employed." *Id.*

The circumstances in *Goodluck India* and *Dalian Meisen* are different from Lechenwood's case because here, Commerce has usable record evidence that shows Lechenwood did not import core materials from China. This evidence either can be used to cure the "gap" or used as neutral facts available under 19 U.S.C. § 1677e(a).

In addition, as discussed above, Commerce should have issued a supplemental questionnaire to Lechenwood and allowed for an opportunity to correct the error in the 12 months leading up to the Preliminary Determination pursuant to 19 U.S.C. § 1677m(d).

After the Preliminary Determination, Lechenwood filed corrected data of its imports from China, which were all face and back veneers, and [          ] exports to Vietnam, but Commerce unlawfully rejected this data as untimely new factual information. *See* Ltr from

deKieffer & Horgan, re: Lechenwood (Rejected) Rebuttal to Preliminary Determination (Sept. 16, 2022), **PR556, CR444**.


### D.  Arrow Forest International Co., Ltd.

Commerce's determination to apply AFA is not supported by substantial evidence and contrary to law.  The information Commerce claimed that Arrow failed to provide was either requested for the first time in the 2nd supplemental Q&V, and thus Commerce had a statutory obligation to issue a deficiency questionnaire, or such missing information was immaterial to the circumvention inquiry and thus does not create a "gap" on the record for Commerce to use FA, much less AFA.  DH Plaintiffs Tr.II 56.2 Br. at 51-57.

In defending Commerce's AFA determination, Defendant first argues that AFI failed to report that it "[                                        ] from China" as shown in the Vietnamese import data.  Def. Tr.II Rsp. Br. at 101-102.  Defendant further argues that the fact that Arrow's parent company Ike Trading Co., Ltd. ("Ike Trading") was not a Chinese company is immaterial because Commerce issued a clarification memo noting that the affiliate need not be Chinese.  *See id.*  Defendant's arguments are not supported by record evidence.

First, the statement that Arrow [                                        ] from China is incorrect.  In the proceeding below, Commerce only found that Arrow failed to report Ike Trading's "plywood inputs" from China.  *See* Final IDM at 81 (citing GOV Data).  The GOV's import data shows that in the entire POI, Arrow had [     ] import from Ike Trading, consisting of [                                        ] from China.  *See* GOV Import Data, **PR351, PR353, CR362, CR364-365.**  The fact that Ike Trading is not a Chinese company is also

27

relevant in this context because that import was *not reportable* in any of the questionnaires issued prior to the 2^(nd) Supplemental Q&V.  As such, Commerce had an obligation under 19 U.S.C. § 1677m(d) to give Arrow at least one opportunity to clarify why it did not report this import.  *Apiário Diamante Comercial Exportadora Ltda. v. United States*, 705 F. Supp. 3d 1398, 1440-41 (Ct Int'l Trade 2024) (rejecting Commerce's argument that it had issued more than one supplemental questionnaires in the course of the proceeding and satisfied § 1677m(d), instead holding that it still needed to issue a subsequent questionnaire that gives the submitter "actual notice of the deficiency or reiterate[s] the initial request" over the submitter's failure to correctly respond to Question 25 in the second supplemental questionnaire); *Shelter Forest Int'l Acquisition, Inc. v. United States*, 497 F. Supp. 3d 1388, 1399 (Ct. Int'l Trade 2021) ("Commerce must give respondents notice when it identifies deficiencies in submissions and provide parties with an opportunity to respond."), *aff'd,* 2022 U.S. App. LEXIS 16491 (Fed. Cir. 2022) [Nonprecedential].

Moreover, after the Preliminary Determination, Arrow tried to explain that despite its best efforts to comply with Commerce's request, it overlooked that one import and thus did not notify Commerce this was a purchase from another country, not China, and it was the third-country unaffiliated seller's error that caused the goods being first delivered to China, which then had to be reexported from China to Vietnam.  *See* Ltr. from deKieffer & Horgan on behalf of Arrow, re: Rebuttal to the Department's Preliminary Determination (Sept. 14, 2022) ("Arrow Rejected Post-Prelim. Rebuttal") **PR543, CR438.**  Arrow also submitted full purchase packages, including shipping documents, as supporting documentation.  *Id.* at 5-6 & Exhibits 3-5. However, Commerce rejected Arrow's explanation and the supporting documents, exacerbating its violation of § 1677m(d).

PUBLIC VERSION

Defendant next argues that Commerce correctly found, based on the Coalition's July 12, 2021 submission, that Arrow failed to disclose a Chinese company, Dalian Jianlin, as its affiliate, and that unreported affiliate created a gap on the record because Commerce is statutorily required to examine affiliations in circumvention inquiries. *See* Def. Tr.II Rsp. Br. at 102-103. Defendant does not respond to Arrow's argument that Commerce should have issued a supplemental questionnaire on this issue, however. *See* DH Plaintiffs Tr.II 56.2 Br. at 53-54. By way of brief background, Arrow reported as early as in its initial Q&V response that it is not affiliated with any Chinese exporter or producer of plywood or plywood inputs. *See* Ltr. from Fox Rothschild on behalf of Arrow re: Quantity and Value Questionnaire Response (Sept. 29, 2020) ("Arrow Q&V QR") at 4, **PR75, CR17-18**. It was also evident from that first Q&V QR filing that Arrow is affiliated with Ike Trading, a U.S. company, through corporate ownership. *Id.* at Exhibit 2. Nine months later in July 2021, the Coalition submitted an Ike Trading website printout that refers to Dalian Jianlin as a "subsidiary" in China and a "Shine (Basswood) veneer manufacturing plant." Ltr from Wiley Rein on behalf of the Coalition, re: Comments on Certain Second Supplemental Quantity and Value Questionnaire Responses (July 12, 2021) ("Pet. July 12, 2021 Cmts.") at Exhibit 5, **PR346, CR359**. By that time Arrow had already filed its 2nd Q&V Response. *See* Ltr. from Fox Rothschild on behalf of Arrow re: Q&V Second Supplemental Questionnaire (June 30, 2021) ("Arrow 2nd Supp Q&V QR"), **PR278, CR240**. At a minimum, Commerce should have issued a supplemental questionnaire for Arrow to address this issue under § 1677m(d), so that Arrow can demonstrate that the website advertisement was incorrect and an overstatement for advertisement purposes. *See* Arrow Rejected Post-Prelim. Rebuttal at 4-5 & Exhibit 1, **PR543, CR438.**

Further, even assuming Dalian Jianlin was an affiliate, Arrow still did not withhold

PUBLIC VERSION

necessary information that is a prerequisite for Commerce to apply FA or AFA.  Defendant's argument that affiliation was a statutory criterion for Commerce to examine in a circumvention proceeding must be rejected. *See* Def. Tr.II Rsp. Br. at 103, *citing* 19 U.S.C. § 1677j(b)(3)(B). This provision cited only requires Commerce to examine "whether the manufacturer or exporter of the merchandise described in paragraph (1)(B) {i.e., in the country that has the existing AD or CVD Order imposed against it} is affiliated with the person who uses the merchandise described in paragraph (1)(B) to assemble or complete in the foreign country the merchandise that is subsequently imported into the United States{.}"  *See* DH Plaintiffs Tr.II 56.2 Br. at 55-56, *quoting* 19 U.S.C. § 1677j(b)(3)(B).  Because the record contains uncontested information that

[

            ], Arrow did not withhold any "necessary information" by not reporting this alleged Chinese affiliate.  *Id.*, *citing* GOV Import Data.

        Defendant argues unpersuasively that it is Commerce's role, not the respondent's, to determine what information is necessary to make a circumvention determination.  Def. Tr.II Rsp. Br. at 103.  However, the courts have held consistently that Commerce cannot apply FA or AFA if the record, viewed as a whole, establishes that there is no necessary information missing despite one party's non-cooperation.  *See GPX Int'l Tire Corp. v. United States,* 893 F. Supp. 2d 1296, 1332 (Ct. Int'l Trade 2013) ("When Commerce has access to information on the record to fill in the gaps created by the lack of cooperation by the government, as opposed to the exporter/producer, however, it is expected to consider such evidence."); *Dalian Meisen Woodworking Co. v. United States*, 2022 Ct. Intl. Trade LEXIS *52, Slip Op. 2022-45 at 19-20 (May 12, 2022) (finding that in countervailing cases involving Export Buyer's Program, "it is difficult to see how missing operational information about the program {that resulted from the

30

PUBLIC VERSION

Government of China's non-responsive questionnaire response} is 'necessary' or relevant in the face of Plaintiffs' non-use evidence."), *citing Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261, 1270 (Ct Int'l Trade 2018) and subsequent remands.

Lastly, Defendant in its brief did not respond to Plaintiff's third argument that Commerce erred in basing its AFA determination in part over the fact that Arrow inadvertently reported imports from China using the U.S. HTS numbers instead of the Vietnamese HTS numbers and failed to include the Vietnam Customs Import Declaration that accompanies the sample purchase package. *See* DH Plaintiffs Tr.II 56.2 Br. at 56-57; *see generally* Def. Tr.II Rsp. Br. at 101-103. The Coalition, in its brief, argues that Commerce's action was proper because "Commerce provided respondents with multiple opportunities to provide complete and correct information." *See* Coalition Tr.II Rsp. Br. at 21. However, the Coalition was unable to provide any record citation to substantiate its claim that the HTS number and the Vietnamese Import Declaration for a sample purchase were requested at any time prior to the 2nd Supplemental Q&V questionnaire. As such, Commerce's failure to identify the deficiency and provide Arrow an opportunity to correct its reporting, and its subsequent rejection of Arrow's corrected data were contrary to law and an abuse of discretion.

### E.  Her Hui Wood (Vietnam) Co.

In its moving brief, Her Hui demonstrated that Commerce acted contrary to law in each instance cited in support of Commerce's AFA application. Specifically, while Her Hui did not list all species of the face and back veneers incorporated in the plywood products sold to the United States during the POI, Commerce failed to notify Her Hui and provide an opportunity for

Her Hui to correct its data in the 16 months leading up to the Preliminary Determination.  *See* DH Plaintiffs Tr.II 56.2 Br. at 57-58; Final IDM at 94.  Further, Commerce compared Her Hui's 2nd Supplemental Q&V QR with the GOV data and found that Her Hui failed to report its imports from China exported by third-country suppliers, and separately that Her Hui's response to the last question in the 2nd Supplemental Q&V response was not responsive to the question asked.  *See* DH Plaintiffs Tr.II 56.2 Br. at 57-58 at 61-63; Final IDM at 94-95.  Her Hui had different reasons for misunderstanding these two questions in the 2nd Supp. Q&V questionnaire but the resulting "missing information" is the same, i.e., a spreadsheet detailing all of Her Hui's imports from China consisting of only face veneer imports, from two affiliated non-Chinese companies, and the accompanying sample purchase package.  Since both questions were asked for the first time in the 2nd Supplemental Q&V questionnaire, Commerce failed to comply with the statutory obligation to issue a supplemental questionnaire in the 12 months leading up to the Preliminary Determination.

With respect to the incorrect face/back veneer species reporting, Defendant first avers that Commerce considered Her Hui's explanation in the Final IDM.  Def. Tr.II Rsp. Br. at 72-73.  However, Defendant does not rebut the argument that Commerce acted contrary to law by failing to issue a deficiency questionnaire for 16 months on this issue.  DH Plaintiffs Tr.II 56.2 Br. at 59-60. *Id.*  Her Hui's reporting was obvious from its 1st Supp. Q&V QR because Her Hui submitted sample U.S. sales documents, which clearly show it sold plywood with [

] face/back veneers.  *See* Ltr from Fox Rothschild LLP on behalf of Her Hui re: Quantity & Value Supplemental Questionnaire Response (Mar. 23, 2021) ("Her Hui Supp. Q&V QR") at Exhibit 2, **PR211, CR188-189.**  It was also in that response that Her Hui re-submitted the exhibit listing wood species used in the plywood products it sold to the United States to

delete duplicated reporting of certain core material species but kept the face/back species unchanged from the prior filing.  *Id.* at 2 & Exhibit 3.  Therefore, Commerce, in reviewing exhibits to this one filing made on March 23, 2021, knew that Her Hui sold plywood products with face/back species not reported in its species list.  Commerce had 16 months to issue a supplemental questionnaire for Her Hui to explain this discrepancy and/or correct its species reporting before the Preliminary Determination, but failed to do so.

Her Hui acknowledges that in its species reporting chart it listed only 5 species of face/back veneers species (to fill out Commerce's template species reporting chart as provided), where it should have added more rows to the chart to provide an exhaustive list of face/back species sold in the POI.  *See* Her Hui Q&V QR at Question 7 & Attachment II-C, **PR62**.  However, this inadvertent error does not relieve Commerce from its obligation to issue a deficiency questionnaire and does not excuse Commerce's subsequent rejection of Her Hui's corrected species chart filed after the Preliminary Determination.  *See* 19 U.S.C. § 1677m(d); Ltr from deKieffer & Horgan, re: Her Hui Rebuttal to Preliminary Determination (Sept. 16, 2022) ("Her Hui Rejected Post-Prelim. Rebuttal") at Exhibit 1, **PR555, CR443.**  In addition, on this issue Defendant claims that Commerce "did address the substance of the {rejected} submission in its final determination.  Thus, any claimed procedural error would be harmless." Def. Tr.II Rsp. Br. at 73, *citing* Final IDM at 94.  The "substance" of the rejected submission was Her Hui's corrected species chart, which Commerce did not address and instead requested Her Hui to remove the exhibit.  *See* Ltr from deKieffer & Horgan, re: Refiled Her Hui Rebuttal to Preliminary Determination (October 31, 2022), **PR652, CR556.**  Insofar as Defendant argues that Commerce considered Her Hui's explanation and still correctly determined to apply AFA instead of FA, as discussed above, Commerce erred by not supporting the additional finding that

PUBLIC VERSION

Her Hui subjectively and objectively failed to cooperate to the best of its ability. *See supra,*
*Nippon Steel*, 337 F. 3d at 1382-83 and *Nat'l Nail Corp.*, 390 F. Supp. 3d at 1373 (discussing the
objective and subject components of the 'best of its ability standard').

Defendant further contends that Commerce's 2nd supplemental Q&V questionnaire issued
satisfied the requirement under § 1677m(d). This argument fails. There was not a single
question in the 2nd supplemental Q&V questionnaire that could have possibly alerted Her Hui of
this error. *See BlueScope Steel v. United States*, 548 F. Supp. 3d 1351, 1364 (Ct. Int'l Trade
2021) (discussing supplemental questionnaire that satisfies § 1677m(d) needs to "specifically
point[s] out and request[s] clarification of [the] deficient response,' and identifies the
information needed to make the required showing."), *citing Hyundai Steel Co. v. United States*,
518 F. Supp. 3d 1309, 1322-23 (Ct. Int'l Trade 2021); *NSK Ltd. v. United States*, 481 F.3d 1355,
1360 n.1 (Fed. Cir. 2007).

As to the other reason Commerce cited for applying AFA, in the 2nd Supplemental Q&V
questionnaire, Commerce requested *for the first time* that Her Hui report its imports of plywood
and plywood inputs from China from companies other than Chinese companies, and its affiliated
non-Chinese company's exports of plywood and plywood inputs from China to Vietnam. *See*
Ltr. from Fox Rothschild LLP on behalf of Her Hui re: Q&V Second Supplemental
Questionnaire (July 6, 2021) ("Her Hui 2nd Supp Q&V QR") at 1-2 (i.e., Questions 1 and 4),
**PR292.** In the POI, Her Hui imported a total of [

]. *See* GOV Import Data. At that time,
because Her Hui (incorrectly) interpreted Commerce's questions, it did not report those imports.
*Id*. Commerce not only failed to issue a supplemental questionnaire to follow up on these two

34

requests made for the first time in the 2nd Supplemental Q&V, but also failed to consider the circumstances and unlawfully applied AFA.

Defendant does not address Her Hui's argument that Commerce violated § 1677m(d) in not identifying the discrepancy and provide Her Hui at least one opportunity to respond, *see* DH Plaintiffs Tr.II 56.2 Br. at 62, but instead claims that Her Hui should have contacted Commerce if it was confused about the nature of the request. Def. Tr.II Rsp. Br. at 74-75. Defendant's argument is beside the point. Her Hui did not know that it misunderstood Commerce's request until Commerce applied AFA in the Preliminary Determination, a full year after Her Hui's last response was filed. Further, Commerce abused its discretion in rejecting Her Hui's reported [    ] imports and the sample purchase package filed promptly after the Preliminary Determination.

Lastly, Defendant did not address Her Hui's argument that both AFA reasons cited by Commerce against Her Hui relate solely to face/back veneers, rendering the missing information immaterial for purposes of the circumvention inquiry. DH Plaintiffs Tr.II 56.2 Br. at 60 & 62. Her Hui has repeatedly reported that in the POI, the only core material it used to produce plywood products were [                    ], and Her Hui imported them from [                    ]. *See* Her Hui Q&V Rsp. at Exhibit 1 (Oct. 1, 2020), **PR99, CR55-56**; Her Hui Supp. Q&V QR at 2, **PR211, CR188-189.** Commerce failed to identify any error in Her Hui's reporting of its core wood materials, and indeed nothing on the record undermines this reporting. The Coalition, for its part, argues that Her Hui's failure to report those face veneer imports "prevented Commerce from examining any of its Chinese imports to confirm whether those imports were actually inputs that could be used to produce inquiry merchandise." *See* Coalition Tr.II Rsp Br. at 42, *citing* Final IDM at 95. This argument fails because even if Her

Hui had correctly reported those imports, the only supporting documents Commerce actually required were 1 sample purchase package for all of Her Hui's face veneer imports, which would not contain any information regarding how the face veneers were consumed/used. *See* Her Hui 2nd Supp Q&V QR at 2, **PR292.**

Commerce already determined that even Chinese origin face/back veneer, if used without Chinese core veneers, does not bring the final product into this circumvention inquiry. *See* Clarification Memo, **PR21.**  Even if Commerce found that Her Hui withheld information regarding face veneer imports, Her Hui's product is still not inquiry merchandise.  As such, the Court should find Commerce's AFA determination against Her Hui unsupported by substantial evidence and contrary to law.

### F.  Long Luu Plywood Production Co., Ltd.

In defending Commerce's reasons for applying AFA to Long Luu, Defendant first argues that Commerce reasonably applied AFA based on Long Luu's first reporting in its initial Q&V QR that it did not purchase plywood inputs from Vietnamese resellers but later reported in the 2nd Supp. Q&V QR having purchased a small amount of face veneers from Vietnamese resellers. Def. Tr.II Rsp. Br. at 77-78.  Defendant further claims that "because Long Luu failed to identify the error in its original submission or explain how it was fixed in the supplemental response, Commerce could not determine which information was correct, and therefore reasonably found discrepancies on the record – i.e., a gap{.}"  Defendant's argument is untenable.

Although Commerce did not know how the error in the original submission occurred or how it was fixed in the supplemental response by the time it issued the Preliminary

PUBLIC VERSION

Determination, Long Luu explained, as follows, in its post-preliminary submission and in its case brief before the agency:

> In the Q&V questionnaire response, Long Luu's understanding was that this circumvention investigation concerned Chinese core veneers/veneer panels/veneer core platforms, so it focused its answers and efforts on the source of its core veneers. Accordingly, due to the very limited time to respond the questionnaire, Long Luu was unable to obtain confirmation from each of its Vietnamese face veneers suppliers if they imported the face veneers from China. However, in the response to the second Q&V questionnaire response, after careful further confirmation, Long Luu correctly confirmed that it had a small amount of face veneer purchases from unaffiliated Vietnamese suppliers that imported from China.

*See* Long Luu's Refiled Rebuttal to Preliminary Determination (October 31, 2022) at 2, **PR654, CR558**.  Commerce accepted Long Luu's explanation onto the record, which satisfied what Commerce claims was needed to treat the revised information as a correction, not a discrepancy. Commerce erred in still finding it as a discrepancy in its Final Determination. *See* Final IDM at 99.

Even if the Court agrees with Commerce that the reseller 3rd party information provided in Long Luu's 2nd Supp. Q&V QR does not qualify as a correction, Commerce's determination is inconsistent with § 1677m(d).  In the 12 months leading up to the Preliminary Determination, Commerce should have issued a supplemental questionnaire for Long Luu to reconcile the relevant reporting in its initial Q&V QR with that in the 2nd Supp. Q&V QR, or revise data in either one.

Long Luu also rejects the notion that Long Luu is expected to have recorded in its books and records the information regarding whether each of its Vietnamese suppliers is a reseller.  *See* Def. Tr.II Rsp. Br. at 78, *citing* Final IDM at 137.  Absurdly, for any of its unaffiliated suppliers that have a production facility, Long Luu would need to know if they also sometimes trade

products from their upstream suppliers - and if so - exactly the portion its unaffiliated supplier produced versus purchased, and what portion was sold to Long Luu versus to their other unaffiliated customers.  Only then could Long Luu ascertain if the supplier acted as a reseller in dealing with Long Luu. Such supply chain information is highly guarded business confidential information. In its final determination, Commerce neither explained its conclusory statement nor supported it with any record facts.  *See* Final IDM at 137 & n.707 (referring to Comment 6, but Comment 6 does not contain any discussion regarding why or how respondents would have recorded in their books and records such detailed information of their unaffiliated suppliers). Further, at least Long Luu informed Commerce that Long Luu needed to request such information from its suppliers.  *See* Ltr. from deKieffer & Horgan, re: Refiled Long LUU Rebuttal to Preliminary Determination (October 31, 2022) at 2, **PR654, CR558**.

Defendant next argues that Commerce correctly found that Long Luu failed to identify all species of wood it used to produce plywood, thereby finding that Long Luu withheld information.  Def. Tr.II Rsp. Br. at 78, *citing* Final IDM at 60. To be clear, Commerce on page 60 of the Final IDM only addressed a different issue, addressed next.  *See* Final IDM at 60.  In the Final IDM, this issue was discussed on page 100.  However, as demonstrated in Long Luu's moving brief, neither Commerce's finding that Long Luu failed to report a species of wood nor Defendant's arguments are supported by record evidence.  *See* DH Plaintiffs Tr.II 56.2 Br. at 67-68.

By way of a brief summary of the relevant facts – in its initial Q&V QR, Long Luu reported the wood species for the face veneer, back veneer, and various core materials for all plywood products it sold to the United States *during the POI*, exactly as Commerce requested.

PUBLIC VERSION

*See* Ltr. from Fox Rothschild LLP on behalf of Long Luu re: Quantity and Value Questionnaire

Response (September 30, 2020) ("Long Luu Q&V QR") at 4 & Exhibit 1's Attachment II-C,

**PR84, CR31-32**.  In that exhibit, Long Luu reported various wood species, but did not report

[       ] under the face/back veneer columns or the three core materials columns.  *Id.* at Exhibit

1's Attachment II-C.  Subsequently, in the second supplemental Q&V, Commerce requested

Long Luu to report its direct plywood or plywood inputs imported from China *during the POI*

(i.e., "December 2016 through March 2020"), and Long Luu reported importing "[

          ]" from a Chinese supplier [

                    ] in 2020 and provided Commerce-requested sample purchase package for the

"*first entry*" of such import.  Ltr. from Fox Rothschild LLP on behalf of Long Luu re: Q&V

Second Supplemental Questionnaire (July 12, 2021) ("Long Luu 2nd Supp QR") at 1 & Exhibits

1 & 2, **PR342, CR352-354**.  In the Preliminary Determination, by comparing those two

responses, Commerce found that there was a discrepancy in Long Luu's species reporting.  *See*

Prelim. AFA Memo at 18.

    After the Preliminary Determination, Long Luu explained twice to Commerce that there

was no "discrepancy" - the fact is that Long Luu neither imported [       ] veneers directly from

China during the POI, nor did it sell plywood products incorporating [        ] veneers during the

POI.  *See e.g.*, Long LUU, Case Brief (Jan. 9, 2023) at 6-7, **PR 756, CR595;** DH Plaintiffs Tr.II

56.2 Br. at 68.  However, in Long Luu's 2nd supplemental Q&V QR, it inadvertently reported its

imports from China for the time period from December 2016 through <u>December 2020</u>, instead of

Commerce's requested end date of March 2020.  This is evident by that Exhibit 2 of Long Luu's

2nd Supplemental Q&V QR consisting of the "first entry" of Long Luu's direct import of such

[       ] veneers from China was a purchase made in [            ], and the shipping documents

PUBLIC VERSION

shows the veneers did not leave China until [                    ], so it could not have possibly

arrived at Long Luu's factory by March 2020 for Long Luu to incorporate them into any

plywood products sold before the end of March 2020. *See* Long Luu 2nd Supp QR at 1 & Exhibit

2, **PR342, CR352-354**. This is further corroborated by the GOV Import Data showing that

[                                                          ] in the entire POI. *See* GOV

Import Data, **CR364-365**. In Short, Long Luu's species reporting in its initial Q&V QR and 2nd

Supplemental Q&V QR were different because Long Luu inadvertently reported for a *longer*

period (than requested by Commerce) in the 2nd Supplemental Q&V QR, but that was not a

discrepancy, and certainly not an instance where it withheld information as Defendant suggests.

*See* Def. Tr.II Rsp. Br. at 78. Moreover, Long Luu did not under-report species in the plywood

products it sold in the POI, nor did it under-report species of the veneers it imported in the POI.

Therefore, there was no "gap" in the record in any event, and Commerce had no basis to apply

FA, much less AFA, under 19 U.S.C. §§ 19 U.S.C. § 1677e(a)-(b).

On this issue, Defendant also blames Long Luu for not articulating this purported mis-

reporting or explanation until after the preliminary determination. *See id.* However, Long Luu

had no reason to know that Commerce would compare the wood species in plywood sold to the

United States in the POI with species of wood inputs imported from China in the POI until

Commerce drew that inappropriate comparison in the Preliminary Determination.

In contrast, Commerce preliminarily applied AFA to An An Plywood Joint Stock

Company ("An An") over three perceived discrepancies, one of which was that An An did not

report exporting plywood with pine veneers in its initial Q&V QR but subsequently reported

importing pine veneers from China in its 2nd Supplemental Q&V QR. *See* Prelim. AFA Memo at

3. After comments and briefing, Commerce recognized that An An's sample purchase package

40

in its 2nd Supp. Q&V QR demonstrate that An An's import of Pine veneers from China was at the very end of March 2020, and accepted An An's explanation that it did not report pine as a species incorporated in plywood products because it did not use those pine veneers in plywood sold before the end of March 2020.  *See* Final IDM at 75.  Another example would be that a Vietnamese manufacturer could have imported 3 different species of face veneers from China in the POI, but still correctly report that it only incorporated 2 (out of the 3) species into plywood products sold to the United States in the POI – thus creating a discrepancy by Commerce's comparison method - when the manufacturer only used that "unreported" species to produce plywood sold only in domestic market.  Given that Commerce's comparison of the species reported in these two questionnaire responses was inappropriate, Long Luu could not have foreseen that Commerce would use such comparison until it reviewed Commerce's Preliminary Determination.

Following the Preliminary Determination, Long Luu explained to Commerce that it over-reported its imports for 9 months more than requested promptly and cited to record evidence establishing this was an inadvertent harmless error, not a discrepancy, similar to what An An did. In the Final, Commerce still found this to be discrepancy.  Commerce's finding was not only unsupported by record evidence, but also arbitrary and capricious.  *See Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003) (citation omitted) ("[A]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.").

The third discrepancy was that Long Luu failed to provide the requested sample purchase documentation – i.e., commercial invoice, bill of lading, packing list, and customs declaration, of Long Luu's local Vietnamese supplier for their import from China in the 2nd Supplemental Q&V QR.  *See* Final IDM at 60 & 100; Prelim AFA Memo at 18; DH Plaintiffs Tr.II Rsp. Br. at 66

PUBLIC VERSION

(discussing that although Long Luu misunderstood Commerce's request and instead provided the commercial invoice it received from its local reseller supplier, Commerce erred in not issuing a supplemental questionnaire as required under § 1677m(d)). In its brief, Defendant contends "Commerce complied with its duty to notify Long Luu of its deficiencies by requesting the same information more than once." Def. Tr.II Rsp. Br. at 79, *citing* Supp. Questionnaire (**PR154**), 2nd Supp. Questionnaire (**PR257**). The record shows the contrary.

In the Supplemental Q&V, Commerce asked six questions, yet not a single question required Long Luu to provide any information regarding local reseller suppliers, let alone any documentation related to those purchases. *See generally*, Dep't Commerce, Supplemental Questionnaire for Interested Parties (Feb. 22, 2021), **PR154**. Even in the initial Q&V, Commerce only asked Long Luu to report *if* it had purchased plywood inputs from Vietnamese resellers – and if so – the amount purchased. *See* Initial Q&V at Question 5, **PR62**. Commerce did not ask Long Luu to provide the reseller's import data or their purchase documents in the initial Q&V. Indeed, Commerce made the request for Long Luu to provide sample purchase documents of its local suppliers for the first time in the 2nd Supplemental Q&V questionnaire, and thus it had the statutory obligation to at least provide Long Luu one opportunity to remedy the deficiency, pursuant to 19 U.S.C. § 1677m(d). After Long Luu requested from its local supplier the sample purchase package to try to remedy the deficiency post-preliminary, Commerce rejected the information. *See* Ltr. from deKieffer & Horgan, re: Long LUU Rebuttal to Preliminary Determination (Sept. 16, 2022) ("Long LUU Rejected Post-Prelim. Rebuttal") at 4 & Exhibit 2, **PR557, CR445**.

The last discrepancy noted by Commerce is that Long Luu reported the shipment from [         ] to be "[                                        ]." *See* Long Luu 2nd Supp QR

42

PUBLIC VERSION

at Exhibits 1, **PR342, CR352-354**.  That is the same over-reported post-POI import discussed in

relation to the species discrepancy above.  Commerce incorrectly determined that this was an

import of core veneers and therefore Long Luu mischaracterized its imported core veneers as

face and back veneers.  *See* Final IDM at 100.  Critically, this cannot not be characterized as a

discrepancy as the import should not have been reported in the 2nd Supp. Q&V QR, where

Commerce only requested that Long Luu report its POI imports.  *See* DH Plaintiffs Tr.II 56.2 Br.

at 67.  Defendant argues that Commerce considers any inaccurate record statement certified as

accurate a matter of concern and does not simply deem such actions irrelevant, and that

respondents do not get to determine which information to deem relevant. *See* Def. Tr.II Rsp. Br.

at 79.  Long Luu did not try to determine Post-POI imports to be irrelevant.  Instead, Commerce

decided that it was irrelevant by virtue of only requesting information of respondents' POI

imports.  *See generally,* Dep't Commerce, 2nd Supplemental Q&V Questionnaire for Interested

Parties (June 15, 2021), **PR 257**.

Moreover, Long Luu was never asked to report information about its Post-POI [      ]

veneer purchase from [          ] *at any time*.  Even if Commerce – upon receiving Long

Luu's 2nd Supplemental Q&V QR – had a change of heart and decided that post-POI imports are

relevant, it must follow §1677m(d) to issue a supplemental questionnaire to Long Luu.  In

*Hitachi Energy USA Inc. v. United States*, the Federal Circuit found Commerce acted unlawfully

in denying Hyundai's request to remedy the asserted service-related revenue reporting deficiency

when such data deficiency was created by Commerce during a remand proceeding, by switching

to a different calculation methodology. *See Hitachi Energy USA Inc. v. United States*, 34 F.4th

1375, 1383-84 (Fed. Cir. 2022).  Long Luu also made a request to remedy this asserted

deficiency by submitting additional documentation, and indeed tried to provide additional

information and documentation to demonstrate that it *used* the imported [      ] veneers as face and back veneers, but Commerce rejected it. Long Luu Rejected Post-Prelim. Rebuttal at 3 & Exhibit 1, **PR557, CR445**.

In any event, as discussed in more detail in TEKCOM's section below, Commerce's determination that certain thickness and certain species necessarily mean the imported veneers were core veneers, not face veneers, is unsupported by substantial evidence. Long Luu notes that the purchase documents it provided called the veneers "[                    ]" and does not state face or back or core, so under the "Actual Description," Long Luu's reporting them as "[                                ]" is accurate. *See* Long Luu 2nd Supp. Q&V QR at Exhibit 2, **PR342, CR352-354**. Additionally, the thickness of this veneer was only [      ] which is thinner than TEKCOM's imported poplar veneers, and TEKCOM's veneer thickness already more closely resembles face veneer thickness than core veneer thickness as determined by Commerce. Therefore, Commerce's finding that Long Luu misreported core veneers as face veneers is even more egregious. Ultimately, Commerce's request was for the actual description of the imported veneer, so Long Luu did precisely as requested and submitted the requested sample import package. If upon reviewing the import package, Commerce suspected that Long Luu mischaracterized core veneers as face veneers, it must at least issue Long Luu a supplemental questionnaire to request additional supporting documents to comply with its statute.

### G. TEKCOM Corporation

Commerce's AFA determination with respect to TEKCOM is not supported by substantial evidence and contrary to law. TEKCOM addressed why each of the reasons cited by

PUBLIC VERSION

Commerce in supporting the AFA application cannot be sustained.  We address Defendant's

response to each below.

Defendant first argues that Commerce correctly found that TEKCOM failed to report

[                                                                                    ] based on the GOV Import Data.

*See* Def. Tr.II Rsp. Br. at 81-82.  In doing so, Defendant claims that the Vietnamese entity of

those entries was a "prior iteration of the company," and TEKCOM was aware that Commerce's

request for information applied to both companies because it provided information of both

companies in its initial Q&V Response.  *Id.*

However, the importer of record of those entries was not just a "prior iteration of the

company."  The predecessor entity T E K C O M Corporation (hereinafter, "TEK HCM") has

different corporate ownership and a different business ID number.  *See* TEKCOM Q&V QR at 2-

3 & Exhibits 1-2 (Oct. 1, 2020), **PR117, CR121-125**.  TEK HCM's name on the business license

is also written differently than TEKCOM's.  Based on Commerce's standard practice in normal

antidumping investigations and reviews, they would have been treated as two different entities.

Specifically, when a Vietnamese exporter is granted separate rate ("SRA") status in a final

determination or final results, that Vietnamese exporter is excused from filing an SRA in the next

review and instead only needs to file a much more streamlined separate rate certification

("SRC").  However, "Companies who had changes to corporate structure, ownership, or to the

official company name may not file a Separate Rate Certification but must instead file a Separate

Rate Application."  *See* Dep't Commerce, Socialist Republic of Vietnam's Separate Rate

Certification, available at https://enforcement.trade.gov/nme/sep-rate-files/cert-20150323/srv-sr-

cert-20150416.pdf (last accessed December 16, 2024).

45

Further, TEK HCM ceased all operations as of [                    ], so any exports they made in the past cannot possibly be subject to this circumvention inquiry.  TEKCOM Q&V QR at 2-3, **PR117, CR121-125**.  TEKCOM reported TEK HCM's existence and its data in the initial Q&V QR so that Commerce was fully informed.  TEKCOM did its part to disclose a company that had been defunct *for years*.  In issuing the 2nd Supplemental Q&V, if Commerce intended for TEKCOM to report its own import data as well as TEK HCM's imports, it should have made that clear.  Indeed, Commerce made that clear for a different respondent that apparently had only a name change.  *See* 2nd Supplemental Q&V Questionnaire at Attachment I (June 15, 2021) (listing one respondent as "Hoang Huy Investment & Development Production JSC now DBA/exporting under BMY Vietnam Company Limited"), **PR257**.

Defendant claims that "{i}ntentional obtuseness on the part of respondent does not obviate Commerce's *multiple requests* … for the relevant information."  Def. Tr.II Rsp. Br. at 82, *quoting Hyundai Heavy,* 332 F. Supp. 3d at 1341-42 (emphasis supplied).  However, Commerce did not make "multiple requests" for TEKCOM to report TEK HCM's import data.  At most, Commerce made a single request for TEK HCM's import data, assuming *arguendo* Commerce's request in the 2nd Supp. Q&V counts.  If anything, *Hyundai Heavy* undermines Defendant's position in this case.  In *Hyundai Heavy,* "Commerce asked HHI on three separate occasions to separately report service-related revenue.  Twice, HHI did not; and the third time, HHI provided a worksheet which was not responsive in the form or manner requested by Commerce."  *Hyundai Heavy*, 332 F. Supp. 3d at 1341.  After confirming that "HHI was informed that its reporting of service-related revenue was deficient because Commerce made multiple requests for such information," the Court concluded that Commerce met its obligation pursuant to 19 U.S.C. § 1677m(d).  *Id.*  In the case with TEKCOM, Commerce did not issue any

PUBLIC VERSION

questionnaire after the 2nd Supplemental Q&V.  Further, it was in the 2nd Supplemental Q&V where Commerce requested *for the first time* that TEKCOM report its imports from China from unaffiliated companies under HTS 4408 and 4412.  Therefore, after identifying this as a discrepancy, Commerce had the obligation to at least issue one supplemental questionnaire for TEKCOM to correct its reporting, consistent with the Court's analysis in *Hyundai Heavy. See Hyundai Heavy*, 332 F. Supp. 3d at 1341.  Further, Defendant's argument that it was not required to issue a supplemental questionnaire given practicability concerns is unconvincing.  *See* Def. Tr.II Rsp. Br. at 82.  Not only did Commerce have 12 months to issue a supplemental questionnaire before the Preliminary Determination, it was Commerce's decision to wait until the 2nd Supplemental Q&V to request this information.  Commerce cannot wait until it did not have enough time to issue a deficiency questionnaire to request information that was not previously requested and skirt its obligation under § 1677m(d).

After the Preliminary Determination, TEKCOM made a request to remedy this deficiency by submitting the excel chart and purchase package requested in the 2nd Supp. Q&V Questionnaire for those [    ] entries and additional documents to show that the entries were not incorporated in any plywood products exported to the United States.  *See* Ltr from deKieffer & Horgan, re: TEKCOM Rebuttal to Preliminary Determination (Oct. 13, 2022) ("TEKCOM Rejected Post-Prelim. Rebuttal") at 2-4 & Exhibits NFI-1 to NFI-6, **PR608, CR453.**  Commerce abused its discretion in rejecting the information when there was plenty of time to verify or consider them.  *See supra, Papierfabrik*, 843 F.3d at 1384 (Fed. Cir. 2016); *Fisher S.A.*, 700 F. Supp. 2d at 1375-76 (Ct. Int'l Trade 2010).

Next, Defendant argues that Commerce's finding that TEKCOM mischaracterized its imported veneer as face veneer is supported by record evidence.  *See* Def. Tr.II Rsp. Br. at 82-83

(Defendant referred to its response to other parties' arguments).  In response to other parties' arguments, Defendant claimed that Commerce correctly relied on trade data collected by the International Trade Commission (ITC) and the bill of materials of the mandatory respondent Linyi Chengen from the first annual review of the *HWPW from China* AD Order.  *Id.* at 56-57 & 69-70; *see also*, **Final IDM at 79-80**.  As TEKCOM already addressed, the ITC reports necessarily deal in generalities, but Commerce has an obligation to investigate respondents specifically for their own data, which it failed to do.  *See* DH Plaintiffs 56.2 Br. at 76.

Notably, based on general ITC data, approximately half of the plywood exported from non-subject countries (and thus could include Vietnamese plywood) and ***more than 5% of the plywood exported from China*** contains plywood with face veneers equal or greater than .4mm.  *See* DOC, EAPA Scope Document No. 25: ITC Publ. No. 4747, Hardwood Plywood Inv. Nos. 701-TA-565 & 731-TA-1341 Final Rpt. (Dec. 2017) ("ITC Final Report") at Table IV-7, **PR399.** Specifically, Table IV-7 shows in data collected from 2014 through the first half of 94.6% of U.S. imports from China contain face veneers less than .4mm, while the rest contains face veneers equal or greater than .4mm.  *Id.*  That table also shows only 54.1% of U.S. imports from non-subject sources (thus could have included Vietnam) contain face veneers less than .4mm, while the rest contains face veneers equal or greater than .4mm.  *Id.*  Therefore, even the general ITC data does not support Commerce's erroneous presumption that any veneer imported from China that is greater than .4mm must be *core* veneer.

Further, because the ITC Report does not contain information regarding core veneer thickness, Commerce relied on Chengen's data to find that the vast majority of the core veneers should be "between [                    ] in thickness".  Prelim. AFA Memo. at 22.  The thickness of

PUBLIC VERSION

TEKCOM's veneers more closely resemble the thickness of face veneer rather than core veneers. *See* DH Plaintiffs 56.2 Br. at 76.  The poplar veneers TEKCOM imported were [

].  *See* TEKCOM 2nd Supp. Q&V QR at Exhibit SQ2-3 (July 9, 2021), **PR326, CR326-327.**  According to Commerce's methodology, TEKCOM's poplar veneers were thicker than most of the Chinese face veneer thickness (.4mm on the upper end) but also thinner than what Commerce found to be the normal core veneer thickness (1.5mm on the lower end).  The midpoint of this range is [        ], thus TEKCOM's veneers thickness is closer to face veneers than core veneers.

With that said, TEKCOM maintains that Commerce's determination as to whether respondents' veneers are face/back veneers or core veneers based on veneer thickness is speculation and cannot be sustained.  *Novosteel SA v. United States*, 284 F.3d 1261, 1276 (Fed. Cir. 2002) (Dyk, J., dissenting) ("It is well established that speculation does not constitute 'substantial evidence.'").  The general ITC data only represents general trade patterns, but it does not dictate TEKCOM's actual production, or any other particular company's actual production for that matter.  In fact, Commerce has seen from TEKCOM's own purchase documents that it imports some other face veneers thicker than .4mm and did not find that as a discrepancy.  *See* TEKCOM 2nd Supp. Q&V QR at Exhibit 2-2.  Additionally, record documents show that at least Her Hui sells plywood products without a back veneer, so the outermost layer of the core platform (which is made from the thicker core veneers) becomes the back veneer for purposes of the scope of the case.  *See* Her Hui 1st Supp. Q&V Rsp. at Exhibit 2 (Her Hui's sample U.S. sale commercial invoice includes plywood with a product code [      ], which is defined as plywood product of [                                        ], **PR211, CR188-189.**  Plywood products without a full-sized back veneer is not uncommon, especially plywood sold to cabinet

49

manufacturers to produce cabinet boxes because the back of the cabinet box will be put against

the wall and is never seen after installation.  TEKCOM or any other respondents could have

ordered 2.0mm thick veneers from China and used them as back veneers in products that do not

require a fancier back veneer.

     Commerce's reliance on species to determine face/back veneers or core veneers is

likewise not supported by substantial evidence. Several respondents, including TEKCOM,

reported in their initial Q&V response selling plywood with face/back poplar veneers.  *See* DH

Plaintiffs Tr.II 56.2 Br. at 76; *see e.g.*, TEKCOM Q&V QR at Exhibit 5, **PR117, CR121-125**;

[

     ].  Further, Commerce has [

    ].

*See* Golden Bridge 1st Supp. Q&V QR at Exhibit SQ-1, **PR186, CR164**.

     The so-called substantive evidence, i.e., ITC data and Chengen's data on thickness and

species, are not definitive evidence. At best, such information justifies Commerce being

suspicious that TEKCOM might have misreported core veneer as face veneer, therefore

warranting a supplemental questionnaire requesting supporting documents to demonstrate that

TEKCOM indeed sold plywood with poplar face and back veneers.  Defendant argues that

"Commerce specifically requested that respondents provide sample entry documentation … for

the first entry of plywood products into Vietnam" as supporting documents.  *See* Def. Tr.II Rsp.

Br. at 83-84.  However, TEKCOM provided each of the documents requested by Commerce for

its poplar veneer imports.  TEKCOM 2nd Supp. Q&V QR at Exhibit SQ2-3, **PR326, CR326-327**.

TEKCOM responded it imported poplar face veneers exactly in the form and manner requested

PUBLIC VERSION

by Commerce and the specific supporting documents requested by Commerce.  *See* DH Plaintiffs

Tr.II 56.2 Br. at 71-72.  TEKCOM notes that on its sample package's commercial invoice, the

poplar veneers were called "Poplar", without specifically stating face veneer or core veneer.  *See*

TEKCOM 2nd Supp. Q&V QR at Exhibit SQ2-3.  It was because *Commerce* requested that

TEKCOM provide the "actual description" of the veneers that TEKCOM described them as

"Poplar face/back veneer sheets."  *Id* at Exhibit SQ2-1 & SQ2-3.  TEKCOM did the same for its

other face veneer imports, with which Commerce found no discrepancy.  *Compare id.* (reporting

"[                                        ]" as the actual description for certain purchases), *with id.* at

Exhibit SQ2-2 (providing sample purchase package in which the commercial invoice refers to

the pine veneers as "[        ]").

Commerce's alleged discrepancy against TEKCOM's poplar veneer reporting therefore

amounts to a factual finding that TEKCOM could not have used [                ] poplar veneers

as face/back veneers, when TEKCOM was <u>*never*</u> asked to document that.  After the Preliminary

Determination, TEKCOM submitted additional documentation to rebut this implied new factual

finding but that was unlawfully rejected by Commerce.  *See* TEKCOM Rejected Post-Prelim.

Rebuttal at 5-7 & Exhibits NFI-7 to NFI-9, **PR608, CR453.**

Defendant also claims that TEKCOM's argument that the size of the poplar veneers

imported indicate that they were used as face veneer is without record support.  *See* Def. Tr.II

Rsp. Br. at 83 (discussing a statement TEKCOM made in its post-preliminary filing that was

rejected by Commerce).  TEKCOM disputes that extensive general industry knowledge is

considered "new factual information," but in any event, the Court should find Commerce abused

its discretion in rejecting TEKCOM's post-preliminary filing for portions including this

statement as well as documents in rebuttal to each of Commerce's reasons for applying AFA to TEKCOM.

Commerce's last reason for applying AFA is based on a discrepancy of imported veneer species between TEKCOM's initial Q&V QR and its 2nd Supplemental Q&V QR, which contained two new cedar species not previously reported.  Final IDM at 102.  Defendant in its argument referenced its response against Long Luu on a similar issue.  TEKCOM's circumstances are different from Long Luu's to the extent that Long Luu's alleged misreporting of species resulted from Long Luu inadvertently reporting species in plywood sold *after* the POI.  However, as explained in Her Hui's and Long Luu's sections above, Commerce's refusal to treat TEKCOM's species reporting in 2nd Supp. Q&V QR as corrective information cannot stand because an explanation regarding how the error occurred and how TEKCOM fixed the error was provided to Commerce before Commerce's Final Determination.  *See* Ltr from deKieffer & Horgan, re: Refiled TEKCOM Rebuttal to Preliminary Determination (December 5, 2022) at 7, **PR670, CR562**.  Further, Commerce failed to comply with the law to issue a deficiency questionnaire to TEKCOM in the 12 months leading up to the Preliminary Determination.

### H.  Vietnam Zhongjia Wood Company Limited

In the Final Determination, Commerce applied AFA to Zhongjia for two reasons.  First, Commerce discovered during the verification unreported kapok veneers purchased from a Vietnamese company [                                                      ].  *See* Final IDM at 158-161.  Second, Zhongjia's outside (i.e., third-party) accountant did not bring hard copies of Zhongjia's 2020 Q1 material purchase invoices to Zhongjia's facility 1.5 hours outside of the city of Hanoi accounting office.  *Id.* at 161-165.  Commerce therefore found that Zhongjia

withheld information from Commerce and failed to act to the best of its ability, warranting AFA. *Id.* In its brief, Zhongjia argued that Commerce's determination is not supported by substantial evidence and contrary to law.  *See* DH Plaintiffs Tr.II 56.2 Br. at 78-86.

On the first issue, as Zhongjia explained during the verification, it did not report [

] as a "Vietnamese supplier of {} plywood inputs" because it "did not consider [

] a supplier."  *See* Dep't Commerce, memorandum: Verification of Vietnam Zhongjia Wood Company Limited (Dec. 21, 2022) ("Zhongjia Ver. Report") at 6, **PR679, CR566**; Dep't Commerce, 2nd Q&V Questionnaire – Question 2 (June 15, 2021), **PR257**.  The kapok core veneers were bundled by [                    ] along with their production facility that Zhongjia purchased for its operation.  Zhongjia Ver. Report at 6.  Zhongjia only used them [

]. *Id.*

Defendant maintains that Commerce expected Zhongjia to comply with the wording of the questionnaire, and that "whether or not veneers are used to produce plywood not sold to the United States does not negate the fact that they are still *inputs used to produce plywood*." Def. Tr.II Rsp. Br. at 37-38 (emphasis supplied).  However, the kapok veneers were *not* used to produce plywood.  *See* Zhongjia Ver. Report at 6.  Zhongjia's interpretation of Commerce's request to report "Vietnamese supplier of {} plywood inputs" does not include a supplier of bundled scrap materials, was reasonable.  This is particularly true in light of the sub-questions under this question. For each Vietnamese supplier of plywood inputs identified, Zhongjia was required to report all of their imports from China under subheadings 4408 or 4412 for the entire POI (regardless of whether such imports were used by the supplier itself or sold to any of its

customers) and provide a sample purchase package between the Vietnamese supplier's Chinese supplier and that Vietnamese supplier. *See* 2nd Q&V Questionnaire – Question 2 (June 15, 2021), **PR257.**

Moreover, as Zhongjia argued, Commerce's expectation that Zhongjia would have some internal records to show how those kapok veneers were used is unreasonable. *See* DH Plaintiffs Tr.II 56.2 Br. at 77-78 (discussing that Commerce pointed to no record facts, cases, or local law or regulation to demonstrate that Zhongjia was expected to keep internal records for scrap consumption; distinguishing the respondent's action underlying *Nippon Steel* from Zhongjia's because the Court found Commerce was reasonable to expect the respondent who makes U.S. sales based on two different weighing methods to maintain a conversion factor for those different weighing methods); *see also, supra, Nippon Steel*, 337 F. 3d at 1382-83 and *Nat'l Nail Corp.*, 390 F. Supp. 3d at 1373 (discussing that Commerce must make an objective and subjective showing that the respondent failed to cooperate to the "best of its ability" prior to drawing an adverse inference).

Defendant claims that Commerce observed that 25 respondents demonstrated that they maintained the records requested by Commerce, and thus Commerce reasonably assumed this type of information should have been available to respondent. Def. Tr.II Rsp. Br. at 39, *citing* Final IDM at 136. However, there Commerce only stated that "name of affiliates, location of suppliers, species of veneer used to produce hardwood plywood" are information that Commerce reasonably expected respondents to know in part because 25 respondents demonstrated that hardwood plywood producers do indeed maintain {such information}. *See* Final IDM at 136. In the Final IDM Commerce *did not* discuss requesting and verifying any respondents' *consumption*

54

*records for scrap material.  See generally,* Final IDM at 158-161.  In fact, Commerce did not

respond to Zhongjia's argument that consumption records for scrap materials are not normally

expected, much less required, to be maintained by Zhongjia.  *See id.*; *see also*, Zhongjia's

Rebuttal Brief (Feb. 1, 2023) at 5, **PR805, CR607.**

     Critically, Commerce verified that Zhongjia did not sell any plywood to the U.S. that

incorporated kapok veneers. The circumvention investigation is against finished hardwood

plywood sold to the United States.  Zhongjia demonstrated, and Commerce verified, Zhongjia's

sales, so what Zhongjia did with the kapok veneers from [                ], whether using them

as scrap material, or destroying them, or selling to another company, etc., is immaterial.

     In response, Defendant repeats the two reasons Commerce provided in its Final IDM.

*See* Def. Tr.II Rsp. Br. at 38, *citing* Final IDM at 159.  According to Defendant, "the fact that

Commerce did not identify—at verification—any kapok wood used to produce plywood does not

mean that no such wood, or other core veneer species from the unreported supplier, was used to

produce hardwood plywood during the inquiry period." *Id.*  This argument is contradicted by the

Verification Report. *See* DH Plaintiffs Tr.II 56.2 Br. at 80, *citing* Zhongjia Ver. Report at 6

(Commerce's verifiers reviewed all of Zhongjia's invoices from [                ] and did not

identify any other invoices other than the kapok invoices mentioned; in addition, "{w}e did not

identify any other reported suppliers in our examination of Zhongjia's *sales* of plywood")

(emphasis supplied); *see also*, Zhongjia Ver. Report at 3 (Commerce fully verified Zhongjia's

accounting records of "sales of finished plywood to customers" made both prior to 2020 and

after 2020).  Second, Zhongjia already demonstrated that Commerce's statement in the Final

IDM that "Zhongjia *did* use some of its unreported hardwood plywood veneer purchases to

produce hardwood plywood" was wrong and unsupported by any record evidence. *See* DH

Plaintiffs Tr.II 56.2 Br. at 80, *quoting* Zhongjia Ver. Report at 6, **PR679, CR566**.  In sum, the

verification report unequivocally shows that Commerce fully verified Zhongjia's U.S. sales,

from Zhongjia's sales documents to its accounting system recording the sales.  Zhongjia did not

make any U.S. sales of plywood incorporating kapok veneers.  *See* Zhongjia Verification Exhibit

(Oct. 28, 2022) at VE-1, **PR646, CR531-539**.

      Additionally, Zhongjia reasonably believed that the verifiers were satisfied with

Zhongjia's response for not reporting [             ] as a plywood input supplier.  Had

Commerce found it to be a discrepancy, it should have provided Zhongjia a chance to provide

additional documents Commerce might require to further support the immateriality of the issue

pursuant 19 U.S.C. § 1677m(d).  *See* DH Plaintiffs Tr.II 56.2 Br. at 82-83, *citing SKF USA Inc v.*

*United States*, 29 C.I.T. 969, 979-80 (2005) (finding Commerce's deficiency notification

provided to SKF for the first time in the final decision memorandum did not comply with §

1677m(d)); *see also Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1384 (Fed. Cir.

2022), modified on denial of reh'g, No. 20-2114, 2022 U.S. App. LEXIS 32375 (Fed. Cir. Nov.

23, 2022) ("The government states in its brief that Commerce was not required to permit

Hyundai to provide additional information because the deficiency in question was not

determined until 'verification.' However, the statutory entitlement to notice and opportunity to

remedy any deficiency is unqualified in the circumstances of this case.") (internal citation

omitted).  Although Zhongjia cannot provide internal consumption records, in theory Zhongjia

could have provided sample sales records beyond its U.S. sales to show that it did not consume

kapok veneers in its plywood production, regardless of market.  The Court should also reject

Defendant's claims that the input supplier information was "asked twice" given that the

PUBLIC VERSION

Defendant can only cite to the 2nd Supp. Q&V where Commerce requested this information.  *See* Def. Tr.II Rsp. Br. at 40, *citing* Zhongjia 2nd Supp. Q&V Rsp. at Exhibit SQ2-3, **PR318, CR302-304**.

On the second issue that Zhongjia did not have its spiral-bound purchase invoice books for Q1 of 2020 on site, Defendant argues that *SKF* is inapplicable because "the respondent communicated its willingness and ability" to provide the documents that were not on site. Defendant's argument has no merit. Def. Tr.II Rsp. Br. at 41. However, in *SKF*, the Court specifically stated that there was "a conflict in testimony between the parties" because SKF testified that they communicated willingness and ability to provide the documents, while a Commerce official testified that "SKF had specifically said it would be impossible to obtain that data on such short notice."  *SKF USA*, 29 C.I.T. at 974.  Further, Defendant argued that Commerce was not required to itemize beforehand every possible document it will need during verification, particularly where the outline indicates that the list of items is not necessarily all-inclusive.  *See* Def. Tr.II Rsp. Br. at 41-42; *see also,* Coalition Tr.II Rsp. Br. at 60.  However, given the importance of the 2020 Q1 purchase records and this truncated one-day verification, Commerce's verification procedure is even more unreasonable.  Zhongjia did not have two more days of verification to pull documents as SKF had, because Commerce had set the verification to one day to begin with.

Neither Commerce nor Defendant explained why travelling from one to another office during the late afternoon on the sole day of verification was not practicable for Zhongjia to accomplish.  *Id.* at 42, *citing* Final IDM at 164.  Had Commerce made it clear to Zhongjia that reviewing the 2020 Q1 spiral-bound book is critical, Zhongjia would have asked the outside

accountant to have her colleague deliver the documents while Commerce reviewed other documents, which took a few more hours; there was more than enough time for the 2020 Q1 records to be delivered.  *See* DH Plaintiffs Tr.II 56.2 Br. at 84.  Additionally, Commerce's explanation of why it was not practicable or reasonable to return to Zhongjia another day (i.e., "there was no room for last-minute modification to accommodate more time at one particular site") is unreasonable in light of the two cancelled verifications following Zhongjia's on-site visit.  *See* Final IDM at 164-165.  The team that verified Zhongjia verified on Friday, and the two remaining companies on the verification schedule on the following Monday and Tuesday dropped out after Commerce issued the revised verification schedule.  *See* Dep't Commerce, Memo: Revised Verification Schedule (Oct. 13, 2022), **PR609**.

Defendant further argues that Commerce's decision to apply total AFA over the Q1 2020 purchase records are reasonable otherwise. *See* Def. Tr.II Rsp. Br. at 43.  Aside from criticizing Zhongjia's failure to report [                    ] as an input supplier, addressed above, Defendant avers that Zhongjia admitted that its early recordkeeping process upon opening in Q4 2019 were poor and evolved as its business developed, and that it only started using professional accounting software at the start of 2020.  *See id.*  However, what Zhongjia admitted was that they did not have some internal consumption record for the kapok veneer used as scrap "because they did not have a well-organized recordkeeping system when they first started," so that statement was specific to the startup phrase.  Zhongjia Ver. Report at 6, **PR679, CR566.**  Moreover, the fact that Zhongjia did not start using a professional accounting software until 2020 is of no moment because Commerce verified both Zhongjia's 2019 accounting records and 2020 accounting records.  *Id.* at 3 (Section III of the verification outline is "Accounting and Data system").  The verifiers reported that they successfully verified both the 2020 accounting records and 2019

58

PUBLIC VERSION

accounting records, describing how the verification was conducted (i.e., reviewing all aspects of accounting system from purchases of raw materials to production of plywood and to sales of finished plywood to customers. *Id.* At verification, Commerce found no discrepancies. *Id.* Therefore, the verification report shows that Commerce verified a tremendous amount of information for both 2019 and 2020 Q1 in the course of its 8-hour visit. Commerce's AFA application is not supported by record evidence and contrary to law.

## IV.    Conclusion

As demonstrated above, the Court should reject each and all reasons Commerce cited for applying AFA to the DH Exporter Plaintiffs for being unsupported by record evidence and unlawful. Most notably, Commerce systematically avoided its obligations to investigate by failing to issue reasonable supplemental questionnaires pursuant to 19 USC § 1677m(d), made even more unreasonable by the extraordinary lengths of time between its questionnaires, the massive gap of one year between the last questionnaire and the Preliminary Determination, and the further extraordinary one-year Commerce afforded itself for its Final Determination. DH Plaintiffs respectfully request that the Court grant their motion for judgment on the agency record and remand Commerce's final determination for further proceeding consistent with the Court's holding.

Respectfully submitted,

 /s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
Vivien J. Wang
**DEKIEFFER & HORGAN, PLLC**
1156 Fifteenth St., N.W.

PUBLIC VERSION

Suite 1101
Washington D.C.  20005
Tel: (202) 783-6900
Email: gmenegaz@dhlaw.com

Date: January 2, 2025                    *Counsel to DH Consolidated Plaintiffs*

## <u>WORD COUNT CERTIFICATE OF COMPLIANCE</u>

This brief has been prepared utilizing Microsoft Word 2016 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth in the Court's Second Amended Scheduling Order dated August 20, 2024.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **17,997** words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz
Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
1156 Fifteenth St., N.W.
Suite 1101
Washington D.C.  20005
*Counsel to DH Consolidated Plaintiffs*