Slip Op. 26-5

## UNITED STATES COURT OF INTERNATIONAL TRADE

SHELTER FOREST INTERNATIONAL
ACQUISITION, INC.,

      Plaintiff,

      and

GREATRIVER WOOD CO., LTD., ET
AL.,

      Consolidated Plaintiffs,

      v.

UNITED STATES,

      Defendant,

      and

COALITION FOR FAIR TRADE IN
HARDWOOD PLYWOOD,

      Defendant-Intervenor.

Before: Mark A. Barnett, Chief Judge
Consol. Court No. 23-00144

**PUBLIC VERSION**

## OPINION AND ORDER

[Remanding the U.S. Department of Commerce's affirmative finding of circumvention of
the antidumping and countervailing duty orders on certain hardwood plywood products
from the People's Republic of China.]

Dated: January 28, 2026

William Chandler, Pillsbury Winthrop Shaw Pittman LLP, of Washington, DC, argued for
Plaintiff Shelter Forest International Acquisition, Inc. Also on the brief were Daniel L.
Porter, William C. Sjoberg, and Ana M. Amador.

William Marshall, Sandler Travis & Rosenberg, P.A., of New York, NY, argued for
Consolidated Plaintiffs USPLY LLC, Boise Cascade Building Materials Distribution LLC,

Consol. Court No. 23-00144                                                      Page 2

Cabinetworks Group Inc., ACPI Wood Products LLC, Cabinetworks Group Middlefield, LLC, and Cabinetworks Group Michigan, LLC.

Bryan P. Cenko, Mowry & Grimson, PLLC, of Washington, DC, argued for Consolidated Plaintiffs Concannon Lumber Company, Northwest Hardwoods, Inc., Richmond International Forest Products LLC, Taraca Pacific Inc., UFP International, LLC, Medallion Forest Products, Hardwoods Specialty Products USLP, Paxton Hardwoods LLC, and Rugby Holdings LLC.[1]  Also on the brief were Jeffrey S. Grimson and Jill A. Cramer.

Gregory S. Menegaz and Vivien J. Wang, The Inter-Global Trade Law Group PLLC, of Washington, DC, argued for Consolidated Plaintiffs American Woodmark Corporation, Del Valle Kahman & Company, Ike Trading Company Limited, Pittsburgh Forest Products, Panoply Wood Products USA Inc., American Pacific Plywood, Inc., Eagle Industries Company Limited, Golden Bridge Industries Pte. Ltd., Lechenwood Viet Nam Company Limited, Arrow Forest International Co., Ltd., Her Hui Wood (Vietnam) Co., Long LUU Plywood Production Co., Ltd., TEKCOM Corporation, and Vietnam Zhongjia Wood Company Limited.  Also on the brief were Alexandra H. Salzman and Judith L. Holdsworth.

Stephen Brophy, Husch Blackwell, LLP, of Washington, DC, for Consolidated Plaintiff Greatriver Wood, Co., Ltd.

Gregory S. McCue, Steptoe LLP, of Washington DC, for Consolidated Plaintiff Tumac Lumber Co., Inc.

Sosun Bae, Senior Trial Counsel, and Collin T. Mathias, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant United States.  Also on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Tara K. Hogan, Assistant Director.  Of counsel on the brief was Savannah Maxwell, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Stephanie M. Bell, Wiley Rein LLP, of Washington DC, argued for Defendant-Intervenor Coalition for Fair Trade in Hardwood Plywood.  Also on the brief were Timothy C. Brightbill, Tessa V. Capeloto, Maureen E. Thorson, and John Allen Riggins.

---

[1] The court also granted these parties' motion to intervene as plaintiffs.  Order (Aug. 23, 2023), ECF No. 15.  Following consolidation, however, they participated as consolidated plaintiffs, not as plaintiff-intervenors.

Barnett, Chief Judge:  This consolidated case addresses the U.S. Department of Commerce's ("Commerce" or "the agency") affirmative final determination of circumvention of the antidumping duty ("AD") and countervailing duty ("CVD") orders on certain hardwood plywood products from the People's Republic of China ("China").  *See Certain Hardwood Plywood Prods. From the People's Republic of China*, 88 Fed. Reg. 46,740 (Dep't Commerce July 20, 2023) (final scope determination and affirmative final determination of circumvention of the AD and CVD orders) ("*Final Determination*"), ECF No. 21-6, and accompanying Issues and Decision Mem., A-570-051, C-570-052 (July 14, 2023) ("I&D Mem."), ECF No. 21-7.[2]  Circumvention determinations are governed by section 781 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677j (2018).[3]  In the *Final Determination*, Commerce found that imports of certain hardwood plywood completed in Vietnam using inputs from China under five production scenarios, discussed in more detail below, are circumventing the AD/CVD orders on certain hardwood plywood from China.  88 Fed. Reg. at 46,740.

---

[2] The administrative record for the *Final Determination* is contained in public and confidential antidumping and countervailing duty records.  *See* Public AD R. ("PR"), ECF No. 21-1; Confid. AD R. ("CR"), ECF No. 21-2; Public CVD R., ECF No. 21-3; Confid. CVD R., ECF No. 21-4.  Parties filed joint appendices containing record documents cited in their briefs.  Tranche I Confid. J.A. (Part 1), ECF No. 66; Tranche I Public J.A. (Part 1), ECF No. 67; Tranche I Confid. J.A. (Part 2), ECF No. 82; Tranche I Public J.A. (Part 2), ECF No. 83; Tranche II Confid. J.A. (Part 1), ECF No. 90; Tranche II Public J.A. (Part 1), ECF No. 91; Tranche II Confid. J.A. (Part 2), ECF No. 114; Tranche II Public J.A. (Part 2), ECF No. 115; Suppl. Confid. J.A., ECF No. 123; Suppl. Public J.A., ECF No. 124.  Consistent with the parties, the court cites to the documents filed on the record of the AD proceeding.  The court references the confidential version of the record documents unless otherwise indicated.

[3] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and all citations to the U.S. Code are to the 2018 edition, unless otherwise specified.

Multiple interested parties who participated in the circumvention inquiry, consisting of Vietnamese producers or exporters and U.S. importers, filed a total of 22 actions challenging the *Final Determination*, which the court consolidated under this lead case. *See* Order (Oct. 20, 2023), ECF No. 25. This consolidated case is now before the court on motions for judgment on the agency record pursuant to U.S. Court of International Trade Rule 56.2 filed by Plaintiff and Consolidated Plaintiffs.[4] The United States ("the Government") and Defendant-Intervenor Coalition for Fair Trade in Hardwood Plywood ("the Coalition") defend Commerce's determination. Given the number of issues raised, this case proceeded with two rounds of briefing as proposed by the Parties (referred to as Tranche I and Tranche II). *See* Scheduling Order (Nov. 29, 2023), ECF No. 30. Tranche I covered procedural and certain evidentiary claims. *See id.* at 1–2. Tranche II covered Commerce's rejection of untimely new factual information, compliance with 19 U.S.C. § 1677m(d), and use of adverse facts available. *See id.* at 2. For the following reasons, the court remands the *Final Determination* for reconsideration or further explanation consistent with this opinion.

---

[4] For ease of reference, the court includes a three-part appendix at the conclusion of the opinion identifying all parties and relevant briefs (including abbreviated citations) in each round of briefing.

## BACKGROUND

I.    **Statutory Framework**

A.  **Anti-Circumvention[5]**

The United States may, under certain circumstances, issue orders imposing duties on goods determined to be subsidized by a foreign government or sold in the U.S. market at less than fair value.  19 U.S.C. §§ 1671 (CVD), 1673 (AD).  To address circumvention of such orders, Congress has authorized Commerce to include merchandise imported from a non-subject country within the scope of the orders pursuant to statutory criteria.  *Id.* § 1677j.

For "[m]erchandise completed or assembled in other foreign countries," *id.* § 1677j(b), the relevant provisions of the anti-circumvention statute are as follows:

(1) In general

If--

(A) merchandise imported into the United States is of the same class or kind as any merchandise produced in a foreign country that is the subject of [an AD or CVD order],

(B) before importation into the United States, such imported merchandise is completed or assembled in another foreign country from merchandise which . . . (ii) is produced in the foreign country with respect to which such order or finding applies,

(C) the process of assembly or completion in the foreign country referred to in subparagraph (B) is minor or insignificant,

---

[5] "Anti-circumvention" is typically used in reference to the purpose of the statute and Commerce's corresponding inquiry; however, the Parties and the court sometimes use "anti-circumvention" and "circumvention" interchangeably.

(D) the value of the merchandise produced in the foreign country to which the antidumping duty order applies is a significant portion of the total value of the merchandise exported to the United States, and

(E) [Commerce] determines that action is appropriate under this paragraph to prevent evasion of such order or finding,

[Commerce] . . . may include such imported merchandise within the scope of such order or finding . . . .

*Id.* § 1677j(b)(1).

To determine if the process is minor or insignificant, Commerce considers:

(A) the level of investment in the foreign country,

(B) the level of research and development in the foreign country,

(C) the nature of the production process in the foreign country,

(D) the extent of production facilities in the foreign countries, and

(E) whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States.

*Id*. § 1677j(b)(2).

To determine whether to include such merchandise in an AD or CVD order pursuant to paragraph (1), Commerce considers "the pattern of trade, including sourcing patterns," affiliations between "the manufacturer or exporter of the merchandise described in paragraph (1)(B)" and "the person who uses the merchandise described in paragraph (1)(B) to assemble or complete [the inquiry merchandise] in the foreign country," and the existence of increased "imports into the foreign country of the merchandise described in paragraph (1)(B)" following "the issuance of [an AD or CVD] order." *Id*. § 1677j(b)(3).

"[T]o the maximum extent practicable," Commerce should issue its determination "within 300 days from the date of the initiation of a countervailing duty or antidumping circumvention inquiry." *Id.* § 1677j(f).

### B. Adverse Facts Available

During a circumvention inquiry, Commerce solicits information from interested parties. If an interested party "withholds information that has been requested," "fails to provide such information by the deadlines," "significantly impedes a proceeding," or provides information that "cannot be verified," Commerce "shall, subject to section 1677m(d) . . . use the facts otherwise available in reaching the applicable determination." *Id.* § 1677e(a)(2). Section 1677m(d) governs deficient submissions. If Commerce determines that a response is deficient, the agency "shall promptly inform the [submitting party] of the nature of the deficiency and shall, to the extent practicable, provide that [party] with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle." *Id.* § 1677m(d).

If, however, Commerce determines that "an interested party has failed to cooperate by not acting to the best of its ability," the agency "may use an inference that is adverse to the interest of that party in selecting from among the facts otherwise available." *Id.* § 1677e(b)(1). The use of such inferences is commonly called "AFA" for "adverse facts available."

## II.    Factual Background and Procedural History

### A.  Initiation and Information Gathering

On January 4, 2018, Commerce issued AD and CVD orders on "hardwood and decorative plywood, and certain veneered panels" from China.  *Certain Hardwood Plywood Prods. From the People's Republic of China*, 83 Fed. Reg. 504 (Dep't Commerce Jan. 4, 2018) (am. final determination of sales at less than fair value, and AD order) ("*Plywood AD Order*"); *Certain Hardwood Plywood Prods. From the People's Republic of China*, 83 Fed. Reg. 513 (Dep't Commerce Jan. 4, 2018) (CVD order) ("*Plywood CVD Order*") (together, "the *Plywood Orders*").  The *Plywood Orders* define hardwood and decorative plywood, *inter alia*, "as a generally flat, multilayered plywood or other veneered panel, consisting of two or more layers or plies of wood veneers and a core, with the face and/or back veneer made of non-coniferous wood (hardwood) or bamboo."  *Plywood AD Order*, 83 Fed. Reg. at 512; *Plywood CVD Order*, 83 Fed. Reg. at 515.  "[T]he scope of the *Plywood Orders* unambiguously covers hardwood plywood and certain veneered panels that . . . 'consist[] of two or more layers or plies of wood veneers and a core,' i.e., at least three plies."  *Viet. Finewood Co. v. United States*, 47 CIT __, __, 633 F. Supp. 3d 1243, 1262 (2023).[6]

On February 25, 2020, shortly after Commerce initiated the scope inquiry underlying the Finewood Scope Ruling discussed *supra*, note 6, the Coalition requested

---

[6] Commerce had previously issued a scope ruling in which the agency concluded that the *Plywood Orders* covered two-ply panels, and that such panels imported into Vietnam from China by Vietnam Finewood Company Limited ("Finewood") were not

Commerce to issue a scope ruling that certain additional hardwood plywood products

that are assembled in Vietnam using Chinese inputs are also within the scope of the

*Plywood Orders*.  Request for Scope Ruling/Anti-Circumvention Ruling (Feb. 25, 2020)

("Ruling Req.") at 1, CR 5–6, PR 19; *see also Certain Hardwood Plywood [Prods.] From*

*the People's Republic of China*, 85 Fed. Reg. 3,024 (Dep't Commerce Jan. 17, 2020)

(notice of covered merch. referral and initiation of [Finewood] scope inquiry).  In the

alternative, the Coalition requested a country-wide circumvention finding.  Ruling Req.

at 2, 31, 50–52.  The Coalition focused on two production scenarios in which Chinese

producers or exporters shipped "the main components of hardwood plywood," i.e., face,

back, and core veneers, from China to Vietnam for assembly into finished hardwood

plywood and exportation to the United States.  *Id.* at 21.[7]

 Commerce requested clarification of the merchandise potentially subject to these

inquiries.  *See* Coalition's Resp. to Req. for Clarification (May 12, 2020) ("Coalition's

May 12, 2020 Resp."), CR 7, PR 20.  Specifically, Commerce requested the Coalition to

---

substantially transformed in the manufacture of three-ply hardwood plywood.  *See*
Enforcement and Protect Act (EAPA) Investigation No. 7252: Final Scope Ruling (Jan.
21, 2022) ("Finewood Scope Ruling"), CR 397, PR 394.  Following the court's decision
to remand that scope ruling, Commerce issued a revised scope ruling under protest.
*See Far East Am., Inc. v. United States*, 47 CIT __, __, 654 F. Supp. 3d 1308, 1310
(2023).  The court sustained Commerce's determination.  *Id.* at 1311.  No party
appealed, and the court's decision became final.  *Far East Am., Inc. v. United States*, 47
CIT __, __, 673 F. Supp. 3d 1333, 1337 (2023).  Accordingly, it is settled law that the
scope of the *Plywood Orders* requires a minimum of three plies.

[7] The two production scenarios the Coalition sought to include involved the production
in China of face veneers, back veneers, and either an assembled core or individual core
veneers; the shipment of these components to Vietnam for assembly into finished
hardwood plywood; and exportation of the finished hardwood plywood to the United
States.  Ruling Req. at 21.

consider the inclusion of three additional scenarios based on Commerce's view that

"there may be scenarios where plywood components produced in China are combined

with plywood components produced in Vietnam or third countries."  *Id.* at 2; *see also id.*

at 2–6 (discussing the additional scenarios).[8]  The Coalition responded that Commerce

should find the merchandise produced under each additional production scenario to be

in-scope but made no specific mention of relying on an anti-circumvention analysis to

reach any determination for the three production scenarios.  *See id.* at 2–6.[9]

---

[8] The three scenarios raised by Commerce consisted of (1) fully assembled veneer core platforms manufactured in China and combined with face and/or back veneers produced in Vietnam or third countries; (2) multi-ply panels of glued core veneers manufactured in China that are combined in Vietnam to produce veneer core platforms and combined with a face and/or back veneer produced in China, Vietnam, or a third country; and (3) core veneers manufactured in China and processed into a veneer core platform in Vietnam and combined with a face and/or back veneer produced in Vietnam or other third country.  Coalition's May 12, 2020 Resp. at 2–6.  Commerce proposed the inclusion of a fourth scenario involving "core veneers fully produced in Vietnam or a third country [that are] assembled into a veneer core platform in Vietnam and combined with a face and back veneer produced in China"; however, the Coalition stated it was not requesting Commerce to include such a scenario in its analysis.  *Id.* at 6.

[9] For two of Commerce's additional scenarios, the Coalition premised its response on its view that the scope of the *Plywood Orders* covered two-ply products.  *See* Coalition's May 12, 2020 Resp. at 2, 4.  For one of Commerce's additional scenarios, namely, the one involving "[c]ore veneers that are produced in China, further processed into a veneer core platform in Vietnam, and combined with a face and/or back veneer produced in Vietnam or other third country," the Coalition stated that such merchandise "should be found to be in scope" based on the relative value of the core veneers and the absence of a substantial transformation of the individual core veneers.  *Id.* at 5–6.  It is unclear whether the Coalition's reference to relative value implies support for an anti-circumvention analysis for this scenario rather than a scope analysis (because single veneers were never considered by the agency to be in-scope), or whether the Coalition's reference to substantial transformation indicates sole reliance on a scope analysis for this scenario.

In June 2020, Commerce initiated scope and circumvention inquiries.  *Certain Hardwood Plywood Prods. From the People's Republic of China*, 85 Fed. Reg. 36,530 (Dep't Commerce June 17, 2020) (initiation of anti-circumvention inquiries and scope inquiries on the AD and CVD orders; Vietnam assembly) ("*Initiation Notice*").  With respect to circumvention, Commerce initiated the inquiry on a country-wide basis.  *Id.* at 36,533.[10]  Commerce included five production scenarios in the inquiries, the two proposed by the Coalition and the three suggested by Commerce and described *supra*, note 8, adding in reference to those three, "*should such production scenarios exist.*"  *Id.* at 36,531 n.12 (emphasis added).  The hardwood plywood produced according to the five production scenarios is referred to as "inquiry merchandise."  *Id.* at 36,531; *see also* Clarification of Merchandise Subject to Anti-Circumvention and Scope Inquiries (July 9, 2020) ("Initiation Clarification Mem."), PR 21.

Commerce proceeded to request information for these inquiries.  After identifying potential respondents, on September 10, 2020, Commerce issued quantity and value ("Q&V") questionnaires to 57 producers and exporters of hardwood plywood in Vietnam. *See* Q&V Questionnaire for Vietnamese Producers and Exporters of Certain Hardwood Plywood Prods. (Sept. 10, 2020) ("Q&V Questionnaire"), Attach. I, PR 62 (list of companies).  Fifty-one companies responded to the questionnaire, including two unsolicited responses.  *See* Prelim. Decision Mem. (July 22, 2022) ("Prelim. Mem.") at

---

[10] Initiation on a country-wide basis means that Commerce will consider whether a "finding applicable to all exports might be warranted."  *Initiation Notice*, 85 Fed. Reg. at 36,533 n.38.

3, PR 409.  Eight companies that Commerce contacted did not respond.  *Id.*  None of

the responding companies reported producing inquiry merchandise.  *Id.*

On February 22, 2021, Commerce issued supplemental questionnaires to the 51

responding companies and to the Government of Vietnam ("GOV").  Q&V Suppl.

Questionnaire for Vietnamese Producers and Exporters of Certain Hardwood Plywood

Prods. (Feb. 22, 2021) ("1st Suppl. Questionnaire"), Attach. I, PR 154 (list of

companies); [GOV] Scope Ruling/Anticircumvention Ruling Inquiry (Feb. 22, 2021),

Attach., PR 153.  Forty-six of those companies and the GOV timely responded.  *See*

Prelim. Mem. at 3.

On June 15, 2021, Commerce issued a second supplemental questionnaire to

the 46 companies that responded to the first supplemental questionnaire.  Q&V Second

Suppl. Questionnaire for Vietnamese Producers and Exporters of Certain Hardwood

Plywood Prods. (June 15, 2021) ("2nd Suppl. Questionnaire"), Attach. I, PR 257 (list of

companies); *see also* Clarification of Second Q&V Suppl. Questionnaire Resp. (June

25, 2021) ("2nd Suppl. Clarification Mem."), PR 272 (clarifying certain requests for

information in the Second Supplemental Questionnaire).  Forty-five companies timely

responded.  Prelim. Mem. at 3–4.  The GOV also timely responded to a supplemental

questionnaire.  *Id.* at 4.

Commerce issued 11 company-specific questionnaires.  *See, e.g.*, I&D Mem. at

133 n.690.  The recipient companies responded.  *See id.*  In response to the Q&V and

later questionnaires, all respondents reported that they did not produce inquiry

merchandise.  Prelim. Mem. at 4.  Commerce explained that because all respondents

reported that they did not produce inquiry merchandise, the agency declined to select
mandatory respondents.  *Id.*

Commerce placed on the record documents obtained during an evasion
investigation conducted by U.S. Customs and Border Protection ("Customs" or "CBP")
pursuant to 19 U.S.C. § 1517 (the Enforce and Protect Act or "EAPA") that involved
Finewood.  *See* Placing Docs. Relevant to this Proceeding on the R. (Feb. 18, 2022)
("Finewood Mem."), CR 396, PR 393.  Those documents included the Finewood Scope
Ruling.[11]

### B.  Preliminary Determination

In July 2022, Commerce issued an affirmative preliminary scope and
circumvention determination.  *Certain Hardwood Plywood Prods. From the People's
Republic of China*, 87 Fed. Reg. 45,753 (Dep't Commerce July 29, 2022) (prelim. scope
determination and affirmative prelim. determination of circumvention of the AD and CVD
orders) ("*Prelim. Determination*").  Based on Commerce's Finewood Scope Ruling,
Commerce determined that the output of three production scenarios is in-scope
merchandise.  Prelim. Mem. at 15.  Commerce further determined that two additional

---

[11] Commerce issued the Finewood Scope Ruling in connection with a covered
merchandise referral from CBP pursuant to 19 U.S.C. § 1517(b)(4)(A).  That provision
allows CBP to refer an issue to Commerce for a scope ruling if CBP is "unable to
determine whether the merchandise at issue is covered merchandise," 19 U.S.C.
§ 1517(b)(4)(A), i.e., merchandise that is subject to an AD or CVD order, *id.*
§ 1517(a)(3).

production scenarios involved merchandise that circumvented the *Plywood Orders*. *Id.* at 16–26.

The three production scenarios Commerce preliminarily found to involve in-scope merchandise were: (1) "[f]ace veneer, back veneer, and assembled core components (e.g., veneer core platforms) manufactured in China and assembled in Vietnam"; (2) "[f]ully assembled veneer core platforms manufactured in China that are combined in Vietnam with face and/or back veneers produced in Vietnam or third countries"; and (3) "[m]ulti-ply panels of glued core veneers manufactured in China that are combined in Vietnam to produce veneer core platforms and combined with either a face and/or back veneer produced in China, Vietnam, or a third country." *Id.* at 15.[12]

The two production scenarios Commerce preliminarily concluded did not involve in-scope (i.e., two-ply) merchandise but met the criteria for circumvention were: (1) "[f]ace veneer, back veneer, and individual core veneers produced in China and assembled into hardwood plywood in Vietnam"; and (2) "[i]ndividual core veneers manufactured in China and processed into a veneer core platform in Vietnam and combined with a face and/or back veneer produced in Vietnam or other third country." *Id.* at 16.[13]

---

[12] The first production scenario Commerce preliminarily found to be in-scope was proposed by the Coalition. The second and third production scenarios Commerce preliminarily found to be in-scope were based on Commerce's further inquiry. *See* Coalition's May 12, 2020 Resp.

[13] The first production scenario in which Commerce preliminarily found circumvention was based on the agency's further inquiry while the second production scenario was proposed by the Coalition. *See id.*

At the time of the *Preliminary Determination*, Commerce considered that two plies were sufficient to be considered in-scope merchandise.  Accordingly, Commerce's three in-scope production scenarios involved Chinese-origin veneers consisting of at least two plies that were not substantially transformed during assembly in Vietnam.  *See id.* at 14–15.  Commerce's two circumventing scenarios involved single-ply veneers of Chinese origin, insufficient for Commerce to consider such merchandise to be in-scope merchandise.  *See id.* at 16–17, 26.

Most relevant here, with respect to circumvention, Commerce preliminarily determined to apply AFA to non-responding companies and to the companies that responded to Commerce's multiple questionnaires but as to which Commerce determined there were "significant discrepancies, inconsistencies, or misleading information."  *Id.* at 10–11; *see also id.* at 12 (listing five bases for AFA).  Commerce provided additional explanation regarding the failings it attributed to each of the AFA companies in a separate confidential memorandum.  Appl. of [AFA] for the Prelim. Determination (July 22, 2022) ("Prelim. AFA Mem."), CR 412, PR 410.  "As AFA," Commerce "preliminarily [found] that [the companies subject to AFA] produced and/or exported hardwood plywood under all of the five production scenarios that are subject to these inquiries."  Prelim. Mem. at 12–14.  Commerce thus used its AFA finding to determine "that Vietnamese companies are completing hardwood plywood in Vietnam under the aforementioned production scenarios," *id.* at 18, thereby meeting the second

statutory criterion pursuant to 19 U.S.C. § 1677j(b)(1)(B) (completion or assembly in another foreign country).[14]

Commerce also relied, in part, on AFA to determine that the "process of assembly and completion was minor or insignificant."  *Id.* at 20.  In addition to the use of adverse inferences, however, Commerce cited record evidence provided by the Coalition and evidence from the Finewood scope proceeding.  *Id.* at 19–20.[15] Commerce further stated that because "the *core* veneers . . . make up the vast majority of the value of the wood materials," any differences between the two circumventing scenarios regarding sourcing of face or back veneers did not alter the analysis.  *Id.* at 20 & n.83.  Commerce primarily cited evidence provided by the Coalition, including a declaration and data regarding patterns of trade, to support the agency's finding that the respondents were assembling or completing inquiry merchandise in Vietnam.  *See id.* at 19–20.  Commerce also cited the Coalition's evidence to support the agency's conclusion that the additional statutory criteria all supported an affirmative circumvention finding.  *See id.* at 20–26 (discussing the level of investment, level of research and development, nature of production processes, extent of production facilities, and relative value of the processing performed, in Vietnam; the relative value

---

[14] There is no dispute that the hardwood plywood exported from Vietnam to the United States is of the same class or kind as the subject merchandise exported from China for purposes of 19 U.S.C. § 1677j(b)(1)(A).

[15] For its minor or insignificant analysis, Commerce also cited generally to the Finewood Memorandum, Prelim. Mem. at 19 n.81, and a production cost memorandum Commerce prepared concurrent with the preliminary memorandum using data from the Finewood scope proceeding, *see, e.g.*, *id.* at 20 n.82; Prod. Costs Analysis and Data for the Prelim. Determination (July 22, 2022), CR 413, PR 411.

of the merchandise produced in China; and the "additional factors" involving patterns of trade, affiliations, and increased imports).

Commerce announced a certification program to administer the country-wide preliminary finding.  *Id.* at 27–28.  The program would allow certain companies to certify on an entry-specific basis that imports of hardwood plywood from Vietnam into the United States did not contain inquiry merchandise.  *Id.* at 27.  However, Commerce preliminarily determined that the 36 companies for which Commerce used AFA were not eligible to participate in the certification program.  *Id.*  Commerce stated that it would "reconsider the eligibility" of those companies "to participate in the certification process if they demonstrate in a future segment of the [AD/CVD] proceedings (e.g., a changed circumstances review or administrative review) that the hardwood plywood they produce in and/or export from Vietnam was not produced under any of the production scenarios subject to these inquiries."  *Id.* at 27–28.

### C.  Final Determination

On July 20, 2023, Commerce issued its affirmative *Final Determination*.  88 Fed. Reg. at 46,740.  While the determination covered the five production scenarios, I&D Mem. at 10–11, Commerce stated summarily, "the entire premise of these inquiries is whether Vietnamese companies imported Chinese core veneers, or face/back veneers plus core veneers, to use in the production of their hardwood plywood," *id.* at 139. Commerce also stated that it declined to accept new factual information submitted after the *Preliminary Determination* for use in the *Final Determination*.  *Id.* at 5.

In summarizing changes from the *Preliminary Determination*, Commerce explained that it first had to reconsider its earlier finding that three production scenarios involved in-scope merchandise because of the agency's reversal of the Finewood Scope Ruling. *Id.* at 10–11.  That reversal came in a remand determination to comply with the unambiguous scope language requiring a minimum of three plies.  *See Far East Am.*, 654 F. Supp. 3d at 1310.  For this *Final Determination*, Commerce found that merchandise produced under the first three scenarios "enter[s] Vietnam further downstream in the production process" as compared to the scenarios that Commerce "preliminarily determined [were] circumventing the [*Plywood Orders*]."  I&D Mem. at 11. Thus, Commerce found, "the circumvention analysis outlined in the *Preliminary Determination* . . . supports an affirmative circumvention determination for these three scenarios."  *Id.*

In addressing the statutory criteria, Commerce explained that the evidence supporting its earlier finding "that production scenarios four and five involve the completion of merchandise using inputs produced in China" also supported the "finding that hardwood plywood produced under scenarios one, two, and three exported to the United States from Vietnam was assembled and completed in Vietnam using Chinese-origin hardwood plywood inputs" and was thus circumventing the *Plywood Orders*.  *Id.* at 12 & n.28 (citing Prelim. Mem. at 18).  Commerce also found that the petitioner-provided evidence, in conjunction with Commerce's use of AFA, supported a finding that production under all five scenarios is minor and insignificant.  *Id.* at 12–14, 30–45. Commerce made no changes to its preliminary analysis for the "additional factors"

considered pursuant to 19 U.S.C. § 1677j(b)(3), namely, patterns of trade, affiliation, and import levels.  *Id.* at 14, 45–53.

Commerce made certain changes with respect to the list of companies subject to AFA.  *Id.* at 14, 75–76 (removing two companies from the list of AFA companies ineligible to certify their exports).  In response to claims that Commerce failed to comply with 19 U.S.C. § 1677m(d) before resorting to AFA, Commerce claimed that "respondents were repeatedly notified of the necessary information that Commerce requested and they were also provided with multiple opportunities to provide that information."  *Id.* at 123.  Commerce considered the first and second supplemental questionnaires issued to all responding companies and the company-specific questionnaires issued to a subset of those respondents to constitute notice of any deficiencies and stated that it was not practicable to issue additional questionnaires.  *Id.* at 123–33.  Commerce separately explained its determination to apply AFA to two companies that failed verification, *id.* at 147–50, 158–65, and to apply AFA to two companies that responded to the Q&V Questionnaire but failed to respond to the First Supplemental Questionnaire (and thus were not issued the Second Supplemental Questionnaire), *id.* at 105–09.

Commerce listed three groups of AFA companies totaling 37 companies in the appendices accompanying the Issues and Decision Memorandum: 20 "companies that

failed to provide usable responses";[16] four "companies that refused and failed

verification";[17] and 13 "companies that failed to respond."[18]  *Id*., Apps. I–III (formatting

altered).

        In the *Final Determination*, Commerce made a country-wide circumvention

finding.  88 Fed. Reg. at 46,741; *see also* I&D Mem. at 189–92.  Commerce affirmed its

establishment of a certification program for "eligible firms to certify when their entries

are not produced under any of the [five] production scenarios."  I&D Mem. at 194.

Commerce continued to prohibit all AFA companies from participating in the certification

regime.  *Id.*  As a result, entries from AFA companies would be suspended and the

importers required to pay cash deposits of estimated AD and CVD duties.  *Id.* at 195.

Commerce explained that suspended entries may be reviewed for a determination as to

---

[16] Those companies are: Arrow Forest International Co., Ltd, BAC Son Woods Processing Joint Stock Company, BHL Thai Nguyen Corp., Eagle Industries Company Limited, Golden Bridge Industries Pte. Ltd., Govina Investment Joint Stock Company, Greatriver Wood Co. Ltd., Groll Ply and Cabinetry, Hai Hien Bamboo Wood Joint Stock Company, Her Hui Wood (Vietnam) Co., Ltd., Hoang LAM Plywood Joint Stock Co., Huong Son Wood Group Co., Ltd., Innovgreen Thanh Hoa Co. Ltd., Lechenwood Viet Nam Company Limited, Long LUU Plywood Production Co., Ltd., Long Phat Construction Investment and Trade Joint Stock Company, Plywood Sunshine Ltd. Co., Quang Phat Woods JSC, TEKCOM Corporation, and Win Faith Trading.
[17] Those companies are: Cam Lam Joint Stock Company, TL Trung Viet Company Limited, VVAT Company Limited, and Zhongjia Wood Company Limited.
[18] The non-responding companies are: Bao Yen MDF Joint Stock Company, BHL Vietnam Investment and Development, Dong Tam Production Trading Company Limited, Linwood Vietnam Co. Ltd, Quoc Thai Forestry Import Export Limited Company, Rongjia Woods Vietnam Company Limited, Sumec Huongson Wood Group Co. Ltd., Tan Tien Co. Ltd, Thang Long Wood Panel Company Ltd., Thanh Hoa Stone Export Company, Truong Son North Construction JSC, Vietind Co. Ltd., and Vietnam Golden Timber Company Limited.

whether they contain subject merchandise in a subsequent administrative review.  *See id.*

This appeal followed.  The court heard oral argument on July 1, 2025.  Docket Entry, ECF No. 127.[19]

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c).  The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

### DISCUSSION

From the *Initiation Notice* in June 2020 to the *Final Determination* in July 2023, Commerce spent three years investigating more than 50 Vietnamese companies for circumvention of the *Plywood Orders*.  The court first addresses certain procedural challenges to Commerce's *Final Determination* before turning to Commerce's compliance with the statutory facts available and adverse facts available requirements and other matters that are necessary to address at this time.  While the procedural challenges that follow are not meritorious, the court finds that a remand is required for various reasons tied to Commerce's use of AFA.

---

[19] Subsequent citations to the oral argument include the approximate time stamp from the recording, which is available at https://www.cit.uscourts.gov/sites/cit/files/20250701_23-00144_MAB.mp3.  (The court is aware that the time stamp may vary between the online version of the recording and any downloaded versions of the recording and provides time stamp ranges in an effort to account for the difference.)

I.    **Procedural Challenges**

Plaintiffs' challenges to Commerce's approach to the inquiry almost exclusively implicate decisions that are left to the agency's discretion.  Thus, they are readily dismissed.

A.    **Data Collection and Use of Secondary Sources**

DH Plaintiffs[20] argue that the agency's data collection was inadequate, and that the agency erred by relying on "uncorroborated secondary sources."  DH Pls.' T1 Mem. at 20–27; *see also* Greatriver's T1 Mem. at 17–21; MG Pls.' T1 Mem. at 28–33.

Nothing in the statute prescribes specific questions Commerce must ask. Plaintiffs fault Commerce for not requesting information specific to the statutory criteria governing circumvention, *see, e.g.*, DH Pls.' T1 Mem. at 21–23, but Commerce requested information relevant to the production of inquiry merchandise by the respondents and about affiliations with producers or exporters of plywood or plywood inputs in China, *see, e.g.*, Q&V Questionnaire, Attach. II.  While Commerce may have curtailed its data collection when it concluded that the AFA companies' responses regarding the nonproduction of inquiry merchandise were inadequate to the agency's inquiry, Commerce was not required to request information regarding the additional

---

[20] For consistency and ease of reference, the court uses the same firm-based naming conventions for groups of plaintiffs that are used by the parties in their respective briefs.

statutory criteria that are relevant to whether inquiry merchandise is circumventing the

*Plywood Orders* when no company reported producing inquiry merchandise.[21]

        Plaintiffs' arguments regarding Commerce's reliance on a petitioner-provided

declaration and information from the Finewood scope proceeding, *see, e.g.*, DH Pls.' T1

Mem. at 24–27, also lack merit.  While framed as a failure to "corroborate" information,

Plaintiffs' real concern appears to lie in the weight Commerce afforded to those sources

of information.  *See, e.g.*, *id.* at 25 (asserting that Commerce "cite[s] almost exclusively

to the Coalition's submission in support of its findings"); *id.* at 26 (arguing that

Commerce failed to consider factors relevant to the determination whether "to accord

weight to . . . a declaration").  But interested parties had, and used, the opportunity to

rebut the information in the Coalition's declaration.  *See, e.g.*, Cmts. [on] Pet'r's Req. for

Scope/Anti-Circumvention Inquiry (Mar. 20, 2020) at 22, CR 6–7, PR 19 (discussing

their position that the declaration "provides no concrete evidence whatsoever to support

[the Coalition's] hypothesis").  With respect to the Finewood scope documents,

Commerce placed those documents on the record of this proceeding and provided

interested parties with the opportunity to submit rebuttal information.  Finewood Mem. at

1.  Plaintiffs have not offered persuasive reasons to reject Commerce's use of this

---

[21] Indeed, had Commerce concluded that the AFA companies' responses regarding the
lack of production of inquiry merchandise *were* reliable, there likely would have been no
need for Commerce to request additional information.  The court's conclusion that
Commerce erred in its AFA analysis, discussed below, does not change the court's
assessment with respect to the decisions Commerce made at the time it prepared the
questionnaires.

information.[22]  As to the weight Commerce afforded these sources of information in

support of the agency's affirmative circumvention determination, the court need not

further address whether substantial evidence ultimately supported Commerce's

determination because the court's resolution of arguments regarding the agency's use

of AFA requires a remand and, thus, the nature of the record may change.

       To the extent Plaintiffs seek to argue that Commerce failed to comply with the

corroboration requirement in 19 U.S.C. § 1677e(c), Plaintiffs failed to develop any

argument that the corroboration provision applied to the record information Commerce

obtained or placed on the record in this circumvention inquiry.  *See* DH Pls.' T1 Mem. at

27 (containing what appears to be an incidental citation to section 1677e(c) within a

block quotation intended to support the view that the "court simply cannot accept

Commerce's finding of circumvention exclusively on uncorroborated secondary sources

as supported by substantial evidence").  Accordingly, the court declines to further

address the argument.  *See Home Prods. Int., Inc. v. United States*, 36 CIT 665, 673,

837 F. Supp. 2d 1294, 1301 (2012) ("[I]ssues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived."

(quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990) (alteration in original))).

---

[22] Contrary to Plaintiffs' arguments, MG Pls.' T1 Mem. at 28, 32; Greatriver's T1 Mem. at 18, Commerce's reversal of its Finewood scope ruling based on the court's interpretation of the scope language does not suggest inherent inaccuracies in the underlying factual information collected during the Finewood Scope Proceeding, particularly insofar as that information is contemporaneous with a portion of the inquiry period.

### B.  Non-selection of Mandatory Respondents

Greatriver argues that Commerce erred by failing to select mandatory respondents.  Greatriver's T1 Mem. at 18; Greatriver's T1 Reply at 3–4.

Nothing in the circumvention statute suggests, let alone requires, the selection of mandatory respondents.  Even in AD/CVD investigations and administrative reviews, Commerce's selection of mandatory respondents is discretionary.  *See* 19 U.S.C. § 1677f-1(c)(2), (e)(2).  Although Greatriver points out that Commerce has selected mandatory respondents in the past, Greatriver's T1 Mem. at 20, the agency explained that "there is no established practice for selecting respondents" for circumvention inquiries, I&D Mem. at 21, and Greatriver demonstrates no error in that assertion.

Disagreement with Commerce's reasons for not selecting mandatory respondents here is not a basis for a remand.  Commerce stated that it did not select mandatory respondents because no respondents "reported selling inquiry merchandise to the United States."  I&D Mem. at 22.  While examining the no-shipment claims of the largest exporters considered representative of the Vietnamese industry may be a more efficient preliminary step than attempting to "fully vet" such claims from roughly 50 companies, *id.* at 21, that decision was for Commerce to make.  However, as discussed herein, Commerce cannot avoid its statutory obligations pursuant to 19 U.S.C. § 1677m(d) based on impracticability arising from a circumstance solely within Commerce's control (i.e., its decision not to select respondents for individual examination).

### C.  Time Taken to Complete the Circumvention Inquiry

STR Plaintiffs fault Commerce for taking roughly 1,120 days to complete its investigation, rather than the 300 days "contemplated" by the statute.  STR Pls.' T1 Mem. at 28 (citing 19 U.S.C. § 1677j(f)).  DH Plaintiffs raise a similar argument.  DH Pls.' T2 Mem. at 86–87.  Plaintiffs overreach: the statute directs the agency to make the determination within 300 days of initiation "to the maximum extent practicable."  19 U.S.C. § 1677j(f).  STR Plaintiffs offer no legal basis for judicial action in response to Commerce exceeding a non-mandatory deadline.  DH Plaintiffs' arguments are likewise short on legal authority for the court to impose any consequence for Commerce exceeding this timeline.

In sum, Plaintiffs' procedural challenges either lack merit or implicate issues, such as Commerce's weighing of the evidence, that the court must hold in abeyance pending Commerce's remand determination.  *See infra*, Section VI.  Accordingly, none of Plaintiffs' procedural arguments provide an independent basis for a remand.

### II.  Adverse Facts Available ("AFA")

For the *Final Determination*, Commerce concluded that the AFA companies failed to cooperate to the best of their ability and treated their questionnaire responses stating that they do not produce inquiry merchandise as unreliable.[23]  A crucial statutory

---

[23] While the focus of Commerce's *Final Determination*, and, in particular, the agency's Issues and Decision Memorandum, is on the AFA companies, the court infers from the difference between the number of AFA companies and the number of Q&V questionnaires the agency issued that Commerce accepted the no-shipment claims from roughly 20 companies.  Commerce's cash-deposit instructions to Customs stated

predicate for Commerce's affirmative circumvention finding, namely, that inquiry

merchandise relevant to the five production scenarios *is* being completed or assembled

in Vietnam for purposes of 19 U.S.C. § 1677j(b)(1)(B), is thus based on an adverse

inference.  I&D Mem. at 11–12 (discussing completion of merchandise in a foreign

country); Prelim. Mem. at 18 (stating that, "as AFA, we preliminarily find that

Vietnamese companies are completing hardwood plywood in Vietnam under the

aforementioned production scenarios," and that such finding is "bolstered" by trade data

and a declaration provided by the Coalition).

As an initial matter, contrary to the Government's position, Commerce's use of

AFA is not moot.  The Government argues that Commerce's use of an adverse

inference is moot because the consequences of AFA—ineligibility to certify and

requirement to pay cash deposits—have been superseded by the final results of the fifth

administrative review ("AR5"), in which certain companies obtained cash-deposit

refunds and entry into the certification regime.  Oral Arg. 2:17:30–2:24:30.  Plaintiffs

argue that Commerce's use of AFA is not moot because the circumvention finding

amounts to a presumption that may be rebutted *if* the companies are eligible to certify,

but the requirement to certify extends for the life of the *Plywood Orders* and the

eligibility to certify may be rescinded.  Oral Arg. 2:26:30–2:34:30.  The court disagrees

with the Government because, in the absence of evidence of the production of inquiry

---

generally that "importers and exporters of hardwood plywood from Vietnam are eligible
for the certification process" *unless* they are identified as ineligible in the instructions.
*See* Message No. 3215402 (Aug. 3, 2023) ¶ 5(a), PR 845.  Commerce listed 37
companies as ineligible.  *See id.*

merchandise by respondents, Commerce's use of AFA underpins the agency's entire

affirmative determination, without which there would be no certification regime.

Additionally, in AR5, Commerce did not find that all AFA companies are eligible to

participate in the certification process, and AR5 did not address the assessment rates

for all entries that were suspended in the course of the circumvention inquiry.  *See*

*generally* Decision Mem. for Hardwood Plywood Prods. From China, A-570-051, C-570-

052 (May 12, 2025) ("AR5 Decision Mem.").[24]  Importantly, as the Government

acknowledges, any remand regarding Commerce's use of AFA may require Commerce

to reconsider its basis for a country-wide circumvention finding if Commerce continues

to reach an affirmative determination.  Oral Arg. 2:22:30–2:25:00.  Accordingly, the

court addresses Commerce's AFA analysis.

### A.  Compliance with 19 U.S.C. § 1677m(d)

As noted above, if Commerce determines that a response is deficient, the

agency has an obligation to "promptly inform the [submitting party] of the nature of the

deficiency and shall, to the extent practicable, provide that [party] with an opportunity to

remedy or explain the deficiency in light of the time limits established for the completion

of investigations or reviews under this subtitle."  19 U.S.C. § 1677m(d).  Compliance

with section 1677m(d) is a necessary predicate to the agency's use of the facts

otherwise available and, thus, the adverse inferences drawn from the facts available.

---

[24] Commerce's decision memoranda are publicly available at https://access.trade.gov/
public/FRNoticesListLayout.aspx, with separate links for pre- and post-June 2021
memoranda.

Plaintiffs contend that they lacked adequate notice of deficiencies prior to the preliminary determination.  STR Pls.' T2 Mem. at 16–19; DH Pls.' T2 Mem. at 19–20, 38–40, 47–48, 52–53, 59–60, 62–63, 66–67, 70–71 (advancing similar arguments for each respondent);[25] Greatriver's T2 Mem. at 14–17; MG Pls.' T2 Mem. at 16, 19–20. The Government counters that Commerce made "repeated requests" for information in the form of supplemental questionnaires both to respondents and to the GOV, and those requests provided notice of deficiencies.  Def.'s T2 Resp. at 17–19.[26]  Moreover, the Government contends, steps taken by some respondents to correct deficiencies identified in response to GOV data and comments by the Coalition mean that notice was adequate.  Def.'s T2 Resp. at 19.  According to the Coalition, Commerce had to balance the recommended 300-day timeframe for completion with section 1677m(d)'s requirement to provide an opportunity to remedy deficiencies "to the extent practicable." Def.-Int.'s T2 Resp. at 15.

In this inquiry, Commerce issued two types of supplemental questionnaires: "generic" first and second supplemental questionnaires, so characterized because they were sent to all responding companies and included the same generic questions, and

---

[25] With respect to Golden Bridge Industries Pte. Ltd., Commerce identified a discrepancy based on that company's response to a request Commerce made for the first time in the Second Supplemental Questionnaire.  DH Pls.' T2 Mem. at 38–39.  DH Plaintiffs argue that Commerce's June 25, 2021, memorandum clarifying HTS codes to be reported in the second supplemental questionnaire response does not relieve Commerce of its obligations under 19 U.S.C. § 1677m(d).  *Id.* at 56–57.

[26] This reference to "repeated requests" for information appears throughout this section of the Government's brief and with respect to specific companies.  *See* Def.'s T2 Resp. at 17–115.

"company-specific" supplemental questionnaires sent to specific respondents with questions specific to that respondent.  Whether any supplemental questionnaire constitutes adequate notice is fact-specific and depends on the questionnaires themselves.  As the court has observed, "one or more supplemental questionnaires can fulfill [Commerce's] obligation to provide an opportunity to remedy deficient submissions pursuant to 19 U.S.C. § 1677m(d)" provided that the "subsequent questionnaire [gave] the submitter actual notice of the deficiency or reiterated the initial request."  *Apiário Diamante Comercial Exportadora Ltda. v. United States*, 48 CIT __, __, 705 F. Supp. 3d 1398, 1410 (2024) (internal citation omitted).  The court first addresses whether the generic supplemental questionnaires provided notice to respondents of any deficiencies and then addresses whether the company-specific questionnaires provided notice to the recipient company of the deficiencies upon which Commerce based its use of AFA.

## 1. First and Second Supplemental Questionnaires

Commerce asserted that the first and second supplemental questionnaires discharged the agency's duty under the statute to provide notice of deficiencies and it was impractical to issue further questionnaires.  I&D Mem. at 123, 125, 129–34.  This assertion applies to the companies that did not receive a company-specific questionnaire *and* those that did receive a company-specific questionnaire but for whom Commerce used AFA based on their responses to the generic supplemental

questionnaires.[27]  The court disagrees that Commerce provided these companies with

adequate notice of deficiencies in their prior questionnaire responses based solely on

the first and second supplemental questionnaires.

A review of the questionnaires dispels the notion that the generic supplemental

questionnaires provided adequate notice of deficiencies.  Among other matters, the

Q&V Questionnaire requested information about plywood inputs produced in China,

inputs sourced from resellers in Vietnam, wood species, and affiliations with producers

or exporters of plywood or plywood inputs in China.  Q&V Questionnaire, Attach. II.  The

First Supplemental Questionnaire requested, among other matters, documentation from

companies that reported no exports of plywood using Chinese core components and

either reported peeling their own veneers or reported purchasing core components.  1st

Suppl. Questionnaire, Attach. II.  The First Supplemental Questionnaire also requested

information about the respondents' affiliations, if any, with Chinese manufacturers or

---

[27] In the next section, the court discusses the respondents that received company-specific questionnaires and addresses whether those questionnaires provided adequate notice of deficiencies.  That analysis shows that Win Faith Trading is the only respondent for which the company-specific questionnaire provided notice of the deficiency underlying Commerce's use of AFA.  Accordingly, the analysis in this section applies to all companies listed in Appendix I of the Issues and Decision Memorandum *except* Win Faith Trading.  *See* I&D Mem., App. I.  Those companies are: Arrow Forest International Co., Ltd, BAC Son Woods Processing Joint Stock Company, BHL Thai Nguyen Corp., Eagle Industries Company Limited, Golden Bridge Industries Pte. Ltd., Govina Investment Joint Stock Company, Greatriver Wood Co. Ltd., Groll Ply and Cabinetry, Hai Hien Bamboo Wood Joint Stock Company, Her Hui Wood (Vietnam) Co., Ltd., Hoang LAM Plywood Joint Stock Co., Huong Son Wood Group Co., Ltd., Innovgreen Thanh Hoa Co. Ltd., Lechenwood Viet Nam Company Limited, Long LUU Plywood Production Co., Ltd., Long Phat Construction Investment and Trade Joint Stock Company, Plywood Sunshine Ltd. Co., Quang Phat Woods JSC, and TEKCOM Corporation.  *See id.*; *supra*, note 16.

exporters of plywood or plywood inputs or with Chinese individuals with such affiliations. *Id.* The Second Supplemental Questionnaire requested respondents to report the eight-digit Harmonized Tariff Schedule ("HTS") subheadings and description for all imports under HTS headings 4408 and 4412, including the supplier names and sample entry documentation, for respondents' imports into Vietnam from China. 2nd Suppl. Questionnaire, Attach II. Commerce also requested a list of Vietnamese suppliers of plywood or plywood inputs; a description of products purchased from these Vietnamese suppliers; and, as necessary, HTS information and documentation regarding the suppliers' purchase of plywood or plywood inputs from China. *Id.* Lastly, Commerce requested similar HTS information and documentation for products that affiliates of the respondents exported from China to Vietnam, including the identity of the Vietnamese companies that the respondents' Chinese affiliates provided with products covered by HTS headings 4408 or 4412. *Id.*[28]

Neither supplemental questionnaire contains words like "clarify," "deficient," "discrepancy," or "inconsistency." To the contrary, the supplemental questionnaires sought "additional details." 1st Suppl. Questionnaire, cover page at 1; 2nd Suppl.

---

[28] Commerce issued a clarification regarding the Second Supplemental Questionnaire. Commerce stated that the HTS information requested should be reported using the HTS of Vietnam. Commerce also stated that it "seeks an exhaustive list of all products exported from China and entered into Vietnam under subheadings 4408 and 4412 by any affiliate of your company, regardless of where that affiliated company is located." 2nd Suppl. Clarification Mem. at 1. Commerce further stated that it "requested information for plywood and wood inputs of plywood exported from China to Vietnam, regardless of the ultimate destination of that plywood or the plywood produced from those wood inputs of plywood." *Id.* at 2.

Questionnaire, cover page at 1.  Commerce's attempt to equate "additional information" with "clarification" is not persuasive.  *See* I&D Mem. at 123 ("[The fact t]hat Commerce requested this information in the First Supplemental Q&V Questionnaire notified respondents that there were deficiencies in these areas in the Q&V Questionnaire responses and that Commerce needed additional information/clarification.").  Commerce stated no such request for clarification in either of the generic supplemental questionnaires and instead stated that recipients were "receiving this letter because [they] responded to Commerce's" prior questionnaire.  1st Suppl. Questionnaire, cover page at 1; 2nd Suppl. Questionnaire, cover page at 1.

Indeed, that Commerce sent the first and second supplemental questionnaires to *all* companies that responded to the prior questionnaire, including those for whom Commerce identified no errors in their responses, *see* 1st Suppl. Questionnaire, Cover Letter at 1; 2nd Suppl. Questionnaire, Cover Letter at 1, undermines Commerce's claim that the supplemental questionnaires provided notice of any particular deficiency.  While Commerce need not use certain "magic words" to alert a respondent to a deficiency, these generic and widely-issued supplemental questionnaires are the type of "[b]roadly drawn" questionnaires that do not provide notice of any particular deficiency and therefore deprives respondents of the opportunity to remedy later-identified deficiencies.  *Hyundai Steel Co. v. United States*, 45 CIT __, __, 518 F. Supp. 3d 1309, 1322 (2021); *see id.* at 1326 (supplemental questionnaire did not satisfy section 1677m(d) when it

mentioned "nothing about any error" and failed to use language that would alert the respondent to a deficiency in a prior response).[29]

Commerce's, and by extension the Government's, references to "repeated requests" for information overstate the record.  The Government argues that the First Supplemental Questionnaire "addressed inconsistencies regarding affiliates and inputs," and the Second Supplemental Questionnaire "addressed multiple [additional] issues." Def.'s T2 Resp. at 17–18.  But as discussed above, even if Commerce intended to address those matters in the generic supplemental questionnaires, Commerce failed to alert the respondents to any specific inconsistencies or issues.  At most, with respect to affiliations, Commerce requested overlapping information.  Commerce first requested information regarding affiliated producers or exporters of plywood or plywood inputs in China, Q&V Questionnaire, Attach. II at 2 (question 8), then requested information about affiliations with Chinese manufacturers or producers or with Chinese individuals and their affiliations, 1st Suppl. Questionnaire, Attach. II at 2 (question 3).  Commerce followed these requests with a request for HTS and other information relevant to affiliates and the affiliates' exports from China into Vietnam, 2nd Suppl. Questionnaire, Attach. II at 2 (question 3.a), later clarifying that HTS information should be reported regardless of the affiliate's location, 2nd Suppl. Clarification Mem. at 1.  But Commerce did not express any deficiency in, or need to revisit, previous answers.  Rather,

---

[29] Commerce's company-specific questionnaires referenced prior responses by each recipient respondent and requested reconciliation of those responses with other reported information.  *See, e.g.*, Plywood Sunshine Co. Ltd. Q&V Suppl. Questionnaire (Feb. 26, 2021) ("Plywood Sunshine Suppl. Questionnaire"), CR 159, PR 163.

Commerce requested partially overlapping information in an iterative and slightly different fashion.[30]

Accordingly, even with this minimal overlap, Commerce's generic supplemental questionnaires did not provide notice of the multiple deficiencies Commerce subsequently claimed as the basis for AFA, which also included issues surrounding the reporting of HTS codes, veneer type, wood species type, suppliers, and shareholders; discrepancies with GOV data; missing Customs papers; and corrections to prior responses that were not explicitly presented as such.[31]

The Government further suggests that data from the GOV, and the Coalition's submissions, should have alerted respondents to inconsistencies in their questionnaire responses or with respect to the GOV data or other record evidence, and that this

---

[30] Commerce's memorandum clarifying the Second Supplemental Questionnaire indicates that the agency distinguishes information about companies "in China," the language used in the Q&V Questionnaire, from information about "Chinese companies," akin to the language used in the First Supplemental Questionnaire. *Compare* Q&V Questionnaire, Attach. II at 2, *with* 1st Suppl. Questionnaire, Attach. II at 2. Presumably, then, exporting a product from China to Vietnam requires a company to be "in China" but not necessarily "Chinese" with respect to ownership. *See* 2nd Suppl. Clarification Mem. at 1. Thus, Commerce requested different information in the Q&V and first supplemental questionnaires, belying Commerce's assertion that it made "repeated requests for the same information." I&D Mem. at 131.

[31] Many respondents assert that they first learned about Commerce's concerns with their questionnaire responses in the *Preliminary Determination*, roughly a year after responses to the Second Supplemental Questionnaire were filed, and thus not "promptly" with respect to any questionnaire response. Commerce does not rely on the *Preliminary Determination* to fulfill the notice requirement. *See, e.g.*, I&D Mem. at 126 (explaining that "[a]lthough Commerce explained its findings for the first time in the *Preliminary Determination*, Commerce had notified the parties of deficiencies, and provided them with an opportunity to remedy the deficiencies"). Accordingly, the court reviews Commerce's position that the generic supplemental questionnaires provided the requisite notice and finds that they did not.

information is relevant to 19 U.S.C. § 1677m(d).  Def.'s T2 Resp. at 18–19 (relying, in

part, on 19 C.F.R. § 351.501(c)(1)(v)).  The question is not, however, whether

respondents had the opportunity, pursuant to Commerce's regulations, to submit

rebuttal factual information.  Rather, the question before the court is whether Commerce

complied with *its obligations* pursuant to 19 U.S.C. § 1677m(d).  The Government offers

no authority for the proposition that interested party filings alone may fulfill that

requirement.  And while the Government relies on *New Mexico Garlic Growers Coalition

v. United States,* 42 CIT __, __, 352 F. Supp. 3d 1281, 1294–95 (2018), for the

proposition that notice requirements are satisfied when "the petitioner submits

comments regarding the deficiencies and Commerce issues a supplemental

questionnaire," Def.'s T2 Resp. at 20, that case is unavailing.  There, Commerce issued

a specific supplemental questionnaire based on the petitioner's comments about

"misreporting."  *N.M. Garlic Growers*, 352 F. Supp. 3d at 1294–95.  That relationship

between a petitioner's comments and Commerce's supplemental questionnaires is

absent here.

Arguments surrounding administrability and practicability are also unpersuasive.

The Coalition suggests that "the scale of the underlying investigation" makes this a case

of first impression with respect to Commerce's compliance with 19 U.S.C. § 1677m(d),

Def.-Int.'s T2 Resp. at 16 n.3, but the requirement to inform respondents of deficiencies

does not change based on the number of respondents or because Commerce declined

to select mandatory respondents.[32]  Similarly, while the court is mindful that Commerce

operates under time and resource constraints, *see* I&D Mem. at 133 (describing the

"unprecedented" scale of the investigation), the court is likewise mindful that 19 U.S.C.

§ 1677j(f) lacks a mandatory statutory deadline, as evidenced by the three years

Commerce spent on this inquiry.

Case law cited by the Government to support Commerce's reliance on the

generic supplemental questionnaires is largely inapposite because those cases involved

explicit notice.  *See* Def.'s T2 Resp. at 19.  In *Maverick Tube Corp. v. United States*, the

U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") found the notice

requirement met when, in the supplemental questionnaire, "Commerce noted that

Borusan 'did not . . . report [hot-rolled steel] purchases for [Borusan's] two other mills,'

despite the original questionnaire asking for that information."  857 F.3d 1353, 1356

---

[32] Regarding this point, parties debate the relevance of *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1384 (Fed. Cir. 2022), namely, the statement that "the statutory entitlement to notice and opportunity to remedy any deficiency is unqualified." The *Hitachi* court subsequently issued an order modifying the sentence to state that "the statutory entitlement to notice and opportunity to remedy any deficiency is unqualified *in the circumstances of this case*."  *Hitachi Energy USA Inc. v. United States*, 2022 WL 17175134, at *1 (Fed. Cir. Nov. 23, 2022) (per curiam) (emphasis added) (denying petition for panel rehearing or rehearing en banc).  The modification is consistent with the statutory language tempering Commerce's obligation to provide an opportunity to remedy a deficiency based on what is "practicable" and "in light of the time limits established for the completion of investigations or reviews."  19 U.S.C. § 1677m(d). The statute, however, requires notice *regardless* of whether Commerce is able to afford the respondent an opportunity to remedy the deficiency.  *See id.* (stating that Commerce shall inform the respondent of the deficiency and shall, when practicable, provide an opportunity to remedy the deficiency).  Such notice is important also for respondents to dispute Commerce's deficiency finding and exhaust their administrative remedies.  Here, however, for the respondents covered by this analysis, Commerce provided neither timely notice nor opportunity to remedy deficiencies.

(Fed. Cir. 2017) (second alteration in the original).  Likewise, in *Essar Steel Ltd. v. United States*, the supplemental questionnaire specifically identified a response to the original questionnaire and contrasted it with a press release, thus clearly identifying a precise inconsistency.  678 F.3d 1268, 1275–76 (Fed. Cir. 2012).[33]

Recently, in *Baroque Timber Industries (Zhongshan) Co. v. United States*, the court followed the rationale of *Maverick Tube* to hold that Commerce did not comply with section 1677m(d) because the agency did not explicitly identify the deficiency and request clarification.  49 CIT __, __, 766 F. Supp. 3d 1296, 1311–13 (2025).[34]  The court reasoned that "Commerce's repetition alone of the [pertinent] questions was not sufficient to provide the [responding party] with notice that its initial responses to those questions were deficient."  *Id.* at 1313.  Based on the foregoing, the court reaches the same conclusion here.[35]

---

[33] *Essar*, in fact, does not address notice but rather involves a challenge to Commerce's conclusion that a party did not act to the best of its ability in responding to the questionnaire.  678 F.3d 1268 at 1275–76.

[34] The court issued a parallel opinion in *Baroque Timber Industries (Zhongshan) Co. v. United States*, 49 CIT __, 776 F. Supp. 3d 1290 (2025), holding the same.

[35] The Government also cites *Saha Thai Steel Pipe Public Co. v. United States*, 47 CIT __, __, 663 F. Supp. 3d 1356, 1373–74 (2023), and *Apiário Diamante*, 705 F. Supp. 3d at 1410.  Def.'s T2 Resp. at 19–20.  Those cases are distinguishable.  *See Saha Thai*, 663 F. Supp. 3d at 1373–74 (finding compliance with 19 U.S.C. § 1677m(d) when Commerce issued a "series of questionnaires" seeking information about affiliates and the respondent demonstrated understanding of the questions); *Apiário Diamante*, 705 F. Supp. 3d at 1410–11 (acknowledging that a supplemental questionnaire may suffice for purposes of notice but rejecting the Government's argument that general references to "acceptable types of documentation" was sufficient to provide notice by "reiterat[ing] the requests . . . for correspondence").  Additionally, in *Hyundai Heavy Industries, Co. v. United States*, the court concluded that Commerce complied with 19 U.S.C. § 1677m(d) when the agency issued a supplemental questionnaire specifically requesting the

Accordingly, the court finds that, for the companies covered by this analysis, *see supra*, note 27, Commerce failed to comply with 19 U.S.C. § 1677m(d). As such, a remand is required for Commerce to afford the statutorily required notice and opportunity to remedy deficiencies with respect to these companies.

### 2. Company-Specific Questionnaires

For the respondents that received company-specific questionnaires, additional analysis is necessary to consider whether those questionnaires provided notice of the deficiencies the agency relied on to disregard the responses and use AFA.[36]

### i. Plywood Sunshine Co. Ltd. ("Plywood Sunshine")

Commerce stated three bases for using AFA with respect to Plywood Sunshine: inconsistencies between responses to the Q&V and second supplemental questionnaires regarding the reporting of Vietnamese suppliers of plywood inputs;[37]

---

respondent to clarify its earlier answer to a question about service-related revenue and, if necessary, to revise its sales database. 42 CIT __, __, 332 F. Supp. 3d 1331, 1337, 1341–42 (2018). *Hyundai Heavy Industries* does not support Commerce's actions here.

[36] While the court addresses these companies individually based on their particular facts, Commerce also relied on deficiencies in their responses to the generic supplemental questionnaires to use AFA. The court's analysis of the generic supplemental questionnaires thus applies equally to these respondents.

[37] Commerce explained that although Plywood Sunshine initially reported that it did not source inputs from resellers in Vietnam, in the second supplemental questionnaire response Plywood Sunshine reported purchasing inputs from Vietnamese suppliers. Prelim. AFA Mem. at 20 & nn.176–77 (citing Submission of Q&V Resp. (Oct. 1, 2020) ("Plywood Sunshine Q&V Resp.") at 3–4, CR 49–50, PR 96, and Submission of Second Suppl. Q&V Resp. (July 8, 2021) ("Plywood Sunshine 2nd Suppl. Resp."), Ex. 2, CR 274–75, PR 306).

revisions to the reporting of wood species;[38] and a failure to fully respond to

Commerce's request for "an exhaustive list" of products exported from China to Vietnam

under certain tariff subheadings regardless of where the affiliate was located.  Prelim.

AFA Mem. at 20.[39]  In Plywood Sunshine's company-specific questionnaire, Commerce

requested further information about the timing of the company's plywood sales and

exports to the United States, and about the wood species and veneer type for sales

during the inquiry period.  Plywood Sunshine Suppl. Questionnaire, Attach.[40]

     MG Plaintiffs contend that Commerce failed to provide notice of, or an

opportunity to explain or remedy, any deficiencies.  MG Pls.' T2 Mem. at 17–20.  In

support of Commerce's determination, the Government references its prior arguments

---

[38] Commerce stated that Plywood Sunshine reported [[                         ]] in the Q&V
questionnaire response but no species for the [[                         ]].  Prelim. AFA
Mem. at 20 & n.178 (citing Plywood Sunshine Q&V Resp., Ex. 1 at Attach. II-C).
According to Commerce, Plywood Sunshine "contradicted this information" when it
reported producing plywood with face and back veneers, and reported purchasing
[[             ]] and [[                              ]].  Id. at 20 & nn.179–81
(citing Submission of Suppl. Q&V Resp. (Mar. 25, 2021) ("Plywood Sunshine 1st Suppl.
Resp.") at 2, CR 212, PR 229; Plywood Sunshine 2nd Suppl. Resp., Exs. 1–3).  The
court understands Commerce's citation to page 2 of the first supplemental questionnaire
response to identify information on page 5 of the document's internal pagination, which
is the second page of Plywood Sunshine's response to the company-specific
questionnaire.

[39] The court cites to the preliminary AFA memorandum throughout this section based on
Commerce's detailed analysis therein.  In the I&D Memorandum, Commerce addressed
arguments made by counsel for Plywood Sunshine more generally in its discussion of
section 1677m(d) and AFA.  See I&D Mem. at 123–24.

[40] Commerce noted that Plywood Sunshine had reported plywood sales only in [[
             ]] even though the company was incorporated in [[      ]].  Plywood Sunshine
Suppl. Questionnaire, Attach. (question 1).  Commerce also requested Plywood
Sunshine to report the wood species for any [[                         ]] after Plywood
Sunshine reported only [[             ]] for [[                ]].  Id., Attach. (question 2).

about section 1677m(d) generally and states that the company-specific questionnaire "address[ed] at least one of the issues" that underpinned Commerce's use of AFA. Def.'s T2 Resp. at 110; *see also* Def.-Ints.' T2 Resp. at 51.

With respect to the reporting of resellers with inputs sourced from China, Commerce faulted Plywood Sunshine for information provided in response to the Second Supplemental Questionnaire.  *See* Prelim. AFA Mem. at 20.  The matter was therefore not addressed in the company-specific questionnaire, which pre-dated the Second Supplemental Questionnaire by several months.  *Compare* Plywood Sunshine Suppl. Questionnaire (dated Feb. 26, 2021), *with* 2nd Suppl. Questionnaire (dated June 15, 2021).

The same is true with respect to Plywood Sunshine's response to Commerce's request for all tariff headings used by affiliates that exported plywood or plywood inputs from China to Vietnam.  Plywood Sunshine reported that it had no exports under headings 4408 or 4412 by *Chinese* affiliates to report.  *See* Plywood Sunshine 2nd Suppl. Resp. at 3.  However, after issuing the Second Supplemental Questionnaire, Commerce clarified that it sought such information regardless of where the affiliate is located.  *See* 2nd Suppl. Clarification Mem. at 1.  While there is no evidence that Plywood Sunshine *had* any non-Chinese affiliates shipping such inputs from China to report, Commerce faulted the company for not being "fully responsive to Commerce's request for information."  Prelim. AFA Mem. at 20.  More importantly, to the extent that Commerce identified a deficiency in Plywood Sunshine's response to this new

information request, Commerce was required to comply with 19 U.S.C. § 1677m(d)

before using this response as a basis for its use of AFA.

      With respect to wood species, Commerce provided notice of a perceived gap in

Plywood Sunshine's reporting regarding face or back veneer species.  *See* Plywood

Sunshine Suppl. Questionnaire, Attach. at 1–2 (question 2).  While Plywood Sunshine

was notified of this deficiency, Commerce faulted the company for "contradict[ing]"

earlier-reported information.  Prelim. AFA Mem. at 20 & n.179 (citing Plywood Sunshine

1st Suppl. Resp.).  Although section 1677m(d) permits Commerce, subject to section

1677m(e), to disregard additional information if Commerce "finds that such response is

not satisfactory," Commerce failed to support its decision to disregard the supplemental

information with any such finding.  Commerce also did not address Plywood Sunshine's

fuller explanation regarding its clarification of the reported production and sales

information.  *See, e.g.*, Plywood Sunshine 1st Suppl. Resp. at 5 (stating that, during the

inquiry period, the company "sold only veneer core platforms in the domestic market"

but that, in April 2020, Plywood Sunshine "sold its first container" of "plywood with birch

face and back veneer . . . to the United States").  Commerce failed to explain why this

additional information, specifically requested by the agency, should be treated as

contradictory and as a basis for AFA.

      Thus, in sum, Commerce's issuance of a company-specific questionnaire did not

provide adequate notice of the deficiencies Commerce claims to exist with respect to

Vietnamese suppliers, tariff schedules, and the additional information Plywood

Sunshine provided with respect to wood species and veneer type.

### ii. Win Faith Trading Ltd. ("Win Faith")

For Win Faith, Commerce based its determination to use AFA on inconsistent answers about a specific affiliated company. Prelim. AFA Mem. at 23. Win Faith had reported that it was affiliated with a Chinese exporter ("company A")[41] but also that it was not affiliated with any Chinese plywood producers. *Id.* Commerce pointed to "publicly-available information" to show that company A "specialized in manufacturing and exporting wood panel products, including plywood," and that company A's "related group of companies includes multiple plywood factories." *Id.* Commerce further identified a sales contract connecting company A to Win Faith's U.S. sales. *Id.*

Commerce issued a company-specific questionnaire to Win Faith asking it to remedy these inconsistencies. [Win Faith] Q&V Suppl. Questionnaire (June 29, 2021) ("Win Faith Suppl. Questionnaire"), CR 238, PR 276. In its response, Win Faith explained that company A "is only a trading company" that describes itself in a particular manner (i.e., as affiliated with producers) "for advertisement purposes." Win Faith's Resp. to the Q&V Suppl. Questionnaire (July 6, 2021) ("Win Faith Suppl. Resp.") at 2, CR 250, PR 288. Win Faith further pointed to Commerce's determination in other segments and proceedings involving China that company A "is only a trading company." *Id.* Win Faith further attested that "none of its Chinese affiliates produce plywood or plywood inputs." *Id.* Commerce deemed this response unpersuasive and continued to use AFA for the *Final Determination*. *See* I&D Mem. at 102–03.

---

[41] The identity of the exporter, [[                                        ]], is considered proprietary information.

MG Plaintiffs contend that, "[t]o the extent that Commerce had further questions" regarding Win Faith's responses, section 1677m(d) required Commerce to issue another questionnaire.  MG Pls.' T2 Mem. at 16.  But as it concerns Win Faith, Commerce issued a clear questionnaire noting the inconsistencies in Win Faith's reporting and requested Win Faith to reconcile those statements and provide further information about affiliated Chinese producers of plywood or plywood inputs.  *See* Win Faith Suppl. Questionnaire.  Win Faith thus had the opportunity to explain and document the reasons for any inconsistent statements.  Commerce was not required to provide Win Faith with another opportunity to do so.

### iii.  Lechenwood Viet Nam Company Limited ("Lechenwood")

Commerce identified two issues with Lechenwood's reporting: Lechenwood's reporting of its affiliations with Chinese producers of plywood or plywood inputs and Lechenwood's reporting of HTS codes for its inputs imported into Vietnam from China.  Prelim. AFA Mem. at 17–18; I&D Mem. at 98–99.  On the first issue, Commerce issued Lechenwood a company-specific questionnaire.  *See* [Lechenwood] Q&V Suppl. Questionnaire (Feb. 26, 2021), Attach., PR 161.  DH Plaintiffs contend that Commerce failed to comply with 19 U.S.C. § 1677m(d) only with respect to Lechenwood's reporting of HTS codes.  DH Pls.' T2 Mem. at 46–49; *see also* Shelter Forest's T2 Mem. at 14–18 (advancing a similar argument).[42]  The Government asserts that Commerce explained

---

[42] Shelter Forest asserts that "a simple clarification could have addressed" Lechenwood's reporting of its affiliates, Shelter Forest's T2 Mem. at 20, but does not explain why Commerce's issuance of a company-specific questionnaire on this matter failed to provide the necessary notice of Commerce's need for further information.

why it was not practicable to issue another questionnaire.  Def.'s T2 Resp. at 94 (citing I&D Mem. at 133).

Lechenwood responded to Commerce's Second Supplemental Questionnaire on July 9, 2021.  [Lechenwood] Submission of Second Suppl. Q&V Resp. (July. 9. 2021) ("Lechenwood 2nd Suppl. Resp."), CR 348, PR 338.  Therein, Lechenwood reported various six-digit, nine-digit, and ten-digit tariff subheadings, *id.* Ex. 1, but not the eight-digit subheadings Commerce had requested or the customs declarations for the corresponding entries, *see* 2nd Suppl. Questionnaire, Attach. II at 1; Prelim. AFA Mem. at 18.  Commerce further stated that data from the GOV indicated that Lechenwood had imports under an unreported HTS subheading.  Prelim. AFA Mem. at 18.  Commerce also found that Lechenwood had reported invalid subheadings.  *Id.* at 18 n.159.

As a general matter, Commerce's assertion that its questionnaires provided adequate notice of deficiencies and the opportunity to address those deficiencies, I&D Mem. at 133, is unsupported by record evidence with respect to deficiencies identified in Lechenwood's response to the Second Supplemental Questionnaire.  While Lechenwood responded to the Second Supplemental Questionnaire on July 9, 2021, Lechenwood 2nd Suppl. Resp. at 1, Commerce issued no supplemental questionnaires with respect to the HTS reporting first requested in the Second Supplemental Questionnaire in the more than 12 months between Lechenwood's response and the *Preliminary Determination*.

Additionally, with respect to the timing of Lechenwood's submission relevant to the GOV's submissions, the GOV submitted initial data on April 6, 2021.  I&D Mem. at

Consol. Court No. 23-00144                                                          Page 46

76; *see also id.* at 130 & n.669 (referencing the GOV's initial April 2021 submission and

a June 2021 submission with English translations).  But on July 21, 2021, the GOV

submitted a revised dataset.  *See* [GOV] Resp. to the Suppl. Questionnaire (July 21,

2021) ("GOV July 21, 2021 Submission"), Ex. GOV-02, CR 362, 364, PR 351, 353.[43]

The revisions to the GOV data were necessary, in part, to provide product codes and

English-language translations for the names of Vietnamese importers.  Suppl.

Questionnaire for GOV (June 15, 2021), CR 235–36, PR 260.  Commerce also

requested documentation regarding specified importers, including Lechenwood.  *Id.*

Attach. II.

        As previously noted, Lechenwood filed its response to the Second Supplemental

Questionnaire on July 9, 2021, Lechenwood 2nd Suppl. Resp. at 1, *before* the GOV

submitted its final data set, *see* GOV July 21, 2021 Submission, Ex. GOV-02.

Commerce's assertion that "the GOV provided its information before the responses to

Commerce's second supplemental questionnaires were due" and that "parties were able

to address any inconsistencies between the GOV data and their initial or first

supplemental questionnaire responses in their [second] supplemental questionnaire

responses," I&D Mem. at 76; *see also id.* at 130, is undermined by the content and

timing of the various submissions.  Commerce failed to consider adequately that the

GOV provided information that Commerce did not request in the initial Q&V

Questionnaire or First Supplemental Questionnaire or that the GOV filed revised data

_____

[43] On August 9, 2021, the GOV provided the data in Excel format.  CR 391, PR 371.

after parties, such as Lechenwood, responded to the Second Supplemental Questionnaire.

Accordingly, while Commerce complied with 19 U.S.C. § 1677m(d) with respect to Lechenwood's reporting regarding its affiliates, Commerce did not comply with the statute with respect to Lechenwood's reporting of HTS codes.[44]

### iv.  Eagle Industries Company Limited ("Eagle" or "Eagle Industries")

In relying on adverse facts available for Eagle Industries, Commerce pointed to discrepancies created by Eagle's second supplemental questionnaire response.  [Eagle] Q&V Second Suppl. Questionnaire [Resp.] (July 9, 2021) ("Eagle 2nd Suppl. Resp."), CR 319–22, PR 324.  First, Commerce explained that Eagle Industries initially stated that it was affiliated with a Chinese plywood producer but did not source plywood from that producer.  Prelim. AFA Mem. at 6–7.  Eagle Industries later, however, listed that producer as a supplier, and GOV data indicated the same.  *Id.* at 7.  Second, Commerce challenged Eagle Industries' reporting of certain types of veneers as face

---

[44] Commerce stated that its use of AFA was justified for the companies with "two or more  . . . failings" in their questionnaire responses.  I&D Mem. at 140.  Because the court is remanding Commerce's use of AFA for Lechenwood with respect to one of two bases, Commerce must reconsider its use of AFA for this company.  On remand, to the extent Commerce continues to use AFA, Commerce may also reconsider its use of this potentially arbitrary "two or more" metric, *id.*, and, instead of using that metric, explain why "none of the reported data is reliable or usable," *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011).  Any change in Commerce's approach to AFA must, however, be applied consistently to the respondents.

veneers instead of core veneers.  *Id.* at 7.[45]  Commerce rejected Eagle Industries'

contention that these responses constituted corrections or modifications.  I&D Mem. at

76–77.

While Commerce stated that the company-specific questionnaire for Eagle

Industries "addressed inconsistencies within the source documents provided by Eagle"

and thus provided notice of deficiencies, *id.* at 125, neither DH Plaintiffs nor the

Government meaningfully discuss Eagle Industries' company-specific questionnaire,

*see* DH Pls.' T2 Mem. at 11–23; Def.'s T2 Resp. at 17–22, 45–51.  Instead, DH

Plaintiffs argue that Commerce failed to notify Eagle about the deficiencies found in

relation to the generic supplemental questionnaires.  DH Pls.' T2 Mem. at 15–23.

The point is well-taken.  The company-specific questionnaire Commerce issued

to Eagle Industries did not provide notice of the deficiency that Commerce later used as

---

[45] With respect to veneer type (i.e., face/back/core), Commerce appeared simply to disagree with Eagle's reporting rather than find a specific deficiency.  *See* Prelim. AFA Mem. at 7; I&D Mem. at 85.  The issue raised with respect to Eagle appears to stem from the fact that the scope of the *Plywood Orders* does not expressly distinguish between a three-ply core platform exported to the United States (where additional veneers may be added), and other hardwood plywood consisting of three plies.  *See* I&D Mem. at 84–85 (stating that Eagle "attempts to characterize its use of core veneer imports as face and back veneers rather than core veneers because Eagle used them as the outermost veneers" in subsequent exports to the United States).  Relying on the scope language, Commerce claimed that "a veneer cannot be a face or back veneer if it is not attached to a core," *id.* at 85 (emphasis omitted), but the scope also defines the core in relation to "material(s) that are situated between the face and back veneers," *id.* at 6.  To the extent Commerce found Eagle's claims regarding veneer type to be unsupported or warranting additional scrutiny based on ultimate use, Commerce should have requested Eagle Industries to provide further documentation to support its characterizations of veneer type before declaring those characterizations erroneous or unreliable.

the basis for AFA.  Rather, Commerce issued Eagle a company-specific questionnaire to obtain additional and clarifying information about the company's first shipment to the United States.  [Eagle] Q&V Suppl. Questionnaire (June 29, 2021) at 1, Attach., CR 239, PR 277.  Commerce inquired about a discrepancy in the bill of lading with respect to the relationship between Eagle and two other entities and requested a different copy of the bill of lading.  *Id.*  Commerce also identified a discrepancy between Eagle Industries' date of incorporation and the date of one of Eagle's purchase orders.  *Id.*  Eagle responded to the company-specific questionnaire on July 6, 2021, Eagle Indus.' Resp. to the Q&V Suppl. Questionnaire (July 6, 2021), CR 249, PR 287, and to the second supplemental questionnaire three days after that, Eagle 2nd Suppl. Questionnaire Resp.

Because Eagle's company-specific questionnaire (dated June 29, 2021) predates Eagle's response to the generic second supplemental questionnaire (dated July 9, 2021), the company-specific questionnaire did not provide notice of the discrepancies in that July 9 response underlying Commerce's use of AFA.  *See* Prelim. AFA Mem. at 6–7.  Despite Commerce's issuance of a company-specific questionnaire, in this case, Eagle is in the same position as a respondent that received only the generic supplemental questionnaires.  Because the generic supplemental questionnaires failed to provide notice of any deficiencies in Eagle's responses, Commerce failed to comply with 19 U.S.C. § 1677m(d) with respect to Eagle industries.

### v.  Groll Ply & Cabinetry Ltd. ("Groll Ply")

Commerce identified three discrepancies with respect to Groll Ply.  First, Commerce discussed Groll Ply's seemingly contradictory reporting regarding its affiliations with producers or exporters of plywood or plywood inputs in China, highlighting one specific company.  *See* Prelim. AFA Mem. at 11.  Next, Commerce identified discrepancies in Groll Ply's reporting of its imports from China with respect to date and HTS codes as compared to the GOV data.  *Id.*[46]  Lastly, Commerce explained that although Groll Ply reported consuming a certain species of domestically sourced core veneer, the GOV data suggested that Groll Ply imported merchandise from China that had "characteristics indicative of core veneers."  *Id.* at 11–12.

STR Plaintiffs argue that Commerce failed to comply with 19 U.S.C. § 1677m(d).  STR Pls.' T2 Mem. at 35.  The Government counters that "[n]otwithstanding practicality concerns, given the discrepancies woven throughout Groll Ply's questionnaire responses, it was reasonable for Commerce to expect that issuing another supplemental questionnaire would not resolve the discrepancies."  Def.'s T2 Resp. at 62.

The first company-specific questionnaire for Groll Ply addressed an inconsistency between Groll Ply's reported date of incorporation and the dates of certain reported shipments.  *See* [Groll Ply] Q&V Suppl. Questionnaire (Feb. 26, 2021), Attach.,

---

[46] Commerce noted that Groll Ply reported importing inputs from China into Vietnam in [[                    ]] but that the GOV data reflected entries also in [[        ]].  Prelim. AFA Mem. at 11.

PR 159.  Groll Ply responded that it had mistakenly reported its incorporation as April 2020, when the company was incorporated in April 2019.  [Groll Ply] Submission of Suppl. Q&V Resp. (Mar. 29, 2021) ("Groll Ply 1st Suppl. Resp."), Attach. at 1, CR 221, PR 238.  Groll Ply's second company-specific questionnaire identified "missing information" and posed "additional questions about [Groll Ply's] ownership."  I&D Mem. at 125.  In that second company-specific questionnaire, Commerce identified documentation from a sale between a Groll Ply intermediary and a U.S. customer, then sought information about an individual's involvement with Groll Ply, documentation associated with Groll Ply's first shipment to the United States, and documentation from Groll Ply's subsequent four shipments to a certain U.S. customer.  [Groll Ply] Q&V Second Suppl. Questionnaire (June 15, 2021) ("Groll Ply 2nd Suppl. Questionnaire"), Attach. I, CR 234, PR 259.[47]  Groll Ply provided information about the person's involvement with the company and the requested documentation.  *See* [Groll Ply] Submission of Q&V Resp. (July 6, 2021) ("Groll Ply 2nd Suppl. Resp."), Attachs. I–II, CR 252, PR 290.

The company-specific questionnaires did not provide notice of the deficiencies Commerce later relied on to use AFA.  Regarding Commerce's finding of discrepancies with respect to Groll Ply's reported affiliations in response to the First Supplemental Questionnaire, while Groll Ply stated that it "is not affiliated with any producers or exporters of plywood or plywood inputs in China," Groll Ply 1st Suppl. Resp., Attach. II

---

[47] Specifically, Commerce inquired about [[                    ]].  Groll Ply 2nd Suppl. Questionnaire, Attach. I at 1.

at 2, Groll Ply disclosed the name of the individual and company that formed the basis for the discrepancy Commerce identified, *id.*, Attach. II at 3; *see also* Prelim. AFA Mem. at 11.[48]  That individual, [[        ]], is not the same individual, [[            ]], that Commerce requested Groll Ply to address in the second company-specific questionnaire.  Thus, while Commerce issued its second company-specific questionnaire to Groll Ply in order to inquire about certain information in its first supplemental questionnaire response, Commerce did not request further information about [[        ]].  *See* Groll Ply 2nd Suppl. Questionnaire, Attach. I.[49]

Commerce's two additional bases for using AFA, namely, inconsistencies with GOV data regarding Groll Ply's reporting of HTS codes, dates of importation, and the types of veneers purchased by Groll Ply from China, *see* Prelim. AFA Mem. at 11–12, were not among the deficiencies Commerce informed Groll Ply about in the company-specific questionnaires.  Additionally, the Government's assertion that Commerce

---

[48] In the First Supplemental Questionnaire, Commerce requested Groll Ply to state whether it is "affiliated with . . . any Chinese individual that is affiliated with any Chinese manufacturer and/or exporter of plywood or plywood inputs."  1st Suppl. Questionnaire, Attach. II at 2.  While Groll Ply responded in the negative, it reported information about a shareholder, [[        ]], who [[

                                                                            ]].  Groll Ply 1st Suppl. Resp., Attach. II at 3.  That company, [[        ]], served as [[

        ]] the U.S. customer and Groll Ply on Groll Ply's sales of hardwood plywood to the United States.  *Id* at 4.  Groll Ply provided documentation identifying [[        ]] as the seller of Groll Ply's first shipment to the United States and [[

        ]].  *Id.*, Ex. 2.  Groll Ply later provided evidence that [[        ]] sold [[

        ]] to Groll Ply from China.  *See* [Groll Ply] Re-Submission of Second Suppl. Q&V Resp. (Aug. 6, 2021), Ex. 2, CR 387–88, PR 335.
[49] Specifically, Commerce inquired about [[            ]], Groll Ply 2nd Suppl. Questionnaire, Attach. I, but not [[        ]] or his company, [[

        ]], Groll Ply 1st Suppl. Resp., Attach. II at 3.

reasonably declined to issue further questionnaires based on an expectation that any responses would generate further discrepancies is unsupported by record evidence because when Commerce informed Groll Ply about deficiencies, the company addressed them.  Accordingly, Commerce failed to comply with 19 U.S.C. § 1677m(d) with respect to Groll Ply.

### vi.  Hai Hien Bamboo Wood Joint Stock Co. ("Hai Hien")

Commerce cited two deficiencies to justify its use of AFA with respect to Hai Hien.  First, Commerce stated that, although Hai Hien asserted that it was not affiliated with any Chinese producer or exporter, the record reflected otherwise.[50]  Prelim. AFA Mem. at 12; I&D Mem. at 93–94.  Next, Commerce contested Hai Hien's reporting of its poplar veneers as face veneers based on data from the U.S. International Trade Commission ("ITC") about veneer thickness and wood species.  Prelim. AFA Mem. at 12–13; I&D Mem. at 92–93.

In its company-specific questionnaire to Hai Hien, Commerce inquired about four matters.  First, Commerce sought additional information about one of Hai Hien's

---

[50] Commerce pointed to evidence placed on the record by the Coalition indicating that, in 2017, [[

                                                                                         ]].  Prelim. AFA Mem. at 12 & n.103 (citing [Coalition] Cmts. on Certain Second Suppl. Q&V Questionnaire Resps. (July 13, 2021), Ex. 3, CR 359, PR 346.  This appeared to contradict Hai Hien's response to the company-specific questionnaire that [[

                             ]], given that Hai Hien was reportedly incorporated in [[       ]].  Prelim. AFA Mem. at 12; Hai Hien's Resp. to the General 2d SQ and Company-Specific Q&V SQ ("Hai Hien Co-Specific Resp.") (July 2, 2021) at 5, CR 242–44, PR 284.

shareholders in relation to the company's previous report that it was "not affiliated with producers or exporters of plywood or plywood inputs in China in terms of common ownership." [Hai Hien] Q&V Suppl. Questionnaire (June 16, 2021) ("Hai Hien Suppl. Questionnaire"), Attach., CR 237, PR 261.[51] Second, Commerce sought information about investment capital that Hai Hien received from a plywood manufacturer in China and a "Chinese investment representative of Hai Hien." *Id.* Third, Commerce sought information about the wood species of core, face, and back veneers and other details about Hai Hien's first shipment to the United States. *Id.* Finally, Commerce sought clarification about the signatory on a certain sales contract. *Id.* On July 2, 2021, Hai Hien responded to Commerce. Hai Hien Co-Specific Resp. Commerce, in defending the company-specific questionnaire as sufficient notice of deficiency, explained that the questionnaire addressed "inconsistent information about Hai Hien's Chinese affiliates, inconsistent information between the source documents provided by Hai Hien and the narrative responses to Hai Hien's June 16 Supplemental Response, and information about one of Hai Hien's representatives." I&D Mem. at 125.

STR Plaintiffs argue that with respect to Hai Hien's reporting regarding its shareholder, any "misunderstanding could have been clarified" with an additional questionnaire. STR Pls.' T2 Mem. at 26–27. With respect to veneer type, they contend

---

[51] Commerce requested additional information about [[                ]]. Hai Hien Suppl. Questionnaire, Attach. at 1.

that "Commerce asked no questions and requested no documentation on the actual use of the face veneers." *Id.* at 28.[52]

Commerce's company-specific questionnaire afforded Hai Hien the opportunity to provide additional information about the particular shareholder, [[          ]]. Hai Hien's response, however, was unclear with respect to the company's use of the term "established."[53]

With respect to Commerce's other basis for using AFA, Commerce's company-specific questionnaire inquired about wood species but not veneer type. Hai Hien

---

[52] MG Plaintiffs adopt the arguments of others. MG Pls.' T2 Mem. at 10. MG Plaintiffs do not make additional arguments specific to Hai Hien but assert that for many companies, including Hai Hien, the "Preliminary Determination served as the first notice" of deficiencies. *Id.* at 9–10.

[53] Commerce requested Hai Hien to report whether the shareholder "*holds* any positions in, or owns any shares of any, Chinese producers or exporters of plywood or plywood inputs." Hai Hien Suppl. Questionnaire, Attach. at 1 (emphasis added). Because Commerce's question was phrased in the present tense, it would seemingly have been accurate for Hai Hien to respond in the negative, because there is no indication that [[          ]] held any such positions as of the date of Hai Hien's response. Instead, Hai Hien reported that [[          ]] has not held any such positions "*[s]ince Hai Hien was established.*" Hai Hien Co-Specific Resp. at 5 (emphasis added). Commerce understood that by "established," Hai Hien intended to refer to its incorporation in [[     ]]. Prelim. AFA Mem. at 12. Hai Hien later argued that by "established" it meant "restructured," I&D Mem. at 93, which occurred in [[          ]], [Hai Hien] Q&V Questionnaire Resp. (Oct. 1, 2020), Attach. II at 2, CR 76–79, PR 106; *see also* Hai Hien Case Br. (Jan. 10, 2023) at 3–4, CR 592, PR 752. But Commerce requested Hai Hien to provide documentation to support its response about [[          ]], where that documentation, if so provided, could have shed light on Hai Hien's response and what it intended by the term "established." Hai Hien Suppl. Questionnaire, Attach. at 1. Hai Hien does not identify supporting documentation. *See* Hai Hien Co-Specific Resp. at 5. Whether this ambiguity supports Commerce finding a failure to cooperate pertains to a separate, but related, statutory consideration pursuant to 19 U.S.C. § 1677e(b)(1) that the court need not reach at this time.

Suppl. Questionnaire, Attach.[54]  Accordingly, the company-specific questionnaire did

not provide notice of a deficiency for that issue.  *See* Prelim. Mem. at 12–13 (discussing

concerns with Hai Hien's reporting of veneer type).  And while Hai Hien supplied the

information requested regarding plywood inputs in its response to the Q&V

questionnaire, Commerce rejected the characterization of its imported veneers as face

veneers, determining that they were core veneers, based on ITC data and information

that Commerce itself had previously collected.  *See id.*; I&D Mem. at 92–93.[55]  If

Commerce believed that this difference amounted to a deficiency, the agency should

have provided Hai Hien with a meaningful opportunity to respond.  Absent such notice,

Commerce failed to meet the requirements of 19 U.S.C. § 1677m(d) with respect to Hai

Hien.

---

[54] Regarding exhibits that Hai Hien provided in its March 8, 2021, first supplemental Q&V response, the company-specific questionnaire requested Hai Hien to explain the omission of poplar in its identification of species of veneer used in plywood cores as well as documentation supporting the eucalyptus it used to produce plywood cores.  Hai Hien Suppl. Questionnaire, Attach. at 2.

[55] Hai Hien reported that it used poplar face veneers imported from China to produce plywood it exported to the United States.  Prelim. AFA Mem. at 12.  Commerce, however, considered the thickness of the veneers to be indicative of core veneers.  *Id.* at 12–13.  Commerce supported this characterization of veneer type with ITC data showing that "poplar is one of the most common species used in core veneers by Chinese plywood producers" and that "imported Chinese plywood rarely has face veneers made of poplar."  *Id.* at 12.  Commerce also previously found that Dongfangjuxin used poplar for its core veneers, *id.*, and records showed that core veneers possess a thickness like that of Hai Hien's poplar veneers, *see* I&D Mem. at 92–93.

### 3.  Conclusion Regarding 19 U.S.C. § 1677m(d)

The Government and the Coalition focus primarily on the number of questionnaires Commerce issued.  But section 1677m(d) implicates both the quantity and quality of the questionnaires.  The question before the court is whether Commerce "promptly inform[ed]" the respondents of "the nature of the deficienc[ies]" and provided them "with an opportunity to remedy or explain the deficiency in light of the [established] time limits" or otherwise justified why it was not, at the time, practicable to do so.  19 U.S.C. § 1677m(d).  For all respondents discussed above except Win Faith, Commerce did not fulfill its obligations.  Accordingly, for those companies for which Commerce used AFA based on deficient (as distinct from non-existent) responses (aside from Win Faith), Commerce's circumvention determination must be remanded.

### B.  Failure to Cooperate

As mentioned above, Commerce "may use an inference that is adverse to the interests of" a party if Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability."  19 U.S.C. § 1677e(b).  "Compliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  "[T]he standard does not require perfection," but "it does not condone inattentiveness, carelessness, or inadequate record keeping."  *Id.*

Because Commerce's use of AFA is subject to compliance with section 1677m(d), *see* 19 U.S.C. § 1677e(a), for the companies covered by the remand

necessitated by the foregoing discussion, the court need not address the agency's basis for finding a failure to cooperate. Below, the court addresses arguments raised by certain other companies about Commerce's use of AFA based on their particular circumstances.

### 1. Win Faith

Win Faith is the only company as to which Commerce used AFA based on deficient questionnaire responses for which remand is not required pursuant to 19 U.S.C. § 1677m(d). As discussed above, Commerce applied AFA based on Win Faith's failures with respect to its reporting of affiliated hardwood plywood producers in China, specifically, company A.[56] I&D Mem. at 102–03, 144. MG Plaintiffs contend that there was no material gap in the record. MG Pls.' T2 Mem. at 13. They further contend that Win Faith provided evidence of Commerce's own finding in the underlying antidumping investigation that the affiliate is a trading company, evidence with which Commerce failed to engage. *Id.* at 15.

The Government contends that there was a relevant gap in the record and Commerce was not required to accept Win Faith's reliance on the underlying investigation because each segment of a proceeding has a different record. Def.'s T2 Resp. at 105–07. The Coalition contends that the issue is not whether company A is a producer but whether company A, and therefore Win Faith, are affiliated with other

---

[56] As described *supra*, note 41, company A is [[          ]].

Chinese plywood producers.  Def.-Int.'s T2 Resp. at 56–58 (citing Prelim. AFA Mem. at 23).

MG Plaintiffs counter that the "applicable determination" is whether Win Faith exported hardwood plywood to the United States with Chinese core veneers and that affiliation is not relevant to this determination or, thus, a basis for AFA.  MG Pls.' T2 Reply at 14.

Commerce's explanation for its use of AFA for Win Faith addresses two related issues: whether company A is a plywood producer, and whether company A is affiliated with other plywood producers in China.  I&D Mem. at 102–103. While Commerce's findings regarding the latter issue are supported by substantial evidence, Commerce failed to address evidence relevant to the first issue.  Commerce's determination to use AFA for Win Faith will therefore be remanded.

Win Faith informed Commerce that company A is an affiliated trading company and Chinese plywood exporter, i.e., not a producer.  [Win Faith] Q&V Questionnaire Resp. (Oct. 1, 2020), Attach. II at 5, CR 116, PR 116; [Win Faith] Q&V Suppl. Questionnaire Resp. (Mar. 8, 2021) at 2, CR 174, PR 196; [Win Faith] Q&V Second Suppl. Questionnaire (July 9, 2021) at 3, CR 313, PR 322.  Win Faith explained that Commerce determined that company A was a trading company in two prior investigations, which established that the affiliate was found to be an exporter, not a producer.  [Win Faith] Rebuttal to Pet'r's Cmts. on Q&V Questionnaire Resp. (Mar. 25,

2021) at 2, CR 215, PR 231.[57]  In discussing this issue, Commerce referred to its

preliminary determination, implying that Commerce had considered the investigations

and yet "found that Win Faith's unsupported assertions did not overcome the record

evidence that supported the finding that Win Faith had a Chinese affiliate that produced

hardwood plywood."  I&D Mem. at 102.[58]  Commerce's preliminary decision

memorandum, however, does not address these prior investigations and, thus, failed to

address evidence relevant to the determinations as to whether company A is a plywood

producer, and, thus, whether Win Faith is affiliated with a plywood producer.

   Also at issue was whether company A is itself affiliated with Chinese plywood

producers.  *See* Prelim. AFA Mem. at 23; I&D Mem. at 102–03.  Win Faith asserted,

without supporting evidence, that any advertised affiliations regarding company A and

plywood producers did not meet the definition of "affiliation" under Commerce's

regulations.  Win Faith Suppl. Resp. at 1–2.  However, given the absence of evidence to

---

[57] Win Faith cites to *Certain Hardwood Plywood Products From the People's Republic of China*, 82 Fed. Reg. 53,460, 53,466 (Dep't Commerce Nov. 16, 2017) (final determination of sales at less than fair value, and final affirmative determination of critical circumstances, in part), and *Hardwood and Decorative Plywood From the People's Republic of China*, 78 Fed. Reg. 58,273 (Dep't Commerce Sept. 23, 2013) (final determination of sales at less than fair value).

[58] In support, Commerce identified "[p]ublicly-available information indicat[ing] that [[       ]]," with whom Win Faith claimed affiliation, "is affiliated with [a] Chinese plywood manufacturer."  Prelim. AFA Mem. at 23.  Statements online further indicated that [[     ]] "has specialized in manufacturing and exporting wood panel products, including plywood, for more than 20 years," and that "[[       ]] related group of companies includes multiple plywood factories."  *Id.*  The seller associated with Win Faith's first shipment of plywood to the United States during the inquiry period has an email address ending in [[           ]] and an address in the [[       ]].  *Id.*

support Win Faith's position, Commerce reasonably found that Win Faith did not fully

cooperate with respect to the request for information regarding company A's affiliations.

    MG Plaintiffs' assertion that information about affiliates is not relevant to the

"applicable determination," which they define narrowly as whether Win Faith exported

hardwood plywood to the United States with Chinese core veneers, lacks merit.  The

"applicable determination" is a determination pursuant to 19 U.S.C. § 1677j regarding

circumvention.  *See* 19 U.S.C. § 1677e(a) (permitting Commerce to "use the facts

otherwise available in reaching the applicable *determination under this subtitle*"

(emphasis added)).   Insofar as MG Plaintiffs intend to argue that information about

affiliates is not relevant to Win Faith's production processes, that argument also fails as

undeveloped and contrary to Commerce's discretion to decide what information the

agency needs to complete its inquiry.  *See, e.g.*, *Ansaldo Componenti, S.p.A. v. United

States*, 10 CIT 28, 37, 628 F. Supp. 198, 205 (1986) ("It is Commerce, not the

respondent, that determines what information is to be provided . . . .").  As Commerce

explained, "Commerce considers affiliations between respondents and the companies in

the country of the [*Plywood*] *Orders* to evaluate details like the likelihood of

circumvention, the ease of circumvention, sourcing capabilities, *etc*."  I&D Mem. at 140.

Commerce's explanation is consistent with the anti-circumvention statute, which

includes affiliations among the considerations relevant to a circumvention finding.  19

U.S.C. § 1677j(b)(3)(B).

    Commerce's own reasoning, however, precludes the court from sustaining

Commerce's overall use of AFA with respect to Win Faith.  Commerce explained that

"[i]t is the sum of two or more . . .  failings that rendered the questionnaire responses unreliable and warranted the application of AFA."  I&D Mem. at 140 (referring to the companies to which Commerce applied AFA due to inconsistencies and discrepancies in their questionnaire responses).  In relation to Win Faith, Commerce discussed deficiencies under the single heading of "Affiliation."  *Id.* at 102–03; *see also* Prelim AFA Mem. at 23 (condensing Win Faith's analysis into a single paragraph).  Thus, it is unclear whether Commerce considered Win Faith to have a single deficiency, or multiple deficiencies relevant to this single area of inquiry.  Because Commerce's determination regarding Win Faith's deficient reporting is supported by substantial evidence only in part, with respect to company A's affiliations, and because Commerce did not explain how it applied its own "two or more failings" standard for the use of AFA, a remand is required for Commerce to reconsider its overall finding that Win Faith failed to cooperate for purposes of 19 U.S.C. § 1677e(b)(1).

### 2. Cam Lam Joint Stock Company ("Cam Lam")

Cam Lam is one of the companies that failed verification.  Commerce determined that the sales information Cam Lam attempted to submit at verification did not constitute a minor correction to previously reported information.  I&D Mem. at 147.  Commerce further determined that because such information was in Cam Lam's possession and should have been reported earlier, Cam Lam failed to cooperate to the best of its ability.  *Id.* at 150.  "As AFA, [Commerce found] that Cam Lam had sales of inquiry merchandise

during the inquiry period and that Cam Lam is ineligible to participate in the certification program." *Id.*

STR Plaintiffs contend that the corrections presented at verification were minor, Commerce's decision to end verification was unsupported by substantial evidence, and the corrections presented were immaterial to the circumvention determination. STR Pls.' T2 Mem. at 28–31; STR Pls.' T2 Reply at 14–16.

The Government contends that Cam Lam's attempted corrections "amounted to a near-wholesale revision of its Q&V data." Def.'s T2 Resp. at 31; *see also* Def.-Int.'s T2 Resp. at 22–24 (advancing similar arguments). The Government asserts that Commerce reasonably concluded that the magnitude of the changes "call into question the reliability of the entirety of Cam Lam's reporting, including the species of veneers it consumed, the suppliers of those veneers, the customers to whom it sold, and the country of origin of the veneers." Def.'s T2 Resp. at 33 (citing I&D Mem. at 150). Thus, the Government contends, Commerce was within its discretion to end verification. *Id.* at 32.

Commerce's determination to find the proposed corrections not minor, thus ending verification and applying AFA, is supported by substantial evidence. As Commerce explained:

> [T]he quantity changes related to [Cam Lam's] reported U.S. sales were not limited to the month of July, despite Cam Lam's explanation for the changes largely resting on a change in that month and that being the only month in which Cam Lam claimed reclassification of sales from U.S. to third country. We also noted quantity changes of an unexpected magnitude for a change to the conversion calculation from pieces to cubic meters and for a company that should be very familiar with this type of

> conversion.  Specifically, verifiers noted that the total reported U.S.
> quantity was reduced by nearly 10 percent, and on a month-by-month
> basis the changes ranged from an increase in more than 26 percent and a
> decrease in more than 65 percent.  Third country sales' totals increased
> from zero to over 11,400 cubic meters (m3) worth $4.6 million U.S. dollars
> (USD), and domestic sales totals increased by 116 percent in volume
> (5,565.12 m3 to 12,010.89 m3) and 79 percent in value ($2,761,711.84
> USD to $4,949,904.40 USD).

I&D Mem. at 147 (quoting Verification of [Cam Lam] (Dec. 21, 2022) ("Cam Lam Ver.

Rep.") at 3, CR 571, PR 689).  STR Plaintiffs offer no explanation for why these

corrections should be considered minor and instead attack Commerce's purported

decision not to allow Cam Lam to explain the corrections.  STR Pls.' T2 Mem. at 29–30.

However, the record indicates that when Commerce requested an explanation at

verification, Cam Lam officials could not provide one.  Cam Lam Ver. Rep. at 3–4.

Commerce balances the "tension between finality and correct result" by accepting, at

verification, only minor corrections, those that remedy "minor mistakes in addition,

subtraction, or other arithmetic function, minor data entry mistakes, clerical errors

resulting from inaccurate copying, duplication, or the like, [or] minor classification

errors."  *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1342–43 (Fed. Cir. 2021)

(citations omitted) (alteration in original).  Accepting the changes here "would have

impacted all of Cam Lam's data."  I&D Mem. at 150.  Commerce's determinations that

the changes were not minor, that ending verification was appropriate, and that Cam

Lam failed to cooperate fully in responding to Commerce's requests for information, are

supported by substantial evidence.

### 3.  Vietnam Zhongjia Wood Co. Ltd. ("Zhongjia")

Zhongjia is another company that failed verification.  Commerce found that Zhongjia failed to "report all of the core veneers it purchased during the inquiry period," *id.* at 158, and failed to report one core veneer supplier ("company B"),[59] *id.* at 159.  The unreported core veneers consisted of kapok wood veneers, potentially with other species of core veneers.[60]  In the Second Supplemental Questionnaire, Commerce requested "[a] complete list of all your Vietnamese suppliers of plywood or plywood inputs."  2nd Suppl. Questionnaire, Attach. II.  Zhongjia did not report company B as such a supplier.  [Zhongjia] Second Suppl. Questionnaire [Resp.] (July 9, 2021) ("Zhongjia 2nd Suppl. Resp.") at 2, Ex. SQ2-3, CR 302, PR 318.  At verification, Zhongjia claimed that core veneers purchased from company B were not used for plywood production but was unable to produce documentation to support that statement.  Verification of [Zhongjia] (Dec. 21, 2022) ("Zhongjia Ver. Rep.") at 6, CR 566, PR 679.[61]  Commerce's verifiers "did not identify any kapok wood used to produce plywood" in their "examination of Zhongjia's records."  *Id.*  In finding a failure to

---

[59] The supplier is [[              ]].

[60] Commerce stated that "the core veneers [Zhongjia] purchased from this unreported company *included* kapok wood veneers" I&D Mem. at 159 (emphases added), but did not specify any other type of unreported core veneers.

[61] Zhongjia reported that "[company B] used to be a manufacturer at the same site where Zhongjia is currently located" and that "Zhongjia purchased machinery, tools, and veneers from [company B]" when company B went bankrupt and Zhongjia took over its manufacturing site.  Zhongjia Ver. Rep. at 6.  Zhongjia reported using the [[              ]] from [company B] . . . [[                          ]] it purchased from [company B], [[                                                    ]]" and reported similar usage of the kapok wood veneers.  *Id.*

cooperate, Commerce stated that "[w]hether wood veneers are used to produce hardwood plywood or plywood not sold to the United States does not negate the fact that wood veneers are inputs used to produce plywood."  I&D Mem. at 159–60. Commerce explained that verification is a spot check, and one error suggests the presence of others.  *Id.* at 160.

Commerce also faulted Zhongjia for failing to provide Quarter 1 ("Q1") 2020 material input records.  *Id.* at 161; *id.* at 163 ("[T]he majority of Zhongjia's period of inquiry sales occurred in Q1 2020," and, thus, "the raw material inputs from that same quarter were necessary for Commerce to verify Zhongjia's reported information.").  As AFA, Commerce found "that Zhongjia produced inquiry merchandise during the inquiry period."  *Id.* at 165.

### i.  Unreported Inputs

DH Plaintiffs contend that Zhongjia did not report company B as a supplier because Zhongjia understood the Second Supplemental Questionnaire to request information about plywood or plywood input suppliers, and Zhongjia did not use the core veneers it purchased from company B to make plywood.  DH Pls.' T2 Mem. at 79; *see also* DH Pls.' T2 Reply at 53.  DH Plaintiffs further contend that "Zhongjia's purchases from [company B] consist of kapok wood veneers," which are made from locally grown timber and Commerce "did not identify any kapok wood used to produce plywood."  DH Pls.' T2 Mem. at 79–80 (quoting Zhongjia Ver. Rep. at 6).  According to DH Plaintiffs, Commerce's statement that "Zhongjia *did* use some of its unreported hardwood plywood veneer purchases to produce hardwood plywood," I&D Mem. at 159, is

unsupported by record evidence, DH Pls.' T2 Mem. at 80.  They further assert that
internal records regarding scrap consumption before the inquiry began were not
reasonably required to be kept under the objective showing of a failure to cooperate
required by *Nippon Steel*.  *Id.* at 81; DH Pls.' T2 Reply at 54.

      The Government contends that Zhongjia was required to "report all Vietnamese
suppliers of plywood or plywood inputs regardless of whether the veneers were used to
produce hardwood plywood."  Def.'s T2 Resp. at 37.  The Government reiterates
Commerce's statement that "Zhongjia *did* use some of its unreported hardwood
plywood veneer purchases to produce hardwood plywood," *id.* at 38 (quoting I&D Mem.
at 159), but also, somewhat inconsistently, that "[a]ll the record evidence shows is that
Zhongjia purchased kapok wood veneers, not what merchandise those veneers were
used to produce," *id.*  The Coalition advances similar arguments in support of
Commerce's determination.  Def.-Int.'s T2 Resp. at 58–61.

      Commerce's determination with respect to this issue is not supported by
substantial evidence.  Commerce's statement that "Zhongjia *did* use some of its
unreported hardwood plywood veneer purchases to produce hardwood plywood," I&D
Mem. at 159, relies on a misinterpretation of one sentence in a rebuttal brief noting
Zhongjia's response to a question by the verifiers asking "if Zhongjia purchased any
veneers from other companies that it did not report 'whether or not the veneers were
used to produce plywood,'" *id.* at 159 n.818 (quoting Zhongjia Rebuttal Br. (Feb. 1,
2023) at 5, CR 607, PR 805).  Unlike the question posed by the verifiers, Commerce's
questionnaire requested a "complete list of all your Vietnamese suppliers of plywood or

plywood inputs." Zhongjia 2nd Suppl. Resp. at 2. Zhongjia listed none based on its reasonable understanding that the question requested information about plywood input suppliers. *See* DH Pls.' T2 Mem. at 79 (citing Zhongjia Ver. Rep. at 6).

Commerce must "let the respondent know what information [Commerce] really wants," and may not fault a respondent "for failing to provide information beyond the scope of the question that Commerce asked." *Baroque Timber*, 766 F. Supp. 3d at 1314 (first quoting *Ta Chen Stainless Steel Pipe v. United States*, 23 CIT 804, 820, 1999 WL 1001194, at *13 (1999), then quoting *Jinan Yipin Corp. v. United States*, 31 CIT 1901, 1916, 526 F. Supp. 2d 1347, 1360–61 (2007)). Here, because Commerce did not clearly request information about Vietnamese suppliers of veneers that were *not* used as inputs in the production of plywood, Commerce's determination that Zhongjia erred in failing to report company B is not supported by substantial evidence.

### ii. Q1 2020 Records

DH Plaintiffs contend that Zhongjia's failure to have the Q1 2020 material input purchase records available arose from Zhongjia's accountant's misunderstanding of the verification agenda. DH Pls.' T2 Mem. at 83. They further contend that Commerce abused its discretion by not allowing Zhongjia time to retrieve the Q1 2020 records from another location. *Id.* at 84–85; DH Pls.' T2 Reply at 57–58. Lastly, they assert that Commerce's statement that it "was unable to review official records from 2019" is incorrect. DH Pls.' T2 Mem. at 85 (quoting I&D Mem. at 163).

Consol. Court No. 23-00144                                          Page 69

The Government contends that Commerce was not required to provide Zhongjia with the additional time it need to produce the Q1 2020 records that it should have prepared in advance for verification.  Def.'s T2 Resp. at 40–42.

Commerce's determination with respect to this issue is supported by substantial evidence.  Commerce's verification agenda requested information from different timeframes depending on the question.  *See* Verification of Questionnaire Resps. (Oct. 7, 2022) at 9, PR 606.  In one question, for example, Commerce requested that the company provide sample documentation of its procedure for tracing the country of origin of its wood inputs "for one sale in July 2019."  Zhongjia Ver. Rep. at 5.  However, under "Material Inputs," Commerce did not specify 2019 records in stating that it would "[r]eview the methodology used to determine that hardwood plywood inputs were, or were not, purchased from, or originated from, the People's Republic of China, including (but not limited to): 1. Production records; 2. Material purchases and freight invoices; 3. Material consumption charts/bills of material; 4. Lot Numbers."  *Id*.  Commerce based its request to inspect Q1 2020 records on this Material Inputs question.  I&D Mem. at 161.

That Zhongjia claims to have misunderstood the questions is of no moment. Moreover, Commerce explained that information from 2020 was particularly important because "most" of Zhongjia's "inquiry period sales actually occurred during Q1 2020" and Zhongjia "only started using professional accounting software at the start of 2020." I&D Mem. at 163.  Thus, there was all the more reason for Zhongjia to be prepared with this information at verification, and Commerce did not abuse its ample discretion by declining to extend verification for Zhongjia to retrieve the requested records.

While the court sustains Commerce's determination regarding Zhongjia's failure to produce the Q1 2020 records at verification, a remand is necessary for Commerce to reconsider or explain further its decision to use AFA in light of the absence of substantial evidence to support Commerce's decision with respect to the unreported inputs from company B.[62]

### 4. TL Trung Viet Company Limited ("TL Trung")

Because TL Trung declined to participate in verification the day before the scheduled visit, Commerce found, as AFA, "that TL Trung . . . exported inquiry merchandise during the inquiry period." I&D Mem. at 167.

MG Plaintiffs contend that any adverse inference used against TL Trung must fail because Commerce's overall circumvention determination fails for the reasons stated in their Tranche I brief regarding Commerce's determination "that the process of assembly or completion in . . . Vietnam was minor or insignificant." MG Pls.' T2 Mem. at 25. The Government contends that Commerce's use of AFA as to TL Trung should be sustained. Def.'s T2 Resp. 44–45; *see also* Def.-Int.'s T2 Resp. at 54 (arguing the same).

Commerce's determination that TL Trung failed to cooperate is supported by substantial evidence. Absent any alternative argument, Commerce's determination

---

[62] Commerce evaluated companies that failed verification differently from companies to which it applied AFA for having at least two deficiencies. Oral Arg. 3:01:10–3:03:10; *see also* I&D Mem. at 140 (explaining Commerce's "two or more" failings standard with respect to the companies that had deficient questionnaire responses, not with respect to companies that failed verification).

regarding TL Trung stands or falls on Commerce's decision with respect to whether the completion or assembly in Vietnam was minor or insignificant, an issue the court does not yet reach.  *See infra*, pages 81–82, 92–93.

### 5.  Bao Yen MDF Joint Stock Company ("Bao Yen") and Thang Long Wood Panel Company Ltd ("Thang Long")

Commerce applied AFA to Bao Yen and Thang Long because, although they responded to the initial questionnaire, they did not respond to the First Supplemental Questionnaire.[63]  *See* I&D Mem. at 105–07.  Commerce rejected Bao Yen's explanation of alleged third-party miscommunications.  *Id.* at 105.  Commerce also rejected Thang Long's explanation that the company erroneously believed it was not required to respond and explained that the company was listed as a required respondent.  *Id.* at 106–08.

MG Plaintiffs contend that Bao Yen and Thang Long acted to the best of their abilities.  MG Pls.' T2 Mem. at 22.  They assert that the failures arose from a miscommunication with IKE Trading, which was responsible for representing the companies' interests in the proceeding, and the "reasonable" view that the companies were excused from responding because they did not produce inquiry merchandise.

---

[63] While Commerce and the parties discuss Bao Yen's and Thang Long's respective failures to respond "to the supplemental Q&V questionnaires," i.e., using the plural form, I&D Mem. at 106; *see also id.* at 105 ("[W]e note that the supplemental *questionnaires* listed both Bao Yen and Dong Tam as 'Companies that are required to respond to this supplemental questionnaire.'" (emphasis added)), only the First Supplemental Questionnaire listed those companies as required respondents.  *See* 1st Suppl. Questionnaire, Attach. I; *cf.* 2nd Suppl. Questionnaire, Attach. I (not including either company).  Companies that did not respond to the First Supplemental Questionnaire did not receive the second questionnaire.  *See* Prelim. Mem. at 3–4.

*Id.* at 23.  According to Plaintiffs, Bao Yen's and Thang Long's failures were not "particularly serious."  MG Pls.' T2 Reply at 2 (quoting *Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1087 (Fed. Cir. 2025)).  They assert that applying AFA "led to an inaccurate result" because Commerce assessed duties on non-subject merchandise. *Id.* at 7.

The Government contends that any miscommunication or mistake about whether a response was required does not excuse the failure to respond.  Def.'s T2 Resp. at 28–30.  The Coalition supports Commerce's determination.  Def.-Int.'s T2 Resp. at 21–22.

Commerce's determination is supported by substantial evidence.  Bao Yen's and Thang Long's reasons for not responding are not persuasive.  The burden was on the respondents to ensure their interests were protected throughout the inquiry, by monitoring the agency docket, maintaining counsel as they had done originally, making sure any third party allegedly responsible for representing their interests was doing so, and promptly bringing any failures in that regard to Commerce's attention.  It was not "reasonable" to conclude "that they were not required to respond to Commerce's supplemental questionnaires given that they did not produce plywood subject to Commerce's circumvention investigation," MG Pls.' T2 Mem. at 23, because their responses were necessary to establish the relevant facts.  Indeed, that excuse is at odds with the argument that any non-response was the fault of IKE Trading.  *See id.*

Contrary to Plaintiffs' argument that the *Oman Fasteners* court raised the bar for Commerce to use AFA only upon finding a "particularly serious failure to cooperate," MG Pls.' T2 Reply at 2 (citation and emphasis omitted), this situation does not fall within

the ambit of *Oman Fasteners*.  There, the Federal Circuit used the phrase "serious failure to cooperate" in connection with the court's review of Commerce's selection of the highest possible dumping margin and compliance with section 1677e(d)(2) regarding the agency's "evaluation . . . of the situation that resulted in [Commerce] using an adverse inference in selecting among the facts otherwise available."  *Oman Fasteners*, 125 F.4th at 1086 (alteration in original) (emphasis omitted) (quoting 19 U.S.C. § 1677e(d)(2)).  That situation is inapposite to the binary nature of Commerce's circumvention determination here.  *See, e.g.*, *Max Fortune Indus. Co. v. United States*, 37 CIT 549, 558 (2013) (observing that in a circumvention inquiry, unlike in an antidumping investigation, "there is no calculation") (internal quotation marks and citation omitted).[64]  In any event, MG Plaintiffs do not explain why a wholesale failure to respond to a questionnaire is not a "serious failure to cooperate" even if that were the relevant standard.  Other arguments they present are equally lacking in merit.[65]  *See* MG Pls.' T2 Reply at 3–7.  Accordingly, Commerce's determination that Bao Yen and

---

[64] *Oman Fasteners* addressed this issue in the context of whether the public interest factor supported a preliminary injunction barring the collection of cash deposits at the assigned rate.  125 F.4th at 1085–88.

[65] MG Plaintiffs argue that neither Bao Yen nor Thang Long had the "intent" not to cooperate.  MG Pls.' T2 Reply at 4.  However, "the statute does not contain an intent element."  *Nippon Steel*, 337 F.3d at 1383.  Additionally, they argue that Commerce's use of AFA "led to an inaccurate result whereby antidumping and countervailing duties will be assessed against Bao Yen's and Thang Long's exports of non-subject merchandise."  MG Pls.' T2 Reply at 6.  MG Plaintiffs' characterizations merely repackage their arguments against Commerce's use of AFA and do not present independent grounds for a remand.  *See id.* at 7 (arguing that the record does not "support such an inaccurate result when other [record] information . . . can fill any alleged gap").

Thang Long did not cooperate to the best of their abilities is supported by substantial evidence.

### 6. Conclusion Regarding Commerce's Failure-to-Cooperate Determinations

In sum, Commerce's failure-to-cooperate determinations are supported by substantial evidence with respect to Cam Lam, TL Trung, Bao Yen, and Thang Long. Commerce's determinations with respect to Win Faith and Zhongjia will be remanded. The court now turns to Commerce's use of adverse inferences when selecting from among the facts available.

### C. Selection of Adverse Facts Available

When Commerce determines that a respondent has failed to cooperate, any adverse inference "may include reliance on information derived from--(A) the petition, (B) a final determination in the investigation under this subtitle, (C) any previous review under section 1675 of this title or determination under section 1675b of this title, or (D) any other information placed on the record."  19 U.S.C. § 1677e(b)(2).  "Deriving information requires a logical connection between the source, i.e., the record evidence, and the result."  *Jinko Solar Imp. and Exp. Co. v. United States*, 49 CIT __, __, 789 F. Supp. 3d 1275, 1288 (2025).  Thus, Commerce must draw adverse inferences from the *factual record*; neither subsection (a) nor (b) of section 1677e "relieves Commerce from relying on *some facts* to make the requisite determinations to satisfy the [statutory] elements."  *Changzhou Trina Solar Energy Co. v. United States*, 43 CIT __, __, 359 F. Supp. 3d 1329, 1340 (2019) (emphasis added).  Indeed, "[i]f Commerce could simply

declare the statute satisfied without resorting to actual facts, Congress would have had no need to provide potential sources of information for adverse inferences, as it did in 19 U.S.C. § 1677e(b)(2)(A)–(D)."  *Id.*  That is why "Commerce's AFA determination must be supported by substantial evidence."  *Jindal Poly Films Ltd. of India v. United States*, 44 CIT __, __, 439 F. Supp. 3d 1354, 1361 (2020) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

Plaintiffs argue that Commerce's use of AFA here was unsupported by substantial evidence.  *See, e.g.*, Greatriver's T1 Mem. at 17.  Plaintiffs argue that Commerce relied on flawed evidence, specifically from the Finewood scope proceeding and from the petitioner.  *See, e.g.*, DH Pls.' T1 Mem. at 20–27.  In highlighting these flaws, Plaintiffs strike at a wider issue with Commerce's application of AFA—that the agency did not identify facts in the record upon which it based its adverse inferences.

While it is true that circumvention is effectively a binary choice (either it is or is not occurring), *see Max Fortune*, 37 CIT at 559, an affirmative determination requires certain statutory elements to be met, *see* 19 U.S.C. § 1677j.  Among those elements is the sale of merchandise that is of the "same class or kind" as merchandise subject to an AD/CVD order and that is "completed or assembled" in Vietnam using certain Chinese components, i.e., inquiry merchandise, here based on five production scenarios.  I&D Mem. at 11–12; *see also* 19 U.S.C. § 1677j(b)(1)(A)–(B) (enumerating the required elements).  The finding that the merchandise of the same class or kind was completed or assembled from relevant Chinese components is, at least in part, a factual

determination.  Nevertheless, Commerce failed to support with substantial evidence the factual bases for its adverse inferences used to support this most fundamental finding.

To recap, Commerce concluded, "as AFA," that the AFA companies "are producing inquiry merchandise and circumventing the [*Plywood Orders*]."  I&D Mem. at 63; *see also, e.g.*, Prelim. Mem. at 12.  At oral argument, and as discussed at the beginning of this section on AFA, the Government averred that Commerce's use of AFA is moot with respect to those companies permitted into the certification regime as a result of AR5 and, relatedly, that Commerce's AFA finding with respect to production of inquiry merchandise logically followed, and is separate from, Commerce's circumvention finding.  Oral Arg. 3:24:30–3:28:30.  The Government likened Commerce's use of AFA to the agency's CVD determinations, in which Commerce finds evidence of a subsidy program and applies AFA to find that a particular company used or benefitted from that program.  *Id.* 3:25:30–3:27:30.  The Government thus argued that Commerce need not (and in fact acknowledged that Commerce did not) identify specific facts to support its AFA findings with respect to the respondents' production of inquiry merchandise.  *Id.* 3:28:20–3:30:30.  That argument fails in this case.

Commerce's circumvention finding for the *Final Determination* rested on its *Preliminary Determination* with respect to two production scenarios and extended that finding to the additional three production scenarios initially found to be in-scope.  I&D Mem. at 10–11.  For completion or assembly, Commerce examined the production scenarios relative to each other, and concluded that:

> [b]ecause production scenarios one, two, and three involve more
> production in China . . . compared to production scenarios four and
> five . . ., we find that this record information also supports finding that
> hardwood plywood produced under scenarios one, two, and three
> exported to the United States from Vietnam was assembled and
> completed in Vietnam using Chinese-origin hardwood plywood inputs
> (including face/back and/or core veneers).

*Id.* at 12.  That discussion thus relates to the production scenarios *as Commerce*

*defined them*, and not to any direct or specific evidence of production by the

respondents.  Moreover, Commerce's preliminary finding on this statutory factor also

rested primarily, if not completely, on AFA.

For the *Preliminary Determination*, Commerce stated, "[a]s AFA," that the 22

companies with deficient responses and the 14 non-responding companies "produced

and/or exported hardwood plywood under all of the five production scenarios that are

subject to these inquiries."  Prelim. Mem. at 12, 13–14.  Further, under the heading

titled, "Completion of Merchandise in Another Foreign Country," Commerce relied on

AFA to meet the statutory requirement.  *Id.* at 18 ("As noted above, as AFA, we

preliminarily find that Vietnamese companies are completing hardwood plywood in

Vietnam under the aforementioned production scenarios.").  Commerce went on to state

that "[t]his preliminary *finding* is *bolstered* by data placed on the record by the

petitioner," namely, trade data and a declaration.  *Id.* at 18–19 (emphases added).

Commerce concluded that "[t]his *general* record evidence, in conjunction with our

preliminary AFA determination" supported the finding that "hardwood plywood that is

exported to the United States from Vietnam was assembled and completed in Vietnam

using Chinese-origin hardwood plywood inputs (including face/back and/or core veneers)."  *Id.* at 19 (emphasis added).

Commerce approached its analysis backwards.  Instead of using an adverse inference when selecting from among the facts available and explaining the connection "between the source . . . and the result," *Jinko Solar*, 789 F. Supp. 3d at 1288, Commerce drew an adverse *conclusion* (completion of inquiry merchandise) in order to fulfill that statutory requirement and identified evidence the agency claims "bolstered" the finding Commerce already made.  It is unclear whether Commerce considered the Coalition's evidence, in the form of trade data and one declaration, sufficient on its own to make an affirmative finding regarding the completion or assembly of inquiry merchandise by each respondent subject to AFA.  Moreover, it bears repeating that insofar as Commerce relied on evidence submitted by the Coalition, as it relates to circumvention, the Coalition's request was limited to two production scenarios.  Ruling Req. at 21; *see also* Coalition's May 12, 2020 Resp. at 2–5.  While an agency finding of circumvention with respect to two scenarios may have the same impact as one based on five scenarios, it is for Commerce, in the first instance, to examine the evidence and articulate a sound rationale for the breadth of its determination, both in terms of production scenarios and the agency's country-wide determination.

The Government seeks to analogize Commerce's determination in this case to the agency's circumvention finding on carbon steel butt-weld pipe fittings.  Oral Arg. 0:25:45–0:28:30 (referencing Commerce's Issues and Decision Mem. for the Anti-Circumvention Inquiry of the AD Order on Carbon Steel Butt-Weld Pipe Fittings from

China, A-570-814 (June 14, 2019) ("China Butt-Weld Mem.")).  The attempted analogy is inapposite.  In that case, while all respondents initially reported no production of inquiry merchandise, one respondent later revised its reporting.  China Butt-Weld Mem. at 10.  Commerce also discovered, at verification, that another company had shipped inquiry merchandise to the United States.  *Id.* at 10–11.[66]  Thus, in that case, Commerce relied on a combination of direct evidence of production of inquiry merchandise along with petitioner-provided evidence to establish the completion or assembly statutory element.  *Id.* at 14–15.  In contrast, here, Commerce does not cite any direct evidence of the respondents' production of inquiry merchandise to fulfill the statutory requirement.[67]  Thus, the Government's argument that the court should essentially overlook any infirmities in Commerce's use of AFA for the *Final Determination* because Commerce otherwise adequately supported its circumvention

---

[66] At oral argument, the Government also pointed to Commerce's preliminary finding in a circumvention inquiry (based on minor alterations) involving 1-hydroxyethylidene-1, 1-diphosphonic acid from China.  Oral Arg. 0:25:45–0:28:30.  In that case, however, Commerce issued questionnaires to 12 potential producers of inquiry merchandise and received only one response from a Taiwanese exporter of inquiry merchandise that did not involve production in China (as well as voluntary responses from two U.S. importers).  Prelim. Decision Mem. for Circumvention Inquiry on HEDP From China, A-570-045, C-570-046 (May 5, 2025) at 2–3.  The unique circumstances of this case stand in stark contrast to Commerce's HEDP circumvention inquiry because the vast majority of respondents here responded to Commerce's initial, supplemental, and, when applicable, company-specific questionnaires and Commerce attempted to examine the responses from all responding companies.

[67] Commerce relied on documents from the Finewood scope proceeding for its minor or insignificant analysis, *see, e.g.*, I&D Mem. at 30; Prelim. Mem. at 19, not its completion or assembly analysis.  Thus, the Government's contention at oral argument that the Finewood documents support Commerce's use of AFA to find production of inquiry merchandise by other companies, Oral Arg. 0:18:30–0:23:00, 3:27:00–3:28:30, is impermissibly *post hoc*.

finding lacks merit.  Commerce's circumvention determination rests in part on

conjecture, which is not enough to meet the substantial evidence standard of review.

*See, e.g.*, *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378

(Fed. Cir. 2013) (noting that Commerce determinations cannot be based on "mere

conjecture or supposition").

        The Government's attempt to analogize Commerce's use of AFA to an adverse

subsidy finding also fails.  With respect to a CVD investigation, Commerce "shall" initiate

"whenever an interested party" files a petition "on behalf of an industry" that "alleges the

elements necessary for the imposition" of a countervailing duty and provides

"information reasonably available to the petitioner supporting those allegations."  19

U.S.C. § 1671a(b)(1).  Commerce decides whether to initiate an investigation based on

the "accuracy and adequacy of the evidence provided in the petition."  19 C.F.R.

§ 351.203(b)(1); *see also* 19 U.S.C. § 1671a(c)(1)(A).  In a CVD investigation, if

Commerce determines to use AFA based on nonparticipation or noncompliance by a

respondent, it may consider the information in the petition as a source of facts available

for an adverse inference.  19 U.S.C. § 1677e(b)(2)(A).  Here, at least with respect to the

three production scenarios added by Commerce, there was no evidence from the

Coalition to support Commerce's adverse inference.[68]

---

[68] Recall that Commerce acknowledged the speculative nature of these production
scenarios in its *Initiation Notice*.  85 Fed. Reg. at 36,531 n.12 (identifying the three
additional production scenarios with the caveat "should such production scenarios
exist").

The court well understands that respondents are in possession of the information Commerce needs to evaluate whether circumvention is occurring.  When respondents withhold or fail to timely provide such necessary information or otherwise decline to participate in a proceeding, Commerce is statutorily authorized to make an adverse inference when relying upon the facts available.  Moreover, the court is aware that after an AD or CVD order is imposed, issues of circumvention and evasion may arise such that the domestic industry, Commerce, and Customs become engaged in an exercise of "Whack-A-Mole."  While that exercise is statutorily sanctioned, adherence to the requirements of the statute ensures that legitimate market-driven supply shifts not amounting to circumvention or evasion are not mistaken for a "mole."

Accordingly, Commerce must reconsider its compliance with 19 U.S.C. § 1677m(d) for most of the AFA companies and its failure-to-cooperate determinations survive only with respect to a few companies as discussed above.  After remedying those errors, Commerce must also reconsider its use of AFA pursuant to 19 U.S.C. § 1677e(b) and must reconsider its finding with respect to completion or assembly

pursuant to 19 U.S.C. § 1677j(b)(1)(B).[69]  Commerce's reconsideration must also

address whether the record evidence continues to support a country-wide finding.[70]

### III.  Commerce's Rejection of New Factual Information

After Commerce issued the *Preliminary Determination*, various interested

parties—producers/exporters and U.S. importers—asked Commerce to accept new

factual information ("NFI").  Commerce declined to do so, largely *en masse*.  I&D Mem.

at 55–63.  Multiple Plaintiffs contend that Commerce abused its discretion by declining

to accept NFI.  *See* Shelter Forest's T1 Mem. at 7–16; Greatriver's T1 Mem. at 22–24;

MG Pls.' T1 Mem. at 16–28; STR Pls.' T1 Mem. at 18–26.  For the most part, the court

declines to address these arguments at this time.  The information that the respondents

sought to submit allegedly is the type that they would have submitted if Commerce had

provided adequate notice of deficient questionnaire responses pursuant to 19 U.S.C.

---

[69] The court's remand for Commerce to reconsider the assembly or completion statutory element is not based on the Tranche I arguments raised by DH Plaintiffs that conflate sections 1677j(b)(1)(B) and (C) of the anticircumvention statute.  DH Plaintiffs state:

> The first question to resolve is therefore whether the manufacturing processes in Vietnam, hypothetically using Chinese veneers, are *mere assembly or completion* operations.  Only if the answer is "yes" to this first question does the second question arise as to *whether the assembly or completion is minor or insignificant*.

DH Pls.' T1 Mem. at 28 (emphases added).  Section 1677j(b)(1)(B) does not qualify the nature of the completion or assembly as "mere" or the like.  In any event and as discussed below, the court defers resolution of arguments about Commerce's "minor or insignificant" analysis pending Commerce's remand redetermination.

[70] As discussed below, the court declines to reach the Tranche I arguments addressing the additional statutory criteria in section 1677j(b)(1)(C)–(E), (2)–(3), because the record evidence available for Commerce to consider may change.  For that reason, to the extent those arguments remain relevant, parties should renew the arguments before the agency to develop the record for judicial review.

§ 1677m(d) and the court, as explained above, will remand Commerce's determination

based on its non-compliance with section 1677m(d).  In the event Commerce's rejection

of NFI is not rendered moot by the agency's compliance with section 1677m(d), parties

may renew those arguments, with specificity, following the agency's redetermination.

Two companies, however, require specific attention.[71]

### A.  Shelter Forest International Acquisition Inc. ("Shelter Forest")

Shelter Forest is an importer, not a respondent, and is thus not covered by the

analysis above regarding 19 U.S.C. § 1677m(d).  Therefore, the court considers Shelter

Forest's arguments regarding the rejection of its NFI.

At the administrative level, Shelter Forest argued that good cause supported

acceptance of untimely NFI because Shelter Forest's information would show that its

supplier, Lechenwood, shipped only hardwood plywood without Chinese cores.  I&D

Mem. at 57.  Shelter Forest further argued that it did not believe it needed to participate

in the circumvention inquiry before the *Preliminary Determination* both because Shelter

Forest thought Lechenwood was adequately responding and because Shelter Forest

did not believe the inquiry covered its imported merchandise.  *Id.*  Commerce rejected

those arguments.  *Id.*  Commerce explained that Lechenwood, as the respondent, "was

required to respond to Commerce's requests for information, and a U.S. importer [i.e.,

---

[71] Greatriver argues that Commerce's rejection of its NFI was "especially egregious" because Greatriver was selected for verification, which Commerce then canceled the day before.  Greatriver's T1 Mem. at 23–24.  Because Greatriver is among the companies covered by the court's remand on 19 U.S.C. § 1677m(d), for the reason discussed above, the court does not address the circumstances surrounding Commerce's rejection of that company's NFI.

Shelter Forest] cannot provide Commerce with a complete picture of a respondent's

production practices, nor can it cure a respondent's failures to provide reliable

information." *Id.*  Commerce further stated that information provided by one U.S.

importer for that respondent is insufficient to alleviate the agency's concerns about the

reliability of the respondent-provided information and the respondent's ability to

"accurately certify its merchandise." *Id.*  Commerce also stated that the agency is not

responsible for Shelter Forest's decision not to participate earlier in the proceeding; the

*Initiation Notice* alerted Shelter Forest to the circumvention inquiry, parties had notice

that the certification regime covered non-inquiry merchandise, and any need for

Commerce to resort to AFA would preclude those companies from participating in the

certification regime.  *Id.* at 57–58.

     Before the court, Shelter Forest contends that it was diligent in proffering

information relevant to Lechenwood and that Commerce's reasons for rejecting its

submission are not persuasive.  Shelter Forest's T1 Mem. at 15–19.[72]  The Government

argues that Commerce permissibly rejected the untimely NFI because Shelter Forest's

---

[72] Shelter Forest also argues that the *Preliminary Determination* constituted factual information that Shelter Forest had the right to rebut.  Shelter Forest's T1 Mem. at 15 n.2; *see also* Shelter Forest's T1 Reply at 11.  Arguments such as this that are not properly developed—including arguments minimally raised in a footnote or in a reply brief—are generally forfeited.  *See, e.g.*, *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1375 n.4 (Fed. Cir. 2005).  In any case, the court agrees with the Government's argument that Commerce's preliminary *analysis* of the record was not new evidence, statements of fact, documents, or data that is rebuttable pursuant to 19 C.F.R. § 351.102(b)(21)(iv).  *See* Def.'s T1 Resp. at 54.

reasons for its dilatory attempt to submit the information were not persuasive.  Def.'s T1

Resp. at 54–56; *see also* Def.-Int.'s T1 Resp. at 31–33 (advancing similar arguments).

Commerce reasonably rejected Shelter Forest's submission.  Shelter Forest was

on notice of the circumvention inquiry and could have participated in the proceeding

prior to the *Preliminary Determination*.  I&D Mem. at 57.  It is simply not the case that

Shelter Forest had no earlier opportunity to address issues with its exporter's

responses.  *See* Shelter Forest's T1 Reply at 5 (arguing to the contrary).  Shelter Forest

could have entered an appearance at any time and filed submissions from the outset of

the inquiry.  Shelter Forest's argument that Commerce effectively required Shelter

Forest to be alert to potential deficiencies in Lechenwood's submissions, *see* Shelter

Forest's T1 Reply at 9, is not persuasive.  As it turns out, Shelter Forest must accept the

consequences of its decision to rely upon Lechenwood to represent its interests when

nothing prevented Shelter Forest from participating in a timely manner, even if only to

provide potentially duplicative information.

Moreover, as Commerce explained, information from one U.S. importer cannot

cure an exporter's failure to "provide Commerce with a complete picture of [that

exporter's] production practices."  I&D Mem. at 57.  A respondent's alleged failure to

provide information requested across multiple questionnaires is not "good cause" for an

importer to decide belatedly to participate.  Therefore, Commerce's determination that

Shelter Forest failed to meet the good cause standard is supported by substantial

evidence, and Commerce did not abuse its discretion in rejecting Shelter Forest's untimely NFI.[73]

## B. Win Faith

Because, as explained above, the court concludes that Commerce provided Win Faith with notice of deficiencies pursuant to 19 U.S.C. § 1677m(d), the arguments surrounding the agency's rejection of Win Faith's NFI remain ripe for review notwithstanding the remand for other aspects of Commerce's AFA determination.

During the circumvention inquiry, Win Faith filed ministerial error comments, with NFI redacted, urging Commerce to issue a post-preliminary questionnaire to permit the company to fill the identified evidentiary gaps. Win Faith Refiling of Ministerial Error Cmts. (Sept. 29, 2022), Attach. 1 at 2, 6–7, CR 451, PR 578. Win Faith also attempted to submit a factual "rebuttal" to the *Preliminary Determination*, which Commerce rejected. Win Faith Rebuttal to the Dep't's Prelim. Determination (Sept. 21, 2022), CR 447, PR 562; Rejection of Win Faith's Submission (Nov. 29, 2022), PR 661. MG Plaintiffs challenge that rejection. MG Pls.' T1 Mem. at 7–8, 21–24.

Commerce based its rejection of untimely NFI, including Win Faith's submissions, on the burden of considering a large amount of post-preliminary

---

[73] In fact, good cause is not the regulatory standard; untimely extension requests require extraordinary circumstances. 19 C.F.R. § 351.302(c). Shelter Forest has not attempted to address the extraordinary circumstances standard, but at the same time, Commerce did not appear to apply that heightened standard. *See* I&D Mem. at 58 ("Shelter Forest has not presented any good cause for Commerce to accept its untimely post-preliminary NFI."). Because Commerce's determination that Shelter Forest failed to meet the good-cause standard is supported by substantial evidence, any discrepancies between the standards are harmless error and need not be addressed.

information.  *See* I&D Mem. at 58–59, 62–63.  As such, Commerce's decision with

respect to Win Faith is dependent upon and interconnected with its decision as to

multiple other respondents.  Accordingly, because Commerce's determination as to

those respondents is being remanded and there is no basis for the court to distinguish

Win Faith, the court remands Commerce's rejection of Win Faith's NFI as well.

Commerce may further explain its determination with respect to Win Faith or reconsider

that determination if the agency finds that reopening the record regarding Win Faith is

appropriate, particularly insofar as Commerce must reopen the record for other

respondents to comply with 19 U.S.C. § 1677m(d), and insofar as Win Faith's

information may be relevant to Commerce's reconsideration of the factual basis for a

country-wide circumvention finding.

## IV.    Expansion of Scope and Certification Regime

Several Plaintiffs raise arguments regarding the inclusion of inquiry merchandise

in the scope of the *Plywood Orders* and Commerce's establishment of a certification

regime.  These arguments will not be affected by further record development on

remand; thus, the court resolves the arguments now.

DH Plaintiffs argue that Commerce expanded the scope of the *Plywood Orders*

because "the ITC did not respond to Commerce's belated notification" and the ITC

found no injury from Chinese core veneers.  DH Pls.' T1 Mem. at 39.  MG Plaintiffs

direct their scope-expansion arguments to the certification regime, arguing that

"Commerce abused its discretion in implementing a certification regime and issuing

customs instructions that covered [so-called] safe harbor merchandise."  MG Pls.' T1

Mem. at 35.  By "safe harbor merchandise," MG Plaintiffs refer to "core veneers fully

produced in Vietnam or a third-country that are assembled into a veneer core platform

in Vietnam and combined with a face and back veneer produced in China."  *Id.* at 34

(quoting Initiation Clarification Mem. at 2).  STR Plaintiffs advance similar arguments.

*See* STR Pls.' T1 Mem. at 7–10.  They further contend that "Commerce's *Preliminary*

*Determination* and CBP instructions resulted in the assessment of AD and CVD duties

on merchandise expressly deemed not subject to these inquiries."  *Id.* at 10.[74]

    The Government contends that DH Plaintiffs misunderstand the nature of a

circumvention finding, which is that merchandise found to be circumventing is within the

scope of an existing order and is not an expansion of an order.  Def.'s T1 Resp. at 37;

*see also* Def.-Int.'s T1 Resp. at 33–34 (advancing similar arguments).  The Government

further contends that Commerce nowhere used the phrase "safe harbor merchandise" in

the Initiation Clarification Memorandum or elsewhere.  Def.'s T1 Resp. at 62–63.  The

Government argues that Commerce's certification regime in this case is standard

practice when "inquiry merchandise . . . is indistinguishable on its face from non-inquiry

merchandise at [the time of] entry."  *Id.* at 63.  Accordingly, the Government argues,

Plaintiffs misunderstand the purpose of the Initiation Clarification Memorandum because

it did not operate to exempt non-inquiry merchandise from the certification regime.  *Id.*;

*see also* Def.-Int.'s T1 Resp. at 34–37.

---

[74] In its Tranche II brief, Shelter Forest also purports to challenge Commerce's
exclusion of Lechenwood from the certification regime.  Shelter Forest's T2 Mem. at 23.
What follows, however, are arguments regarding Commerce's use of AFA and rejection
of Shelter Forest's NFI, *id.* at 23–28, which the court has already addressed.

In reply, MG Plaintiffs urge the court to reject the Government's and the
Coalition's arguments about the certification regime because the "[h]ardwood plywood
subject to Commerce's affirmative circumvention findings . . . are physically
distinguishable from safe harbor merchandise by the naked eye."  MG Pls.' T1 Reply at
15 (citing Case Br. (Jan. 9, 2023) ("Importers' Case Br.") at 39, CR 586, PR 746).  STR
Plaintiffs contend that Commerce's procedures are insufficient to alleviate due process
concerns or allow retroactive certification.  STR Pls.' T1 Reply at 9–10.[75]

Concerns about scope expansion are misplaced.  "Commerce's consideration of
certain types of articles within the scope of an order" pursuant to a lawful circumvention
inquiry "will be a proper clarification or interpretation of the order instead of improper
expansion or change even where these products do not fall within the order's literal
scope." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1370 (Fed. Cir. 1998)
(citing 19 U.S.C. § 1677j).  Additionally, while 19 U.S.C. § 1677j(e) directs Commerce to
"notify the [ITC] of the proposed inclusion of such merchandise in such countervailing or
antidumping order or finding," the statute allows, but does not require, the ITC to
thereafter "request consultations with [Commerce]."

Plaintiffs' arguments about Commerce's certification regime also lack merit.  As
discussed above, Commerce implemented a certification program allowing certain
companies to certify that hardwood plywood exported from Vietnam to the United States
does not consist of inquiry merchandise.  Prelim. Mem. at 27–28; I&D Mem. at 171.

---

[75] DH Plaintiffs did not address this issue in their reply brief.

Such entries are not subject to the *Plywood Orders* or the requirement to pay cash

deposits.  Prelim. Mem. at 27–28.  The AFA companies are not eligible to participate in

the certification program.  *Id.* at 27.  They must instead make cash deposits pending a

subsequent review in which Commerce may find the companies eligible to certify if they

adequately demonstrate they did not ship subject merchandise.  *See* I&D Mem. at 186–

87.  Accordingly, Commerce issued instructions to CBP implementing this regime.

Message No. 3215402.

　　　This is not an improper duty assessment.  "Final duty liability typically is

determined in an administrative review of an order pursuant to 19 U.S.C. § 1675(a)(1)."

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United*

*States*, 43 CIT __, __, 393 F. Supp. 3d 1271, 1274 (2019) (explaining distinctions

between cash-deposit rates and assessment rates).  Consistent with this process,

Commerce has expanded, and stated it will continue to expand, the period of review for

subsequent administrative reviews to determine the correct assessment rate for entries

pursuant to the circumvention inquiry.  *See Certain Hardwood Plywood Prods. From the*

*People's Republic of China*, 90 Fed. Reg. 21,271 (Dep't Commerce May 19, 2025) (final

results of the admin. revs. of the [AD] and [CVD] orders, final determination of no

shipments; 2021–2022) ("*AR5 Final Result*s"); AR5 Decision Mem. at 68.  Commerce

also has allowed the AFA companies an opportunity to demonstrate eligibility for the

certification regime in these subsequent reviews.  *See AR5 Final Results*, 90 Fed. Reg.

at 21,272.[76]  Accordingly, these scope and certification arguments lack merit.

## V.    Voluntary Remand

STR Plaintiffs argue that Commerce failed to provide appropriate instructions to

Customs.  STR Pls.' T1 Mem. at 29–31.  In the *Final Determination*, Commerce

declined to apply AFA to An An Plywood Joint Stock Company ("An An") and

Greatwood Hung Yen Joint Stock Company ("Greatwood").  I&D Mem. at 75–76.  In its

instructions to CBP, Commerce noted that the two companies were eligible for

certification, but, according to STR Plaintiffs, did not address the suspension of

liquidation imposed at the preliminary stage or the return of cash deposits.  STR Pls.' T1

Mem. at 29–30.  On this issue, the Government requests a voluntary remand, without

confessing error, to reconsider its position, noting that the "instructions did not address

An An and Greatwood's entries for the period from initiation to the final determination."

Def.'s T1 Resp. at 67–68.

An agency may "request a remand (without confessing error) in order to

reconsider its previous position" and "the reviewing court has discretion over whether to

---

[76] There appears to be no merit to the argument that Commerce's certification regime
forces U.S. importers to declare "safe harbor" merchandise as subject merchandise.
Commerce's Initiation Clarification Memorandum addressed what *is* inquiry
merchandise—not how non-inquiry (and thus non-subject) merchandise shipped by
non-certification-eligible companies would be treated in any certification program.
Initiation Clarification Mem. at 2.  Further, nothing in the record indicates that non-
inquiry merchandise is ascertainable by "the naked eye."  MG Plaintiffs rely solely on a
citation to an administrative case brief that, in turn, lacks citation to any facts of record.
Importers' Case Br. at 39.

remand." *SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001)

(citations omitted).  The court may grant a request for a voluntary remand "if the

agency's concern is substantial and legitimate," *id.*, meaning that the agency "has a

compelling justification," finality concerns "do[] not outweigh that justification," and "the

scope of the request is appropriate," *Changzhou Hawd Flooring Co. v. United States*, 38

CIT 1175, 1178, 6 F. Supp. 3d 1358, 1361 (2014) (citations omitted).  The court agrees

that a remand is appropriate for Commerce to reconsider its instructions to CBP with

respect to An An and Greatwood.

## VI.   Remaining Arguments

As detailed above, this case proceeded with two rounds of briefing generally

divided into certain procedural or evidentiary matters (Tranche I) and adverse facts

available and related considerations (Tranche II).  But as discussed herein, the issues

are not so neatly divided.  While some of Plaintiffs' Tranche I arguments are readily

dismissed, the court finds that several of Plaintiffs' Tranche II arguments have merit and

require Commerce's reconsideration of its affirmative country-wide determination.  And,

when appropriate, the court has attempted to narrow the matters that remain

unaddressed prior to Commerce's remand proceeding.  This remand obviates, for now,

the need to address some of Plaintiffs' Tranche I arguments relevant to the additional

circumvention statutory criteria.

Those arguments relate primarily to Commerce's analysis under 19 U.S.C.

§ 1677j(b)(1)(C)–(E) and (b)(2)–(3).  For example, Plaintiffs challenge Commerce's

weighing of certain evidence, namely, a petitioner-provided declaration and documents

from the Finewood scope proceeding; Commerce's consideration of the forestry industry as part of plywood production in Vietnam; and the agency's analysis of the patterns of trade.  Because the nature of the administrative record may change on remand, and thus so too Commerce's weighing of all relevant evidence, the court declines to consider these arguments at this time.

The court also declines to consider Plaintiffs' various arguments grounded in the meaning of certain statutory phrases, including completion or assembly, and minor or insignificant, and whether Commerce's methodologies underlying those determinations are consistent with the statutory terms.  Parties may renew such arguments during the remand proceeding, as appropriate, and, while accounting for any changes as a result of the remand, when Commerce's determination returns to the court.

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's *Final Determination* is remanded to the agency for reconsideration consistent with this opinion; it is further

**ORDERED** that Commerce shall file its remand redetermination on or before June 29, 2026; it is further

**ORDERED** that, given the amount of time taken to conduct the circumvention inquiry in the first instance and the subsequent briefing and decision on the numerous challenges to the *Final Determination*, Commerce may consider whether its resolution

Consol. Court No. 23-00144                                    Page 94

of the issues on remand would be facilitated by the incorporation of evidence from

subsequent administrative reviews into the record of this inquiry; it is further

      **ORDERED** that, upon completion of the remand, the parties shall further consult

and, within 14 days, submit a joint proposal to the court to govern further proceedings,

including deadlines for briefing and the joint appendix and appropriate word limits that

take account of the extensive briefing already submitted.


                    /s/    Mark A. Barnett
                    Mark A. Barnett, Chief Judge

Dated: <u>January 28, 2026</u>
      New York, New York

## APPENDIX A – Parties[77]

| Parties | Short Name |
|---|---|
| Shelter Forest International Acquisition, Inc. | Shelter Forest |
| American Woodmark Corporation, Del Valle Kahman & Company, Ike Trading Company Limited, Pittsburgh Forest Products, Panoply Wood Products USA Inc., American Pacific Plywood, Inc., Eagle Industries Company Limited, Golden Bridge Industries Pte. Ltd., Lechenwood Viet Nam Company Limited, Arrow Forest International Co., Ltd., Her Hui Wood (Vietnam) Co., Vietnam Zhongjia Wood Company Limited, Long LUU Plywood Production Co., Ltd., and TEKCOM Corporation | DH Plaintiffs[78] |
| Greatriver Wood Co., Ltd., a.k.a. Cong Ty TNHH Greatriver Wood or Greatriver Wood Company Limited | Greatriver |
| Tumac Lumber Co., Inc. | Tumac |
| Concannon Lumber Company, Northwest Hardwoods, Inc., Richmond International Forest Products LLC, Taraca Pacific Inc., UFP International, LLC, Medallion Forest Products, Hardwoods Specialty Products USLP, Paxton Hardwoods LLC, and Rugby Holdings LLC d/b/a Rugby Architectural Building Products | MG Plaintiffs |
| Cabinetworks Group, Inc. f/k/a ACProducts, Inc., ACPI Wood Products, LLC, Cabinetworks Group Middlefield, LLC, Cabinetworks Group Michigan, LLC, Boise Cascade Building Materials Distribution LLC, and USPLY LLC | STR Plaintiffs |
| Coalition for Fair Trade in Hardwood Plywood | Coalition |
| United States (representing the U.S. Department of Commerce) | Defendant or the Government |

[77] For consistency and ease of reference, the court uses the same firm-based naming conventions for groups of plaintiffs that are used by the parties in their respective briefs.
[78] After all briefs were filed, counsel for DH Plaintiffs joined The Inter-Global Trade Law Group PLLC.

## APPENDIX B – Tranche I Briefs[79]

| Filing | Short Name |
|---|---|
| Consol. Pls. Mot. for J. on the Agency R. and Consol. Pls. [DH Pls.] Rule 56.2 Mem. in Supp. of Mot. for J. Upon the Agency R., ECF No. 31 | DH Pls.' T1 Mem. |
| Mot. For J. on the Agency R. and [Shelter Forest] Rule 56.2 Mem. in Supp. of Mot. for J. on the Agency R., ECF No. 32 | Shelter Forest's T1 Mem. |
| [Greatriver] Rule 56.2 Mot. for J. on the Agency R. and [Greatriver] Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 33 | Greatriver's T1 Mem. |
| Consol. Pl. [Tumac] Br. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 34 | Tumac's T1 Mem. |
| Confid. Rule 56.2 Mot. for J. on the Agency R. on Behalf of Consol. Pls. [MG Pls.] and Mem. of P. & A. in Supp. of Mot. for J. on the Agency R., ECF No. 35 | MG Pls.' T1 Mem. |
| Consol. Pls. [STR Pls.] Rule 56.2 Mot. for J. on the Agency R. and Mem. of P. & A. in Supp. of R. 56.2 Mot. for J. on the Agency R., ECF No. 37 | STR Pls.' T1 Mem. |
| Def.'s Resp. to Pls.' Rule 56.2 Mots. for J. on the Agency R., ECF No. 59 | Def.'s T1 Resp. |
| Confid. Def.-Int. [Coalition] Resp. to Mot. for J. on the Agency R., ECF No. 62 | Def.-Int.'s T1 Resp. |
| Consol. Pls. [DH Pls.] Reply Br., ECF No. 71 | DH Pls.' T1 Reply |
| [Greatriver] Reply in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 72 | Greatriver's T1 Reply |
| Pl. Shelter Forest's Tranche I Reply Br. in Supp. of Mot. for J. on the Agency R., ECF No. 73 | Shelter Forest's T1 Reply |

[79] The appendices do not include errata that were granted without physical substitution.

Consol. Court No. 23-00144                                      Page 97

| Consol. Pls. [Tumac] Br. in Supp. of Reply Br. Filed by Consol. Pls., ECF No. 74 | Tumac's T1 Reply |
|---|---|
| Confid. Reply Br. on Behalf of Consol. Pls. [MG Pls.], ECF No. 75 | MG Pls.' T1 Reply |
| [STR Pls.] Reply Br., ECF No. 77 | STR Pls.' T1 Reply |

## APPENDIX C – Tranche II Briefs

| Filing | Short Name |
|--------|-----------|
| [STR Pls.] Tranche 2 Rule 56.2 Mot. for J. on the Agency R. and Mem. of P. & A. in Supp. of its Rule 56.2 Mot. for J. on the Agency R., ECF No. 39 | STR Pls.' T2 Mem. |
| Confid. Consol. Pls. Mot. for J. on the Agency R. and Consol. Pls. [DH Pls.] Rule 56.2 Mem. in Supp. of Mot. for J. Upon the Agency R., ECF No. 48 | DH Pls.' T2 Mem. |
| Confid. [Greatriver] Rule 56.2 Mot. for J. on the Agency R. and [Greatriver] Mem. in Supp. of Mot. for J. on the Agency R., ECF No. 52 | Greatriver's T2 Mem. |
| Consol. Pl. [Tumac] Br. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 53 | Tumac's T2 Mem. |
| Mot. for J. on Agency R. and Pl. Shelter Forest's Tranche II Rule 56.2 Mem. in Supp. of Mot. for J. on the Agency R., ECF No. 54 | Shelter Forest's T2 Mem. |
| Confid. Rule 56.2 Tranche II Mot. for J. on the Agency R. of [MG Pls.] and Mem. of P. & A. in Supp. of Rule 56.2 Tranche II Mot. for J. on the Agency R. of Consol. Pls. [MG Pls.], ECF No. 55 | MG Pls.' T2 Mem. |
| Confid. Def.'s Resp. to Pls.' and Consol. Pls.' Rule 56.2 Mots. for J. on the Agency R., ECF No. 68 | Def.'s T2 Resp. |
| Confid. Def.-Int. [Coalition] Resp. to Mot. for J. on the Agency R., ECF No. 85 | Def-Int.'s T2 Resp. |
| [STR Pls.] Tranche II Reply Br., ECF No. 99 | STR Pls.' T2 Reply |
| Confid. [DH Pls.] Tranche II Reply Br., ECF No. 101 | DH Pls.' T2 Reply |
| Confid. [Greatriver] Tranche II Reply Br. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 105 | Greatriver's T2 Reply |
| Confid. Tranche II Reply Br. on behalf of [MG Pls.], ECF No. 106 | MG Pls.' T2 Reply |

Consol. Court No. 23-00144                                          Page 99

| Consol. Pls. Brief in Supp. of Reply Br. Filed by Consol. Pls. [Tumac], ECF No. 108 | Tumac's T2 Reply |
|---|---|
| Pl. Shelter Forest's Tranche II Reply Br., ECF No. 109 | Shelter Forest's T2 Reply |